APPEAL,COX,PROTO

# United States District Court
# Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1 (Chicago)
# CRIMINAL DOCKET FOR CASE #: 1:09–cr–00332–2
# *Internal Use Only*

Case title: USA v. Rodriguez et al

Date Filed: 04/16/2009
Date Terminated: 06/03/2013

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 09/12/2011 | 501 | 9 | MOTION by Glenn Lewellen for leave to *File Instanter Motion to Suppress Statements, Doc. 500* (Gambino, Andrea) (Entered: 09/12/2011) |
| 09/13/2011 | 505 | 13 | MINUTE entry before the Honorable Joan B. Gottschall: The defendant's motion to suppress 501 and motion for leave to file instanter 500 are denied without prejudice. The parties have been repeatedly informed of the necessity of following the Local Rules and this court's standing orders, especially in light of the size and complexity of this case. Here, the defendant filed both motions at approximately 7:30 p.m. on Monday evening and noticed them for presentment at Wednesdays motion call, despite the court's standing order requiring at least three days' notice. The motions must be re–filed and noticed properly before the court will consider them. Mailed notice (rj, ) (Entered: 09/13/2011) |
| 09/13/2011 | 507 | 14 | MOTION by Glenn Lewellen for leave to *File Instanter Motion to Suppress Statements, Doc. 506* (Gambino, Andrea) (Entered: 09/13/2011) |
| 09/14/2011 | 518 | 33 | MINUTE entry before the Honorable Joan B. Gottschall:as to Glenn Lewellen, Motion hearing held on 9/14/2011 regarding motion to suppress, 506 , motion for leave to 507 . Mailed notice (rj, ) (Entered: 09/20/2011) |
| 09/14/2011 | 520 | 34 | MINUTE entry before the Honorable Joan B. Gottschall as to Saul Rodriguez, Hector Uriarte, Jorge Uriarte, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Robert Cardena: Status hearing held. Oral motion by Keith Spielfogel for interim payment of attorneys fees in this case is granted. The court finds that this case is lengthy and complex and that interim fees should be rewarded where requested. Mailed notice (yap, ) (Entered: 09/20/2011) |
| 09/15/2011 | 509 | 18 | MOTION by USA for disclosure as to Glenn Lewellen (Tracy, Tiffany) (Entered: 09/15/2011) |
| 09/19/2011 | 515 | 29 | MOTION to withdraw as attorney as to Glenn Lewellen *by* Scott J. Frankel (Frankel, Scott) (Entered: 09/19/2011) |
| 09/19/2011 | 517 | 31 | RESPONSE by USA as to Glenn Lewellen regarding MOTION by Glenn Lewellen to suppress *Statements Made During Execution of Search Warrant Based on False Statements* 506 (Block, Steven) (Entered: 09/19/2011) |
| 09/20/2011 | 521 | 35 | MINUTE entry before the Honorable Joan B. Gottschall as to Glenn Lewellen (2): Status hearing held 9/12/11. Defendant's motion to supplement |

| | | | |
|---|---|---|---|
| | | | 474 is granted in part and denied in part; granted insofar as the supplemental pleading has been considered in its entirety, but denied as to the relief requested. Defendant's motion to suppress statements 454 is deniedfor a full explanation, see separate order. Defendant's motion to file instanter 507 is granted, but the corresponding motion to suppress statements 506 is denied as moot in light of the government's representation that it does not seek to introduce those statements at trial (see ECF No. 517). Mailed notice (yap, ) (Entered: 09/20/2011) |
| 09/20/2011 | 522 | 36 | ORDER as to Glenn Lewellen 521 Signed by the Honorable Joan B. Gottschall on 9/20/2011. (yap, ) Modified text on 9/20/2011 (yap, ). (Entered: 09/20/2011) |
| 09/21/2011 | 526 | 47 | MINUTE entry before the Honorable Joan B. Gottschall as to Glenn Lewellen (2): Motion hearing held. MOTION to withdraw as attorney as to Glenn Lewellen by Scott J. Frankel 515 is granted. Government's application for order to disclose tax returns and return information 509 is granted. Oral motion by United States for leave to file an oversized brief is granted. Mailed notice (yap, ) (Entered: 09/23/2011) |
| 09/21/2011 | 528 | 48 | ORDER as to Glenn Lewellen for disclosure of tax returns and return information 526 Signed by the Honorable Joan B. Gottschall on 9/21/2011. (yap, ) (Entered: 09/23/2011) |
| 09/23/2011 | 531 | 53 | MOTION by USAEvidentiary Proffer Supporting the Admissibility of Co–Conspirator Statements as to Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Walter Johnson, Robert Cardena (Attachments: # 1 Supplement Table of Contents, # 2 Certificate of Service)(Reynolds, Terra) (Entered: 09/23/2011) |
| 10/08/2011 | 548 | 244 | RESPONSE by Glenn Lewellen regarding MOTION by USAEvidentiary Proffer Supporting the Admissibility of Co–Conspirator Statements as to Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Walter Johnson, Robert 531 (Gambino, Andrea) (Entered: 10/08/2011) |
| 10/12/2011 | 568 | 275 | MINUTE entry before the Honorable Joan B. Gottschall as to Saul Rodriguez (1), Glenn Lewellen (2), Hector Uriarte (3), Jorge Uriarte (4), Manuel Uriarte (5), Andres Flores (6), Tony Sparkman (7), Fares Umar (8), Walter Johnson (9), Jorge Lopez (10) and Robert Cardena (11): Motion hearing held. Application for Order to Disclose Tax Returns and Return Information 540 is granted. Agreed motion for an extension of time for Defendant Hector Uriate to respond to the Government's Santiage Proffer 542 by 10/12/2011 is granted. Government's reply by 10/19/2011. Motion by Defendant Hector Uriarte to direct U.S. Marshals Service to serve subpoenas 544 is granted. The US Marshals Service is directed to serve necessary subpoenas without costs to the defendant, allowing for early return of subpoenas. Motion by Tony Sparkman for appointment of co–counsel in the trial of the above–captioned case 549 is granted. Douglas J. Rathe is given leave to file appearance on behalf of Tony Sparkman as co–counsel. Enter Order. Oral motion by Kent Carlson that Fares Umar be brought to MCC for trial preparation is granted due to the complexity of case. Voir dire will begin on 11/7/2011. Opening statements will begin on 11/14/2011. Mailed notice (cdy, |

| | | | |
|---|---|---|---|
| | | | ) (Entered: 10/17/2011) |
| 10/14/2011 | 558 | 257 | Agreed Application for Order to Disclose Tax Returns and Return Information at Trial by USA as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Tracy, Tiffany) (Entered: 10/14/2011) |
| 10/14/2011 | 559 | 259 | MOTION by USAGovernment's Motion To Bar Expert Witness Testimony as to Glenn Lewellen (Attachments: # 1 Exhibit Exhibits A–E)(Block, Steven) (Entered: 10/14/2011) |
| 10/14/2011 | 561 | 274 | MINUTE entry before the Honorable Joan B. Gottschall:as to Hector Uriarte, Jorge Uriarte, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Robert Cardena. Counsel met and conferred on 10/14/11 regarding jury panel selection. The court will enter under seal a list of the jurors who have been considered thus far by counsel. Mailed notice (rj, ) (Entered: 10/14/2011) |
| 10/14/2011 | 573 | 281 | ORDER as to defendants Saul Rodriguez et al for disclosure of tax returns and return information 572 Signed by the Honorable Joan B. Gottschall on 10/14/2011. (yap, ) (Entered: 10/19/2011) |
| 10/17/2011 | 571 | 276 | RESPONSE by Glenn Lewellen regarding MOTION by USAGovernment's Motion To Bar Expert Witness Testimony as to Glenn Lewellen 559 (Attachments: # 1 Exhibit)(Madden, Matthew) (Entered: 10/17/2011) |
| 10/19/2011 | 574 | 283 | REPLY by USA to response to motion, 548 *Governments Reply in Support of Evidentiary Proffer Supporting the Admissibility of Co−conspirator Statements* (Block, Steven) (Entered: 10/19/2011) |
| 10/19/2011 | 581 | 287 | MINUTE entry before the Honorable Joan B. Gottschall as to Rodriguez et al : Motion hearing held. Motion by Defendant, Jorge Uriarte (4 )to adopt response to Santiago Proffer 555 is granted. Government's motion to bar expert witness testimony 559 is denied as to the terms stated of record. Defendant, Glenn Lewellen's (2) expert to state his conclusions by 10/24/2011. Oral motion by United States for leave to file motion to sever defendant Robert Cardena from this trial (11) and appear on Friday, October 21, 2011 at 9:30AM. is granted. Mailed notice (yap, ). (Entered: 10/20/2011) |
| 10/24/2011 | 586 | 288 | MOTION by Glenn Lewellen to quash *Subpoena Duces Tecum and to Request Protective Order* (Attachments: # 1 Notice of Filing Notice of Motion to Parties, # 2 Text of Proposed Order Proposed attached as Exhibit A)(Coppa, Karen) (Entered: 10/24/2011) |
| 10/24/2011 | 588 | 298 | Response to Defendant Manuel Uriarte's Pro Se Motion for Substitution of Counsel by USA as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Attachments: # 1 Certificate of Service)(Reynolds, Terra) (Entered: 10/24/2011) |
| 10/25/2011 | 589 | 304 | PROPOSED Voir Dire by Glenn Lewellen (Gambino, Andrea) (Entered: 10/25/2011) |
| 10/25/2011 | 593 | 308 | PROPOSED Voir Dire by USA as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony |

| | | | |
|---|---|---|---|
| | | | Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Block, Steven) (Entered: 10/25/2011) |
| 10/25/2011 | 594 | 311 | Proposed Statement of the Case by USA as to Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Tony Sparkman, Robert Cardena (Block, Steven) (Entered: 10/25/2011) |
| 10/25/2011 | 595 | 313 | Proposed Witness List by USA as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Attachments: # 1 Certificate of Service)(Reynolds, Terra) (Entered: 10/25/2011) |
| 10/25/2011 | 596 | 320 | Government's List of Counsel &Others by USA as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Attachments: # 1 Certificate of Service)(Reynolds, Terra) (Entered: 10/25/2011) |
| 10/26/2011 | 599 | 322 | MINUTE entry before the Honorable Joan B. Gottschall as to Hector Uriarte:Defendant's motion for extension of time 591 is granted. Mailed notice (rj, ) (Entered: 10/26/2011) |
| 10/26/2011 | 605 | 323 | Notice of Parties at Counsel Table by Glenn Lewellen (Gambino, Andrea) (Entered: 10/26/2011) |
| 10/26/2011 | 606 | 325 | MINUTE entry before the Honorable Joan B. Gottschall:as to Glenn Lewellen, Motion hearing held on 10/26/2011 regarding motion to quash 586 , ( Responses due by 10/27/2011, Replies due by 10/31/2011.) Ruling by mail. Mailed notice (rj, ) (Entered: 10/27/2011) |
| 10/28/2011 | 613 | 326 | RESPONSE by Glenn Lewellen regarding MOTION by Glenn Lewellen to quash *Subpoena Duces Tecum and to Request Protective Order* 586 (Gambino, Andrea) (Entered: 10/28/2011) |
| 10/28/2011 | 614 | 331 | MOTION by Hector UriarteDefendants' Joint Proposed Jury Voir Dire Questions as to Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Walter Johnson, Robert Cardena (Giacchetti, Cynthia) (Entered: 10/28/2011) |
| 10/28/2011 | 616 | 339 | MOTION *Defendants' Joint Request for Additional Peremptory Challenges* (Gambino, Andrea) (Entered: 10/28/2011) |
| 10/28/2011 | 617 | 343 | SUPPLEMENT by USA to motion for miscellaneous relief, 531 (Attachments: # 1 Certificate of Service)(Reynolds, Terra) (Entered: 10/28/2011) |
| 10/28/2011 | 618 | 364 | LIST of additional potential witnesses by Robert Cardena as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Attachments: # 1 Notice of Filing)(Ravitz, Gary) Modified text by Clerk's office on 10/31/2011 (yap, ). (Entered: 10/28/2011) |
| 10/28/2011 | 619 | 367 | Agreed Statement of the Case by USA as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, |

| | | | |
|---|---|---|---|
| | | | Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Attachments: #_1 Certificate of Service)(Reynolds, Terra) (Entered: 10/28/2011) |
| 10/31/2011 | 622 | 370 | MOTION by Glenn Lewellen for disclosure *regarding the time of day and location of the charged 9/11/01 kidnapping* (Madden, Matthew) (Entered: 10/31/2011) |
| 10/31/2011 | 624 | 372 | RESPONSE by Manuel Uriarte to supplement 617 (Loeb, Robert) (Entered: 10/31/2011) |
| 10/31/2011 | 625 | 379 | REPLY by Glenn Lewellen to motion hearing, set/reset motion and RRdeadlines/hearings 606 , MOTION by Glenn Lewellen to quash *Subpoena Duces Tecum and to Request Protective Order* 586 , response to motion 613 *City of Chicago's Reply to Glenn Lewellen's Response to City's Motion to Quash Subpoena* (Attachments: #_1 Notice of Filing Notice of Filing to parties)(Coppa, Karen) (Entered: 10/31/2011) |
| 10/31/2011 | 627 | 386 | MOTION by Glenn Lewellen for disclosure *of Contact Information for Antonio Zepeda Contreras* (Attachments: #_1 Exhibit Request for Information and Refusal to Provide it)(Gambino, Andrea) (Entered: 10/31/2011) |
| 10/31/2011 | 631 | 393 | MOTION by USA in limine as to Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Walter Johnson, Robert Cardena (Attachments: #_1 Certificate of Service)(Reynolds, Terra) (Entered: 10/31/2011) |
| 11/01/2011 | 634 | 403 | RESPONSE to Motion to Disclose Specific Time, Day &Location of the Charged Kidnapping on September 11, 2001 by USA as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Attachments: #_1 Certificate of Service)(Reynolds, Terra) Modified on 11/2/2011 (cdy, ). (Entered: 11/01/2011) |
| 11/01/2011 | 637 | 406 | Response to Motion for Disclosure of Brady/Giglio Information by USA as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Attachments: #_1 Certificate of Service)(Reynolds, Terra) (Entered: 11/01/2011) |
| 11/02/2011 | 639 | 410 | RESPONSE by Glenn Lewellen regarding MOTION by USA in limine as to Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Walter Johnson, Robert Cardena 631 (Madden, Matthew) (Entered: 11/02/2011) |
| 11/02/2011 | 642 | 415 | REPLY by Glenn Lewellen to MOTION by USAEvidentiary Proffer Supporting the Admissibility of Co–Conspirator Statements as to Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Walter Johnson, Robert 531 *Glenn Lewellen's Supplemental Response to Government's Second Santiago Proffer* (Gambino, Andrea) (Entered: 11/02/2011) |
| 11/03/2011 | 643 | 425 | Response to Joint Motion to Exclude Evidence by USA as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres |

| | | | |
|---|---|---|---|
| | | | Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Attachments: #_1 Certificate of Service)(Reynolds, Terra) (Entered: 11/03/2011) |
| 11/03/2011 | 644 | 436 | MOTION by USA to File Instanter as to Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Walter Johnson, Robert Cardena re miscellaneous other, 643 (Attachments: #_1 Certificate of Service)(Reynolds, Terra) Modified text by Clerk's office on 11/7/2011 (yap, ). (Entered: 11/03/2011) |
| 11/03/2011 | 645 | 438 | MOTION by USA to File Instanter as to Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Walter Johnson, Robert Cardena re miscellaneous other, 643 (Attachments: #_1 Certificate of Service)(Reynolds, Terra) Modified text by Clerk's office on 11/7/2011 (yap, ). (Entered: 11/03/2011) |
| 11/03/2011 | 648 | 441 | REPLY by USA to supplement_617 , response_624 , reply 575 , MOTION by USAEvidentiary Proffer Supporting the Admissibility of Co–Conspirator Statements as to Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Walter Johnson, Robert_531 (Block, Steven) (Entered: 11/03/2011) |
| 11/04/2011 | 650 | 449 | MINUTE entry before the Honorable Joan B. Gottschall: as to Glenn Lewellen. Petitioner City of Chicago's motion to quash_586 is granted. Mailed notice (rj, ) (Entered: 11/04/2011) |
| 11/04/2011 | 651 | 451 | Memorandum by USA as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena *Government's Memorandum Regarding Proposed Supplemental Voir Dire* (Block, Steven) (Entered: 11/04/2011) |
| 11/04/2011 | 652 | 454 | First Amended Witness List by Glenn Lewellen *on behalf of all defendants* (Gambino, Andrea) (Entered: 11/04/2011) |
| 11/04/2011 | 660 | 473 | MINUTE entry before the Honorable Joan B. Gottschall as to defendants Saul Rodriguez (1), Hector Uriarte (3), Jorge Uriarte (4), Manuel Uriarte (5), Andres Flores (6), Tony Sparkman (7), Fares Umar (8), Walter Johnson (9), Jorge Lopez (10), Robert Cardena (11); Pretrial status hearing held 11/4/11. Cardena's motion to exclude 620 is denied. Lewellens motion to disclose_622 is denied; Lewellen to provide alibi defense by 11/18/11. Lewellen's motion for disclosure_627 is denied as moot in light of the government's representations in open court. Hector Uriarte's motion for extension of time 628 is taken under advisement pending. The government's combined motions in limine_631 are granted in part and denied in part as stated on the record. Hector Uriarte's motion for clothing 632 is granted; defense counsel to provide clothes, including clip–on ties. Hector Uriarte's motion to adopt 636 is granted. The government's motions to file instanter_644 and_645 are granted. Jorge Uriarte's motion to sever 649 is denied for the reasons stated in open court. The parties should provide their proposed cautionary jury instructions by 11/9/11. Mailed notice (yap, ) (Entered: 11/07/2011) |
| 11/06/2011 | 658 | 458 | |

| | | | |
|---|---|---|---|
| | | | REPLY by USA to reply to motion, 642 , supplement 617 , MOTION by USAEvidentiary Proffer Supporting the Admissibility of Co–Conspirator Statements as to Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Walter Johnson, Robert 531 , response to motion, 548 (Block, Steven) (Entered: 11/06/2011) |
| 11/07/2011 | 659 | 471 | SUPPLEMENT by USA to miscellaneous other, 595 (Attachments: # 1 Certificate of Service)(Reynolds, Terra) (Entered: 11/07/2011) |
| 11/07/2011 | 663 | 474 | MINUTE entry before the Honorable Joan B. Gottschall as to Glenn Lewellen (2), Hector Uriarte (3), Jorge Uriarte (4), Manuel Uriarte (5), Tony Sparkman (7), Robert Cardena (11): Voir Dire Begun. Jury selection commenced and continued. Jury Trial continued to 11/8/2011 at 10:00 A.M. Oral motion by United States to change the caption of the case to read USA v. Glenn Lewellen is granted in part and denied in part. The court will call the case as discussed in open court. Mailed notice (yap, ) (Entered: 11/08/2011) |
| 11/14/2011 | 671 | 475 | PROPOSED LIMITING Instructions by USA REGARDING JUAN LUEVANO AND MICHAEL GARCIA MURDERS as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Block, Steven) Modified text by Clerk's office on 11/15/2011 (yap, ). (Entered: 11/14/2011) |
| 11/14/2011 | 672 | 476 | PROPOSED Jury Instructions by USA REGARDING POTENTIAL PENALTIES FACED BY DEFENDANTS as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Block, Steven) Modified text by Clerk's office on 11/15/2011 (yap, ). (Entered: 11/14/2011) |
| 11/14/2011 | 674 | 481 | MINUTE entry before the Honorable Joan B. Gottschall:as to Hector Uriarte, Jorge Uriarte, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Robert Cardena, Jury selection held on 11/14/2011 and concluded, Jury impaneled and sworn. ( Jury Trial set for 11/15/2011 at 10:00 AM. ) Mailed notice (rj, ) (Entered: 11/15/2011) |
| 11/15/2011 | 673 | 477 | PROPOSED Jury Instructions by Glenn Lewellen (Gambino, Andrea) (Entered: 11/15/2011) |
| 11/15/2011 | 676 | 483 | MINUTE entry before the Honorable Joan B. Gottschall:as to Hector Uriarte, Jorge Uriarte, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Robert Cardena, Jury trial held on 11/15/2011, ( Jury Trial set for 11/18/2011 at 09:30 AM. ) Mailed notice (rj, ) (Entered: 11/16/2011) |
| 11/16/2011 | 675 | 482 | REVISED PROPOSED limited Jury Instructions by USA as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Block, Steven) Modified text by Clerk's office on 11/17/2011 (yap, ). (Entered: 11/16/2011) |
| 11/16/2011 | 677 | 484 | MINUTE entry before the Honorable Joan B. Gottschall:as to Hector Uriarte, Jorge Uriarte, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Robert |

| | | | |
|---|---|---|---|
| | | | Cardena, Jury Instruction Conference held on 11/16/2011. Mailed notice (rj, ) (Entered: 11/16/2011) |
| 11/18/2011 | 680 | 485 | MINUTE entry before the Honorable Joan B. Gottschall:as to Hector Uriarte, Jorge Uriarte, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Robert Cardena, Jury trial held on 11/18/2011, ( Jury Trial set for 11/21/2011 at 01:00 PM. ) Mailed notice (rj, ) (Entered: 11/18/2011) |
| 11/21/2011 | 681 | 486 | MOTION by Glenn Lewellen for leave to *Spend Thanksgiving Day at the Cissell Home* (Gambino, Andrea) (Entered: 11/21/2011) |
| 11/21/2011 | 682 | 489 | PROPOSED Jury Instructions by Manuel Uriarte as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Loeb, Robert) (Entered: 11/21/2011) |
| 11/23/2011 | 687 | 493 | MOTION by Glenn Lewellen for writ *of Habeas Corpus Ad Testificandum* (Gambino, Andrea) (Entered: 11/23/2011) |
| 11/23/2011 | 689 | 497 | MOTION by USA in limine as to Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Walter Johnson, Robert Cardena (Attachments: # 1 Certificate of Service)(Reynolds, Terra) (Entered: 11/23/2011) |
| 11/23/2011 | 691 | 508 | MOTION by USA in limine as to Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Walter Johnson, Robert Cardena (Attachments: # 1 Exhibit Transcript Excerpts)(Block, Steven) (Entered: 11/23/2011) |
| 11/25/2011 | 692 | 526 | PROPOSED Jury Instructions by Manuel Uriarte as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Loeb, Robert) (Entered: 11/25/2011) |
| 11/25/2011 | 693 | 528 | PROPOSED Jury Instructions by Manuel Uriarte as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Loeb, Robert) (Entered: 11/25/2011) |
| 11/25/2011 | 694 | 530 | PROPOSED Jury Instructions by Manuel Uriarte as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena (Loeb, Robert) (Entered: 11/25/2011) |
| 11/28/2011 | 697 | 532 | MOTION by USAGovernment's Motion for a Deposition Under Rule 15(a) as to Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Fares Umar, Walter Johnson, Robert Cardena (Tracy, Tiffany) (Entered: 11/28/2011) |
| 11/28/2011 | 700 | 535 | MINUTE entry before the Honorable Joan B. Gottschall:as to Hector Uriarte, Jorge Uriarte, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Robert Cardena, Jury trial held on 11/28/2011, ( Jury Trial set for 11/29/2011 at 10:00 AM. ) Mailed notice (rj, ) (Entered: 11/29/2011) |

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*DEFENDANT GLENN LEWELLEN'S MOTION TO FILE INSTANTER*
*MOTION TO SUPRESS STATEMENTS MADE DURING EXECUTION OF*
*SEARCH WARRANT BASED ON FALSE STATEMENTS*

Defendant GLENN LEWELLEN, by his attorneys, Andréa E. Gambino and

Scott J. Frankel, respectfully requests that this Court permit him to file *instanter*

his Motion to Suppress Statements Made During Execution of Search Warrant

Based on False Statements.   This Motion is based on evidence contained in the

August 16, 2011, discovery production, and on the government's representation in

the August 19, 2011, hearing that it would seek introduction of the statements that

are the subject of this Motion to Suppress.

In support of this Motion, defendant GLENN LEWELLEN, through counsel,

states the following:

(1)    Glenn Lewellen incorporates the history laid out in his first Motion to File

Instanter, granted by the Court on August 11, 2011, [R. 437, R. 446], and his second

Motion to File Instanter, granted by the Court on August 19, 2011.  R. 465.

(2)    On August 16, 2011, approximately one month after the original deadline for

filing pre-trial motions had passed, counsel for GLENN LEWELLEN a discovery

production which included the police reports, DEA reports of Sesar Sanchez's

proffers, the Search Warrant and Affidavit issued on May 23, 2006, and the report

of an interview of Glenn Lewellen that occurred contemporaneously with the

execution of the Search Warrant, upon which the Motion to Suppress Statements is

based.

(3)    At the hearing before this Court on August 19, 2011, counsel for Mr. Lewellen

inquired of government counsel, on the record, whether the government intended to

introduce evidence or statements obtained as a result of the May 23, 2006, search of

storage units owned by Glenn Lewellen.  Counsel inquired because the reports

tendered in discovery indicated that the May 23, 2006, search warrant was based on

false statements allegedly made by Chicago Police Officer John Rizzi,

misrepresenting statements made by a cooperating informant known as Sesar

Sanchez or Caleb Barbosa, and referred to in the search warrant affidavit as "John

Doe #2".

(4)    Counsel for the government reported that the government did not intend to

introduce evidence found during the search, but that it did intend to introduce

statements allegedly made by Glenn Lewellen to an officer at the time of the search.

(5)    GLENN LEWELLEN'S  Motion to Suppress Statements Made During the

Execution of a Search Warrant Based on False Statements is based on the

information received in the August 16, 2011, discovery production, and the

government's representations, made on August 19, 2011.

(6)     In addition to preparing this Motion, counsel for Mr. Lewellen also prepared

and filed a Motion to Supplement, Doc. 474, filed on August 26, 2011; and two

replies to Government Responses to Motions for Severance and Discovery,

Documents 480 and 481, filed on September 1, 2011.

(7)     Counsel for Glenn Lewellen are responding to discovery productions with

appropriate motions as swiftly as humanly possible.

        WHEREFORE, counsel for GLENN LEWELLEN respectfully request that

the Court permit the filing *instanter* of the Motion to Suppress Statements Made

During the Execution of a Search Warrant Based on False Statements, filed

separately as Document No. 500.

DATE:          September 12, 2011                    Respectfully submitted,

                                                    s/Andréa E. Gambino
                                                    An Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

3

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 12, 2011, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which sent

notification of such filing to the following:

Counsel for Co-Defendants

Steven Block, Esq.
Terra Reynolds, Esq.
Tiffany Tracy, Esq.
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604


and I hereby certify that I have mailed by United State Postal Service or hand

delivered the document to the following non-CM/ECF participants: N/A.


DATE:         September 12, 2011        Respectfully submitted,

                                        By:     s/Andréa E. Gambino
                                                Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

4

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 0332 - 2 | **DATE** | 9/13/2011 |
| **CASE TITLE** | United States vs. Lewellen | | |

**DOCKET ENTRY TEXT**

The defendant's motion to suppress [501] and motion for leave to file *instanter* [500] are denied without prejudice. The parties have been repeatedly informed of the necessity of following the Local Rules and this court's standing orders, especially in light of the size and complexity of this case. Here, the defendant filed both motions at approximately 7:30 p.m. on Monday evening and noticed them for presentment at Wednesday's motion call, despite the court's standing order requiring at least three days' notice. The motions must be re-filed and noticed properly before the court will consider them.

Docketing to mail notices.

| Courtroom Deputy Initials: | RJ |
|---|---|

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*DEFENDANT GLENN LEWELLEN'S MOTION TO FILE INSTANTER
MOTION TO SUPRESS STATEMENTS MADE DURING EXECUTION OF
SEARCH WARRANT BASED ON FALSE STATEMENTS*

Defendant GLENN LEWELLEN, by his attorneys, Andréa E. Gambino and

Scott J. Frankel, respectfully requests that this Court permit him to file *instanter*

his Motion to Suppress Statements Made During Execution of Search Warrant

Based on False Statements.   This Motion is based on evidence contained in the

August 16, 2011, discovery production, and on the government's representation in

the August 19, 2011, hearing that it would seek introduction of the statements that

are the subject of this Motion to Suppress.

In support of this Motion, defendant GLENN LEWELLEN, through counsel,

states the following:

(1)     Glenn Lewellen incorporates the history laid out in his first Motion to File

Instanter, granted by the Court on August 11, 2011, [R. 437, R. 446], and his second

Motion to File Instanter, granted by the Court on August 19, 2011.  R. 465.

(2)     On August 16, 2011, approximately one month after the original deadline for

filing pre-trial motions had passed, counsel for GLENN LEWELLEN a discovery

production which included the police reports, DEA reports of Sesar Sanchez's

proffers, the Search Warrant and Affidavit issued on May 23, 2006, and the report

of an interview of Glenn Lewellen that occurred contemporaneously with the

execution of the Search Warrant, upon which the Motion to Suppress Statements is

based.

(3)     At the hearing before this Court on August 19, 2011, counsel for Mr. Lewellen

inquired of government counsel, on the record, whether the government intended to

introduce evidence or statements obtained as a result of the May 23, 2006, search of

storage units owned by Glenn Lewellen.  Counsel inquired because the reports

tendered in discovery indicated that the May 23, 2006, search warrant was based on

false statements allegedly made by Chicago Police Officer John Rizzi,

misrepresenting statements made by a cooperating informant known as Sesar

Sanchez or Caleb Barbosa, and referred to in the search warrant affidavit as "John

Doe #2".

(4)     Counsel for the government reported that the government did not intend to

introduce evidence found during the search, but that it did intend to introduce

statements allegedly made by Glenn Lewellen to an officer at the time of the search.

(5)     GLENN LEWELLEN'S  Motion to Suppress Statements Made During the

Execution of a Search Warrant Based on False Statements is based on the

information received in the August 16, 2011, discovery production, and the

government's representations, made on August 19, 2011.

(6)     In addition to preparing this Motion, counsel for Mr. Lewellen also prepared and filed a Motion to Supplement, Doc. 474, filed on August 26, 2011; and two replies to Government Responses to Motions for Severance and Discovery, Documents 480 and 481, filed on September 1, 2011.

(7)     Counsel for Glenn Lewellen are responding to discovery productions with appropriate motions as swiftly as humanly possible.

WHEREFORE, counsel for GLENN LEWELLEN respectfully request that the Court permit the filing *instanter* of the Motion to Suppress Statements Made During the Execution of a Search Warrant Based on False Statements, filed separately as Document No. 506.

DATE:          September 13, 2011                    Respectfully submitted,

                                                     s/Andréa E. Gambino
                                                     An Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 13, 2011, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which sent

notification of such filing to the following:

Counsel for Co-Defendants

Steven Block, Esq.
Terra Reynolds, Esq.
Tiffany Tracy, Esq.
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604


and I hereby certify that I have mailed by United State Postal Service or hand

delivered the document to the following non-CM/ECF participants: N/A.


DATE:        September 13, 2011       Respectfully submitted,

                                       By:    s/Andréa E. Gambino
                                              Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES of AMERICA | No. 09-332 |
| v. | Judge Joan B. Gottschall |
| GLENN LEWELLEN, et. al. | |

## APPLICATION FOR ORDER TO DISCLOSE
## TAX RETURNS AND RETURN INFORMATION

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United

States Attorney for the Northern District of Illinois, makes application to this Court, pursuant

to 26 U.S.C. § 6103(i)(1), for an order, directing the Internal Revenue Service to disclose to

Applicant tax returns and return information of:

Glenn Lewellen
SSN: xxx-xx-xxxx;

LEWELLEN HOME BUILDERS, INC.
EIN: xx-xxxxxxx;

R&L DEVELOPMENT, LLC
EIN: xx-xxxxxxx;

WALK-OFF PROPERTIES, LLC
EIN: xx-xxxxxxx;

NORTHCENTRAL EQUITIES, LLC;

PHEASANT RIDGE LOCKPORT, LLC
EIN: xx-xxxxxxx; and

MCZ/QUEEN BEAN MELODY

EIN: xx-xxxxxxx,

which tax returns and return information are described as follows:

(1)     Certified copies of all individual and joint income tax returns (Forms 1040) and corporate income tax returns (Forms 1120 or 1120S), all schedules attached thereto, and transcripts of all return information, including IMFOLTs and BMFOLTs, and income information, including IRPTRs, for tax years 1996 to 2010; and

(2)     For the tax years 1996 to 2010, copies of any audits, work papers, revenue agents' transmittal reports, special agents' reports, witness affidavits, statements, memoranda of interviews, etc., currently held by IRS and any related material which may be developed subsequent to this request, involving the above-named taxpayers.

In support of this application, applicant states as follows:

(1)     There is reasonable cause to believe, based on information believed to be reliable, that violations of Title 21, United States Code, Section 846, Title 18, United States Code, Sections 1962(d) and 2 (conspiracy to commit racketeering and conspiracy to possess with intent to distribute narcotics have been committed).   The facts relied upon are as follows:

On November 18, 2010, Glenn Lewellen ("Lewellen") and ten others were charged in the present case in a Third Superseding Indictment alleging conspiracy to commit racketeering, in violation of Title 18, United States Code, Section 1962(d) and conspiracy to possess with intent to distribute narcotics, in violation of Title 21, United States Code, Section 846.  The indictment charges that between 1996 and 2002, Lewellen was employed

2

as a police officer by the Chicago Police Department ("CPD") and alleges that while a police officer, and after leaving the CPD, Lewellen and his conspirators participated in the conduct of the affairs of the enterprise by identifying victims from whom they could obtain wholesale quantities of controlled substances or large sums of money, kidnapping those individuals, and holding them for ransom or robbing them. Lewellen and other members of the enterprise and their associates also used threats of violence, violence, and intimidation to cause kidnapping and robbery victims to provide wholesale quantities of controlled substances and/or large sums of money to secure their release.

The indictment further alleges that Lewellen and his co-conspirators, including Saul Rodriguez, distributed and caused the wholesale quantities of controlled substances to be distributed to wholesale customers in the Chicago area and elsewhere shared in the proceeds of the enterprise's illegal activities, including, but not limited to: murder, kidnappings, robberies, and trafficking of controlled substances. According to the indictment they also invested proceeds from their participation in the enterprise's illegal activities in real estate and businesses to conceal their involvement in and their proceeds.

Since Lewellen's retirement from CPD, Lewellen has engaged in multiple financial/business transactions with co-defendant Rodriguez. The majority of the transactions between Lewellen and Rodriguez, which include sale of properties, have been conducted  under one of several businesses either operated, managed, and/or owned by Lewellen. For example, since his retirement, Lewellen has owned and operated LEWELLEN HOME BUILDERS, INC., a construction company . Public records reveal that Lewellen and

LEWELLEN HOME BUILDERS, INC. built a new home in Countryside, Illinois, where co-
defendant Rodriguez lived until his arrest on April 9, 2009.  Lewellen is also the managing
member of TACOMA NARROWS, LLC, BRIDGES DEVELOPMENT COMPANY, LLC,
WALK-OFF PROPERTIES, LLC, NORTHCENTRAL EQUITIES, LLC, MCZ/QUEEN
BEAN MELODY, PHEASANT RIDGE LOCKPORT, LLC, and the President   of
LEWELLEN HOME BUILDERS, INC., all doing business out of  Lewellen's residence.
Rodriguez and Lewellen are listed as fifty percent (50%) owners of   R & L
DEVELOPMENT, LLC, also doing business out of Lewellen's residence.  Rodriguez has
invested approximately $2,000,000 in R & L DEVELOPMENT, LLC.  Lewellen, along with
Rodriguez, is a signer for the business account for R&L DEVELOPMENT, LLC.   An
analysis of the bank account indicates Rodriguez provided the majority of the deposits into
the account; approximately $1,002,085.63 and Lewellen endorsed all the outgoing checks
on the account, in the amount of  $1,002,085.63.

(2)      There is reasonable cause to believe the above-described tax returns and return
information are or may be relevant to a matter related to the commission of the above-
mentioned violations in that the tax returns and related documents may be used to show
transactions and relationships between Lewellen and his co-conspirators, ownership interests
between Lewellen and his co-conspirators, and may be further used to analyze sources of
reported income for the co-conspirators and the related entities to compare to alleged sources
of income arising from the affairs of the enterprise.

4

(3)      The information sought to be disclosed cannot reasonably be obtained, under the circumstances, from any other source, and is sought exclusively for use in the federal criminal investigation and trial of the above-mentioned violations.

Applicant further states that the following individuals are personally and directly engaged in investigating the above-mentioned violations and, if appropriate, in preparing the matter for trial:

AUSA Tiffany J. Tracy;

AUSA Steven A. Block;

AUSA Terra Reynolds;

David Reynolds, Special Agent, Drug Enforcement Administration;

Catherine Huber, Supervisory Special Agent, Internal Revenue Service; and

Lily Acosta, Special Agent, Internal Revenue Service

The information sought herein is solely for use for that purpose.  No disclosure will be made to any other person except in accordance with the provisions of 26 U.S.C. § 6103 and 26 C.F.R. 301.6103(i)-1.

Wherefore, applicant requests that this Court enter an order on this application directing disclosure by the Internal Revenue Service of the tax returns and return information specified above.

Respectfully submitted,

5

_s/Patrick J. Fitzgerald by: James Conway_

_____
PATRICK J. FITZGERALD
United States Attorney

_s/Tiffany J. Tracy_
Tiffany J. Tracy
Assistant United States Attorney
219 S. Dearborn Street, Rm. 500
Chicago, Illinois 60604
(312) 353-1412

Date:  September 15, 2011

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES | No. 09-332 |
| v. | Judge Joan B. Gottschall |
| GLENN LEWELLEN | |

## ORDER FOR DISCLOSURE OF TAX RETURNS
## AND RETURN INFORMATION

The United States Attorney for the Northern District of Illinois has made an

application for an order, pursuant to 26 U.S.C. § 6103(i)(1), directing the Internal Revenue

Service to disclose tax returns and return information of:

Glenn Lewellen
SSN: xxx-xx-xxxx;

LEWELLEN HOME BUILDERS, INC.
EIN: xx-xxxxxxx;

R&L DEVELOPMENT, LLC
EIN: xx-xxxxxxx;

WALK-OFF PROPERTIES, LLC
EIN: xx-xxxxxxx;

NORTHCENTRAL EQUITIES, LLC;

PHEASANT RIDGE LOCKPORT, LLC
EIN: xx-xxxxxxx; and

MCZ/QUEEN BEAN MELODY
EIN: xx-xxxxxxx,

which tax returns and return information is described as:

(1)     certified copies of all certified copies of all individual and joint income tax returns (Forms 1040) and corporate income tax returns (Forms 1120 or 1120S), all schedules attached thereto, and transcripts of all return information, including IMFOLTs and BMFOLTs, and income information, including IRPTRs, for tax years 1996 to 2010; and

(2)     for the tax years 1996 to 2010,  copies of any audits, work papers, revenue agents' transmittal reports, special agents' reports, witness affidavits, statements, memoranda of interviews, etc., currently held by IRS and any related material which may be developed subsequent to this request, involving the above-named taxpayers.

After examining the application, this Court finds:

(1)     There is reasonable cause to believe, based upon information believed to be reliable, that violations of federal criminal statutes, namely Title 21, United States Code, Section 846, Title 18, United States Code, Sections 1962(d) and 2 (conspiracy to commit racketeering and conspiracy to possess with intent to distribute narcotics) have been committed;

(2)     There is reasonable cause to believe that the above-described tax returns and return information are or may be relevant to a matter related to the commission of the above-mentioned violations; and

(3)     The information sought to be disclosed cannot reasonably be obtained, under the circumstances, from any other source, and is sought exclusively for use in the federal criminal investigation, and, if appropriate, the trial of the above-mentioned violations.

The Court further finds that the following personnel, namely:

AUSA Tiffany J. Tracy;

AUSA Steven A. Block;

AUSA Terra Reynolds;

David Reynolds, Special Agent, Drug Enforcement Administration;

Catherine Huber, Supervisory Special Agent, Internal Revenue Service; and

Lily Acosta, Special Agent, Internal Revenue Service

are personally and directly engaged in, and the information sought is solely for their use in, investigating and, if appropriate, preparing for trial concerning the above-mentioned violations.

IT IS THEREFORE ORDERED that the Internal Revenue Service:

(1)     Disclose such tax returns and return information as described as certified copies of all individual and joint income tax returns (Forms 1040) and corporate income tax returns (Forms 1120 or 1120S), as well as all schedules attached thereto; transcripts of all return information, including IMFOLTs and BMFOLTs, and income information, including IRPTRs, for tax years 1996 to 2010; and (b) for the tax years 1996 to 2010, copies of any audits, work papers, revenue agents' transmittal reports, special agents' reports, witness affidavits, statements, memoranda of interviews, etc., currently held by IRS and any related

3

material which may be developed subsequent to this request, involving the above-named taxpayers.

(2)     Certify where tax returns and return information described above have not been filed or are not on file with the Internal Revenue Service that no such returns and information have been filed or on file;

(3)     Disclose such tax returns and tax return information described above as may come into possession of the Internal Revenue Service subsequent to the date of this order, but not for longer than 30 days thereafter;

(4)     Disclose such tax returns and tax return information and make such certification only to the following personnel, namely:

AUSA Tiffany J. Tracy;

AUSA Steven A. Block;

AUSA Terra Reynolds;

David Reynolds, Special Agent, Drug Enforcement Administration;

Catherine Huber, Supervisory Special Agent, Internal Revenue Service; and

Lily Acosta, Special Agent, Internal Revenue Service

and to no other person; and

(5)     Disclose no tax returns or tax return information not described above.

IT IS FURTHER ORDERED that applicant and the following personnel, namely:

AUSA Tiffany J. Tracy;

AUSA Steven A. Block;

4

AUSA Terra Reynolds;

David Reynolds, Special Agent, Drug Enforcement Administration;

Catherine Huber, Supervisory Special Agent, Internal Revenue Service; and

Lily Acosta, Special Agent, Internal Revenue Service

and any attorney of the United States Department of Justice who may be subsequently assigned in this matter, shall use the tax returns and tax return information disclosed solely in investigating the above-mentioned violations, and such other violations of the federal criminal code, as, although presently unknown, are discovered in the course of this investigation, and, if appropriate, preparing the matter for trial.  No disclosure shall be made to any other person except in accordance with the provisions of 26 U.S.C. § 6103 and 26 C.F.R. 301.6103(i)-1.

_____
Judge Joan B. Gottschall

Dated: _____

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )
v.    )    No. 09 CR 332
    )    Judge Joan B. Gottschall
    )
GLENN LEWELLEN,    )
    )
    Defendant.    )

**UNOPPOSED MOTION TO WITHDRAW**

Now comes, Scott J. Frankel and submits the following Motion to withdraw.

1.    Glenn Lewellen retained Scott J. Frankel to represent him in the above captioned matter, and Mr. Frankel filed his appearance on or about January 11, 2011. Mr. Lewellen is also represented by Andrea Gambino.

2.    By mutual agreement between Mr. Frankel and Mr. Lewellen, Scott J. Frankel requests leave to withdraw as counsel for Glenn Lewellen. Mr. Lewellen continues to be represented by Andrea Gambino, so there is no issue regarding continuity of counsel.

3.    Counsel has served this Motion to Withdraw on Glenn Lewellen by e-mail and United States Mail on September 19, 2011.

4.    In addition on September 16, 2011, Scott J. Frankel spoke with AUSA Steven Bloch who has no objection to the Motion to Withdraw.

1

WHEREFORE for the foregoing reasons, it is respectfully requested that the foregoing

motion be granted

Respectfully submitted,

/s/Scott J. Frankel

Scott J. Frankel
53 W. Jackson #1615
Chicago, Illinois 60604
(312) 759-9600
Attorney number: 6195429

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332-2 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION TO SUPPRESS STATEMENTS

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby submits the following response to defendant Glenn Lewellen's motion to suppress statements and asks the Court to deny the motion as moot.

Defendant has moved to suppress statements that he made to Chicago police officers who were present during execution of a search warrant at his Frankfort warehouse on May 23, 2006 (doc. 506). Defendant contends that his statements should be suppressed because the search warrant was obtained unlawfully, and defendant's statements, therefore, are "fruits of the poisonous tree." Though the government disputes that defendant's statements should be suppressed, the government does not intend to elicit testimony regarding defendant's statements at trial. The Court, therefore, should deny defendant's motion as moot.

1

For the reasons stated above, the government respectfully asks that the

Court deny defendant's motion to suppress statements as moot.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:   s/ Steven A. Block
      TERRA L. REYNOLDS
      STEVEN A. BLOCK
      TIFFANY J. TRACY
      Assistant United States Attorneys
      United States Attorney's Office
      219 S. Dearborn St., 5th Floor
      Chicago, Illinois  60604

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.2
### Eastern Division

UNITED STATES OF AMERICA

Plaintiff,

v.                                                    Case No.: 1:09–cr–00332

Honorable Joan B. Gottschall

Saul Rodriguez, et al.

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, September 14, 2011:

     MINUTE entry before the Honorable Joan B. Gottschall:as to Glenn Lewellen, Motion hearing held on 9/14/2011 regarding motion to suppress, [506], motion for leave to[507]. Mailed notice (rj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 332 - 1,2,3,4,57,8,11 | **DATE** | 9/14/2011 |
| **CASE TITLE** | USA vs. Rodriguez et al | | |

**DOCKET ENTRY TEXT**

Status hearing held.  Oral motion by Keith Spielfogel for interim payment of attorneys fees in this case is granted.  The court finds that this case is lengthy and complex and that interim fees should be rewarded where requested.

Docketing to mail notices.

00:05

| | Courtroom Deputy Initials: | RJ |
|---|---|---|

Case 1:09-cr-00332   Document 521   Filed 09/20/11   Page 1 of 1   PageID 2139
Case: 13-2321     Document: 7-6     Filed: 07/11/2013     Pages: 535

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 0332 - 2 | **DATE** | 9/20/2011 |
| **CASE TITLE** | United States vs. Lewellen | | |

**DOCKET ENTRY TEXT**

Status hearing held 9/12/11.  Defendant's motion to supplement [474] is granted in part and denied in part; granted insofar as the supplemental pleading has been considered in its entirety, but denied as to the relief requested.  Defendant's motion to suppress statements [454] is denied–for a full explanation, see separate order. Defendant's motion to file *instanter* [507] is granted, but the corresponding motion to suppress statements [506] is denied as moot in light of the government's representation that it does not seek to introduce those statements at trial (*see* ECF No. 517).

■ [ For further detail see separate order(s).]

Docketing to mail notices.

:30

| | Courtroom Deputy Initials: | RJ/JKF |
|---|---|---|

09CR0332 - 2 United States vs. Lewellen

Page 1 of 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 09 CR 0332-2 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

Defendant Glenn Lewellen has moved to suppress statements allegedly made at the time of his arrest on November 19, 2010.  In his initial motion, Lewellen focused in part on whether he was in "custody" at the time of his alleged statements and whether he had already obtained counsel prior to his arrest (*see* ECF No. 454), but in his supplemental pleading he makes it clear that he does not challenge any statements on Fifth Amendment grounds.  Instead, Lewellen claims that certain statements were deliberately elicited without any waiver of his right to counsel in violation of the Sixth Amendment and *Fellers v. United States*, 540 U.S. 519 (2004).  (*See* ECF No. 474.)

### I. BACKGROUND

The relevant facts are as follows.  Lewellen was indicted under seal before this court on November 18, 2010, and he was arrested the next day outside of a hotel in Nevada.  According to the government's version of events, the arresting agent (Agent Reynolds) informed Lewellen that "he was indicted in the Northern District of Illinois on RICO charges including drug conspiracy, kidnappings, and obstruction of justice."  Lewellen then stated that "all that happened over five years ago" and that "he could not be charged with crimes that occurred over [five] years ago."  After some discussion

regarding whether Lewellen needed medical attention, he then told the agents where three weapons were located and that those weapons "could be removed for safekeeping." He subsequently remarked that "he stopped wearing his weapon on his person two weeks ago" but that "if he was armed during the time of this arrest that he would have shot himself."[1]

At a status hearing on August 19, 2011, the government reiterated its position that the statements were voluntary, claiming that "there were no questions pending" at the time the defendant offered his statements. At that hearing, the court asked defense counsel if the issue was whether the statements were volunteered or made in response to interrogation. Counsel responded that there were two questions: whether the statements were made "at all," and if so, whether the statements were volunteered. The supplemental pleading is not as clear, as Lewellen does not argue or offer facts in support of his claim that the statements were not made (save for sprinkling the word "allegedly" where appropriate), and instead focuses entirely upon the voluntariness of his statements.

The government reads Lewellen's supplemental motion as conceding the facts and presenting two legal questions: whether Lewellen had a Sixth Amendment right to counsel at the time of his statements, and whether, based on the government's version of the facts (as set forth in the Drug Enforcement Administration's Report of Investigation, dated November 22, 2010 (the "DEA-6 Report")), the agents deliberately elicited the statements in violation of the Sixth Amendment. The court initially was not convinced that Lewellen had conceded the facts. The supplemental brief is inconsistent: at times Lewellen seems to rely solely upon the government's version of events, but he also

---

[1]    While there were other statements recounted by the arresting agent, only the statements discussed herein are raised by Lewellen's supplemental pleading.

claims that he made his statements either "in response to agents['] statements" or in response to agents' questions.  (*See* ECF No. 474 at 2.)  Giving Lewellen the benefit of the doubt, this court scheduled an evidentiary hearing for September 12, 2011.

At the time of the scheduled hearing, however, the court was informed that Lewellen did not plan to testify or to introduce any evidence.  But although Lewellen had offered no evidence to support his argument either in his briefing or before the court, he maintained that the DEA-6 Report was an incomplete "summary" of the arrest.  Lewellen then argued that he should be permitted to cross-examine Agent Reynolds.  However, given Lewellen's failure to meet his burden of providing "sufficiently definite, non-conjectural and detailed" allegations to support a disputed issue of material fact, the court declined to require Agent Reynolds to testify.  *See United States v. Curlin*, 638 F.3d 562, 564, 566-67 (7th Cir. 2011) ("District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion.  In order to be granted an evidentiary hearing, the defendant's allegations and moving papers must be 'sufficiently definite, specific, non-conjectural and detailed.'  The defendant bears the burden of both identifying a definite disputed factual issue, and demonstrating its materiality.") (quoting *United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007)); *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004).  Consequently, the court will take the facts as set forth in the DEA-6 Report as true in determining whether to grant Lewellen's motion to suppress his alleged statements.

## II. ANALYSIS

### A. Sixth Amendment Right to Counsel

The court first must address the legal question of whether Lewellen's right to counsel under the Sixth Amendment had attached at the time of his arrest. Lewellen argues that he was "immediately shrouded" in the protections of the Sixth Amendment by virtue of his indictment on November 18, 2010. (*See* ECF No. 454 at 2.) For its part, the government argues that the routine formulation of the right to counsel—that it is triggered "at or after the time that judicial proceedings have been initiated . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment,'" *see Fellers*, 540 U.S. at 523 (quoting *Brewer v. Williams*, 430 U.S. 387, 398 (1977))—was modified by the Supreme Court's decision in *Rothgery v. Gillespie County, Texas*, 554 U.S. 191, 194 (2008), when the Court stated that "the right to counsel guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty." In other words, the government reads *Rothgery* to hold that the right to counsel under the Sixth Amendment attaches only when a defendant first appears before a judicial officer.

The court strongly disagrees. *Rothgery* dealt with a question of state procedure: there, officers arrested a defendant without a warrant and brought him before a magistrate judge pursuant to an "article 15.17" hearing. *Id.* at 195. He was not provided an attorney until six months later, and he argued that this violated his Sixth Amendment right to counsel. The state argued that no such right had attached at the hearing, both because the "relevant prosecutors" were unaware of the hearing and because the officer who appeared

at the hearing had no ability to "commit the state to prosecute." The Supreme Court was not persuaded: "This Court has held that the right to counsel guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty. The question here is whether attachment of the right also requires that a public prosecutor . . . be aware of that initial proceeding or involved in its conduct. We hold that it does not." *Id.* at 194-95.

Thus, *Rothgery* did not eliminate the attachment of the right to counsel upon indictment. Instead, the case merely stands for the proposition that one of the ways in which the Sixth Amendment right to counsel attaches is by virtue of an initial appearance before a judicial officer—regardless of whether a public prosecutor is present. Indeed, other courts have interpreted *Rothgery* in the same fashion. *See, e.g.*, *United States v. Boskic*, 545 F.3d 69, 81-82 (1st Cir. 2008) ("*Rothgery*, the Court's most recent pronouncement on the Sixth Amendment right to counsel, establishes that the right attaches at least when the defendant first appears before a judicial officer. . . . It is equally well settled that the Sixth Amendment right may attach before a defendant first faces a judicial officer. The Court repeatedly has included the return of an indictment . . . among the circumstances that constitute the 'initiation of adversary judicial criminal proceedings.'"); *see also Philmore v. McNeil*, 575 F.3d 1251, 1257 (11th Cir. 2009) (continuing to state that post-*Rothgery*, defendants' Sixth Amendment rights attach upon indictment); *United States v. Stein*, 541 F.3d 130, 153 (2d Cir. 2008) (same). This conclusion is further supported by the fact that *Rothgery* itself cites the "formal charge,

preliminary hearing, indictment, information, or arraignment" language with approval. *See Rothgery*, 554 U.S. at 198.

The other case cited by the government, *United States v. States*, --- F.3d ----, 2011 WL 2857263 (7th Cir. 2011), is distinguishable. There, the Seventh Circuit joined the vast majority of other circuits in holding that the filing of a complaint does not trigger the Sixth Amendment right to counsel. *Id.* After so holding, the court went on to state that "in the federal system, the initial appearance, Fed. R. Crim. P. 5, marks the point at which interrogations by law enforcement cease to be controlled by the Fifth Amendment and begin to be governed by the Sixth Amendment." *Id.* at *5.

The government interprets *States* to mean that regardless of whether a defendant is arrested pursuant to a complaint, an indictment, or an information, he has no right to counsel until his initial appearance before a magistrate judge "as required by Rule 5." But this is nonsensical. The *States* court was evaluating one narrow question: "whether filing a criminal complaint . . . constitutes the initiation of adversary judicial proceedings." Thus, the court's pronouncement that Rule 5 "marks the point" at which the right to counsel attaches must be evaluated in that context—*i.e.*, proceeding pursuant to a complaint. Indeed, the very structure of the Federal Rules of Criminal Procedure makes this clear. *See United States v. Hayes*, 231 F.3d 663, 677 n.1 (9th Cir. 2000) (Reinhardt, C.J., dissenting) ("The rules are organized chronologically, beginning with the rule that describes a complaint. The rules then follow a time line from that point through the arrest or summons on complaint, initial appearance, indictment, arraignment, pre-trial procedures, trial, and judgment."); *see also United States v. Gaines*, 555 F.2d 618, 625 n.8 (7th Cir. 1977) (drawing the distinction between an initial appearance and

arraignment on indictment, as the latter "is covered by Rule 10" whereas "the purpose of the appearance before the magistrate and the preliminary hearing, dealt with in Rule 5, is quite different").

*States* did not speak to the effect of an indictment in triggering the right to counsel, but other Seventh Circuit cases firmly establish that an indictment triggers the Sixth Amendment. *See, e.g.*, *Watson v. Hulick*, 481 F.3d 537, 542 (7th Cir. 2007); *Lehn v. Holmes*, 364 F.3d 862, 866 (7th Cir. 2004) ("Once the indictment was returned there, [the defendant's] Sixth Amendment right to counsel attached."); *United States v. Spruill*, 296 F.3d 580, 585 (7th Cir. 2002) ("[a]dversarial proceedings" under the Sixth Amendment were initiated against the defendant upon indictment); *see also United States v. Bing Yi Chen*, No. 10-0357-cr, 2011 WL 1882636, at *1 (2d Cir. May 18, 2011) ("The Sixth Amendment right to counsel attaches upon indictment; it 'does not arise at the time of arrest upon a warrant following the filing of a complaint.'" (citation omitted)).

In sum, both *Rothgery* and *Fellers* are fully consistent with this court's conclusion and the holdings of countless other courts: that Lewellen's right to counsel under the Sixth Amendment had attached at the time of his November 19, 2010 arrest by virtue of his earlier indictment. *See Rothgery*, 430 U.S. at 198; *Fellers*, 540 U.S. at 523; *Patterson v. Illinois*, 487 U.S. 285, 290-91 (1988) ("[P]etitioner's Sixth Amendment right came into existence with his indictment.").

## B. Waiver and Deliberate Elicitation

Accordingly, two questions remain for this court: (1) whether Lewellen waived his right to counsel under the Sixth Amendment, and (2) if not, whether law enforcement

deliberately elicited statements in violation of the Sixth Amendment.[2]   *United States v. Spruill*, 296 F.3d 580, 585 (7th Cir. 2002) ("[W]e are required to answer three questions to determine whether a constitutional violation has occurred: '(1) whether the right to counsel had attached at the time of the [statement]; (2) if so, whether the accused executed a valid waiver of his right to counsel; and (3) absent a valid waiver, whether the police conduct violated the accused's right to counsel.'" (quoting *Quadrini v. Clusen*, 864 F.2d 577, 585 (7th Cir. 1989)).   As to waiver, Lewellen was not provided a *Miranda* warning or any other indication that he had a right to counsel before he made his statements, and indeed the government has not argued that Lewellen waived his rights. This court is mindful that "there is a presumption against finding a waiver of the right to counsel"; waiver generally requires "an intentional relinquishment or abandonment of a known right or privilege."   *Johnson v. Thurmer*, 624 F.3d 786, 790 n.1 (7th Cir. 2010) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).   On these facts, the court cannot say that Lewellen waived his right to counsel.

Nonetheless, there is no Sixth Amendment violation here, because the DEA-6 Report establishes that the arresting agents did not deliberately elicit the statements from Lewellen.   *See United States v. Li*, 55 F.3d 325, 328 (7th Cir. 1995) (where it is clear the defendant did not waive his right to counsel, "[t]o find a Sixth Amendment violation, the statements in question must have been (1) deliberately elicited (2) by a government agent.") (citing *United States v. York*, 933 F.2d 1343, 1355 (7th Cir. 1991); *Quadrini*, 864 F.2d at 585 ("[A]bsent a valid waiver, confessions elicited from an accused after the right to counsel has attached violate the sixth and fourteenth amendments if they were elicited outside the presence of counsel.").   While incriminating statements can be deliberately

---

[2]     The question of whether the statements were made "at all" is ultimately one for the jury.

elicited without the use of questions or interrogations, *see Maine v. Moulton*, 474 U.S. 159, 177 n.13 (1985), the officers must have engaged in "some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks," *see Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). In other words, "the Sixth Amendment is not violated whenever—by luck or happenstance—the [government] obtains incriminating statements from the accused after the right to counsel has attached"; instead, the concern is the "knowing exploitation . . . of an opportunity to confront the accused without counsel being present." *Moulton*, 474 U.S. at 176.

Lewellen's first statements ("all that happened over five years ago") were made after Agent Reynolds simply informed Lewellen of the charges against him. Lewellen argues that under *Fellers*, the agent's action constitutes deliberate elicitation. In *Fellers*, police knocked on the defendant's door, identified themselves, and asked to enter the home. *Fellers*, 540 U.S. at 521. Once inside, they informed the defendant that "they had come to discuss his involvement in methamphetamine distribution," that they "had a federal warrant for his arrest," and that he had been indicted on conspiracy to distribute methamphetamine. *Id.* The officers then specifically told the defendant that the indictment addressed his involvement with "certain individuals, four of whom they named." *Id.* At that point, the defendant told the police that he knew those individuals and he "had used methamphetamine during his association with them." The Supreme Court concluded that there was "no question" that the officers had deliberately elicited information from the defendant, but in so holding, the Court again emphasized that the officers had "informed [the defendant] that their purpose in coming was to discuss his

involvement in the distribution of methamphetamine and his association with certain charged co-conspirators." *Id.* at 524.

So while Lewellen seeks to equate Agent Reynolds' conduct with that of the officers in *Fellers*, the fact is that Agent Reynolds never indicated he wished to converse with Lewellen or that Lewellen would need to "discuss" anything relating to the charges. Not only were no questions pending, but the court does not believe that Agent Reynold's behavior can be characterized as an attempt to deliberately elicit a response. *See United States v. Cannon*, 715 F.2d 1228, 1232 (7th Cir. 1983) (affirming the district court's finding that an officer did not deliberately elicit statements by handing the defendant a copy of the indictment and telling the defendant that the indictment was the basis for his arrest). As these statements were not deliberately elicited by Agent Reynolds, the court will not suppress them.

This court reaches the same conclusion with regard to the second set of statements (*i.e.*, the statements about the guns). Lewellen's statements were not made in response to any questioning by or discussion with agents relating to weapons, but instead were made after agents asked him if he needed medical assistance. So while it is true that the agents had engaged in some conversation with Lewellen, that conversation was completely unrelated to the statements subsequently made. *See United States v. Pallais*, 921 F.2d 684 (7th Cir. 1990). In *Pallais*, for instance, the defendant initiated a conversation with a government agent, and the agent asked the defendant about a "ringleader's whereabouts." During the course of their conversation, the defendant mentioned that he had been "semi-retired for the last year and a half [to] two years." *Pallais*, 921 F.2d at 689-90. The government took this as an admission of guilt and sought to admit that statement. In

evaluating the conversation, the court held that the agent had not deliberately elicited the statement, because not only had the defendant initiated the conversation, "but the incriminating statement that he volunteered was not in response to the agent's questions." *Id.* Likewise, the statements offered by Lewellen had no relation to the discussion he had been having with the agents. The DEA-6 Report establishes that the agents did not say or do anything that could be viewed as eliciting these incriminating statements from Lewellen.

### III. CONCLUSION

For the reasons stated above, the court denies Lewellen's motion to suppress statements.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge


DATED:   September 20, 2011

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 332 - 2 | **DATE** | 9/21/2011 |
| **CASE TITLE** | | USA vs. Glenn Lewellen | |

**DOCKET ENTRY TEXT**

Motion hearing held.  MOTION to withdraw as attorney as to Glenn Lewellen by Scott J. Frankel [515] is granted.  Government's application for order to disclose tax returns and return information [509] is granted.  Oral motion by United States for leave to file an oversized brief is granted.

Docketing to mail notices.

00:06

| | Courtroom Deputy Initials: | RJ |
|---|---|---|



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES | No. 09-332 |
| v. | Judge Joan B. Gottschall |
| GLENN LEWELLEN | |

## ORDER FOR DISCLOSURE OF TAX RETURNS
## AND RETURN INFORMATION

The United States Attorney for the Northern District of Illinois has made an
application for an order, pursuant to 26 U.S.C. § 6103(i)(1), directing the Internal Revenue
Service to disclose tax returns and return information of:

Glenn Lewellen
SSN: xxx-xx-xxxx;

LEWELLEN HOME BUILDERS, INC.
EIN: xx-xxxxxxx;

R&L DEVELOPMENT, LLC
EIN: xx-xxxxxxx;

WALK-OFF PROPERTIES, LLC
EIN: xx-xxxxxxx;

NORTHCENTRAL EQUITIES, LLC;

PHEASANT RIDGE LOCKPORT, LLC
EIN: xx-xxxxxxx; and

MCZ/QUEEN BEAN MELODY
EIN: xx-xxxxxxx,

which tax returns and return information is described as:

(1)     certified copies of all certified copies of all individual and joint income tax returns (Forms 1040) and corporate income tax returns (Forms 1120 or 1120S), all schedules attached thereto, and transcripts of all return information, including IMFOLTs and BMFOLTs, and income information, including IRPTRs, for tax years 1996 to 2010; and

(2)     for the tax years 1996 to 2010,  copies of any audits, work papers, revenue agents' transmittal reports, special agents' reports, witness affidavits, statements, memoranda of interviews, etc., currently held by IRS and any related material which may be developed subsequent to this request, involving the above-named taxpayers.

After examining the application, this Court finds:

(1)     There is reasonable cause to believe, based upon information believed to be reliable, that violations of federal criminal statutes, namely Title 21, United States Code, Section 846, Title 18, United States Code, Sections 1962(d) and 2 (conspiracy to commit racketeering and conspiracy to possess with intent to distribute narcotics) have been committed;

(2)     There is reasonable cause to believe that the above-described tax returns and return information are or may be relevant to a matter related to the commission of the above-mentioned violations; and

2

(3)     The information sought to be disclosed cannot reasonably be obtained, under

the circumstances, from any other source, and is sought exclusively for use in the federal

criminal investigation, and, if appropriate, the trial of the above-mentioned violations.

The Court further finds that the following personnel, namely:

AUSA Tiffany J. Tracy;

AUSA Steven A. Block;

AUSA Terra Reynolds;

David Reynolds, Special Agent, Drug Enforcement Administration;

Catherine Huber, Supervisory Special Agent, Internal Revenue Service; and

Lily Acosta, Special Agent, Internal Revenue Service

are personally and directly engaged in, and the information sought is solely for their use in,

investigating and, if appropriate, preparing for trial concerning the above-mentioned

violations.

IT IS THEREFORE ORDERED that the Internal Revenue Service:

(1)     Disclose such tax returns and return information as described as certified

copies of all individual and joint income tax returns (Forms 1040) and corporate income tax

returns (Forms 1120 or 1120S), as well as all schedules attached thereto; transcripts of all

return information, including IMFOLTs and BMFOLTs, and income information, including

IRPTRs, for tax years 1996 to 2010; and (b) for the tax years 1996 to 2010, copies of any

audits, work papers, revenue agents' transmittal reports, special agents' reports, witness

affidavits, statements, memoranda of interviews, etc., currently held by IRS and any related material which may be developed subsequent to this request, involving the above-named taxpayers.

(2)     Certify where tax returns and return information described above have not been filed or are not on file with the Internal Revenue Service that no such returns and information have been filed or on file;

(3)     Disclose such tax returns and tax return information described above as may come into possession of the Internal Revenue Service subsequent to the date of this order, but not for longer than 30 days thereafter;

(4)     Disclose such tax returns and tax return information and make such certification only to the following personnel, namely:

AUSA Tiffany J. Tracy;

AUSA Steven A. Block;

AUSA Terra Reynolds;

David Reynolds, Special Agent, Drug Enforcement Administration;

Catherine Huber, Supervisory Special Agent, Internal Revenue Service; and

Lily Acosta, Special Agent, Internal Revenue Service

and to no other person; and

(5)     Disclose no tax returns or tax return information not described above.

IT IS FURTHER ORDERED that applicant and the following personnel, namely:

4

AUSA Tiffany J. Tracy;

AUSA Steven A. Block;

AUSA Terra Reynolds;

David Reynolds, Special Agent, Drug Enforcement Administration;

Catherine Huber, Supervisory Special Agent, Internal Revenue Service; and

Lily Acosta, Special Agent, Internal Revenue Service

and any attorney of the United States Department of Justice who may be subsequently assigned in this matter, shall use the tax returns and tax return information disclosed solely in investigating the above-mentioned violations, and such other violations of the federal criminal code, as, although presently unknown, are discovered in the course of this investigation, and, if appropriate, preparing the matter for trial.  No disclosure shall be made to any other person except in accordance with the provisions of 26 U.S.C. § 6103 and 26 C.F.R. 301.6103(i)-1.

Judge Joan B. Gottschall

Dated: _Sept 21 2011_

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| SAUL RODRIGUEZ, *et al*. | ) | |

GOVERNMENT'S EVIDENTIARY PROFFER SUPPORTING THE
<u>ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS</u>

PATRICK J. FITZGERALD
United States Attorney

By:      TERRA REYNOLDS
STEVEN A. BLOCK
TIFFANY J. TRACY
Assistant U.S. Attorneys
219 South Dearborn Street, Room 500
Chicago, Illinois 60604
(312) 353-5300

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully submits this written proffer, pursuant to the provisions of Federal Rule of Evidence 801, including Federal Rule of Evidence 801(d)(2)(E), and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1987), of the government's evidence supporting the admission of co-conspirators' statements at trial. This proffer sets forth a summary of the evidence that the government will offer at trial relating to a conspiracy among defendants Glenn Lewellen, Manuel Uriarte, Hector Uriarte, Jorge Uriarte, Fares Umar, and Robert Cardena, who conspired together, and with others, to commit offenses against the United States, namely racketeering, murder, kidnapping, robbery, and drug trafficking. This proffer also summarizes the defendants' and their co-conspirators' statements that furthered the defendants' participation in the conspiracy.

This proffer sets forth the principles under which the statements of defendants are admissible pursuant to Rule 801(d)(2)(E) as statements of co-conspirators. The legal principles governing admissibility of co-conspirator statements apply to the racketeering and drug conspiracies charged in this case. This proffer begins by briefly discussing the conspiracies charged in this case. It then discusses the law governing the admissibility of co-conspirator statements under Rule 801(d)(2)(E).

The government is not detailing all of its evidence showing the existence of the racketeering and narcotics conspiracies charged in the third superseding indictment or all of the statements that were made in furtherance of the conspiracies. Instead, this proffer outlines the law governing the admissibility of such statements, provides background to the Court for evaluating the admissibility of these statements, and highlights examples of its evidence. In this manner, the government will establish to the Court the existence of the evidence available to complete the necessary foundation at trial and the roles of various witnesses, as well as the bases for admission.

I.      OVERVIEW OF THE CHARGED CONSPIRACIES

In January 2011, a grand jury returned a multi-count third superseding indictment against defendants Saul Rodriguez, Glenn Lewellen, Manuel Uriarte, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Jorge Lopez, Walter Johnson, and Robert Cardena.  The third superseding indictment charged defendants Saul Rodriguez, Glenn Lewellen, Manuel Uriarte, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, and Fares Umar with being members and associates of the Rodriguez Enterprise, a criminal organization whose members and associates engaged in acts of violence, including murder, kidnapping, robbery, and narcotics distribution, in violation of Title 18, United States Code, Section 1962(d) (Count One).  The third superseding indictment further charged defendants Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Jorge Lopez, Walter Johnson, and Robert Cardena with having participated in a narcotics conspiracy known as the Rodriguez Drug Trafficking Organization ("Rodriguez DTO") to possess and distribute narcotics, in violation of Title 21, United States Code, Section 846 (Count Thirteen).

Saul Rodriguez and Glenn Lewellen founded the Enterprise in approximately 1996.  At the time, Glenn Lewellen was an officer with the Chicago Police Department ("CPD"), responsible for managing the cooperation of Saul Rodriguez.  Saul Rodriguez was a drug dealer who, at the direction of Lewellen, continued his illegal activities after he began cooperating.  Rodriguez and Lewellen began stealing narcotics and narcotics proceeds from drug traffickers in the Chicago area as a means of enriching themselves.  In approximately 2001, Fares Umar joined the Enterprise and robbed and kidnapped individuals with Rodriguez and Lewellen.  Umar participated in numerous kidnappings and thefts with Rodriguez, Lewellen, and others, until he was sent to prison in 2006.

Between 2000 and 2006, Saul Rodriguez recruited Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Jorge Lopez, Andres Flores, Tony Sparkman, Robert Cardena, Andres Torres, and Pedro Victoria to join the Enterprise. Hector Uriarte and Jorge Uriarte evolved into managers of the Enterprise's activities, putting together teams of individuals to carry out its illegal activities while participating in those activities themselves. Andres Flores, Tony Sparkman, Robert Cardena, and Manuel Uriarte were among the members of the Enterprise that followed the orders given to them by Saul Rodriguez, Hector Uriarte and Jorge Uriarte. The Enterprise engaged in multiple criminal activities. First, members of the Enterprise kidnapped drug dealers and other individuals the Enterprise believed to have money so that the Enterprise could obtain narcotics and money for their release. Second, members of the Enterprise engaged in armed robberies of drug dealers and others in order to obtain narcotics and/or money. Third, certain members of the Enterprise, including Rodriguez, Andres Flores, Manuel Uriarte, Hector Uriarte, and Jorge Uriarte, engaged in murder in exchange for money, narcotics, and/or to increase a member's status in the Enterprise. Rodriguez was responsible for determining if and what each of the members of the Enterprise would be paid for their involvement in the foregoing activities.

In addition, members of the Enterprise engaged in the illegal trafficking of controlled substances, namely cocaine. As set forth above, several members of the Enterprise are charged with participating in a narcotics conspiracy in addition to their participation in the racketeering conspiracy. Members of the Rodriguez DTO obtained those controlled substances through kidnapping, robbery, murder, theft, and purchase. Pedro Victoria provided the Rodriguez DTO with thousands of kilograms of cocaine that the DTO then distributed. Walter Johnson purchased the vast

majority of the thousands of kilograms of cocaine that the Rodriguez DTO purchased and obtained

by engaging in other criminal activities.

## II.    THE  LAW  GOVERNING  THE  ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that a "statement" is not hearsay

if it "is offered against a party" and is "a statement by a coconspirator of a party during the course

and in furtherance of the conspiracy."   The admission of a co-conspirator statement against a

defendant is proper where the government establishes by a preponderance of evidence that:  (1) a

conspiracy or scheme existed; (2) the defendant and the declarant were members of that particular

conspiracy or scheme; and (3) the statement was made during the course and in furtherance of the

conspiracy or scheme.  *See, e.g., Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States*

*v. Westmoreland*, 312 F.3d 302, 309 (7th Cir. 2002).

### A.    The *Santiago* Proffer Is the Approved Method of Proffering Co-Conspirator Statements

In this Circuit, the preferred way for the government to makes its preliminary factual showing

as to the admissibility of such statements is by filing a pretrial written proffer of the government's

evidence.  *See, e.g., United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001); *United States v.*

*Irorere,* 228 F.3d 816, 824 (7th Cir. 2000).  In making its preliminary factual determinations, the

court must consider the statements themselves as evidence of a conspiracy and whether the

statements the government seeks to admit were made in furtherance of that conspiracy. *United States*

*v. Brookins*, 52 F.3d 615, 623 (7th Cir. 1995); *United States v. Maholias*, 985 F.2d 869, 877 (7th Cir.

1993).  Indeed, the court may consider all non-privileged evidence.  *United States v. Lindemann*, 85

F.3d 1232, 1238 (7th Cir. 1996).

**B.** **Co-Conspirator Statements Are Admissible as Nonhearsay Despite the Absence of a Formal Conspiracy Charge, and Regardless of Criminal Intent of Each Co-Conspirator**

Statements may be admitted under Rule 801(d)(2)(E) notwithstanding the lack of any formal conspiracy charge. *See, e.g., United States v. Godinez*, 110 F.3d 448, 454 (7th Cir. 1997); *Santiago*, 582 F.2d at 1130. In addition, there is no requirement that each member of the venture share a criminal intent for the co-conspirator rule to apply to statements that members made in furtherance of the scheme. These two rules are based on the very nature of the co-conspirator doctrine:

> The distinction should be noted between "conspiracy" as a crime and the co-conspirator exception to the hearsay rule. Conspiracy as a crime comprehends more than mere joint enterprise. It also includes other elements, such as a meeting of the minds, criminal intent and, where required by statute, an overt act. . . . The co-conspirator exception to the hearsay rule, on the other hand, is merely a rule of evidence founded, to some extent, on concepts of agency law. It may be applied in both civil and criminal cases. . . . Its rationale is the common sense appreciation that a person who has authorized another to speak or to act to some joint end will be held responsible for what is later said or done by his agent, whether in his presence or not.
>
> \*   \*   \*
>
> The substantive criminal law of conspiracy, though it obviously overlaps in many areas, simply has no application to this evidentiary principle. Thus, once the existence of a joint venture for an illegal purpose, or for a legal purpose using illegal means, and a statement made in the course of and in furtherance of that venture have been demonstrated by a preponderance of the evidence, it makes no difference whether the declarant or any other "partner in crime" could actually be tried, convicted and punished for the crime of conspiracy.

*United States v. Gil*, 604 F.2d 546, 549-550 (7th Cir. 1979) (citations omitted).

This distinction was also explored in *United States v. Coe*, 718 F.2d 830 (7th Cir. 1983). In *Coe*, the court explained that a so-called co-conspirator statement's admissibility does not depend on the substantive law of conspiracy:

> Conspiracy as an evidentiary rule differs from conspiracy as a crime. The crime of conspiracy comprehends much more than just a joint venture or concerted action,

6

whereas the evidentiary rule of conspiracy is founded on concepts of agency law. . . .
Recognizing this, some courts refer to the coconspirator exception as the "joint
venture" or "concert of action" exception. . . . A charge of criminal conspiracy is not
a prerequisite for the invocation of this evidentiary rule. . . .  Indeed, it may be
invoked in civil as well as criminal cases.  . . .

The proposition that the government did have to establish by a preponderance of
independent evidence was that [the individuals] . . . were engaged in a joint venture--
that there was a "combination between them . . . ."

*Coe*, 718 F.2d at 835 (citations omitted).[1]

### C.    The Supreme Court's *Crawford* Decision Has Not Changed the Admissibility of Co-Conspirator Statements.

The Supreme Court's decision in *Crawford  v. Washington*, 541 U.S. 36 (2004), changed

much of the law concerning out-of-court testimonial statements, but it did not affect the admissibility

of co-conspirator statements.  In *Crawford*, the prosecution introduced a tape-recorded statement

made before trial by the defendant's wife to law enforcement.  *Id.* at 38.  At trial, however, the wife

was unavailable as a witness due to the state's spousal privilege law, and thus the defendant did not

have an opportunity to cross-examine her.  *Id.* at 40.  The Court ruled that admission of the statement

violated the Confrontation Clause, holding that where the government offers an unavailable

declarant's hearsay that is "testimonial" in nature, the Confrontation Clause requires actual

confrontation, that is, cross-examination, regardless of how reliable the statement may be.  *Id.* at 51-

52.  As examples of "testimonial" statements, the Court listed prior testimony at a preliminary

hearing, before a grand jury, or at a former trial, and to police interrogations.  *Id.* at 68.

--------

[1]  *See also Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229, 249 (1917)(explaining origin of
the co-conspirator rule in the law of partnership)("the act or declaration of one, in furtherance of the common
object, is the act of all, and is admissible as primary and original evidence against them.").

7

The rule in *Crawford* does not apply, however, to statements that are not hearsay.[2] Thus, the Seventh Circuit has squarely held that *Crawford* does not apply to – and did not change the law relating to – co-conspirator statements.  In *United States v. Jenkins*, 419 F.3d 614 (7th Cir. 2005), the court noted:

> As to the Confrontation Clause argument, *Crawford* does not apply.  The recordings featured the statements of co-conspirators.  These statements, by definition, are not hearsay.  *Crawford* did not change the rules as to the admissibility of co-conspirator statements.

419 F.3d at 618.   Because co-conspirator statements are not "testimonial" hearsay statements, *Crawford* is not implicated, and those statements may be admitted without offending the Sixth Amendment.

## D.     The Proper Standard for Admissibility Is Preponderance of the Evidence

A district court's preliminary determination of admissibility for purposes of Rule 801(d)(2)(E) is distinct from the standard required in determining on appeal whether sufficient evidence exists to uphold a jury verdict.   The standard to be applied in the context of admissibility under Rule 801(d)(2)(E) is a preponderance-of-the-evidence standard.  *Lindemann*, 85 F.3d at 1238 (*citing Bourjaily*, 438 U.S. at 175-76); *Godinez*, 110 F.3d at 454).

## E.     Principles for Determining Membership in and Existence of the Conspiracy

### 1.     *The court may consider the proffered statements themselves.*

---

[2]  The rule in *Crawford* also does *not* apply where:  (1) a statement, though testimonial in nature, is not offered for the truth of the matter asserted, 541 U.S. at 59 n.9; (2) the declarant testifies at trial and is subject to cross-examination regarding the prior statement, *id.* at 59 n.9; (3) the statement is non-testimonial, *id.* at 60; or (4) the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination, *id.* at 59.  Another exception to the confrontation requirement applies where the defendant procured the declarant's unavailability, that is, "forfeiture by wrong-doing," *see id.* at 62; Fed. R. Evid. 804(b)(6).

A district court may consider the proffered statements themselves in determining the existence of a conspiracy, and a defendant's participation in it. *Bourjaily,* 483 U.S. at 180; *United States v. de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990). However, the government typically must present some evidence, independent of the statements. *Lindemann*, 85 F.3d at 1238.

### 2. *Both direct and circumstantial evidence can be considered.*

Once the conspiracy is established, the evidence may be either direct or circumstantial. *Irorere*, 228 F.3d at 823; *United States v. Patterson*, 213 F. Supp. 2d 900, 910-11 (N.D. Ill. 2002)(Bucklo, J.), *aff'd*, 348 F.3d 218, 225-26 (7th Cir. 2003). Indeed, "[b]ecause of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendants' participation can usually be established only by circumstantial evidence." *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir. 1983). *See also Lindemann*, 85 F.3d at 1238 (secretive nature of conspiracies one reason for conspirator exception to hearsay rule).

In this case, the evidence is both direct and circumstantial. For example, the government's evidence includes seized narcotics, wiretapped conversations, consensually recorded conversations, surveillance reports, and post-arrest statements. The cooperating defendants and co-conspirators will testify about their participation and the participation of others in certain acts committed in furtherance of the racketeering and drug conspiracies. Those individuals will further testify about conversations with other defendants and co-schemers about the racketeering and drug conspiracies. In addition, the evidence will demonstrate that defendants and their co-schemers sought to prevent the imposition of criminal liabilities against them by gathering information about ongoing federal investigations into their activities, and intimidating witnesses. The circumstances surrounding those activities are circumstantial evidence of the defendants' intent.

9

### 3. *Requirements for determining if a person has joined the conspiracy.*

A defendant joins a conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met or has agreed with every co-conspirator. *United States v. Boucher*, 796 F.2d 972, 975 (7th Cir. 1986); *United States v. Balistrieri*, 779 F.2d 1191, 1225 (7th Cir. 1985); *see also Rodriguez*, 975 F.2d at 411 (defendant must have intended to join and associate himself with the conspiracy's criminal design and purpose). The government need not prove, however, that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy *United States v. Sims*, 808 F. Supp. 620, 623 (N.D. Ill. 1992)(Alesia, J.). As the Supreme Court has said:

> A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. . . . The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other. . . . If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.

*Salinas v. United States*, 522 U.S. 52, 63-4 (1997)(citations omitted).[3]

In this case, defendants acted jointly as part of the Rodriguez Enterprise and the Rodriguez DTO. For example, Glenn Lewellen served the Rodriguez Enterprise and the Rodriguez DTO by, among other things, directing and participating in the illegal activities of the Enterprise, including, but not limited to, obstruction of justice, kidnapping, robbery, and narcotics trafficking. Lewellen drew on his experience as a Chicago police officer and provided certain members and associates of the Enterprise with information concerning the fact of, and extent of, ongoing federal criminal investigations into the Enterprise's illegal activities. Hector Uriarte and Jorge Uriarte served the

---

[3] *See also United States v. Liefer*, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985); *United States v. Towers*, 775 F.2d 184, 189 (7th Cir. 1985).

Rodriguez Enterprise and the Rodriguez DTO by among other things, directing and participating in the illegal activities of the Enterprise, including, but not limited to murder, kidnapping, robbery, and narcotics trafficking.  Fares Umar served the Rodriguez Enterprise and the Rodriguez DTO by, among other things, participating in the illegal activities of the Enterprise, including, but not limited to, kidnapping, robbery, and narcotics trafficking.  Manuel Uriarte served the Rodriguez Enterprise by, among other things, participating in the illegal activities of the enterprise, including, but not limited to, murder and kidnapping.  Robert Cardena served the Rodriguez DTO by, among other things, participating in the theft of narcotics.

A defendant may be found to have participated in a conspiracy even if he joined or terminated his relationship with others at a different time than another defendant or co-conspirator. *United States v. Ramirez*, 796 F.2d 212, 215 (7th Cir. 1986); *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir.1985).[4]  A district court may consider the conduct, knowledge, and statements of the defendant and others in establishing participation in a conspiracy.  A single act or conversation, for example, can suffice to connect the defendant to the conspiracy if that act leads to the reasonable inference of intent to participate in an unlawful enterprise.  *See, e.g., Sims*, 808 F. Supp. at 623.[5]  Statements made during the course of and in furtherance of a conspiracy, even in its embryonic stages, are admissible against those who arrive late to join a going concern.  *United States v. Potts*,

_____

[4] A defendant, even if not an "agreeing" member of a conspiracy, may nonetheless be found guilty of conspiracy if he knew of the conspiracy's existence at the time of his acts, and his acts knowingly aided and abetted the business of the conspiracy, *see United States v. Scroggins*, 939 F.2d 416, 421 (7th Cir. 1991); *Sims*, 808 F. Supp. at 623 n.1, even if the defendant was not charged with aiding and abetting, *see United States v. Kasvin*, 757 F.2d 887, 890-91 (7th Cir.1985).

[5] Similarly, efforts by an alleged co-conspirator to conceal a conspiracy may support an inference that he joined the conspiracy while it was still in operation.  *See Redwine;* 715 F.2d at 321; *United States v. Robertson*, 659 F.2d 652, 657 (5th Cir. 1981).

840 F.2d 368, 372 (7th Cir. 1987).   A conspirator who has become inactive in the conspiracy

nevertheless is liable for his co-conspirators' further statements unless he openly disavows the

conspiracy or reports it to the police.  *United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

*See also United States v. Andrus,* 775 F.2d 825, 850 (7th Cir. 1985).

### F.      Statements Made in Furtherance of the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts look

for a reasonable basis upon which to conclude that the statement furthered the conspiracy's goals.

*United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000).  Under the reasonable-basis standard,

a statement may be susceptible to alternative interpretations and still be "in furtherance" of the

conspiracy; the statement need not have been exclusively, or even primarily, made to further the

conspiracy in order to be admissible under the co-conspirator exception.  *See, e.g., Johnson*, 200 F.3d

at 533 (citing *United States v. Stephenson,* 53 F.3d 836, 845 (7th Cir. 1995)).

The Seventh Circuit has found a wide range of statements to satisfy the "in furtherance"

requirement.  *See, e.g.*, *United States v. Cozzo*, No. 02 CR 400, 2004 U.S. Dist. LEXIS 7391 (N.D.

Ill. April 16, 2004) (Zagel, J.)(collecting cases).   In general, a statement that is "part of the

information flow between conspirators intended to help each perform his role" is admissible under

Rule 801(d)(2)(E).  *United States v. Santos*, 20 F.3d 280, 286 (7th Cir. 1994), *quoting United States

v. Johnson*, 927 F.2d 999, 1001 (7th Cir. 1991); *accord*, *United States v. Gajo*, 290 F.3d 922, 929 (7th

Cir. 2002).  These include statements made:  (1) to identify other members of the conspiracy and

their roles,  *United States v. Roldan-Zapata,* 916 F.2d 795, 803 (2d Cir. 1990); *United States v.

Magee*, 821 F.2d 234, 244 (5th Cir. 1987); (2) to recruit potential co-conspirators, *United States v.

Curry*, 187 F.3d 762, 766 (7th Cir. 1999); (3) to control damage to an ongoing conspiracy, *United*

*States v. Van Daal Wyk,* 840 F.2d 494, 499 (7th Cir. 1988); *Kapp,* 2003 U.S. Dist. LEXIS 3989, at

*3; (4) to keep conspirators advised as to the progress of the conspiracy, *Potts,* 840 F.2d at 371;

*Kapp,* 2003 U.S. Dist. LEXIS 3989, at *3; (5) to conceal the criminal objectives of the conspiracy,

*United States v. Kaden,* 819 F.2d 813, 820 (7th Cir. 1987); (6) to plan or to review a conspirator's

exploits, *United States v. Molt,* 772 F.2d 366, 368-69 (7th Cir. 1985); or (7) as an assurance that a

conspirator can be trusted to perform his role. *United States v. Pallais,* 921 F.2d 684, 688 (7th Cir.

1990); *Van Daal Wyck,* 840 F.2d at 499. The Seventh Circuit has also said that "[s]tatements made

to keep coconspirators informed about the progress of the conspiracy, to recruit others, or to control

damage to the conspiracy are made in furtherance of the conspiracy." *Stephenson,* 53 F.3d at 845.

*Accord, United States v. Curtis,* 37 F.3d 301, 307 (7th Cir. 1994).

### 1.   *Statements made to execute the conspiracy.*

Statements made by conspirators to conduct the business of the conspiracy and to accomplish

its goals are "classic examples of statements made to conduct and further" a conspiracy. *Cox,* 923

F.2d at 527. Statements such as these, which are "intended to promote the conspiratorial objectives,"

should be admitted pursuant to Rule 801(D)(2)(E).[6] Statements that prompt the listener to act in a

manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the

conspiracy.[7] Whether a particular statement tends to advance the objectives of the conspiracy or to

induce the listener's assistance is determined by an examination of the context in which it is made.

*Garlington v. O'Leary,* 879 F.2d 277, 284 (7th Cir. 1989).

---

[6] *United States v. Sinclair,* 109 F.3d 1527, 1534 (10th Cir. 1997); *accord, United States v. Shores,* 33 F.3d 438, 444 (4th Cir. 1994).

[7] *United States v. Monus,* 128 F.3d 376, 392 (6th Cir. 1997); *United States v. Simmons,* 923 F.2d 934, 945 (2d Cir. 1991); *United States v. Smith,* 833 F.2d 213, 219 (10th Cir. 1987).

### 2.    *Statements regarding the conspiracy's activities.*

Statements "describing the purpose, method, or criminality of the conspiracy," are made in furtherance of the conspiracy because conspirators make such statements to guide each other toward achievement of the objectives of the conspiracy.  *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992).  Similarly, statements that are part of the information flow between conspirators made in order to help each conspirator perform his role are "in furtherance" of the conspiracy.  *See, e.g.*, *Godinez,* 110 F.3d at 454; *Garlington*, 879 F.2d at 283-84; *Van Daal Wyk,* 840 F.2d at 499. Statements to assure that a conspirator can be trusted to perform his role also satisfy the "in furtherance" requirement.  *See, e.g.*, *United States v. Romo*, 914 F.2d 889, 897 (7th Cir. 1990); *de Ortiz*, 907 F.2d at 635-36 (7th Cir. 1990).

### 3.    *Statements to recruit conspirators.*

Statements made to recruit potential members of the conspiracy are made "in furtherance" of the scheme.  *Curry*, 187 F.3d at 766; *Godinez*, 110 F.3d at 454.

### 4.    *Statements regarding the activities of other conspirators designed to inform or reassure the listener.*

Statements made by conspirators to other individuals who participate in, or interact with, the conspiracy contribute to the conspiracy.  *See Van Daal Wyk*, 840 F.2d at 499 (wholesaler instructed his courier not to deliver any additional quantities of cocaine to the defendant, a dealer).

> The exchange of information is the lifeblood of a conspiracy, as it is of any cooperative activity, legal or illegal.  Even commenting on a failed operation is in furtherance of the conspiracy, because people learn from their mistakes.  Even identification of a coconspirator by an informative nickname. . .  is in furtherance of the conspiracy, because it helps to establish, communicate, and thus confirm the lines of command in the organization.  Such statements are "part of the information flow between conspirators intended to help each perform his role," and no more is required to make them admissible.

*Pallais*, 921 F.2d at 688.   The same logic dictates that discussions concerning a conspiracy's successes are admissible as statements in furtherance of the conspiracy.  *See id.; Van Daal Wyk*, 840 F.2d at 499.

Statements intended to reassure the listener regarding the progress or stability of the conspiracy also further the conspiracy.  *United States v. Sophie*, 900 F.2d 1064, 1073 (7th Cir. 1990) (description of past drug deals).  Likewise, statements made to reassure and calm the listener may further the conspiracy *see Garlington*, 879 F.2d at 284; *United States v. Molinaro*, 877 F.2d 1341, 1343-44 (7th Cir. 1989) (upholding admission of statements designed to iron out disputed details of the conspiracy and to control the damage apparently done to the conspiracy).

   5.    ***Statements relating to the progress and past accomplishments of the conspiracy.***

Statements made by co-schemers concerning past exploits by members of the conspiracy are in furtherance of the conspiracy when made to assist in managing and updating other members of the conspiracy.  *Potts*, 840 F.2d at 371; *Molt*, 772 F.2d at 368-69.   Similarly, statements regarding a conspirator's failure to fully accomplish the objective of the conspiracy are admissible "as updates on the status of the conspiracy" and how that status affected the future of the conspiracy.  *United States v. Doyle*, 771 F.2d 250, 256 (7th Cir. 1985).

   6.    ***Statements to conceal the criminal objectives of the conspiracy.***

Finally, statements made to conceal the criminal objectives of the conspiracy are made "in furtherance" of the conspiracy where, as here, ongoing concealment is one of its purposes.  *See, e.g., United States v. Maloney*, 71 F.3d 645, 660 (7th Cir. 1995); *Kaden*, 819 F.2d at 820.   "Avoiding detection by law enforcement officials clearly furthers the aims of a conspiracy."  *United States v.*

15

*Troop*, 890 F.2d 1393, 1404 (7th Cir. 1989). Statements made to control damage to an ongoing

conspiracy have also been found to have been made in furtherance of the conspiracy. *See*

*Stephenson*, 53 F.3d at 845; *Van Daal Wyk*, 840 F.2d at 499.

### G.    Alternative Bases for Admissibility of Statements

The government believes that the statements of co-schemers set forth in this proffer should

be admitted as non-hearsay under the co-conspiracy doctrine. There are alternative bases, however,

for admission of many of the statements. These bases do not require a Rule 801(d)(2)(E) analysis.

### 1.    *Defendants' own statements.*

A defendant's own admissions are admissible against him pursuant to Fed. R. Evid.

801(d)(2)(A), without reliance on the co-conspirator-statement rule.[8/]  *Maholias*, 985 F.2d at 877.

A defendant's own admissions, moreover, are relevant to establishing the factual predicates for the

admission of conspirator statements against him. *See, e.g., Godinez*, 110 F.3d at 455; *Potts*, 840

F.2d at 371-72.[9/]

### 2.    *Non-Hearsay Statements*

The coconspirator statement rule is also not implicated where the relevant verbal declaration

is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to

verification; an example would be an order or a suggestion. *See United States v. Tuchow*, 768 F.2d

855, 868 n.18 (7th Cir. 1985). This rule defines "statement" as "an oral or written assertion" or

---

[8/] Rule 801(d)(2)(A) provides in pertinent part that a "statement" is not hearsay if "[t]he statement is offered against a party and is . . . the party's own statement, in either an individual or a representative capacity."

[9/] Other sections of Rule 801(d)(2) provide alternative bases of admissibility that may apply. Rule 801(d)(2)(B), for example, provides for the admissibility of "adopted" statements.

"nonverbal conduct of a person, if it is intended by the person as an assertion."  Thus, a statement

which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not

invoke a Rule 801(d)(2)(E) analysis.  *Id.*

## III.   THE GOVERNMENT'S PROFFER REGARDING THE EXISTENCE OF THE CONSPIRACIES

As set forth in the third superseding indictment, the Rodriguez Enterprise and the Rodriguez

DTO operated through the statements and actions of the charged defendants and uncharged co-

conspirators spanning over at least thirteen years.  The government's theory is that the Rodriguez

Enterprise was a criminal enterprise that committed acts of violence and drug trafficking in the

Chicago area.  Numerous cooperating witnesses who were members of the Rodriguez Enterprise and

the Rodriguez DTO will testify at trial, as will victims of the Enterprise's criminal activity.

The government submits the following summary of evidence:[10/]

### A.   Saul Rodriguez' Cooperation with the CPD

On February 8, 1996, officers from the CPD arrested Saul Rodriguez in the area of 47th and

Laflin.  One of the arresting officers was Glenn Lewellen.  According to Glenn Lewellen's CPD

personnel file, Glenn Lewellen began serving as a Chicago Police Officer on or about December 22,

1986.  After Saul Rodriguez' arrest, Glenn Lewellen drove Saul Rodriguez to an apartment on

Lawndale Avenue that Saul Rodriguez used to store drugs and drug proceeds.  According to Saul

---

[10/]   This summary is based on information contained in investigative reports, grand jury transcripts and documents obtained during the investigation.  Defendants have been provided relevant investigative reports, as well as grand jury transcripts of likely government witnesses.  In addition, defendants have been given electronic copies of many documents, and have been given access to other documents collected by the government during its investigation.

Rodriguez, CPD officers searched the apartment and recovered 13 pounds of marijuana and approximately $8,000.

After Saul Rodriguez saw CPD officers search the apartment, Glenn Lewellen drove Saul Rodriguez to an unmarked warehouse-type building two blocks away from U.S. Cellular Field. Glenn Lewellen told Saul Rodriguez that if he cooperated with the CPD, charges would not be filed against him. Glenn Lewellen also told Saul Rodriguez that he could cooperate with the CPD in exchange for payment. Glenn Lewellen gave Saul Rodriguez his phone number and instructed him to call the next day.

The next day, Saul Rodriguez called Glenn Lewellen and met with him and another CPD officer. Glenn Lewellen and the other CPD officer drove Saul Rodriguez throughout the Chicago area. As they did so, Saul Rodriguez pointed out homes in the Chicago area belonging to people Saul Rodriguez knew to be involved in the drug business.

In the next few weeks, Saul Rodriguez provided Glenn Lewellen with information regarding two or three separate drug-related matters. After doing so, Glenn Lewellen told Saul Rodriguez that he would not be formally charged with any offenses stemming from his arrest or the CPD's search of his stash apartment. Saul Rodriguez' criminal history does not reflect his February 8, 1996 arrest by the CPD. The only record of that arrest is Saul Rodriguez' written *Miranda* waiver dated February 8, 1996 in his confidential source ("CS") file maintained by the CPD.

Glenn Lewellen told Saul Rodriguez that he could continue to work for the CPD as a paid informant. Glenn Lewellen claimed that Saul Rodriguez could be paid up to $1,000 per kilogram of cocaine that was seized as a result of the information he provided. On February 28, 1996, Saul Rodriguez signed a CPD cooperating individual agreement. The agreement bears the signatures of

18

Saul Rodriguez and Glenn Lewellen. Under the agreement, Saul Rodriguez agreed not to "sell or deliver any controlled substance, dangerous drug, marijuana, or any substance purported to be same to anyone." Saul Rodriguez also agreed to "not engage in any illegal or improper conduct" while "working with the Chicago Police Department, Organized Crime Division, as a Cooperating Individual." Glenn Lewellen gave Saul Rodriguez an undercover name, Bill Pager, under which he would be paid.

During the same meeting that Saul Rodriguez signed the cooperating individual agreement, Glenn Lewellen instructed Saul Rodriguez to call him when he had information pertaining to drug-related matters in Chicago. In contrast to what was contained in the agreement, however, Glenn Lewellen told Saul Rodriguez that he should continue doing what he was doing. Saul Rodriguez understood Glenn Lewellen to be telling him that he should continue to buy and sell drugs so that he would have information pertaining to drug-related matters to give to Glenn Lewellen. Glenn Lewellen also instructed Saul Rodriguez to call him when and if he was arrested by law enforcement. Glenn Lewellen told Saul Rodriguez that he would help him out of such a situation.

Between the Spring of 1996 and 2000, Saul Rodriguez worked as a paid informant for CPD. During that period of time, Saul Rodriguez reported almost exclusively to Glenn Lewellen. During that period of time, Saul Rodriguez continued to buy and sell cocaine in the Chicago area. Most of the information Saul Rodriguez provided to Glenn Lewellen and his colleagues was based on Rodriguez' purchase and sale of drugs in the Chicago area. Glenn Lewellen and his colleagues never fully debriefed Saul Rodriguez about his own criminal activity or the criminal activity of others. Rather, Saul Rodriguez chose when and if to provide information to Glenn Lewellen. Saul Rodriguez also chose what information to provide to Glenn Lewellen. Saul Rodriguez provided only

19

that information that would not compromise his ability to continue to buy and sell drugs. If it served Saul Rodriguez' interests, Saul Rodriguez asked Glenn Lewellen not to take action against certain individuals. Most of the time, Glenn Lewellen accommodated Saul Rodriguez' interests.

Saul Rodriguez typically called Glenn Lewellen or met with him in person to provide him with the information Saul Rodriguez chose to share with the CPD. Saul Rodriguez understood that Glenn Lewellen was the person responsible for initiating and conducting any investigation that resulted from the information he provided. The information Saul Rodriguez provided to Glenn Lewellen was typically vehicle registration information or information about the location at which drugs or money were being stored. Saul Rodriguez never swore out an affidavit or testified in court regarding the information he provided to Glenn Lewellen and his colleagues.

Saul Rodriguez further understood that Glenn Lewellen was the person responsible for requesting that he be paid for the information he provided. Glenn Lewellen told Saul Rodriguez when he and his colleagues seized drugs or money as a result of the information that Saul Rodriguez provided to him. CPD officers other than Glenn Lewellen delivered payment to Saul Rodriguez in cash. Saul Rodriguez' CPD CS file reflects that between 1996 and 2001, he was paid approximately $807,859. Glenn Lewellen told Saul Rodriguez that the IRS was unlikely to audit him or other CPD informants. Saul Rodriguez did not declare the money the CPD paid him on his tax returns, and therefore did not pay taxes on that money.

During the time that Saul Rodriguez worked for the CPD as a paid informant, Glenn Lewellen became aware that Saul Rodriguez was still buying and selling drugs separate and apart from his cooperation with the CPD. For example, in the Summer of 1996, Saul Rodriguez paid a mechanic to install and repair trap compartments in vehicles Rodriguez used to store and transport

20

marijuana.   Unbeknownst to Saul Rodriguez, the mechanic was working for the DEA as a confidential source.

Between May 1996 and September 1996, at the direction of the DEA, the mechanic installed and repaired trap compartments in cars, including a Buick, for Saul Rodriguez.  On June 6, 1996, Saul Rodriguez picked up the Buick from the mechanic.  On June 19, 1996, the DEA conducted surveillance of the Buick and watched as a courier drove it to the area of 48th and Racine.  The courier walked away from the area.  Law enforcement entered the Buick using a duplicate set of keys.  Law enforcement recovered approximately 154.6 pounds of marijuana inside of the Buick.  Law enforcement seized the marijuana and left the area.

Saul Rodriguez told Glenn Lewellen about the seizure because he wanted to find out what had happened and whether he was being investigated.  Glenn Lewellen told Saul Rodriguez that he would make some calls to figure out what had happened.  In July 1996, Glenn Lewellen twice spoke to DEA Agent Al Doescher, the agent leading the investigation of Saul Rodriguez.  Glenn Lewellen identified himself as a narcotics investigator with the CPD at 35th and Normal in Chicago.  Glenn Lewellen told Agent Doescher that Saul Rodriguez was serving as a confidential informant ("CI") in investigations of high level marijuana and cocaine distributors in the Chicago area.  Glenn Lewellen explained that the DEA's continued investigation of Saul Rodriguez would hamper the CPD's investigations in which Saul Rodriguez was serving as a CI.  Based on the foregoing information, Agent Doescher informed Glenn Lewellen that upon concurrence of the Assistant United States Attorney then assigned to the case, the DEA would terminate its investigation of Saul Rodriguez in order to further the CPD's investigation in which Saul Rodriguez was serving as a

confidential informant.  In September 1996, the DEA closed its investigation of Saul Rodriguez based on Glenn Lewellen's representations of Rodriguez' cooperation.

Following his conversations with Agent Doescher, Glenn Lewellen never told Saul Rodriguez who he called or what he found out about the seizure.  Glenn Lewellen also never told Saul Rodriguez to stop buying and selling drugs.  Instead, Glenn Lewellen and the CPD continued to use Saul Rodriguez as a confidential informant and pay him for the information he provided.

### B.   1998 Theft of Narcotics Proceeds

No later than 1998, Saul Rodriguez noticed that the CPD was paying him less money than what Glenn Lewellen had promised to pay him.  Saul Rodriguez' CPD CS file reflects that in or around 1998, the CPD started paying him less than $1,000 for every kilogram of cocaine that was seized as a result of the information he provided.  Saul Rodriguez complained about this to Glenn Lewellen.  Glenn Lewellen assured him that he would do something to address Saul Rodriguez' concerns.  Shortly after that, Glenn Lewellen gave Saul Rodriguez two kilograms of cocaine.  Saul Rodriguez understood that Glenn Lewellen obtained the cocaine from a seizure of cocaine that the CPD had made.  Saul Rodriguez understood that Glenn Lewellen was giving him the cocaine to address his concerns that he was not being paid enough for his cooperation with the CPD.  Saul Rodriguez sold the cocaine Glenn Lewellen gave to him.

Soon after Glenn Lewellen gave Saul Rodriguez two kilograms of cocaine, Saul Rodriguez and Glenn Lewellen worked together to steal approximately $500,000 from a cocaine supplier named Alex Estrada.[11]  The plans for the theft began when Alex Estrada came to Saul Rodriguez' parents' home with a bag containing what he claimed was $500,000.  Alex Estrada told Saul Rodriguez that

---

[11]Earlier this year, Alex Estrada was killed while a fugitive in Mexico.

he planned on using the money to buy his next shipment of cocaine. Alex Estrada told Saul Rodriguez that he was unable to find the supplier from whom he wanted to buy the cocaine. Alex Estrada asked Saul Rodriguez if he could store the money at Saul Rodriguez' parents' home. Saul Rodriguez agreed to let him do so.

A week later, Alex Estrada came back to Saul Rodriguez' parents' home. Alex Estrada took the bag containing the money and told Saul Rodriguez that he was going to buy the cocaine from a supplier near 62nd and Mozart. Later that same day, Alex Estrada contacted Saul Rodriguez and told him that he had been unable to buy cocaine from the supplier near 62nd and Mozart. Alex Estrada told Saul Rodriguez where he was located with the money. Saul Rodriguez met with Glenn Lewellen and gave him the information about Alex Estrada. Glenn Lewellen suggested that they should just take the money from Alex Estrada. Glenn Lewellen said that he would execute a traffic stop of the car in which Alex Estrada was transporting the money and then steal the money from Alex Estrada. Glenn Lewellen and Saul Rodriguez agreed to divide up whatever money Glenn Lewellen stole.

Later that same day, Glenn Lewellen called Saul Rodriguez and asked to meet. Once Saul Rodriguez arrived, Glenn Lewellen and Saul Rodriguez evenly split the money Glenn Lewellen had stolen. Saul Rodriguez' share was approximately $160,000, around $90,000 less than what he expected it to be given how much money Alex Estrada had told Saul Rodriguez he had in the bag. Saul Rodriguez figured that Glenn Lewellen had taken a portion of the money he had stolen from Alex Estrada before he split the money with him. Alex Estrada never told Saul Rodriguez that his money had been stolen.

23

### C.      1998/1999 Theft of Narcotics Proceeds

Soon after Glenn Lewellen stole the money from Alex Estrada, Saul Rodriguez told Glenn Lewellen about a home where a large amount of drug proceeds were being stored.  Saul Rodriguez cannot recall where the home was located or to whom the home was connected.  Glenn Lewellen told Saul Rodriguez that he and another police officer would go into the home, identify themselves as police officers, restrain anyone in the home, and then steal any cocaine or money from inside the home.  Glenn Lewellen  and Saul Rodriguez agreed that Glenn Lewellen, the other police officer, and Saul Rodriguez would split up the money.

Glenn Lewellen told Saul Rodriguez the day on which he and the other officer were going to go into the stash house.  Saul Rodriguez rented a room at a hotel, the name of which he cannot remember, in the area of 63rd and Harlem in Chicago.  Saul Rodriguez stayed there until Glenn Lewellen and the other officer arrived.  Saul Rodriguez believes that the other officer was assigned to the same group as Glenn Lewellen but that he has since passed away.  Once Glenn Lewellen and the other officer arrived at the hotel room, they counted the money they had obtained from the home, approximately $800,000, and divided it into thirds.

### D.      Glenn Lewellen's Obstruction of Justice on December 21, 1999

In or around July 1999, Saul Rodriguez provided information to Glenn Lewellen that resulted in Glenn Lewellen's July 8, 1999 arrest of Refugio Ruiz Cortez and the seizure of 10 kilograms of cocaine.  Glenn Lewellen was the sole eyewitness to Refugio Ruiz Cortez' crime, which was prosecuted by the government.  *United States v. Refugio Ruiz Cortez*, 99 CR 493 (Judge Rebecca Pallmeyer).

On December 20, 1999, Refugio Ruiz Cortez proceeded to trial, during which Glenn Lewellen testified. Glenn Lewellen's testimony regarding Refugio Ruiz Cortez' possession of the 10 kilograms of cocaine was false and designed to protect Saul Rodriguez and Rodriguez' drug operation. Glenn Lewellen testified that he saw Refguio Ruiz Cortez holding a bag containing 10 kilograms of cocaine and that . In fact, Glenn Lewellen took a bag containing 10 kilograms of cocaine from the trunk of Saul Rodriguez' courier, Individual A, after Refugio Ruiz Cortez had already distributed it to her. Glenn Lewellen denied having had contact with Individual A on that day.

On December 22, 1999, the jury found Refugio Ruiz Cortez guilty of the crime charged in the indictment. On March 24, 2000, Judge Pallmeyer sentenced Refugio Ruiz Cortez to 210 months imprisonment. In May 2010, the government moved to dismiss the indictment against Refugio Ruiz Cortez and asked that Judge Pallmeyer order him to be released from prison immediately based on Glenn Lewellen's false testimony. On June 1, 2010, Judge Pallmeyer granted the government's motion and ordered Refugio Ruiz Cortez released from prison.

### 1.    *Information from Glenn Lewellen's Trial Testimony*

On December 21, 1999, Glenn Lewellen testified that on July 8, 1999, at approximately 3:00 p.m., he and CPD Officer Noel Sanchez began surveillance of an apartment building located on West New York Street in Aurora, Illinois. Both officers were in unmarked police cars and were dressed in civilian clothing. Glenn Lewellen watched the rear of the apartment building, while Officer Sanchez watched the front of the building. Glenn Lewellen was the sole eyewitness with respect to the events that took place at the rear of the apartment.

Glenn Lewellen testified that between 3:00 p.m. and 7:25 p.m., he saw Refugio Ruiz Cortez repeatedly on the back porch of the residence on West New York Street.  According to Glenn Lewellen, at approximately 7:25 p.m., a silver car without license plates pulled into the parking lot of the residence on West New York Street so that the car's trunk was facing the back door of the house.  Glenn Lewellen testified that shortly after the silver car pulled into the parking lot, Refugio Ruiz Cortez returned to the back porch.  Glenn Lewellen claimed that Refugio Ruiz Cortez motioned to the silver car and returned inside the building.  Glenn Lewellen explained that he believed that a drug deal was about to occur, and as a result moved his surveillance vehicle closer to the parking lot and back porch.  Glenn Lewellen testified that because police backup for the officers had not arrived, he informed Officer Sanchez over their Nextel mobile phones that they would have to seize the drugs before the drugs reached the silver car.

Glenn Lewellen stated that a few minutes later, Refugio Ruiz Cortez returned to the back door of the building, stuck his head out the back door, and looked around.  Glenn Lewellen testified that Refugio Ruiz Cortez then walked onto the back porch, and again looking around in all directions.  Glenn Lewellen claimed that Refugio Ruiz Cortez was carrying a large, yellow bag that appeared to be very heavy.  Glenn Lewellen testified that Refugio Ruiz Cortez walked down the porch stairs and toward the silver car.  Glenn Lewellen explained that in order to break up the drug deal, he pulled his unmarked car into the parking lot of the residence on West New York Street.  Glenn Lewellen stated that he stopped his car next to the silver car and directly in front of Refugio Ruiz Cortez.  According to Glenn Lewellen, Refugio Ruiz Cortez looked at Glenn Lewellen, dropped the yellow bag, and ran back into the house.  Glenn Lewellen stated that the silver car fled the scene.  Glenn Lewellen testified that he then informed Officer Sanchez over the Nextel phone

that Refugio Ruiz Cortez had fled inside the house and instructed Officer Sanchez to watch the front of the house to ensure Refugio Ruiz Cortez did not escape through another door.

Glenn Lewellen testified that he retrieved the yellow bag from where Refugio Ruiz Cortez had dropped it in the parking lot. According to Glenn Lewellen, the yellow bag contained approximately 10 kilograms of cocaine. Glenn Lewellen stated that he secured the cocaine in the trunk of his police car. Glenn Lewellen explained that shortly thereafter, he and Officer Sanchez, who had joined him in the rear parking lot, entered the back door of the residence at West New York Street and saw that there was a closed apartment door on the right side of the building. According to Glenn Lewellen, the closed apartment door was in the same direction that Refugio Ruiz Cortez had turned each time he entered the back door. Glenn Lewellen testified that he knocked on the apartment door. Glenn Lewellen stated that Refugio Ruiz Cortez opened the door and was immediately arrested.

### 2. *Information from Saul Rodriguez*

While working as a confidential source with the CPD, in July 1999, Saul Rodriguez gave Glenn Lewellen information about an area in the western suburbs of Chicago to which Saul Rodriguez was going to send his courier, Individual A, to pick up approximately 20 kilograms of cocaine. During Saul Rodriguez's conversation with Glenn Lewellen, Saul Rodriguez mentioned that Individual A would be driving a grey colored Dodge Intrepid to pick up the cocaine. Saul Rodriguez understood that Individual A typically stored the drugs and money she transported on Saul Rodriguez's behalf in the trunk of the Intrepid. Saul Rodriguez understood that Glenn Lewellen and his colleagues would go to the area Saul Rodriguez had described and attempt to seize cocaine or money from that location. Saul Rodriguez expected that the CPD would pay him if it made a seizure

as a result of the information he provided to Glenn Lewellen.  Saul Rodriguez was not worried that

Glenn Lewellen or his colleagues would stop and arrest Individual A.

According to Saul Rodriguez, within hours or days of talking to Glenn Lewellen, Saul

Rodriguez directed Individual A to pick up 20 kilograms of cocaine.  As Individual A drove to the

area, individuals working for the cocaine supplier provided her with the exact address of the home

from which she should pick up the cocaine.  Individual A called Saul Rodriguez and provided him

with the address.  Saul Rodriguez then called Glenn Lewellen and provided him with the address at

which Individual A would be picking up the cocaine.  Saul Rodriguez understood that Glenn

Lewellen and his colleagues would travel to that address to conduct surveillance of the house and

seize drugs or money.

Within minutes of talking to Glenn Lewellen, Saul Rodriguez received a call from Individual

A.  Individual A sounded very scared.  Individual A told Saul Rodriguez that someone had pulled

her over and ordered her to open the trunk of the car.  Individual A told Saul Rodriguez that she did

so.  Individual A said that he saw the man open the trunk, look inside, and then shut the trunk.

Individual A said the man then ordered her to get out of the area.  Individual A did so.  Saul

Rodriguez told Individual A to not worry about it.

According to Saul Rodriguez, within hours or days, Glenn Lewellen told Saul Rodriguez that

the CPD had executed a search warrant on the  stash house from which Individual A had picked up

the 20 kilograms of cocaine.  Glenn Lewellen told Saul Rodriguez that drugs or drug proceeds were

recovered during the search and that arrests were made.  The CPD paid Saul Rodriguez $10,000 for

assistance he provided with regard to the July 8, 1999 seizure of approximately 10 kilograms of

cocaine from Refugio Ruiz Cortez.[12]   After the seizure, Glenn Lewellen never told Saul Rodriguez

to stop buying and selling drugs.   Instead, Glenn Lewellen and the CPD continued to use Saul

Rodriguez as a confidential source and to pay Saul Rodriguez for the information he provided.

### 3.   *Information from Individual A*

According to Individual A, between 1993 and 2003, she served as a courier picking up and

delivering drugs and drug proceeds for Saul Rodriguez.   In or around 1999, Saul Rodriguez asked

her to pick up cocaine directly from a man in the suburbs of Chicago.   Individual A agreed to do so.

This was the only time Saul Rodriguez ever asked Individual A to pick up cocaine directly from

another person.   Individual A drove her grey Dodge Intrepid to the address Saul Rodriguez had given

to her, and found it to be for a home in a residential neighborhood.   Once at the home, Individual A

met with a Hispanic man she had never seen before.   The man gave Individual A a duffel bag she

believed to contain approximately 10 kilograms of cocaine.   Individual A put the duffel bag in the

trunk of the Intrepid and was walking towards the driver's side door when a blue four-door vehicle

pulled out in front of her, blocking Individual A from leaving the area.   Individual A saw a white

man with grey hair who appeared to be approximately 6 feet tall and to be around forty years old get

out of the car and approach her.   The man identified himself as a police officer and demanded that

Individual A open the trunk of the Intrepid.   Individual A opened the trunk of her car by pressing a

button on the door of the Intrepid.   Individual A saw the man walk to the trunk area of the Intrepid

and then walk over to his car.   Individual A was so nervous that she did not look to see if the man

---

[12]   As set forth above, Saul Rodriguez recalls that the drug transaction was going to be for 20
kilograms of cocaine.

was carrying anything with him.  The man then shouted at Individual A to "get the fuck out of here" and drove away.  As soon as the man did so, Individual A drove away from the area.

As Individual A drove away from the area, she called Saul Rodriguez and told him about what had happened.  Saul Rodriguez told Individual A to calm down and go home.   Individual A did so.  Upon arriving home, Individual A looked inside of the trunk of the Intrepid and saw that the bag containing the cocaine was no longer there.  Individual A had not stopped anywhere between the time that she was stopped by the purported police officer and the time she checked the trunk. Individual A believes that the man who claimed to be a police officer took the bag of cocaine out of the trunk of the Intrepid.   Individual A did not talk to Saul Rodriguez for several days out of fear that the police were investigating them.  Individual A then went back to working as a drug courier for Saul Rodriguez.

### 4.   *Information from Refugio Ruiz Cortez*

On May 18, 2010, law enforcement interviewed Refugio Ruiz Cortez at the Schuykill Federal Correctional Institute in Minnersville, Pennsylvania.  Refugio Ruiz Cortez admitted to having given a female a bag containing 10 kilograms of cocaine in the doorway of his apartment on July 8, 1999. Refugio Ruiz Cortez did not see how the female arrived or left the area of his apartment building. Shortly after the female left with the bag containing the cocaine, Glenn Lewellen knocked on Refugio Ruiz Cortez' door.  Glenn Lewellen asked Refugio Ruiz Cortez where the cocaine was located inside of the apartment.  Glenn Lewellen then searched the apartment and placed Refugio Ruiz Cortez under arrest.  Glenn Lewellen later told Refugio Ruiz Cortez that the person to whom Refugio Ruiz Cortez had given the bag of cocaine had dropped the bag and run from the area.

### E.  June 3, 2000 Murder of Juan Luevano

#### 1.  *Information from Saul Rodriguez*

According to Saul Rodriguez, in approximately 1999, he learned that Juan Luevano, aka "Baby G," was dating his ex-girlfriend, Individual B.  Saul Rodriguez had lived with Individual B for a number of years, and at that time, had one child with her.  At the time Saul Rodriguez learned that Juan Luevano was dating his ex-girlfriend, Saul Rodriguez and Juan Luevano were best friends.  They had an understanding that they would never date the same woman.  Saul Rodriguez confronted Juan Luevano with his suspicions that Juan Luevano was dating Individual B.  Saul Rodriguez does not remember whether Juan Luevano denied having done so or not.  Saul Rodriguez never spoke to Juan Luevano again.

Shortly after talking to Juan Luevano for the last time, Saul Rodriguez instructed Individual C to set fire to Juan Luevano's black Chrysler LHS.  Saul Rodriguez had met Individual C through Individual A.  Saul Rodriguez told Individual C that Juan Luevano parked the Chrysler LHS behind the home of Juan Luevano's parents' home in the area of 47th and Laflin in Chicago.  Saul Rodriguez agreed to pay Individual C $500 for torching Juan Luevano's car.  Individual C later told Saul Rodriguez that he had set fire to Juan Luevano's car.  Saul Rodriguez paid Individual C for his work.

Months after having had Individual C destroy Juan Luevano's vehicle, Saul Rodriguez approached Glenn Lewellen about setting up Juan Luevano.  Saul Rodriguez told Glenn Lewellen that he wanted someone to go to jail for a long time.  Glenn Lewellen told Saul Rodriguez that if he wanted the person to go to jail for a long time, Saul Rodriguez would need to hide a large amount of cocaine in that person's home.  Saul Rodriguez provided Glenn Lewellen with Juan Luevano's

name and information.  Glenn Lewellen and Saul Rodriguez agreed that Saul Rodriguez would call

Glenn Lewellen after the cocaine was placed in Juan Luevano's home.

Saul Rodriguez later took approximately 2-3 ounces of cocaine and mixed it with cutting

agents to make a kilogram of cocaine.  After making the kilogram, Saul Rodriguez drove to Juan

Luevano's home and threw the kilogram onto the balcony of Juan Luevano's home.  Saul Rodriguez

then met with Glenn Lewellen and explained that he had thrown the kilogram of cocaine on to the

balcony of Juan Luevano's home.  Glenn Lewellen instructed Saul Rodriguez to meet with another

police officer and inform him that he  knew that there was cocaine inside of Juan Luevano's home.

Glenn Lewellen instructed Saul Rodriguez not to inform the other police officer that they had

spoken.  Later that same day, Saul Rodriguez met with the other police officer.  Saul Rodriguez

informed the other police officer that he had recently been in Juan Luevano's home and observed

cocaine in the apartment.  Saul Rodriguez later learned that the CPD searched the house, recovered

the cocaine, and arrested Juan Luevano.  Saul Rodriguez learned that Juan Luevano was later

released from custody.[13/]

Approximately one year after he discovered that Juan Luevano had been dating Individual

B, Saul Rodriguez was asked to meet with Individual D.  At the time, Individual D was serving time

in an Illinois Department of Corrections ("IDOC") facility.  Saul Rodriguez drove to the facility once

or twice and met with Individual D.  Saul Rodriguez made the trips with Individual E.  Individual

E was a mutual friend of Saul Rodriguez, Individual D, and Juan Luevano.

---

[13/]   According to CPD records, on October 15, 1999, CPD officers obtained a search warrant to search the home of Juan Luevano located at 1938 S. 49th Court in Cicero.  During the search, officers recovered approximately $7,000, a firearm and 1 kilogram of cocaine.  Officers subsequently arrested Luevano, who was charged with offenses stemming from the search.  Luevano bonded out.  The state charges were pending against Luevano at the time of his death.

According to Saul Rodriguez, he made the trips because of Individual D's status as an influential member of the La Raza street gang.  Though Saul Rodriguez was not an active member of La Raza at the time, Saul Rodriguez maintained a close connection with the gang in the hopes that if he ever got arrested, members of the gang could protect him in jail.  During the meetings, Individual D said that Juan Luevano had slept with Individual D's wife.  Individual D asked Saul Rodriguez to find someone to "get" Juan Luevano.  Saul Rodriguez understood that Individual D was asking him to find someone to kill Juan Luevano.  Saul Rodriguez agreed to do so.  Saul Rodriguez talked to Individual E about what Individual D had asked of him.  Saul Rodriguez asked Individual E to provide him with information about Juan Luevano's whereabouts.  Individual E told Saul Rodriguez that he visited bars with Juan Luevano on most Friday and Saturday nights.  Individual E offered to call Saul Rodriguez the next time he went out drinking with Juan Luevano.  Saul Rodriguez told Individual E that he (Rodriguez) was going to be directly involved in the shooting. Saul Rodriguez did not want Individual E to know that he was going to have two members of the City Knights street gang commit the murder.  Saul Rodriguez was concerned for his safety if the La Razas found out he had assisted the City Knights in murdering a member of the La Raza street gang.

Saul Rodriguez then met with Manuel Uriarte in the area of 48th and Wood Street in Chicago. Saul Rodriguez had first met Manuel Uriarte in high school.  Saul Rodriguez knew that Manuel Uriarte was a member of the City Knights street gang who had committed acts of violence blocks away from where he grew up.  During the meeting, Saul Rodriguez told Manuel Uriarte about Individual D's request that Juan Luevano be killed.  Manuel Uriarte told Saul Rodriguez that he would be happy to kill Juan Luevano and that Andres Flores would be the other shooter.  Manuel Uriarte told Saul Rodriguez that in exchange for killing Juan Luevano, he wanted Saul Rodriguez

33

to "look out" for him and Hector Uriarte. Saul Rodriguez understood that Manuel Uriarte was asking him to sell Manuel Uriarte and Hector Uriarte drugs or give them other opportunities to make money in the future in exchange for killing Juan Luevano.

During his conversation with Manuel Uriarte, Saul Rodriguez gave Manuel Uriarte Juan Luevano's address in Cicero, Illinois. Saul Rodriguez told Manuel Uriarte that a person close to Juan Luevano would be giving Saul Rodriguez information about Juan Luevano's whereabouts. Saul Rodriguez told Manuel Uriarte that he would pass that information along to him. Saul Rodriguez met with Manuel Uriarte and Andres Flores one or two times and discussed the plan. Manuel Uriarte and Andres Flores informed Saul Rodriguez they had been conducting surveillance at Juan Luevano's house.

On the night Juan Luevano was murdered, Saul Rodriguez spoke to Individual E who said that Juan Luevano was drinking at a bar in Chicago, and that he would call Saul Rodriguez again when Juan Luevano was leaving the bar. Saul Rodriguez called Manuel Uriarte and provided him with the information Saul Rodriguez had received from Individual E. Manuel Uriarte told Saul Rodriguez that he and Andres Flores were going to drive toward Juan Luevano's home. Saul Rodriguez then received another call from Individual E informing him that Juan Luevano was leaving the bar. Saul Rodriguez called Manuel Uriarte and gave him the message Saul Rodriguez had received from Individual E. Later that same night, Saul Rodriguez received a telephone call from Manuel Uriarte, who told him that "it's done." Saul Rodriguez understood Manuel Uriarte to be saying that he and Andres Flores had killed Juan Luevano.

Manuel Uriarte later told Saul Rodriguez that he and Andres Flores had shot Juan Luevano as Juan Luevano was exiting a vehicle near Juan Luevano's home. Manuel Uriarte explained that

34

Juan Luevano then walked towards the front door of Juan Luevano's home, where Manuel Uriarte and Andres Flores shot Juan Luevano again. Manuel Uriarte told Saul Rodriguez that Juan Luevano took it, meaning the shooting, like a gangster. Manuel Uriarte told Saul Rodriguez that he and Andres Flores had used revolvers to commit the crime. Saul Rodriguez understood that Manuel Uriarte used a revolver to commit the crime because the firearm would not discharge shell casings when it was fired. Manuel Uriarte told Saul Rodriguez that he and Andres Flores had dismantled the revolvers and disposed of them.

### 2.   *Information from Andres Flores*

In the Summer of 1999 or 2000, Manuel Uriarte approached Andres Flores about shooting Juan Luevano. Manuel Uriarte informed Andres Flores that Saul Rodriguez wanted Juan Luevano killed because Juan Luevano was dating Saul Rodriguez' ex-girlfriend, Individual B. At the time that Manuel Uriarte approached Andres Flores, Manuel Uriarte was dating Andres Flores' sister. Manuel Uriarte has since married Andres Flores' sister. Manuel Uriarte wanted Andres Flores involved in the killing because of Andres Flores' experience shooting people. Manuel Uriarte claimed that he would pay Andres Flores $10,000 to commit the murder.

Manuel Uriarte later informed Andres Flores that Saul Rodriguez provided Juan Luevano's address in Cicero. After Manuel Uriarte learned Juan Luevano's address, Manuel Uriarte and Andres Flores conducted surveillance on the residence three or four times. Andres Flores and Manuel Uriarte planned to kill Juan Luevano when he either left or arrived at his home. Manuel Uriarte and Andres Flores later met with Saul Rodriguez to discuss what Manuel Uriarte and Andres Flores had observed at Juan Luevano's house.

While conducting surveillance, Manuel Uriarte and Andres Flores were standing across the street from Juan Luevano's house when a car arrived. Andres Flores and Manuel Uriarte observed Juan Luevano and a female exit the vehicle and enter the house. Manuel Uriarte and Andres Flores were unable to get into position to shoot Juan Luevano. Manuel Uriarte and Andres Flores broke the window out of the home and stole the purse that was located inside. Manuel Uriarte later showed Andres Flores a picture of Juan Luevano that was in the purse. Andres Flores understood that Manuel Uriarte knew Juan Luevano, but Manuel Uriarte never explained how he knew him.

On the night of the shooting, Manuel Uriarte called Andres Flores and explained that Saul Rodriguez had just called to inform him that Juan Luevano was at a bar drinking and would be home later. Manuel Uriarte and Andres Flores then drove to the area of Juan Luevano's house. Both armed with handguns, Manuel Uriarte and Andres Flores waited in a gangway across the street from Juan Luevano's house. After waiting more than an hour, Andres Flores observed a vehicle park in the area of Juan Luevano's house. Andres Flores then observed a male walk toward the house, Andres Flores and Manuel Uriarte then walked across the street and fired several shots. Andres Flores recalled that he shot Juan Luevano from a distance of 5 to 10 feet and knew that Juan Luevano was dead. After the shooting, Manuel Uriarte and Juan Luevano then ran from the area to their vehicle and left the area. Manuel Uriarte gave Andres Flores $5,000 for the shooting. Andres Flores gave Manuel Uriarte the guns from the shooting. Andres Flores understood that Manuel Uriarte would get rid of the guns.

36

### F.      May 31, 2001 Murder of Michael Garcia

In 2001, Jorge Lopez asked Saul Rodriguez to kill Michael Garcia, aka "Snoop." Jorge Lopez explained that he believed Michael Garcia was responsible for killing his brother Edwardo Lopez. Jorge Lopez wanted Michael Garcia dead to avenge the death of his brother. Saul Rodriguez agreed to commit the murder for at least $10,000. Saul Rodriguez asked Manuel Uriarte to commit the murder for $10,000. Manuel Uriarte agreed to do so. Manuel Uriarte then asked Andres Flores to commit the murder for $5,000. Andres Flores agreed to do so. In the late evening hours of May 31, 2001, Andres Flores shot Michael Garcia to death in front of his home in Chicago. Manuel Uriarte drove Andres Flores to and from the shooting.

### 1.      *Information from Jorge Lopez*

On August 8, 1998, Jorge Lopez' brother, Edwardo Lopez, aka "Cubby," died of injuries suffered as a result of being hit by a car in the area of 55th and Kedzie in Chicago. At the time, Edwardo Lopez was a member of the Satan Disciples ("SD") street gang. After Edwardo Lopez' death, Jorge Lopez spoke with SD members who were with Edwardo Lopez at the time of his death. Those SD members told Jorge Lopez that members of the Latin Kings street gang were in the car that hit Edwardo Lopez. Those SD members further identified the driver of the car as a person nicknamed "Snoop."

For the next two and one-half years, Jorge Lopez gathered information about Snoop. During that time, Jorge Lopez obtained a description of Snoop, learned that Snoop lived in the area of 42nd or 43rd street, one block east of California, and that Snoop drove a blue mini van. Jorge Lopez subsequently conducted surveillance in the area of Snoop's house several times. On at least one occasion, Jorge Lopez saw Snoop near his home. Jorge Lopez got out of the car in which he was

conducting surveillance and walked toward Snoop.  Jorge Lopez had a 9mm semi-automatic firearm on him, but was unable to bring himself to shoot Snoop.

Shortly after the foregoing incident, Jorge Lopez and Saul Rodriguez had a series of conversations during which they discussed the death of Jorge Lopez' brother and Jorge Lopez' interest in killing Snoop.  The conversations took place at a gym in the Chicago area where both men worked out.  During those conversations, Jorge Lopez provided Saul Rodriguez with the information he had gathered on Snoop.  Saul Rodriguez offered to find someone to kill Snoop.  Saul Rodriguez told Jorge Lopez that the murder would cost him $10,000.  Jorge Lopez agreed to pay the fee.

Within a few months of hiring Saul Rodriguez to kill Snoop, Saul Rodriguez and Jorge Lopez met at Jorge Lopez' home and discussed that Snoop had been killed.  According to Jorge Lopez, Saul Rodriguez demanded that Jorge Lopez pay him $15,000.  Jorge Lopez did so.

## 2. *Information from Saul Rodriguez*

Saul Rodriguez knew that Jorge Lopez' brother Edwardo Lopez had died sometime in the late 1990s.  In the year after Juan Luevano was murdered, Jorge Lopez and Saul Rodriguez had a series of conversations during which they discussed the death of Jorge Lopez' brother and Jorge Lopez' interest in killing Snoop.  The conversations took place at a gym in the Chicago area where both men worked out.  During those conversations, Jorge Lopez provided Saul Rodriguez with the information he had gathered on Snoop.  Saul Rodriguez offered to find someone to kill Snoop.  Saul Rodriguez told Jorge Lopez that the murder would cost him $10,000.  Jorge Lopez agreed to pay the fee.

After Jorge Lopez agreed to the murder-for-hire, Saul Rodriguez contacted Manuel Uriarte and Andres Flores.  Saul Rodriguez asked Manuel Uriarte if they would be willing to kill someone for $10,000.  Manuel Uriarte and Andres Flores agreed to do so.  Saul Rodriguez showed Manuel

Uriarte and Andres Flores where Snoop lived and pointed out a van that Snoop drove.  Saul Rodriguez told Manuel Uriarte and Andres Flores that Jorge Lopez was the person who wanted the man killed.

Manuel Uriarte called Saul Rodriguez after the shooting and later met with him.  Manuel Uriarte told Saul Rodriguez that he (Manuel Uriarte) waited with Andres Flores for Snoop to arrive at the house but that Andres Flores was the person who shot Snoop as he was leaving his apartment carrying beer.  Manuel Uriarte said that Andres Flores then got back in the car with him and they drove away.  Manuel Uriarte said that Andres Flores should receive the $10,000 payment because Flores was the person who shot Snoop.  Saul Rodriguez and Jorge Lopez later met at Jorge Lopez' home and discussed that Snoop had been killed.  According to Saul Rodriguez, Jorge Lopez paid $10,000 for the murder.

### 3.   *Information from Andres Flores*

In the Summer of 2000, Andres Flores was working in Detroit, Michigan, when Manuel Uriarte contacted Andres Flores regarding another shooting.  Manuel Uriarte informed Andres Flores that Saul Rodriguez wanted an individual that lived on the second floor a house located in the area of California Ave. between 40th and 50th Streets shot and killed.  Manuel Uriarte did not inform Andres Flores of the victim's name but did know that the victim drove a minivan.

Manuel Uriarte and Andres Flores drove to the area in Andres Flores' van around 11:00 p.m. on the night of the shooting.  Manuel Uriarte parked near the victim's house and later gave Andres Flores a handgun.  Andres Flores walked toward the house and observed the mini van parked near the house.  While waiting near the house, Andres Flores observed two individual's leave the house and walk toward the van.  Andres Flores assumed that the individual that walked toward the driver's

39

side door was the intended victim.  As the driver was about to open the door of the minivan, Andres Flores ran toward him and started shooting.  Andres Flores estimated that he shot the victim approximately five times.  Andres Flores started shooting the driver at approximately 10 feet away, and continued shooting until Andres Flores was standing right next to him.  Andres Flores knew that the individual was dead.  Andres Flores then ran toward Manuel Uriarte's vehicle.

While in the van, Andres Flores told Manuel Uriarte what happened.  Manuel Uriarte then mentioned that he was going to call Saul Rodriguez to tell him what happened.  Andres Flores was paid $2,500 before this killing and $2,500 afterward.  Andres Flores bought a crib and other baby furniture with the money that he received from the shooting.

### 4.    *Information from Individual F*

According to Individual F, one day after Individual F's release from prison in 1998, Jorge Lopez' brother, who Individual F knew by the nickname "Cubby," was killed by members of a rival gang, the Latin Kings.  Individual F heard that the Latin Kings had run Cubby over with their car.  Jorge Lopez and Individual F talked about Cubby's death.  It was clear to Individual F that Jorge Lopez was devastated by the death of his brother.  Jorge Lopez told Individual F that he was not going to drink until the people responsible for Cubby's death were gone.  Individual F understood Jorge Lopez to be saying that he was not going to drink alcohol until the people responsible for Cubby's death were dead.

Two or three years passed during which Individual F never saw Jorge Lopez drink alcohol.  During that period of time, Individual F saw Jorge Lopez in social settings on a regular basis.  In 2000 or 2001, Jorge Lopez and Individual F were out in the neighborhood of 50th and Oakley in Chicago.  Jorge Lopez told Individual F something like "it's done, it's finally over," and suggested that they get

a drink.  Individual F understood Jorge Lopez to mean that he could drink again because the people responsible for killing Cubby had died.  Individual F and Jorge Lopez drank together that night.

### G.    2001 Kidnapping & Robbery of Victim A & Victim B

In or around 2001, Saul Rodriguez learned about a home in Will County where he believed wholesale quantities of cocaine and/or cocaine proceeds were being stored.  Saul Rodriguez, Glenn Lewellen, and Fares Umar agreed that they would enter the home, restrain anyone inside, and take any cocaine or cocaine proceeds located inside of the home.  Soon thereafter, Saul Rodriguez, Glenn Lewellen, and Fares Umar entered the home in Will County.  Glenn Lewellen and Fares Umar restrained the two men that were inside of the home.  Saul Rodriguez, Glenn Lewellen, and Fares Umar found duffle bags inside of the house containing at least 80 kilograms of cocaine.  Saul Rodriguez sold the cocaine and split the profits with Glenn Lewellen and Fares Umar.

### 1.    *Information from Saul Rodriguez*

In or around 2000 and 2001, Saul Rodriguez was buying cocaine from Individual G.  At some point during that time, Individual G told Saul Rodriguez that he was going to be meeting with a person near a Denny's restaurant in Will County.  Individual G told Saul Rodriguez that that the person with whom he was meeting had a large quantity of cocaine available for sale.  Saul Rodriguez had previously told Individual G about his involvement in stealing cocaine and money from people involved in the drug business.  Saul Rodriguez understood that Individual G was telling him about his meeting with the person at the Denny's restaurant so that he could locate the place where the person was storing cocaine or money, restrain anyone inside, and steal the cocaine or money from that location.  Individual G told Saul Rodriguez that he expected to receive a portion of whatever cocaine or money he was able to steal.

Saul Rodriguez subsequently had a series of conversations with Glenn Lewellen during which Saul Rodriguez provided Glenn Lewellen with the date, time, and location of the meeting between Individual G and the person with whom he was scheduled to meet. Saul Rodriguez gave Glenn Lewellen the information so that he could conduct surveillance of the meeting.

On the day of the meeting, Saul Rodriguez met with Fares Umar and asked him to participate in any home invasion that would result from Glenn Lewellen's surveillance of a person believed to have a large quantity of cocaine for sale. Saul Rodriguez and Fares Umar grew up in the same neighborhood. Saul Rodriguez approached Fares Umar for this task because of Fares Umar's large size, violent background, and ability to speak Spanish. Saul Rodriguez told Fares Umar that he and Glenn Lewellen would go inside of any location they tied to the person who had a large quantity of cocaine for sale, restrain anyone inside, and take any cocaine or money they found inside of the location. Fares Umar agreed to participate in the home invasion.

Glenn Lewellen called Saul Rodriguez while he was with Fares Umar. Glenn Lewellen said that he had found the home where the person he was surveilling might be storing cocaine. Glenn Lewellen, Fares Umar, and Saul Rodriguez met near the person's home, which Saul Rodriguez remembered was in Will County. The men agreed that Fares Umar and Glenn Lewellen would enter the home, restrain anyone inside, and steal whatever cocaine or money was inside of the home. The men agreed that Saul Rodriguez would conduct surveillance outside of the home. The men drove to the home where they believed the person Glenn Lewellen had been surveilling was keeping cocaine. Glenn Lewellen and Fares Umar entered the house while Saul Rodriguez remained outside. Ten or fifteen minutes later, Glenn Lewellen asked Saul Rodriguez to pull his car into the garage and come inside of the house. Saul Rodriguez did so.

42

Once inside of the house, Saul Rodriguez saw two Hispanic men that he did not recognize. Both men's hands and feet were tied together and their bound hands and feet were then tied together behind their backs. Both men's eyes were taped shut.  Saul Rodriguez understood that Glenn Lewellen and Fares Umar had restrained the men.  Within minutes of entering the house, Saul Rodriguez saw Fares Umar with two duffle bags that looked to be full.  Saul Rodriguez looked inside at least one of the bags and saw that it contained kilograms of cocaine.  Saul Rodriguez took the bags from Fares Umar, put them in the trunk of his (Saul Rodriguez') car and drove away from the house. Soon thereafter, Saul Rodriguez met with Glenn Lewellen and Fares Umar. Saul Rodriguez understood that Glenn Lewellen and Fares Umar had left the men they had kidnapped restrained, but alive, inside of the house.

Saul Rodriguez does not remember where he took the bags containing the cocaine.  Saul Rodriguez counted the contents of the bags and found them to contain a total of between 80 and 100 kilograms of cocaine.  Saul Rodriguez gave approximately $250,000 worth of the cocaine to Individual G, and sold the rest.  Saul Rodriguez kept approximately $300,000 to $350,000 in the proceeds from his sale of the cocaine.  Saul Rodriguez gave that same amount to Glenn Lewellen. Saul Rodriguez gave Fares Umar approximately $150,000 from the proceeds of his sale of the cocaine.

### H.     2001 Kidnapping & Robbery of Victim C

In 2001, Saul Rodriguez' brother-in-law Andres Torres told Saul Rodriguez that he was collecting and delivering cocaine proceeds for a cocaine supplier named Individual H.  Working with Andres Torres, Saul Rodriguez, Glenn Lewellen, and Fares Umar conducted surveillance of Individual H's money courier to whom Andres Torres delivered the cocaine proceeds.   That surveillance resulted in the identification of the home in which the money courier stored the cocaine proceeds Andres Torres delivered to him.   Saul Rodriguez, Glenn Lewellen, and Fares Umar subsequently entered the home by force, restrained the money courier inside, and took two duffle bags containing approximately $1,500,000 in cocaine proceeds.  Saul Rodriguez, Glenn Lewellen, Fares Umar, and Andres Torres each received a share of the cocaine proceeds.

#### 1.     *Information from Saul Rodriguez*

In or around 2000 or 2001 after the Will County home invasion and kidnapping, Saul Rodriguez' brother-in-law, Andres Torres, told Saul Rodriguez that he was helping a person to deliver large amounts of drug proceeds to money couriers who were responsible for getting the money back to Mexico.  Saul Rodriguez identified a picture of Individual H as the person Andres Torres was helping to deliver large amounts of drug proceeds to money couriers.  Saul Rodriguez first met Andres Torres shortly after meeting Torres' sister in 1997 or 1998.   Saul Rodriguez ended up marrying Andres Torres' sister.  When Saul Rodriguez first met Andres Torres, he was working as a painter.  Within a couple of years, Andres Torres began transporting drugs and drug proceeds for Saul Rodriguez, and transporting drug proceeds for other individuals, including Individual H.

Saul Rodriguez called Glenn Lewellen after learning about Andres Torres' work for Individual H and told him what Andres Torres was doing.  Glenn Lewellen and Saul Rodriguez agreed that they

should steal the money Andres Torres delivered to the money couriers.  Saul Rodriguez told Andres Torres about what he and Glenn Lewellen wanted to do.  Andres Torres agreed to help them out.

For the next couple of months, Andres Torres called Saul Rodriguez when he was delivering drug proceeds for Individual H.  Andres Torres often told Saul Rodriguez the approximate amount of money he was delivering.  The amount was always at least in the hundreds of thousands of dollars.  Andres Torres usually told Saul Rodriguez that the amount of money was not large enough to warrant stealing it.  Glenn Lewellen and Saul Rodriguez conducted surveillance of Andres Torres each time he delivered the drug proceeds to the money courier, and of the money courier as he transported the drug proceeds back to a home in the Chicago area.  Within a matter of weeks, Glenn Lewellen had determined that the home was located at or around the 2800 block of S. Kenneth in Chicago.

After following Andres Torres on his deliveries of drug proceeds for approximately two months, Andres Torres called Saul Rodriguez and told him that he was delivering over $1,000,000 in drug proceeds to the money courier at a location in Chicago.  Andres Torres and Saul Rodriguez decided that the amount of money was large enough to warrant them trying to steal it.  Saul Rodriguez called Glenn Lewellen and Fares Umar separately, and told them what Andres Torres had just said.  They agreed that Glenn Lewellen would follow Andres Torres to the location where he was delivering the drug proceeds to the money courier. They agreed that Glenn Lewellen would then follow the money courier to the house on S. Kenneth in Chicago.  They agreed that Saul Rodriguez and Fares Umar would drive to the area in which the house was located and wait for Glenn Lewellen.  They agreed that Glenn Lewellen and Fares Umar would then enter the house and steal the narcotics proceeds.

Ultimately, Saul Rodriguez, Fares Umar, and Glenn Lewellen met in the area of the money courier's home. Each man arrived in his own car. Glenn Lewellen, Saul Rodriguez, and Fares Umar got out of their cars and stood at the side of the money courier's home. While there, Saul Rodriguez saw a Hispanic man trying to enter the house with two large duffel bags. Glenn Lewellen and Fares Umar approached the man and led him into the house. Glenn Lewellen was wearing a ballistic vest and a chain with a police badge hanging around his neck.

Within minutes, Saul Rodriguez walked into the house. Saul Rodriguez saw the Hispanic man that he had seen outside restrained in one of the rooms of the house. The man's hands and feet were tied and the man's eyes were taped shut. Saul Rodriguez understood that Glenn Lewellen and Fares Umar had restrained the man. While in the house, Glenn Lewellen and Fares Umar found a firearm and bullet-proof vest, which they took along with the duffel bags containing what Saul Rodriguez thought were the drug proceeds Andres Torres had delivered to the money courier earlier that day.

Glenn Lewellen, Fares Umar, and Saul Rodriguez left the house together and then drove away in their respective vehicles. Fares Umar took the gun, bullet-proof vest, and bags of money with him. They left the man who was inside of the house restrained, but alive. Soon after that, Glenn Lewellen, Fares Umar, and Saul Rodriguez met in a garage where they counted the contents of the bags. They counted a total of $1,500,000. Saul Rodriguez gave himself and Glenn Lewellen the largest shares of the money. Saul Rodriguez gave Fares Umar approximately $150,000 to $200,000. Saul Rodriguez gave Andres Torres more money than Fares Umar.

### 2. *Information from Andres Torres*

Andres Torres has known Individual H since 1992. In approximately 1999, Individual H asked Andres Torres to help him collect and deliver drug proceeds on his behalf. Andres Torres did

46

so once that year.  In or around 2000 or 2001, Individual H asked Andres Torres to collect and deliver

drug proceeds on his behalf.  Andres Torres agreed to do so.  This time, however, Andres Torres

collected and delivered drug proceeds for Individual H on multiple occasions.

Soon after beginning to collect and deliver drug proceeds for Individual H again, Andres

Torres told Saul Rodriguez what he was doing.  Saul Rodriguez asked Andres Torres to tell him when

Individual H directed him to collect and deliver drug proceeds.  Andres Torres agreed to do so.

Andres Torres understood that Saul Rodriguez was asking Andres Torres for the information so that

Saul Rodriguez could use it to steal the money.  Andres Torres further understood that he would

receive a portion of whatever money Saul Rodriguez stole.

Approximately three or four months later, Individual H contacted Andres Torres and asked

him to collect and deliver another load of drug proceeds.  Andres Torres agreed to do so.  Individual

H explained that Andres Torres needed to transport bags of money to an unknown person that would

be waiting in the area of 60th and Pulaski in a white Dodge Intrepid.  After discussing this job with

Individual H, Andres Torres called Saul Rodriguez and told him what was happening.

Andres Torres later met with Individual H in a garage in the 6500 block of S. Laporte in

Chicago.  Individual H gave Andres Torres two duffel bags containing money.  Andres Torres put the

bags in a car which he drove to meet with the man in the white Dodge Intrepid.  At the meeting,

Andres Torres delivered the bags to the man in the white Dodge Intrepid.  Andres Torres did not

follow the man in the white Dodge Intrepid as he drove away from the meet location with the bags

of money.  Later that night, Individual H met with Andres Torres and told him that the police had

confiscated the money Andres Torres had delivered to the man in the white Dodge Intrepid.

47

A few hours after meeting with Individual H, Andres Torres met with Saul Rodriguez at his house on 37th Place in Chicago. While there, Saul Rodriguez told Andres Torres that he and others had stolen the money Andres Torres had delivered to the man in the white Dodge Intrepid. Saul Rodriguez told Andres Torres that he did not know the total amount that had been stolen. Saul Rodriguez later paid Andres Torres between $80,000 and $150,000 of the money that had been stolen. Saul Rodriguez later told Andres Torres that Fares Umar and Glenn Lewellen were involved in the theft of the money from Individual H's money courier.

## I.     2002 Kidnapping of Victim D

In 2001 or early 2002, Individual A suggested that Saul Rodriguez and others kidnap her grandmother, Victim D. At that time, Victim D had operated a bar on W. 47th Street in Chicago for more than two decades. Individual A claimed that Victim D had access to a large amount of money that she could use to pay a ransom to secure her release. Saul Rodriguez agreed to commit the kidnapping. In early 2002, at the direction of Saul Rodriguez, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, and Fares Umar participated in the kidnapping of Victim D. Saul Rodriguez "paid" a ransom of $80,000 to secure Victim D's release. Victim D subsequently paid Saul Rodriguez back with money from an unknown source. Saul Rodriguez split the proceeds of the ransom with Individual A and those who participated in the kidnapping.

### 1.     *Information from Victim D*

For the past 24 years, Victim D has operated a bar on 47th Street in Chicago. During that same period of time, Victim D has lived in an apartment above the bar. Victim D first met Saul Rodriguez at some time before 2002. Victim D understood Saul Rodriguez to be a friend of her granddaughter, Individual A.

Victim D stated that late one night in what she believes was December 2001, she got into her car, which was parked in front of her bar.  As she sat down, two Hispanic men dressed like "drug gang bangers" attempted to pull her out of her car.  Victim D did not recognize the men.  Victim D held on to the steering wheel of her car, which she began honking.  The men spoke to Victim D in Spanish.  Given their accents, Victim D believed that they were not native Spanish speakers and that they were from the United States.  The men were unable to pull Victim D and ran away from the area.  Before they did so, one of the men told her something along the lines of "this isn't a joke."

On a morning approximately one month later, Victim D was taking the garbage out behind her bar when she saw a blue van stopped at the corner.  Victim D saw a tall man standing next to the van.  Victim D dropped off the trash and was walking back towards her bar when a man grabbed her, put a bag over her head, and threw her into what she believed was the van she had just seen.

Once inside of the van, someone tied Victim D's hands together and feet together and then tied her hands and feet together behind her back.  Victim D was screaming and struggling to break free.  Victim D heard a man say in Spanish "cut her, cut her."  Based on what the man was saying Victim D stopped screaming and resisting.  Victim D was driven in the van for ten or fifteen minutes until it arrived at a garage.  Victim D was able to hear the garage door open, the van enter the garage, and the garage door close.

Victim D was kept inside of the van inside of the garage for two days and two nights.  At no point during that time was she given food or was she cut loose to use the bathroom.  While being held, Victim D heard the voices of three men.  All of the men spoke Spanish.  One of the men was the same man who had spoken when she was first put in the van.  Victim D believed that the men were non-native Spanish speakers and were from the United States.

49

Upon arriving at the garage, one of the men told Victim D that she would need to pay the people holding her $2,000,000 in order to secure her release.  Victim D explained that she did not have the money.  The man then asked Victim D to provide him with names and numbers of people who could pay a ransom to secure her release.  The man took a cell phone that Victim D had on her person when she was kidnapped.  Victim D directed the man to call her boyfriend, her son, and one of her daughters.  Victim D heard the man speak to her daughter, telling her "if you call the police, we'll kill her."

After what seemed to Victim D to be two days, one of the men said that a ransom of $80,000 was being paid to secure her release.  At the time, Victim D did not know who had paid the ransom. Victim D was driven around in the van for ten minutes and left on the ground in an alley.  Before leaving her, one of the men removed the tape from her hands and feet.  The man told Victim D to count to 100 or 200 before she removed the tape from her eyes.  Victim D followed those instructions.

After removing the tape from her eyes, Victim D walked to a church in the area of 36th Street in Chicago and contacted her family.  Victim D and her family never contacted the police.  Victim D was later told that her family paid a ransom of approximately $180,000 to the kidnappers.  Victim D paid those family members back for having paid the ransom.  Victim D denied having paid any money directly to Saul Rodriguez or Individual A.

### 2. *Information from Individual A*

One month before Victim D's kidnapping, Individual A told Saul Rodriguez that her grandmother had saved several hundred thousand dollars from her work at the bar.  Within days or weeks of this conversation, Saul Rodriguez and Individual A had a series of conversations during which he told Individual A that he wanted to kidnap her grandmother.  Individual A agreed to

participate in the kidnapping.  Saul Rodriguez agreed to pay Individual A a portion of any ransom paid to release her grandmother.  Saul Rodriguez did not tell Individual A who else would be involved in the kidnapping, where her grandmother would be held, or for how long she would be held.

The day before the kidnapping, Saul Rodriguez called Individual A while she was working at her grandmother's bar.  Saul Rodriguez wanted to know where her grandmother was and when she would be leaving her home the next day.  Individual A's grandma has lived in an apartment above the bar since the 1980s.  Individual A told Saul Rodriguez that her grandmother was sleeping upstairs and would not be leaving until the following day.

The next day, Individual A was at her home in Lyons, Illinois when she got a call from her aunt.  Individual A's aunt told Individual A that her grandmother was missing.  Individual A understood that her grandmother was missing because Saul Rodriguez had kidnapped her.  Individual A told her aunt that she would meet her at the bar.  Before Individual A got to the bar, she called Fares Umar.  Individual A met Fares Umar through Saul Rodriguez and socialized with him from time to time.  Individual A understood that Fares Umar was Saul Rodriguez' "muscle."  During the call, Individual A never asked Fares Umar whether he had kidnapped her grandmother.  Individual A assumed that Fares Umar was involved.  Rather, Individual A asked Fares Umar not to hurt her grandmother.  Fares Umar responded by saying that he would not hurt her.

Once at her grandmother's bar, Individual A met with family members waiting there.  While there, Individual A overheard her aunt receive a phone call.  After the call, Individual A's aunt said that the kidnappers had demanded $2,000,000 in exchange for her grandmother's release.  Individual A and her family attempted to pull together ransom money to pay to the kidnappers.  Ultimately, Individual A and her family put together over $100,000 in ransom money.

51

While putting the money together, Individual A talked to Saul Rodriguez over the phone. She told him how much money her family was able to put together. Saul Rodriguez agreed to "pay" $80,000 towards the ransom with the understanding that her grandmother would pay him back after she was released. Saul Rodriguez told Individual A to pick the money up from him in the Chicago area near Archer and Pulaski. Individual A did so and returned to her family with the additional money. Individual A placed all of the ransom money in the trunk of her grandmother's car, which was left in the area of McKinley Park.

Shortly after dropping off the ransom money, Individual A learned that her grandmother had been released in the area of 36th and Damen in Chicago. Individual A and other family members picked up her grandmother from that location and drove her home. Two or three days later, Individual A told her grandmother that Saul had paid $80,000 of the ransom and that she paid another $30,000. Over the next few months, Individual A's grandmother gave her two checks addressed to Saul Rodriguez paying him back for the ransom money.

In the months after her grandmother was released, Saul Rodriguez paid Individual A a total of $30,000 for her involvement in the kidnapping. Saul Rodriguez paid Individual A in cash. Over time, her grandmother also paid Individual A $30,000 as a "repayment" for the money she had contributed towards the ransom. The grandmother paid Individual A mostly in cash.

### 3.   *Information from Saul Rodriguez*

In or around 2001 or 2002, Individual A approached Saul Rodriguez about kidnapping her grandmother, Victim D. Saul Rodriguez identified a picture of Victim D as Individual A's grandmother. At the time, Individual A was working as a drug and money courier for Saul Rodriguez. Individual A complained that her grandmother had lots of money but was unwilling to give her any

52

of it.  Individual A claimed that her grandmother could come up with the money to pay a large cash ransom to secure her release.  Saul Rodriguez agreed to participate in the kidnapping.

After talking to Individual A, Saul Rodriguez had several separate conversations with Individual A, Fares Umar, and Hector Uriarte about kidnapping Victim D.  Saul Rodriguez believes that Jorge Uriarte and/or Manuel Uriarte was also involved in the kidnapping.  They agreed to kidnap Victim D outside of her bar.  They agreed that Victim D should be transported in a van to a garage near Archer and California that Saul Rodriguez rented where she would be held until she arranged for someone to pay a ransom to secure her release.

They agreed that the individuals responsible for taking Victim D should use her phone to contact Individual A.  They agreed that Individual A would tell Victim D that Saul Rodriguez would pay the ransom.  After Saul Rodriguez "paid" the ransom, the people holding Victim D would release her.  Victim D would then pay Saul Rodriguez back for the ransom he "paid" for her release.  They agreed to split whatever money Saul Rodriguez received.

On the day of the kidnapping, Saul Rodriguez understood that Fares Umar, Hector Uriarte, and Jorge Uriarte or Manuel Uriarte were in a van near Victim D's bar.  One of the men called Saul Rodriguez and told him that they had kidnapped Victim D.  According to Saul Rodriguez, Victim D was held for a few hours.  Saul Rodriguez understood that the men who kidnapped her would have restrained her by tying her hands and feet together and by taping her eyes shut.  Saul Rodriguez spoke with Victim D while she was being held.  Victim D asked if Saul Rodriguez could help pay a ransom to secure her release.  She sounded very scared as she asked Saul Rodriguez to do so.  Saul Rodriguez agreed to pay a ransom of $80,000 to $100,000 so long as Victim D paid him back.  She agreed to do so.

After speaking with Victim D, Saul Rodriguez instructed the men holding her to release her. Saul Rodriguez understood that the men released Victim D in another area close to where she had been held.  Saul Rodriguez talked to Victim D within days of her release.  Over the next six months or so, Victim D paid Saul Rodriguez the $80,000 to $100,000 he had allegedly paid to secure her release.  Saul Rodriguez gave Individual A at least half of the money.  Saul Rodriguez split the remaining money with the others who had participated in the kidnapping.

### 4.    *Information from Andres Flores*

In 2002, Manuel Uriarte informed Andres Flores that Saul Rodriguez and Individual A had a plan to kidnap Victim D and hold her for ransom. Andres Flores understood that Victim D owned a bar and lived either above it or nearby in the area near 47th St. in-between Kedzie and California. Manuel Uriarte later informed Andres Flores that Jorge Uriarte, Hector Uriarte, and Fares Umar would also be involved in the kidnapping.  Prior to the kidnapping, Andres Flores was instructed by Hector Uriarte or Manuel Uriarte to park in the area of the bar and watch for law enforcement.  Jorge Uriarte, Manuel Uriarte, and Fares Umar drove to Victim D's house in a conversion van.   Andres Flores parked in the area and waited for the others to kidnap Individual A's grandmother.

Once Individual A's grandmother was in the van, Andres Flores followed the van to a garage near McKinley Park in Chicago.  When Andres Flores arrived to the garage, he observed Individual A's grandmother inside.  Manuel Uriarte then instructed Andres Flores to watch the grandmother throughout the night.   Individual A's grandmother was blindfolded and kept in the van all night. Sometime during the night Individual A's grandmother asked Andres Flores to use the bathroom. Andres Flores called Hector Uriarte, Jorge Uriarte, or Manuel Uriarte for instruction.  One of the brothers told Andres Flores not to let Individual A's grandmother out of the van.  Andres Flores told

Individual A's grandmother to relieve herself in the van.  At some point the next day, Manuel Uriarte

called Andres Flores and told him to release Individual A's grandmother.  Andres Flores drove

Individual A's grandmother to an alley and let her go.

Andres Flores later learned from Manuel Uriarte or Hector Uriarte that Individual A's

grandmother paid around $100,000 in ransom.  Andres Flores also learned that Individual A's family

possibly "lent" her grandmother money to secure her release that her grandmother would have to pay

back.  A few days after Individual A's grandmother was released, Hector Uriarte or Manuel Uriarte

paid Andres Flores around $5,000 for assisting in the kidnapping.

### J.      December 24, 2002 Murder of Miguel De La Torre

On or about December 24, 2002, Saul Rodriguez lured a cocaine supplier named Miguel De

La Torre to a meeting in the Chicago area under the guise of paying him for a shipment of cocaine.

Prior to Miguel De La Torre's arrival, Saul Rodriguez, Hector Uriarte, Jorge Uriarte, and Manuel

Uriarte agreed to restrain Miguel De La Torre and torture him until he provided information about

the location of cocaine or money that the men could steal.  The men agreed to kill Miguel De La Torre

if he refused to provide the information.  Upon his arrival to the meeting, Jorge Uriarte and Manuel

Urirate restrained Miguel De La Torre, tortured him by burning and beating him, and strangled him

to death when he refused to provide the requested information.  Saul Rodriguez, Hector Uriarte, Jorge

Uriarte, and Manuel Uriarte left Miguel De La Torre's body in the trunk of his car, which they parked

in the Chicago area.  On January 23, 2003, the CPD found Miguel De La Torre's body.

According to Saul Rodriguez, in late 2002, he was purchasing cocaine from individuals

including Individual G.  In late 2002, Individual G told Saul Rodriguez that he was leaving town to

visit family in Mexico.  Individual G expected that he would be gone until February or March of the

following year.  Before he left, Individual G introduced Saul Rodriguez to his cousin, Miguel.  Saul Rodriguez identified a picture of Miguel De La Torre as the person he knows as Miguel.  Soon after meeting Miguel, Miguel offered to sell cocaine to Saul Rodriguez.  Saul Rodriguez accepted Miguel's offer.  Saul Rodriguez bought cocaine from Miguel with the intention of kidnapping Miguel and demanding that he either pay cocaine or cash ransom to secure his release, or identify his source of supply so that Saul Rodriguez could steal cocaine or money from that person.

In late 2002, Saul Rodriguez purchased 20 kilograms of cocaine from Miguel.  Miguel delivered the cocaine to Saul Rodriguez in a dark colored Nissan to one of the garages behind the home and the three-flat apartment buildings Saul Rodriguez owned on 37th Place.  Miguel fronted the cocaine to Saul Rodriguez.  Within a week or so, Saul Rodriguez contacted Miguel and told him that he was ready to pay him for a portion of the cocaine.  Saul Rodriguez directed Miguel to meet him in the front of the home and three-flat apartment buildings on 37th Place.  Miguel did so.  Saul Rodriguez delivered partial payment of the cocaine to him there.  Saul Rodriguez did so in order to make Miguel feel as if he could trust him.

After Saul Rodriguez made the first payment to Miguel, Saul Rodriguez contacted Hector Uriarte, Jorge Uriarte, and Manuel Uriarte about Saul Rodriguez' plan to kidnap Miguel.  Saul Rodriguez, Hector Uriarte, Jorge Uriarte, and Manuel Uriarte had several discussions that resulted in a plan regarding the kidnapping.  They agreed that Saul Rodriguez would lure Miguel back to the same garage where Miguel had delivered cocaine to Saul Rodriguez.  They agreed that Jorge Uriarte and Manuel Uriarte would be waiting in the garage for Miguel.  They agreed that Jorge Uriarte and Manuel Uriarte would scare Miguel into providing them with information about the location of cocaine or money, or the name of his supplier.  They agreed that Jorge Uriarte and Manuel Uriarte

would restrain, threaten, and physically harm Miguel in an effort to get him to provide that information. They agreed that if Miguel failed to provide the requested information, Jorge Uriarte and Manuel Uriarte would kill him. They did not discuss how Jorge Uriarte and Manuel Uriarte would kill Miguel. They agreed to split the proceeds from the sale of any cocaine or money they obtained.

Shortly after Saul Rodriguez, Hector Uriarte, Jorge Uriarte, and Manuel Uriarte agreed to participate in the kidnapping of Miguel, Saul Rodriguez called Miguel and told him that he was ready to pay Miguel the remainder of the money owed to him for the 20 kilograms of cocaine. Saul Rodriguez told Miguel to meet him in the same garage where Miguel had delivered the cocaine to him. Within hours, Miguel told Saul Rodriguez that he would be at the garage shortly. Manuel Uriarte and Jorge Uriarte entered the garage. Before Manuel Uriarte and Jorge Uriarte entered the garage, Saul Rodriguez gave them an extension cord they could use to strangle Miguel. Saul Rodriguez stayed near the garage. Saul Rodriguez cannot remember if Hector Uriarte was present on the day Miguel was killed. Saul Rodriguez saw Miguel enter the alley driving his dark colored Nissan and then saw Miguel drive into the garage. Saul Rodriguez stayed near the garage in a car. Saul Rodriguez was not able to hear anything that was happening inside of the garage. Saul Rodriguez never saw Miguel alive again.

Approximately 15 to 20 minutes later, Jorge Uriarte left the garage and spoke with Saul Rodriguez in person. Jorge Uriarte told Saul Rodriguez that Miguel was refusing to provide the requested information. Jorge Uriarte then returned to the garage. Several minutes later, Jorge Uriarte left the garage and spoke with Saul Rodriguez in person again. Jorge Uriarte told Saul Rodriguez that things had gotten out of control. Jorge Uriarte explained that Miguel had a stroke and died. Saul

57

Rodriguez understood that Miguel died because Jorge Uriarte and Manuel Uriarte had killed him. Saul Rodriguez understood that Miguel's body was still inside of the garage.

Jorge Uriarte, Manuel Uriarte, and Saul Rodriguez discussed where to leave Miguel's Nissan. Saul Rodriguez never saw Miguel's body after he had been killed. Saul Rodriguez understood that Jorge Uriarte and Manuel Uriarte had put his body in the trunk of the Nissan. At first, someone suggested that the Nissan be driven to and left in Indiana. Jorge Uriarte wanted to avoid toll roads so that Miguel's Nissan and anyone inside of it would not be photographed. They agreed that Manuel Uriarte and Jorge Uriarte would drive the Nissan somewhere in the Chicago area. They agreed that Saul Rodriguez would follow them in a separate car.

Saul Rodriguez followed Jorge Uriarte and Manuel Uriarte as they drove the Nissan to a residential area near I-94 and Diversey in Chicago, where they parked the car. After parking and exiting the Nissan, Jorge Uriarte and Manuel Uriarte got into the car in which Saul Rodriguez was traveling. They then drove back to the area of the home and apartments on 37th Place. While driving there, they discussed how Miguel had been unwilling to give Jorge Uriarte and Manuel Uriarte any information about where he was storing cocaine or money, or about the identity of his supplier. They discussed how Miguel had not died as a result of having had a stroke. Instead, Jorge Uriarte and Manny admitted to having strangled Miguel to death. Jorge Uriarte and Manuel Uriarte talked about how a bad smell came from Miguel as they were strangling him. Jorge Uriarte told them that now that Miguel was dead, it was "over" and they should never talk about the murder again. They all agreed to keep quiet about the murder.

While on their way back to the home and apartments on 37th Place or soon after that, Jorge Uriarte gave Saul Rodriguez Miguel's personal belongings to destroy. Those belongings included

58

a set of keys and a wallet.   Saul Rodriguez returned to the same garage in which Miguel died and

burned Miguel's personal belongings.  Days after Miguel was killed, Saul Rodriguez got a call from

Individual G.   Individual G told Saul Rodriguez that Miguel was missing.  Saul Rodriguez told

Individual G that he had not seen Miguel in several days.   Months later, Saul Rodriguez met with

Individual G at Xtreme Gym.  During the meeting, Individual G told Saul Rodriguez that Miguel's

body had been found on the north side of Chicago.  Saul Rodriguez paid Jorge Uriarte and Manuel

Uriarte between $40,000 and $80,000 each for having killed Miguel.  Saul Rodriguez got the money

from his sale of the other part of the cocaine for which he never had to pay Miguel.  Hector Uriarte

asked Saul Rodriguez to pay Jorge Uriarte and Manuel Uriarte more money, but he never did.

### K.    2003 Kidnapping and Robbery of Victim E

In or around 2000 or 2001, a cocaine supplier, Individual I, identified to Saul Rodriguez the

person, Victim E, from whom he was picking up cocaine in the Chicago area.[14] Individual I identified

Victim E's home as being on 44th Street in Lyons, Illinois.  Saul Rodriguez shared the information

he had learned from Individual I with Glenn Lewellen and Fares Umar.  Glenn Lewellen, Fares Umar

and Saul Rodriguez conducted surveillance of Victim E's home.  They agreed to break into the home,

restrain anyone inside, and steal any money or cocaine found inside.  They agreed that once inside of

the house, Glenn Lewellen and Fares Umar would identify themselves as police officers.

On the day of the home invasion, Glenn Lewellen, Fares Umar, and Saul Rodriguez were

outside of Victim E's home in separate vehicles.  Glenn Lewellen and Fares Umar got out of their

vehicles and approached the back of Victim E's home.  Glenn Lewellen was wearing a ballistic vest

---

[14] Based on information collected by law enforcement, we have reason to believe that this incident
took place in or around 2003 rather than in 2001.

and badge on a chain around his neck.  Saul Rodriguez then saw Glenn Lewellen and Fares Umar enter the home of Victim E.

Within minutes, Saul Rodriguez saw Glenn Lewellen leaving Victim E's and walk towards Saul Rodriguez in his vehicle.  Glenn Lewellen told Saul Rodriguez that they had found Victim E, who they had tied up.  Glenn Lewellen said he and Fares Umar had been unable to find any cocaine or money in the house.  Glenn Lewellen told Saul Rodriguez that Victim E was unwilling to provide any information about the location of cocaine or money.  Glenn Lewellen asked Saul Rodriguez if there was a place they could take Victim E.  Saul Rodriguez told Glenn Lewellen that they could take him to the garage on S. Seeley in Chicago that Saul Rodriguez was renting.  Fares Umar drove Victim E to the garage in his van.  Saul Rodriguez drove there in his vehicle.  Glenn Lewellen did not come along.

Once there, Saul Rodriguez saw that Victim E was sitting in Fares Umar's van with a bag or some other item over his head.  Saul Rodriguez told Fares Umar to make Victim E talk about where the cocaine or money was hidden.  Saul Rodriguez heard Fares Umar yell at Victim E in Spanish, demanding to know where the cocaine or money was hidden.  Fares Umar told Saul Rodriguez that Victim E refused to talk and that they needed to try a different tactic.  Fares Umar and Saul Rodriguez agreed that Fares Umar should hit Victim E in the ribs until he agreed to give them the requested information.  Saul Rodriguez saw Fares Umar enter the van where Victim E was being held, and then heard him punching Victim E at least twice, for around thirty seconds each time.  After being punched repeatedly, Saul Rodriguez heard Victim E say in Spanish that his ribs were broken.  Saul Rodriguez then heard Victim E say that there was cocaine in an old car in the garage of his home.

Fares Umar and Saul Rodriguez then left Victim E restrained in the van inside of the garage at 3642 S. Seeley in Chicago.  Fares Umar and Saul Rodriguez drove together back to the home of Victim E.  Once there, they entered the garage of the home of Victim E, and searched the older car parked inside of the garage.  They found 20 kilograms of cocaine inside of the trunk of the car. Shortly after that, Fares Umar and Saul Rodriguez returned to the garage on S. Seeley in Chicago. They released Victim E in the area.  Saul Rodriguez later called Glenn Lewellen and lied that Fares Umar and Saul Rodriguez had been unable to find any cocaine or money in the home of Victim E. Saul Rodriguez sold the 20 kilograms of cocaine he and Fares Umar stole from the home of Victim E and split the profits with Umar.

### L.    Theft of Narcotics Proceeds from Individual J

In or around the Spring of 2003, Hector Uriarte told Saul Rodriguez that he owed Individual J $36,000 for two kilograms of cocaine that Individual J had fronted to him.  Saul Rodriguez knew "Individual J" to be a real estate agent at a company next to the Las Islas Marias restaurant near 53rd and Pulaski in Chicago.  Hector Uriarte told Saul Rodriguez that he did not want to pay Individual J for the cocaine, and asked Saul Rodriguez for help.  Hector Uriarte wanted to deliver the money to Individual J at his home in the area of Cicero and 79th Street in Chicago, and then have Glenn Lewellen appear to conduct a traffic stop of Hector Uriarte before he had the opportunity to deliver the money to Individual J.  Hector Uriarte thought that Individual J would believe that law enforcement had seized the money from Hector Uriarte, and therefore not make Hector Uriarte pay for the cocaine.  After talking to Hector Uriarte, Saul Rodriguez called Glenn Lewellen and told him about Hector Uriarte's plan.  Glenn Lewellen agreed to participate in the theft of the money.

Within days, Hector Uriarte told Saul Rodriguez that he was ready to deliver the money to Individual J. Glenn Lewellen and Saul Rodriguez drove to the area of Individual J's home in separate cars. Glenn Lewellen was driving an older model Caprice Classic that had a siren installed in it. Saul Rodriguez had borrowed the car from a girlfriend so that Glenn Lewellen could appear as if he were a police officer. After meeting up with Glenn Lewellen, Lewellen and Saul Rodriguez drove in separate cars towards Individual J's home. As Saul Rodriguez did so, he saw Hector Uriarte's car in front of Individual J's home. Individual J was standing next to Hector Uriarte's car. Saul Rodriguez then heard Glenn Lewellen activate the siren of the Caprice Classic. Saul Rodriguez saw Hector Uriarte pull away from Individual J's house. Saul Rodriguez saw Glenn Lewellen follow Hector Uriarte away from the area. Saul Rodriguez stayed where he was at.

Minutes later, Glenn Lewellen and Saul Rodriguez met up near Individual J's home. Later that same day, Saul Rodriguez talked to Hector Uriarte. Saul Rodriguez told Hector Uriarte to pay Glenn Lewellen $18,000 and to keep the other $18,000 for himself. Hector Uriarte agreed. Hector Uriarte gave Saul Rodriguez $18,000, which Rodriguez gave to Glenn Lewellen. Hector Uriarte told Saul Rodriguez that Individual J did not believe that the car Glenn was driving was actually a police car. Individual J explained that the car was too old to still be used by the police. Saul Rodriguez knew Individual J was right. This led Saul Rodriguez to buy the Crown Victoria that was used in future kidnappings and home invasions. Saul Rodriguez' purchase of the Crown Victoria is detailed below.

### M.     May 29, 2003 Kidnapping of Victim F

In 2003, Saul Rodriguez, Hector Uriarte, Jorge Uriarte, and Fares Umar planned the kidnapping of Saul Rodriguez' friend Victim F. Saul Rodriguez knew Victim F and his family had

access to money that could be used to pay a ransom to secure his release. On or about May 29, 2003, Hector Uriarte, Jorge Uriarte, and Fares Umar kidnapped Victim F from outside of his home, restrained him, and transported him to another location where he was threatened. Hector Uriarte, Jorge Uriarte, and Fares Umar demanded that Victim F arrange that a ransom be paid to secure his release. Victim F called Saul Rodriguez and asked him to help pay the ransom. Victim F did so not knowing that Saul Rodriguez had coordinated his kidnapping. Saul Rodriguez agreed to pay a ransom of at least $700,000 so long as Victim F agreed to pay him back. Saul Rodriguez "paid" the ransom and Victim F was released. Over the next few years, Victim F "repaid" Saul Rodriguez at least $700,000, much of which came from Victim F' sale of real estate.

### 1.   *Information from Victim F*

Victim F is 33 years old and has lived in the Chicago area nearly all of his life. Victim F' father owns a rim shop in Chicago. Victim F met Saul Rodriguez before 2000 while working at his father's rim shop. Saul Rodriguez bought rims from the shop and referred many other customers to the shop. While at the shop, Saul Rodriguez would often ask whether the rim shop was a profitable business. At some point, Saul Rodriguez wanted to invest money in the shop. Victim F and his father never took Saul Rodriguez up on his offer. In 2000, Victim F started his own business through which he buys, remodels, and sell houses.

On May 29, 2003, Victim F was living in a three-flat building on the north side of Chicago. Between 10:00 and 11:00 a.m., Victim F walked out the back of the building and down the stairs to the backyard, where he had parked his black Cadillac Escalade EXT. The backyard butted up against an alley. While walking down the stairs, Victim F saw a person wearing a hooded sweatshirt leaning up against the corner of his neighbor's garage. There was a grocery cart near the person. As Victim

63

F was walking through the backyard towards his Escalade, a man quickly approached him and put what he believed was a gun against his head. Victim F believed it was a gun because he had the opportunity to quickly glance at it. Victim F also believed it was a gun because he could feel the barrel of the gun against his head. The man identified himself as a police officer. Victim F noticed that the man was tall, and had a large build. Victim F believed that the man that came up to him claiming to be a police officer was the same person that he had seen only moments before leaning up against his neighbor's garage. Victim F believed that because of what the man was wearing, and because he had not seen anyone else in the area.

The man claiming to be a police officer instructed Victim F to put his hands up. Victim F did so. The man searched Victim F, put his hands behind his back, and tied his hands together with what he felt were plastic straps. During this time, Victim F was asking the man what this was about. Victim F also told him that he had the wrong guy. Within seconds a van arrived. As it did, the man told Victim F something like "we've got the right guy, you're coming with us." The man's words and actions made Victim F believe that he was not a police officer. Victim F started to try to move away from the man. The man got Victim F into a bear hug and wouldn't let him go. Once the van arrived, Victim F saw a second man get out of the van and come over to where he was standing. That man put a bag over Victim F' head while the man claiming to be the police officer held on to him. The two men then put Victim F into the van.

Once inside of the van, one of the men placed duct tape over the top of the bag around Victim F' eyes and mouth. One of the men hog tied Victim F, by putting duct tape around his hands and feet, and then tying his hands and feet together behind his back. Victim F noticed that the van was driven around for about an hour before it stopped and entered what he believed was a garage. Once inside

64

of the garage, one of the men brought what Victim F believed was one or two dogs inside of the van. The man told Victim F that the dogs would attack him if he tried to escape.

Victim F remained tied up in the van until he was released late that night. Victim F was never given any food or the opportunity to use the restroom. Victim F believed that at least two men were responsible for taking and holding him. Victim F believed that based on hearing two different voices. Both men spoke to him in English the entire time. Both men used slang terms that he had heard gang members use in the past.

While Victim F was being held, one of the men told Victim F that he and the people that he was with knew everything about Victim F. The man described how Victim F had gone to the Blockbuster the day before he was kidnapped. Victim F had done so. The man said something like "we're professionals," and explained that Victim F would need to pay a ransom in order to secure his release. That man explained that they didn't want to take Victim F' jewelry or cars. The man explained that Victim F would need to call someone who would be willing to pay the ransom for his release.

The man grabbed Victim F' cell phone, which he had on him. Victim F heard the man reciting names that he had saved as contacts in his cell phone. Several minutes later, the man recited the name "Saul." Victim F knew that the name Saul was for Saul Rodriguez. When the man mentioned Saul's name, Victim F told him to call the number. The man did so and put the phone up to Victim F' face. Victim F then talked to Saul Rodriguez. Victim F explained that he had been kidnapped and needed help in paying a ransom. Saul Rodriguez told Victim F to relax and that he knew how to talk to the people who had kidnapped him. Saul Rodriguez told Victim F to put the man back on the phone. The man took the phone away, and walked away so that Victim F could not hear what he was saying.

65

Within the next thirty minutes, one of the men who was holding Victim F put the phone up against his face.  Victim F heard Saul Rodriguez' voice on the other end of the phone.  Saul Rodriguez told Victim F that the men who had taken him wanted $400,000 in order to release him.  Saul Rodriguez asked Victim F to let him talk to the men who had taken him.  One of the men holding him took the phone away from Victim F, and walked away from the area so that he couldn't hear what was being said.  Soon after that, the man came back and told me something like "you better hope that your friend comes through."  Victim F explained that it wasn't about the money.  Victim F explained that he was in real estate but could not get any money to secure his own release while being held.  The man responded by something like, "Oh, so you have plenty of money?  Guess what?  It just went up."

Shortly after the conversation, one of the men put a phone up to Victim F' face.  Victim F heard Saul Rodriguez' voice on the other end of the phone.  Saul Rodriguez asked Victim F what he had told the men.  Saul Rodriguez explained that the men who had taken Victim F now wanted him to pay them double the ransom that they had previously asked for.  One of the men took the phone away from Victim F and walked away from the area so that he couldn't hear what he was saying.  A few minutes later, one of the men put the phone back up against Victim F' face.  Saul Rodriguez explained that he was going to pay $700,000 to secure Victim F' release.  Saul Rodriguez told Victim F that he would need to be paid back right away.

An hour or so later, one of the men told Victim F that they had gotten paid,  needed to count the money, and would release him after dark.  Many hours later that day, the men got back into the van with Victim F.  Victim F was wearing a Rolex watch.  It was the President style watch that had a black face and diamond encrusted numbers.  Victim F had spent about $20,000 on the watch.  One

of the men took the watch from Victim F' wrist.  Minutes after one of the men took Victim F' Rolex, Victim F heard the garage door open and felt the van begin to move.  The van drove around for twenty minutes or so before it came to a stop.

While the van was moving, one of the men told Victim F that they would know if he talked to the police and warned him that if he did so they would "get" people that he knew.  Once the van stopped, one of the men cut the duct tape from Victim F' feet and hands.  One of the men got Victim F out of the van and put him on the ground.  Moments later, Victim F heard the van leave.  A short time later, Victim F took the tape off of his eyes.  There was a plastic bag next to him that contained his keys, identification, and phone.  Victim F called a friend to pick him up.  The friend picked up Victim F and drove him to the rim shop.

Victim F met with Saul Rodriguez at the rim shop.  Victim F asked Saul Rodriguez for details about his discussions with the men who had taken him and how he had paid the ransom.  Saul Rodriguez told Victim F not to worry about it, that he should get some rest, and that they would talk about it another time.  One or two days later, Victim F met again with Saul Rodriguez.  During the meeting, Saul Rodriguez told Victim F that he had paid the kidnappers $700,000 and that he had borrowed part of that money from other people.  Victim F told Saul Rodriguez that he would pay him back.

Between the Summer of 2003 and November 2006, Victim F paid Rodriguez over $700,000 as repayment for the ransom that he had paid for his release.  Victim F paid Rodriguez by cash, check, and wire.  Victim F generally drew the money he paid to Rodriguez from his personal checking account and his business checking account.  The money in those accounts came mostly from Victim F' sale of real estate.  Once or twice, Victim F got the money from friends and family.

67

Victim F remained friends with Saul Rodriguez after he was kidnapped.  Victim F last saw Saul Rodriguez in late March or early April 2009.  Saul Rodriguez came to see Victim F at his office near North and Ashland in Chicago.  Saul Rodriguez told Victim F that he might be going away for awhile and that Victim F probably wouldn't see him again.  Saul Rodriguez thanked Victim F for his friendship, gave him a hug, and left.

## 2.    *Information from Saul Rodriguez*

In or around the Summer of 2003, Saul Rodriguez coordinated the kidnapping of Victim F. Saul Rodriguez first met Victim F while Victim F was working at a rim shop that was owned by Victim F' father.  Saul Rodriguez often went to the rim shop to purchase rims and tires for vehicles he owned.  Saul Rodriguez also recommended that other people buy rims and tires from the store. During the time that Saul Rodriguez hung out at the rim shop, he became friends with Victim F. Based on what Saul Rodriguez heard and saw at the rim shop, he believed that Victim F and his family had lots of money.  At some point, Victim F stopped working at the rim shop to start a career investing in real estate.  Saul Rodriguez believed that Victim F was making a large amount of money in real estate.

Saul Rodriguez decided to kidnap Victim F and hold him for a ransom of cocaine or money. At first, Saul Rodriguez planned to kidnap Victim F with the help of Glenn Lewellen, Fares Umar, Hector Uriarte, and Jorge Uriarte.  Saul Rodriguez cannot remember if Manuel Uriarte was involved or not.  The group of them did surveillance of Victim F to figure out his daily routine.   Glenn Lewellen conducted surveillance of Victim F a couple of times.   Glenn Lewellen then became impatient about their progress and stopped helping them out.  Everyone else stayed involved.  They ultimately agreed that Fares Umar would dress like a homeless person and push a shopping cart down

68

the alley behind Victim F's house at the time when he would usually leave the house. They agreed that Fares Umar would then rush up to Victim F and force him into a van occupied by Hector Uriarte and Jorge Uriarte. They agreed that Fares Umar, Hector Uriarte and Jorge Uriarte would then drive Victim F to Fares Umar's garage where Victim F would be held until someone paid a ransom to secure his release. They agreed that Saul Rodriguez would not be present when Victim F was kidnapped or when he was being held since Victim F knew him, and would be able to identify his voice.

Saul Rodriguez was about a block away in a separate car when the kidnapping took place. Fares Umar, Hector Uriarte, or Jorge Urirate called Saul Rodriguez and told him that they had gotten Lopez. Saul Rodriguez drove behind the van to Fares Umar's home. Saul Rodriguez parked and went inside Fares Umar's house and talked to Fares Umar. Saul Rodriguez told Fares Umar to direct Victim F to tell them who could come up with ransom money of $500,000. Victim F supposedly asked Fares Umar, "Is that all my life is worth?" Ultimately the ransom was increased to $1,000,000 because of his comment. Victim F made a number of calls, but was unable to reach anyone. Victim F then asked to speak with Saul Rodriguez. Saul Rodriguez was very close to where Victim F was being held when Saul Rodriguez got the call from him. In fact, Saul Rodriguez could have been in Fares Umar's yard. Victim F told Rodriguez that he had been kidnapped and was being held for money. Victim F asked if Saul Rodriguez could pay the ransom of $1,000,000. Saul Rodriguez told Victim F Lopez that he would be willing to pay the ransom. Saul Rodriguez told Victim F that he would speak to the kidnappers and make sure that he got released. Saul Rodriguez spoke to Fares Umar, and instructed him to release Victim F after a few hours.

69

A few hours after Saul Rodriguez spoke to Victim F, Fares Umar, Hector Uriarte, and Jorge Uriarte released Victim F. Saul Rodriguez does not know where they released Victim F. The same day Victim F was released, Saul Rodriguez talked to Victim F. He thanked Saul Rodriguez over and over again for having paid the ransom. Over the next three years, Victim F paid Saul Rodriguez around $850,000. Sometimes, Victim F paid Saul Rodriguez in cash. Other times, at Saul Rodriguez' direction, Victim F paid him by wire transferring money to him at various Las Vegas casinos. Saul Rodriguez split the money he received from Victim F with Fares Umar, Hector Uriarte, and Jorge Uriarte. Fares Umar, Hector Uriarte, and Jorge Uriarte got around $200,000 each. Saul Rodriguez kept the rest of the money. Because of their friendship, Saul Rodriguez doubts that Victim F ever knew that he was responsible for coordinating his kidnapping.

### N.    Summer 2003 Purchase of the Ford Crown Victoria

####    1.    *Information from Saul Rodriguez*

In or before the Summer of 2003, Saul Rodriguez bought a dark green Crown Victoria Individual C had seen at a car dealer near Roosevelt and Western Avenue in Chicago. Saul Rodriguez bought the Crown Victoria because he thought it could easily be made to look like an unmarked police car, and therefore be used in kidnappings and home invasions. Saul Rodriguez sent Individual C to buy the Crown Victoria so that he wouldn't seem connected to the purchase. Individual C bought the Crown Victoria with $3,000 in cash that Saul Rodriguez had given to him. Individual C purchased the Crown Victoria under the name of Individual A's mother. Saul Rodriguez asked that he do so in order to add one more layer between Saul Rodriguez and the purchase of the Crown Victoria.

At the time Individual C bought the Crown Victoria, it had a spotlight on the driver's side, and a push bar on the front grill. After Individual C bought the Crown Victoria he drove it to Saul Rodriguez. Saul Rodriguez gave it to a friend and had him install lights and sirens on the Crown Victoria. Saul Rodriguez hid the Crown Victoria in a garage on Seeley and the garage near Archer and California. Saul Rodriguez and other members and associates of the enterprise used the Crown Victoria during a number of kidnappings, starting with the kidnapping of Victim G.

About eight to nine months before his April 2009 arrest, Saul Rodriguez talked to Hector Uriarte about the Crown Victoria. Hector Uriarte told Saul Rodriguez that he still had it. Saul Rodriguez thought that Hector Uriarte had gotten rid of it a year beforehand. When Saul Rodriguez learned that he had not done so, Saul Rodriguez told Hector Uriarte that he should get rid of the Crown Victoria. Weeks after talking to Hector Uriarte about the Crown Victoria, Saul Rodriguez saw the Crown Victoria for sale in the parking lot of Platinum Auto Sales in Joliet, Illinois. The auto dealership is operated by Individual K.

After seeing the Crown Victoria, Saul Rodriguez stopped in the dealership and told Individual K to sell the Crown Victoria as quickly as possible. Saul Rodriguez did not tell Individual K how he and the others had used the Crown Victoria. Instead, Saul Rodriguez told Individual K that keeping the Crown Victoria on his lot could get him in trouble with law enforcement.[15]

---

[15] In the Summer of 2009, law enforcement interviewed Individual K, who said that he had sold the Crown Victoria to a man in Joliet. Individual K provided law enforcement with the VIN for the Crown Victoria. A records check reflected that the Crown Victoria had been towed and titled to Naperville Towing. A manager of Naperville Towing agreed to let law enforcement to take the Crown Victoria, which was towed to a police facility and was subsequently searched by the FBI for hair, blood, and fiber evidence.

71

### 2.   *Information from Individual C*

Prior to the kidnapping of Victim G, Saul Rodriguez directed Individual C and Fares Umar to buy a vehicle that looked like a police car.  According to Individual C,  Saul Rodriguez gave Fares Umar approximately $4,500 to buy the car.  Fares Umar and Individual C purchased a green Ford Crown Victoria.  Individual C registered the vehicle under a fake name, Victor Villareal, and a fake address.  According to Individual C, Saul Rodriguez had another person place lights and a siren in the vehicle.

### O.   **Summer 2003 Kidnapping of Victim G**

In the Summer of 2003, Saul Rodriguez, Hector Uriarte, Jorge Uriarte, Glenn Lewellen, Manuel Uriarte, and Fares Umar planned and carried out the kidnapping of Victim G.  Victim G was kidnapped near his family's home, restrained, and transported to another location where he was kept until family arranged for a ransom payment of 180 kilograms of cocaine and cocaine proceeds to be paid  to secure his release.

### 1.   *Information from Jorge Lopez*

In 2003, Jorge Lopez purchased cocaine from cocaine suppliers, "the twins."  In the Summer of 2003, Jorge Lopez delivered approximately 15 kilograms of cocaine two to three times to Saul Rodriguez.    On a day shortly after completing the last cocaine transaction with Saul Rodriguez, Victim G had picked up Jorge Lopez and driven him to one of the twins' homes in the area on the south side of Chicago.  Upon arriving in the neighborhood, they saw a vehicle that looked like an unmarked police car parked at the corner down from the twins' home.  Jorge Lopez saw three to four men inside of the unmarked police car.  Victim G did a u-turn and drove him and Jorge Lopez by the

unmarked police car.  Jorge Lopez saw that the driver of the unmarked police car was a white male in his mid-40s.

Victim G then drove to the twins' home.  The twins and Jorge Lopez were storing their motorcycles in the garage of that home.  Victim G's twin brother was already at the home when Victim G and Jorge Lopez arrived.  Victim G's twin brother and Jorge Lopez got on two of the motorcycles and drove away from the home towards downtown Chicago.  Victim G did not go along with them.  While out riding with Jorge Lopez, Victim G's twin brother received a phone call from a family member or a friend.  Shortly thereafter, Jorge Lopez learned from Victim G's twin brother that Victim G had been kidnapped.  For the next day or two, Jorge Lopez spent time with Victim G's twin brother and the twins' crew as they arranged to secure the release of Victim G.  Ultimately, Victim G was released.

Three to five days after Victim G was released, Jorge Lopez met with Saul Rodriguez.  During the meeting, Jorge Lopez and Saul Rodriguez discussed a $100,000 debt Saul Rodriguez owed for cocaine that Jorge Lopez had fronted to him.  Jorge Lopez does not recall discussing Victim G's kidnapping with Saul Rodriguez.

### 2.  *Information from Saul Rodriguez*

In the early 2000's, Jorge Lopez introduced Saul Rodriguez to two individuals who Rodriguez knew as "the twins."  Jorge Lopez introduced Saul Rodriguez to the twins at Hoops Gym in Chicago, where they played basketball together.  Saul Rodriguez understood the twins to be large-scale drug traffickers in the Chicago area.  According to Jorge Lopez, the twins' family had property throughout the Chicago area, including a three-flat apartment building near Archer and Keeler in Chicago.

Given the twins' significant involvement in the drug business, Saul Rodriguez knew that they had access to a large amount of cocaine and money.  Over time, Saul Rodriguez told Glenn Lewellen, Fares Umar, Hector Uriarte, and Individual C what he knew about the twins.  They agreed that they should kidnap at least one of the twins, and hold him until a cocaine or money ransom was paid for his release.  They agreed to conduct surveillance of the twins to figure out where they spent their time in the Chicago area.  They agreed that Glenn Lewellen and Fares Umar would conduct a traffic stop of at least one of the twins.  They agreed that Hector Uriarte, Jorge Uriarte, and Manuel Uriarte would meet Glenn Lewellen and Fares Umar, take the twin, and drive him to Individual C's home.  They agreed that the twin would be held in the basement of Individual C's home until a ransom was paid to secure his release.

As they planned to kidnap the twins, Saul Rodriguez was also planning to take a trip to Las Vegas in the early Fall of 2002 or 2003 to watch a boxing match.  The match was either Oscar De La Hoya versus Fernando Vargas, or Oscar De La Hoya versus Sugar Shane Mosley.  Victim G asked Saul Rodriguez if he could get tickets to the fight and hotel reservations for him, his twin brother, and their friends.  Saul Rodriguez agreed to do so.  At that time, Saul Rodriguez was involved in the boxing promotion business, and often gambled large amounts of money at Las Vegas casinos.  As a result, it was easy for Saul Rodriguez to buy large numbers of tickets to prize fights, and get good deals on hotel rooms at casinos.  Saul Rodriguez used Victim G's credit card to reserve the hotel rooms.  Saul Rodriguez told Victim G that when they got to Las Vegas, he would get them the tickets to the boxing match.  Saul Rodriguez planned to travel to Las Vegas separately and watch the fight with people other than the twins and their friends.

One day months before traveling to Las Vegas for the boxing match, Jorge Lopez told Saul Rodriguez that he was with the twins for the day. Jorge Lopez explained that the twins had just bought motorcycles. Jorge Lopez gave Saul Rodriguez this information not knowing that he was going to use it to kidnap one of the twins. Glenn Lewellen, Fares Umar, and Saul Rodriguez were already out conducting surveillance in the area of the twins' family's three-flat apartment building on the south side of Chicago. Within hours of receiving the information from Jorge Lopez, Saul Rodriguez saw Jorge Lopez and a person Saul Rodriguez later realized was one of the twins ride away from the area on motorcycles. Saul Rodriguez told Glenn Lewellen and Fares Umar about what he had seen. Soon after that, Saul Rodriguez saw the other twin, Victim G, driving a light blue Lexus away from the garage in the alley behind his family's three-flat apartment building. Within minutes, Glenn Lewellen called Saul Rodriguez and told him that he and Fares Umar had one of the twins. Glenn Lewellen told Saul Rodriguez to move the Lexus from where he had stopped it. Saul Rodriguez understood that Glenn Lewellen and Fares Umar had stopped Victim G in his Lexus, kidnapped him, and driven him away from the area in the Crown Victoria.

Saul Rodriguez found the Lexus in the alley a few houses from the garage of the twins' family's three-flat apartment building. The car was still running. Saul Rodriguez moved the Lexus to a parking space in the street. Saul Rodriguez then drove to Individual C's house on Moody Avenue in Burbank, Illinois. Individual C and Fares Umar were at the house when Saul Rodriguez got there. Fares Umar told Saul Rodriguez that Victim G was in the basement of the house. Saul Rodriguez didn't go downstairs to see or talk to Victim G because he was worried that Victim G might recognize him or his voice. Saul Rodriguez figured that Victim G was tied up so that he couldn't get away, and that his eyes were taped shut so that he couldn't see who was keeping him at the house.

75

Once at the house, Saul Rodriguez and others started to make ransom calls to Victim G's twin brother. Saul Rodriguez did not make any of the ransom calls. Saul Rodriguez figured that Victim G's twin brother or anyone else with whom he would speak would recognize his voice. Instead, Saul Rodriguez asked Individual L and Fares Umar to make the calls. Saul Rodriguez drove Individual L to pay phones in the Chicago area from which he made the ransom calls. Fares Umar made the ransom calls from Individual C's home using cell phones. Saul Rodriguez told both Individual L and Fares Umar who to call and what to say.

Whomever made the first call told Saul Rodriguez that Victim G's twin brother had agreed to leave a large amount of cocaine and an amount of money in a van near 1st Avenue and Cermak or Roosevelt in the Chicago area. Saul Rodriguez told Hector Uriarte to pick up the cocaine. Hector Uriarte, Jorge Uriarte, and Manuel Uriarte drove out to the area to pick up the van containing the ransom. Glenn Lewellen and Saul Rodriguez drove in separate cars to the area, and conducted surveillance. One of the Uriartes drove the van containing the cocaine and money to a location other than Individual C's home. Saul Rodriguez drove to that location, and inspected one of the kilograms by cutting into one of the kilograms and looking at the powder inside. The cocaine inside of the kilograms looked to be of poor quality. Saul Rodriguez knew that he would have problems selling that cocaine. All of the cocaine was packaged the same way, so Saul Rodriguez figured that all of the cocaine was of poor quality. They kept the money that had been delivered. Saul Rodriguez had someone return the cocaine in the van in which it had been delivered. Another person followed that guy to give him a ride after he dropped the van off. Glenn Lewellen went to the drop-off area in a separate car to conduct surveillance.

Saul Rodriguez spoke to Fares Umar and told him about the problems with the quality of the cocaine. Saul Rodriguez told Fares Umar to tell Victim G that Victim G's twin brother was playing around and not taking things seriously. Fares Umar later told Saul Rodriguez that he allowed Victim G to call his twin brother. Fares Umar told Saul Rodriguez that Victim G yelled at his twin brother and told him to follow the instructions the kidnappers were giving him. Fares Umar told Saul Rodriguez that Victim G's twin brother subsequently agreed to leave a large amount of cocaine in a car near Harlem and Roosevelt in Chicago. Saul Rodriguez told Hector Uriarte to go pick up the car containing the cocaine. Hector Uriarte, Jorge Uriarte, and Manuel Uriarte drove out to the area to pick up that car. Glenn and Saul Rodriguez drove to the area in separate cars and conducted surveillance. Saul Rodriguez was in a car with Individual A and Individual C. Saul Rodriguez told them the reason that they were in the car was to watch the Uriarte brothers pick up the ransom Victim G's twin brother was dropping off.

One of the Uriarte brothers delivered the cocaine to a location other than Individual C's home. Saul Rodriguez went to that separate location, cut into one of the kilograms of cocaine, and saw that the cocaine was of good quality. Saul Rodriguez later counted the quantity of cocaine that had been delivered, and found it to be 180 kilograms. Soon after that, Saul Rodriguez returned to Individual C's home. Around that time, Saul Rodriguez told Fares Umar to release Victim G. At least two of the men who were involved in the kidnapping drove Victim G in a van west of Chicago, where they released him. Saul Rodriguez followed the van to that area, but drove off before Saul Rodriguez saw anyone remove Victim G from the van. Saul Rodriguez believes that they kept Victim G for a day before they released him.

Saul Rodriguez sold most or all of the 180 kilograms of cocaine that Victim G's twin brother delivered to secure Victim G release.  Saul Rodriguez gave Glenn Lewellen around $500,000 to $750,000 in the profits from his sale of the cocaine and the money they got. Saul Rodriguez gave Individual C around $80,000 to $150,000 in the profits from his sale of the cocaine and the money they got.  Saul Rodriguez gave Fares Umar more money than what he had given to Individual C.  Saul Rodriguez gave Hector Uriarte, Jorge Uriarte, and Manuel Uriarte equal shares of around $250,000 to $300,000 for their help.  Saul Rodriguez gave Hector Uriarte the money for Jorge Uriarte and Manuel Uriarte.  Hector Uriarte was responsible for getting the money to them.  Saul Rodriguez kept the remaining profits from his sale of the cocaine and a share of the money they got.  It was around the same amount of money Saul Rodriguez paid to Glenn.

A week or so after Victim G was kidnapped and released, Saul Rodriguez met with Jorge Lopez at the Ford City Mall.  Saul Rodriguez told Jorge Lopez that he had heard that Victim G had been kidnapped.  Jorge Lopez told Saul Rodriguez that Victim G had been kidnapped.  Jorge Lopez asked Saul Rodriguez how he knew about the kidnapping.  Saul Rodriguez told him that he had heard about it from someone.  Within a few days, Jorge Lopez called Saul Rodriguez and told him that the twins suspected him of having been involved in the kidnapping.  Jorge Lopez said that the twins believed that Saul Rodriguez was the person making the ransom calls to Junior.  Saul Rodriguez told him that he wasn't involved in the kidnapping.

Months later, the twins and their friends made the trip to Las Vegas to attend the boxing match.  Saul Rodriguez traveled to Las Vegas separately to watch the same match.  While in Las Vegas, Saul Rodriguez saw the twins at a club.  Saul Rodriguez talked to Victim G's twin brother briefly.  They did not talk about the kidnapping.

78

### 3.   *Information from Individual C*

Individual C does not recall the date or year of this incident.  Individual C does recall that he and Saul Rodriguez had a series of conversations with Saul Rodriguez about Rodriguez' plan to kidnap a large drug trafficker and hold the individual until a large ransom was paid for his release. Hector Uriarte was present for one of the conversations.  Eventually, Individual C agreed to participate in the kidnapping.

Individual C and Saul Rodriguez subsequently conducted surveillance on numerous occasions of the target of the kidnapping in the area of Kedzie and Keeler Avenues in Chicago.  Hector Uriarte participated in the surveillance on at least one occasion.  Saul Rodriguez and Individual C eventually saw the target of the kidnapping.  Saul Rodriguez identified the target as one of the "Twins."  Saul Rodriguez explained that the twins were large drug traffickers who had strong connections with large Mexican drug cartels and access to millions of dollars.  Saul Rodriguez said that he wanted to kidnap one of the Twins and hold him in a garage until a ransom was paid for his release.

On the day of the kidnapping, Individual C drove the van in which the Twin would be transported.  Saul Rodriguez directed Individual C to drive to an alley near Kedzie.  When Individual C arrived in the area, he saw Fares Umar and Glenn Lewellen standing next to one of the Twins. Fares Umar and Glenn Lewellen were dressed like police officers.  Individual C identified a picture of Victim G as the Twin who had been kidnapped.  Fares Umar put Victim G, who had been restrained, into the van. Saul Rodriguez instructed Individual C to drive Victim G to his home in Burbank, Illinois.

While driving home, Individual C called Individual A and instructed her to leave the home and not return until he instructed her to do so.  Once home, Individual C and Fares Umar walked

Victim G into the basement of the home.  Individual C saw that Victim G's hands were restrained and that his eyes had been covered.  Individual C explained to Victim G that the kidnappers wanted money in exchange for his release.  Individual C remained in the basement with Victim G while Fares Umar and Saul Rodriguez made calls to Victim G's family demanding the ransom payment. Individual C learned that there was a problem with the first ransom payment and that a second ransom payment would be made.

Saul Rodriguez instructed Individual C to help him collect the second ransom payment. Individual C left Victim G in the basement of his home and went to the area of I-290 and Harlem. Once there, Individual C saw Saul Rodriguez and Individual A sitting in a truck together.  Saul Rodriguez instructed Individual C to get into a van containing cocaine that had been left by Victim G's family and drive it to the area of Ashland and Diversey.  Individual C did so.  At Saul Rodriguez' instruction, Individual C delivered some of the cocaine to Hector Uriarte, delivered other cocaine to Saul Rodriguez' parents home in Lyons, and stored the remaining cocaine at Individual C's in Burbank.

Later that day, Saul Rodriguez instructed Fares Umar and Individual C to release Victim G. They did so in the area of Roosevelt Avenue and 25th Avenue.  Saul Rodriguez ultimately paid Individual C $5,000 for his participation in the kidnapping.

### 4.    *Information from Individual A*

In 2003, Saul Rodriguez called Individual A and instructed her to drive to the area of Harlem and I-290.  She did so.  Once there, Saul Rodriguez got into Individual A's car and told Individual A that he and others had kidnapped  someone and that they were in the area to conduct surveillance of a ransom drop.  Saul Rodriguez told Individual A that the person that they had kidnapped was very

high up in the drug business.  Saul Rodriguez explained that they needed to conduct surveillance of the ransom drop to ensure that law enforcement or others did not arrive to the area before the ransom was delivered.  While sitting with Saul Rodriguez, Individual A saw Hector Uriarte and Jorge Uriarte sitting in a car close to hers.

While sitting with Saul Rodriguez, Individual A heard him making and receiving calls using the push-to-talk function of his Nextel phone.  During one of those calls, someone told Saul Rodriguez that they had picked up the ransom.  Individual A had not seen the ransom being dropped or get picked up.  Saul Rodriguez next made a call saying that the others who were involved should meet him at his parents' home in Lyons.  After Saul Rodriguez made that call, Individual A drove Rodriguez to his parents' home.  As they approached the driveway of his parents' home, Saul Rodriguez told Individual A to pull up next to a grey Pontiac that was nearby.  She did so.  Once there, Saul Rodriguez took a box out of the Pontiac and put it in the back of her vehicle.  Individual A then saw Saul Rodriguez put at least two boxes into the trunk of his Accord.  Based on her dealings with Saul Rodriguez, she believes that the boxes contained cocaine.  Individual A also saw Hector Uriarte and Jorge Uriarte in the area of Saul Rodriguez' parents' home.

Before leaving Saul Rodriguez' parents' home, Rodriguez told Individual A not to go home.  At the time, Individual A was living in Burbank with Individual C.  Individual A called her husband and asked him what was going on.  Individual C would only say that it was something bad and that she should just stay away.  Sometime the next day, Individual C called Individual A and told her it was okay to come home.  Individual A drove home and gave Individual C the box containing what she believed contained cocaine.  Saul Rodriguez did not pay Individual A for conducting surveillance with him and transporting the box of cocaine on his behalf.  Individual A does not know who was

kidnapped, how much was paid to secure his release, or how much money Individual C received for his participation in the kidnapping.

### 5. *Information from Individual F*

According to Individual F, one day in the Summer of 2003, Individual F was at work when he received a call from Jorge Lopez. Jorge Lopez told Individual F that Victim G had been kidnapped. Individual F knew Victim G and his twin brother sold wholesale quantities of cocaine in the Chicago area. Jorge Lopez instructed Individual F to go to the Greek Town area of Chicago and meet with him and other members of the twins' crew. Individual F did so. For the next day, Individual F was present as Victim G's twin brother negotiated and paid a ransom to secure Victim G's release.

A few years after Victim G was kidnapped, Individual F met Saul Rodriguez in Las Vegas. Saul Rodriguez was there with a person Individual F knows as "Gordo" and a person Individual F knows as "Lefty." Individual F identified a photograph of Hector Uriarte as the person he knows as Gordo and a photograph of Jorge Uriarte as the person he knows as Lefty. They all stayed in a large suite at the Mandalay Bay in Las Vegas. While inside of their hotel room, Saul Rodriguez told Individual F that he had coordinated the kidnapping of Victim G. Saul Rodriguez claimed that Jorge Lopez had helped lure Victim G to the place where he was taken. Saul Rodriguez also claimed that a person Individual F knows as "Sumo" was responsible for holding Victim G. Individual F identified a photograph of Fares Umar as the person he knows as Sumo.

### P. November 18, 2003 Kidnapping of Victim H

In the Fall of 2003, Saul Rodriguez, Fares Umar, Individual C, Individual M, and others planned the kidnapping of Victim H. Saul Rodriguez received information that Victim H was a drug

82

trafficker who had access to a large quantity of cocaine and money that could be used to secure his release in the event he was kidnapped.  On November 18, 2003, Saul Rodriguez, Fares Umar, Individual C, and Individual M kidnapped Victim H.  Fares Umar and Individual C made a series of ransom demands to Victim H's family resulting in their delivery of $400,000 to a drop location.  Unbeknownst to Saul Rodriguez, Fares Umar, and Individual C, the family had reported the kidnapping to law enforcement, who directed the family to make the payment.  Law enforcement arrested Fares Umar and Individual C when they picked up the ransom payment at the meet location.  Victim H was found and released.  Fares Umar took the fall for his fellow members of the Enterprise, claimed he committed the offense alone, and pled guilty to a state charge stemming from the incident.

### 1.      *Information from Victim H*

Following his release, Victim H agreed to speak to the CPD about his kidnapping.  According to Victim H, he was kidnapped by a Hispanic man and a black man while walking to his van, which was parked in the driveway of Victim H's home.  The men held themselves out as police officers and brandished both weapons and badges.  One of the men handcuffed Victim H and placed him in Victim H's van while the other man drove the van away from the area.  Before being placed in his van, Victim H noticed a third man sitting in a Crown Victoria parked nearby.  Victim H was unable to provide a description of the person sitting in the Crown Victoria.

Victim H described being driven in the van for approximately 15 minutes at which time it pulled into a garage.  Once in the garage, the Hispanic man took Victim H's cell phone, taped his hands and ankles, and handcuffed his hands.  Victim H never saw the black man who had kidnapped him again.  Shortly thereafter, Victim H overheard a man calling Victim H's wife demanding that she pay a ransom to secure his release.  The man later told Victim H that he was taken because he was

a rich man, that his captors wanted $1,000,000 in ransom, that the captors were professionals, and would try and avoid killing him. Victim H was left in the van overnight handcuffed behind his back. Victim H's captors checked on him several times. The next day, Victim H was handcuffed to a seat in the van after complaining of pain. Victim H remained restrained in the van until found by law enforcement later that day. The CPD conducted a physical lineup including Fares Umar and Individual C. Victim H did not identify either Fares Umar or Individual C.

### 2.     *Information from Saul Rodriguez*

In or around the Fall of 2003, a cocaine trafficker told Saul Rodriguez about a person he knew to be a distributor of wholesale quantities of cocaine in the Chicago area, Victim H. Saul Rodriguez understood that the cocaine supplier knew this information because he was purchasing cocaine from Victim H. Saul Rodriguez shared the information with Fares Umar and Hector Uriarte. They agreed to would kidnap Victim H for a ransom of cash or cocaine. Fares Umar, Hector Uriarte, and Saul Rodriguez started to do surveillance of the home in which they believed Victim H lived. They saw that it was a residence on the north side of Chicago with a long driveway, blocks away from Fares Umar's home.

After conducting surveillance at the home of Victim H several times, Hector Uriarte decided not to participate in the kidnapping. Saul Rodriguez does not remember why Hector Uriarte stopped participating. Saul Rodriguez needed to find another person to participate in the kidnapping. Saul Rodriguez knew a guy named Individual M from the gym where they worked out. Individual M was a bodybuilder who was constantly asking Saul Rodriguez for a job. Saul Rodriguez told Individual M that he wanted him to help kidnap a person that owed money to Fares Umar from a drug deal. Saul

Rodriguez promised Individual M that the person he helped to kidnap would not be hurt. Individual M agreed to help with the kidnapping.

On the day of the kidnapping, Fares Umar, Individual M, and Saul Rodriguez agreed that Fares Umar and Individual M would drive the Crown Victoria to the home of Victim H. Saul Rodriguez agreed to conduct surveillance outside of the home of Victim H. Individual C was also involved. They agreed that the person conducting surveillance would contact Fares Umar when he saw Victim H come outside. Fares Umar would then activate the lights and sirens on the Crown Victoria and enter the driveway of the home of Victim H. They agreed that Fares Umar and Individual M would claim to be police officers, place Victim H in the Crown Victoria, and drive Victim H to the garage of Fares Umar's home where he would be held until his release.

While conducting surveillance, Saul Rodriguez saw the Crown Victoria enter the driveway with its lights and sirens on. Minutes later, Saul Rodriguez saw Victim H's van and the Crown Victoria drive away. Saul Rodriguez drove to Fares Umar's house where he met with Individual M. Saul Rodriguez took Individual M back to his car where he had parked it earlier that day. Saul Rodriguez later met with Fares Umar at Fares Umar's house. Saul Rodriguez believes that Individual C was there as well. Fares Umar told Saul Rodriguez that the family of Victim H exited the house as Fares Umar was talking to Victim H. The family of Victim H did not believe that Fares Umar and Individual M were police officers. Fares Umar reacted by pushing Victim H into the van that was already in the driveway. Fares Umar drove the van away from the area, as Individual M followed in the Crown Victoria.

During Saul Rodriguez' discussion with Fares Umar, he understood that Victim H was being held in the garage of Fares Umar's home. Saul Rodriguez understood that Victim H was likely

restrained, being threatened with physical violence, and being beaten.  Saul Rodriguez further understood that Fares Umar was directing Victim H to contact individuals who he believed could pay a ransom to secure his release.  Though Saul Rodriguez did not know how much money Fares Umar was  requesting, Saul Rodriguez understood that he would receive a portion of whatever ransom money or cocaine we received.

After speaking to Fares Umar, Saul Rodriguez returned home.  That night, the cocaine trafficker who had told Saul Rodriguez about Victim H called Rodriguez and told Rodriguez that Victim H had been kidnapped.  Saul Rodriguez did not tell the cocaine trafficker that he was involved with the kidnapping.  Instead, Saul Rodriguez pretended to be surprised to hear what happened.

The next day, Saul Rodriguez spoke to Fares Umar again.  He told Saul Rodriguez that he had made several calls to the family of Victim H.  Based on what Fares Umar was telling Saul Rodriguez, Saul Rodriguez did not think that the family of Victim H could pay the ransom to secure his release.  Saul Rodriguez suggested that Fares Umar let Victim H go but Fares Umar convinced him to wait and see if the family could come up with the money.  Saul Rodriguez waited with Fares Umar as he and Individual C made the last phone call to the family of Victim H from a cell phone near Austin and Chicago in Chicago.  All of the sudden, the family of Victim H had come up with the ransom money.  The wife of Victim H told Fares Umar that the money would be left in a car, the license plate of which she provided without being asked.  At the time, Saul Rodriguez thought that the family of Victim H may have contacted the police, who were instructing the family on how to proceed with the negotiations.

Despite his concern, Saul Rodriguez agreed to travel to the area where Individual C and Fares Umar were traveling to pick up the money and watch for law enforcement.  Fares Umar drove himself

and Individual C in a Chevy Suburban to pick up the money. Saul Rodriguez drove in a mini van.

When Fares Umar and Individual C arrived in the area to pick up the money, Saul Rodriguez saw

several unmarked police cars and left the area. While leaving the area, Saul Rodriguez got a phone

call from Fares Umar who explained that the police were chasing him as he was driving the car, and

that Individual C was attempting to leave the area on foot. Saul Rodriguez drove back home and

called an attorney. Shortly after returning home, Saul Rodriguez learned that law enforcement had

arrested both Individual C and Fares Umar. Saul Rodriguez also learned that Individual C had been

released from custody, while Fares Umar was charged with the kidnapping.

Saul Rodriguez hired a lawyer to represent Fares Umar in the kidnapping case. Saul

Rodriguez did so, in part, to make sure that Fares Umar was not cooperating with law enforcement.

Soon after his arrest, Fares Umar was released on bond. After Fares Umar's release on bond, Saul

Rodriguez promised Fares Umar that he would pay his family's bills in the event that he was found

guilty of the charges against him. Saul Rodriguez did so to ensure that Fares Umar would not

cooperate with law enforcement. Around that same time, Saul Rodriguez met with the cocaine

trafficker and asked him to meet with Victim H's family. More specifically, Saul Rodriguez asked

the cocaine trafficker to request that Victim H not cooperate with law enforcement. Saul Rodriguez

told the cocaine trafficker to tell Victim H and his family that he would pay Victim H for doing so.

The cocaine trafficker met with Victim H and his family, who rejected Saul Rodriguez' offer.

Saul Rodriguez later contacted Individual A and asked her to speak with Victim H and the

supplier's family. Saul Rodriguez understand that Victim H and the supplier's family refused to open

the door. Finally, on several occasions, Saul Rodriguez drove Fares Umar past the home of Victim

H. Fares Umar told Saul Rodriguez that he was interested in asking Victim H to no longer cooperate

with law enforcement.  Fares Umar and Saul Rodriguez never saw Victim H when they drove past his home.  As such, Saul Rodriguez understood that Fares Umar never asked Victim H to stop cooperating with law enforcement.  Fares Umar remained on bond until he was convicted in or around 2006 of charges related to the kidnapping.  Fares Umar is currently serving time for that conviction in state prison.  Between the time of Fares Umar's arrest and his conviction, Fares Umar continued to participate in kidnappings and home invasions with Saul Rodriguez and others.  Individual M has since died.[16]

### 3.   *Information from Individual C*

Sometime in the late Summer or early Fall of 2003, Saul Rodriguez approached Individual C about kidnapping a drug trafficker in the Chicago area.  Individual C agreed to participate in the kidnapping.  Saul Rodriguez later contacted Individual C and told him that he had identified the home in which the target of the kidnapping lived.  Saul Rodriguez explained that Fares Umar and Individual M would act as police officers and kidnap Victim H.  Saul Rodriguez, Fares Umar, Individual M, and Individual C later met to discuss the kidnapping.  Saul Rodriguez suggested that Fares Umar and Individual M drive the Crown Victoria to Victim H's home while Individual C follow in another car.

On the day of the kidnapping, Individual C met with Saul Rodriguez, Individual M and Fares Umar near Victim H's home.  Fares Umar and Individual M approached Victim H's home while Individual C followed close behind.  Fares Umar and Individual M placed Victim H into Victim H's van.  Fares Umar drove Teodoro Beuno is his van to Fares Umar's home.  Individual C drove the

---

[16]  Saul Rodriguez explained that Individual M was a professional bodybuilder.  Law enforcement has found a body building magazine identifying Individual M as a bodybuilder who died on May 2, 2005 from heart problems.

Crown Victoria to Fares Umar's home where he met with Saul Rodriguez and Fares Umar. Individual M's involvement in the kidnapping ended at that point.

While at Fares Umar's home, Individual C overheard Fares Umar make several ransom calls to the family of Victim H.  That night, Fares Umar directed Individual C to feed Victim H, who was still being kept in his van in the garage of Fares Umar's home.  When Individual C entered the van, he saw that Victim H was tied to the roof or handle of the van and that he was blindfolded.  Individual C became concerned that Fares Umar was making too many ransom demands, all of which were going unmet.

At some point the next day, Saul Rodriguez, Fares Umar, and Individual C drove down near Roosevelt and I-90 to make another call to Teodoro Beuno's family.  Eventually, Fares Umar received a call from Victim H's family, who had agreed to pay a ransom of at least $300,000.  A family member told Fares Umar where they would leave the ransom payment.  Saul Rodriguez directed Fares Umar and Individual C to pick up the ransom.  Saul Rodriguez followed Fares Umar and Individual C in a separate vehicle to the location at which the ransom was dropped off.  Individual C got out of the car he was in with Fares Umar and retrieved a bag containing what he believed was the ransom money from a car in the area.  Shortly after returning to Fares Umar's vehicle, numerous police vehicles entered the area.  Fares Umar drove away from the area at a high rate of speed.  While driving, Fares Umar called Saul Rodriguez and told him that the police were following them and that he (Umar) wanted Saul Rodriguez to use his vehicle to block the police that were chasing them. Saul Rodriguez did not assist Fares Umar and Individual C, whom police apprehended soon thereafter.

After being taken to the police station, Individual C was placed into a holding room with Fares Umar.  Individual C later told the police that he was at a bar earlier during the day and someone that

89

he did not know asked him to help pick up a bag.  Individual C told the police that he agreed to help

the unknown man obtain the bag, but that he did not have any information regarding kidnappings.

Later that night, Individual C was released and was never charged for his involvement in the

kidnapping.

Within days of being released from custody, Saul Rodriguez called Individual C and asked

to meet.  During the meeting, Saul Rodriguez questioned why Individual C  was released from jail

and not charged.  Individual C told Saul Rodriguez that he was not cooperating with law enforcement

and did not know why he was not charged.  Individual C  later received telephone calls from both

Hector Uriarte and Jorge Uriarte and during separate telephone conversations, both Uriartes told him

not to cooperate with the police.

Individual C learned that Saul Rodriguez paid for an attorney to represent Fares Umar in the

case brought against him in state court.  Individual C learned that Saul Rodriguez paid for Fares

Umar's attorney's fees and also agreed to give money to Umar's wife while Umar was incarcerated.

### 4.    *Information from Individual A*

In late 2003 or early 2004, Individual C and Fares Umar were arrested for kidnapping Victim

H.  Individual C never talked to Individual A about his involvement in that kidnapping.  Individual

A knows that Fares Umar is currently serving time for the kidnapping of Victim H.  Shortly after

Fares Umar and Individual C were arrested for the kidnapping of Victim H, Saul Rodriguez directed

Individual A to a home and asked Individual A to go up and talk to the people inside about the case

involving Victim H.  Individual A knocked on the door, which a woman answered.  As soon as

Individual A began to speak, the woman slammed the door in her face.  Individual A went back to

the car and told Saul Rodriguez what had happened.  Saul Rodriguez tried to get Individual A to go

back to talk to the woman again.  Individual A told him that she wouldn't do it.  They never talked about the kidnapping again.

### Q.      2004 Theft of 70 Kilograms of Cocaine

In 2004, Saul Rodriguez, Glenn Lewellen, Andres Torres, and others planned and executed the theft of 70 kilograms of cocaine that a cocaine supplier, Individual N, was unloading at Glenn Lewellen's warehouse in the Frankfort area.[17]  Saul Rodriguez sold the cocaine and split the proceeds with those who participated in the event.

### 1.      *Information from Individual N*

In 2004, Individual N was involved in drug trafficking by driving vehicles containing large quantities of cocaine from one location to another in the Chicago area.  Around that same time, Individual N met Saul Rodriguez.  After meeting Saul Rodriguez, Individual N asked Rodriguez if he knew of a large parking lot in an industrial area in Chicago from which cocaine could be unloaded from a semi-tractor trailer.  Saul Rodriguez told Individual N that he could use a warehouse located int eh area of I-80 and Route 53 near Frankfort.  Individual N agreed to provide Saul Rodriguez with a portion of the 70 kilograms of cocaine that he expected would be in the semi-tractor trailer.

On the day that the semi-tractor trailer was scheduled to arrive at the warehouse parking lot, Individual N met with Saul Rodriguez.  Individual N and Saul Rodriguez agreed that they would drive together in Rodriguez' car, while Andres Torres would meet them by the warehouse.  Individual N understood that Andres Torres would receive the cocaine from the warehouse on Saul Rodriguez' behalf and later deliver the cocaine to Rodriguez' customers.  Soon thereafter, Individual N received

---

[17]  According to information from subpoenaed financial records, beginning in 2001, Glenn Lewellen rented a warehouse in New Lenox, Illinois.  In 2005 and 2006, Glenn Lewellen purchased units at a warehouse in Frankfort, Illinois.

a call from the driver of the semi-tractor trailer who advised that he was approximately three hours away from the Chicago area.

After receiving the call from the driver of the semi-tractor trailer, Individual N and Saul Rodriguez drove together in Rodriguez' car to the warehouse.  Once there, Individual N told Saul Rodriguez that the location would work to unload the cocaine.  Soon thereafter, Individual N and Saul Rodriguez met the driver of the semi-tractor trailer in the area of Exit 122 and I-80.  Saul Rodriguez then drove Individual N and the driver to the warehouse, where the driver agreed to deliver the cocaine at that location.  Saul Rodriguez and Individual N drove the driver back to the semi-tractor trailer.  The three men later met up again in the parking lot of the warehouse.  Andres Torres arrived separately in a Ford Harley Davidson F-150.

After the semi-tractor trailer arrived at the warehouse's parking lot, Individual N took one large bag containing cocaine and placed it into Andres Torres' truck.  As Individual N was moving a second bag from the semi-tractor trailer to Andres Torres' truck, Individual N noticed a dark colored Ford Crown Victoria enter the parking lot with emergency lights activated.  Saul Rodriguez instructed Individual N to run.  Saul Rodriguez and Individual N fled the area on foot, while Andres Torres hid under his truck.

As Individual N ran from the area, he told Saul Rodriguez that something did not feel right.  Individual N explained that if the police were actually involved, there would be more than one police car.  Saul Rodriguez told Individual N to continue to run away from the area.  Individual N and Saul Rodriguez walked several miles away from the area.  Andres Torres ultimately picked up Individual N and Saul Rodriguez. Individual N did not question Saul Rodriguez or Andres Torres further about

what had happened.  Individual N assumed that the person(s) in the Crown Victoria had seized the cocaine.

### 2.    *Information from Saul Rodriguez*

In or around 2004, a cocaine dealer, Individual N, contacted Saul Rodriguez and told him that he was looking for a place to unload a trailer containing 100 kilograms of cocaine.  Saul Rodriguez had previously bought cocaine from Individual N.  Saul Rodriguez talked to Andres Torres about Individual N's request.  Andres Torres suggested that Individual N use a warehouse that Glenn Lewellen was renting in Frankfort, Illinois.  Saul Rodriguez understood that Andres Torres was storing his painting materials at the warehouse.  Saul Rodriguez does not remember the location of the warehouse.

Within a week, Saul Rodriguez drove Individual N to Glenn's warehouse.  Individual N agreed to use the parking lot in front of Glenn's warehouse to unload the cocaine.  Individual N agreed to sell a portion of the cocaine to Saul Rodriguez.  After speaking to Individual N, Saul Rodriguez had several conversations with Glenn Lewellen and Andres Torres about stealing the cocaine Individual N wanted to unload at the warehouse.  They agreed that Andres Torres and Saul Rodriguez would be at the warehouse to guide the tractor trailer's driver to the designated location and to purportedly pick up the cocaine Saul Rodriguez had agreed to buy from Individual N.  They agreed that once the tractor trailer was outside of the warehouse, Glenn Lewellen would arrive in the Crown Victoria, and appear as if he was conducting a seizure of the cocaine.  They agreed that Andres Torres and Saul Rodriguez would then run away from the area with Individual N.  They agreed that Andres Torres' co-worker and friend nicknamed "Chappito" would remove the cocaine from the tractor trailer and load it into another car.  They agreed that Glenn would detain the driver of the

93

tractor trailer until all of the cocaine had been removed from the tractor trailer and loaded into another car.

Within the month, Individual N called Saul Rodriguez and told him that the tractor trailer containing cocaine was scheduled to arrive at the warehouse on a certain date at a certain time. Saul Rodriguez provided that information to Glenn Lewellen and Andres Torres. Individual N, Andres Torres, and Saul Rodriguez went to the warehouse on the day and at the time Individual N expected the tractor trailer to arrive. Andres Torres and Saul Rodriguez drove to the warehouse together in Andres Torres' truck. Saul Rodriguez saw the tractor trailer arrive outside of the warehouse. Within minutes, Saul Rodriguez saw Glenn Lewellen arrive in the area in the Crown Victoria with the lights and siren on. Individual N, Andres Torres, and Saul Rodriguez ran away from the warehouse into what seemed to be farm land. Individual N tried to go back to the warehouse, explaining that something seemed wrong. Saul Rodriguez told Individual N that they needed to stay away from the warehouse in order to avoid being arrested.

Within a half hour, Andres Torres and Saul Rodriguez called Chappito to give them and Individual N a ride back to the warehouse. Chappito picked them up and drove them back to the warehouse. Once there, Andres Torres and Saul Rodriguez got into Andres Torres' truck and drove away. Saul Rodriguez counted the cocaine Glenn Lewellen, Andres Torres, Chappito, and Saul Rodriguez had stolen from the tractor trailer, which totaled approximately 70 kilograms, rather than 100 kilograms, of cocaine. Saul Rodriguez sold the cocaine at a profit of approximately $1,300,000. Glenn Lewellen and Saul Rodriguez received the largest shares of the profit. Andres Torres received at least $100,000. Saul Rodriguez does not remember if Chappito received any money.

Within months of the theft from the tractor trailer, Saul Rodriguez learned that Individual N had been arrested.  Law enforcement had found 100 kilograms of cocaine in a garage that was controlled by Individual N.  Saul Rodriguez also learned that Individual N had been released from custody shortly after he was arrested.  Saul Rodriguez was concerned that Individual N was cooperating with law enforcement.  Saul Rodriguez never spoke to Individual N about the theft of the 70 kilograms of cocaine.

### 3.   *Information from Andres Torres*

In approximately 2004, Saul Rodriguez and Andres Flores met with a cocaine supplier, Indivdiual N.  Several months after the meeting, Saul Rodriguez asked Andres Torres to help find him find a warehouse where cocaine could be unloaded from a tractor trailer.  Andres Torres told Saul Rodriguez about Glenn Lewellen's warehouse on Cedar Road in New Lennox that he was renting. Saul Rodriguez later told Andres Torres about his plan to steal the cocaine from the tractor trailer with the help of Andres Torres and Glenn Lewellen.  Andres Torres agreed to help out.

Saul Rodriguez told Andres Torres about his plan to steal the cocaine.  Saul Rodriguez planned on going to the warehouse with Individual N to unload the cocaine from the tractor trailer. While helping Individual N, Saul Rodriguez would call Andres Torres and Andres Torres would contact Glenn Lewellen.  One day before the tractor trailer was set to arrive, Saul Rodriguez gave Andres Torres a prepaid phone.  Saul Rodriguez demanded that Andres Torres only use that phone to contact him. On the day of the theft, Saul Rodriguez called Andres Torres and told him that the tractor trailer was on its way to the warehouse.  Saul Rodriguez said that when he called next, Andres Torres should contact Glenn Lewellen. When Saul Rodriguez next called him, Andres Torres called Glenn Lewellen.

Some time later that day, Saul Rodriguez contacted Andres Torres again and said that he had gone to the warehouse with Individual N. Saul Rodriguez said that while they were unloading the trailer, Glenn Lewellen arrived in an unmarked police car. After Glenn Lewellen arrived, Individual N and Saul Rodriguez fled the area. Glenn Lewellen stayed behind and stole the load of cocaine with the help of another person. Andres Torres believes that Saul Rodriguez, Glenn Lewellen, and Andres Torres stole between 50 and 80 kilograms of cocaine from the trailer. Saul Rodriguez paid Andres Torres between $60,000 and $80,000 for assisting in the theft.

### R.    2004 Kidnapping of Victim I

In the Fall of 2004, Pedro Victoria asked Saul Rodriguez to kidnap an individual named Arnulfo Hernandez-Delatore who owed Pedro Victoria a drug debt in the hundreds of thousands of dollars. Saul Rodriguez agreed to participate in the kidnapping in exchange for a portion of whatever money he and members of the enterprise were able to obtain during the kidnapping. On the day of the kidnapping, Pedro Victoria provided Saul Rodriguez with the location at which he could find Arnulfo Hernandez-Delatore. Saul Rodriguez, Hector Uriarte, Jorge Uriarte, and Manuel Uriarte went to the location and kidnapped the person they believed to be Arnulfo Hernandez-Delatore, restrained that person, transported that person to another location, and then threatened that person while questioning him about the drug debt. Almost immediately, Saul Rodriguez, Hector Uriarte, Jorge Uriarte, Manuel Urirate, and Pedro Victoria realized that they had not kidnapped Arnulfo Hernandez-Delatore. In fact, they had kidnapped Victim I, a worker for Arnulfo Hernandez-Delatore. Victim I was released later the same day on which he was taken.

1.    *Information from Victim I*

According to Victim I, he began to work at the Northlake Tap, which was also known as Bar Jerez, in Northlake, Illinois, when he was 19 years old.  Victim I was hired by Arnulfo Hernandez. Victim I identified a photograph of Arnulfo Hernandez-Delatore as the person he knows as Arnulfo Hernandez.  While working for Arnulfo Hernandez, Victim I often drove to different stores to buy things for the bar.

In or around the Fall of 2004, Arnfulo Hernandez asked Victim I to drive to the area of Kedzie and Ogden in Chicago.  Victim I believed that Arnulfo Hernandez wanted him to buy supplies for the bar.  Victim I remembers that he drove his black Pontiac Grand Am to the meeting.  Once Victim I got to the area, two individuals pushed Victim I into a white work type van.  Once inside of the van, Victim I' hands, eyes, and feet were taped.  Before Victim I' eyes were taped, he saw that the two men were Hispanic.  One was chubby, about 5'8" to 5'10".  He was dressed like a gang banger in baggy clothes, and had a goatee.  Victim I stated that a picture of Hector Uriarte looks similar to the person he first saw.  Victim I saw the other man, but only noticed that he had a shaved head.  Victim I said a picture of Saul Rodriguez looks similar to the second person he saw in the van.

Once Victim I was inside of the van, he was driven for about a half hour before the van stopped.  When the van stopped, someone told Victim I in Spanish "You're here because of the money you owe."  Victim I could hear two people in the van, and they called him by the names Arnulfo Hernandez and Toro.  Victim I told the men that he was not Arnulfo Hernandez and that they had the wrong guy.  One of the men then punched Victim I in the stomach.  A few minutes after that, Victim I could hear the two men speaking in English, but couldn't hear what they were saying.

After a few hours, Victim I was driven to another location.  Prior to being let go, one of the men told him to keep the tape on his eyes for 15 minutes and that the men would be watching.  That person told Victim I that if he took it off before the 15 minutes was up, he would be harmed. Victim I believed them.

Victim I left the tape on for several minutes.  When Victim I took the tape off, he could see that he had been dropped off in a location near to where he had originally parked his car.  Victim I then drove back home and called his girlfriend and asked her to come get him.  Once Victim I' girlfriend got to his house, he told her what happened.  Victim I's girlfriend drove him to a hotel in Melrose Park near 15th Avenue and North Avenue.  They spent the night there because Victim I was concerned for his safety.  Victim I has not seen or spoken to Arnulfo Hernandez since the day he was kidnapped.  Victim I never returned to the Northlake Tap bar.

### 2.     *Information from Pedro Victoria*

According to Pedro Victoria, between 2001 or 2002 and October 23, 2007, he sold Saul Rodriguez wholesale quantities of cocaine.  Pedro Victoria understood that in addition to selling cocaine, Saul Rodriguez also collected drug debts on behalf of Mexican-based drug cartels.  On one occasion, Pedro Victoria hired Saul Rodriguez to collect money for a drug debt Arnulfo Hernandez-Delatore, aka "Toro," owed to him.  Pedro Victoria had fronted approximately $1,000,000 worth of cocaine to Arnulfo Hernandez-Delatore.  Arnulfo Hernandez-Delatore still owed Pedro Victoria $600,000 for the cocaine.  Pedro Victoria was contacted by the person who had fronted the cocaine to him.  The cocaine supplier demanded full payment from Pedro Victoria.  Pedro Victoria became concerned that he would be beaten or killed if he did not pay his supplier soon.  Fearing for his safety, Pedro Victoria contacted Saul Rodriguez, who agreed to kidnap Victim I.

98

On the day of the kidnapping, Saul Rodriguez called Pedro Victoria and told him that the person Saul Rodriguez believed to Arnulfo Hernandez-Delatore had been kidnapped. Pedro Victoria later met with Saul Rodriguez and two other unknown people at a garage located near 30th and South Damen, near McKinley Park. Once he arrived to the garage, Pedro Victoria saw a white van parked in the garage. Pedro Victoria saw Victim I, whom he didn't recognize, tied up and blind folded inside the van, parked inside the garage. Pedro Victoria also saw Saul Rodriguez there with two other men who worked for Saul Rodriguez. Pedro Victoria identified photographs of Hector Uriarte and Jorge Uriarte as Saul Rodriguez' workers. Pedro Victoria told Saul Rodriguez that the individual was not Arnulfo Hernandez-Delatore, and instructed Saul Rodriguez to let the young man go. Saul Rodriguez wanted to kill the man, but Pedro Victoria demanded that Rodriguez let him go, because he was not involved in the dispute. Rodriguez later told Pedro Victoria that his helpers copied the young man's driver license information and threatened to kill him before letting him go. Pedro Victoria has not spoken with Arnulfo Hernandez-Delatore since this man was kidnapped.

Pedro Victoria was not able to provide a time frame for the foregoing events.

### 3.    *Information from Saul Rodriguez*

A few months before Alex Estrada's arrest by the DEA in late 2005, Pedro Victoria told Saul Rodriguez about a person nicknamed "Toro" who owed Pedro Victoria $800,000 for cocaine that Pedro Victoria had sold him years beforehand. Pedro Victoria asked Saul Rodriguez to help him collect the money from Toro. Saul Rodriguez did not know Toro, and had never seen Toro before. Pedro Victoria told Saul Rodriguez that he would attempt to lure Toro to a location where Saul Rodriguez could kidnap him and hold him until he agreed to pay Pedro Victoria. Pedro Victoria told Saul Rodriguez that he would pay Saul Rodriguez and anyone who helped him with the kidnapping

99

a portion of whatever money or cocaine was recovered from Toro.  Saul Rodriguez agreed to help

Pedro Victoria by kidnapping Toro.

After talking with Pedro Victoria, Saul Rodriguez had a series of conversations with Hector

Uriarte, Jorge Uriarte, and Manuel Uriarte about kidnapping Toro.  They agreed to help with the

kidnapping.  They agreed that once they got the information from Pedro Victoria, Hector Uriarte,

Jorge Uriarte, and Manuel Uriarte would kidnap Toro and transport him in a van to a garage near

Archer and California until Toro arranged for a cocaine or money ransom to be paid to secure his

release.

Within a couple of weeks, Pedro Victoria called Saul Rodriguez and told him that Toro would

be at a Walgreens in the area of Archer and Kedzie in Chicago later that day at a specific time.  Pedro

Victoria told Saul Rodriguez that Toro would be driving a particular car.  Saul Rodriguez doesn't

remember what Pedro Victoria said about the type of car that Toro would be driving.  Saul Rodriguez

contacted Hector Uriarte, Jorge Uriarte, and Manuel Uriarte, and asked them to meet him near Archer

and Kedzie.  They did so.  Saul Rodriguez drove to the area in his Lincoln LS.  Hector Uriarte, Jorge

Uriarte, and Manuel Uriarte drove to the area in a van. Once there, Manuel Uriarte got into the car

with him.

Shortly after getting to the area, Saul Rodriguez saw the car that Pedro Victoria said Toro

would be arriving in.  Saul Rodriguez drove his car up next to the car in which the person he believed

to be Toro was in.  That person was alone and was actually Victim I.  Saul Rodriguez told Victim I

to get in his car.  Victim I got out of his car, and got into the front passenger seat of Saul Rodriguez'

car.  Before he did so, Manuel Uriarte got out of the front seat of Saul Rodriguez' car and into the

back seat.  Victim I immediately asked him "how we going to do this?"  Saul Rodriguez understood

that Victim I had been told to meet with him for the purpose of picking up a shipment of drugs. Saul Rodriguez told Victim I that they were going to go to the place where he could pick something up.

Saul Rodriguez drove Victim I to an alley a couple of blocks away. Saul Rodriguez parked the car in the alley so that Victim I could not get out of the car. Saul Rodriguez saw that Hector Uriarte and Jorge Uriarte had followed him in the van. Saul Rodriguez told Victim I that he had to come with them. When Victim I resisted, Manuel Uriarte pulled out his gun and pointed it at him. Manuel Uriarte and Saul Rodriguez then took Victim I from his car and put him in the van. Saul Rodriguez believed that Manuel Uriarte got into the van with Victim I. Saul Rodriguez followed the van as it drove to the garage near Archer and California. As he did so, Saul Rodriguez realized he had dropped his phone in the alley. Saul Rodriguez drove back to the alley, where he picked up his phone. Saul Rodriguez then returned to the area of Archer and California. Saul Rodriguez parked his car and went inside of the garage.

Once inside of the garage, Saul Rodriguez saw that the side door to the van was open. Saul Rodriguez saw Victim I sitting in the back of the van with his eyes covered and his hands tied together. Saul Rodriguez understood that Hector Uriarte, Manuel Uriarte, and Jorge Uriarte were responsible for having restrained Victim I. By the time he got to the garage, Hector Uriarte, Manuel Uriarte, and Jorge Uriarte told him that Victim I was telling them that they had taken the wrong person. Saul Rodriguez called Pedro Victoria and told him that they thought that they had kidnapped the wrong person. Pedro Victoria told Saul Rodriguez he would come to where they were at and figure it out.

Within fifteen minutes, Pedro Victoria was at the garage. Saul Rodriguez told Pedro Victoria to look inside of the van and let them know if the person inside was Toro. Pedro Victoria refused to

look inside of the van.  Pedro Victoria told Saul Rodriguez to look at the person's arms.  Victim I did not have hairy arms.  Saul Rodriguez had also looked at the driver's license inside of the wallet Hector Uriarte, Jorge Uriarte, or Manuel Uriarte had taken from Victim I .  Saul Rodriguez discussed the name on the license with Pedro Victoria.  Pedro Victoria and Saul Rodriguez figured out that the name on the license did not match Toro's real name, which Pedro Victoria then disclosed to him. Saul Rodriguez does not remember Toro's real name.   Saul Rodriguez doesn't remember the name on the driver's license.

Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Pedro Victoria, and Saul Rodriguez realized that they had kidnapped the wrong person.  They ultimately agreed to let the person go.  Saul Rodriguez followed Hector Uriarte, Jorge Uriarte, and Manuel Uriarte for a few blocks as they drove the Victim I away from the area.  Saul Rodriguez understands that before Victim I was released, Hector Uriarte, Jorge Uriarte, and Manuel Uriarte threatened him to not call the police.  Pedro Victoria never paid Saul Rodriguez for helping him attempt to kidnap Toro.  Saul Rodriguez never paid Hector Uriarte, Jorge Uriarte, or Manuel Uriarte for their assistance in attempting to kidnap Toro.

### 4.   *Information from Enrique Hinojosa-Acevedo*

In August 2004, Enrique Hinojosa-Acevedo met Individual O at a ranch in the area of Joliet, Illinois.  Individual O asked Enrique Hinojosa-Acevedo to work for him distributing kilograms of cocaine to customers in the Chicago area.  Individual O told Enrique Hinojosa-Acevedo that he would pay him $500 for every kilogram of cocaine he distributed.  Enrique Hinojosa-Acevedo agreed to work for Individual O.  After meeting with Individual O, Enrique Hinojosa-Acevedo brokered large kilogram cocaine transactions between Individual O and customers, including Pedro Victoria.

While working for Individual O, Enrique Hinojosa-Acevedo met a person he knew by the nickname "Toro." Enrique Hinojosa-Acevedo often met Toro at his bar in Northlake, Illinois. Based on their relationship, Enrique Hinojosa-Acevedo understood that Toro sold drugs. Enrique Hinojosa-Acevedo never conducted a drug deal with Toro. Pedro Victoria told Enrique Hinojosa-Acevedo that he had supplied Toro with large quantities of cocaine. Pedro Victoria also told Enrique Hinojosa-Acevedo that Toro had not paid for the last shipment of cocaine Pedro Victoria had delivered to Toro. Pedro Victoria told Enrique Hinojosa-Acevedo that Toro owed him around $600,000. Pedro Victoria asked for Enrique Hinojosa-Acevedo to help collecting the debt Toro owed to him.

About one month after Pedro Victoria told Enrique Hinojosa-Acevedo about Toro's debt, Enrique Hinojosa-Acevedo was at a ranch in the Joliet area with Individual O, Pedro Victoria, and a person he knows as "Pelon." Enrique Hinojosa-Acevedo identified a photograph of Saul Rodriguez as the person he knows as "Pelon." While at the ranch, Enrique Hinojosa-Acevedo heard Pedro Victoria tell the others that Toro had not paid him for the last shipment of cocaine he had received from Pedro Victoria. Enrique Hinojosa-Acevedo heard Pedro Victoria and Individual O instruct Saul Rodriguez to get the money from Toro.

During the time that Pedro Victoria was trying to collect the drug debt Toro owed to him, Enrique Hinojosa-Acevedo often spoke to Alex Estrada. During this time, Alex Estrada often asked Enrique Hinojosa-Acevedo for information about Toro, such as where Toro lived. On one occasion, Enrique Hinojosa-Acevedo told Alex Estrada that he was planning on meeting Toro at a particular place and time in the Chicago area. Enrique Hinojosa-Acevedo went to the meeting location but Toro never arrived.

103

While Enrique Hinojosa-Acevedo was in Mexico, Alex Estrada told him that Toro sent a person in his place to attend the meeting. Enrique Hinojosa-Acevedo later heard that the person Toro had sent in his place was Toro's brother-in-law. Alex Estrada explained that Pedro Victoria arranged for that person, believing he was Toro, to be kidnapped. Alex Estrada told Enrique Hinojosa-Acevedo that the person was ultimately released. Enrique Hinojosa-Acevedo believed that Pedro Victoria had told Alex Estrada to call him and get the information about when Enrique Hinojosa-Acevedo planned on meeting with Toro so that Pedro Victoria could kidnap Toro. Enrique Hinojosa-Acevedo has not spoken with Toro since the kidnapping occurred.

**S.      2004 Kidnapping & Robbery of Victim J, Victim K & Victim L**

In 2004, Jorge Lopez was buying cocaine from the twins, who had fled to Mexico to evade arrest in the United States. Jorge Lopez delivered the money for the cocaine he purchased to Victim J. Jorge Lopez told Saul Rodriguez about his interest in having Victim J kidnapped and robbed. Jorge Lopez theorized that the twins would not retaliate for the kidnapping. Jorge Lopez and Saul Rodriguez agreed to commit the kidnapping.

Jorge Lopez, Saul Rodriguez, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, and Fares Umar subsequently planned and executed the kidnapping of Victim J at a money stash house controlled by the twins. During the kidnapping, the participants found two other men inside of the home. Victim J and the two other men (Victim K and Victim L) were restrained and threatened to reveal the location of cocaine and money. Victim J was then transported to another location where the participants in the kidnapping found 135 kilograms of cocaine. Saul Rodriguez sold the cocaine and split the proceeds from his sale of the cocaine with those members of the enterprise who had participated in the kidnapping and robbery.

104

1.      *Information from Victim J*

In the early Summer of 2001, Victim J met the twins while working as a barber in the Chicago area.  Soon after that, Victim J began working at a barber shop owned by the twins.  During that period of time, Victim J came to understand that the twins sold drugs for a living.  While working at the barber shop, the twins paid for Victim J to travel with them to Las Vegas to attend the Sugar Shane Mosley v. Oscar De La Hoya fight.

Soon after returning from Las Vegas, the City of Chicago closed the barber shop owned by the twins.  Victim J then moved in with a worker for the twins, Individual P.  Soon after moving in with Individual P, Victim J began wiring money for the twins, and later picking up drug proceeds for the twins.  Victim J then met with the twins in Puerto Vallarta, Mexico.  Victim J understood that the twins were in Mexico because they were wanted on a money laundering charge in the United States.

While in Mexico, Victim J met with one of the twins, who asked if Victim J wanted to work for the twins.  The twin told Victim J that he should not cooperate in the event that he was arrested by the police.  The twin promised to pay Victim J $100,000 if he did not cooperate.  Victim J flew back to the United States after three or four days.

Upon returning to Chicago, Victim J picked up and delivered bags of drug proceeds at least once a day for the next several months.  During that period of time, the twins instructed Victim J to meet with a person he knew by the nickname "Oso."  Victim J identified a picture of Jorge Lopez as the person he knows as Oso.

In what Victim J believed to be the Fall or early Winter of 2003, he picked up drug proceeds about five times.[18]  Before each meeting, Victim J received a phone call from one of the twins.  The

---

[18]  Based on information gathered from law enforcement, the government believes the events Victim J describes took place in 2004 rather than 2003.

person on the phone told Victim J where and when to meet with Jorge Lopez.  Each time, Victim J

met with Jorge Lopez outside of a house on the South Side of Chicago.  Jorge Lopez would leave the

house and get into Victim J's car.  Once Jorge Lopez was inside of Victim J's car, Jorge Lopez gave

Victim J a package  containing drug proceeds.  Victim J then drove Jorge Lopez to an apartment

building in the South Loop.   After dropping Jorge Lopez off, Victim J drove to the garage of one of

the twins' associates, Victim K, on Armitage and I-94.  Once there, Victim J delivered the package

he received from Jorge Lopez to the twins' associate.

In what Victim J believes was December 2003, Victim J drove to Polo's home to give him

a gift.  When Victim J got to the area of Victim K's  home, he noticed a blue van with about three or

four men inside.  The men looked to Victim J to be Mexican gang bangers.  Victim J identified a

picture of Fares Umar as one of the men he saw sitting in the van.  It looked as if the gangbangers

were watching Victim K's house.  As Victim J passed the van, he thought that the gangbangers were

watching him.  Victim J was so worried that he called one of the twins and expressed his concern

about being robbed by the men he had seen in the van.  The twin told Victim J that he was just being

paranoid.  Victim J ended up driving away from the area without giving Victim K his gift.

Later that night, Victim J was at Dave & Buster's in downtown Chicago with his cousin,

Victim L, when one of the twins called.  The twin told Victim J to meet with Jorge Lopez at his

apartment building in the South Loop and pick something up from him.  Victim J and Victim L drove

to Jorge Lopez' apartment.  Once there, Jorge Lopez walked out to Victim J's car and gave him an

envelope containing what Victim J believed to he money.  Jorge Lopez then walked away.  Victim

J called one of the twins and told him that he had picked up the money from Jorge Lopez.  Victim J

complained that the envelope could only contain a small amount of money.  Victim J and Victim L

drove straight to Polo's home near Armitage.  While driving there, Victim J began to think that something was wrong.  Jorge Lopez usually got into Victim J's car when he delivered money to him.  This time, Jorge Lopez had refused to do so.  Jorge Lopez usually delivered a large bag containing money to Victim J.  This time, Jorge Lopez delivered an envelope containing a small amount of money to Victim J.

As Victim J got to the Armitage exit on I-94, Victim J called Victim K and told him to open the garage door.  As Victim J entered the garage, he noticed that Victim K was not inside of the garage as he normally would be.  Victim J told Victim L to go inside of the home and get Victim K.  As Victim L did so, Victim J saw a few men running from outside of the garage, which was still open, toward his car.  At first, Victim J thought that the men were police officers and that he was going to be arrested.

As the men ran closer, Victim J heard one or several of them say "Chicago Police!," and give him a series of verbal commands.  The people spoke in Spanish.  One of the men walked towards Victim J, pointed a gun at his head, and told him to look down and put his hands on the steering wheel. Victim J was able to see the man but only for a brief second.  Victim J did what the man told him to do.  After Victim J put his hands on the steering wheel, someone put duct tape over his eyes.  Someone then duct taped his hands together in front of his body.  It was then that Victim J realized that the men were not police officers, and that he was being robbed.

After Victim J's eyes and hands were duct taped, someone pulled him out of the car and put him face down on the ground.  The man who talked to Victim J before asked him in Spanish how much money he had on him.  He was the only person who spoke to Victim J directly that night.  Victim J told him that he had about $800 in his pocket.  The man told Victim J that they, meaning

107

the men who were robbing him, were "professionals" and were not interested in his money or jewelry. The man said that they had been following Victim J for a long time.  The man explained that they knew everything about Victim J and that if he told them where the "work" and the money were being kept, that he wouldn't be hurt.  Victim J understood the word "work" to refer to cocaine.  The man threatened Victim J that if no drugs or money were found that he would be tortured until they got what they wanted.  At that point, Victim J started to pray.  Victim J knew that the money was in Victim K's house but did not know for certain where any cocaine was being stored.

Someone then told Victim J to sit on his knees.  Victim J did so.  Victim J then felt the barrel of a gun being placed against his head.  The man who had talked to him before again demanded to know where the drugs and money were being hidden.  While in the garage, the man who was talking to Victim J told someone over the phone in English that they had found $80,000.  Victim J understood that they had found the money in Victim K's home.  Victim J thought that the men would release him because money had been found in Victim K's house.

Instead, the man told Victim J that he was going to come with them.  Someone picked Victim J up and put him in the back seat of Victim J's GMC Envoy.  Victim J heard and felt other men get into the car.  Someone then drove the car away.  Victim J's head was resting on the lap of one of the men.  Victim J felt the barrel of a gun against his head.  As they left Victim K's house, Victim J assumed that Victim L and Victim K were tied up or dead inside of Victim K's house.

As someone was driving the Envoy, Victim J heard the man who had previously spoken to him say that they had followed him to a house on Diversey before.  Victim J had delivered money to a home on Diversey before.  The man explained that they wanted to go inside of the house.  While driving there, the man told Victim J that if nothing was found in the house, they would send him to

108

Mexico in parts.  The man asked Victim J for the code to get inside of the gate.  Victim J gave the man the code.  Victim J felt the car enter the garage and heard at least two people get out of the car.  The people in the back of the car with Victim J did not move.  Victim J did not hear the garage door open or close.  Victim J was so terrified that he was unable to pay attention to everything that was happening around him.  Victim J was spending the time asking God to forgive him for his sins so that he wouldn't go to hell.

After a few minutes, Victim J heard someone yell "Bingo" from inside the house.  At that moment, Victim J felt relieved that someone had found money or cocaine inside of the house.  Someone took Victim J out of the car and put him on the floor inside of the house.  Victim J stayed on the floor for the next 45 minutes.  During that time, he heard men going in and out of the house.  Victim J understood that they had found money or cocaine and were loading it into the car.  After 45 minutes, the man who had spoken to Victim J before told him that he had left a razor and phone nearby and that after Victim J heard the garage close, he could cut himself free.

As soon as Victim J heard the garage door close, Victim J broke the tape on his hands with his own strength and removed the tape from his eyes.  Victim J used the phone to call one of the twins.  Victim J told the twin what had happened and where he was at.  Victim J asked about Victim L and Victim K.  The twin said that they were okay, that he had spoken to them.  The twin said that Victim L and Victim K had been tied up in Victim K's home.  The twin arranged for someone to come by and pick up Victim J.  The twin eventually blamed Jorge Lopez for having participated in the kidnapping and theft.  Within weeks of the kidnapping and theft, Victim J moved out of fear for his life.  Victim J never found out how much money or cocaine was taken, but heard from people that it was around $4,000,000 of money and cocaine.

109

### 2.   *Information from Jorge Lopez*

In the Fall of 2004, Jorge Lopez told Saul Rodriguez about a plan to make some quick money. Jorge Lopez explained that many of the twins' employees had been stealing from the twins because both of them were in Mexico attempting to evade capture on a warrant for their arrest in the United States.   Jorge Lopez told Saul Rodriguez that they could steal drugs and money from a courier who worked for the twins, Victim J.   Jorge Lopez approached Saul Rodriguez with the idea because Jorge Lopez had heard that Saul Rodriguez and his crew engaged in such robberies.

In November 2004, Jorge Lopez met with Saul Rodriguez in the area of Archer and Narragansett in Chicago.   During the meeting, Jorge Lopez told Saul Rodriguez that he was receiving 15 to 20 kilograms of cocaine every two weeks from Victim J.   Victim J also picked up the cocaine proceeds from Jorge Lopez.   Jorge Lopez claimed that Victim J talked openly about the quantity of cocaine he was distributing for the twins.   Initially, Jorge Lopez and Saul Rodriguez agreed to wait until Giovanni had a large amount of cocaine in his possession and then rob him.   Jorge Lopez did not talk to Saul Rodriguez about who Saul Rodriguez was going to use to commit the robbery.

In order to conduct the robbery, Jorge Lopez and Saul Rodriguez had to locate the stash house being used by Victim J. Lopez called Saul Rodriguez shortly before he next delivered money to Victim J so that Saul Rodriguez could follow Victim J to the home where he took the money.   Jorge Lopez first called Saul Rodriguez shortly before making a $100,000 payment to Victim J.   Jorge Lopez delivered the money to Victim J outside of the apartment building in which he lived in the South Loop.

Two to three days later, Jorge Lopez spoke to Saul Rodriguez again.   Saul Rodriguez asked Jorge Lopez to deliver money to Victim J again.   Jorge Lopez believed Saul Rodriguez was making

the request because he had been unable to follow Victim J after the prior delivery.  Jorge Lopez
agreed to make another delivery to Victim J.  Jorge Lopez delivered only a small amount of money
(tens of thousands of dollars) to Victim J outside of his South Loop apartment building.

Later that same day, Saul Rodriguez called Jorge Lopez and told him that Saul Rodriguez and
others had been unable to find any cocaine or money inside of the house to which they had followed
Victim J.  Jorge Lopez reassured Saul Rodriguez that the cocaine had to be somewhere since Victim
J had recently told Jorge Lopez that he was in possession of 200 kilograms.  Within a few hours, Saul
Rodriguez called Jorge Lopez again and said that they had found the cocaine.  One day later, Saul
Rodriguez told Jorge Lopez that he had stolen the money that Jorge Lopez had paid to Victim J and
200 kilograms of cocaine.

Jorge Lopez agreed to allow Saul Rodriguez to pay him with proceeds from Saul Rodriguez'
sale of the stolen cocaine.  Jorge Lopez understood that he was going to be paid for the sale of 50
kilograms of cocaine at a price of $18,000 per kilogram.  Saul Rodriguez made partial payments to
Jorge Lopez every week.  Saul Rodriguez ultimately paid Jorge Lopez between $550,000 and
$600,000.

### 3.    *Information from Saul Rodriguez*

In or around late 2004 or early 2005, Jorge Lopez told Saul Rodriguez that he was buying
large quantities of cocaine from the twins on a regular basis.  Jorge Lopez explained that he delivered
the cocaine proceeds to a money courier for the twins, Victim J.  Jorge Lopez explained that Victim
J often picked up money from him at his apartment building in the South Loop.  Jorge Lopez told
Saul Rodriguez that Victim J delivered the money to a condominium near I-90/I-94 and Diversey.
Jorge Lopez identified Victim J's car as a black Chevy Trailblazer.  Jorge Lopez explained that there

was a trap compartment in the rear of the Trailblazer capable of holding a large amount of cocaine and cocaine proceeds.

Jorge Lopez told Saul Rodriguez that the twins did not retaliate when their cocaine or cocaine proceeds were stolen or seized by other people. As a result, Jorge Lopez suggested that they should kidnap Victim J and hold him until he arranged for a cocaine or money ransom to be paid to secure his release. Saul Rodriguez agreed to participate in the kidnapping. Jorge Lopez and Saul Rodriguez agreed that Jorge Lopez would contact Saul Rodriguez the next time he met with Victim J so that he could follow Victim J back to the place where he took the money.

Within weeks, Jorge Lopez called Saul Rodriguez and told him that he was going to be delivering money to Victim J within a couple of days. Saul Rodriguez talked to Hector Uriarte who agreed to conduct surveillance of Victim J with him. Saul Rodriguez understood that Hector Uriarte would reach out to other people to get them involved in the surveillance as well. Saul Rodriguez talked to Fares Umar about conducting surveillance of Victim J. A couple of days later, Jorge Lopez called Saul Rodriguez and told him that he was going to deliver money to Victim J that day in the area of 13th and State at a certain time. Hector Uriarte, Jorge Uriarte, and Saul Rodriguez went to the area of 13th and State and watched as Jorge Lopez delivered a bag containing what Rodriguez believed was cocaine proceeds to a person inside of a black Trailblazer. Saul Rodriguez believes that Fares Umar and another person were also there conducting surveillance. They followed the Trailblazer to the area of I-90/I-94 and Diversey, where they lost track of it. Saul Rodriguez called Jorge Lopez and told him that they had lost track of the Trailblazer.

Within a couple of weeks, Jorge Lopez called Saul Rodriguez to tell him that Victim J was on his way to Jorge Lopez's apartment building to pick up cocaine proceeds from him. Saul

Rodriguez talked to Hector Uriarte who agreed to conduct surveillance of Victim J with him. Saul Rodriguez understood that Hector Uriarte would reach out to other people to get them involved in the surveillance that day as well. Saul Rodriguez also talked to Fares Umar about conducting surveillance of Victim J that day, and Fares Umar agreed to do so. Hector Uriarte, Jorge Uriarte and Saul Rodriguez went to the area of 13th and State in separate cars and watched as Jorge Lopez delivered a bag containing what Saul Rodriguez believed was cocaine proceeds to a person in a black Trailblazer. Saul Rodriguez believe that Fares Umar and another person were also there conducting surveillance. They followed the black Trailblazer as it left the area of Jorge Lopez's apartment building. One of them saw Victim J pull into a garage behind a two-flat building near I-90/I-94 and Armitage.

A few weeks later, Jorge Lopez called Saul Rodriguez and told him that Victim J was on his way to Jorge Lopez's apartment building to pick up cocaine proceeds from him. At the time, Saul Rodriguez was with his wife in her Lexus SUV. Saul Rodriguez called Hector Uriarte and Fares Umar and told them about the information Jorge Lopez had just shared with him. They agreed to meet at a gas station near I-90/I-94 and Armitage. Saul Rodriguez assumed that Hector Uriarte would call Jorge Uriarte and the other person who had previously conducted surveillance on Victim J. After speaking to Hector Uriarte and Fares Umar, Saul Rodriguez told his wife to drive him to the gas station near I-90/I-94 and Armitage. She dropped him off a few blocks away from the gas station.

Saul Rodriguez walked to the gas station where he met with Hector Uriarte, Jorge Uriarte, Fares Umar, and another person. They had arrived in a mini van and at least one other car. They agreed that Fares Umar, Hector Uriarte, and Jorge Uriarte would stand in the gangway alongside the garage, and then enter the garage once Victim J drove inside. Saul Rodriguez understood that they

would make Victim J let them into the building by threatening him, in part, with guns. Saul Rodriguez understood that they would then restrain Victim J by tying his hands and feet and covering his eyes. Saul Rodriguez understood that they would then search the building, restrain anyone else inside, and search for any cocaine or money. Saul Rodriguez agreed to conduct surveillance of the area with the other person.

At the end of the meeting at the gas station, Saul Rodriguez got into the mini van with another person. They drove to the area of the building where they had seen the black Trailblazer drive a few weeks beforehand, and conducted mobile surveillance of the area. Shortly after that, Saul Rodriguez saw a black Trailblazer driving in to the garage. Saul Rodriguez called Hector Uriarte and told him that Victim J was arriving at the garage. Shortly after that, Hector Uriarte called Saul Rodriguez and told him that he had Victim J and Victim J's relative, Victim L, restrained inside of the building, but that they had been unable to find any money or drugs. Saul Rodriguez got out of the car and walked into the garage, the door to which one of the others had opened.

Once inside of the garage, Saul Rodriguez saw Jorge Uriarte. Jorge Uriarte told Saul Rodriguez that there was nothing in the house, but that they had found money in a small bag in the back seat of the Trailblazer. Saul Rodriguez later counted the money to be between $30,000 to $40,000. Saul Rodriguez assumed that Jorge Lopez had just delivered that money to Victim J. Jorge Uriarte confirmed that Victim J was refusing to say where they could find any additional money or cocaine. Jorge Uriarte told Rodriguez that he knew what to do and left the garage. Saul Rodriguez understood Jorge Uriarte to be saying that he knew how to get Victim J to tell him where the cocaine was kept,  A few minutes later, Jorge Uriarte came back to the garage and told him that he had threatened Victim J with harming Victim L unless Victim J provided information about where the

twins were hiding money or cocaine.   After being threatened, Victim J agreed to provide that information.

Jorge Uriarte then brought Victim J out to the garage.   Jorge Uriarte told Victim J to tell them how to operate the trap compartment in the Trailblazer.   Victim J gave them the directions.   Saul Rodriguez followed the directions and the trap compartment opened.   Saul Rodriguez went to the back and saw that the trap compartment was empty.   Jorge Uriarte and Saul Rodriguez agreed to drive Victim J's Trailblazer to the place where Victim J believed the twins were hiding additional money or cocaine.

Before they left, Saul Rodriguez called his wife.   Saul Rodriguez understood that she was still parked where she had dropped him off earlier that night.   Saul Rodriguez told her to drive to an alley near the building where they were at.   She did so.   Saul Rodriguez walked over to where she had driven and put the bag containing the money that had been found in the backseat of the Trailblazer in the back of the Lexus SUV.   Saul Rodriguez told his wife that he was going to stay in the area, that she should go home, and that he would be home later.   His wife didn't ask any questions and drove away.

After dropping off the bag of money with his wife, Saul Rodriguez walked back to the garage where Jorge Uriarte and Victim J were at.   Jorge Uriarte put Victim J in the backseat of the Trailblazer.   Victim J's hands were tied together and his eyes were covered.   Jorge Uriarte got into the passenger's seat of the Trailblazer, and Saul Rodriguez drove away from the area following the directions that Victim J provided to him.   While they were in the car with Victim J, Victim J was saying that he would tell them what they wanted to know, and asked that they not hurt his relative. Victim J sounded very afraid.

115

Hector Uriarte, Fares Umar, and the other person involved in the kidnapping followed Jorge Uriarte and Saul Rodriguez as they drove Victim J to the place where the additional cocaine or money was hidden. The directions Victim J gave led them to a gated town home complex in the area of I-90/I-94 and Fullerton Avenue in Chicago. Victim J gave them the code to get past the initial gate. Victim J told them which town home to go to. Saul Rodriguez opened the garage of the town home using a garage door opener inside of the Trailblazer. Saul Rodriguez parked the Trailblazer inside of the garage.

Jorge Uriarte and Rodriguez took Victim J out of the Trailblazer and brought him inside of the town home. Once inside, they left Victim J on the floor of the kitchen or living room. They searched the town home for cocaine and money. They found multiple kilograms of cocaine stacked in the kitchen pantry. Jorge Uriarte and Saul Rodriguez packed the cocaine in the pantry into two big duffle bags that were in the town home. They also found a cooler or bag containing additional kilograms of cocaine. They loaded the duffle bags and the cooler or bag into the back of the Trailblazer. Before leaving, Jorge Uriarte and Saul Rodriguez left a knife or a cutter near where Victim J was laying. Jorge Uriarte told him to wait ten minutes and then cut himself free. Jorge Uriarte and Saul Rodriguez then left the town home, got back into the Trailblazer and drove away. As they did so, Jorge Uriarte or Saul Rodriguez told the others, who were waiting nearby, that they had found cocaine inside.

Jorge Uriarte and Saul Rodriguez drove to the area of I-55 and Weber Road near Bolingbrook where they abandoned the Trailblazer. Hector Uriarte picked them up in another car, in which they loaded the duffle bags and cooler or bag containing cocaine. Saul Rodriguez doesn't remember where they left the cocaine. At some point, Saul Rodriguez counted the bricks of cocaine, and found

116

approximately 135 kilograms of cocaine.  Saul Rodriguez gave Jorge Lopez between 25 and 35 kilograms of cocaine.  Saul Rodriguez sold most or all of the remaining 100 to 110 kilograms of cocaine.  Saul Rodriguez may have given Hector Uriarte the cocaine in the cooler or bag.  Saul Rodriguez gave it to Hector Uriarte because he believed the cocaine to be of poor quality.  Before they stole anything, Hector Uriarte, Jorge Uriarte, and Saul Rodriguez agreed to get equal portions of the proceeds from his sale of the cocaine and the money that was taken.  That figure was around $300,000 to $350,000.  Saul Rodriguez gave Fares Umar a smaller percentage of the profits – around $200,000.  The other person involved in the kidnapping got around $150,000.  Saul Rodriguez gave Hector Uriarte his portion of the proceeds as well as the proceeds that Jorge Uriarte and the other person were entitled to receive.  Saul Rodriguez told Hector Uriarte what to pay Jorge Uriarte and the other person.

### T.   2004 Aiding and Abetting Possession of 300 Kilograms of Cocaine

In or around 2003, Saul Rodriguez helped a cocaine supplier named Alex Estrada escape from a Mexican prison.  In or around 2004, Alex Estrada returned to the Chicago area with access to a ready supply of cocaine.  Alex Estrada asked Saul Rodriguez for help in finding a warehouse where he could unload a shipment of cocaine.  Saul Rodriguez and Andres Torres facilitated Alex Estrada's use of a warehouse in the Frankfort area owned by Glenn Lewellen.  Alex Estrada paid Andres Torres for his help.

### 1.   *Information from Saul Rodriguez*

Saul Rodriguez lost touch with Alex Estrada after Glenn Lewellen stole $500,000 from him during a supposed traffic stop sometime in the 1990s.  In or around 2003, Saul Rodriguez was vacationing in Valle de Juarez when he heard people talking about how Alex Estrada was in jail in Zacatecas, Mexico.  Later during the same trip, Saul Rodriguez visited Alex Estrada in jail.  The

117

jailers allowed Saul Rodriguez to visit Alex Estrada in his cell.  While there, Saul Rodriguez saw that Alex Estrada had four cell phones and two kilograms of cocaine in his cell.  Alex Estrada told Saul Rodriguez that he was using the cocaine to pay off the guards in the jail.  Alex Estrada asked Saul Rodriguez to talk to the warden about how much money the warden would need to allow Alex Estrada to "escape" from prison.  Alex Estrada told Saul Rodriguez that he was willing to pay as much as $400,000 to get out of jail.  Alex Estrada gave Saul Rodriguez a number to give to the warden if he was interested in completing the deal.  Saul Rodriguez agreed to do so.

Later that same day, Saul Rodriguez met with the warden at the airport in Zacatecas.  Alex Estrada arranged the meeting.  Saul Rodriguez went to the airport alone.  During the meeting, Saul Rodriguez told the warden that Alex Estrada was willing to pay him $250,000 in exchange for allowing Alex Estrada to "escape" from prison.  Saul Rodriguez gave the warden the number Alex Estrada had given to him.  Saul Rodriguez told the warden to call the number to coordinate the payment from Alex to him.  Saul Rodriguez returned to Chicago shortly after meeting with the warden.  Six months later, Saul Rodriguez heard that Alex Estrada had "escaped" from prison.

Soon after learning that Alex Estrada had escaped from prison, Alex Estrada called Saul Rodriguez and told him that he was in the Chicago area with his girlfriend.  Alex Estrada stayed at Saul Rodriguez' Countryside residence for a week or two before he moved into a condominium in the area of  Bolingbrook or Plainfield.  While Alex Estrada was staying at Saul Rodriguez' house, Alex Estrada claimed that he had recently met with Individual Q, a Mexican cartel boss, at one of his homes in Mexico.  Alex Estrada claimed that as a result of meeting with Individual Q, he would be getting fronted cocaine on a regular basis.  Alex Estrada asked Saul Rodriguez if he knew of a warehouse where he could unload tractor trailers containing cocaine.  Saul Rodriguez called Andres

118

Torres, who arranged for Alex Estrada to use a warehouse that Glenn Lewellen had in Frankfort,

Illinois. Andres Torres was storing his painting equipment at the warehouse.

Andres Torres called Saul Rodriguez after the tractor trailer had been unloaded. Andres

Torres told Saul Rodriguez that he was at the warehouse when the tractor trailer arrived. Andres said

that several people with large firearms showed up. Andres Torres told Saul Rodriguez that he and

those individuals unloaded the cocaine into the warehouse. Andres Torres told Saul Rodriguez that

Alex Estrada paid him $30,000 for his help. Andres Torres told Saul Rodriguez that he did not want

to continue to work with Alex Estrada because the people with whom Alex Estrada worked carried

large firearms. Based on the amount of money that Alex Estrada paid Andres Torres, Saul Rodriguez

believed that the load of cocaine Andres Torres unloaded was approximately 300 kilograms.

Within a couple of days, Glenn Lewellen called Saul Rodriguez screaming about what had

happened in the warehouse. Glenn Lewellen explained that there was lettuce all over the warehouse.

Until Glenn Lewellen called, Saul Rodriguez did not know that the cocaine that had been unloaded

at the warehouse had been hidden under a shipment of lettuce. Glenn Lewellen told Saul Rodriguez

to get the warehouse cleaned. Saul Rodriguez called Andres Torres and told him about Glenn

Lewellen's call. Saul Rodriguez told him to make sure that the warehouse got cleaned up.

### 2.   *Information from Andres Torres*

In approximately 2004, Saul Rodriguez introduced Andres Torres to a person he knows as

Alex at a family gathering. Andres Torres identified a photograph of Alex Estrada as the person he

knows as Alex. Saul Rodriguez explained that Alex Estrada wanted to use the warehouse Andres

Torres rented from Glenn Lewellen to unload something. Saul Rodriguez further stated that the

unloading would be done at night. Saul Rodriguez told Andres Torres that he would be paid

119

approximately $3,000 for allowing Alex Estrada to use the warehouse.  Saul Rodriguez told Andres Torres to leave the warehouse unlocked for Alex Estrada.  Andres Torres understood that Alex Estrada needed the warehouse to unload cocaine from a trailer.  Andres Torres agreed to let Alex Estrada use the warehouse and left it unlocked for several nights.  Andres Torres later met with Saul Rodriguez, who paid him approximately $3,000 for the use of the warehouse.

After a week or two, Andres Torres received a call from Glenn Lewellen.  Glenn Lewellen was angry and complained that there was a big mess at the warehouse.  Glenn Lewellen explained that there were boxes of lettuce or cabbage all over the warehouse.  Glenn Lewellen said that he knew that the warehouse had been used to unload cocaine, which must have been packaged in the lettuce or cabbage.  Glenn Lewellen also said that Saul Rodriguez should let him know when he is going to be doing anything.  Andres Torres understood Glenn Lewellen to mean that Saul Rodriguez should let him know before he used the warehouse to unload shipments of cocaine.  Glenn Lewellen wanted Andres Torres to come and clean up the warehouse.  Within a couple days, Glenn Lewellen called to say a dumpster had been delivered to the warehouse and Andres Torres could come over to clean up the mess.  Andres Torres cleaned up Glenn Lewellen's warehouse with the assistance of some of his painters.    Andres Torres spoke with Saul Rodriguez after speaking with Glenn Lewellen about the mess at the warehouse.

## U.    2005 Attempted Murder of Victim X

### 1.    *Information from Saul Rodriguez*

In what Saul Rodriguez believes was 2004, Individual I contacted Rodriguez regarding a murder for hire.  Individual I told Saul Rodriguez that he needed help in having someone killed.  Saul Rodriguez, Andres Flores, and Individual I later met to discuss the murder for hire.  During the

meeting, Individual I provided Andres Flores with a description of Victim X. Individual I mentioned that Victim X frequently drank at a bar near 53rd and Kedzie in Chicago. Saul Rodriguez believes that Andres Flores may have brought another person to the meeting with Individual I. Andres Flores later told Saul Rodriguez that Flores had shot Victim X as he left the bar near 53rd and Kedzie. Andres Flores explained that he had shot Victim X as he was getting into a car but that the weapon then jammed. Andres Flores said that Victim X was able to exit his car and leave the area on foot. Andres Flores did not believe that Victim X died as a result of being shot. Saul Rodriguez does not know if Individual I ever paid Andres Flores for the shooting, or whether Victim X died as a result of being shot.

### 2.  *Information from Andres Flores*

In the Spring or Summer of 2005, after Andres Flores was released from prison, Saul Rodriguez and Hector Uriarte recommended Andres Flores to a man that needed someone killed. Andres Flores understood that the person that was targeted owed someone money. Hector Urirate introduced Andres Flores to the man, though Andres Flores does not know his name. Andres Flores and Hector Uriarte met with the man and he told Flores and Hector Uriarte that someone owed him money. The person that owed the money hung out at a bar near 53rd St. and Kedzie. The man said that the individual to be killed drove a white Jeep Cherokee. Andres Flores did not learn the name of the person who was to be killed or what he looked like. Andres Fores was to go to the bar near 53rd St. and Kedzie and wait in the parking lot until he saw a man go to a white Jeep Cherokee and then shoot him. Hector Uriarte told Andres Flores he would be paid around $15,000 to $20,000 to commit the murder.

Soon after the meeting with Hector Uriarte and the man who wanted someone killed, Hector Uriarte called Andres Flores to tell him that the person to be killed was at the bar. Andres Flores drove toward the bar, then drove one street over and parked his car. Andres Flores walked through a gangway, across an alley, and waited in a small backyard next to the bar's parking lot. Andres Flores could see a white Jeep Cherokee in the parking lot. Andres Flores brought with him a revolver that Hector Uriarte had given him. Andres Flores saw a guy get out of the bar and walk toward the white Jeep Cherokee. Andres Flores jumped the fence separating the backyard from the parking lot, and walked toward the Jeep Cherokee. By this time, the man was already sitting in the driver's seat of the Jeep Cherokee. Andres Flores shot through the driver's side window toward the man's face. The window shattered and Andres Flores thought he hit him, but the man did not die. The man got out of the passenger's side of the Jeep Cherokee and started to run away. Andres Flores followed the man and shot at him one more time but missed. Andres Flores did not shoot at the man again. Andres Flores left the area in his Chevy Lumina. Andres Flores later met up with Hector Uriarte and the man who solicited the murder in the area of 47th St. and Kedzie. Andres Flores received around $7,000 to $8,000 for the shooting. Andres Flores did not receive the full amount because he had not been successful in killing the man.

### V.  May 2006 Obstruction of a Federal Investigation

In late 2005, the DEA initiated an investigation of Saul Rodriguez' drug trafficking activities. The DEA had identified Pedro Victoria as one of the people who supplied Saul Rodriguez with cocaine. The DEA also had identified Andres Torres as Saul Rodriguez' brother-in-law and drug courier. The DEA aimed to wiretap Andres Torres' phone in order to capture conversations between Andres Torres and Saul Rodriguez. The DEA hoped that such conversations would enable it to

wiretap Saul Rodriguez' phone in order to capture conversations between Saul Rodriguez and Pedro Victoria.

In March 2006, the DEA conducted a controlled buy of cocaine from Andres Torres. As a result of that controlled buy, the DEA was able to obtain an order authorizing the wiretap of a cellular telephone used by Andres Torres. By May 6, 2006, Glenn Lewellen told Saul Rodriguez and Andres Torres that the federal government was conducting a wiretap investigation of their activities. Saul Rodriguez and Andres Torres stopped using their phones, including the phone that the DEA was wiretapping, thereby compromising the DEA's investigation of Saul Rodriguez and his associates.

### 1. *Information from Saul Rodriguez*

In the Spring of 2006, Saul Rodriguez was purchasing wholesale quantities of cocaine from a number of different Mexican-based sources of supply. Saul Rodriguez sold nearly all of the cocaine to Walter Johnson. Andres Torres served as the courier transporting the cocaine to and cocaine proceeds from Walter Johnson. Following one transaction, the source of supply complained to Saul Rodriguez that the cocaine proceeds were $100,000 short. Saul Rodriguez inspected the cocaine proceeds at a warehouse Glenn Lewellen owned in the Frankfort area. Saul Rodriguez understood that Andres Torres had access to the warehouse and was using the space to store drugs and drug proceeds on Saul Rodriguez' behalf. Saul Rodriguez blamed Andres Torres for the shortage and told him that he would have to work off the difference.

Shortly after the money from a transaction was approximately $100,000 short, Saul Rodriguez coordinated a cocaine deal with Roberto Palma-Chavez, a person who coordinated shipments of cocaine from Mexico to the Chicago area, and shipments of cocaine proceeds from the Chicago area to Mexico. Roberto Palma-Chavez directed Saul Rodriguez to meet with his courier in the area of

47th Street and Cicero in Chicago.  Once Saul Rodriguez got there, he saw Manny Corral.  Saul Rodriguez has known Manny Corral since childhood.

During Saul Rodriguez' meeting with Manny Corral, Manny Corral agreed to front 50 kilograms of cocaine to him in a matter of days.  Ultimately, the deal happened about three blocks east of Cicero on 47th Street in Chicago. Saul Rodriguez sent Andres Torres to pick up the cocaine. Saul Rodriguez directed Andres Torres to deliver all 50 kilograms of cocaine to Walter Johnson. Andres Torres did so.  Within days, Walter Johnson delivered the money to Andres Torres for the cocaine.  Saul Rodriguez told Andres Torres that he was not going to pay him for his work on this particular deal.  Instead, Saul Rodriguez would put what Andres Torres would have earned towards the money he owed me for the money missing from the warehouse.

Around this same time, Andres Torres told Saul Rodriguez that he was talking to the  person who, unbeknownst to Andres Torres and Saul Rodriguez, was the DEA CS that conducted the one kilogram transaction with Andres Torres.  Saul Rodriguez claimed that he had nothing to do with any cocaine transaction Andres Torres did with the CS.  If Andres Torres mentioned Saul Rodriguez' name to the CS, he did so in an effort to get the CS to buy the cocaine.

By early May 2006, one of Saul Rodriguez' cocaine customers other than Walter Johnson told Saul Rodriguez that Andres Torres had offered to sell him cocaine.  That same person told Saul Rodriguez that Andres Torres had admitted to having sold cocaine to Walter Johnson.  Saul Rodriguez drove to Walter Johnson's house in Matteson, Illinois, where Saul Rodriguez talked to Walter Johnson.  Saul Rodriguez told Walter Johnson that he had learned that Walter Johnson was buying cocaine from Andres Flores. Saul Rodriguez told Walter Johnson to stop buying cocaine from Andres Torres.  Saul Rodriguez explained that Andres Torres would cooperate if he was arrested by

law enforcement.  Saul Rodriguez assured Walter Johnson that he would never talk about their dealings if he was arrested.

Within a day or two, Saul Rodriguez met with Andres Torres at his home in Frankfort.  Saul Rodriguez confronted Andres Torres about his sale of cocaine to Walter Johnson.  Saul Rodriguez told Andres Torres to not sell cocaine to Walter Johnson directly again.  Andres Torres agreed that he wouldn't do so.

Within days of finding out about Andres Torres' purchase of cocaine from Roberto Palma-Chavez and sale of cocaine to Walter Johnson, Saul Rodriguez got a call from Glenn Lewellen.  They met in the area of Wolf Road between their homes.  During the meeting, Glenn Lewellen told Saul Rodriguez that he had just spoken with an agent who had previously worked in the country of Colombia.  Glenn Lewellen explained that the agent told him that the feds were listening to Saul Rodriguez' phone and Andres Torres' phone.  Glenn Lewellen did not say which agency was investigating them.  Glenn Lewellen told Saul Rodriguez to get rid of his phone and to tell Andres Torres to do the same thing.  Saul Rodriguez understood that Glenn Lewellen was providing this information to him so that he could avoid being detected by law enforcement.

After talking to Glenn Lewellen, Saul Rodriguez immediately stopped using the cell phone he used to speak with Andres Torres.  Saul Rodriguez kept the cell phone on which he conducted his legitimate business.  Saul Rodriguez found a way to speak to Andres Torres other than on the phone that he had been using on the time.  Saul Rodriguez told Andres Torres about what Glenn Lewellen had said and told him to get rid of his cell phones.  Within days, Andres Torres left the Chicago area on a previously planned trip to Mexico to visit family.

### 2.    *Information from Andres Torres*

In approximately January or February 2006, there was a problem with some of the drug proceeds Andres Torres had picked up for Saul Rodriguez. Approximately $100,000 was missing from the cash that was being stored at a warehouse in Frankfort that belonged to Glenn. Saul Rodriguez came to the warehouse and they spread the bundles of cash on the floor and counted them. Saul Rodriguez became angry and blamed him for stealing the money. Saul Rodriguez then said that they would no longer work together. Andres Torres later told Glenn Lewellen about the money missing from the warehouse. Glenn Lewellen laughed and said that Saul Rodriguez had probably stolen it himself.

Shortly after the time that Saul Rodriguez blamed Andres Torres for stealing drug proceeds, Andres Torres decided to make some money on his own by selling cocaine to Walter Johnson. Andres Torres still had Walter Johnson's number in his phone and also had a number for Roberto Palma-Chavez. Andres Torres called Roberto Palma-Chavez and he agreed to sell Andres Torres cocaine. Roberto Palma-Chavez told Andres Torres that he would be getting a call from his worker. Andres Torres then called Walter Johnson, who agreed to buy the cocaine.

Within a couple weeks, Manuel Corral called and they agreed to meet. Andres Torres obtained approximately 50 kilograms of cocaine from Manny Corral and sold it to Walter Johnson. Walter Johnson later returned three kilograms of the cocaine because he did not like the quality of the cocaine. Andres Torres had recently run into a man that Torres knew from high school. Unbeknownst to Andres Torres, the man was working for the DEA as a CS. The CS told Andres Torres that he wanted to purchase cocaine. Andres Torres sold the CS one of the bad kilograms of

126

cocaine that Walter Johnson had returned.  At some point, Andres Torres returned the two other kilograms of cocaine to Manny Corral.

While Andres Torres was waiting for the second payment from Walter Johnson, Andres Torres got a call from Pedro Victoria.  Pedro Victoria offered to sell Andres Torres twenty kilograms of cocaine.  Andres Torres ultimately sold the kilograms of cocaine to Sesario Sanchez.  Andres Torres distributed the cocaine to Sesario Sanchez at Glenn Lewellen's warehouse.

At around this time period, Andres Torres was contacted by Saul Rodriguez who asked to meet.  Andres Torres met with Saul Rodriguez at a park in Chicago.  Jorge Uriarte and Hector Uriarte were also there with two other men.  Saul Rodriguez told Andres Torres that he had found out that Andres Torres was selling cocaine to Walter Johnson without him.  Saul Rodriguez was upset and demanded that Andres Torres pay him back for the missing $100,000 by giving him all of the profits from Andres Torres' cocaine sales to Walter Johnson.  Andres Torres agreed to pay Saul Rodriguez the money.

At around this same time, Andres Torres became concerned that law enforcement might be investigating him.  Andres Torres asked Glenn Lewellen if he could find out if Andres Torres was being investigated.  Andres Torres was scheduled to travel to Mexico in a few days.  Earlier in the week, Glenn Lewellen had been cautioning Andres Torres to stay away from Saul Rodriguez.  The day before Andres Torres was scheduled to leave to Mexico, Glenn Lewellen called Andres Torres and asked to meet at his warehouse.  Glenn Lewellen said that he needed to talk to him in person and that what he had to say could not be said over the phone.  Andres Torres met with Glenn Lewellen at the warehouse in the afternoon.  Glenn Lewellen told Andres Torres that he had just come from downtown, where he had talked to some people.  Glenn Lewellen told Andres Torres that he had to

127

pull a couple strings, but that he had found out some things.  Glenn Lewellen told Andres Torres that

Saul Rodriguez and Andres Torres should not be talking on their phones.  Glenn Lewellen further said

that Andres Torres should not throw his phone away right away because it would look suspicious.

Andres Torres understood from Glenn Lewellen's comments that law enforcement was monitoring

his telephone calls.  If Glenn Lewellen had not warned Andres Torres, Andres Torres would have

continued to use his phone to discuss drug transactions.

Later that same day, Andres Torres met with the CS and told him things were hot and that the

phones were being monitored.  Andres Torres told the CS to get a new phone and that they should

only talk on that phone.  Andres Torres also told the CS that he had obtained the information from

a former police officer.  In the next few days, Andres Torres made his planned trip to Mexico.  Andres

Torres stayed in Mexico for two or three weeks before he came back to the Chicago area.

### W.   2006 kidnapping of Victim Z, Victim AA, and Victim BB

#### 1.   *Information from Saul Rodriguez*

Shortly after learning that Andres Torres had been selling cocaine without his permission, Saul

Rodriguez met with Torres, Hector Uriarte, and Jorge Uriarte in a park near Kilborn and 49th Avenue.

Andres Torres told Saul Rodriguez that he was making a cocaine proceeds delivery to Manuel Corral

in the near future.  Andres Torres explained that all of the money he delivered to Manuel Corral

would be transferred to a semi-tractor trailer.  Saul Rodriguez subsequently directed Jorge Uriarte and

Hector Uriarte to conduct surveillance in the area of the semi-tractor trailer and attempt to steal the

drug proceeds.

Days later, Jorge Uriarte, Hector Uriarte, and two other individuals whose identities Saul

Rodriguez cannot remember conducted surveillance in the area of 31 Street[t] and Kostner Avenue.

Andres Torres had told Saul Rodriguez that someone in a Dodge Intrepid would deliver the cocaine proceeds to the semi-tractor trailer. Saul Rodriguez later learned that Jorge Uriarte and Hector Uriarte broke the window out of the Intrepid and forced Victim Z out of the window, but later released him. Andres Torres later told Saul Rodriguez that Hector Uriarte and Jorge Uriarte were at the right location but that he had the wrong person.

### 2.   *Information from Andres Flores*

In approximately 2006, Hector Uriarte called Andres Flores and told him to meet at the Home Depot at 31 Street and Cicero. Andres Flores understood that Hector Uriarte wanted to meet because they had a job to do, which would involve something illegal. Andres Flores drove to the Home Depot with Tony Sparkman and Robert Cardena. When Andres Flores, Tony Sparkman, and Robert Cardena got to the Home Depot, they met up with Hector Uriarte. Hector Uriarte told Andres Flores, Tony Sparkman, and Robert Cardena that he knew of a few guys who were going to be traveling to Mexico with drug proceeds. Hector Uriarte told Andres Flores, Tony Sparkman, and Robert Cardena that they were going to rob them.

Andres Flores, Tony Sparkman, and Robert Cardena drove to the area near the tractor lot, and Saul Rodriguez picked up Andres Flores and Tony Sparkman. Saul Rodriguez drove a short distance, and they met a shorter Mexican man parked on the street. Andres Flores got at least one gun from the man and got back in Saul Rodriguez's car. Saul Rodriguez drove Andres Flores and Tony Sparkman to a lot that housed tractor trailers. Andres Flores and Tony Sparkman were to hide and wait for the men with the drug proceeds to arrive. The lot was in the area north of 31 Street west of Home Run Inn pizza. Andres Flores and Tony Sparkman hid under a trailer and waited. Andres Flores had one of the guns they had just gotten from the Mexican man, which was a .45 caliber black

129

semi-automatic.  After a short while, Andres Flores saw one or two cars entering the lot and then Hector Uriarte, Saul Rodriguez, Jorge Uriarte, Robert Cardena, and another person came in behind the cars.

Andres Flores and Tony Sparkman got out from under the trailer and they all approached the cars, which contained approximately 3 or 4 men.  Andres Flores and Tony Sparkman ordered the men out of the cars.  The driver of one of the cars would not get out.  Andres Flores smashed the driver's side window and pulled the driver out of the car.  Andres Flores and the others placed the men on the ground, tied their hands and feet with duct tape, and put them under a trailer.   Jorge Uriarte questioned one of the men regarding the location of the money.  The man would not tell Jorge Uriarte where the money was located.  As Jorge Uriarte and Hector Uriarte spoke with one of the men, Andres Flores searched the tractor trailer but did not find anything.  Andres Flores then searched the men and found that one of them had approximately $2,000 or $3,000.  Someone took the money and Flores and the others left the area.   Andres Flores later met with Hector Uriarte, Jorge Uriarte, and Tony Sparkman. During that meeting they equally divided the money that was taken from the individual at the truck lot.

### X.    Summer 2006 Possession of 300 Kilograms of Cocaine

In the Summer of 2006, Saul Rodriguez coordinated the theft of 300 kilograms of cocaine from a home in Joliet, Illinois.  Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, and Robert Cardena participated in the theft.  Saul Rodriguez paid himself and those who participated in the theft with the proceeds from Saul Rodriguez' sale of the 300 kilograms of cocaine.

1.    *Information from Saul Rodriguez*

In or around 2006, Saul Rodriguez was buying cocaine from a high-level Mexican-based drug trafficker, Individual R.  At the time, Individual O worked from Mexico coordinating the distribution of cocaine to, and the collection of cocaine proceeds from, Individual R's customers in the Chicago area.   In or around that same time, a cocaine trafficker Saul Rodriguez knew as Individual I told him that a friend had access to a GPS device that could be attached to the bottom of a car.  Saul Rodriguez began to think about how the GPS device could be used to locate the house or warehouse where Individual O and his people were storing cocaine in the Chicago area so that they could then steal the cocaine.

A couple of months after Individual I told Saul Rodriguez about the GPS device, Saul Rodriguez got a call from one of Individual O's workers saying that a load of cocaine had either arrived or was about to arrive in the Chicago area.  Saul Rodriguez told Individual I that he wanted to use the GPS device, and explained how he intended to use the GPS device.  Individual I told Saul Rodriguez that he was willing to give him the GPS device.  Saul Rodriguez agreed to give Individual I and the people who had the GPS device a portion of the proceeds of any cocaine or money that they stole as a result of using it.   Individual I delivered the GPS device to Saul Rodriguez or Ruben Villarreal.

Saul Rodriguez first met Ruben Villarreal in the late 1990's at Triangle Electronics on Pulaski in Chicago.  Saul Rodriguez was often at the store to have electronic and stereo equipment installed in his cars.  Ruben Villarreal was often the person who installed that equipment in his cars.  Within years of meeting him, Ruben Villarreal started his own electronics and stereo store, named  TriStar Electronics.  By in or around 2004, it was clear that Ruben Villarreal was having a difficult time

making ends meet.  In or around the Spring of 2006, Saul Rodriguez asked Ruben Villarreal if he

would transport cocaine and cocaine proceeds for Saul Rodriguez.  Ruben Villarreal agreed to do so.

When working for Saul Rodriguez as a courier, Ruben Villarreal often stored and distributed

cocaine and cocaine proceeds in the TriStar Electronics' garage.  The garage was located in the back

of the store, and accessible through the alley that ran behind the store.  Before getting the GPS device,

Saul Rodriguez talked to Ruben Villarreal about installing the GPS device on the car used by

Individual O's money couriers.  Saul Rodriguez told Ruben Villarreal that he hoped they could use

the GPS device to determine where the money couriers were taking the money we were delivering

to them.  Ruben Villarreal agreed to install the device.

Around the time that Saul Rodriguez received the GPS device, Individual O called Saul

Rodriguez and told him that he could distribute 50 kilograms of cocaine to him.  Saul Rodriguez

directed Ruben Villarreal to pick up 50 kilograms of cocaine from Individual O's worker.  He did so.

Saul Rodriguez was fronted the entire 50 kilograms of cocaine.  Saul Rodriguez directed Ruben

Villarreal to deliver all of the cocaine to Walter Johnson.  Saul Rodriguez sold at least part of the

cocaine to Walter Johnson on a fronted basis.  Within days, Walter Johnson called Saul Rodriguez

and told him that he was ready to deliver the remaining payment for the cocaine.  Saul Rodriguez told

Ruben Villarreal to pick up the payment from Walter Johnson.  He did so.  Saul Rodriguez called one

of Individual O's workers, and told him to send the money couriers to TriStar Electronics.  By that

time, Ruben Villarreal had received the GPS device, and was prepared to install it on the car used by

Individual O's money couriers.

After speaking to one of Individual O's workers, Saul Rodriguez drove to TriStar Electronics.

Ruben Villarreal was at the store.  Soon after getting there, Ruben Villarreal and Saul Rodriguez were

together in the store's garage when we saw the money couriers arrive there in a white four-door car.

Saul Rodriguez saw two Hispanic men get out of the car. The driver had a chubby build, was around

5'8", and was wearing a large belt buckle. Based on how he was dressed, Saul Rodriguez understood

that he was from Mexico. Saul Rodriguez took the driver and the passenger to the front of the store.

While there, Saul Rodriguez talked to them about the things that TriStar Electronics had for sale.

Saul Rodriguez understood that while he was talking to them, Ruben Villarreal was in the garage area

of TriStar Electronics installing the GPS device on the car in which the money couriers arrived. Saul

Rodriguez also understood that Ruben Villarreal was loading the cocaine proceeds from Walter

Johnson into their car. Within ten minutes, Ruben Villarreal came out to the front of the store and

told the men that he was finished with their car. The money couriers got into their car, and drove

away.

After the money couriers left TriStar Electronics, Saul Rodriguez called Individual I.

Individual I began tracking the GPS and telling Saul Rodriguez where the car was located. At some

point, Individual I told Saul Rodriguez that the car was stopped in Joliet. Individual I gave Saul

Rodriguez the address. That night, Hector Uriarte and Saul Rodriguez drove to the address together.

The address was for a home in Joliet right across the street from a hospital. The home had a detached

garage set back from the house. They saw the money couriers' car on which Ruben Villarreal had

installed the GPS device parked in front of the house. After a few minutes, Hector Uriarte and Saul

Rodriguez drove off. Hector Uriarte and Saul Rodriguez agreed that he, Jorge Uriarte, Tony

Sparkman, and Andres Flores would go into the house in front of which the white car was parked,

restrain anyone inside, and steal any cocaine or money that they found.

133

The next day, Saul Rodriguez stayed away from the Joliet area.  Saul Rodriguez understood that Hector Uriarte, Jorge Uriarte, Tony Sparkman, and Andres Flores were going into the home Hector Uriarte and Saul Rodriguez had found in Joliet  At some point in time that day, Saul Rodriguez talked to Hector Uriarte.  Hector Uriarte told Saul Rodriguez that they had gone into the house and garage they had found in Joliet.  Hector Uriarte said that they had not found anyone in the house or the garage.  Hector Uriarte said that they had found boxes containing cocaine and a bag or cooler containing cocaine in the house or the garage.  Hector Uriarte told Saul Rodriguez that he had taken the boxes and bag or cooler to his male cousin's home fifteen minutes away from the house in Joliet.

The next day, Saul Rodriguez went to Hector Uriarte's cousin's home where Saul Rodriguez met with Hector Uriarte, Jorge Uriarte, and his cousin.  The boxes and the bag or cooler containing cocaine were inside of the garage of the cousin's home.  They counted the contents of one box and it contained 20 kilograms of cocaine.  There were around 13 or 14 boxes.  They also counted the contents of the bag or cooler, and found it contained between 25 and 35 kilograms of cocaine.  Between the boxes and the bag or cooler, there were around 300 kilograms of cocaine.  Saul Rodriguez stored the cocaine at Hector Uriarte's cousin's home until Saul Rodriguez gave out or sold all of it.  Soon after stealing the cocaine, Saul Rodriguez gave Individual I and his friend who had obtained the GPS device between 50 and 75 kilograms of cocaine.  Saul Rodriguez sold the remaining amount of cocaine over the next three to six months.  Hector Uriarte, Jorge Uriarte, and Saul Rodriguez each received $800,000 in profits from his sale of the cocaine.  Saul Rodriguez gave Hector Uriarte his money, Jorge Uriarte's money, money to pay Andres Flores and Tony Sparkman,

134

and around $80,000 to $100,000 for Hector Uriarte's cousin.  Hector Uriarte was responsible for giving those people their money.

### 2.   *Information from Andres Flores*

In approximately July or August 2006, Jorge Uriarte or Hector Uriarte told Andres Flores that Saul Rodriguez may need individuals to steal a large load of cocaine or drug proceeds from a home in Joliet, Illinois.  Andres Flores agreed to participate in the theft.  Hector Uriarte or Jorge Uriarte later told Andres Flores to bring firearms to a meeting in the Joliet area.  Andres Flores did so.  Once at that location, Andres Flores met with Hector Uriarte, Jorge Uriarte, Tony Sparkman, and Robert Cardena.  The men then drove to a house near a hospital in Joliet.  Andres Flores waited at the front door of the house with a firearm while Tony Sparkman, Robert Cardena, and Jorge Uriarte walked toward the rear of the house.  Robert Cardena the other firearm.  Andres Flores knocked on the front door.  Andres Flores was surprised when Robert Cardena opened the front door from inside.  There was no one in the house.  Jorge Uriarte and Hector Uriarte began searching a garage at the house. Inside the house, Andres Flores found six or seven kilograms of cocaine in a cooler. Jorge Uriarte and Hector Uriarte found a maroon van inside the garage which contained cardboard boxes full of cocaine.   During the search a small box filled with money was also found and stolen.

Andres Flores, Hector Uriarte, Jorge Uriarte, Tony Sparkman, and Robert Cardena loaded all of the boxes and the cooler filled with cocaine into Hector Uriarte's Expedition.  After the cocaine was loaded into the Expedition, Jorge Uriarte and Hector Uriarte left and Andres Flores drove the Expedition with the cocaine to Jorge Uriarte and Hector Uriarte's cousin's residence in the Joliet or Lockport, Illinois area.  When Andres Flores arrived to the house, he met with Jorge Uriarte and

Hector Uriarte's cousin. Andres Flores parked the Expedition inside the garage and then left with the others.

After leaving the cocaine at Jorge Uriarte and Hector Uriarte's cousin's house, Hector Uriarte, Jorge Uriarte, and Andres Flores drove to Saul Rodriguez' house.  Once there, Hector Uriarte and Jorge Uriarte told Saul Rodriguez that no one was at the house and that the cocaine was easily stolen. Hector Uriarte then told Andres Flores to come to his house the next day.  The next day, at Hector Uriarte's house, Hector Uriarte gave Andres Flores $5,000 in spending money. Within weeks of the theft, Hector Uriarte had paid Andres Flores a total of $125,000 for having participated in the theft of cocaine.  Andres Flores spent all of the money he received from the theft of the cocaine within a year on trips for him and his family and on a Ford Expedition Andres Flores bought from Hector Uriarte.

### Y.    Summer 2006 Kidnapping of Victim M and Victim N

The day after the theft of the 300 kilograms of cocaine, Saul Rodriguez was asked by the Mexican-based drug cartel that owned the cocaine to investigate its theft.  The cartel arranged for Saul Rodriguez to kidnap two individuals and question them regarding their involvement in the theft of the cocaine.  Saul Rodriguez, Hector Uriarte, Jorge Uriarte, Tony Sparkman, and another person kidnapped Victim M and Victim N and kept them against their will at a home in Aslip, Illinois, questioned them about the theft, beat them, and then released them. Saul Rodriguez and the others did so despite knowing that Victim M and Victim N had nothing to do with the theft of the cocaine.

### 1.    *Information from Victim M*

Between late 2000 and the Summer of 2007, Victim M distributed wholesale quantities of cocaine and collected cocaine proceeds for a number of Mexican-based drug trafficking organizations.

These organizations had workers in Joliet who oversaw their cocaine businesses.  Victim M helped those people distribute cocaine to customers on the East Coast, and collect money from the customers' sale of the cocaine.

In 2005 and 2006, Victim M was working with Individual R.  In 2006, Individual R told Victim M that someone had stolen 300 kilograms of cocaine from a stash house in the Joliet area. Before that time, Victim M had received cocaine from and delivered cocaine proceeds to the couriers, Individual S and Individual T, who lived at the stash house.  Victim M knew that the cocaine that had allegedly been stolen belonged to Individual O.  Victim M had purchased cocaine from Individual O from 2000 to 2004, and in 2005 agreed to cover a $150,000 cocaine debt for Individual O.

Early one day in March 2006, Individual R came to Victim M's auto body store in Joliet and told Victim M that Individual O had sent people to the Chicago area to find out what had happened to the 300 kilograms of cocaine.   Individual R explained to Victim M that those people had first kidnapped Individual S and Individual T, and then kidnapped Victim N, a person with whom Victim M worked in the cocaine business.   Victim M  identified a photograph of Victim N as the person he knows as Victim N.  Individual R said the kidnappers had come to see him the night before and asked to see Victim M.  Individual R told the kidnappers that his people had nothing to do with the stolen cocaine, but that he would bring Victim M to them the next day.  While in Victim M's body shop, Individual R asked Victim M to come with him to meet the people who kidnapped Victim N so that Victim M could talk to them.  Individual R told Victim M that they just wanted to ask Victim M questions, promised that nothing bad would happen to Victim M, and that Victim M would be back in a couple of hours.  Victim M agreed to meet them.

137

Early in the afternoon that same day, Individual R drove Victim M to the Auto Zone parking lot located near Cass and Collins in Joliet.  Once there, Individual R and Victim M met with one of the kidnappers.  Victim M identified Saul Rodriguez as one of the kidnappers.  During a debriefing of Victim M in early 2008, Victim M stated that Saul Rodriguez was standing near a 2004 or 2005 bluish-grey four door Acura.  Victim M saw Victim N sitting in the front passenger's seat of the Acura.  Victim M identified a photograph of Hector Uriarte as the person sitting in the back seat of the Acura.   No one else was in the Acura.

Individual R talked to Saul Rodriguez in front of Victim M.  Saul Rodriguez told Individual R that he needed Victim M to go with him.  Individual R told Saul Rodriguez that he wouldn't let Victim M go with him until Victim M spoke to Individual O.  Saul Rodriguez promised Individual R that he would put Victim M on the phone with Individual O, but that Victim M needed to go with him right then.  Saul Rodriguez also said that he was not ready to let Victim N go.  Victim M got into the back seat of the Acura, where Uriarte was still sitting.  Victim N was still sitting in the front passenger's seat.  Saul Rodriguez got into the driver's seat of the Acura, and drove them away from the area.

Saul Rodriguez drove them east towards Indiana.  At some point before they reached the first toll on I-80, Saul Rodriguez made a call on his cell phone.  Victim M heard him tell the person on the other end of the line "you'll have to talk to him, I told your uncle that I'd put him on the phone with you."  Saul Rodriguez then gave Victim M the phone.  Individual O was on the other end of the line.  Victim M spoke to Individual O for about ten minutes.  During the conversation, Victim M was very upset.  Victim M reminded Individual O that Victim M had covered a $150,000 debt for him, and that he had never paid Victim M back.  Victim M told Individual O that Victim M had nothing to do with

138

the stolen 300 kilograms of cocaine.  Individual O told Victim M that he was sorry, but that he was in the same situation as Victim M.  Individual O claimed that he too had been kidnapped, and was being held hostage somewhere at that same time.  Victim M didn't believe him.  During his conversation with Individual O, Victim M heard Hector Uriarte repeatedly tell Saul Rodriguez "this is bullshit".  Saul Rodriguez kept on telling Victim M "keep it low."  After about ten minutes, Saul Rodriguez took the phone from Victim M, and told Victim M that Victim M could talk to Individual O later.  Saul Rodriguez talked to Individual O briefly and then hung up the phone.

Around the time that Victim M stopped talking to Individual O, Saul Rodriguez paid the first toll on I-80.  Shortly after that, Uriarte put a blanket over Victim M and told Victim M to get down. Victim M could tell that Saul Rodriguez then drove the Acura off of the expressway, and drove on to a bumpy road.  After a short time, the Acura came to a stop.  Someone took Victim M from the Acura and threw Victim M into the back of a cargo van.  Someone threw Victim N in the van with Victim M.  Victim M could tell that it was a cargo van because the van had no upholstery.  Victim M could also hear the sliding door of the van open and close.  Before the door closed, Victim M heard Saul Rodriguez say something like, "Don't worry, everything will be okay."  Saul Rodriguez did not get into the van.  Hector Uriarte was screaming at Victim M as Victim M was being moved from the Acura into the van, and then got into the van with Victim M and Victim N.

The driver of the van then drove Victim M and Victim N away from the area.  Victim M was still covered and could not see where they were going.  Victim M did hear other people in the car shouting directions about taking I-294 instead of I-290 and taking certain turns.  After a short period of time, the van came to a stop.  Hector Uriarte told Victim M and Victim N to keep their heads down and not look at anything.  Hector Uriarte then took Victim M and Victim N out of the van.  Victim

139

M kept his head down but could tell that the van was parked in a driveway of a home in a residential neighborhood.  Hector Uriarte walked Victim M and Victim N from the driveway into a garage that was attached to a house and then inside of the house.

Victim M was held hostage in the house for the next three to four days.  Based on Victim M's time in the house, Victim M saw that the house was a tri-level home.  Victim M also saw that there were painting materials in the house.  Around his second day at the house, Victim M heard people talking about the fact that the owners of the house were coming back in the next couple of days.

When Victim M was first brought into the house, Victim M was walked past a bathroom, and into a laundry room on the main floor.  Victim N was taken somewhere else.  Victim M later heard Victim N screaming and yelling.  It sounded as if Victim N had been taken to an upper level of the home.  Saul Rodriguez came into the laundry room.  Saul Rodriguez handcuffed Victim M's hands in front of his body with zip ties.  Saul Rodriguez tied Victim M's legs together at the ankles with blue painter's tape, and taped a towel around his eyes and head so that he could not see.  Saul Rodriguez told Victim M that people were going to ask Victim M questions.  He directed Victim M to listen to them and answer the questions as honestly as he could.  Saul Rodriguez then put a cloth or some paper in Victim M's mouth and taped his mouth shut.

Shortly after this, Victim M heard a man come into the laundry room. He asked Victim M questions about the missing cocaine, including, "Who drove the car?" and "Who took the cocaine?" Victim M didn't recognize his voice, but thought that based on his voice, he was Black rather than Hispanic.  Someone cut the tape off of Victim M's mouth so that he could answer the questions.  Victim M answered that he did not know, and that he had nothing to do with the stolen cocaine.  At that point, someone pulled Victim M's hands up and began to hit Victim M in the chest and stomach.

140

Victim M was then left alone for what seemed to Victim M to be an hour or two.  For what seemed to Victim M to be the rest of the day, this man asked Victim M questions about the missing cocaine. Victim M always told him that he did not know the answers to his questions, and that he had nothing to do with the stolen cocaine.  In response, Victim M was beaten in the chest and stomach.  Victim M's head was also put under water in a sink in the laundry room.  Victim M does not know who was beating him but often heard the voice of Hector Uriarte swearing at Victim M or encouraging someone else to beat Victim M more severely or kill Victim M.  According to Victim M, each beating lasted what seemed to be a very long time, over ten minutes.  After each beating, Victim M was left alone for an hour or two.

After what seemed to be a day, Victim M heard Saul Rodriguez come back to the laundry room and tell the others that they should not have beaten Victim M so badly.  Saul Rodriguez said that he had been unable to sleep well because something seemed wrong about the way Victim M continued to deny having anything to do with the stolen cocaine and Victim M's claim that Individual O owed Victim M money.

After about a day in the laundry room, someone brought Victim M down to the basement of the house, where Victim M was tied to a pipe in the ceiling.  While Victim M was downstairs, a person kept on asking Victim M questions about the stolen cocaine every hour to two hours.  Victim M kept on answering that Victim M didn't know, and that Victim M didn't have anything to do with the stolen cocaine.  After giving those answers, Victim M was beaten in the chest and stomach for what seemed to Victim M be a very long time and was then left alone for an hour or two.  Victim M continued to hear the voice of Hector Uriarte swear at Victim M and encourage others to beat Victim M more severely or kill Victim M.  At some point, Victim M began to choke and throw up blood.

After the first few beatings in the basement, Saul Rodriguez came downstairs and yelled at the others for having continued to beat Victim M so badly.  Someone then cut off his blindfold and cut Victim M down.  Victim M was left on the basement floor.  At some point, Victim M remembers Victim N holding him and telling him "don't fucking leave me here."  Around that same time, Saul Rodriguez took Victim M out of the basement to the living room.  Saul Rodriguez told Victim M that he needed to receive one more call and that Victim M would be released in a day or so.  Victim M heard Saul Rodriguez telling the others that he could not keep Victim M much longer because something did not seem right.  Once in the living room, Saul Rodriguez gave Victim M water, pain medication, and tried to take care of his bruises from the beatings.  Saul Rodriguez took Victim M to the bathroom and cleaned Victim M up.  Saul Rodriguez also tried to feed Victim M.

After cleaning Victim M up, Saul Rodriguez let Victim M speak to Individual R by phone so that he could hear his voice. Individual R asked Victim M if he was okay.  Victim M told him that he was.  Saul Rodriguez took the phone away from Victim M shortly after that.  A few hours before Victim M was released, Saul Rodriguez let Victim M talk to Individual O again on the phone.  Again, Victim M got very angry with Individual O, telling him that Victim M had nothing to do with the stolen cocaine, and that Individual O was the person who owed Victim M  money.

Victim M saw Saul Rodriguez go outside with phone and talk to Individual O.  Saul Rodriguez came back inside of the house and gave Victim M the phone.  Individual O told Victim M that he was going to have Victim M released.  Victim M told him that he was not going to leave without Victim N.  Individual O asked Victim M if Victim N was still at the house with Victim M.  Victim M told him that Victim N was there and that he was alive.  Individual O told Victim M that he was going to vouch for Victim M and asked that he do the best that he could for him (Individual

142

O).  Victim M understood that Individual O wanted him to not talk about having been kidnapped and

beaten, and to help him find out who stole his 300 kilograms of cocaine.

During the second conversation with Individual O, Hector Uriarte got very upset and started

yelling that Victim N and Victim M should be "finished off."  Victim M understood Hector Uriarte

to be saying that Victim N and Victim M should be killed.  Victim M could hear Hector Uriarte

putting a magazine into a gun and take off the gun's safety.  Victim M told Victim N not to worry,

since Victim M believed that if they were going to kill them, they would have already done so.

At around 3:00 a.m., Saul Rodriguez walked Victim M and Victim N towards the garage of

the house.  Victim M understood that he was going to be released.  Saul Rodriguez gave Victim M

a number of warnings, including that Victim M should never go to the police and tell them about

having been kidnapped.  Saul Rodriguez and Hector Uriarte walked Victim M and Victim N out of

the house, through the garage, and to the driveway where the Acura was parked.  They had put

blankets over their heads before they left the house.  Victim M got into the back seat of the Acura

with Hector Uriarte.  Victim N got into the front passenger's seat.  Saul Rodriguez got into the

driver's seat.  Once they were in the car, Hector Uriarte told Victim M to keep his head down.  Within

a few minutes, Hector Uriarte pushed Victim M's head down.  The blanket came off Victim M's head

enough so that he could see the Alsip water tower.  Based on what Victim M saw and his knowledge

of the area, Victim M believes that he had been kept in a neighborhood in the area of 127th Street and

Cicero Avenue.

Saul Rodriguez continued to drive for another 15 or 20 minutes, at which time the Acura came

to a stop.  Victim M took the blanket off of his head, and saw that they were at a gas station near 171st

Street and 94th Avenue.  Individual R was already there.  Victim M was able to recognize the interior of the vehicle he was riding as that of the Acura.

Victim M saw Saul Rodriguez and Individual R meet outside of the Acura.  They spoke for a half hour or forty minutes.  Victim M was able to hear the first portion of the conversation because some of the windows in the Acura were rolled down.  Victim M heard Saul Rodriguez say that he was sorry that things had gotten so heated up, and that his people had to "tap" Victim M.  Victim M also heard Saul Rodriguez say that he knew that Individual R's people, including Victim M, had nothing to do with the stolen cocaine, but that Saul Rodriguez was just following orders.  At some point, Hector Uriarte rolled up the windows in the Acura so that Victim M couldn't hear the rest of the conversation.  After Saul Rodriguez and Individual R stopped talking, Victim N and Victim M were allowed to leave with Individual R.

After leaving the parking lot, Individual R drove Saul Rodriguez and Victim N to a motel near Route 6 and what is now I-355.  Individual R brought Victim M and Victim N into a room, where a Mexican chiropractor examined Victim M.  He told Victim M that he had fractured ribs and told Victim M to take Vicodin or morphine for the pain.  Individual R then drove Victim M to his home where Victim M stayed for the next week getting better.  His entire chest, back and stomach area was black and blue for the next three to four weeks.

## 2. *Information from Saul Rodriguez*

The same day Saul Rodriguez counted the cocaine, he got a call from Individual O.  During the call, Individual O asked Saul Rodriguez to investigate the theft of approximately 300 kilograms of cocaine from a home in Joliet.  Saul Rodriguez understood Individual O was asking him about the cocaine that he had stolen.  Individual O told Saul Rodriguez that he should call his uncle.  Individual

O gave Saul Rodriguez his uncle's number.  Individual O explained that he believed that his uncle,

Individual R, may have stolen the cocaine.  Individual O instructed Saul Rodriguez to check

Individual R's home for the cocaine.  Saul Rodriguez had never heard of or seen Individual R before

that time.

After that same day, Saul Rodriguez called Individual R, and explained that Individual O

wanted Saul Rodriguez to contact him about the cocaine that had gone missing from a home in Joliet.

Individual R and Saul Rodriguez met at a location near Joliet.  Saul Rodriguez subsequently searched

the home of Individual R and found no cocaine inside.  Individual R  and Saul Rodriguez

subsequently called Individual O.  Saul Rodriguez told Individual O that his uncle had nothing to do

with the theft of any of the cocaine.  Saul Rodriguez went to the meeting with Individual R, Hector

Uriarte and possibly others.

The next day, Saul Rodriguez received another call from Individual O.  During the call,

Individual O told me to meet with his uncle again.  Individual O explained that his uncle would be

bringing two people with him who had possibly stolen the cocaine.  Saul Rodriguez understood that

Individual O wanted Saul Rodriguez to kidnap those individuals, and beat them until they admitted

their involvement, if any, in the theft of cocaine.  Saul Rodriguez understood that Individual R would

not be bringing anyone who was actually involved in the theft of the cocaine.  That is because Ruben

Villarreal, Piasa, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Robert Cardena, and

Saul Rodriguez all had a part in stealing the cocaine.

After speaking with Individual O the second time, Saul Rodriguez talked to Hector Uriarte

and Jorge Uriarte and told them about his conversation with Individual O.  Saul Rodriguez told

Hector Uriarte and Jorge Uriarte that Saul Rodriguez was concerned that Individual O may suspect

them as having stolen the cocaine.  Hector Uriarte and Jorge Uriarte assured Saul Rodriguez that no one knew that they were the people responsible for stealing the cocaine.  Hector Uriarte, Jorge Uriarte, and Saul Rodriguez agreed that they would kidnap anyone Individual R brought with him to the meeting.  They also agreed that they would restrain and blindfold the victims, take them to another location, and question them about the missing cocaine.  They also agreed that the victims should be threatened and beaten so as to make it appear as if: 1) Saul Rodriguez and his associates had nothing to do with the theft of the cocaine, and 2) that Saul Rodriguez and his associates truly suspected the victims of having stolen the cocaine.

The next day, Saul Rodriguez drove his four-door 2005 grey Acura to a body shop in Joliet, Illinois at the direction of Individual R.  Hector Uriarte was riding in the Acura as a passenger.  Jorge Uriarte and Tony Sparkman were following Saul Rodriguez in another car.  Once at the body shop, Saul Rodriguez met with Individual R.  While there, Individual R introduced Saul Rodriguez to a person that Saul Rodriguez understood that he would be kidnapping.  Saul Rodriguez had never seen the man before, and cannot remember his name.  Saul Rodriguez identified a picture of Victim M as the person he understood he would be kidnapping.  Individual R explained that the person would get cleaned up and meet Saul Rodriguez in the parking lot of an auto parts store in Joliet.  Individual R also told Saul Rodriguez that the other person that he would be taking would meet them there.

Hector Uriarte, Jorge Uriarte, Tony Sparkman, the other person, and Saul Rodriguez drove to the auto parts store in the two cars.  Shortly after arriving there, Individual R showed up in the parking lot of the auto parts store in a Jeep Cherokee.  Individual R got out of the Jeep with Victim M and Victim N.  Individual R told Saul Rodriguez to take care of the men and to bring them back.

146

Based on Saul Rodriguez' conversations with Individual R, he understood that the two men were cocaine customers of Individual R or workers for Individual R.

The men entered the Acura. Saul Rodriguez drove the two men and Hector Uriarte to Individual U's home in Alsip, Illinois. At that point, the men were not free to leave. Individual U had recently purchased the home, but had not yet moved in. Before driving to Individual U's home, Saul Rodriguez had called Individual U and asked to borrow his home for a few days. Saul Rodriguez did not tell Individual U the truth about why he would be using the home. While driving towards Individual U's home, Saul Rodriguez called Individual O and told him that he had the two men. Victim M asked to speak to Individual O. Saul Rodriguez let him do so. Saul Rodriguez heard Victim M argue with Individual O and tell him that he had nothing to do with the missing cocaine. Saul Rodriguez was surprised to hear Victim M so upset with Individual O. Saul Rodriguez had expected him to be more scared than anything. After a few minutes, Hector Uriarte told the man that he needed to get off the phone and took the phone from the man's hands.

As Saul Rodriguez approached Individual U's home, Hector Uriarte placed blankets over both of the people they had taken. Tony Sparkman, Jorge Uriarte, and the other person followed them in a car, which they parked nearby. Saul Rodriguez pulled the car up in the driveway. Saul Rodriguez met Individual U at his house. Saul Rodriguez and Individual U spoke for a few minutes outside of the house at which time Individual U left his home. After Individual U left, Saul Rodriguez, Hector Uriarte, Tony Sparkman, Jorge Uriarte, and the other man led Victim M and Victim N to the back door of Individual U's home, which led to a laundry room. Once inside of the house, the mens' hands and feet were tied together and their eyes were taped shut. Saul Rodriguez walked to the upper floor of the house, where Saul Rodriguez called Individual O on a cell phone. During the conversation,

147

Individual O instructed Saul Rodriguez to find out if the men they had taken were responsible for having stolen the cocaine in Joliet.  Individual O told Saul Rodriguez to "rough them up."  Saul Rodriguez understood that Individual O wanted him to beat the men and threaten them until they admitted what involvement, if any, they had with the theft of cocaine.  Saul Rodriguez talked to Hector Uriarte and Jorge Uriarte about Individual O's request.  Saul Rodriguez understood that Tony Sparkman and the other person were still with the men in the laundry room.  Saul Rodriguez told them about what Individual O had asked him to do.  Jorge Uriarte told Saul Rodriguez to not worry, that he knew what to do.  Saul Rodriguez understood that he was going to beat them in a way that wouldn't severely injure or kill them, but make Individual O believe that we didn't have anything to do with stealing the cocaine.

After the telephone call, Saul Rodriguez saw Jorge Uriarte enter the laundry room with a metal rod.  Saul Rodriguez stayed up on the top floor of the house.  Saul Rodriguez was not able to see what Jorge Uriarte was doing.  Saul Rodriguez was able to hear Jorge Uriarte hit the men repeatedly with the metal rod for a minute or so.  Saul Rodriguez heard the men react to each strike by screaming or moaning.  While Jorge Uriarte was beating the men, Saul Rodriguez heard Jorge Uriarte ask the men repeatedly where the cocaine was in a threatening manner.  Saul Rodriguez did not hear the men respond.

After the first round of beatings, Saul Rodriguez called Individual O on a cell phone.  During the call, Saul Rodriguez told Individual O that Saul Rodriguez didn't think either of the men we had kidnapped had stolen the cocaine.  Individual O told Saul Rodriguez that Saul Rodriguez was wrong and that the men we had kidnapped were responsible for the theft.  Individual O told Saul Rodriguez to continue to keep the men and that he would call Saul Rodriguez back.

148

At the end of the first day on which they were holding the men at Individual U's home, they agreed that they should keep the men in the laundry room. They also agreed that Tony Sparkman and the other person should stay at the home over night. Hector Uriarte and Jorge Uriarte left in the vehicle in which Jorge Uriarte had arrived with Tony Sparkman and the other person. Hector Uriarte, Jorge Uriarte, and Saul Rodriguez agreed that Tony Sparkman and the other person should watch the men. Saul Rodriguez can't remember who passed along those instructions to Tony Sparkman and the other person.

Saul Rodriguez left Individual U's house in his Acura. The next morning, Hector Uriarte, Jorge Uriarte, and Saul Rodriguez went back to the house. Saul Rodriguez drove there in his Acura, and Hector Uriarte and Jorge Uriarte met Saul Rodriguez there in another car. Tony Sparkman and the other person were still at the home. Both men they kidnapped were still in the laundry room. Both men were still restrained and blindfolded. One of the men was laying down, while the other man was standing. Both men appeared to be exhausted.

Within an hour of arriving at the home, Saul Rodriguez saw Hector Uriarte and Jorge Uriarte walk into the laundry room with the metal rod. Saul Rodriguez was not able to see what they were doing. Saul Rodriguez heard Hector Uriarte or Jorge Uriarte beat the men repeatedly with a metal rod for a minute or so. Each man responded to each blow by moaning. During the beatings, Saul Rodriguez heard Hector Uriarte or Jorge Uriarte telling the men to admit that they had stolen the cocaine and tell them where it was at. During the beatings, Hector Uriarte or Jorge Uriarte told Saul Rodriguez that one of the men couldn't breathe. Saul Rodriguez went into the laundry room where he saw that Victim M was struggling to breathe. Saul Rodriguez saw that Hector Uriarte, Jorge Uriarte, Tony Sparkman, and the other person were all inside of the laundry room. Saul Rodriguez

149

told Hector Uriarte or Jorge Uriarte to take the tape off of Victim M's mouth and to remove his blindfold. Hector Uriarte or Jorge Uriarte did so. Hector Uriarte or Jorge Uriarte stood Victim M up, and allowed him to catch his breath.

Saul Rodriguez took Victim M to one of the bathrooms in the house. Saul Rodriguez sat Victim M down and gave him some water. Saul Rodriguez allowed Victim M to contact his wife. Victim M sounded very scared. Saul Rodriguez only allowed him to talk to his wife for a few minutes. Saul Rodriguez told Victim M that he was just waiting on a call and after he got it he would let him go. Saul Rodriguez told Victim M that he knew that he didn't steal the cocaine and that he had only kidnapped him because that is what Saul Rodriguez had been told to do. Saul Rodriguez stayed with Victim M for another fifteen minutes or so. During that time, Victim M told Saul Rodriguez that he had a wife and kids that he wanted to get back to. Saul Rodriguez reassured him that he would be released. Saul Rodriguez then returned the man to the laundry room.

Shortly after returning the man to the laundry room, Saul Rodriguez called Individual O again. Saul Rodriguez told Individual O that they had severely beaten the men that they had kidnapped. Saul Rodriguez told Individual O that one of the men was having problems breathing. Saul Rodriguez told Individual O that despite these beatings, the men denied having any involvement in the theft of the cocaine. Individual O told Saul Rodriguez that people above him wanted the men to "disappear." Saul Rodriguez understood Individual O to be telling him to kill the men. Saul Rodriguez told Individual O that he would not do that. Individual O finally agreed to allow Saul Rodriguez to let the men go. Individual O told Saul Rodriguez that he had sent a group of Latin King gang members looking for other people he suspected of having been involved in theft of cocaine. Individual O did not tell Saul Rodriguez who they were looking for.

150

At some point while Saul Rodriguez and the others were holding the men inside of Individual U's home, Individual U came to the house unannounced. Individual U came through the main entrance of the house. Saul Rodriguez walked up to Individual U in order to prevent him from going further into the house and seeing what they were doing there. Saul Rodriguez told Individual U that he would be done with the house soon and asked him to leave the house right away. Individual U did so. At the time Individual U came inside of the house, the men they had kidnapped were in the laundry room. Hector Uriarte, Jorge Uriarte, Tony Sparkman, and the other person were all still in the house.

After the last call with Individual O, Saul Rodriguez drove both men and Hector Uriarte in the Acura to the area of I-80 and Harlem Avenue in Orland Park. Another car holding Jorge Uriarte, Tony Sparkman, and the other person followed Saul Rodriguez to that location in another car. Hector Uriarte and Saul Rodriguez covered the heads of the men they kidnapped as they left Individual U's home. Once at the meet location, Saul Rodriguez met with Individual R. Saul Rodriguez had called Individual R beforehand and instructed him to meet them there. During the meeting, Individual O's looked at the men, both of whom were still sitting in Saul Rodriguez' Acura. Individual R told Saul Rodriguez that he was very upset that Saul Rodriguez and the others had kept the men for so long. Saul Rodriguez apologized to Individual R and allowed both men to leave the Acura. Saul Rodriguez then called Individual O and told him that he had released the two men to Individual R.

About two weeks later, Saul Rodriguez talked to another cocaine supplier, Individual V, about having kidnapped the men. Individual V told Saul Rodriguez that two other men were responsible for having stolen the cocaine from the house in Joliet. According to Individual V, those two men went to Mexico to be questioned abut the missing cocaine. Individual V did not tell Saul Rodriguez

what happened to the men once they arrived in Mexico. Saul Rodriguez understood that the suppliers of the cocaine likely killed the men as a result of their suspicion that the men were responsible for stealing the cocaine.

A month or so after the kidnapping, Pedro Victoria told Saul Rodriguez that someone had stolen 300 kilograms of cocaine, and that Individual O was being held responsible for the debt. Pedro Victoria explained that as a result, Individual O was trying to find out who took the cocaine. According to Pedro Victoria, Individual O still believed that Individual R had something to do with the theft.

### 3.    *Information from Andres Flores*

Shortly after participating in the theft of the cocaine from the house in Joliet, Hector Uriarte called Andres Flores and informed him that Saul Rodriguez had been hired by the owners of the stolen cocaine to try to find out who stole it. Days later, Hector Uriarte called Andres Flores and instructed him to drive to an exit off of the expressway near Joliet. Andres Flores understood that would assist in investigating the theft of cocaine. Andres Flores met with Hector Uriarte, Jorge Uriarte, and Saul Rodriguez. Andres Flores then drove to a location and observed Saul Rodriguez meet with an older Mexican man who Andres Flores believed had a mustache who drove a green Jeep Cherokee. The description Andres Flores provided is consistent with the appearance of and car belonging to Individual R. Saul Rodriguez, Hector Uriarte, and Jorge Uriarte, and Andres Flores, later accompanied the Mexican man to a house. Once at the house, Saul Rodriguez went inside for a short period of time. Andres Flores understood that Saul Rodriguez was acting as if he were searching for the stolen cocaine. Andres Flores later left the house and does not know if Saul Rodriguez, Jorge Uriarte, or Hector Uriarte continued to investigate the stolen cocaine.

152

### 4.    *Information from Individual U*

Individual U met Saul Rodriguez through his wife after 2001 or 2002.   Individual U considered Saul Rodriguez to be a good friend until Saul Rodriguez' arrest in April 2009.   In mid-May 2006, Individual U and his wife purchased the tri-level single family residence with an attached garage in Alsip.   Individual U and his wife did not move in right away.   Instead, they made improvements to home for at least one month before moving in.   One day before Individual U and his wife moved in, Saul Rodriguez called Individual U and asked if he could use the house for an unspecified period of time.   Saul Rodriguez claimed that he had gotten into a fight with his wife and needed somewhere to stay.   That night, Individual U met Saul Rodriguez at the house in Alsip.   Saul Rodriguez was already there when Individual U arrived.   Individual U saw that Saul Rodriguez had driven there in an Acura or Honda Accord. Individual U did not see whether there was anyone else with Saul Rodriguez that night.

The next day, Individual U stopped by the house in Alsip unannounced.   Individual U entered the house through the main entrance.   Within seconds of entering the house, Saul Rodriguez approached Individual U.   From where he was standing, Individual U could see Hector Uriarte and Jorge Uriarte inside on the main floor of his home.   Individual U knew both Hector Uriarte and Jorge Uriarte through Saul Rodriguez.   He had spent time with them at social functions.   On that day, Hector Uriarte and Jorge Uriarte said hello to Individual U.   Saul Rodriguez hurried Individual U out of the house before he had the chance to go further inside.   Individual U left the house extremely concerned about what was going on inside.   As he drove away, Individual U called Saul Rodriguez and demanded that he leave the house. Saul Rodriguez told Individual U said that he was almost done at the house.

153

One or two days later, Saul Rodriguez called Individual U and told him that he had left the house. That Friday, Individual U went to the house and did not find anything amiss. Individual U found that there were bags of garbage inside of the garbage cans. Individual U did not look inside of the garbage bags to see what they contained. Individual U never talked to Saul Rodriguez again about his use of the house.

### 5. *Information from Individual F*

In the Spring of 2006, one of the twins asked Individual F if he had heard anything about 300 kilograms of cocaine having stolen in the Chicago area. Individual F understood that one of the twins had expected to receive the cocaine. The next day, Individual F asked Saul Rodriguez about it. At first, Saul Rodriguez denied having any knowledge of it. Fifteen or twenty minutes later, Saul Rodriguez said something like "that's weird that you're asking, because I did it." Saul Rodriguez claimed that it was the easiest job that he and the people who helped him out had ever done. Saul Rodriguez explained that he knew the person who was responsible for taking delivery of and distributing the cocaine that he had stolen. Saul Rodriguez claimed that the person told him where the cocaine was being stored. Saul Rodriguez identified himself, Jorge Uriarte and Hector Uriarte as the ones who stole the cocaine. Saul Rodriguez said that they went to the house where the cocaine was being stored, just walked in, and took the cocaine.

Saul Rodriguez said that the person who told him about the cocaine being at the house then hired Saul Rodriguez, Jorge Uriarte, and Hector Uriarte to investigate the theft by questioning the men who were responsible for watching the cocaine. Saul Rodriguez told Individual F that he, Jorge Uriarte, and Hector Uriarte grabbed a couple of guys and smacked them around while asking them about the missing cocaine. Saul Rodriguez stated that they later "did them." Individual F understood

154

that Saul Rodriguez, Jorge Uriarte, and Hector Uriarte killed those people that they kidnapped. Individual F never told the twins about what Saul Rodriguez said out of fear that Saul Rodriguez would retaliate against him.

### Z.   October 20, 2007 Kidnapping of Victim O Through Victim U

In October 2007, Pedro Victoria told Saul Rodriguez about a band leader, Victim O, who was storing millions of dollars in a safe at his home in Summit, Illinois.   Pedro Victoria and Saul Rodriguez agreed that Saul Rodriguez would coordinate the kidnapping and robbery of Victim O, and split the proceeds between themselves and the participants in the kidnapping and robbery.   Between early and mid-October 2007, Hector Uriarte, Jorge Uriarte, Andres Flores, and Tony Sparkman made two unsuccessful attempts to kidnap and rob Victim O.   On October 20, 2007, Hector Uriarte, Jorge Uriarte, Andres Flores, and Tony Sparkman broke into Victim O's home, and held Victim O, Victim O's pregnant wife, and their five young children against their will.   The men only recovered $2,000 from the home.   Victim O reported the kidnapping and robbery to the Summit Police Department.

#### 1.   *Information from Victim O*

Victim O has worked as a music promoter since 1997 or 1998.   In that role, Victim O promotes bands throughout the United States and Mexico.   In the Fall of 2007, Victim O and his family lived in a three-flat home in Summit, Illinois.   At that time, Victim O's family consisted of Victim O, his pregnant wife, and their five children who ranged in age from five to twelve.   On a Friday morning in October 2007, Victim O heard the doorbell ring at his home.   Victim O looked out of the front window and saw a man who he did not recognize.   The man motioned to Victim O to open the door.   Victim O asked the man what he wanted.   The man continued to motion to him to open the door.   Victim O pretended to dial numbers in view of the man standing outside.   The man

155

ran off as Victim O pretended to dial the phone.  About ten minutes later, Victim O went outside and

looked around.  Victim O did not see the man or anything suspicious.

Two days later, on Sunday morning, Victim O's wife told him that there was a man in the

backyard of their home looking in the window of their detached garage.  Victim O's wife explained

that she thought it was the same man who had rung the doorbell on Friday.  Victim O looked outside

the window but did not see anyone.  About five minutes later, Victim O went outside into the

backyard.  In his rush to get outside, Victim O did not shut the door.  Victim O then ran around his

home looking for the man.

Once Victim O reached the back of his home, he looked down the alley towards the church

from which his son would soon be returning.  Victim O did not see his son.  Victim O then looked

down the gangway between his home and his neighbor's home.  Victim O saw a black man standing

there making a phone call.  Victim O identified a photograph of Tony Sparkman from a series of

photographs of as the person he saw making the phone call that day.  Tony Sparkman saw him and

then walked quickly towards Victim O.  As he did so, Victim O saw that Tony Sparkman had a gun

in one of his hands.  Tony Sparkman did not point the gun at Victim O.  Victim O moved away from

Tony Sparkman.  As he did so, Victim O saw the man he had seen outside of his front door on Friday

running down the gangway towards him.  That man tried to grab Victim O from behind.  By that time,

Victim O's son had returned from the church to the back of his home.

While the man from the gangway was trying to grab Victim O from behind, Victim O  saw

Tony Sparkman trying to grab his son.  The man who was trying to grab Victim O from behind

pointed a gun at his head.  The man was telling Victim O "don't move motherfucker, don't move."

The man and Victim O fought with one another, pulling on each other's clothing.  As Victim O did

so, Victim O yelled out that there were cameras on the house.  There were not cameras on the house.

Victim O  told them that anyway to get them away from him and his son and away from his home.

Victim O was fearful for the life of his son and the lives of the rest of his family members.  The men

ran away.

One week later on Saturday morning, Victim O was at home with his family.  Victim O was

in the basement with some of  his children.  Victim O's wife, who was then three months pregnant

with their youngest son, was on the main floor with the rest of their children. At approximately 9:30

a.m., Victim O heard a loud crashing noise.  When Victim O first heard the noise, he thought it was

noise from road construction near his home.  Soon after that, though, one of Victim O's daughters ran

downstairs and told Victim O that someone had broken into the house.  Victim O ran upstairs.  As

Victim O was on his way upstairs, he saw Tony Sparkman hiding near the stairs that go up to the

second floor.  Victim O saw a red ramming device on the floor next to Tony Sparkman.  Victim O

realized that Tony Sparkman had already broken through two other doors to get to that point. At that

moment, Tony Sparkman pointed a gun at his head and told him to "go back."  Victim O walked back

downstairs.  As Victim O did so, Tony Sparkman was pointing a gun at his head.

Victim O got to the laundry room, where Tony Sparkman ordered him to get down on the

ground.  Tony Sparkman pushed Victim O to the ground.  Tony Sparkman then kneeled on Victim

O and pointed a gun at his head.  While Victim O was on the ground, Tony Sparkman was shouting

at him "don't move motherfucker."  He then asked Victim O "where's the money?" and "where's the

safe?"  Victim O asked him, "What are you talking about?  What money?  What safe?"  Tony

Sparkman told Victim O to "shut the fuck up, motherfucker."  While Victim O was in the laundry

room, he was able to see a second man come downstairs.  Victim O noticed that the second man was

the same man he had seen at the house the previous Friday and Sunday.  The second man asked him in English "where's the money?"  Victim O did not answer the man.

Tony Sparkman and the second man left Victim O in the laundry room and went to the room where Victim O's wife irons clothes.  Victim O sat up and watched the two men throw the clothes hanging in that room on the floor.  They appeared to be looking for something.  Victim O next saw them go into the office.  Victim O was not able to see what they were doing in the office from where he was sitting in the laundry room.  Victim O assumed that they were looking for money.  Victim O heard his wife and one of his daughters crying hysterically up on the main floor.  Victim O walked upstairs and saw his wife and children sitting in the dining room.  There was a third man wearing sunglasses and a hat standing in the dining room in front of Victim O's wife and children between the window and the door to the dining room.  Victim O had never seen the third man before.

Victim O stayed in the in the dining room with his wife and children until the men left.  While in the dining room, Victim O heard one of his sons tell the man that Victim O's wife was pregnant. Victim O heard the third man telling his wife that everything was going to be fine and that they would be gone soon.  While in the dining room, Victim O saw a fourth man come out of his bedroom. Victim O had never seen the fourth man before.  Victim O wasn't able to see what the fourth man had been doing while in the bedroom.  Victim O assumed he was looking for money.

The men left Victim O's home no later than 10:30 a.m.  Before they did so, the third man told Victim O that when they left he should not call the police.  That same man also instructed Victim O to wait ten minutes before calling an ambulance.  Soon after that, the men left Victim O's home. Victim O did not call the police until later that same day.  Victim O's wife and children asked him to not call the police.  They told Victim O that while he was downstairs, the men holding them on the

158

main floor warned them to not call the police.  They also told Victim O that when the men had come into the house, they identified themselves as police.  Victim O knew that the men were not police officers because he had seen at least two of them before.  At that point in time, Victim O was most concerned for his family.

Once things calmed down, Victim O walked around his home to see if the men had taken anything.  Victim O found $2,250 missing from a pocket of a pair of pants in his bedroom.  Victim O also found $1,800 worth of Mexican pesos missing from the top drawer of a dresser in the basement.  Victim O noticed that the men had moved the furniture around in every room, and had gone through the dresser drawers, kitchen cabinets, closets, desk drawers, and file cabinets in the house.

During the time that the men were inside, Victim O was able to observe things about how the men spoke and what they were wearing.  The third and fourth men on the main floor spoke in both English and Spanish.  Judging by their Spanish accents, Victim O believes that they were not native Spanish speakers. Their English was much better.  Victim O noticed that all of the men wore gloves. Victim O saw all but one of the men with a handgun.  All of the men wore a dark blue t-shirt bearing the Chicago Police department emblem on the front of the shirt.

Once Victim O called the police, it took them only two to three minutes to arrive.  The officers were from the Summit Police Department.  They interviewed Victim O.  Additional men then came to the house to collect evidence.

### 2.   *Information from Pedro Victoria*

Two or three weeks before his arrest on October 23, 2007, Pedro Victoria spoke to a friend who claimed that Victim O had approximately $7,000,000 in a safe in the basement of his home.

Pedro Victoria's friend asked for Victoria's help in finding someone to steal the money. Pedro Victoria agreed to do so. Shortly thereafter, Pedro Victoria contacted Saul Rodriguez, who agreed to take the job. Pedro Victoria believed that he, Saul Rodriguez, and Victoria's friend would split any of the money that was stolen from Victim O. Victim O and his family lived in a three-flat in the area of Cicero, Illinois. On the day of the robbery and kidnapping, Saul Rodriguez called Pedro Victoria while Rodriguez' associates were searching Victim O's home. Saul Rodriguez said that they had been unable to find any money inside of the home. Saul Rodriguez also told Pedro Victoria that Victim O's wife and children were home at the time of the home invasion.

### 3.    *Information from Saul Rodriguez*

In early October 2007, Pedro Victoria told Saul Rodriguez about a person, Victim O, that kept millions of dollars in a safe at a house in Summit, Illinois. Pedro Victoria explained that Victim O was a band leader or a band promoter. Pedro Victoria told Saul Rodriguez that he had found out about Victim O through a mutual friend of his and the band leader. Pedro Victoria claimed that the mutual friend was a former member of Victim O's band or was in one of the bands Victim O promoted. The mutual friend had been in Victim O's house, where Victim O had paid him $30,000 to $50,000 in cash that the mutual friend had seen Victim O get from a safe inside of the house. According to the mutual friend, the safe had been stacked full of bills in $100 denominations. Pedro Victoria and Saul Rodriguez agreed that he would have people get inside of Victim O's house, steal the money from the safe, and give Pedro Victoria a portion of any money that was stolen.

Pedro Victoria later pointed out Victim O's house to Saul Rodriguez. It was a three-flat home in the area of Summit. Saul Rodriguez later called Hector Uriarte, gave him the address of the house, and told him what Pedro Victoria claimed was inside of the house. Hector Uriarte told Saul

160

Rodriguez that he was interested in going into the house and stealing whatever money was inside of the safe.  Saul Rodriguez told Hector Uriarte that he expected to get a portion of any money that Hector Uriarte stole.

Within a week or so, Hector Uriarte told Saul Rodriguez that he and Jorge Uriarte were conducting surveillance of the house.  Hector Uriarte told Saul Rodriguez about the routine of Victim O's family.  Hector Uriarte explained that they had seen his wife and children, but not Victim O himself.  A couple of days later, Hector Uriarte told Saul Rodriguez that he and others had tried to get into the house by going up and knocking on the front door.  Based on events that happened later on involving Victim O, Saul Rodriguez figured that Hector Uriarte had used Jorge Uriarte, Andres Flores, and Tony Sparkman to try and get into the house.  Hector Uriarte explained that the person knocking on the door had disguised themselves as a cable or Com Ed technician.  Hector Uriarte said that the people inside of the house would not let that person in.

One or two weeks later, on the afternoon of a weekend day, Hector Uriarte called Saul Rodriguez while inside of Victim O's home.  Saul Rodriguez subsequently spoke to both Hector Uriarte and Jorge Uriarte.  During the conversation, one of them told Saul Rodriguez that he and the others, who Saul Rodriguez later found out included Andres Flores and Tony Sparkman, were inside of Victim O's home, but that they had been unable to find a safe.  One of them told Saul Rodriguez that the home was empty and did not have a lot of furniture inside of it.  Saul Rodriguez reminded Hector Uriarte and Jorge Uriarte that Pedro Victoria had said that the safe was inside of the house.  Saul Rodriguez figured that they were going to keep on looking for the safe.

Shortly after that, Saul Rodriguez got a call from Hector Uriarte who said that he and the others had gotten split up.  Hector Uriarte asked Saul Rodriguez if he could go and pick up Tony

Sparkman, who was walking towards Archer Avenue. Saul Rodriguez told Hector Uriarte that he would do so. Saul Rodriguez drove to the area. Saul Rodriguez had a series of conversations with Hector Uriarte that resulted in Hector Uriarte telling him that Tony Sparkman was at the Los Gallos restaurant on Archer east of Harlem. Hector Uriarte told Saul Rodriguez to take Tony Sparkman to Andres Flores' apartment. Saul Rodriguez had been to Andres Flores' apartment before. It was in the area of 48th or 49th and five blocks east of Central in Chicago. Saul Rodriguez arrived at the restaurant and saw Tony Sparkman standing outside with a hat on. Tony Sparkman got into the car. Saul Rodriguez drove him to Andres Flores' apartment. Aside from saying hello to one another, they did not speak to one another.

Once Saul Rodriguez got to the area of Andres Flores' apartment, he parked his car, and got out of the car with Tony Sparkman. They walked along the gangway to the backyard of Andres Flores' apartment. Once there, Saul Rodriguez saw Hector Uriarte, Jorge Uriarte, and Andres Flores. Hector Uriarte and Jorge Uriarte were screaming at Andres Flores. They were referring to him as a pussy and telling him that he had no heart. Saul Rodriguez understood that they were yelling at him because he had failed to perform his role correctly during the home invasion of Victim O's home. Saul Rodriguez asked what had happened. Jorge Uriarte and Hector Uriarte said that there was nothing inside of the house. They said that there wasn't even very much furniture in the house, and that one of the floors appeared to be used as a play room for children. They said that they had found Victim O, his wife, and multiple children inside of the house. They said that they tried to get Victim O to give up the location of the safe, but that he would not do so.

Hector Uriarte and Jorge Uriarte explained that Andres Flores had gone inside of the house when Victim O was outside of the house. They claimed that Andres Flores had left the door open to

162

the house so that Victim O was able to get back inside.  They said that once that Victim O got back inside, he shut the door, basically closing Andres Flores inside of the house.  Meanwhile, Tony Sparkman, Hector Uriarte, and Jorge Uriarte were outside of the house.  Hector Uriarte and Jorge Uriarte stated that they and Tony Sparkman were eventually able to get inside of the house.  Saul Rodriguez noticed that Andres Flores had his head down and wasn't even responding to what Hector Uriarte and Jorge Uriarte were saying.

Hector Uriarte and Jorge Uriarte told Saul Rodriguez that they had left a car behind in the alley behind Victim O's home.  They asked if Saul Rodriguez could drive Andres Flores' girlfriend or wife to the car so that she could drive it back to Andres Flores' apartment.  Saul Rodriguez agreed to do so.  Saul Rodriguez passed by the front of Victim O's house.  The police were not there.  Saul Rodriguez dropped Andres Flores' wife or girlfriend on the next street over and gave her the directions to where she could find the car.

One or two days later, Saul Rodriguez talked to Hector Uriarte about the home invasion of Victim O's home.  Hector Uriarte was demanding that he and the others get paid at least $10,000 each.  Hector Uriarte complained to Saul Rodriguez that he and the others were not getting paid for their efforts to steal money from the house.  Hector Uriarte told Saul Rodriguez that he wanted Pedro Victoria to pay $10,000 to each person that participated in the home invasion.  Pedro Victoria never paid Hector Uriarte or the others.  A week or so after this home invasion happened, Pedro Victoria and others were arrested by the DEA in possession of 80 kilograms of cocaine that Saul Rodriguez intended to sell to Walter Johnson.  Pedro Victoria has been in jail ever since that time.

### 4.   *Information from Andres Flores*

In the Fall of 2007, Hector Uriarte called Andres Flores and directed Andres Flores to meet at his house.  By this time, Andres Flores was again working in construction.  At the meeting, Hector Uriarte explained that Saul Rodriguez had coordinated another home invasion.  Hector Uriarte said that Saul Rodriguez had obtained information from Pedro Victoria about the target of the robbery. Hector Uriarte explained that the target of the robbery was Victim O, a manager of a music group who lived in Summit, Illinois and drove a white Range Rover SUV.  Hector Uriarte said that someone who knows Pedro Victoria had seen a safe in Victim O's house filled with cash.  Hector Uriarte continued that he had been given the address of the house and they would steal the money.  Andres Flores met with Hector Uriarte at least one more time about the proposed robbery before they started to conduct surveillance on Victim O's house.

Jorge Uriarte and Tony Sparkman were also at the foregoing meetings.  During these meetings, it was arranged that they would pretend to be police officers to get into Victim O's house. It was also coordinated that they would each wear blue Chicago Police Department shirts.  Either Hector Uriarte, Jorge Uriarte, or Tony Sparkman purchased the shirts.  The plan also called for the group to grab Victim O if they saw him outside the house and force him to let Jorge Uriarte, Tony Sparkman, and Andres Flores inside.  If Victim O did not exit, the plan called for Andres Flores to knock at the door and attempt to gain entry by posing as a police officer.  They agreed to kick in the door if nothing else worked.

Hector Uriarte showed Andres Flores, Jorge Uriarte, and Tony Sparkman the house.  The group conducted surveillance two or three times in an attempt to learn Victim O's routine.  The home was a two-flat building next to an alley.  Andres Flores identified the house from a photograph.

164

During the surveillance, it was observed that Victim O lived in the home with his wife and several children.  During several of the robbery attempts, Andres Torres carried a .357 magnum revolver and Tony Sparkman carried a .38 caliber revolver.  The guns were brought to intimidate Victim O.

The first robbery attempt occurred over the weekend.  Andres Flores knocked on the front door of Victim O's house wearing a Chicago Police Department shirt and carrying a gun.  While Andres Flores knocked on the door, Hector Uriarte, Jorge Uriarte, and Tony Sparkman waited nearby in their cars.  No one answered the door, but Andres Flores was prepared to force himself inside the door as soon as someone opened the door.  While at the door, Andres Flores saw a man through a window who asked Flores to leave.  Andres Flores left and later met with Hector Uriarte, Jorge Uriarte, and Tony Sparkman.

Sometime later, Hector Uriarte, Jorge Uriarte, Tony Sparkman, and Andres Flores tried again to enter Victim O's house.  Andres Flores drove to the area of the house with Tony Sparkman in Andres Flores' Trailblazer.  Jorge Uriarte and Hector Uriarte followed in the Expedition.  While in the area, Andres Flores observed Victim O's son walking his sisters to the church nearby.  Andres Flores went to the backyard and checked to see if Victim O's Range Rover was there.  Andres Flores then saw the man walk out of the house and toward the alley where he talked to with Tony Sparkman.  Andres Flores then pulled out a gun and grabbed on to the man and told him to go inside his house.  Victim O started struggling with Andres Flores. While Victim O and Andres Flores fought, Victim O's son returned and saw the struggle.  Andres Flores tried to push the man toward the house and the Andres Flores heard Victim O's wife banging on a window from inside the house.  Fearing she had called 911, Andres Flores and Tony Sparkman fled the area.

165

Andres Flores ran from the area and observed Tony Sparkman throw his gun.  Andres Flores stopped and retrieved the gun before running away.  Fearing that the police were contacted, Andres Flores hid his gun and Tony Sparkman's gun in a thick bush.  Andres Flores then ran to the area of 65th and Harlem Avenue, and tried to blend in at a car lot.  Andres Flores then called Jorge Uriarte or Hector Uriarte and instructed them to send someone to pick him up.  Saul Rodriguez later arrived at the car lot in a grey Acura SUV.  Saul Rodriguez, Hector Uriarte, or Jorge Uriarte picked up Tony Sparkman.  Once in the SUV, Saul Rodriguez drove south and they met up with Jorge Uriarte, Hector Uriarte, and Tony Sparkman. Andres Flores got out of Rodriguez's SUV, and got into the Expedition with Hector Uriarte, Jorge Uriarte, and Tony Sparkman.  The truck was driven to Andres Flores' house located in the area of 49th and Laramie where they met up with Saul Rodriguez.  They discussed what happened.  Jorge Uriarte and Hector Uriarte were upset that Andres Flores did not call them as soon as Andres Flores saw Victim O.

Approximately one or two weeks later, Hector Uriarte and Jorge Uriarte asked Andres Flores to assist them again in getting into the house in Summit.  Andres Flores was reluctant to help, but Jorge Uriarte or Hector Uriarte explained that the house may contain $500,000.  Andres Flores agreed to attempt the home invasion again. During a later meeting at Hector Uriarte's house, it was determined that the group would act like police officers and break the door.  Andres Flores could not recall, but someone obtained a red ramming post that would be used to break the door down.

After the plan was formulated, Andres Flores brought two guns again and gave one to Jorge Uriarte.  Andres Flores walked toward the back of the house in Summit with Jorge Uriarte and Tony Sparkman.  Hector Uriarte remained in the Expedition.  Tony Sparkman used the ramming device to gain entry into the house.  As Andres Flores entered the house, Andres Flores saw a female at the top

of the stairs standing in the kitchen. Andres Flores walked up the stairs and forced his way into the kitchen as she tried to close the door. Andres Flores identified himself as a police officer and forced his way into the kitchen.  Once in the kitchen Andres Flores observed that the female appeared to be pregnant and Andres Flores told her to sit down on a chair.  Andres Flores estimated that there were approximately four or five children in the residence. As Andres Flores watched the family upstairs, Tony Sparkman and Jorge Uriarte went to the basement to talk with Victim O.

Victim O was later brought up stairs, and Andres Flores recalled that he was wearing only his underwear.  Andres Flores watched the family while Tony Sparkman and Jorge Uriarte searched for the money. After searching the house, Jorge Uriarte told Andres Flores that they should leave.  Andres Flores does not recall who said it, but someone told the family not to call the police. Hector Uriarte said that Pedro Victoria would pay each of them $10,000 for this unsuccessful robbery.  Andres Flores was never paid.  Andres Flores later found out that Pedro Victoria was arrested with 80 kilograms of cocaine shortly after the invasion of Victim O's home.

### AA.   October 23, 2007 Possession of 80 Kilograms of Cocaine

On October 22, 2007, Saul Rodriguez agreed to purchase 80 kilograms of cocaine from Pedro Victoria on a fronted basis.  On that same day, Walter Johnson agreed to purchase the vast majority of the 80 kilograms of the cocaine from Saul Rodriguez on a partially fronted basis.  On October 23, 2007, Saul Rodriguez sent his courier, Ruben Villarreal, and another individual, Vinnie Calero, to pick up the cocaine and deliver it to Walter Johnson.  Ruben Villarreal and Vinnie Calero were at the home of Pedro Victoria's courier, Roberto Toscano, with Pedro Victoria and Roberto Toscano when the DEA arrested all four men in possession of 80 kilograms of cocaine.

167

### 1.       *Information from Pedro Victoria*

Pedro Victoria met with Saul Rodriguez on October 22, 2007 at his house in Countryside, Illinois.  Saul Rodriguez told Pedro Victoria that one of his customers wanted to purchase 100 kilograms of cocaine.  Saul Rodriguez told Pedro Victoria that his customer was the same individual who had bought cocaine from him in the past.  Pedro Victoria had met that customer before.  Pedro Victoria identified the customer as a black male in a wheelchair.  Pedro Victoria was unable to identify the customer from a photo line-up.  Pedro Victoria's description of Saul Rodriguez' customer is consistent with the appearance of Walter Johnson.

When discussing this cocaine transaction with Saul Rodriguez, it was arranged that Pedro Victoria would call Saul Rodriguez on October 23, 2007 to finalize the plans. During the meeting Saul Rodriguez provided Pedro Victoria with a cellular phone to use to conduct the transaction. The tentative plan was for Pedro Victoria to meet with Ruben Villarreal, Saul Rodriguez' courier, in Bolingbrook, Illinois, and Ruben Villarreal would follow Pedro Victoria to the location where the cocaine was being stored.  Saul Rodriguez then gave Ruben Villarreal's cell phone number to Pedro Victoria.  Pedro Victoria used the cell phone that Saul Rodriguez provided to call Saul Rodriguez and Ruben Villarreal on October 23, 2007.

On October 23, 2007, Pedro Victoria drove to the Subway located at Weber Road and 111th in Bolingbrook.  Pedro Victoria was the first to arrive at the parking lot.  Pedro Victoria then saw Ruben Villarreal's van arrive.  Ruben Villarreal informed Pedro Victoria that he was waiting for another individual but that Pedro Victoria would know him.  Pedro Victoria pulled out of the parking lot and headed to a car wash.  Pedro Victoria turned into the car wash lot and called Saul Rodriguez. Pedro Victoria asked Saul Rodriguez what was going on.  Saul Rodriguez said Ruben Villarreal was

stupid and that another person would make the transaction go faster. Saul Rodriguez didn't tell Pedro Victoria who was coming to meet them.

A little later, Pedro Victoria met up with Ruben Villarreal and saw Vinnie Calero in the passenger seat of Vinnie Calero's van. Pedro Victoria told them to follow him. Pedro Victoria then drove toward Roberto Toscano's residence located on Illinois Street in Aurora, Illinois. Ruben Villarreal and Vinnie Calero followed Pedro Victoria in their van. Upon arriving to Roberto Toscano's house, Roberto Toscano and Ruben Villarreal began moving the cocaine from Roberto Toscano's Expedition and placing into Ruben Villarreal's van. After the cocaine was in the van, Ruben Villarreal and Vinnie Calero began counting the kilograms of cocaine.

After the cocaine was counted, Pedro Victoria was going to leave Roberto Toscano's home and wait for Ruben Villarreal to deliver the money for the cocaine. Saul Rodriguez had previously told Pedro Victoria that Ruben Villarreal would receive payment from Walter Johnson upon delivery of the cocaine, and that Ruben Villarreal would then call Pedro Victoria to coordinate how he would receive the payment. While Vinnie Calero and Ruben Villarreal were counting the cocaine, law enforcement approached and then arrested Pedro Victoria, Vinnie Calero, Ruben Villarreal, and Roberto Toscano.

### 2.    *Information from Saul Rodriguez*

In October 2007, after the home invasion in Summit, Illinois, Pedro Victoria came to Saul Rodriguez' home in Countryside unannounced. While there, Pedro Victoria told Saul Rodriguez that he had a load of 150 kilograms of cocaine in the Chicago area, 80 kilograms of which he was willing to sell to him. Pedro Victoria told Saul Rodriguez that he wanted to conduct the transaction that night. Saul Rodriguez called Walter Johnson to see if he was interested in purchasing the cocaine.

Saul Rodriguez would usually meet Walter Johnson in person to discuss cocaine transactions.  That day, Saul Rodriguez called Walter Johnson because Pedro Victoria wanted to conduct the transaction right away.  During the call, Walter Johnson told Saul Rodriguez that the earliest he could get together was the next morning.  Saul Rodriguez told Pedro Victoria that Walter Johnson wanted to conduct the cocaine transaction the next day.  They agreed that Ruben Villarreal would contact Pedro Victoria and make the arrangements for the retrieval and delivery of the cocaine.

After talking to Pedro Victoria about buying 80 kilograms of cocaine from him, Saul Rodriguez gave Pedro Victoria's cell phone number to Ruben Villarreal.  Saul Rodriguez told Ruben Villarreal to coordinate the transportation of the cocaine between Pedro Victoria and Walter Johnson.  Ruben Villarreal already had Walter Johnson's number.

The next day, Saul Rodriguez called Vinnie Calero.  Vinnie Calero had been asking Saul Rodriguez to supply him with cocaine for some time.  Saul Rodriguez told Vinnie Calero that he would be willing to front him three kilograms of cocaine and put him in contact with customers who would be willing to buy the cocaine.  Saul Rodriguez told Vinnie Calero to meet him later that morning at the Lifetime Fitness.  Vinnie Calero did so.  During the meeting with Vinnie Calero at Lifetime Fitness, Saul Rodriguez gave Vinnie Calero the contact information for Ruben Villarreal.  Saul Rodriguez told Vinnie Calero to meet Ruben Villarreal at a particular location.  Saul Rodriguez then called Ruben Villarreal and told him to pick up Vinnie Calero only after he had picked up the cocaine from Pedro Victoria.  Ruben Villarreal agreed to do so.

Later that morning, Saul Rodriguez tried to call Vinnie Calero's cell phone but Vinnie Calero did not answer.  Saul Rodriguez assumed that Vinnie Calero had been arrested.  Saul Rodriguez then called Walter Johnson and told him that something happened and that he would not be getting the

170

cocaine.  Saul Rodriguez later learned that federal law enforcement had seized the load of approximately 80 kilograms of cocaine from a van in the driveway of Pedro Victoria's worker's home, and arrested Ruben Villarreal, Vinnie Calero, Pedro Victoria, and one of Pedro Victoria's workers.

Within days of the October 23, 2007 seizure and arrests, Saul Rodriguez met with Walter Johnson to discuss those arrests.  Saul Rodriguez explained that he thought it was unlikely that the people who had been arrested would cooperate against him and Walter Johnson.  Despite believing that, however, Walter Johnson and Saul Rodriguez never conducted a drug transaction with one another again.

### BB.    2008 Kidnapping & Robbery of Victim V and Victim W

In 2008, Jorge Lopez provided information to Hector Uriarte about a drug dealer, Victim V, who could be kidnapped and robbed.  Victim V was leasing the home of Saul Rodriguez in Lyons, Illinois.  Hector Uriarte then asked Saul Rodriguez for permission to kidnap and rob Victim V.  Saul Rodriguez gave Hector Uriarte permission to do so.  Hector Uriarte, Jorge Uriarte, Andres Flores, and Tony Sparkman later entered the house by force, tied up two occupants (Victim V and Victim W) inside, and stole two firearms.

#### 1.    *Information from Victim V*

In 2008, Victim V's girlfriend contacted a real estate agent to find a house for them to rent. Victim V's girlfriend eventually signed a lease to rent a house located on 45th Place in Lyons, Illinois. Neither Victim V or his girlfriend knew the owner of the house.  After a few months, Victim V and his girlfriend broke up.  Victim V remained at the house and his girlfriend maintained the lease.  On more than one occasion, Victim V met a man who came to the home to collect the rent.  Victim V

described the man as a Hispanic male, approximately 5'6, who drove a gray Acura SUV. Victim V's description of the man and his car matches that of Saul Rodriguez. During the time that Victim V was living at the home in Lyons, he drove a blue Cadillac Escalade.

In or around May or June of 2008, Victim V and his friend, Victim W, were out drinking and partying in the Chicago area. The men returned home between 4:00 and 5:00 a.m., and fell asleep in two separate bedrooms. Within an hour or two, Victim V's sleep was interrupted when he heard a loud crashing noise at the front door of the house. Based on Victim V's experience being at homes raided by the police, he believed his home was being raided. Victim V next saw his bedroom door open and briefly saw a Hispanic man pointing a gun at him. The Hispanic man was dressed in black clothing and may have been wearing a ballistic vest. Victim V was unable to provide a further description or otherwise identify the Hispanic man.

The Hispanic man ordered Victim V to the ground and instructed him to not look up. The Hispanic man told Victim V that if he looked up, the gunman would shoot him. The Hispanic man asked Victim V where the money and cocaine were hidden. Victim V responded that there was no money or drugs in the home. The Hispanic man then ordered Victim V to crawl into the dining room. Victim V did so. Once there, someone put a blanket over Victim V's head. Someone then placed a gun to Victim V's head and demanded to know where the money and "kilos" were located. Victim V begged the man to not shoot him and again denied that there was money or drugs in the house. Victim V was held in the dining room for the next 5 to 10 minutes. While there, Victim V heard at least two other voices he did not recognize, leading him to believe there were at least three men inside of his home. At times, Victim V heard at least one of these other men questioning Victim W about the location of money and drugs.

172

While being held, Victim V offered to give the man the money in his pocket ($1,500 to $2,000) and a stainless steel Cartier Roadster watch.  The man took both the money and the watch. Victim V had obtained the money and the money to buy the watch from his sale of marijuana to individuals in the neighborhood in which he grew up.  The people Victim V knows from the neighborhood includes Jorge Lopez, aka "Oso."

While being held, one of the men involved in the home invasion said out loud that he had found a gun that Victim V was keeping in his bedroom.  Victim V could not recall the make or model of the gun.  After five to ten minutes, Victim V and Victim W were directed to the basement of the house.  Victim V still had the blanket over his head.  Once there, someone collected the driver's licenses from Victim V and Victim W and directed them to not call the police.  Victim V next heard the men leave the house, and then heard an engine start.  Victim V and Victim W discussed their ordeal briefly.  Victim V assumes, but does not know for certain, that the men took items from Victim W.  Victim V never called the police and never found out who was responsible for the kidnapping and robbery.

### 2.    *Information from Jorge Lopez*

In or around 2008, Jorge Lopez told Hector Uriarte about a drug dealer, Victim V, that had drugs or money that could be stolen.  Jorge Lopez knew Victim V because  he was in the Satan Disciples street gang, which was the same gang in which Jorge Lopez used to be an active member. Jorge Lopez had played cards and socialized with Victim V on occasion.  Victim V was renting Saul Rodriguez's parents' house in Lyons, Illinois at the time Jorge Lopez provided Hector Uriarte with information about Victim V.  Jorge Lopez told Hector Uriarte about Victim V's access to drugs and money because Jorge Lopez expected to receive a share of any drugs or money that Hector Uriarte

and others were able to steal from Victim V.  Jorge Lopez never received any proceeds from this kidnapping.

### 3.    *Information from Saul Rodriguez*

In or around 2008, Saul Rodriguez' parents leased their home on 45th Place in Lyons, Illinois to a woman who was a nurse at Loyola.  Over time, Hector Uriarte told him information he learned about the woman's boyfriend who was living at the home with her.  According to Hector Uriarte, he learned this information from Jorge Lopez, who knew the boyfriend from his time in the Satan Disciples street gang.  Hector Uriarte told Saul Rodriguez that the boyfriend was selling cocaine and marijuana.

Hector Uriarte and Saul Rodriguez agreed that Hector Uriarte could attempt to kidnap the woman's boyfriend, Victim V, when he was outside of Saul Rodriguez' parents' home.  After a few weeks, Hector Uriarte told him that the woman's boyfriend went out pretty frequently, and would therefore be difficult to kidnap outside of the house.  Saul Rodriguez agreed to let Hector Uriarte kidnap the woman's boyfriend, Victim V, when he was inside of his parents' home.

In or around the Fall of 2008, Hector Uriarte called Saul Rodriguez and told him that he and others who he did not name had broken into Saul Rodriguez' parents' home.  Hector Uriarte explained that the woman and Victim V were inside of the home at the time of the home invasion. Hector Uriarte said that he and the others restrained those people and searched the house.  Hector Uriarte claimed that he and the others recovered a 9mm handgun and $800 from inside of the home.

The woman who was renting the home later called Saul Rodriguez and claimed that someone had tried to break into or had broken into the house.  Saul Rodriguez went to his parents' home and

saw that about three doors had been broken.  Saul Rodriguez hired Ruben Villarreal to make the

repairs.

### 4.    *Information from Andres Flores*

Approximately one to one and a half years after the theft of cocaine in Joliet, Hector Uriarte

told Andres Flores that someone he knew as Oso had information that a large scale drug dealer that

Hector Uriarte, Jorge Uriarte, Andres Flores, and Tony Sparkman could rob.  Andres Flores identified

a photograph of Jorge Lopez as the person he knows as Oso.  Hector Uriarte later told Andres Flores

that the drug dealer was living in Saul Rodriguez' parents' house in Lyons, Illinois.  Jorge Uriarte,

Hector Uriarte, Andres Flores, and Tony Sparkman later drove by the house. The person that lived

in Saul Rodriguez' parent's house drove a newer Cadillac Escalade with expensive rims. Before

conducting the home invasion, Andres Flores knew that Hector Uriarte received permission from Saul

Rodriguez to break into the house.  Andres Flores identified a photograph of Victim V as the person

who was living in Saul Rodriguez' parents' home in Lyons and the person Andres Flores and others

kidnapped and robbed.

Hector Uriarte, Jorge Uriarte, Andres Flores, and Tony Sparkman conducted surveillance on

the house on a few different occasions.  It was later determined that they would kick down the back

door and go inside. On the day of the home invasion, Hector Uriarte drove the others in the silver

Expedition to the house at 6:00 or 7:00 a.m.  Hector Uriarte dropped Jorge Uriarte, Andres Flores,

and Tony Sparkman off.  The Escalade was parked in the driveway.  Andres Flores had a gun on him.

As Andres Flores walked to the rear of the house, he noticed that the door was of poor quality.  Tony

Sparkman kicked the door open.

Once inside, Andres Flores walked directly to the front of the house looking for people. Andres Flores later found one victim sleeping and heard Tony Sparkman wake up another victim. Jorge Uriarte or Tony Sparkman covered both victims' heads with blankets. Jorge Uriarte then acted like he was a police officer and questioned both of them.  One of the victims stated that he had recently been robbed and had to sell the rims from his Escalade to pay the debt.  During the search someone found a .40 caliber handgun and 9mm handgun along with approximately $2,000.  Jorge Uriarte also took the watch off of one of the victims in the house. While in the house, Andres Flores recognized one of the men from the high school he had attended.  Andres Flores knew that the man was not a high level drug dealer.  The men were left in a closet in the basement.  Andres Flores went to work at his construction job after the home invasion.

## CC.    2009 Kidnapping of Victim CC, Victim DD, and Victim EE

### 1.    *Information from Saul Rodriguez*

In or around late 2008 or early 2009, Hector Uriarte and Saul Rodriguez talked about how Hector Uriarte was in need of money.  Saul Rodriguez told Hector Uriarte that he could kidnap Victim CC, the son of the owner of a Chicago-based restaurant chain, and hold him for a large cash or cocaine ransom. Saul Rodriguez told Hector Uriarte that Victim CC drove a Cadillac Escalade and a Range Rover. Hector Uriarte told Saul Rodriguez that he was going to start doing surveillance of Victim CC.

Within a week or so, Hector Uriarte told Saul Rodriguez that he had started conducting surveillance of one of the restaurants on Fullerton in Chicago.  Hector Uriarte did not tell Saul Rodriguez with whom he was doing the surveillance.  Hector Uriarte continued to do surveillance of that restaurant over the next few weeks.  At some point, Hector Uriarte told Saul Rodriguez that he

had seen several cars outside of the restaurant at closing on a regular basis.  Within the next month,

Saul Rodriguez learned that Victim CC lived in Burbank off of state street in a house that was brick

and two stories.

Later that day or the next day, Saul Rodriguez told Hector Uriarte that he had found the home

of Victim CC.  Saul Rodriguez drove Hector Uriarte by the home.  A couple of days later, Hector

Uriarte told Saul Rodriguez that he, Jorge Uriarte, and others had gone into the home disguised as

cops.  Hector Uriarte explained that they found Victim CC, a woman about ten years younger than

the man (Victim DD), and a child (Victim EE) inside of the house.  Hector Uriarte explained that they

looked everywhere inside of the house, but that the only thing they found inside of the house was a

money counter with rubber bands.  Hector Uriarte said that Victim DD kept demanding to see the

warrant.  As such, Hector Uriarte believed that Victim DD considered Hector Uriarte and the others

to really be the police.  Hector Uriarte said that  they left the house without taking anything from

inside of the house.

### 2.  *Information from Andres Flores*

In late 2008 or early 2009, Hector Uriarte told Andres Flores that the owners of a Mexican

restaurant had access to a large amount of money.  Hector Uriarte discovered that Victim CC, a family

member or friend of the owner of the restaurant, lived in Burbank, Illinois. Hector Uriarte told Andres

Flores that he wanted to kidnap Victim CC and ask for a large ransom payment.  Andres Flores,

Hector Uriarte, Jorge Uriarte, and Tony Sparkman conducted surveillance and followed Victim CC

to a school and then to a grocery store.  When Victim CC returned home, Andres Flores and Jorge

Uriarte forced Victim CC into the house as Tony Sparkman parked Andres Flores' truck.  As Andres

Flores entered the house, he saw a woman, Victim DD, and a child, Victim EE.  Andres Flores

informed the individuals in the house that Andres Flores, Jorge Uriarte, and Tony Sparkman were police officers. After searching the house, Andres Flores, Jorge Uriarte, and Tony Sparkman exited the house without finding anything.

### DD.     April 9, 2009 Attempted Possession of Cocaine

Between late March and early April 2009, Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, and Tony Sparkman planned the theft of hundreds of kilograms of cocaine that were allegedly been stored in a warehouse in Channahon, Illinois. Individual W had alerted Saul Rodriguez and Jorge Lopez about the location of the cocaine and the opportunity to steal it. Saul Rodriguez believed that Individual F would sell a portion of the cocaine for Saul Rodriguez once it was stolen. Unbeknownst to Saul Rodriguez and his associates, Individual W and Individual F were cooperating with the DEA. On April 9, 2009, Saul Rodriguez, Jorge Lopez, Hector Uriarte, Jorge Uriarte, Andres Flores, and Tony Sparkman attempted to steal what they believed was cocaine from a warehouse in Channahon, Illinois. Law enforcement arrested the men that same day.

### 1.     *Information from Saul Rodriguez*

Saul Rodriguez had a series of conversations with Individual W and Individual F between late March 2009 and early April 2009 about the theft of hundreds of kilograms of cocaine from a warehouse in the Chicago area. Saul Rodriguez believed that Individual W could arrange for Saul Rodriguez to steal the cocaine. Saul Rodriguez directed Jorge Lopez to coordinate the theft with Individual W. Saul Rodriguez directed Individual F to sell a portion of any cocaine that was stolen.

In the days before the theft of cocaine, Hector Uriarte stopped by Saul Rodriguez' home. Saul Rodriguez told Hector Uriarte about his conversation with Individual W and the potential theft of cocaine. Saul Rodriguez told Hector Uriarte that he had discussed the potential theft of cocaine with

178

Individual F, who had agreed to sell a portion of any cocaine that was stolen. Saul Rodriguez asked Hector Uriarte if he was interested in participating in the theft. Hector Uriarte said that he was.

Before that day, Saul Rodriguez knew that Hector Uriarte and Jorge Uriarte had planned on leaving for Mexico to visit family. Hector Uriarte told Saul Rodriguez that he was no longer going to travel to Mexico and was going to participate in the theft of cocaine instead. Saul Rodriguez asked Hector Uriarte to contact Jorge Lopez. Saul Rodriguez explained that Individual W had wanted Jorge Lopez involved in the theft of the cocaine. Before Hector Uriarte left Saul Rodriguez' house that day, he agreed that Hector Uriarte, Jorge Lopez, and Saul Rodriguez would meet at Jorge Lopez' mother's home in Chicago later that same day.

Later that same day, Saul Rodriguez drove to Jorge Lopez' mother's home in the area of Kedzie and 59th in Chicago. Once there, Saul Rodriguez instructed Hector Uriarte and Jorge Lopez to put their cell phones in Hector Uriarte's truck. Saul Rodriguez did so in order to reduce the chances that either of them had devices on them that were capable of recording their conversation. After their phones were in the truck, Saul Rodriguez told Hector Uriarte and Jorge Lopez that Individual W had access to a large amount of cocaine, and that Individual W could  arrange for the cocaine to be stolen. Saul Rodriguez told Hector Uriarte and Jorge Lopez that Individual W wanted Jorge Lopez involved because he could trust Jorge Lopez. Jorge Lopez told Saul Rodriguez that even before this deal he had been trying to find Individual W so that he could purchase cocaine from him. They agreed that Jorge Lopez should met with Individual W. They agreed that Jorge Lopez, Hector Uriarte, and others would handle the planning from that point on. Saul Rodriguez understood that Jorge Lopez or Hector Uriarte would contact him once they stole the cocaine. They did not make any

179

arrangements about where the cocaine would be taken, or who would get what portion of the cocaine or cocaine proceeds.

Saul Rodriguez called Individual F soon after meeting with Hector Uriarte and Jorge Lopez. Saul Rodriguez told him that "things were happening" and that he would call him back. A few days after speaking with Jorge Lopez and Hector Uriarte, Individual F came by Saul Rodriguez' home. Saul Rodriguez told Individual F that he had told Hector Uriarte about the potential theft, and Individual F's involvement in it. Saul Rodriguez told Individual F that Jorge Lopez and Hector Uriarte were going to steal the cocaine.

Saul Rodriguez did not speak with Individual W, Jorge Lopez, or Hector Uriarte again before his arrest on April 9, 2009. Based on Saul Rodriguez' prior conversations with them, and his prior dealings with them, Saul Rodriguez understood that Jorge Lopez would coordinate with Individual W to determine the time and place of the theft of the cocaine. Saul Rodriguez further understood that Jorge Lopez and Hector Uriarte would coordinate how the theft would be conducted, including whether they would involve other people. Saul Rodriguez did not talk to Jorge Lopez and Hector Uriarte about the other individuals that would be involved. Saul Rodriguez understood that Jorge Lopez or Hector Uriarte would contact him once they had stolen the cocaine. Saul Rodriguez understood that the cocaine would be taken to another location where it would be stored until Individual F could pick it up his portion and sell it. While Saul Rodriguez understood that the theft of cocaine would happen soon, he did not know the exact date or time on which the theft was planned. Only after his arrest on April 9 did Saul Rodriguez he learn that Hector Uriarte had gotten Tony Sparkman and Andres Flores involved in the attempted theft of cocaine. Only after his arrest, did

Saul Rodriguez realize that both Individual F and Individual W were cooperating with law enforcement, and that the cocaine Individual W claimed they could steal didn't even exist.

### 2. *Information from Jorge Lopez*

Approximately one month before his arrest, Jorge Lopez received a phone call from Hector Uriarte. During the call, Hector Uriarte asked Jorge Lopez to meet in the area of I-55 and Kingery Avenue. Later that day, Jorge Lopez drove to the location and met with Hector Uriarte. During the meeting, Hector Uriarte told Jorge Lopez that Saul Rodriguez wanted to speak with Jorge Lopez about Individual W. Hector Uriarte explained that Individual W might have access to approximately 300 kilograms of cocaine. Jorge Lopez agreed that he would meet with Hector Uriarte and Saul Rodriguez at Jorge Lopez' mother's home later that day.

Later that day, Jorge Lopez met with Hector Uriarte and Saul Rodriguez at Jorge Lopez' mother's home located on 58th Street in Chicago. Before they began speaking to one another, Saul Rodriguez instructed Jorge Lopez and Hector Uriarte to put their cellular telephones in Hector Uriarte's van. After doing so, Saul Rodriguez then patted down Jorge Lopez. Jorge Lopez had not seen Saul Rodriguez in four years. Saul Rodriguez had never patted down Jorge Lopez in the past.

Saul Rodriguez told Jorge Lopez and Hector Uriarte that Individual W had access to approximately 300 kilograms of cocaine in the Chicago area. Saul Rodriguez explained that they could purchase the cocaine or arrange to steal it. Saul Rodriguez said that Individual W had refused to participate in the theft unless Jorge Lopez was involved. Saul Rodriguez explained that he would rather steal the cocaine than purchase it. Saul Rodriguez explained that the theft would be easy and no weapons would be needed. Saul Rodriguez then asked Jorge Lopez and Hector Uriarte if they wanted to participate in the theft. Jorge Lopez and Hector Uriarte both agreed to participate in the

theft.  Before leaving, Saul Rodriguez agreed that he would provide Jorge Lopez with Individual W's telephone number.  Saul Rodriguez directed Jorge Lopez to coordinate the theft with Individual W.

Hector Uriarte later called Jorge Lopez and provided Individual W's telephone number to him. Jorge Lopez subsequently had a series of conversations with Individual W between late March 2009 and early April 2009 about the theft of the cocaine.  After his first meeting with Individual W, Jorge Lopez met with Hector Uriarte in the area of 43rd and Pulaski in Chicago.  Hector Uriarte said that he and his brother, Jorge Uriarte, would help Jorge Lopez in the theft.

A few days later, Jorge Lopez met Individual W and discussed the theft of the cocaine. Individual W explained that the cocaine would soon arrive in the Chicago area.  Individual W instructed Jorge Lopez to purchase a GPS device before stealing the cocaine.  After speaking to Individual W, Jorge Lopez met with Hector Uriarte.  Jorge Lopez told Hector Uriarte and updated him on the status of the theft.

A few days later, Jorge Lopez met Individual W and discussed the theft of the cocaine. Individual W gave Jorge Lopez a map of the warehouse where the cocaine was being stored.  The map did not reflect in what city the cocaine was being stored.  Individual W said that approximately 450 to 600 kilograms of cocaine were in a van in the warehouse.  Individual W explained that the theft would be easy and would not require Jorge Lopez to use a gun.  After meeting with Individual W, Jorge Lopez met with Hector Uriarte.  During the meeting, Jorge Lopez told Hector Uriarte that more cocaine was being stored at the warehouse than what they had expected.  Hector Uriarte agreed to call his brother, Jorge Uriarte, and arrange to have additional people participate in the theft.

On April 9, 2009, Jorge Lopez, Hector Uriarte, and Jorge Uriarte went to a Target on Pulaski where they bought a GPS device.  Later that same day, Individual W called Jorge Lopez and told him

182

to drive towards the area of the Joliet Mall.  Jorge Lopez then met with Hector Uriarte, Jorge Lopez,

Andres Flores, and Tony Sparkman in the area of 59th Avenue and Pulaski Avenue.  Jorge Lopez

arrived in his own car.  The other men arrived in at least two separate cars.  After meeting up, Jorge

Lopez entered Hector Uriarte's green mini van, Hector Uriarte followed the other men, Jorge, Uriarte,

Andres Flores, and Tony Sparkman, who were in a silver Ford Expedition.

Once at the Joliet mall, the Expedition and the mini van parked at different ends of the mall

to avoid detection.  While there, Hector uriarte told Jorge Lopez that he had a place where they could

hide the cocaine after it had been stolen.  After waiting for approximately an hour or so, Jorge Lopez,

Hector Uriarte, Jorge Uriarte, Andres Flores, and Tony Sparkman ate at a restaurant in the mall.

During the meal, Hector Uriarte explained that he and Jorge Lopez would conduct counter

surveillance during the theft while Jorge Uriarte, Andres Flores, and Tony Sparkman would be

responsible for stealing the van containing the cocaine.

While in the mall, Jorge Lopez got a call from Individual W.  During the call, Individual W

gave Jorge Lopez the address of the warehouse.  Jorge Lopez wrote down the address.  Individual W

explained that they keys to the van containing the cocaine were in a bag in a green garbage can.

Individual W instructed Jorge Lopez to enter the warehouse through the window to make it appear

as if they broke in to the warehouse.  Jorge Lopez and the men left the mall and entered their

respective vehicles.

Once back in the mini van with Hector Uriarte, Jorge Lopez entered the address to the

warehouse in the GPS device.  Hector Uriarte drove the mini van towards the warehouse as Jorge

Uriarte, Andres Flores, and Tony Sparkman followed in the Expedition.  Upon arriving at the

warehouse, Jorge Lopez saw that the Expedition turned in to the warehouse's parking lot while Hector

183

Uriarte continued to drive on the street adjacent to the warehouse in an effort to conduct counter surveillance.  As Hector Uriarte was doing so, Hector Uriarte got a call from Jorge Uriarte indicating that he could not find the key to the van.

Hector Uriarte turned the mini van around and began driving toward the warehouse.  As he did so, Jorge Lopez saw law enforcement driving toward the warehouse.  Hector Uriarte drove away toward a large number of semi tractor trailers.  Jorge Lopez and Hector Uriarte got out of the mini van.  Jorge Lopez saw Hector Uriarte take the temporary license plate from the van.  Hector Uriarte told Jorge Lopez to "break" his phone.  Jorge Lopez threw the box in which the GPS device had come away from the mini van and began to run.  As Jorge Lopez did so, he saw what he believed to be a surveillance plan overhead.  Jorge Lopez ran until law enforcement caught up with him and placed him under arrest.

### 3.   *Information from Andres Flores*

In late March 2009, Hector Uriarte invited Andres Flores to his house.  Andres Flores later met at Hector Uriarte's Burr Ridge house.  Hector Uriarte said that there may be an opportunity to make money by stealing a load of cocaine or cocaine proceeds from a location where it was being stored.  Hector Uriarte said that Saul Rodriguez had obtained the information regarding the location of the cocaine or cocaine proceeds from someone Rodriguez knew from the gym.  Hector Uriarte told Andres Flores that while at the gym, Saul Rodriguez asked Hector Uriarte to steal the cocaine or cocaine proceeds.  During the meeting at the house, Hector Uriarte informed Andres Flores that Jorge Uriarte and Tony Sparkman had agreed to participate in the theft.  Hector Uriarte explained to Andres Flores that the job would be easy because Saul Rodriguez had someone on the inside.  Hector Uriarte

informed Andres Flores that there would be keys to a truck hidden at the location and that a van

would be stolen that contained the cocaine or proceeds.

Andres Flores met with Hector Uriarte, Jorge Uriarte, and Tony Sparkman one or two

additional times before the theft. During these meetings, Hector Uriarte said that the people involved

in the theft of cocaine or cocaine proceeds would be Tony Sparkman, Jorge Uriarte, Andres Flores,

Hector Uriarte, Saul Rodriguez, and Jorge Lopez. Hector Uriarte explained that Jorge Lopez was

involved because the guy with the information did not trust Saul Rodriguez, but he did trust Jorge

Lopez. Andres Flores understood that he would be paid for his participation in the theft, but he did

not know the exact payment. The plan was that the guy with the information would call Jorge Lopez

and give him the location where the cocaine or cocaine proceeds were being stored. Jorge Lopez

would then call Hector Uriarte, who would notify the rest of the participants that it was time to steal

the cocaine or cocaine proceeds. Saul Rodriguez would not participate directly in the theft, but would

sell any cocaine that we stole. Jorge Lopez would also sell some of the cocaine. At some point,

Hector Uriarte told Andres Flores and Tony Sparkman to retrieve two guns belonging to Hector

Uriarte that they stored at Hector Uriarte's ex-brother-in-law's house near 42nd Street and Kedzie in

Chicago. Tony Sparkman and Andres Flores picked up a .357 caliber revolver and one of the firearms

they had stolen during the kidnapping and robbery at Saul Rodriguez' parents' home. Andres Flores

then took the guns to his home.

On April 8, 2009, Hector Uriarte instructed Andres Flores to meet again at Hector Uriarte's

house in Burr Ridge. Hector Uriarte told Andres Flores that the theft of cocaine would happen the

next day. Hector Uriarte told Andres Flores not to go to work the next day but instead come to the

Burr Ridge house early the next morning. Hector Uriarte also told Andres Flores to bring the two

guns with him. Tony Sparkman, Jorge Uriarte, Andres Flores, and Hector Uriarte all obtained prepaid cell phones to use during the attempted theft of cocaine. The phones were prepaid phones so that they could throw them away afterward and to avoid detection by law enforcement.

The next morning, at approximately 5:30 a.m. or 6:00 a.m., Andres Flores put the two guns in an air vent in the interior roof of the Expedition. Tony Sparkman met Andres Flores and they drove to Hector Uriarte's house. Hector Uriarte, Tony Sparkman, Jorge Uriarte, and Andres Flores waited at Hector Uriarte's house for a phone call from Jorge Lopez telling them where to go to steal the cocaine or cocaine proceeds. Later in the day, Jorge Lopez finally called. It was agreed that they would meet at a Home Depot on LaGrange Road and Joliet Road. When they arrived at the Home Depot, Jorge Lopez was already there in a Jeep. Jorge Lopez got out of his Jeep and got into a van with Hector Uriarte and Jorge Uriarte. Tony Sparkman and Andres Flores drove in the Expedition and followed Hector Uriarte's van to a mall in the Joliet area. Tony Sparkman and Andres Flores waited in the Expedition in the parking lot, and then went into the food court at the mall to eat. Tony Sparkman and Andres Flores then returned to the Expedition to wait for a call from Hector Uriarte. Sometime later, Andres Flores received instructions from Hector Uriarte to follow the van.

Andres Flores and Tony Sparkman then followed Hector Uriarte's van onto the expressway and got off at an exit past Joliet, which was a frontage road. Once off the expressway, Hector Uriarte pulled over. Once pulled over, Jorge Uriarte got into the Expedition with Tony Sparkman and Andres Flores. Jorge Uriarte had a Tom-Tom GPS device and a hand drawn map. Jorge Uriarte then entered an address of a warehouse into the GPS device, which was supposedly the location where the cocaine or cocaine proceeds were being stored. Jorge Uriarte had also told Andres Flores that the key to the truck containing the cocaine or cocaine proceeds would be hidden in a potato chip bag, which would

186

be in a green garbage can outside the window of a warehouse.  Andres Flores drove the Expedition, Tony Sparkman was in the front passenger seat, and Jorge Uriarte sat in back.  Hector Uriarte and Jorge Lopez followed them in the green van.  Andres Flores and Jorge Uriarte eventually found the warehouse and the correct garbage can with the key in it.  Jorge Uriarte retrieved the key from the garbage can and then gave the key to Andres Flores.  Andres Flores then went with Jorge Uriarte to the window of the warehouse.  Andres Flores used a pen to cut the screen and then opened the window.  Tony Sparkman got into the driver's seat of the Expedition.  Andres Flores climbed through the window and opened a door from the inside to let in Jorge Uriarte. Andres Flores' job was to drive the van containing the cocaine or cocaine proceeds out of the warehouse.  Andres Flores got in the van and saw that the back of it was loaded with duffel bags, which Andres Flores believed to contain cocaine or money.

Jorge Uriarte then opened the garage door and Andres Flores started the van and he drove out of the warehouse.  When Andres Flores pulled out of the warehouse he saw a large pick up truck driving quickly into the parking lot, and Andres Flores saw the pick up truck hit the Expedition driven by Tony Sparkman as he was attempting to drive away.  Andres Flores then saw more vehicles with lights flashing, and swerved to the right and crashed the van. Law enforcement arrested Andres Flores.  Only after his arrest did Andres Flores learn that Individual W had been cooperating with the DEA and that there was never any cocaine to steal.

## IV.    CONCLUSION

The above is an outline of the evidence that the government will introduce to establish that the charged racketeering and drug conspiracies existed involving Saul Rodriguez, Glenn Lewellen, Manuel Uriarte, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Jorge Lopez, Walter Johnson, and Robert Cardena, Andres Torres, Pedro Victoria, and others.  This Court should find, based upon this proffer, that co-conspirator statements are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:      s/ Terra Reynolds
TERRA REYNOLDS
STEVEN A. BLOCK
TIFFANY TRACY
Assistant U.S. Attorneys
219 South Dearborn Street, Room 500
Chicago, Illinois 60604
(312) 353-5300

Dated: September 23, 2011

188

# TABLE OF CONTENTS

I.    OVERVIEW OF THE CHARGED CONSPIRACIES
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   THE LAW GOVERNING THE ADMISSIBILITY OF CO-CONSPIRATOR
      STATEMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      A.    The *Santiago* Proffer Is the Approved Method of Proffering Co-Conspirator
            Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      B.    Co-Conspirator Statements Are Admissible as Nonhearsay Despite the Absence of
            a Formal Conspiracy Charge, and Regardless of Criminal Intent of Each Co-
            Conspirator
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      C.    The Supreme Court's *Crawford* Decision Has Not Changed the Admissibility of Co-
            Conspirator Statements.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      D.    The Proper Standard for Admissibility Is Preponderance of the Evidence
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      E.    Principles for Determining Membership in and Existence of the Conspiracy
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      F.    Statements Made in Furtherance of the Conspiracy
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      G.    Alternative Bases for Admissibility of Statements
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.  THE GOVERNMENT'S PROFFER REGARDING THE EXISTENCE OF THE
      CONSPIRACIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      A.    Saul Rodriguez' Cooperation with the CPD
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      B.    1998 Theft of Narcotics Proceeds
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      C.    1998/1999 Theft of Narcotics Proceeds
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      D.    Glenn Lewellen's Obstruction of Justice on December 21, 1999
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      E.    June 3, 2000 Murder of Juan Luevano
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
      F.    May 31, 2001 Murder of Michael Garcia
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
      G.    2001 Kidnapping & Robbery of Victim A & Victim B
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
      H.    2001 Kidnapping & Robbery of Victim C
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
      I.    2002 Kidnapping of Victim D
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

J.     December 24, 2002 Murder of Miguel De La Torre
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

K.     2003 Kidnapping and Robbery of Victim E
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

L.     Theft of Narcotics Proceeds from Individual J
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

M.     May 29, 2003 Kidnapping of Victim F
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

N.     Summer 2003 Purchase of the Ford Crown Victoria
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

O.     Summer 2003 Kidnapping of Victim G
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

P.     November 18, 2003 Kidnapping of Victim H
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Q.     2004 Theft of 70 Kilograms of Cocaine
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

R.     2004 Kidnapping of Victim I
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

S.     2004 Kidnapping & Robbery of Victim J, Victim K & Victim L
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

T.     2004 Aiding and Abetting Possession of 300 Kilograms of Cocaine
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

U.     2005 Attempted Murder of Victim X
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

V.     May 2006 Obstruction of a Federal Investigation
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

W.     2006 kidnapping of Victim Z, Victim AA, and Victim BB
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

X.     Summer 2006 Possession of 300 Kilograms of Cocaine
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Y.     Summer 2006 Kidnapping of Victim M and Victim N
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Z.     October 20, 2007 Kidnapping of Victim O Through Victim U
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

AA.    October 23, 2007 Possession of 80 Kilograms of Cocaine
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

BB.    2008 Kidnapping & Robbery of Victim V and Victim W
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

CC.    2009 Kidnapping of Victim CC, Victim DD, and Victim EE
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

DD.    April 9, 2009 Attempted Possession of Cocaine
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

IV.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| SAUL RODRIGUEZ, *et al*. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

GOVERNMENT'S EVIDENTIARY PROFFER SUPPORTING THE
ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS

was served pursuant to the district court's ECF system.

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney

By:   s/ Terra Reynolds
          TERRA REYNOLDS
          Assistant United States Attorney
          219 South Dearborn Street, 5th Floor
          Chicago, IL  60604
          (312) 353-3148

Dated: September 23, 2011

IN THE
UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. |
| | ) | Gottschall |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*RESPONSE TO GOVERNMENT'S SANTIAGO PROFFER*

Defendant GLENN LEWELLEN, through counsel, Andrea E. Gambino and Matthew J. Madden, respectfully requests that this Court find the government's *Santiago* proffer is insufficient to establish the existence of a conspiracy that includes Glenn Lewellen, that Glenn Lewellen participated in a conspiracy, or that Glenn Lewellen made any statements in furtherance of a conspiracy. In support of this Motion, defendant Glenn Lewellen, through counsel states the following:

I.   Glenn Lewellen did not agree to participate in the "Rodriguez Enterprise" and the government has not established that such an enterprise existed.

The government relies almost exclusively on the words of Saul Rodriguez to establish a conspiracy and to demonstrate that Glenn Lewellen was a part of it. This is insufficient. "While the admissibility of conspirators' declarations "is not contingent on demonstrating by non-hearsay evidence either the conspiracy or a given defendant's participation," *United States v. Martinez de Ortiz,* 907 F.2d

1

629, 634 (7th Cir.1990) (en banc), the contents of the proffered co-conspirator statements "are not alone sufficient" to establish the existence of a conspiracy and a defendant's participation in it. Fed.R.Evid. 801(d)(2)(E). In addition to the co-conspirator statements themselves, the Court must consider the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was made, or the evidence corroborating the contents of the statement. *United States v. Zambrana,* 841 F.2d 1320, 1344-45 (7th Cir.1988)." *United States v. Azteca Supply Co.,* 10 CR 80, 2010 WL 4962828 (N.D. Ill. Dec. 1, 2010).

> A.   Rodriguez' tenure as an informant for the Chicago Police Department does not constitute evidence of the establishment of a "criminal enterprise".

The government alleges the existence of the "Rodriguez Enterprise" and that this enterprise was initiated in 1996; however, the government does not allege an agreement between Glenn Lewellen and Saul Rodriguez to undertake any joint illegal activity in 1996.  The government conflates the founding of the "Rodriguez Enterprise" with Glenn Lewellen's legitimate actions as a police officer – arresting a drug dealer and signing him up to become a police informant – with Lewellen's alleged participation in illegal conduct undertaken by Saul Rodriguez.

Glenn Lewellen and his partners and associates at the police department caught Saul Rodriguez in illegal conduct, told him that he could mitigate the negative consequences to him by agreeing to cooperate with law enforcement,

and had him sign an informant agreement.  Glenn Lewellen and Tommy Horton were the officers who signed Saul Rodriguez' informant agreement.  Glenn Lewellen's alleged statements to Saul Rodriguez at the time he became an informant were not statements in furtherance of a criminal conspiracy, but statements made in furtherance of the aims of law enforcement.

The government has no evidence to support the statements of Saul Rodriguez that Glenn Lewellen told him to "continue doing what he was doing." Govt. br. At 19.   Or, that this statement, if it was made constitutes evidence of an agreement on Glenn Lewellen's part to join in any illegal activity that Saul Rodriguez decided to engage in.  On the contrary, the government's evidence shows that Glenn Lewellen and many other Chicago Police Officers used Saul Rodriguez's information to make arrests, seize drugs and proceeds of drug dealing, weapons, and otherwise conduct the business of law enforcement.  The government's evidence also shows that Rodriguez did not always receive payment for his information, that he did earn up to $1000 per kilogram of cocaine seized, and that this payment had to be approved by police officials that were in supervisory positions over Glenn Lewellen and the other officers who used Rodriguez.

The government alleges without the offer of any evidence in support of the allegation that "Saul Rodriguez asked Glenn Lewellen not to take action against certain individuals.  Most of the time Glenn Lewellen accommodated Saul Rodriguez' interests."  Gov. Br. 20.  These statements, even if made, cannot be

considered statements in furtherance of any conspiracy between Glenn Lewellen and Saul Rodriguez, because none existed.  These statements were not made in furtherance of any illegal activity which included Glenn Lewellen's agreement or participation.  At best these alleged statements were made in the context of a legitimate relationship between a police officer and an informant.

Similarly, even assuming *arguendo* the truth of the government's allegation that Glenn Lewellen told Saul Rodriguez "that the IRS was unlikely to audit him or other CPD informants," Govt. Br. 20, this statement is not in furtherance of a conspiracy between Glenn Lewellen and Saul Rodriguez.  The government's evidence shows that the Chicago Police Department paid Rodriguez, and presumably other informants, from a fund whose source is the seized proceeds from illegal activity.  The government's evidence will not show that the CPD issued 1099 forms to its informants and reported to the IRS the payment of these funds.

Glenn Lewellen's alleged awareness that Saul Rodriguez was involved in illegal conduct and his request to a federal agent to allow Rodriguez to continue acting as a CPD informant are not statements in furtherance of a conspiracy or evidence of a conspiracy.  In fact, this, too, is a part of the ordinary conduct of law enforcement business.  Glenn Lewellen had no authority to disrupt a federal investigation.  Agent Al Doescher had to get permission from an Assistant United States Attorney to forego an investigation of Rodriguez.  If either Agent Doescher or the Assistant United States Attorney had believed that their

marijuana investigation was more important than the work Rodriguez was doing

for the CPD investigating cocaine dealers, Lewellen's request would have been

refused. The fact that Glenn Lewellen and the Chicago Police Department

continued to use Rodriguez as an informant is neither evidence of a conspiracy

between Glenn Lewellen and Saul Rodriguez, nor are any statements made

during Rodriguez' tenure as an informant for the Chicago Police Department

properly considered "co-conspirator" statements.

> B.  Vague and unsupportable allegations of the theft of narcotics proceeds do
> not support a finding that a conspiracy existed or that Glenn Lewellen
> participated in it.

The government alleges, based entirely on the unsupported statements of Saul

Rodriguez, that in 1998 Glenn Lewellen gave him two kilograms of cocaine, that

Rodriguez and Lewellen stole money from Alex Estrada, and that Rodriguez and

Lewellen stole money from a person whose name Rodriguez can't remember, from a

place he can't remember, and at a time he can't remember with any specificity.  Govt.

Br. 22-24.  These bare allegations are not sufficient to establish by a preponderance of

the evidence that any agreement to conduct illegal activity existed between Glenn

Lewellen and Saul Rodriguez.

Alex Estrada is not available as a witness, since he was killed in Mexico.

Rodriguez does not provide enough information about either alleged theft of proceeds to

be able to prove or disprove it.  His bare allegation that these events occurred and that

Glenn Lewellen participated in them does not meet even the minimal requirements of

the *Santiago* proffer that the government establish the existence of a conspiracy by a

preponderance of the evidence.

C.    Glenn Lewellen did not obstruct justice in 1999. His testimony against
      Refugio Ruiz-Cortez was not in furtherance of any conspiracy.

In 1999, Saul Rodriguez provided information about a drug deal to Glenn

Lewellen because "Saul Rodriguez expected that the CPD would pay him if it made a

seizure as a result of the information he provided to Glenn Lewellen." Gov. Br. 28.  The

seizure and Glenn Lewellen's truthful testimony about the transaction was not in

furtherance of an illegal agreement between Glenn Lewellen and Saul Rodriguez, but in

furtherance of Glenn Lewellen's duties as a police officer and Saul Rodriguez's actions

as a paid informant.  Rodriguez provided the information and set up the deal to make

money.  He does not claim that Lewellen had any part in the transaction, except to

carry out his legitimate duties as a police officer.  There is no allegation of agreement

between the parties to undertake any joint illegal conduct.

Glenn Lewellen's testimony was consistent with his police report and the reports

of the other officers who participated in the arrest.  Refugio Ruiz Cortez admitted to the

government that he had participated in a drug transaction for 10 kilograms cocaine, and

that he had received a shipment of at least 80 kilograms of cocaine.  The ten that were

seized by Lewellen and other police and DEA officers were the remainder of the

shipment Cortez had received.

After Glenn Lewellen testified at Refugio Ruiz Cortez' trial, the Assistant United

States Attorney responsible for the prosecution wrote a laudatory letter to the police

department about the value of Glenn Lewellen's testimony and participation in the

investigation.  The judge in the case also found Glenn Lewellen's testimony credible and

disbelieved the testimony that the defendant had presented about how the arrest

occurred.

> D.    Saul Rodriguez's uncorroborated claim that Glenn Lewellen told him how
> to set up Juan Luevano is absurd on its face and does not establish the
> existence of a conspiracy between Rodriguez and Lewellen for any
> purpose.

In Fall 1999, three years after Saul Rodriguez began working as a paid

informant for the Chicago Police Department, Rodriguez claims that he "told Glenn

Lewellen that he wanted someone to go to jail for a long time."  Govt. Br. 31.  The

person Rodriguez wanted to exact revenge upon was someone who had been dating

Rodriguez' ex-girlfriend.  Rodriguez then alleges that Glenn Lewellen instructed

Rodriguez that "Saul Rodriguez would need to hide a large amount of cocaine in that

person's home."  Govt. Br. 31.  Rodriguez hardly needed instruction from Lewellen or

anyone else about how to set up a person and get that person arrested for the possession

of cocaine.  There is no corroboration for the alleged conversation between Rodriguez

and Lewellen, and it does not provide evidence of a conspiracy between Lewellen and

Rodriguez to commit any illegal act.

Even assuming *arguendo* that this conversation took place, this event was not in

furtherance of the either of the charged conspiracies in this case.  Setting up Juan

Luevano was a personal vendetta of Saul Rodriguez and evidence of his manipulation of

his position as an informant to serve his own personal ends.  This alleged incident was

not in furtherance of the "Rodriguez Enterprise" the alleged purpose of which was to

make money for the participants.  Exacting revenge on Juan Luevano by having him

arrested – rightly or wrongly – was neither in furtherance of  the "Rodriguez

Enterprise" nor the activities of the "Rodriguez Drug Trafficking Organization."  It was

strictly a personal act of vengeance undertaken by Rodriguez for his own satisfaction.

     E.    The government provides insufficient evidence of a conspiracy to kidnap
         Three individuals in 2001.

Saul Rodriguez claimed to have kidnapped and robbed two people in Will County

on an unspecified date "in or around 2001."  No other evidence is offered to support a

finding that this kidnapping happened or that Glenn Lewellen agreed to participate in

it.  No specific statements by Glenn Lewellen are offered in support of his participation

and no corroboration of Saul Rodriguez' claims is provided.

Rodriguez also claims that Glenn Lewellen participated in a home invasion and

theft of drug proceeds "in or around 2000 or 2001".  Again, Rodriguez makes

unsupported allegations that Glenn Lewellen participated in this event.  The

government offers no statements allegedly made by Lewellen or others in furtherance of

this alleged event.

While Andres Torres admits to having delivered the drug proceeds that

Rodriguez claims to have stolen, Torres was not present for the theft.  Govt. Br. 48.

Torres claims that at some unspecified later date, Rodriguez told him that Glenn

Lewellen was involved in the theft. Govt. Br. 48.  Even assuming *arguendo* the veracity

of Torres' claim, a statement by Rodriguez to Torres about Lewellen's involvement in a

theft does not further any alleged conspiracy or its concealment from law enforcement.

     F.    Allegations of 2003 kidnappings and theft are unsubstantiated and
         insufficient to support a finding that a conspiracy existed or that Glenn
         Lewellen participated in a conspiracy.

Rodriguez alleges that he orchestrated two kidnappings in 2003.  In the first,

Rodriguez claims that Lewellen invaded a person's home, tied him or her up, and then

left Rodriguez and others to continue trying to obtain drugs or money from the victim.

Rodriguez then claims that he lied to Glenn Lewellen about what transpired in order to

avoid providing Glenn with a cut of the proceeds.  Rodriguez' allegations are

unsupported by any other evidence and claim that he lied to keep from involving Glenn.

This is not evidence in furtherance of a conspiracy between Rodriguez and Glenn

Lewellen.

Similarly, the alleged theft of drug proceeds from Individual J is not supported

by any evidence apart from the word of Saul Rodriguez.  No specific statements made by

Glenn or anyone else are offered in support of a finding that this incident occurred, that

Glenn agreed to participate in it.

Rodriguez claims that Glenn Lewellen conducted surveillance of a Victim F on a

couple of unspecified occasions and then did not continue to participate in what

eventually became a kidnapping.  These uncorroborated statements do not support the

government's allegation that Glenn Lewellen was a participant in a conspiracy to

kidnap victim F.

Rodriguez claims that Glenn Lewellen assisted in the kidnapping of one of the

twins in 2003.  No alleged statements by Glenn Lewellen are offered from this alleged

event.

> G.      Andres Torres allowed the use of a warehouse for a drug transaction
>         without Glenn Lewellen's knowledge.

"In or around 2004" Saul Rodriguez and Andres Torres conspired to steal a

shipment of drugs from one of Rodriguez' suppliers.  Govt. Br. 93.  Torres was using a

warehouse to store his painting materials for his painting business.  He rented space

from Glenn Lewellen.  Torres suggested that they use the warehouse for the drug off-

loading.  Rodriguez contends that Glenn agreed to participate in the theft, but there is

no corroboration of this.

Saul and Andres contradict each other about how this alleged theft took place. Saul claims that both Andres and Glenn Lewellen were present and active participants. Andres Torres claims that his role was to notify Rodriguez about when the shipment was expected and to call Glenn and let him know to go to the warehouse.  Torres claims that he was not present for the theft.  He cannot corroborate the claims made by Rodriguez about Glenn Lewellen's knowing and active participation in this alleged event.  No independent corroboration is provided and no statements are offered.

It is undisputed that Glenn Lewellen was not consulted, nor did he participate in the theft of cocaine that was off-loaded in another of Glenn's warehouses sometime in 2004.  When Lewellen  discovered that Andres had used his warehouse without his knowledge, he became angry and wanted Torres to clean up the mess his people had made in the warehouse.  Any alleged statements by Lewellen to Torres were not in furtherance of a conspiracy because Lewellen did not know about or approve the use of his warehouse for unloading a shipment of cocaine.

II.     Glenn Lewellen left the Chicago Police Department in 2003.  He did not have access to federal wiretap information in 2006.

Saul Rodriguez claims that Glenn Lewellen told him that the DEA was investigating Rodriguez and that he immediately stopped using his phone after Glenn told him this. Andres Torres tells a different story and claims that Glenn Lewellen told him about the investigation when the two met at the warehouse.  Govt. Br. 127.  Torres claims that Glenn Lewellen told him that he "should not throw his phone away right away because it would look suspicious."

No taped telephone conversations are offered to support the claims of Rodriguez and Torres.  Nor is there any evidence to support a finding that Glenn Lewellen had access to information about the existence of a federal wiretap, its participating agency, the targets of the investigation, or the numbers that were being monitored.  The government's evidence will show that there were other local law enforcement officers who were working with DEA agents on the investigation of Rodriguez who also had a history of working with Rodriguez.

Torres' claim that he and Glenn Lewellen had a conversation about Saul Rodriguez' allegation that Torres stole money from Rodriguez, has no bearing on a conspiracy of any description.  The claim that "Glenn Lewellen laughed and said that Saul Rodriguez had probably stolen it himself, " Govt. Br. 126,  is not a statement in furtherance of a conspiracy.  There is no legal basis for admitting this alleged statement.

WHEREFORE, defendant GLENN LEWELLEN, respectfully requests that this Court find that the government has failed to meet its burden of  (1) demonstrating that a conspiracy existed – either the "Rodriguez Enterprise" or the "Rodriguez Drug Trafficking Organization; and (2) that Glenn Lewellen participated in any conspiracy to join in any illegal activity.  The unsubstantiated claims of Saul Rodriguez, an admitted liar, thief, murderer, and kidnapper, are an insufficient basis upon which to base a finding – even at the lower preponderance of the evidence threshold -- that Glenn Lewellen participated in a conspiracy to participate in any illegal act.

DATE:          October 7, 2011              Respectfully submitted,

                                           By:     s/Andrea E. Gambino
                                                   s/Matthew J. Madde
                                                   Attorneys for Glenn Lewellen

Law Offices of Andrea E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014

Law Office of Matthew J. Madden
53 W. Jackson Blvd.
Chicago, Illinois  60604
(312) 212-1900

CERTIFICATE OF SERVICE

I hereby certify that the above document has been filed using the CM/ECF

system.  Electronic notice has been sent to the following parties:

Counsel for co-defendants

Terra Reynolds
Steven Block
Tiffany Tracy
Assistant United States Attorneys


DATE: October 7, 2011                    Respectfully submitted,

                                         By:     s/Andrea E. Gambino
                                                 An Attorney for Glenn Lewellen


Law Offices of Andrea E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES of AMERICA | No. 09-332 |
| v. | Judge Joan B. Gottschall |
| SAUL RODRIGUEZ, et. al. | |

### AGREED APPLICATION FOR ORDER TO DISCLOSE TAX RETURNS AND RETURN INFORMATION AT TRIAL

The United States of America, by PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, pursuant to 26 U.S.C. § 6103(i)(4)(A)(i) and (ii) makes application to the Court for an order, authorizing the government to disclose tax returns and return information for the tax years 2008 through 2009 of:

Hector Uriarte;
Jorge Uriarte;
Trip Lyns, Inc.;

and to disclose tax returns and return information for the tax years 2001 through 2008 of:

Walter Johnson;
WJ Enterprises, Inc.

In support of his application, applicant avers the following:

(1)     On November 18, 2010, Hector Uriarte, Jorge Uriarte, Walter Johnson, and others, were charged  in the present case in a Third Superseding Indictment alleging conspiracy to commit racketeering, in violation of Title 18, United States Code, Section 1962(d), and conspiracy to possess with intent to distribute narcotics, in violation of Title 21, United States Code, Section 846;

(2)     The government intends to offer the above-described tax returns and return

1

information at trial to support the charges of conspiracy to commit racketeering and conspiracy to possess with intent to distribute narcotics; and

(3)     The defendants are entitled to examine and copy all exhibits the government intends to introduce at trial, pursuant to Rule 16, Federal Rule of Criminal Procedure.

(4)     The above-described tax returns and return information are probative of a matter in issue relevant to establishing the commission of the crimes charged or the guilt of the defendants in that the returns will show the transactional relationships, or the lack thereof, between the defendants, related corporations and entities, and the alleged conspiracy, and the sources of reported income for the co-conspirators and the related entities to compare to alleged sources of income arising from the affairs of the enterprise.

(5)     The above-described returns may be statements of defendants within the meaning of Federal Rule of Criminal Procedure 16(a)(1)(B)(i), or may otherwise be discoverable.  Defendants agree to this Motion.

WHEREFORE, applicant prays the Court enter an order on this application authorizing disclosure by the Government of the tax returns and return information specified herein at the trial of such case or any related judicial proceeding.

Respectfully submitted,

/s/ Patrick J. Fitzgerald
PATRICK J. FITZGERALD
United States Attorney

By:     /s/ Tiffany J. Tracy
TIFFANY J. TRACY
Assistant United States Attorney
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

Date: October 14, 2011

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332-2 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

## GOVERNMENT'S MOTION TO BAR EXPERT WITNESS TESTIMONY

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby moves the Court to bar defendant from calling an expert witness at trial because defendant has failed to provide the disclosures required by Federal Rule of Criminal Procedure 16(b)(1).  In support of its motion, the government states as follows.

Defendant asked the Court to order the government to produce its expert disclosures by August 31, 2011 – over nine weeks prior to trial.  Defendant argued that the Court should order such an early disclosure "to allow sufficient time for defendants to raise any *Daubert* challenge, or to secure defense experts to rebut the opinions of the government's experts."  Doc. 435.  On August 17, 2011, the Court ordered the government to produce its expert disclosures 30 days prior to trial (doc. 460).  On August 19, 2011, the Court amended its prior order and ordered the government produce expert disclosures 45 days prior to trial (doc. 470).  The government complied with the Court's order and timely provided defendants with its expert disclosures on September 23, 2011.

On December 27, 2010, the government requested from defendant the expert discovery to which it is entitled under Rule 16(b)(1) (Exhibit A).  On August 25, 2011, the government reminded defendant of his obligation to produce expert discovery (Exhibit B).  On September 28, 2011, the

Court held a status hearing.  At the hearing, the government informed the Court that though defendant had told the government he intended to call an expert witness to testify on financial matters, defendant had not provided the materials required by Rule 16(b)(1), including the identity of the witness, the witness's qualifications, a written summary of the witness's anticipated testimony, the witness's opinions, or the bases and reasons for the opinions.  Defense counsel informed the Court that it was not yet able to comply with its disclosure obligations.  The Court ordered defendant to at least provide by October 7, 2011, the name of the witness, the subject matter of his testimony, and the materials upon which the witness would form his opinions.

On October 7, 2011, defendant sent a one paragraph letter to the government that complies with the Court's September 28, 2011 order insofar as it identifies the name of the expert he intends to call at trial (Exhibit C).  Defendant did not, however, inform the government of the subject matter of the expert's testimony (other then to state that the expert "has been retained to examine Mr. Lewellen's finances"), nor identify the documents upon which the expert will base his opinions (whatever they will be).  Counsel for the government followed up with defense counsel in an attempt to ascertain when defendant would comply with the disclosure requirements of Rule 16(b)(1).  On October 13, 2011, defendant informed the government that his expert would not be prepared to tender his opinion until November 7, 2011, the date on which the trial is scheduled to start.

The government has tried to resolve this issue with defense counsel but now requires the Court's assistance.  It is patently unfair for defendant to wait until the parties are on trial to make the required expert disclosures.  The government will have no meaningful opportunity to evaluate the defense expert's opinions and decide if it wishes to retain an expert of its own to rebut the defense expert's testimony.  Moreover, defendant places the Court in the position of potentially

2

needing to schedule and hold a *Daubert* hearing in the middle of a complex, multi-defendant jury trial.  As defense counsel argued when it asked the Court to order the government to produce its expert disclosures months before trial, early disclosure is required to allow sufficient time for a *Daubert* challenge.  Doc. 435.

There is no justification for defendant's delay in providing the required expert disclosures. Defendant has had the bulk of the financial documents in the government's possession for months. In January 2011, the government produced financial records and an index to aid in the review of the documents (Exhibit D).  The government produced a much smaller number of financial documents in August 2011 (Exhibit E) and has occasionally supplemented the discovery.  Defendant has had ample time to retain an expert to analyze these records.  Morever, the government has not disclosed a financial expert and does not intend to call such an expert in its case-in-chief.  Rather, the experts disclosed by the government on September 23, 2011 include experts in the following fields: fingerprint analysis, nuclear and mitochondrial DNA analysis, forensic hair analysis, English-Spanish translation, forensic chemistry, forensic pathology, and ballistics.  Defendant has not given any indication that he intends to call an expert in these fields.  Therefore, the ability of defendant to provide timely expert disclosures was not at all contingent on a review of the government's expert disclosures.

For the reasons stated above, the government respectfully asks the Court to bar defendant's expert witness from testifying at trial.  In the alternative, the government asks the Court to order defendant to provide the disclosures required by Rule 16(b)(1) by October 24, 2011, which is two weeks prior to the start of trial.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:     s/ Steven A. Block
        TERRA L. REYNOLDS
        STEVEN A. BLOCK
        TIFFANY J. TRACY
        Assistant United States Attorneys
        United States Attorney's Office
        219 S. Dearborn St., 5th Floor
        Chicago, Illinois  60604
        (312) 353-5300

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with

FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing

(ECF), the following document:

## GOVERNMENT'S MOTION TO BAR EXPERT WITNESS TESTIMONY

was served pursuant to the district court's ECF system as to ECF filers on OCTOBER 14, 2011.


s/ Steven A. Block
STEVEN A. BLOCK
Assistant United States Attorney
United States Attorney's Office
219 S. Dearborn St., 5th Floor
Chicago, Illinois  60604
(312) 886-7647

*United States Attorney*
*Northern District of Illinois*

| | | |
|---|---|---|
| *Terra Reynolds*<br>*Assistant United States Attorney* | *Dirksen Federal Building*<br>*219 South Dearborn Street, 5th Floor*<br>*Chicago, Illinois 60604* | *(312) 353-3148*<br>*Fax:(312) 353-8298*<br>*E-mail: terra.reynolds@usdoj.gov* |

December 27, 2010

**VIA MAIL & MESSENGER**
Robert Handelsman
77 W. Washington, Suite 1717
Chicago, IL 60603

Re:     ***United States v. Saul Rodriguez, et al., 09 CR 332***

Dear Mr. Handelsman:

Pursuant to Federal Rule of Criminal Procedure 16 and Local Criminal Rule 16.1, enclosed please find a disc and accompanying index labeled United States v. Saul Rodriguez, et al., 09 CR 332, Discovery 12/27/10, and a disc and accompanying index labeled United States v. Saul Rodriguez, et al., 09 CR 332, Discovery (Glenn Lewellen) 12/27/10. The materials contained on the discs include:

1.      Statements of Defendant

2.      Defendant's Criminal History

3.      Documents and Tangible Objects

Original documents, tangible objects, and other items within the scope of Fed.R.Crim.P. 16(a)(1)(E) and within the possession, custody or control of the government are available for your inspection at a mutually convenient time. Please contact me to make arrangements for their review.

Copies of certain of these materials are enclosed.

4.      Reports of Examinations and Tests

5.      Expert Witnesses

6.      Evidence Favorable to Defendant

The government presently is aware of no such evidence.    If the government obtains any such evidence in the future, it will be promptly provided to you.

**GOVERNMENT**
**EXHIBIT**

**A**

The government recognizes its ongoing obligation to supplement these disclosures if new material becomes available or changing circumstances warrant additional disclosures. Consistent with Local Criminal Rule 12.1(b), if you have any additional discovery requests, or questions regarding the materials that have been produced, please contact me about them before filing discovery motions so that we can avoid unnecessary litigation.

In return, the government requests all discovery to which it is entitled pursuant to Federal Rules of Criminal Procedure 12.1, 12.2, 12.3, and 16, and Local Criminal Rule 16.1, including but not limited to:

1. The opportunity to inspect and copy any tangible item or document that may be offered as an exhibit at trial, pursuant to Rule 16(b)(1)(A);

2. The results of any examination or test that may be introduced by the defendant at trial, pursuant to Rule 16(b)(1)(B);

3. A written summary of any expert testimony that the defendant intends to use, including the expert's opinions, the bases and reasons for those opinions, and the expert's qualifications, pursuant to Rule 16(b)(1)(C);

4. Notice of any defense, or of an intent to offer expert testimony, concerning a mental defect or condition inconsistent with the state of mind required for the offense charged, pursuant to Rule 12.2; and

5. Notice of a defense of public authority, pursuant to Rule 12.3.

As to the matters addressed by Local Criminal Rule 16.1, the government makes the following representations:

1. The government agrees to preserve the written notes of government agents, to the extent they still exist.

2. One month prior to trial, the government will notify you of evidence it intends to offer pursuant to Federal Rule of Evidence 404(b).

3. One month prior to trial, the government will file a proffer pursuant to *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), if applicable.

4. One month prior to trial, the government will provide materials required by 18 U.S.C. § 3500 and *Giglio v. United States* for those witnesses whom we intend at that time to call, subject to two exceptions: first, if we obtain § 3500 or *Giglio* material less than one month prior to trial, we will provide that

2

information promptly upon receipt; second, if we determine that certain information should be withheld for witness safety or other reasons, we will notify you that information is being withheld and will provide it as soon as possible and in time for its use at trial. In exchange, the government requests that you provide any statements or reports relating to defense witnesses one month prior to trial as well. If this is not acceptable to you, please let me know prior to the date for the filing of pretrial motions, and I will file a motion with the Court requesting the same.

An additional matter for your consideration is the subject of plea negotiations. As you know, a defendant's timeliness in manifesting an acceptance of responsibility is one of the elements considered in determining whether to reduce the adjusted offense level under the Sentencing Guidelines. Based upon our assessment of the evidence in this case, we will need to begin trial preparation no later than two months before the scheduled trial date. Please note that once we begin trial preparation, the defendant may become ineligible for a reduction for timely acceptance of responsibility under Guideline § 3E1.1(b).

Very truly yours,

PATRICK J. FITZGERALD
United States Attorney

By:    /s Terra Reynolds
Terra Reynolds
Assistant United States Attorney

Enclosures

3

United States v. Saul Rodriguez, et al., 09 CR 332
Discovery (Glen Lewellen)
12/27/2010

| Bates Number - Begin | Bates Number - End | Description |
|---|---|---|
| BIN_001_0574 | BIN_001_0576 | Lewellen Home Builders |
| BLDG_001_0001 | BLDG_001_0001 | Application for Building Permit |
| CPDF_001-0004 | CPDF_001-0400 | Informant File and Personnel File |
| CPDR_001_0008 | CPDR_001_0438 | CPD Reports |
| JLMAIL_001_0001 | JLMAIL_001_0005 | Handwritten Letters |
|  |  |  |



**U.S. Department of Justice**

*United States Attorney*
*Northern District of Illinois*

| | | |
|---|---|---|
| *Tiffany J. Tracy* | *Dirksen Federal Building* | *(312) 353-1412* |
| *Assistant United States Attorney* | *219 South Dearborn Street, 5th Floor* | *Fax (312) 353-4324* |
| | *Chicago, Illinois 60604* | *E-mail Tiffany.Tracy@usdoj.gov* |

August 25, 2011

<u>*Via E-mail*</u>
Andrea Gambino

Re:   ***United States v. Glenn Lewellen***, No. 09 CR 332

Dear Ms. Gambino:

We have received your E-mail of August 19, 2011. Regarding your first request, we are working to provide a second copy of the discs you referenced in your E-mail. They will be sent to you under separate cover. With respect to your questions regarding the government's financial analysis of the case, we will tender our expert disclosures in accordance with the Court's August 19, 2011 order.

Regarding whether the Government is investigating John Rizzi, as you know, the Government may not disclose whether any individual has been or ever will be the subject matter of a grand jury investigation. With respect to your inquiry regarding Peter and Margarito Flores, the Government has not identified victims by name and will only do so if the victims will testify.

Finally, may not accept service of subpoenas for the Metropolitan Correctional Center, and you should contact the state and federal facilities directly to inquire as to the lead time you will need to writ witnesses.

As a reminder, the government requests all discovery to which it is entitled pursuant to Federal Rules of Criminal Procedure 12.1, 12.2, 12.3, and 16, and Local Criminal Rule 16.1, in accordance with the Court-ordered deadlines, including but not limited to:

1.   The opportunity to inspect and copy any tangible item or document that may be offered as an exhibit at trial, pursuant to Rule 16(b)(1)(A);

2.   The results of any examination or test that may be introduced by the defendant at trial, pursuant to Rule 16(b)(1)(B);



GOVERNMENT
EXHIBIT

B

ATYCSP_003_0001

3.   A written summary of any expert testimony that the defendant intends to use, including the expert's opinions, the bases and reasons for those opinions, and the expert's qualifications, pursuant to Rule 16(b)(1)(C);

4.   Notice of any alibi or similar defense the defendant intends to raise, including any defense asserting the defendant's unavailability on or near the dates, times, and places named in the indictment, pursuant to Rule 12.1;

5.   Notice of any defense, or of an intent to offer expert testimony, concerning a mental defect or condition inconsistent with the state of mind required for the offense charged, pursuant to Rule 12.2; and

6.   Notice of a defense of public authority, pursuant to Rule 12.3.

As you know, the Court recently set the deadline for expert disclosures for all parties to 45 days prior to trial.

Very truly yours,

PATRICK J. FITZGERALD
United States Attorney

By:   _____

Tiffany J. Tracy
Assistant United States Attorney

2

ATYCSP_003_0002

October 7, 2011

**By e-mail**

Terra Reynolds
Assistant United States Attorney
Dirksen Federal Building
219 S. Dearborn Street, Fifth Floor
Chicago, Illinois 60604

                    Re:    *United States v. Lewellen, 09 CR 332*

Dear Counsel,

        It is our understanding that the government intends to present evidence at
trial regarding Mr. Lewellen's financial status and certain financial dealings
during the time period of the charged crimes.  Pursuant to Fed. R. Crim. P
16(b)(1)(C), we write to inform you that if the government does present such
evidence, the defense may call Robert J. Kennealy as an expert witness.  His
resume is attached.  Mr. Kennealy has been retained by the defense to examine
Mr. Lewellen's finances from the 1990's to the present.  Given the volume of the
government's recent production of financial documents to the defense, Mr.
Kennealy has not completed his analysis of the relevant documents.  Until the
analysis is complete we are unfortunately not able to provide a more detailed
summary regarding his potential testimony.  We will immediately inform the
government once a more detailed summary is possible.  Please feel free to contact
us if you have any questions.

                    Sincerely,




                    Matthew J. Madden
                    Andrea Gambino
                    Attorneys for Glenn Lewellen



GOVERNMENT
EXHIBIT

C

**ROBERT J. KENNEALY**
**P O Box 131**
**Worth, IL 60482**
**(708) 203-7988**

**RESUME`**

| | |
|---|---|
| PURPOSE: | Available for consultation and testimony on civil and criminal cases involving financial, tax and fraud issues. |

HISTORY:

1994 to present:   Partner in Kennealy & O'Callaghan Investigations & Consulting, private detective agency licensed by the state of Illinois. Conducted all types of investigations including employee misconduct, pre-employment, insurance fraud, trademark infringement, asset searches and pre-trial preparations. Consulted and testified as a summary witness on several civil cases involving anti-trust, stock fraud, inheritance and other business and personal issues.

1965 to 1994:   Special Agent, Criminal Investigations Division, Internal Revenue Service, Chicago, Illinois. Conducted investigations of tax fraud and related offenses, and assisted in the preparation and presentation of the cases at trial. Investigated all types of cases and taxpayers, including individuals, partnerships and corporations. Utilized all acceptable methods of proof such as bank deposits, net worth and expenditures computations as well as specific items. Worked in the General Program, Public Corruption and Organized Crime areas. IRS Strike Force Representative in Chicago for 10 years. Also served as both the undercover and informant coordinator.

EDUCATION:   BA degree from Lewis University, major in accounting. Yearly continuing education classes in tax, accounting and investigative areas from 1968 through 1994.

**U.S. Department of Justice**

*United States Attorney*
*Northern District of Illinois*

| | | |
|---|---|---|
| Terra Reynolds<br>Assistant United States Attorney | Dirksen Federal Building<br>219 South Dearborn Street, 5th Floor<br>Chicago, Illinois 60604 | (312) 353-3148<br>Fax:(312) 353-8298<br>E-mail: terra.reynolds@usdoj.gov |

January 27, 2011

**VIA MAIL**
Robert Handelsman
77 W. Washington, Suite 1717
Chicago, IL 60603

Scott Frankel
53 W. Jackson Blvd., Suite 1615
Chicago, IL 60604

Re:   *United States v. Saul Rodriguez, et al.*, 09 CR 332

Dear Mr. Handelsman and Mr. Frankel:

Pursuant to Federal Rule of Criminal Procedure 16 and Local Criminal Rule 16.1, enclosed please find a disc labeled 1.21.11 Discovery Docs. and accompanying index labeled 1.21.11 Discov. Docs.  Please also find enclosed a disc labeled GL 1.21.11 Fin. Docs. and accompanying index with the same label.

Do not hesitate to contact me should you have any questions.

Very truly yours,

PATRICK J. FITZGERALD
United States Attorney

By:   Terra Reynolds
Assistant United States Attorney

Enclosures

GOVERNMENT
EXHIBIT

**D**

CARDELLS  800-763-0269

**U.S. Department of Justice**

*United States Attorney*
*Northern District of Illinois*

| | | |
|---|---|---|
| *Terra Reynolds* | *Dirksen Federal Building* | *(312) 353-3148* |
| *Assistant United States Attorney* | *219 South Dearborn Street, 5th Floor* | *Fax:(312) 353-8298* |
| | *Chicago, Illinois 60604* | *E-mail: terra.reynolds@usdoj.gov* |

August 16, 2011

**VIA MESSENGER**

Andrea Gambino, Esq.
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604

    Re:   ***United States v. Saul Rodriguez, et al., 09 CR 332***

Dear Ms. Gambino:

    . Pursuant to Federal Rule of Criminal Procedure 16 and Local Criminal Rule 16.1, enclosed please find discs labeled 8.16.11 Discovery and index,  GL Search Docs with index, and 8/16/11 Discovery GL with index.  Please also find enclosed discs labeled: N-61 708-289-3688 audio; Ex. N-11, N-18, N-28; 11/18/03; Torres and CS meet; Ex. N-10, N-13, N-14, N-17, N-19, N-20, N-21, N-29, N-54; Video Footage 5/11/06 discovery; Phone calls N-442 & N-443; 1/26/06 & 1/27/06; and Audio Recordings 5/11/09 Discovery and documents MRDRS_006_001 through _0018.

    Do not hesitate to contact me should you have any questions.

        Very truly yours,

        PATRICK J. FITZGERALD
        United States Attorney

By:

        Stephen Block
        Assistant United States Attorney

Enclosures

**GOVERNMENT EXHIBIT**

**E**

CARDELS 800-783-0399

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 0332 | **DATE** | 10/14/2011 |
| **CASE TITLE** | United States vs. Rodriguez | | |

**DOCKET ENTRY TEXT**

Counsel met and conferred on 10/14/11 regarding jury panel selection. The court will enter under seal a list of the jurors who have been considered thus far by counsel.

Docketing to mail notices.

| | Courtroom Deputy Initials: | RJ/JKF |
|---|---|---|

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 332 | **DATE** | 10/12/2011 |
| **CASE TITLE** | | USA vs. Rodriguez et al | |

**DOCKET ENTRY TEXT**

Motion hearing held. Application for Order to Disclose Tax Returns and Return Information [540] is granted. Agreed motion for an extension of time for Defendant Hector Uriarte to respond to the Government's Santiago Proffer [542] by 10/12/2011 is granted. Government's reply by 10/19/2011. Motion by Defendant Hector Uriarte to direct U.S. Marshals Service to serve subpoenas [544] is granted. The US Marshals Service is directed to serve necessary subpoenas without costs to the defendant, allowing for early return of subpoenas. Motion by Tony Sparkman for appointment of co-counsel in the trial of the above-captioned case [549] is granted. Douglas J. Rathe is given leave to file appearance on behalf of Tony Sparkman as co-counsel. Enter Order. Oral motion by Kent Carlson that Fares Umar be brought to MCC for trial preparation is granted due to the complexity of case. Voir dire will begin on 11/7/2011. Opening statements will begin on 11/14/2011.

■ [ For further detail see separate order(s).]

Docketing to mail notices.

00:20

FILED
2011 OCT 17  AM 8:39
CLERK
U.S. DISTRICT COURT

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

GLENN LEWELLEN

Case No. 09 CR 332-2

The Honorable Joan B. Gottschall

**DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION TO BAR EXPERT TESTIMONY**

The government informed defense counsel that they would be presenting incriminating financial evidence against Mr. Lewellen at trial, including initial representations that the government would potentially be calling their own financial expert to testify in their case-in-chief.  In response to these representations, Mr. Lewellen retained a financial expert in August 2011 to examine the government's financial discovery, tax returns and bank statements during the time period relevant to the charged crimes, 1996-2009.  A large number of financial documents were included in the government productions in January and August 2011.  Those documents were turned over to the expert retained by Mr. Lewellen.  On September 20, 2011, the government produced approximately 120,000 discovery documents (the production included a large amount of duplications from previously produced discovery), many of which pertained to financial discovery.  On September 23, the government provided its expert disclosures, making it clear for the first time that they would not be calling a financial expert to testify at trial.  Given the sheer volume of the financial discovery provided by the government, the defense expert has not yet completed his analysis of Mr. Lewellen's finances during the relevant period, and thus has not offered a firm opinion regarding his analysis.  Until the defense expert has completed the

financial analysis, strict compliance with Rule 16(b)(1) is not possible as there is no opinion rendered.  As soon as the analysis is complete, the government will receive full disclosure.

On September 28, 2011, defense counsel informed the Court that because of the voluminous financial discovery provided by the government they were not yet able to comply with its Rule 16(b)(1) expert notice requirements.  At that time the Court ordered the defendant to produce to the government the name of the witness and the subject matter of his testimony.  On October 7, 2011, counsel for Mr. Lewellen complied with that order by informing the government that they intend to call Robert J. Kennealy as an expert witness regarding Mr. Lewellen finances from the 1990's to the present.  *See* attached Rule 16 Notice Letter.  The notice specifies that Mr. Kennealy would be called upon to respond to evidence presented by the government regarding Mr. Lewellen's financial status or financial dealings during the time period of the charged crimes.  More specifically, if the government's case includes accusations or implications that Mr. Lewellen's financial dealings involved illegitimately gained money related to the charged crimes, Mr. Kennealy would be called upon to testify as to Mr. Lewellen's legitimate financial resources during the relevant time period.

Upon sending the Rule 16 notice to the government through e-mail, defense counsel called counsel for the government to provide additional information regarding the expected testimony of Mr. Kennealy.  At that time defense counsel informed the government counsel that if the government's case-in-chief presented evidence implying that Mr. Lewellen made any investments, purchases, or any other transactions with illegitimate funds related to this case, Mr. Kennealy would be called to testify as to legitimate financial resources that Mr. Lewellen had access to during a given time period.  On the other hand, counsel also informed the government that if no evidence were presented implicating suspicious financial dealings by Mr. Lewellen,

there would likely be no reason to call Mr. Kennealy at all.  The government's contention that

they are not aware of the subject matter of Mr. Kennealy's expected testimony is simply not

accurate.

If the timing of the disclosure regarding Mr. Kennealy's expected testimony is the

government's primary concern, they are certainly in a position to expedite the process.  The

government has informed counsel that they plan to present financial evidence against Mr.

Lewellen that could take up to one full week of trial, but have not indicated specifically what

evidence will be offered.  Defense counsel has made requests since August 2011 for more

specific information regarding the financial evidence the government intends to elicit at trial.  As

Mr. Kennealy's evidence will be rebutting evidence offered by the government, his analysis and

focus could be dramatically narrowed if the government informed Mr. Lewellen about the

specific financial evidence they hope to introduce into evidence. However, without more specific

information regarding the financial evidence that the government plans to present at trial, Mr.

Kennealy's financial analysis needs to be broad enough to rebut evidence from the charged time

period of 1996-2009.

The government states in their motion that on "October 13, 2011, defendant informed the

government that his expert would not be prepared to tender his opinion until November 7, 2011."

This statement is either a misunderstanding stemming from the fact that the AUSA who filed the

motion was not the same AUSA who engaged in the conversation, or it represents a

misrepresentation of the conversation.  Defense counsel informed the government on October 13

that Mr. Kennealy provided assurances that he could produce a report by the start of the trial

(November 7).  Defense counsel made it clear to the government during the referenced October

13 conversation that the defense expert was informed by counsel that the beginning of the trial

was not soon enough, and that the analysis needed to be completed as soon as possible so that the results could be provided to the government.  Despite the contention in the government motion, November 7 was not a date proposed by the defense counsel as suitable to provide full Rule 16 disclosure.  Defense counsel's position on October 13 was, and it remains, that the government will receive full disclosure pursuant to Rule 16(b)(1) as soon as it becomes possible to provide it.[1]

Respectfully submitted,

*Matthew J. Madden*
Matthew J. Madden
Attorney at Law

MATTHEW J. MADDEN
Attorney at Law
53 West Jackson Blvd., Suite 703
Chicago, IL 60604
(312) 212-1900

---

[1] As of the date of this filing, Robert Kennealy has not provided a specific date that he will complete the analysis.  Defense counsel will attempt to get a specific idea regarding a completion date by the October 19, 2011, court appearance regarding this motion.

**MATTHEW J. MADDEN**
ATTORNEY AT LAW
53 WEST JACKSON BLVD., SUITE 703
CHICAGO, ILLINOIS 60604
(312) 212-1900
(312) 663-5386 FAX
matt@mjmaddenlaw.com

October 7, 2011

**By e-mail**

Terra Reynolds
Assistant United States Attorney
Dirksen Federal Building
219 S. Dearborn Street, Fifth Floor
Chicago, Illinois 60604

Re:    *United States v. Lewellen, 09 CR 332*

Dear Counsel,

It is our understanding that the government intends to present evidence at trial regarding Mr. Lewellen's financial status and certain financial dealings during the time period of the charged crimes. Pursuant to Fed. R. Crim. P 16(b)(1)(C), we write to inform you that if the government does present such evidence, the defense may call Robert J. Kennealy as an expert witness. His resume is attached. Mr. Kennealy has been retained by the defense to examine Mr. Lewellen's finances from the 1990's to the present. Given the volume of the government's recent production of financial documents to the defense, Mr. Kennealy has not completed his analysis of the relevant documents. Until the analysis is complete we are unfortunately not able to provide a more detailed summary regarding his potential testimony. We will immediately inform the government once a more detailed summary is possible. Please feel free to contact us if you have any questions.

Sincerely,

Matthew J. Madden
Andrea Gambino
Attorneys for Glenn Lewellen

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES of AMERICA

v.

SAUL RODRIGUEZ, et. al.

No. 09-332

Judge Joan B. Gottschall

## ORDER FOR DISCLOSURE OF TAX RETURNS
## AND RETURN INFORMATION

On this 14th day of October, 2011, upon the application of the United States

Attorney for the Northern District of Illinois for an order, pursuant to 26 U.S.C. §

6103(i)(4)(A)(i) and (ii) to disclose tax returns and return information for the tax years

2008 through 2009 of:

Hector Uriarte;
Jorge Uriarte;
Trip Lyns, Inc.;

and to disclose tax returns and return information for the tax years 2001 through 2008 of:

Walter Johnson;
WJ Enterprises, Inc.

This Court FINDS:

There is reasonable cause to believe, based upon information believed to be

reliable, that such tax returns and return information: (1) are relevant in establishing the

guilt of defendants as to the charges of conspiracy to commit racketeering, in violation of

Title 18, United States Code, Section 1962(d), and conspiracy to possess with intent to

distribute narcotics, in violation of Title 21, United States Code, Section 846; and (2) may

be statements of defendants within the meaning of Federal Rule of Criminal Procedure

16(a)(1)(B)(i) or may otherwise be discoverable.

IT IS THEREFORE ORDERED that the Government may disclose such tax

returns and return information at the trial of such case or any related judicial proceeding.

No disclosure shall be made to any other person except in accordance with the

provisions of 26 U.S.C. § 6103(i)(4).

ENTER:

_____

JOAN B. GOTTSCHALL
United States District Judge

Dated: October 14, 2011

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 09 CR 332-2 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN ) | |

## GOVERNMENT'S REPLY IN SUPPORT OF EVIDENTIARY PROFFER
## SUPPORTING THE ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby submits the following reply in support of its evidentiary proffer supporting the admissibility of co-conspirator statements, pursuant to *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

Defendant Glenn Lewellen contends that the government has failed to establish by a preponderance of the evidence the existence of the racketeering and drug conspiracies alleged in the third superseding indictment or, if such conspiracies existed, that defendant was a member of either. In so doing, defendant makes arguments regarding the credibility of witnesses and how certain evidence should be interpreted that should be raised at trial; these arguments are not relevant to the Court's determination of whether co-conspirator statements should be admitted. For example, defendant argues that the government "relies almost exclusively on the words of Saul Rodriguez to establish a conspiracy" and that defendant was a part of it. Resp. at 1. As an initial matter, the Court should consider the proffered statements themselves in determining the existence of a conspiracy. According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the Court can consider the statements in question (the statements seeking to be admitted) to determine whether the

*Santiago* criteria have been met.  Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the co-conspirator exception to the hearsay rule (Federal Rule of Evidence 801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy.  *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of the defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (en banc).  Moreover, the government's proffer sets forth the anticipated testimony of the following witnesses who will testify regarding defendant's role in the conspiracy in addition to Rodriguez:  Andres Torres, David Venegas, Lisette Venegas, and Refugio Ruiz-Cortez.  Contrary to defendant's argument, the evidence regarding defendant's participation in the conspiracy goes well beyond the testimony of Saul Rodriguez.

There must also be some supporting evidence or facts corroborating the existence of the conspiracy and defendant's participation.  *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009).  The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial.  *See United States v. Johnson*, 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).  In this case, there is ample evidence to corroborate the proffered statements of defendant's co-conspirators.  For example, the government will introduce evidence apart from the co-conspirator statements showing, among other things, the following: (1) defendant signed up Saul Rodriguez as a confidential informant in 1996; (2) Rodriguez signed, and defendant witnessed, a cooperation agreement in which Rodriguez agreed not to engage in any illegal conduct; (3) Rodriguez was paid hundreds of thousands of dollars for

information he provided defendant regarding narcotics traffickers; (4) defendant was aware that Rodriguez continued to traffic narcotics; (5) defendant asked the Drug Enforcement Administration to cease investigating Rodriguez; (6) defendant helped Rodriguez frame an individual by planting drugs in his apartment in order to further gain the trust of his co-conspirator, Rodriguez; (7) defendant testified falsely at a federal criminal trial to protect his co-conspirators; (8) defendant had numerous phone contacts in May 2006 with Andres Torres, Saul Rodriguez, and other members of law enforcement immediately prior to the compromise of a law enforcement wiretap on Torres's phone; (9) defendant possessed wealth far in excess of what he could be expected to have accumulated through his work as a police officer; (10) defendant paid contractors with bags full of cash; and (11) defendant made incriminating statements to law enforcement after his arrest. This corroborative evidence, in addition to the co-conspirator statements, is more than sufficient to show by a preponderance of the evidence the existence of a conspiracy and defendant's participation in it.

Defendant is free to argue at trial that the government's evidence is insufficient to convict him. He can attack the credibility of Saul Rodriguez and the other witnesses, argue that defendant's actions constituted legitimate police work, and that the inferences the government will ask the jury to draw are incorrect. What he cannot do, however, is have the Court try this case on paper before the trial even starts. That is precisely what defendant is asking the Court to do in its response brief. For example, defendant asks the Court to discredit the anticipated testimony of Saul Rodriguez, find that defendant's actions managing Rodriguez as a confidential source were legitimate, find that defendant's role in curtailing a federal investigation of Rodriguez was "part of the ordinary conduct of law enforcement business" (Resp. at 4), and accept defendant's contention that he did not know

3

about the wiretap on Andres Torres's phone in 2006.  Nothing in *Santiago* or the related cases

suggest that the Court should undertake this burden when deciding whether to admit co-conspirator

statements.  Indeed, to do so would set a dangerous precedent whereby courts usurp the role of juries

as the finders of fact in criminal trials.

For the reasons stated above and set forth in the government's *Santiago* proffer, the

government asks that the Court grant the admission of co-conspirator's statements at trial.[1]

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:    s/ Steven A. Block
TERRA L. REYNOLDS
STEVEN A. BLOCK
TIFFANY J. TRACY
Assistant United States Attorneys
United States Attorney's Office
219 S. Dearborn St., 5th Floor
Chicago, Illinois  60604

---

[1]  Defendant also argues that one particular statement made by defendant was not in
furtherance of the conspiracy.  Defendant argues that Torres's anticipated testimony that
defendant told Torres that Rodriguez himself had probably stolen some money that had gone
missing was not in furtherance of the conspiracy.  Resp. at 11.  This statement, however, would
be in furtherance of the conspiracy under several recognized categories of "in furtherance"
statements.  Among these are statements regarding the conspiracy's activities, statements
regarding the activities of the conspiracy designed to reassure the listener, and statements
regarding the past accomplishments of the conspiracy.  *Santiago* Proffer at 12-16.

4

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 332 | **DATE** | 10/19/2011 |
| **CASE TITLE** | USA vs. Rodriguez et al | | |

**DOCKET ENTRY TEXT**

Motion hearing held.  Motion by Defendant, Jorge Uriarte (4 )to adopt response to Santiago Proffer [555] is granted.  Government's motion to bar expert witness testimony [559] is denied as to the terms stated of record.  Defendant, Glenn Lewellen's (2) expert to state his conclusions by 10/24/2011.  Oral motion by United States for leave to file motion to sever defendant Robert Cardena from this trial (11) and appear on Friday, October 21, 2011 at 9:30AM is granted.

Docketing to mail notices.

00:10

| | Courtroom Deputy Initials: | RJ |
|---|---|---|

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 00332 |
| | ) | |
| GLEN LEWELLEN, | ) | Hon. Judge Gottschall |
| | ) | |
| Defendant. | ) | |

**PETITIONER'S MOTION TO QUASH SUBPOENA DUCES TECUM
AND REQUEST FOR PROTECTIVE ORDER**

Petitioner, the City of Chicago ("City"), by its attorney, Stephen R. Patton,

Corporation Counsel of the City, respectfully moves this Court pursuant to Rule 17(c) of

the Federal Rules of Criminal Procedure to quash a portion of a subpoena issued by

Andrea Gambino, on behalf of Defendant Glen Lewellen, seeking documents concerning

an informant maintained by the Chicago Police Department ("CPD").

In addition, defendant seeks two pages of informant information referencing

Lisette Radanovich.  The City has agreed to produce these pages, subject to entry of a

protective order (*See* Exhibit A, City's Proposed Protective Order). Defendant agrees to

entry of a protective order as to these two pages.

The outstanding issue for this court is whether CPD should have to produce the

name and last known address of an informant who provided information to the police that

led to the arrest of Lisette Radanovich.

**PROCEDURAL HISTORY**

On September 14, 2011, the Records Subpoena Unit of the CPD received a

subpoena from Defendant's attorney requesting "[a]ll arrest reports, incident reports,

affidavits of search warrant, informant files, supplemental reports and inventory reports, etc. under RD# Z737840, the August 10, 1995 arrest of ...Chicago, IL." The parties agree that the subpoena has been satisfied except for the production of the informant file sheets for Lisette Radanovich and the confidential informant's name and last known address.[1]

Pursuant to this conversation with Attorney Gambino, the City will produce the two pages of the informant files relating to Lisette Radanovich, subject to the entry of a protective order for these documents. (*See* Exhibit A). The City is also moving to quash the portion of the subpoena seeking files with the name and last known address of the informant. If this Court elects not to quash the portion of the subpoena seeking files with the name and last known address of the informant, the City seeks entry of a protective order, such as the protective order attached as Exhibit A.

## ANALYSIS

Pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive. FED. R. CRIM. P. 17(c); *United States v. Nixon*, 418 U.S. 683, 698 (1974).

The portion of the subpoena seeking documents with the informant's name and last known address should be quashed for several reasons. First, the informant's name and last known address may be withheld pursuant to the confidential informant privilege. Next, the informant's personal information is highly confidential and release of this information may have serious consequences for the informant. Finally, the portion of the subpoena requesting files with the informant's name and last known address should be

---

[1] It is not clear from the subpoena sent by Attorney Gambino that files with the informant name and last known address, personal information of the informant, are requested. However, in a phone conversation with Attorney Coppa on October 17, 2011, Attorney Gambino conveyed that she was seeking those documents.

quashed because there has been no showing that files with this information is relevant or

needed by the Defendant to defend against the charges pending against him.  Each of

these reasons provides an independent basis for quashing the portion of Attorney

Gambino's subpoena requesting documents with informant's name and last known

address.  Accordingly, this Court should quash the portion of the subpoena seeking

informant information.  Alternatively, the informant information requested under the

subpoena should be placed under a protective order.

## I.   THE PORTION OF THE SUBPOENA SEEKING FILES WITH INFORMANT'S NAME AND LAST KNOWN ADDRESS SHOULD BE QUASHED PURSUANT TO THE CONFIDENTIAL INFORMANT PRIVILEGE.

Files with the informant's name and last known address may be withheld pursuant

to the confidential informant privilege.  *Roviaro v. United States*, 353 U.S. 53, 59 (1957).

The confidential informant privilege allows the government to withhold from disclosure

the identity of persons who furnish information of violations of law to officers charged

with enforcement of that law.  *Id.*; *See*, e.g., *U.S. v. Valles*, 41 F.3d 355, 358, (7th Cir.

1994) ("The 'confidential informant privilege' protects from disclosure an informant's

identity and his communications with the government that may tend to reveal his

identity").  The Supreme Court has acknowledged that, "[t]he privilege recognizes the

obligation of citizens to communicate their knowledge of the commission of crimes to

law-enforcement officials and, by preserving their anonymity, encourages them to

perform that obligation."  *Roviaro*, 353 U.S. at 59.  The government is granted the

confidential informant privilege as a right, and need not make a threshold showing of

likely reprisal or retaliation against the informant in order to assert the privilege.  *Valles*,

41 F.3d at 358.

A defendant issuing a subpoena in a criminal case, such as this, bears the burden of demonstrating a need for the information to overcome the confidential informant privilege. *Id.* Thus, here, defendant would have to show that the confidential informant's identity, or the contents of the informant's communication is relevant and helpful to the defense, or is essential to a fair determination of a cause. *Roviaro*, 353 U.S. at 60-61.

In determining whether the identity of confidential informant should be disclosed the courts must balance "the public interest in protecting the flow of information against the individual's right to prepare his defense," and consider "the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* at 62. The role of the informant is evaluated, and "where the informer is a mere 'tipster,' disclosure of his identity will rarely be appropriate under the balancing test." *United States v. Lewis*, 671 F.2d 1025 (7th Cir. 1982); *See*, e.g., *U.S. v. Dawson*, 243 F. Supp 2d 780, 781 (N.D. Ill. 2003) ("Where an informant is a mere 'tipster,' whose involvement in the activity is minimal, the public's interest in protecting informants outweighs the defendant's interest in obtaining access to the informant in order to prepare his defense").

In this case, Defendant has not demonstrated why the confidential informant privilege does not apply and therefore has not overcome his burden. Defendant has not explained how the reports, specifically the files with informant's name and last known address, are relevant to his case or necessary to his defense. Moreover, he has not established that the need for the files with informant information outweighs the public interest in the flow of information and maintaining the privacy and safety of the informant. The disclosure of the confidential informant's identity could pose a serious

4

threat to the informant's safety and likely prevent the use of that informant for law

enforcement purposes in the future.

## II.      THE PORTION OF THE SUBPOENA SEEKING FILES WITH INFORMANT'S NAME AND LAST KNOWN ADDRESS SHOULD BE QUASHED BECAUSE DEFENDANT CANNOT SATISFY THE REQUIREMENTS NECESSARY TO OBTAIN THE REQUESTED DOCUMENTS.

Not only has Defendant failed to show that the confidential informant privilege

does not apply, Defendant has also failed to meet the requirements necessary for

production.  It is the moving party's burden to show all four of the following

requirements to require production of the subpoenaed documents: (1) that the documents

are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in

advance of trial by exercise of due diligence; (3) that the party cannot properly prepare

for trial without such production and inspection in advance of trial and that the failure to

obtain such inspection may tend unreasonably to delay the trial; and (4) that the

application is made in good faith and is not intended as a general "fishing expedition."

*Nixon*, 418 U.S. at 699-700.  In order to meet this burden, the moving party must show

relevancy, admissibility, and specificity.  *Id.* at 700.

Defendant fails to make a requisite showing of three of the four prerequisites for

production.  First, Defendant does not provide an explanation of the relevancy of the files

with the informant's name and last known address.  Next, Defendant has not provided

any explanation as to how the files of the informant's name and address will assist him in

preparing for trial and why he needs these documents for the charges pending against

him.  Finally, Defendant does not explain how this portion of the subpoena is more than a

"fishing expedition."  Presumably, the request for confidential informant information is

sought to contact the informant to go on a "fishing expedition" for information.

Therefore, the subpoena should be quashed.

**III.    IF THIS COURT ELECTS NOT TO QUASH A PORTION OF THE SUBPOENA, THE COURT SHOULD CONDUCT AN *IN CAMERA* INSPECTION OF THE FILES OF THE CONFIDENTIAL INFORMANT'S PERSONAL INFORMATION AND ENTER A PROTECTIVE ORDER FOR THESE DOCUMENTS.**

If this Court determines that the portion of the subpoena at issue should not be quashed for the reasons stated above, the City requests that this Court conduct an *in camera* inspection of the files with the confidential informant's name and last known address.  The City requests further that, after reviewing such document, this Court quash the portion of the subpoena requesting documents with the informant's name and last known address and return the documents to the City's representative.  In addition, if this Court compels production of the documents with the informant's name and last known address in this subpoena, the City requests that this Court enter a protective order requiring, that such documents be for Defendant's counsel's eyes only, and that such documents be returned to the City, once Defendant's case has been resolved. *See* e.g., *Alliance to End Repression v. City of Chicago*, 75 F.R.D. 441 (N.D. Ill. 1981) ("[T]o protect the privacy of individuals and organizations reported on by the FBI in these files, the Court entered a protective order limiting dissemination of information obtained in discovery").

**WHEREFORE,** the City of Chicago, respectfully requests that the portion of the subpoena duces tecum served upon the Chicago Police Department, Records Division, requesting files with the informant's name and last known address be quashed.  In the alternative, the City requests that a protective order concerning the documents be entered limiting the dissemination of the documents at issue.

Respectfully Submitted,

STEPHEN R. PATTON
Corporation Counsel of the City of Chicago

BY:    /s/ *Karen M. Coppa*
       Karen Coppa
       Chief Assistant Corporation Counsel

Karen M. Coppa
Chief Assistant Corporation Counsel
Tia Mathew
Assistant Corporation Counsel
Legal Information, Investigations, and Prosecutions Division
33 North LaSalle Street, 2nd. Floor
Chicago, Illinois 60602
(312) 744-0741

# IN THE UNITED STATES DISTRICT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 09 CR 00332** |
| **v.** | ) | |
| | ) | **Hon. Judge Gottschall** |
| **GLEN LEWELLEN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### NOTICE OF MOTION

TO:    Andrea E. Gambino           Terra Reynolds
         53 W. Jackson Blvd., Ste. 224    U.S. Attorney's Office
         Chicago, Illinois 60604         219 S. Dearborn St., 5th Floor
                                        Chicago, IL 60604

     **PLEASE TAKE NOTICE** that on October 21, 2011, petitioner, City of Chicago, electronically filed *Petitioner's Motion to Quash Subpoena Duces Tecum and Request for Protective Order* with the Clerk of the United States District Court for the Northern District of Illinois.  On October 26, 2011 at 10:00a.m., I shall appear before the Honorable Judge Gottschall in Courtroom 2325, and present the attached motion.

     I hereby certify that I have served this notice and the attached document by causing it to be electronically filed to all parties who are "ECF" filers in this matter this 21st day of October, 2011.

     **DATED** at Chicago, Illinois, this October 21, 2011.

                            By:    */s/ Karen M. Coppa*
                                      Karen M. Coppa
                                      Chief Assistant Corporation Counsel

Karen M. Coppa
Chief Assistant Corporation Counsel
Tia Mathew
Assistant Corporation Counsel
Legal Information, Investigations, and Prosecutions Division
33 North LaSalle Street, 2nd. Floor
Chicago, Illinois 60602
(312) 744-0741



**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA , | ) | |
| | ) | |
| Plaintiff, | ) | Case No: 09 CR 00332 |
| | ) | |
| v. | ) | Hon. Judge Gottschall |
| | ) | |
| GLEN LEWELLEN, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**PROPOSED PROTECTIVE ORDER**</u>

This Court hereby enters this protective order.  Terms of the protective order are as follows:

    A.    The following words and terms are defined for purposes of this qualified protective order:

        1.    "Parties" shall mean the petitioner, City of Chicago, plaintiff, the United States of America, defendant, Glen Lewellen.

        2.    "Protected  Materials" shall mean the two pages of the informant files under RD # Z737840, relating to the August 10, 1995 arrest of Lisette Radanovich.

    B.    This Order governs all exchange or dissemination of information or the production of documents designated as Protected Materials.  The Parties recognize that it may be necessary during the course of this proceeding to produce, disclose, receive, obtain, subpoena, and/or transmit Protected Materials.

    C.    The Protected Materials shall be filed under seal and not made available for review by the general public.

    D.    In addition, the Parties will abide by the following terms and conditions:

        1.    The Protected Materials are for Attorneys Eyes only.

2.        The Parties will not use or disclose the designated Protected Materials released in this proceeding for any other purpose or in any other proceeding.

3.        The Attorneys agree to take reasonable precautions consistent with this Order to prevent the unauthorized or inadvertent disclosure of designated Protected Materials.  The attorneys of record are responsible for employing reasonable measures to control duplication of, access to, and distribution of designated Protected Materials, including abstracts and summaries thereof.

4.        All designated Protected Materials produced during the course of this proceeding shall be returned to the producing party, upon request, within sixty (60) days of the final termination of this action. A producing party denied the return of designated Protected Materials pursuant to this order may petition the Court for the costs and fees of compelling such return.

5.        The individual pages of each document designated as Protected Materials shall bear the following designation: "CONFIDENTIAL AND FILED UNDER SEAL."

6.        Before disclosing designated Protected Materials to any persons working with the attorneys, including but not limited to expert(s) or consulting expert witnesses retained in connection with the litigation, counsel will be responsible for informing each such person that the documents or information containing designated Protected Materials to be disclosed are confidential, are to be held in confidence, are to be used solely for the purpose of preparing for this litigation and further, that these restrictions are imposed by a court order.

7.        This Protective Order may be modified by further written stipulation signed by the signatories pursuant to these terms, or by a further order of this Court upon application to the Court with notice.

ENTER: _____
JUDGE

DATED: _____

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332-5 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| MANUEL URIARTE | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT MANUEL URIARTE'S
## MOTION FOR SUBSTITUTION OF COUNSEL

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby responds to defendant Manuel Uriarte's motion for substitution of counsel and respectfully requests that the Court deny the motion.

## I.    PROCEDURAL HISTORY

On November 18, 2010, a grand jury returned the second superseding indictment in this case charging defendant Manuel Uriarte with having participated in a racketeering conspiracy and two murders.  On that same date, law enforcement arrested defendant in San Jose, California.  In mid-December 2010, defense counsel Keith Spielfogel and Robert Loeb were appointed to represent defendant in the instant case.  Doc. 240-241.  The Court appointed both Mr. Spielfogel and Mr. Loeb to represent defendant because they are highly qualified attorneys and members of the court's panel of capital qualified defense attorneys.  Defense counsel subsequently traveled to San Jose to meet with defendant.  Doc. 242-244.  On January 13, 2011, the grand jury returned a third superseding indictment that charged defendant with the same offenses as those with which he had previously been charged.  Doc. 271.  Defendant returned to the jurisdiction by January 19, 2011, on which date he was arraigned on the third superseding indictment.  Doc. 289.

On February 8, 2011, the parties appeared before this Court for a status hearing on the third

superseding indictment.  At that time, the Court set one trial date of November 7, 2011 for all eleven

defendants.  Doc. 302.  The Court also set a schedule for pretrial motions, requiring that they be filed

no later than July 11, 2011.  *Id.*  On July 11, 2011, defendant sought and obtained an extension of

time in which to file pretrial motions until after the government determined whether it would seek

the death penalty against defendant.  Doc. 413.  On July 20, 2011, defendant moved to continue the

trial date arguing that it could not prepare for trial until the government completed its death penalty

review process.  Doc. 426.  On August 3, 2011, this Court denied defendant's motion without

prejudice, explaining that the government had until August 19, 2011 to inform defendant of the

whether it would seek the death penalty.  Doc. 436.  The Court noted that if there was no decision

by that date, it would grant defendant's motion to sever.  *Id.*

On August 8, 2011, the government informed defendant and the Court that the government

would not seek the death penalty against defendant.  Doc. 439.  The Court subsequently granted

defendant's motion for additional time in which to file pretrial motions, setting August 22, 2011 as

the new deadline.  Doc. 440.  On August 15, 2011, defendant filed a second motion to continue the

trial date.  Doc. 451.  On September 8, 2011, the Court denied defendant's motion.  R. 497.  In doing

so, the Court explained,

> [W]hile a severance and continuance until March or April 2012 would give the defendant the
> additional time he seeks, it would create a significant inconvenience and burden—not only
> to the court and its pending case load, but to the government and the witnesses.  If the court
> were to grant a continuance, the court would have to sever the defendant's trial from that of
> his co-defendants, requiring the court to clear its schedule for a second lengthy, complex jury
> trial with many of the same witnesses and the same evidence already at issue.

*Id.* at 2.

On October 24, 2011, fourteen days before the trial is scheduled to begin, defendant filed a

*pro se* motion for substitution of counsel.  Doc. 583.

## II.   ANALYSIS

The Seventh Circuit has found that a district court should conduct a three-part inquiry when evaluating a defendant's motion for substitution of counsel. *United States v. Simmons*, 582 F.3d 730, 735 (7th Cir. 2009) (citing *United States v. Van Waeyenberghe*, 281 F.3d 951, 959 (7th Cir. 2007)). First, the district court should conduct an inquiry into why the defendant is asking for a new attorney. *Id*. Second, the district court should consider the timeliness of the defendant's request. *Id*. Third, the district court should consider whether a "complete breakdown in communication" has occurred between the attorney and the defendant that would prevent the presentation of an adequate defense. *Id*. On the present record, each of these factors weigh against granting defendant's motion.

Here, with respect to the second factor, defendant's motion for new counsel is untimely.  The trial date has been set for nearly nine months.  Defendant has had ample opportunity to express his dissatisfaction with his counsel and his desire for this Court to appoint new counsel to represent him. Instead of doing so, however, defendant waited until fourteen days before trial to file the instant motion.  A timely motion for new counsel must come well in advance of the proceeding at issue. *See United States v. Hall*, 35 F.3d 310, 313-14 (7th Cir. 1994) (holding that a motion for new counsel filed ten days before defendant's sentencing hearing was untimely).  Nothing in defendant's motion suggests what has happened to induce such a dramatic change in his mind about his counsel's suitability.  *See United States v. Gaya*, 647 F.3d 634 (7th Cir. 2011) (holding that district court did not abuse its discretion in denying defendant's motion for new counsel where defendant was given ample opportunity during previous court appearances to express dissatisfaction with counsel).

With regard to why defendant is asking for new counsel, he does not suggest that his counsel

have infringed on his right to "make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his . . . own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Rather, defendant complains that his counsel have refused to file certain motions, issue certain subpoenas, seek additional *Giglio* materials from the government, and prepare defendant for trial. Doc. 583 at 2. Defendant's complaints appear to be based on his dissatisfaction with tactical decisions that are within counsel's discretion to make. *See United States v. Ladd*, 215 Fed. Appx. 526, 529 (7th Cir. 2007). There is certainly no guarantee that new counsel would make tactical decisions different from present counsel. Moreover, defendant does not have a right to be appointed counsel that will abdicate their professional judgment and utilize whatever tactics defendant desires. Rather, defendant has the right to qualified appointed counsel who will put on a zealous defense; that is precisely what he has been getting for the past year.

Pursuant to *Simmons*, the Court should inquire of defendant why he is seeking new counsel. Based on the reasons defendant states in his motion, it does not appear that there has been a complete breakdown in communication. It seems as if defendant is unhappy that his attorneys will not pursue certain tactics on his behalf or is looking to delay the trial. Moreover, it is not sufficient for defendant to merely state that a complete breakdown has occurred; that is the Court's decision to make after conducting the required inquiry. On the present record, however, no such breakdown is apparent.

**III.     CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion for substitution of counsel.


Respectfully submitted,


PATRICK J. FITZGERALD
United States Attorney


By:     /s Terra Reynolds
        TERRA REYNOLDS
        STEVEN A. BLOCK
        TIFFANY J. TRACY
        Assistant United States Attorneys
        United States Attorney's Office
        219 S. Dearborn St., 5th Floor
        Chicago, Illinois  60604

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332-5 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| MANUEL URIARTE | ) | |

## CERTIFICATE OF SERVICE

    The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

**GOVERNMENT'S RESPONSE TO DEFENDANT MANUEL URIARTE'S MOTION FOR SUBSTITUTION OF COUNSEL**

was served pursuant to the district court's ECF system.

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney

By:    s/ Terra Reynolds
        TERRA REYNOLDS
        Assistant United States Attorney
        219 South Dearborn Street, 5th Floor
        Chicago, IL 60604
        (312) 353-3148

Dated: October 24, 2011

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*DEFENDANT GLENN LEWELLEN'S PROPOSED VOIR DIRE QUESTIONS*

Defendant GLENN LEWELLEN, by his attorneys, Andréa E. Gambino and

Matthew J. Madden, respectfully submit the following proposed voir dire questions:

(1)     Have you read any newspaper articles, articles on the internet, or in other

publications, whether paper or electronic, about any of the people involved in this

case?

(2)     If you have read about this case or any of its participants, what have you

read and what did you think about what you read?

(3)     Within the past year, have you heard any radio or television news programs,

talk shows, or other broadcasts discussing this case or any like it?

(4)     Do you think that a person must be guilty if the government brings charges

against him or her?

(5)     Do you have any experience – good or bad – with Chicago Police Officers?

(6)     What opinions do you hold about Chicago Police Officers?

(7)     Have you or any close friend or family member ever filed a complaint against

a Chicago Police Officer?

(8)     Have you or any close friend or family member sued a Chicago Police Officer?

(9)     Have you or any close friend or family member been poorly treated by a

Chicago Police Officer?

(10)    Have you ever had a bad experience with any law enforcement officer?

(11)    Do you have opinions about law enforcement use of informants?

(12)    Do you read crime novels or mysteries?

(13)    Do you watch television shows, movies, or reality shows based on crime,

crime solving, or the criminal justice system?  If so, which ones?

 (14)   Do you own your home?

(15)    Have you ever had a home built for you, or participated in building a home

yourself?

(16)    Have you ever started a new business?

(17)    Do you own or have you ever purchased an investment property?

(18)    Do you buy or sell cars?

(19)    Do you or any close friend or family member collect antique or show cars?

DATE:          October 25, 2011                Respectfully submitted,

                                               By:     s/Andréa E. Gambino

                                                       s/Matthew J. Madden
                                                       Attorneys for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 25, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Counsel for co-defendants

Steven Block, Esq.
Terra Reynolds, Esq.
Tiffany Tracy, Esq.
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604


and I hereby certify that I have mailed by United State Postal Service or hand delivered the document to the following non-CM/ECF participants: N/A.


DATE:        October 25, 2011         Respectfully submitted,

                                      By:     s/Andréa E. Gambino
                                              Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN *et al.* | ) | |

## GOVERNMENT'S PROPOSED VOIR DIRE QUESTIONS

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully requests that the following questions be propounded to the venire during the course of the Court's voir dire examination in addition to the questions on the Court's juror question sheet:

1.      Have you, a member of your family, or close friend ever been arrested, charged, or convicted for any criminal offense other than a traffic offense?  If yes, please indicate:  (a) the individual's relationship to you; (b) the nature of the offense for which the person was arrested or charged; and (c) the disposition of the charge (i.e., dismissal, imprisonment, probation, fine, etc.)

If you have answered yes to this question , please state whether this experience left you with a negative, positive or neutral impression of judges, the judicial system, prosecutors, defense attorneys, and law enforcement officers.

2.      Do you have a member of the family or a close friend who is an attorney specializing in criminal law or who works as or with private investigators?  Is there anything about what you have heard about the work of this family member or close friend that would make it difficult for you to be fair either to the government or the defendant in this case?

3.      Have you ever had any legal training or law courses or ever worked in a law office? If so, please state the circumstances.

4.      Do you have any family member or close friend who works with or in any law enforcement agency?  If so, do you ever discuss that person's work?  Is there anything about  what you have heard about that person's work that would make it difficult for you to be fair either to the government or the defendants in this case?

5.      Have you or any member of your immediate family or any close friends ever filed a claim or case against the federal government or had a legal dispute with the federal government? If so, please state the nature of the claim or dispute, any resolution of the matter and when and where the dispute occurred.  Was there anything about those proceedings that left you with bad feelings about the federal government?

6.      This case involves federal agents and local police officers from the Chicago area, including agents of the Drug Enforcement Administration and Federal Bureau of Investigation, and officers from the Chicago, Summit, and Cicero Police Departments.  Have you or anyone close to you ever had any experiences with, or do you or anyone close to you have any opinions regarding, such law enforcement agencies – or any other law enforcement agencies – that might make it difficult for you to evaluate fairly and impartially the evidence and render a fair verdict based on the evidence?

7.      Do you access the internet either at home or at work?  For what purposes?  What are the most frequent internet sites that you visit?

8.      Have you or any of your close friends or relatives ever served as a witness at trial or before a grand jury?  If so, please explain the circumstances.  Please state whether the experience

left you with a positive, negative, or neutral impression of law enforcement officers, prosecutors, defense attorneys, judges, or the judicial system.

9.      Have you or any of your close friends or relatives ever been the victim of a crime? If so, what were the circumstances?  Was there anything about that experience that would make it difficult for you to be fair either to the government or the defendants in this case?

10.     Do you hold any religious, philosophical, moral, or other beliefs that would make it difficult for you to judge the conduct of another person?

11.     At various times during the case, the Court will instruct you about the applicable law. It is your obligation to follow the Court's instructions about the law, whether you agree with the law or not.  If you were to find that you disagreed with the law as given to you by this Court, would you nonetheless be able to follow that law and reach a verdict by applying that law to the evidence?

12.     Do you know anything about this case other than what you have heard about in court? If so, please explain.

13.     Is there anything else that has not been asked that would influence your ability to honestly evaluate the evidence in this case and to be fair to either the government or defendants?

<div style="margin-left: 40%;">

Respectfully submitted,
PATRICK J. FITZGERALD
United States Attorney


By:     __s/ Steven A. Block_____
        STEVEN A. BLOCK
        TERRA L. REYNOLDS
        TIFFANY J. TRACY
        Assistant United States Attorneys
        219 South Dearborn Street
        Chicago, Illinois 60604
        (312) 353-5300

</div>

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN *et al.* | ) | |

## GOVERNMENT'S PROPOSED STATEMENT OF THE CASE

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, Eastern Division, respectfully proposes that the following statement of the case be read to prospective members of the jury:

Defendants Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, and Tony Sparkman are charged with having participated in a racketeering conspiracy that involved obstruction of justice, drug trafficking, and acts of violence, including murder, kidnapping, and robbery. Defendant Manuel Uriarte is charged with two counts of murder. Defendants Hector Uriarte, Jorge Uriarte, and Tony Sparkman are charged with three counts of kidnapping and two counts of carrying and using a firearm in connection with certain kidnappings. Defendants Hector Uriarte, Jorge Uriarte, Tony Sparkman, and Robert Cardena are charged with one count of possession of cocaine. Defendants Hector Uriarte, Jorge Uriarte, and Tony Sparkman are charged with one count of attempted possession of cocaine. Defendants Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Tony Sparkman, and Robert Cardena are charged with conspiracy to possess with the intent to distribute and to distribute cocaine and heroin.

Each of the defendants has pleaded not guilty to these charges.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:  ___s/Terra Reynolds_____
TERRA REYNOLDS
STEVEN A. BLOCK
TIFFANY J. TRACY
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, *et al*. | ) | |

## GOVERNMENT'S LIST OF POTENTIAL WITNESSES

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States

Attorney for the Northern District of Illinois, respectfully submits this List of Potential Witnesses[1]

it may call during its case-in-chief in the above captioned matter:

- IRS Special Agent Lilia Acosta

- FBI Special Agent Robert Amann, Jr.

-  DEA Fingerprint Analyst Joseph V. Ambrozich

- DEA Forensic Chemist Timothy Anderson

- DEA Special Agent Scott Ando (Ret.)

- Pedro Avila

- DEA Task Force Officer Sam Ayyad

- IRS Compliance Officer Shirley Ball

- Illinois State Police Forensic Scientist Jaime (Gibson) Bartolotta

- DEA Task Force Officer Michael Bedalow

- FBI Special Agent Loan Bermedez

---

[1]The government will file a supplemental List of Potential Witnesses as necessary to
notify the Court and counsel of any additional witnesses it may call at trial.

- DEA Special Agent Jeanna Bryant

- Teodoro Bueno

- Thomas Burke

- Manuel Calero

- Jose Carranza

- DEA Special Agent Mike Carroll

- Giovanni Chimera

- Roy Cockriel

- DEA Task Force Officer Bob Coleman

- Rogelio Corral

- Roy Corral

- Alvaro De La Torre

- CPD Lieutenant Brian Daley

- Dr. J. Scott Denton

- DEA Special Agent Al Doescher

- CPD Officer S.M. Duffy

- FBI Special Agent Linda Engstrom

- FBI Electronics Technician Robert Farrier

- FBI Forensic Scientist Constance Fisher

- Andres Flores

- CPD Officer Kathleen Gahagan

- Mary Garcia

2

- Paul Garcia

- CPD Youth Investigator Sergio Gaytan (Ret.)

- FBI Special Agent Mark Gutknect

- FBI Special Agent Phillip Hale

- Cicero Police Superintendent Bernard Harrison

- DEA Task Force Officer James Healy

- Mike Harper

- Salvador Hernandez

- Eric Herrera

- FBI Forensic Scientist Shane Hoffman

- Bill Howard

- DEA Intelligence Analyst Jessica Ipema

- CPD Officer Gregory Janicki

- Catalina Johnson, Ph.D.

- Cook County Medical Examiner Dr. Nancy Jones

- Bruce Killian

- Matt Klabisch

- Kenny Klusnick

- FBI Forensic Scientist Sandra Koch

- Jeanette LaFuenta

- Cook County Sheriff's Office Evidence Technician Frank Laskero

- DEA Special Agent Nicholas Loonan

- Jimmy Lopez

- Jorge Lopez

- Angela Luevano

- Illinois State Police Forensic Scientist Brian Mayland

- Illinois State Police Forensic Scientist Courtney Melendez (Ret.)

- James Millner

- Beronica Montano

- Natalie Morgan

- FBI Special Agent Tim Murphy

- DEA Task Force Officer David Nedved

- DEA Special Agent Timothy Oko

- Andrea Ortiz

- CPD Detective Anthony Padilla

- Cook County State's Attorney's Office Investigator Alfred Pappalito

- CPD Officer Paul Pater

- FBI Forensic Scientist Peter Peterson

- David Pineda

- DEA Special Agent Brent Poortinga

- Earl Reed

- ATF Fingerprint Specialist Alison S. Rees

- DEA Special Agent David Reynolds II

- Saul Rodriguez

- Michaelena Rosa

- FBI Special Agent Edgar Rossbach

- Refugio Ruiz-Cortez

- Maria Saldivar

- CPD Officer Noel Sanchez

- DEA Fingerprint Analyst Charles Schauer (Ret.)

- DEA Special Agent Sean Sears

- FBI Special Agent Douglas Seccombe

- Cicero Police Detective Richard Shook

- Luis Silva

- DEA Task Force Officer Ed Sobkowiak

- Alfonso Soria

- Mike Thompson

- CPD Officer Edward Tomasik

- Andres Torres

- Fares Umar

- FBI Special Agent Jennifer Usleber

- Lou Vega

- David Venegas

- Lisette Veneags

- Pedro Victoria

- Illinois State Police Forensic Scientist Susan K. Wilson

- DEA Special Agent Donald Wood

- Cook County Sheriff's Office Evidence Technician Leroy Wojtas (Ret.)

- DEA Task Force Officer Adam Zieminski


Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:  s/Terra Reynolds
     TERRA REYNOLDS
     STEVEN BLOCK
     TIFFANY TRACY
     Assistant United States Attorneys
     219 South Dearborn Street
     Chicago, Illinois 60604
     (312) 353-5300

6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, *et al.* | ) | |

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

## GOVERNMENT'S PROPOSED WITNESS LIST

was served pursuant to the district court's ECF system.

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney

By:     s/ Terra Reynolds
TERRA REYNOLDS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL  60604
(312) 353-3148

Dated: October 25, 2011

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, *et al*. | ) | |

## <u>GOVERNMENT'S LIST OF COUNSEL & OTHERS</u>

Assistant United States Attorneys Terra Reynolds, Steven Block, and Tiffany Tracy, DEA

Special Agent David Reynolds II, and DEA Task Force Officer James Healy will be sitting at

government counsel table during trial.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:  s/Terra Reynolds
TERRA REYNOLDS
STEVEN BLOCK
TIFFANY TRACY
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, *et al*. | ) | |

## CERTIFICATE OF SERVICE

    The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

## GOVERNMENT'S LIST OF COUNSEL & OTHERS

was served pursuant to the district court's ECF system.

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney

By:   s/ Terra Reynolds
TERRA REYNOLDS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL  60604
(312) 353-3148

Dated: October 25, 2011

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 0332 | **DATE** | 10/26/2011 |
| **CASE TITLE** | United States vs. Rodriguez | | |

**DOCKET ENTRY TEXT**

Defendant's motion for extension of time [591] is granted.

Docketing to mail notices.

| | Courtroom Deputy Initials: | RJ/JKF |
|---|---|---|

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*DEFENDANT GLENN LEWELLEN'S NOTICE OF*
*PARTIES AT COUNSEL TABLE*

Defendant GLENN LEWELLEN, by his attorneys, Andréa E. Gambino and

Matthew J. Madden, submit the following list of parties who will be seated at

counsel table:

Glenn Lewellen

Andréa E. Gambino

Matthew J. Madden

The following people may be present to assist at different times during trial:

Stephen Black, Jr.

Shaelyn Gambino Morrison

Jacqueline Anne Swiatek

DATE:       October 26, 2011           Submitted by,

                                       s/Andréa E. Gambino
                                       Attorney for Glenn Lewellen

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 26, 2011, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which sent notification of

such filing to the following:

Counsel for co-defendants

Steven Block, Esq.
Terra Reynolds, Esq.
Tiffany Tracy, Esq.
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604


and I hereby certify that I have mailed by United State Postal Service or hand

delivered the document to the following non-CM/ECF participants: N/A.


DATE:        October 26, 2011          Respectfully submitted,

                                       By:    s/Andréa E. Gambino
                                              Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.2
### Eastern Division

UNITED STATES OF AMERICA

<div style="text-align:center">Plaintiff,</div>

v.

Case No.: 1:09–cr–00332
Honorable Joan B. Gottschall

Saul Rodriguez, et al.

<div style="text-align:center">Defendant.</div>

---

# NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, October 26, 2011:

     MINUTE entry before the Honorable Joan B. Gottschall:as to Glenn Lewellen, Motion hearing held on 10/26/2011 regarding motion to quash[586], ( Responses due by 10/27/2011, Replies due by 10/31/2011.) Ruling by mail. Mailed notice (rj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

IN THE
UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. |
| | ) | Gottschall |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*GLENN LEWELLEN'S RESPONSE TO CITY OF CHICAGO'S MOTION TO
QUASH SUBPOENA FOR INFORMANT FILE*

Defendant GLENN LEWELLEN, through counsel, respectfully

requests that this Court deny the City of Chicago's Motion to Quash

Subpoena for the following reasons:  (1) the information sought pertains to an

individual who, in 1995, was an informant for the Chicago Police

Department, Mr. Lewellen used this informant and is unable to remember

his name; (2) counsel have reason to believe that this individual has

information about the criminal conduct of the government's witnesses who

will testify against Glenn Lewellen, including but not limited to Lisette

Radanovich Venegas and Saul Rodriguez; (3)  based on counsel's

investigation and the discovery received to date, the government's witnesses

have withheld information about their own criminal conduct; (4) the

individual whose identifiers are sought participated in criminal conduct with

Lisette Radanovich [Venegas] and Saul Rodriguez, among others; (5) the

concerns underlying the confidential informant privilege are not implicated

in circumstances where the informant worked for the police 16 years ago and may not currently be working in that capacity.

The government's informant privilege is a limited on that derives from the theory that "citizens have an obligation to divulge their knowledge of crimes to law enforcement officials." *United States v. Jefferson,* 252 F.3d 937, 940 (7th Cir. 2001). The need to protect law enforcement informants is grounded in the desire to encourage citizen cooperation while protecting "innocent informers." This need is less acute when the informant in question is not an active informer, but one who acted as an informant 16 years ago.

The informant in this case engaged in criminal conduct with Lisette Radanovich [Venegas] and Saul Rodriguez. Based on the investigation to date, counsel have reason to believe that Saul Rodriguez has been responsible for at least one violent crime which has not been included in his Grand Jury testimony. While it is true that Saul Rodriguez has admitted to a lifelong dedication to criminal conduct, the terms of his plea agreement require him to cooperate fully and truthfully.

The former informant whose identity is the subject of the subpoena may enable the defense to demonstrate that Mr. Rodriguez has not lived up to the terms of his bargain by withholding information about his own criminal conduct. This will provide a different type of impeachment than that provided by the fact of his bad acts. Such information is both relevant and helpful to the defense of Mr. Lewellen, whose prosecution is based almost

entirely on the uncorroborated words of Saul Rodriguez and his crew: Jorge
Lopez, Lisette  Radanovich [Venegas] and David Venegas, Andres Torres,
Pedro Victoria, and Fares Umar.

The public interest in protecting informants and the flow of their
information is most compelling when the informant is actually working in
that capacity and concern for the individual's safety may be implicated.  In
the circumstances of this case, such concerns are not in play.  The informant
worked for the Chicago Police 16 years ago, the persons against whom this
informant would testify are themselves government informants.  Saul
Rodriguez is in custody and does present a danger to this individual.

Releasing the information pursuant to a protective order, allowing only
counsel to have access to the documents containing the information sought,
and requiring the return of the documents following the resolution of Mr.
Lewellen's case, would address any remaining concerns about the individual's
safety.

WHEREFORE, defendant GLENN LEWELLEN, through counsel,
respectfully requests that this Court deny the City of Chicago's Motion to
Quash Subpoena, and permit the turnover the informant information, under
the terms of the proposed protective order, attached to the City's Motion as
Exhibit A.

DATE: October 28, 2011        Respectfully submitted,

By:    s/Andrea E. Gambino
        s/Matthew J. Madden
        Attorneys for Glenn Lewellen

Law Offices of Andrea E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that the above document has been filed using the

CM/ECF  system.  Electronic notice has been sent to the following parties:

Counsel for co-defendants

Terra Reynolds
Steven Block
Tiffany Tracy
Assistant United States Attorneys


DATE:          October 27, 2011          Respectfully submitted,

                                         By:    s/Andrea E. Gambino
                                                An Attorney for Glenn Lewellen

Law Offices of Andrea E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 09 CR 332 |
| | ) | |
| SAUL RODRIGUEZ, *et al.* | ) | The Honorable Joan B. Gottschall |
| | ) | |
| Defendant. | ) | |

**DEFENDANTS' JOINT SUBMISSION
PROPOSED ADDITIONAL VOIR DIRE QUESTIONS**

Now come the Defendants  Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Tony

Sparkman, Robert Cardena and Glenn Lewellen[1],  by their respective attorneys, and submit the

following additional  proposed questions to supplement the Court's Juror Question Sheet.

**I.  SENSITIVE OR EMOTIONALLY CHARGED TOPICS RELATED TO THE CASE**

The proposed  questions in Section I  relate to specific aspects of the anticipated evidence

in this case.  These topics may present serious difficulties for certain members of the venire that

must be fully explored in order to select a fair and impartial jury.  The Court may wish to

consider examining potential jurors individually on these topics in order to assure honest and

complete answers while avoiding the possibility of such answers tainting the rest of the  jury

pool.

---

[1]Defendant Glenn Lewellen has previously submitted proposed voir dire questions
covering issues relating to media coverage as well as issues relating more specifically to his case.
Defendant Lewellen continues to request those questions as well as the questions suggested in
this joint submission.

1

VIOLENCE

1.  Have you, your relatives, or your  friends ever been the victim of physical violence?

2.  Have you ever witnessed physical violence or seen someone injured by physical violence?

3.  This case will involve evidence of  murder, strangulation, severe beatings, and torture.  Do you have any  reactions to physical violence that would make it difficult for you to be a fair and impartial juror in this case?

4.  This case involves charges of kidnapping, including the kidnapping of a grandmother, a pregnant woman, and young children.  Would such evidence make it difficult for you to be  fair and impartial in judging the defendants?

GUNS

5.  Have you ever owned or shot a gun?

6.  Do you have strong feelings or opinions about guns?

7.  The evidence in this case includes the use of guns to murder, kidnap, restrain, threaten and rob other people. Would such evidence  make it difficult for you to be a  fair and impartial juror in this case?

DRUGS

8.  Have you, a family member, or a friend ever used  or  been addicted to illegal drugs?

9.  Has the use of illegal drugs ever caused a  problem for you, a relative or a  friend?

10.  If you heard testimony that a defendant was at one point a drug addict, would that fact affect your ability to be a fair juror in this case?

11.  This case involves charges of importing and selling large quantities of illegal drugs, particularly cocaine.  Do you have any feelings about illegal drugs that would affect your ability

to be a  fair to both sides in this case?

GANGS

12.  Have you, any members of your family, or friends ever been involved in a gang?

13.  Have you, your family, or friends ever had any personal experience with gangs or gang

members?

14.  What feelings do you have about  gang members?

15.  Would the fact that a defendant was a member of a gang make it difficult for you to be a fair

and impartial juror as to that defendant in this case?

RACE AND ETHNIC BACKGROUND

16.  Have you, a family member, or close friend ever had a bad experience with a person of

another race?

17.  Is there anything about the racial or ethnic background of any of the six defendants that

would make it difficult for you to be a fair and impartial juror in this case?

## II.  LEGAL PRINCIPLES

The following questions are suggested to insure that the jurors selected have no problems

with following those instructions that contain constitutional principles. The language suggested

tracks the Seventh Circuit Instructions on these issues.

While examination on these principles could be accomplished in group questioning, it is

possible that some jurors will have strong disagreement with some of these principles that could

taint the jury pool.  In the event a juror indicates any disagreement with these principles this

Court may want to explore that disagreement outside the presence of other jurors.

*Presumption of Innocence*

The Defendant is presumed to be innocent of each of the charges. This presumption continues during every stage of the trial and your deliberations on the verdict. It is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty as charged.

Do you have any disagreement with the rule that a defendant is presumed innocent?

Do you have any concern about your ability to apply the presumption of innocence to each of the defendants in this case?

*Burden of Proof Beyond a Reasonable Doubt*

The government has the burden of proving the guilt of a defendant beyond a reasonable doubt. This burden of proof stays with the government throughout the case. The defendant is never required to produce any evidence at all.

Do you have any disagreement with the rule that the guilt of a defendant must be established by the evidence beyond a reasonable doubt?

Do you have any problem that this burden of proof beyond a reasonable doubt is put on the government?

Do you have any concern about your ability to hold the government to this burden of proof of beyond a reasonable doubt?

Would you expect a defendant to present evidence in his defense?

Do you have any issue with the fact that the defendant is never required to produce any evidence at all?

Do you have any concern as to your ability to sign a not guilty verdict if the government fails to meet its burden to prove a defendant's guilt on a charge beyond a reasonable doubt?

*Defendant's Failure to Testify*

A defendant has an absolute right not to testify. The fact that a defendant does not testify cannot be considered by you in any way in arriving at your verdict.

Do you have any problem with the principle that a defendant has an absolute right not to testify?

Would you expect a defendant to testify?

If a defendant does not testify, will you hold it against him in any way?

If a defendant does not testify, will you have a problem not considering that in any way in

arriving at your verdict?

## III. VIEWS OF AND RELATIONSHIPS TO LAW ENFORCEMENT

1.  Have you, any family members, or friends ever worked for law enforcement, such as  police

departments, sheriff's departments, FBI,  DEA or other federal agencies, probation or parole

departments,  jails,  prisons, and prosecutors's offices?

2.  Have you, any  family members, or friends ever applied for a job with  law enforcement

(same definition as above)?

3.  Have you, any family members, or friends ever had any contact with any law enforcement

agencies (same definition as above)?

4.  Have you, any family members or friends ever been part of a neighborhood watch program or

any other crime prevention organization?

 5.  Have you, any family members, or friends ever worked as or applied for a job as a security

guard?

6.  Do you have any family members or friends who are attorneys?

7.  Have you ever used the services of an attorney?

8.  Do you  believe that  law enforcement officers always tell the truth?

9.  Would you tend to give greater weight to the testimony of a federal agent?

10.  Would you tend to believe a prosecution witness merely because they are testifying on

behalf of the government?


## IV.  ALTERNATIVE TO GOVERNMENT'S PROPOSED VOIR DIRE QUESTION

Govt. Question 10: Do you hold any religious, philosophical, moral, or other beliefs that would

prevent you from following the legal principles that the judge gives you or prevent you from

being a fair and impartial juror in this case?

## V. SUGGESTED FOLLOW UP TO QUESTIONS ON COURT'S JUROR QUESTION SHEET

*Employment history:*  Place of employment? Business owner or employee?

*Education:* Any other special training and skills? If juror attended college, major and minor

study areas?

*Family members employment.*  Employment of juror's parents.

*Military Service:*  Highest rank or grade? Did you ever serve in or train with military police?

Were your parents, spouse or children ever in  military service?

*Leisure Time Activities:* If juror is involved in an organization : Have you held any office?

Do you contribute money or time to any charitable, political, or other organization?

*Reading:* Do you use the internet?  What internet sites do you visit regularly?

Name a public figure whom you respect or admire?

Have you ever displayed a bumper sticker? If yes, what was the message?

Do you have a favorite saying that reflects your personal philosophy?

Have you ever written a letter to the editor?  If yes, what was the subject matter?

*Television:* What are a few of your favorite movies? What  radio programs do you listen to? Do you routinely watch or listen to any radio or television ministry?

## VI. SUGGESTED ADDITION TO THE COURT'S PRELIMINARY JURY INSTRUCTIONS: THIRD ADMONITION TO JURORS RE THEIR CONDUCT

We understand that  a mistrial recently was declared  in a case because a juror did internet research and provided her results to the rest of the jury.

Therefore we respectfully suggest that the Court's third admonishment to the jury be expanded to specifically include any research on the internet and that this admonishment be repeated  during the trial of the case.

Respectfully submitted,


/s/ Cynthia Giacchetti
One of the Attorneys for Defendant
Hector Uriarte and on behalf of counsel
for Co-Defendants Jorge Uriarte,
Manuel Uriarte, Tony Sparkman, Robert Cardena,
and Glenn Lewellen


CYNTHIA GIACCHETTI
53 West Jackson–Suite 1460
Chicago, Illinois 60604
312-939-6440

7

## CERTIFICATE OF SERVICE

Cynthia Giacchetti, one of the attorneys for the Defendant Hector Uriarte, hereby certifies that Defendants' Joint Submission Proposed Additional Voir Dire Questions was filed electronically using the Court's CM/ECF E-Filing system and was served on all parties on October 28, 2011, by operation of the Court's electronic filing system in accordance with Fed.R.Civ.P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

By:/s/ Cynthia Giacchetti

IN THE
UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. |
| | ) | Gottschall |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*DEFENDANTS' JOINT REQUEST FOR ADDITIONAL
PEREMPTORY CHALLENGES*

Defendants Glenn Lewellen, Jorge Uriarte, Hector Uriarte, Manuel Uriarte,
Robert Cardena, and Tony Sparkman, through counsel, respectfully request,
pursuant to Federal Rule of Criminal Procedure 24(b), that this Court exercise its
discretion and allow 18 or 15 challenges for the defendants and 10 or 9 for the
government.  In support of this Motion, defendants state the following:

(1)    Federal Rule of Criminal Procedure 24(b) provides in relevant part that:

**Peremptory Challenges.** Each side is entitled to the number of
peremptory challenges to prospective jurors specified below.  The court
may allow additional peremptory challenges to multiple defendants,
and may allow the defendants to exercise those challenges separately
or jointly.

(2)    There are six defendants being tried in this case, each of whom is being held
responsible for different predicate acts, of varying degrees of severity, from
obstruction of justice to murder.  Some defendants are also charged in separate
substantive counts, in addition to the two conspiracy counts.

(3)     In addition to the differences in the offenses charged against each defendant, the defendants in this case are also from differing racial, ethnic, and socio-economic backgrounds.  They each have different employment histories and criminal histories. Consequently, they are likely to differ in their opinions about which jurors are able to be fair to each defendant.

(4)     An increase in the allotment of peremptory challenges is necessary to allow each defendant to be able to participate meaningfully in the selection of a jury that is perceived to be fair to his case.  This is particularly true with respect to Mr. Lewellen, Mr. Cardena, and Mr. Sparkman who do not share a common background with the other defendants who are more likely to share a common view of which jurors are more likely to be fair.  Allowing the standard number of challenges would allow for the exercise of only a single independent peremptory per defendant, effectively giving a better opportunity to those who are likely to share a common view of the type of jurors they believe are most likely to be fair to them.

(5)     While the defendants will seek to exercise challenges in concert as often as possible, an additional 8 peremptories would allow each defendant to exercise 3 challenges independently, if necessary.

(6)     Alternatively, an additional 5 peremptories would allow each defendant to exercise two challenges independently, allowing for three to be exercised in concert with the co-defendants.

(7)     Defendants acknowledge that a corresponding increase in the number of peremptories allotted to the government is appropriate.

WHEREFORE, the defendants, through counsel, respectfully request that this Court allot an additional number of peremptory challenges to the defendants, so that each defendant has at least two challenges to exercise independently of his co-defendants.

DATE:          October 28, 2011              Respectfully submitted,

By:     s/Andréa E. Gambino
s/Matthew J. Madden
Attorneys for Glenn Lewellen

And on behalf of:

Cynthia Giacchetti
Molly Armour
Attorneys for Hector Uriarte

John Beal
Attorney for Jorge Uriarte

Keith Spielfogel
Robert Loeb
Attorneys for Manuel Uriarte

Gary Ravitz
Attorney for Robert Cardena

Eugene Steingold
Douglas Rathe
Attorneys for Tony Sparkman

Law Offices of Andrea E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that the above document has been filed using the CM/ECF

system.  Electronic notice has been sent to the following parties:

Counsel for co-defendants

Terra Reynolds
Steven Block
Tiffany Tracy
Assistant United States Attorneys


DATE:          October 28, 2011          Respectfully submitted,

                                         By:    s/Andrea E. Gambino
                                                An Attorney for Glenn Lewellen

Law Offices of Andrea E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN *et al.* | ) | |

## GOVERNMENT'S SUPPLEMENTAL MEMORANDUM REGARDING
## THE ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS

The government has filed with the Court its *Santiago* proffer in which it detailed the admissibility of certain co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). The Court must make a preliminary determination as to whether the preconditions for admission of co-conspirator statements have been met. *United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009). Namely, the Court must determine whether the government has shown the Court, by a preponderance of the evidence, that: (1) the charged conspiracy existed; (2) the defendants and the declarants were members of the conspiracy; and (3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Id*. If the Court determines that the preconditions for admission of co-conspirator statements have been met, it may "admit the statement(s) subject to its later determination during trial that the government has established by a preponderance of the evidence the three foundational elements." *Id*. (citing *United States v. Santiago*, 582 F.2d 1128, 1131 (7th Cir. 1978).

The Court has asked the government to clarify certain issues regarding the conspiracies charged in this case and the co-conspirator statements that government seeks to introduce. The government understands that the Court is seeking clarification on the following issues: (1) the scope

1

of the charged conspiracies; (2) how certain events fall within the conspiracies; and (3) how the proffered statements demonstrate that (a) the charged conspiracies existed; (b) defendants were members of the charged conspiracies; (c) the statements themselves were offered in furtherance of the conspiracies.   The government will address each of these issues and cite to the portions of the *Santiago* proffer in which more detail can be found.

## I.      THE CONSPIRACIES

As the Court is well aware, a conspiracy "is an agreement between two or more persons to accomplish an unlawful purpose."  Seventh Circuit Pattern Instruction 5.08.  *See United States v. Boucher*, 796 F.2d 972, 975 (7th Cir. 1986).  There is no requirement, for admissibility under Rule 801(d)(2)(E), that the government establish all elements of "conspiracy," such as a meeting of the minds and an overt act.  *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548-50 (7th Cir. 1979 ).  The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and/or the maker of the statement at issue (as well as that the statement was in furtherance of the venture).  "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy."  *Gil*, 604 F.2d at 549-550; *see also  Coe*, 718 F.2d at 835.  Moreover, in deciding whether the charged conspiracies existed, the Court should "consider the actions and statements of every one of the alleged participants.  An agreement may be proved from all the circumstances and the words and conduct of all the alleged participants which are shown by the evidence." Pattern Instructions at 81. Here, the government has set forth ample evidence to show that defendants agreed with each other and others to participate in the charged conspiracies.

2

A.      **The Racketeering Conspiracy**

Count One of the third superseding indictment charges defendants Saul Rodriguez, Glenn
Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, and Fares
Umar with having participated in a racketeering conspiracy that involved drug trafficking, acts of
violence, including murder, kidnapping, and robbery, and obstruction of justice.  The Court has
already determined that a sufficient factual basis exists regarding the existence of the racketeering
conspiracy and that several individuals who will be witnesses at trial were co-conspirators in that
conspiracy.  For example, defendants Saul Rodriguez, Andres Flores and Fares Umar have pled
guilty to the racketeering conspiracy charge and have agreed to cooperate against their co-defendants.
Defendant Jorge Lopez has stipulated in his plea agreement to the existence of the racketeering
conspiracy and his participation in it and has agreed to cooperate against his co-defendants.
Unindicted co-conspirators Pedro Victoria, Andres Torres, Lisette Venegas, and David Venegas[1] will
also testify at trial about the racketeering conspiracy and their participation in it.

As set forth in the government's *Santiago* proffer, Saul Rodriguez and Glenn Lewellen
founded the Rodriguez Racketeering Enterprise ("Enterprise") in approximately 1996.  At the time,
Glenn Lewellen was an officer with the Chicago Police Department ("CPD"), responsible for
managing the cooperation of Saul Rodriguez.  Saul Rodriguez was a drug dealer who, at the direction
of Glenn Lewellen, continued his illegal activities after he began cooperating.  Saul Rodriguez and
Glenn Lewellen began stealing narcotics and narcotics proceeds from drug traffickers in the Chicago
area as a means of enriching themselves.  Between 1998 and 2006, Saul Rodriguez recruited Hector

---

[1]  Lisette Venegas and David Venegas were identified as Individual A and Individual C,
respectively, in the government's *Santiago* proffer.

Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Pedro Victoria, Andres Torres, Lisette Venegas, and David Venegas to join the Enterprise.  Members of the conspiracy entered and exited at various times.  Defendants' unlawful agreement, which was to make money through drug trafficking, violent acts, including murder, kidnapping, and robbery, and obstruction of justice, link these acts together as part of the racketeering conspiracy.

Below, the government has summarized the evidence it will present at trial regarding the acts committed by defendants in furtherance of the racketeering conspiracy.

## 1.    **Drug Trafficking**

Between 1996 and April 9, 2009, defendants purchased wholesale quantities of narcotics from suppliers.  Defendants further obtained wholesale quantities of narcotics from various cocaine suppliers and their workers through kidnappings and robberies, and through threats of violence, violence, and intimidation. Glenn Lewellen obstructed justice in order to protect the drug trafficking activities of the Enterprise.

- 1996 Agreement Regarding Rodriguez' Continued Drug Trafficking
  - Participants:
    - Saul Rodriguez
    - Glenn Lewellen
  - Evidence
    - Testimony of Saul Rodriguez
    - Testimony of law enforcement officers
    - CPD Payroll records
    - CPD Informant file
    - Photographs
    - Financial records

- 2001 Kidnapping & Robbery of Victim A & Victim B Resulting in the Possession of 80 Kilograms of Cocaine
  - ▸ Participants:
    - • Saul Rodriguez
    - • Glenn Lewellen
    - • Fares Umar
  - ▸ Evidence:
    - • Testimony of Saul Rodriguez
    - • Testimony of Fares Umar
    - • Financial records

- 2003 Kidnapping & Robbery of Victim E Resulting in the Possession of 20 Kilograms of Cocaine
  - ▸ Participants:
    - • Saul Rodriguez
    - • Glenn Lewellen
    - • Fares Umar
  - ▸ Evidence:
    - • Testimony of Saul Rodriguez
    - • Testimony of Fares Umar
    - • Financial records

- 2003 Kidnapping of Victim G Resulting in the Possession of 100 Kilograms of Cocaine & Cocaine Proceeds
  - ▸ Participants:
    - • Saul Rodriguez
    - • Glenn Lewellen
    - • Fares Umar
    - • David Venegas
    - • Hector Uriarte
    - • Jorge Uriarte
    - • Manuel Uriarte
    - • Lisette Venegas
  - ▸ Evidence:
    - • Testimony of Saul Rodriguez
    - • Testimony of Fares Umar
    - • Testimony of David Venegas
    - • Testimony of Lisette Venegas
    - • Financial records

- 2004 Theft of 70 Kilograms of Cocaine from Individual N
  - ‣ Participants:
    - • Saul Rodriguez
    - • Glenn Lewellen
    - • Andres Torres
  - ‣ Evidence:
    - • Testimony of Saul Rodriguez
    - • Testimony of Andres Torres
    - • Testimony of Individual N
    - • Financial records

- 2004 Kidnapping of Victim J, Victim K & Victim L Resulting in the Possession of 135 Kilograms of Cocaine
  - ‣ Participants:
    - • Saul Rodriguez
    - • Fares Umar
    - • Hector Uriarte
    - • Jorge Uriarte
    - • Jorge Lopez
  - ‣ Evidence:
    - • Testimony of Saul Rodriguez
    - • Testimony of Fares Umar
    - • Testimony of Jorge Lopez
    - • Testimony of Victim J
    - • Financial records

- 2004 Aiding & Abetting Possession of 300 Kilograms of Cocaine
  - ‣ Participants:
    - • Saul Rodriguez
    - • Glenn Lewellen
    - • Andres Torres
  - ‣ Evidence:
    - • Testimony of Saul Rodriguez
    - • Testimony of Andres Torres

- Summer 2006 Theft of 300 Kilograms of Cocaine
  - ▸ Participants:
    - Saul Rodriguez
    - Hector Uriarte
    - Jorge Uriarte
    - Tony Sparkman
    - Andres Flores
    - Robert Cardena
  - ▸ Evidence:
    - Testimony of Saul Rodriguez
    - Testimony of Andres Flores
    - Financial records

- April 9, 2009 Attempted Possession of 600 Kilograms of Cocaine
  - ▸ Participants:
    - Saul Rodriguez
    - Jorge Lopez
    - Hector Uriarte
    - Jorge Uriarte
    - Tony Sparkman
    - Andres Flores
  - ▸ Evidence:
    - Testimony of Saul Rodriguez
    - Testimony of Jorge Lopez
    - Testimony of Andres Flores
    - Testimony of law enforcement officers
    - Consensually recorded conversations
    - Phone records
    - Physical evidence
    - Surveillance video
    - Photographs

2. **Murder**

Certain defendants committed murder or attempted to commit murder in exchange for payment and access to narcotics. Saul Rodriguez directed that each murder take place and certain defendants and other members of the conspiracy carried it out. Though there were sometimes additional reasons why Saul Rodriguez or others wanted the victims killed, the evidence will show that the motivation for the defendants going to trial was pecuniary gain.

- June 3, 2000 Murder of Juan Luevano
  - Participants:
    - Saul Rodriguez
    - Manuel Uriarte
    - Andres Flores
  - Evidence:
    - Testimony of Saul Rodriguez
    - Testimony of Andres Flores
    - Testimony of law enforcement officers
    - Testimony of eyewitnesses
    - Testimony of expert witnesses
    - Physical evidence
    - Photographs

- May 31, 2001 Murder of Michael Garcia
  - Participants:
    - Saul Rodriguez
    - Manuel Uriarte
    - Andres Flores
  - Evidence:
    - Testimony of Saul Rodriguez
    - Testimony of Andres Flores
    - Testimony of law enforcement officers
    - Testimony of eyewitnesses
    - Testimony of expert witnesses
    - Physical evidence
    - Photographs
    - Testimony of Individual F

- December 24, 2002 Murder of Miguel De La Torre
  - Participants:
    - Saul Rodriguez
    - Hector Uriarte
    - Jorge Uriarte
    - Manuel Uriarte
  - Evidence:
    - Testimony of Saul Rodriguez
    - Testimony of law enforcement officers
    - Testimony of expert witnesses
    - Physical evidence
    - Photographs

- 2005 Attempted Murder of Victim X – Hector Uriarte
  - Participants:
    - Saul Rodriguez
    - Hector Uriarte
    - Andres Flores
  - Evidence:
    - Testimony of Saul Rodriguez
    - Testimony of Andres Flores

3.    **Kidnapping & Robbery**

Defendants kidnapped victims to obtain money or drugs by forcing the victims to reveal the location of money or drugs, or by demanding a ransom from victims' family members.  They also robbed and stole cocaine and money.  The following kidnappings and robberies (in addition to those already referenced in the section pertaining to drug trafficking) are part of the racketeering conspiracy.

- 1998 Robbery of $500,000 in Drug Proceeds
  - Participants:
    - Saul Rodriguez
    - Glenn Lewellen
  - Evidence
    - Testimony of Saul Rodriguez
    - Financial records

- 1998/1999 Robbery of $800,000 in Drug Proceeds
  - Participants:
    - Saul Rodriguez
    - Glenn Lewellen
  - Evidence:
    - Testimony of Saul Rodriguez
    - Financial records

- 2001 Kidnapping of Victim C Resulting in the Possession of $1,500,000 in Drug Proceeds
  - Participants:
    - Saul Rodriguez
    - Glenn Lewellen
    - Fares Umar
    - Andres Torres
  - Evidence:
    - Testimony of Saul Rodriguez
    - Testimony of Fares Umar
    - Testimony of Andres Torres
    - Financial records

- 2002 Kidnapping of Victim D Resulting in the Possession of $80,000
  - Participants:
    - Saul Rodriguez
    - Hector Uriarte
    - Jorge Uriarte
    - Manuel Uriarte
    - Fares Umar
    - Andres Flores
    - Lisette Venegas
  - Evidence:
    - Testimony of Saul Rodriguez
    - Testimony of Fares Umar
    - Testimony of Andres Flores
    - Testimony of Lisette Venegas
    - Testimony of Victim D
    - Financial records

- May 29, 2003 Kidnapping of Victim F Resulting in the Possession of $700,000
  - Participants:
    - Saul Rodriguez
    - Hector Uriarte
    - Jorge Uriarte
    - Fares Umar
  - Evidence:
    - Testimony of Saul Rodriguez
    - Testimony of Fares Umar
    - Testimony of Victim F
    - Financial records

- 2004 Kidnapping of Victim I
  - Participants:
    - Saul Rodriguez
    - Hector Uriarte
    - Jorge Uriarte
    - Pedro Victoria
  - Evidence:
    - Testimony of Saul Rodriguez
    - Testimony of Pedro Victoria
    - Testimony of Victim I

11

- 2006 Kidnapping of Victim Z, Victim AA & Victim BB
    - ‣ Participants:
        - • Saul Rodriguez
        - • Hector Uriarte
        - • Jorge Uriarte
        - • Tony Sparkman
        - • Robert Cardena
        - • Andres Flores
    - ‣ Evidence:
        - • Testimony of Saul Rodriguez
        - • Testimony of Andres Flores

- Summer 2006 Kidnapping of Victim M & Victim N
    - ‣ Participants:
        - • Saul Rodriguez
        - • Hector Uriarte
        - • Jorge Uriarte
        - • Tony Sparkman
    - ‣ Evidence:
        - • Testimony of Saul Rodriguez
        - • Testimony of Victim M
        - • Testimony of Andres Flores
        - • Testimony of Individual U
        - • Testimony of Individual F

- October 20, 2007 Kidnapping of Victim O, Victim P, Victim Q, Victim R, Victim S, Victim T & Victim U Resulting in the Possession of $2,000
    - ‣ Participants:
        - • Saul Rodriguez
        - • Hector Uriarte
        - • Jorge Uriarte
        - • Tony Sparkman
        - • Andres Flores
        - • Pedro Victoria
    - ‣ Evidence:
        - • Testimony of Saul Rodriguez
        - • Testimony of Andres Flores
        - • Testimony of Pedro Victoria
        - • Testimony of Victim O
        - • Testimony of law enforcement officers
        - • Photographs

- 2008 Kidnapping and Robbery of Victim V and Victim W Resulting in the Possession of $1,500
  - ▸ Participants:
    - Saul Rodriguez
    - Jorge Lopez
    - Hector Uriarte
    - Jorge Uriarte
    - Tony Sparkman
    - Andres Flores
  - ▸ Evidence:
    - Testimony of Saul Rodriguez
    - Testimony of Jorge Lopez
    - Testimony of Andres Flores
    - Testimony of Victim V

- 2008/2009 Kidnapping of Victims CC, Victim DD & Victim EE
  - ▸ Participants:
    - Saul Rodriguez
    - Hector Uriarte
    - Jorge Uriarte
    - Tony Sparkman
    - Andres Flores
  - • Evidence:
    - Testimony of Saul Rodriguez
    - Testimony of Andres Flores
    - Testimony of Victim DD

### 4.   <u>Obstruction of Justice</u>

Glenn Lewellen obstructed justice in order to conceal his involvement and the involvement

of his co-conspirators in the racketeering conspiracy.

- 1996 Obstruction of a Federal Investigation of Saul Rodriguez' Activities
  - ▸ Evidence:
    - Testimony of law enforcement officer
    - Photographs

13

- 1999 False Testimony at the Federal Jury Trial of Refugio Ruiz-Cortez
  - ▸ Evidence:
    - • Testimony of Saul Rodriguez
    - • Testimony of Lisette Venegas
    - • Trial testimony of Glenn Lewellen
    - • Testimony of Refugio Ruiz-Cortez
    - • Court documents
    - • Testimony of law enforcement officers
    - • Photographs
    - • Financial records

- 2006 Obstruction of a Federal Investigation of Saul Rodriguez' Activities
  - ▸ Evidence:
    - • Testimony of Saul Rodriguez
    - • Testimony of Andres Torres
    - • Testimony of law enforcement officers
    - • Consensually recorded conversations
    - • Phone records
    - • Financial records

## B.    The Drug Conspiracy

Count Thirteen of the third superseding indictment charges defendants Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Robert Cardena, and Jorge Lopez with having participated in a drug conspiracy.  The Court has already determined that a sufficient factual basis exists regarding the existence of the drug conspiracy and that several individuals who will be witnesses at trial were co-conspirators in that conspiracy.  For example, defendants Saul Rodriguez, Andres Flores, Fares Umar, and Jorge Lopez have pled guilty, admitted to having participated in the drug conspiracy, and have agreed to cooperate against their co-defendants.  Unindicted co-conspirators Pedro Victoria, Andres Torres, Lisette Venegas, and David Venegas will also testify at trial about the drug conspiracy and their participation in it.

As set forth in the government's *Santiago* proffer, the objectives of the conspiracy were to obtain narcotics, through purchase as well as through kidnapping, robbery and theft, that could then

14

be sold to make money.   Members of the conspiracy entered and exited at various times.

Defendants' unlawful agreement to possess and distribute narcotics is what link them together as part

of a single drug conspiracy.   A summary of the evidence the government will offer at trial as to the

drug conspiracy is set forth above in Section IIA.

## III.   CO-CONSPIRATOR STATEMENTS[2]

The Court can consider a proffered coconspirator statement itself in determining whether it

was made "in furtherance" of the conspiracy.   *United States v. Shoffner*, 826 F. 2d 619, 627 n.12 (7th

Cir. 1987).   In determining whether a statement was made "in furtherance" of the conspiracy, courts

look for a reasonable basis upon which to conclude that the statement furthered the conspiracy.   *Id*.

at 628.   Under the reasonable basis standard, a statement may be susceptible to alternative

interpretations and still be "in furtherance" of the conspiracy.   *Shoffner*, 826 F.2d at 628.   The

"statement need not have been made exclusively, or even primarily, to further the conspiracy" in

order to be admissible under the coconspirator exception.   *United States v. Johnson*, 200 F.3d 529,

533 (7th Cir. 2000); *United States v. Powers*, 75 F.3d 335, 340 (7th Cir. 1996).

The government has proffered evidence regarding a multitude of statements that were made

in furtherance of the conspiracy.   These statements were in furtherance of the conspiracy in several

ways recognized by the courts.   Among the types of statements that satisfy the "in furtherance"

requirement are:

---

[2]   Many of the co-conspirator statements the government will introduce at trial would also
be independently admissible as admissions by a party opponent, pursuant to Rule 801(d)(2)(A).
For example, Glenn Lewellen's statements to Saul Rodriguez regarding Rodriguez' continued
drug trafficking in 1996, Manuel Uriarte's statements to Andres Flores about the Luevano and
Garcia murders, and Hector and Jorge Uriarte's statements to Jorge Lopez regarding the April 9,
2009 theft of cocaine would all be admissible as admissions of a party opponent.

- Statements made to execute the conspiracy (*United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991))

- Statements regarding the conspiracies activities (*United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992))

- Statements regarding the activities of other conspirators designed to inform or reassure the listener (*United States v. Van Daal Wyk*, 840 F.2d 494 (7th Cir. 1988))

- Statements to recruit conspirators (*United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997))

- Statements relating to the progress and past accomplishments of the conspiracy (*United States v. Potts*, 840 F.2d 368, 371 (7th Cir. 1987)*; United States v. Doyle*, 771 F.2d 250, 256 (7th Cir. 1985))

- Statements to conceal the criminal objectives of the conspiracy (*United States v. Maloney*, 71 F.3d 645, 660 (7th Cir. 1995))

The following are a ***only a few*** examples of co-conspirator statements made in furtherance of the conspiracy broken down by incident and some of they ways that they were in furtherance of the conspiracy.  The *Santiago* proffer includes many more examples of co-conspirator statements that were made in furtherance of the conspiracy.

- 1996 Agreement Regarding Rodriguez' Continued Drug Trafficking

  ‣ Proffered statements:  Lewellen's statements that Rodriguez should continue to traffic narcotics.  Doc. 531 at 17-22.

  ‣ Basis: Statements made to execute the conspiracy and regarding the conspiracy's activities.

16

- June 3, 2000 Murder of Juan Luevano

  ▸ Proffered statements: Manuel Uriarte's conversations with Andres Flores and Saul Rodriguez about the murder.  Doc. 531 at 41-43.

  ▸ Basis: Statements to recruit conspirators; statements relating to the progress of the conspiracy; statements made to execute the conspiracy and regarding the conspiracy's activities.

- May 31, 2001 Murder of Michael Garcia

  ▸ Proffered statements: Manuel Uriarte's conversation with Saul Rodriguez about the murder; Saul Rodriguez' conversation with Jorge Lopez about the murder; Individual F's conversation with Lopez. Doc. 531 at 37-41.

  ▸ Basis: Statements relating to the progress and past accomplishments of the conspiracy; statements made to execute the conspiracy and regarding the conspiracy's activities.

- 2001 Kidnapping and Robbery of Victim A and Victim B – Lewellen

  ▸ Proffered statements: Fares Umar and Saul Rodriguez' conversations about the kidnapping and their conversations with Lewellen about the kidnapping. Doc. 531 at 41-31.

  ▸ Basis: Statements made to execute the conspiracy and regarding the conspiracy's   activities; statements to recruit conspirators

- December 24, 2002 Murder of Miguel De La Torre

  ▸ Proffered statements: Saul Rodriguez' statements with Manuel Uriarte, Hector Uriarte, and Jorge Uriarte about the murder.  Doc. 531 at 55-59.

  ▸ Basis: Statements relating to the progress and past accomplishments of the conspiracy; statements made to execute the conspiracy and regarding the conspiracy's activities; statements to conceal the criminal objectives of the conspiracy.

- 2003 Kidnapping and Robbery of Victim E

  ▸ Proffered statements: Fares Umar and Saul Rodriguez' conversations about the kidnapping and their conversations with Lewellen about the kidnapping.  Doc. 531 at 59-61.

  ▸ Basis: Statements made to execute the conspiracy and regarding the conspiracy's activities

- 2003 Kidnapping of Victim G

  ▸ Proffered statements: Fares Umar, Saul Rodriguez, David Venegas, and Lisette Venegas' conversations among each other about the kidnapping; Saul Rodriguez and Fares Umar's  conversations with Glenn Lewellen, Hector Uriarte, Jorge Uriarte, and Manuel Uriarte about the kidnapping; David Venegas' conversations with Hector Uriarte and Victim G about the kidnapping.  Doc. 531 at 72-82.

  ▸ Basis: Statements made to execute the conspiracy and regarding the conspiracy's activities; statements regarding activities of other conspirators

18

designed to inform or reassure the listener

- 2004 Theft of 70 Kilograms of Cocaine

  ▸ Proffered statements: Saul Rodriguez' and Andres Torres' conversations with Glenn Lewellen; Saul Rodriguez and Andres Torres' conversations with Individual N.  Doc. 531 at 91-96.

  ▸ Basis: Statements made to execute the conspiracy and regarding the conspiracy's activities.

- 2004 Kidnapping of Victim J, Victim K & Victim L

  ▸ Proffered statements: Saul Rodriguez' conversations with Jorge Lopez about the kidnapping; Saul Rodriguez and Fares Umar's conversations with Hector Uriarte and Jorge Uriarte about the kidnapping; Hector Uriarte, Jorge Uriarte, and Fares Umar's statements to Victim J .  Doc. 531 at 104-117.

  ▸ Basis:  statements made to execute the conspiracy and regarding the conspiracy's activities

- 2004 Aiding and Abetting Possession of Cocaine – Lewellen

  ▸ Proffered statements: Saul Rodriguez, Andres Torres' and Alex Estrada's conversations about the cocaine; Andres Torres's conversations with Alex Estrada about the cocaine.  Doc. 531 at 117-120.

  ▸ Basis: Statements made to execute the conspiracy and regarding the conspiracy's activities; statements regarding the activities of other conspirators designed to inform or reassure the listener; statements to conceal the criminal objectives of the conspiracy

19

IV.     **CONCLUSION**

Based on the foregoing and the government's initial *Santiago* proffer, this Court should find

that the government's proffered co-conspirator statements are admissible pending the introduction

of evidence to support its proffer.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:     s/ Terra Reynolds
TERRA REYNOLDS
STEVEN A. BLOCK
TIFFANY TRACY
Assistant U.S. Attorneys
219 South Dearborn Street, Room 500
Chicago, Illinois 60604
(312) 353-5300

Dated: October 28, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, *et al.* | ) | |

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

GOVERNMENT'S SUPPLEMENTAL MEMORANDUM REGARDING
THE ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS

was served pursuant to the district court's ECF system.

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney

By:     s/ Terra Reynolds
        TERRA REYNOLDS
        Assistant United States Attorney
        219 South Dearborn Street, 5th Floor
        Chicago, IL  60604
        (312) 353-3148

Dated: October 28, 2011

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.  09 CR 332-11 |
| v. | ) | Hon. Joan B. Gottschall |
| | ) | |
| GLENN LEWELLEN *et al* | ) | |

**LIST OF ADDITIONAL POTENTIAL WITNESSES**

The defendants jointly hereby file a list of additional potential witnesses, who may or may

not be called in the trial of the captioned case.  The defendants also may or may not call any

person who has been identified by the government as a potential witness.  However, the

defendants respectfully suggest, for purposes of informing the jury, that no distinction be drawn

between the names of persons identified herein and the persons identified by the government as

potential witnesses.

| | | |
|---|---|---|
| Felipe Adan | Michael Borden | Thomas Burke |
| Carmen Cardena | Catalina Cardena | Felicitaz Cardena |
| Ramiro Casas | Jason Coday | Antonio Zepeda Contreras |
| Joseph Digiacomo | Al Doescher | Thomas Dukes |
| Susan Dukes | Mike Harper | Tommy Horton |
| Robert Kennealy | Matt Klabisch | Kenny Klusnick |
| Ashley Lewellen | Glenn Lewellen | Haywood McDuffie |
| Brandy Melgoza. | Jaime Mendez | Jim Millner |
| Al Pappalito | Cynthia Prus | Richard Ptak |
| Sandra Ramirez | John Rea | David Reynolds |

1

Cecelia Rodriguez                Richard Rowan                Noel Sanchez

Rolando Ted Stewart             Michael Thompson            Javier Torres

Natasha Umar                    Sylvia Uriarte              Vanessa Vasquez

Jorge  Vasquez                  James Wagner                Larnell Wheeler

                                Respectfully submitted,

                                s/ Gary Ravitz

                                _____
                                Gary Ravitz, one of the attorneys

Ravitz & Palles, P.C.
203 N.  La Salle, Ste.2100
Chicago, Illinois  60601
(312) 558-1689

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA        )
                                )       No.  09 CR 332-11
            v.                  )       Hon. Joan B. Gottschall
                                )
ROBERT CARDENA                  )

NOTICE OF FILING

TO:   AUSA Steven Block
      219 S. Dearborn, 5th Fl.
      Chicago, IL 60604

      PLEASE TAKE NOTICE that on October 28, 2011, I filed LIST OF ADDITIONAL
POTENTIAL WITNESSES, a copy of which is hereby served upon you.

**CERTIFICATE OF SERVICE**

      PLEASE TAKE NOTICE that on October 28, 2011, I caused the documents listed herein to
be served pursuant to ECF. on the above-named individual, who is a Filing User.

                                    Respectfully submitted,

                                    s/ Gary Ravitz

                                    _____
                                    Gary Ravitz, attorney for
                                    Robert Cardena

Ravitz & Palles, P.C.
203 N.  La Salle, Ste.2100
Chicago, Illinois  60601
(312) 558-1689

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, *et al.* | ) | |

**AGREED STATEMENT OF THE CASE**

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, Eastern Division, respectfully provides the Court with the Agreed Statement of the Case:

Defendants Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, and Tony Sparkman are charged with having participated in a racketeering conspiracy that is alleged to have involved obstruction of justice, drug trafficking, and acts of violence, including murder, kidnapping, and robbery. Defendant Manuel Uriarte is charged with two counts of murder. Defendants Hector Uriarte and Jorge Uriarte are charged with three counts of kidnapping. Defendant Tony Sparkman is charged with two counts of kidnapping. Defendants Hector Uriarte, Jorge Uriarte, and Tony Sparkman are charged with two counts of carrying and using a firearm in connection with certain kidnappings. Defendants Hector Uriarte, Jorge Uriarte, Tony Sparkman, and Robert Cardena are charged with one count of possession of cocaine. Defendants Hector Uriarte, Jorge Uriarte, and Tony Sparkman are charged with one count of attempted possession of cocaine. Defendants Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Tony Sparkman, and Robert Cardena are charged with conspiracy to possess with the intent to distribute and to distribute cocaine and heroin.

Each of the defendants has pleaded not guilty to these charges.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:      s/Terra Reynolds
TERRA REYNOLDS
STEVEN A. BLOCK
TIFFANY J. TRACY
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, *et al.* | ) | |

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

AGREED STATEMENT OF THE CASE

was served pursuant to the district court's ECF system.

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney

By:    s/ Terra Reynolds
TERRA REYNOLDS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL  60604
(312) 353-3148

Dated: October 28, 2011

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | Case No. 09 CR 332-2 |
| v. | |
| | The Honorable Joan B. Gottschall |
| GLENN LEWELLEN | |

## DEFENDANT'S MOTION TO DISCLOSE THE SPECIFIC TIME OF DAY AND LOCATION OF THE CHARGED KIDNAPPING ON 9/11/01

On October 24, 2011 the government requested pursuant to Rule 12.1 that Glenn Lewellen provide notice of any intended alibi defense for the kidnapping of Victims A and B on September 11, 2001.  Rule 12.1(a)(1) states that the government's request for notice of an alibi defense "must state the time, date, and place of the alleged offense."  The government request fails to state the specific time or place of the alleged offense.  It is not possible for the defendant to provide notice of an alibi defense without this information, particularly as to the time of day that the incident allegedly occurred.

The government intends to present witnesses Fares Umar and Saul Rodriguez to testify about the kidnapping of Victims A & B on September 11. 2001.  The specific claims regarding the time of day and the location of the alleged September 11 incident have not been provided to Mr. Lewellen in any form as to either witness.  This information is necessary in order to determine if there is a potential alibi defense as to Mr. Lewellen.  Rule 12.1(a)(2) requires that the defendant provide notice of an alibi defense within fourteen days of the government's request for notice.  This fourteen day period should not begin to run until the government request complies with Rule 12.1(a)(1) by providing the time and place of the alleged offense.

The government has assured counsel that the information will be provided once they have

the opportunity to follow up with their witnesses as to the time of day and location of the

September 11. 2001 kidnapping.  Counsel has no reason to doubt the government's

representation regarding their intent to provide the information, but files the instant motion in an

abundance of caution.


Respectfully submitted,

*Matthew J. Madden*
Matthew J. Madden
Attorney at Law



MATTHEW J. MADDEN
Attorney at Law
53 West Jackson Blvd., Suite 703
Chicago, IL 60604
(312) 212-1900

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA    )
    )    Case No. 09 CR 332-5
v.    )    Honorable Joan B. Gottschall
    )
MANUEL URIARTE    )

### DEFENDANT MANUEL URIARTE'S RESPONSE TO GOVERNMENT'S SUPPLEMENTAL MEMORANDUM REGARDING CO-CONSPIRATOR STATEMENTS

NOW COMES THE DEFENDANT, Manuel Uriarte, by and through his attorneys, Keith Spielfogel and Robert Loeb, and in response to the Government's Supplemental Memorandum Regarding Co-conspirator Statements, respectfully requests that the Court find that the murders of Juan Luevano and Miguel Garcia were not committed in furtherance of the so-called RICO enterprise, that statements in furtherance of those alleged murders not be allowed, and that those two alleged murders be stricken from Count One.

Count 1 alleges a RICO enterprise, led by Saul Rodriguez. The purpose of the alleged enterprise was to profit from kidnapping, robbery, and the illegal trafficking of controlled substances; murders were allegedly committed to further those goals.

In its Supplemental Memorandum, the government lists various alleged acts in furtherance of the enterprise, participants, and sources of evidence. Defendant Manuel Uriarte is not conceding that a RICO enterprise or conspiracy existed. However, and for purposes of this Supplemental Response, even if an enterprise and/or conspiracy existed, the murders of Juan Luevano and Miguel Garcia were not acts in furtherance of either.

1

The government does not provide any basis to conclude that the murders of Luevano and Garcia were in furtherance of the enterprise *per se*.  Defendant Manuel Uriarte maintains that these incidents were for personal motives (revenge), and not for the interests of the enterprise.

### Factual Allegations

The evidence concerning who was responsible for the Luevano and Garcia murders apparently will come primarily from witnesses Saul Rodriguez and Andres Flores.  Below is a summary of their testimony regarding these two events.

**Luevano**:  In his Grand Jury statement, Andres Flores related that Saul Rodriguez had offered Manny Uriarte money to kill Baby G, (Juan Luevano) and that Rodriguez wanted Baby G killed because of Baby G's relationship with Rodriguez's girlfriend or ex-girlfriend. He said that Saul Rodriguez paid Manuel Uriarte for the murder and that Manuel Uriarte forwarded payment to him (Flores).

Saul Rodriguez related in his Grand Jury statement that Juan Luevano was dating his ex-girlfriend, Janet Burgos.  He had one child with her.  Prior to that time, he had been best friends with Baby G.  They had an understanding that they would never date the same woman. Rodriguez also learned that the girlfriend of Benjamin Manteca, a La Raza leader with whom Rodriguez maintained a close relationship, had also slept with Luevano, and Manteca also wanted Luevano killed.  Rodriguez claimed that he asked Manny Uriarte to kill Luevano for these reasons, and that Manny Uriarte allegedly requested that Rodriguez look out for him and his brother.

**Garcia**: Andres Flores did not disclose in his grand jury statement the reason that Saul Rodriguez wanted Miguel Garcia killed.  He testified that he was approached by

Manny Uriarte and asked to participate in the Garcia killing.  He testified that he went to

the home of Michael Garcia with Manny Uriarte.  He stated that when Garcia came home

he (Flores) ran over to Garcia and shot him.  He offered no reason for the killing.  He was

paid $5,000 for his role in the killing.

According to the Santiago proffer, Jorge Lopez had a brother named Edwardo

Lopez, who was a member of the Satan Disciples.  In September of 1998, Edwardo was

run over and killed by a vehicle being driven by a member of  the Latin Kings, a rival

gang.  Jorge Lopez set out on a two year investigation to learn the identity of the person

who had killed his brother.  Eventually, he came to the conclusion that it was Latin King

Michael Garcia.  In 2001, Jorge Lopez asked Saul Rodriguez to have Michael Garcia

killed.  Lopez offered to pay Rodriguez, a friend of his from the gym, for the killing.

In his Grand Jury statement, Saul Rodriguez claims he was approached by Jorge

and asked to find someone to kill the person who had killed his brother, Michael Garcia.

Rodriguez agreed to do so and eventually hired Manny Uriarte to do so.

### Applicable Legal Standards

The requirements of RICO are well covered in *United States v. Turkette*, 452 U.S.

576, (1981).    "The existence of an enterprise 'is proved by evidence of an ongoing

organization, formal or informal, and by evidence that the various associates function as a

continuing unit.'"  *Turkette* at 583.  We have identified three characteristics which an

enterprise must have: a common purpose shared by the individual associates; some

continuity of structure and personnel; and structure distinct from that inherent in the

racketeering activity alleged. *United States v. Kragness,* 830 F.2d 842, 855 (8th

3

Cir.1987). The distinct-structure element can be shown by patterns of retaliation and intimidation undertaken to protect and defend the enterprise's business and associates, *see United States v. Davidson,* 122 F.3d 531, 535 (8th Cir.1997), and by regular training, oversight, and coordination of associates, *see United States v. Darden,* 70 F.3d 1507, 1520–21 (8th Cir.1995)." See also *United States v. Crenshaw*, 359 F.3d 977, 991 (8th Cir. 2004).

RICO is about an enterprise and its goals, not individuals and their individual self-interest. "RICO regulates enterprises, not people. Although RICO 'does not require the violent acts themselves to have any connection to interstate commerce other than that they were committed for the purpose of establishing or maintaining a position within the enterprise,' *United States v. Crenshaw,* 359 F.3d 977, 984 (8th Cir.2004), the predicate acts must still further the goals of an enterprise that itself affects commerce." *Waucash v. United State*s, 380 F.3d 251 (6th Cir. 2004).

Further, the case of *United States v. Kehoe*, 310 F.3d 579 (8th Cir. 2002) distinguishes the requirements of RICO from individuals who associate to commit sporadic crime. "Under RICO, an "enterprise is established 'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.' " *United States v. Kragness*, 830 F.2d 842, 855 (8th Cir.1987) (quoting *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524 (1981)). Three characteristics distinguish a RICO enterprise from "individuals who associate [to commit] sporadic crime." Id. The individuals involved in a RICO enterprise share a common purpose or goal. *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 769 (8th Cir.1992). There is a continuity of personnel, and the organization which they advance is ongoing. Id. Finally, "an ascertainable

4

structure [exists, which is] distinct from that inherent in the pattern of racketeering." Id.

at 769–70; see also *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524; *Kragness*, 830 F.2d at 855;

*United States v. Bledsoe*, 674 F.2d 647, 665 (8th Cir.1982) (internal quotations and

citations omitted)." *Kehoe* at 586.

### Application of Facts to Legal Standard

The purported evidence clearly shows that these acts were committed for revenge.

The revenge in the Luevano killing was for personal animosity that Saul Rodriguez's ex-

girlfriend had a relationship with Luevano. The motive in the Garcia killing was to

avenge a gang-related killing, and the gangs involved in the revenge were unrelated to the

charged enterprise.

If there is a RICO enterprise here, its goal is clearly to financially enrich the enterprise,

and hence its members.  These murders did not enrich the enterprise at all.  These were

sporadic, *ad hoc* incidents to avenge personal issues.  The fact that the acts may have

involved some of the same individuals as the alleged enterprise and that there may have

been some personal remuneration may at first glance make it appear that they are acts

which the government could include in Count One.  However, that superficial look would

ignore the critical issue that the murders do not further the enterprise. It is very clear the

purpose for the murders was personal, and were not the goals or purposes of the

enterprise.

WHEREFORE, Defendant Manuel Uriarte respectfully requests that the Court find

that the murders of Juan Luevano and Miguel Garcia were not committed in furtherance

of the so-called RICO enterprise, that statements in furtherance of those alleged murders

not be allowed, and that those two alleged murders be stricken from Count One.

Respectfully submitted,

/s/ Robert A. Loeb

/s/ Keith A. Spielfogel
Attorneys for Manuel Uriarte

Robert A. Loeb
190 S. LaSalle St., Suite 520
Chicago, IL 60603
312-368-0611
ARDC No. 1681990

Keith A. Spielfogel
190 S. LaSalle St. Suite 520
Chicago, IL 60603
312-236-6021
ARDC No. 2689537

CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of October, 2011, I electronically filed the foregoing Response with the Clerk of the Court using the ECF system which will send notification of such filing to all parties pursuant to the District Court's system as to ECF filers.


_____/s/_____
Robert Loeb

Robert A. Loeb
190 S. LaSalle St.
Suite 520
Chicago, IL 60603
312-368-0611
robertloeb@att.net

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 00332 |
| | ) | |
| GLEN LEWELLEN, | ) | Hon. Judge Gottschall |
| | ) | |
| Defendant. | ) | |

**PETITIONER'S REPLY TO DEFENDANT'S RESPONSE TO CITY'S
MOTION TO QUASH SUBPOENA DUCES TECUM**

Petitioner, the City of Chicago ("City"), by its attorney, Stephen R. Patton,

Corporation Counsel of the City of Chicago, presents this Reply to Defendant's Response

to City's Motion to Quash Subpoena Duces Tecum.

In short, Defendant provides the following reasons as to why he needs the

informant information:  Defendant asserts that the informant committed a crime with two

of the government witnesses and the two witnesses did not inform the United States

Attorney's office about the crime, in violation of the plea agreement.  Defendant wishes

to locate the informant to ask if the informant participated in criminal activity with the

government's witnesses.[1]

For the reasons set forth below, the City's Motion to Quash should be allowed.

---

[1] Based on the oral representation made by Attorney Gambino in court on October 26, 2011, counsel seeks
informant information to locate and interview informant.

# I.   CASELAW DOES NOT ALLOW FOR RELEASE OF INFORMANT'S IDENTITY IN THE CIRCUMSTANCES DESCRIBED BY THE DEFENDANT.

Defendant's reason for disclosure of the informant's identity completely disregards the standard courts rely upon when determining whether disclosure of a confidential informant is required.

*United States v. Andrus,* 775 F. 2d 825 (1985) is on point.  In *Andrus*, the court considered whether the trial court erred in denying defendants' motion to disclose the identity of the informant.  775 F. 2d at 842.  In this case, the defendants wanted the informant's identity disclosed to impeach two witnesses regarding their participation in the drug conspiracy and to show bias which would cause them to testify falsely against the defendants.  *Id.* at 841.  The court found that the only possible value of the informant's testimony to the defendants would have been to implicate the witnesses as persons who were involved in the distribution of cocaine and methaquallone.  *Id.* at 842.  These witnesses admitted to the use of cocaine and being involved in cocaine transactions.  *Id.*  Consequently, the informant would merely have provided cumulative information.  *Id.*  Therefore, the court held the trial court properly denied defendants' motion for disclosure because they did not show a genuine need for the identity of the informant.  *Id.*

In the instant case, Defendant is seeking informant information for a similar reason as the defendants in the *Andrus* case.  Specifically, Defendant represents that he wants the identity of the informant disclosed to meet with the informant and determine whether the informant will offer impeaching testimony of the government's witnesses.  As the court found in *Andrus*, this explanation is insufficient for Defendant to meet his

burden of demonstrating a genuine need for the identity of informant.  This is particularly

true because the government witnesses, Radonovich and Rodriguez, are expected to

testify as to their participation in numerous criminal acts, including Radanovich

kidnapping her own grandmother for ransom.  Moreover, the confidential informant in

the instant case is not an alleged eye witness or participant to the charges pending against

Defendant, and therefore, the identity of the confidential informant should not be

disclosed.  *See*, e.g., *U.S. v. Bender*, 5 F. 3d 267, 270 (7th Cir. 1993) (Court did not

require disclosure of the informant when informant was not a transactional witness, or an

active participant in the investigation leading to arrest).

## II.     DEFENDANT'S REQUEST FOR INFORMANT'S IDENTITY IS NOTHING MORE THAN A "FISHING EXPEDITION."

Defendant assumes that, if this informant can be located, the informant will agree

to meet with defense counsel and then implicate himself in criminal conduct.  This result

is highly unlikely.  It is unrealistic to expect that a police informant would meet with

unknown lawyers and investigators and admit to criminal conduct.  This is nothing more

than a veiled attempt by the defense at a "fishing expedition."  Case law is clear –

informant information may not be released if the request made for such information is not

made in good faith and is intended as a general "fishing expedition."  *United States v.*

*Nixon*, 418 U.S. 683, 699-700 (1974).

## III.    PROTECTING THE IDENTITY OF CONFIDENTIAL INFORMANTS IS NECESSARY TO THEIR SAFETY AND FURTHERING LAW ENFORCEMENT PURPOSES.

Defendant wants information so that he can try and locate and interview a

confidential informant.  However, the Chicago Police Department strives to protect the

identities of individuals who cooperate with law enforcement officials.  The cooperation

of informants assists Chicago Police in crime prevention and crime solving. It is fair to assume that, if informants knew that their names would be made public and that they would be tracked down and interviewed about alleged criminal conduct, they would be hesitant to assist the Chicago Police.

As the *Bender* court duly noted, "Understandably, not many people want to become police informants in light of the violence within the drug subculture. Drug dealers are not known for treating informers with compassion… Disclosing the informant's identity could have compromised those investigations as well as the informant's own safety." *Bender,* 5 F. 3d at 270. In the instant case, the informant had an interest in keeping his or her identity private, and defense counsel has not met the burden requiring disclosure.

While Defendant acknowledges "the need to protect law enforcement informants is grounded in the desire to encourage citizen cooperation while protecting 'innocent informers,' Defendant fails to appreciate the need for this privilege even after an individual is no longer an informant. However, the safety concerns for informants remain even after they no longer work as informants, and the confidential informant privilege is necessary so that individuals continue to cooperate with law enforcement. If informants believe their identity will be released once they no longer provide information, they may be fearful to cooperate with law enforcement in the first instance.

**WHEREFORE,** the City of Chicago, respectfully requests the portion of the subpoena duces tecum served upon the Chicago Police Department, Records Division, requesting files with the informant's name and last known address be quashed. In the

alternative, the City requests that a protective order concerning the documents be entered

limiting the dissemination of the documents at issue.

Respectfully Submitted,

STEPHEN R. PATTON
Corporation Counsel of the City of Chicago

BY:   /s/ *Karen M. Coppa*
      Karen Coppa
      Chief Assistant Corporation Counsel

Karen M. Coppa
Chief Assistant Corporation Counsel
Tia Mathew
Assistant Corporation Counsel
Legal Information, Investigations, and Prosecutions Division
33 North LaSalle Street, 2nd. Floor
Chicago, Illinois 60602
(312) 744-0741

# IN THE UNITED STATES DISTRICT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 09 CR 00332** |
| **v.** | ) | |
| | ) | **Hon. Judge Gottschall** |
| **GLEN LEWELLEN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## NOTICE OF MOTION

TO:    Andrea E. Gambino                    Terra Reynolds
       53 W. Jackson Blvd., Ste. 224        U.S. Attorney's Office
       Chicago, Illinois 60604             219 S. Dearborn St., 5th Floor
                                           Chicago, IL 60604

   **PLEASE TAKE NOTICE** that on October 31, 2011, petitioner, City of Chicago, electronically filed *Petitioner's Reply to Defendant's Response to City's Motion to Quash Subpoena Duces Tecum*  with the Clerk of the United States District Court for the Northern District of Illinois.

   I hereby certify that I have served this notice and the attached document by causing it to be electronically filed to all parties who are "ECF" filers in this matter this 31st day of October, 2011.

   **DATED** at Chicago, Illinois, this October 31, 2011.

                              By:    */s/ Karen M. Coppa*
                                     Karen M. Coppa
                                     Chief Assistant Corporation Counsel

Karen M. Coppa
Chief Assistant Corporation Counsel
Tia Mathew
Assistant Corporation Counsel
Legal Information, Investigations, and Prosecutions Division
33 North LaSalle Street, 2nd. Floor
Chicago, Illinois 60602
(312) 744-0741

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*DEFENDANT GLENN LEWELLEN'S MOTION TO DISCLOSE*
*BRADY/GIGLIO INFORMATION ABOUT ANTONIO ZEPEDA CONTRERAS*

Defendant GLENN LEWELLEN, through his attorneys, Andréa E. Gambino

and Matthew J. Madden, pursuant to *Brady, Giglio*, and their progeny, respectfully

requests an Order, requiring the government to provide contact information for

Antonio Zepeda Contreras.  In support of this Motion, defendant GLENN

LEWELLEN, through counsel, states the following:

(1)      In *Brady v. Maryland,* 373 U.S. 83 (1963), the Supreme Court held that due

process requires the prosecution to provide the defense upon request any evidence

favorable to the accused which is material either to guilt or to punishment. *Id.* at

88.  In *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972),

the Supreme Court held that the government's *Brady* obligation to provide evidence

to the defense encompasses evidence affecting a government witness' credibility.

405 U.S. at 154. The obligation extends beyond the trial prosecutor to "the

government." *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481

(1985).  *See also, United States v. Burnside*, 824 F. Supp. 1215, 1250 (N.D. Ill.

1993)(reviewing history and scope of government's obligation).

(2)     The government's primary co-operating witness, SAUL RODRIGUEZ, alleges

that "in or around 2000 and 2001" Andres Torres told Rodriguez that he was

delivering drug proceeds for "Tono".  Rodriguez alleges that based on information

from Andres Torres, Fares Umar, Andres Torres, and Glenn Lewellen robbed Tono's

drug courier of $1.5 million, a bullet proof vest, and a gun.

(3)     Andres Torres identifies "Tono" as Antonio Zepeda Contreras.

(4)     On November 18, 2010, Special Agent Mike Stone, Task Force Officer Mike

Tate, and Assistant United States Attorney Terra Reynolds interviewed Antonio

Zepeda Contreras.

(5)     Mr. Zepeda Contreras acknowledged knowing Andres Torres, but he stated

that he never directed Torres to deliver boxes or packages in 2001.  Contreras also

denied directing Torres to deliver $1.5 million.  He further stated that he did

construction jobs in 2001 and was never involved in selling drugs.

(6)     Mr. Zepeda Contreras impeaches both Andres Torres and Saul Rodriguez

about an event that allegedly occurred and involved Mr. Lewellen.  Mr. Zepeda

Contreras' testimony may be considered *Brady* information, because it could be

used to rebut the testimony of Rodriguez and Torres and to support Glenn

Lewellen's  position that the alleged incident never happened.  At the very least,

Zepeda Contreras' testimony must be considered *Giglio* information in that it impeaches the allegations of Rodriguez, Torres, and Umar.

(7)     Counsel for Mr. Lewellen requested contact information for Mr. Zepeda Contreras from the government and the government has refused to provide it.  *See, Exhibit 1, e-mail requests and responses.*

(8)     The government's refusal to provide this information must be viewed as withholding *Brady/Giglio* information to which Mr. Lewellen is entitled.  The name of a witness who has exculpatory or impeaching information does little good without the ability to find and subpoena the witness for trial.

(9)     Mr. Lewellen's investigator has attempted to find Mr. Zepeda Contreras, but has been unable to do so because he does not have any data other than Mr. Zepeda Contreras' name and an address where he allegedly lived in 2009.

WHEREFORE,   defendant GLENN LEWELLEN, by his attorneys, respectfully requests that the government provide contact information for Antonio Zepeda Contreras to the defense.

In the alternative, Mr. Lewellen requests that the government be barred from introducing any testimony from the government's cooperating witnesses about the alleged robbery of drug proceeds allegedly belonging to Antonio Zepeda Contreras.

DATE:      October 31, 2011          Respectfully submitted,

                                     By:     s/Andréa E. Gambino
                                             s/Matthew J. Madden

3

Attorneys for Glenn Lewellen

Law Offices of Andrea E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

4

CERTIFICATE OF SERVICE

I hereby certify that the above document has been filed using the CM/ECF

system.  Electronic notice has been sent to the following parties:

Counsel for co-defendants

Terra Reynolds
Steven Block
Tiffany Tracy
Assistant United States Attorneys


DATE:          October 31, 2011          Respectfully submitted,

                                          By:     s/Andrea E. Gambino
                                                  An Attorney for Glenn Lewellen

Law Offices of Andrea E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014



**Andrea Gambino <agambinolaw@gmail.com>**

# Antonio Zepeda Contreras

4 messages

---

**Andrea Gambino <agambinolaw@gmail.com>**                      **Mon, Oct 24, 2011 at 1:41 PM**
To: "Reynolds, Terra (USAILN)" <Terra.Reynolds@usdoj.gov>, "steven.block"
<Steven.Block@usdoj.gov>, "Tracy, Tiffany (USAILN)" <Tiffany.Tracy@usdoj.gov>
Cc: Matthew Madden <matt@mjmaddenlaw.com>

Counsel:
We would like the last known telephone number, address, date of birth, social security number, or
other identifying information for Mr. Antonio Zepeda Contreras, whom you interviewed on November
18, 2010, DEA6_019_0570.

The interview does not state that he was represented by counsel.  If he has, to your knowledge,
obtained counsel in the interim, please let us know that too.

Andrea

--
Andrea E. Gambino
Law Offices of Andrea E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014 or (312) 952-3056
fax:  (312) 341-9696

---

**Reynolds, Terra (USAILN) <Terra.Reynolds@usdoj.gov>**          **Mon, Oct 24, 2011 at 1:44 PM**
To: Andrea Gambino <agambinolaw@gmail.com>, "Block, Steven (USAILN)"
<Steven.Block@usdoj.gov>, "Tracy, Tiffany (USAILN)" <Tiffany.Tracy@usdoj.gov>
Cc: Matthew Madden <matt@mjmaddenlaw.com>

Andrea,


We have provided you with the biographical information we have on file for Mr. Zepeda-Contreras.
To our knowledge, he is not represented by counsel.


Thank you.

Terra Reynolds

---

**From:** Andrea Gambino [mailto:agambinolaw@gmail.com]

**Sent:** Monday, October 24, 2011 1:41 PM
**To:** Reynolds, Terra (USAILN); Block, Steven (USAILN); Tracy, Tiffany (USAILN)
**Cc:** Matthew Madden
**Subject:** Antonio Zepeda Contreras

[Quoted text hidden]

---

**Andrea Gambino <agambinolaw@gmail.com>**                     **Mon, Oct 24, 2011 at 2:17 PM**
To: "Reynolds, Terra (USAILN)" <Terra.Reynolds@usdoj.gov>, "steven.block"
<Steven.Block@usdoj.gov>, "Tracy, Tiffany (USAILN)" <Tiffany.Tracy@usdoj.gov>
Cc: Matthew Madden <matt@mjmaddenlaw.com>

Terra,
I have gone through the index of statements, criminal histories, grand jury, etc., and I do not find
anything other than the one report. I must be overlooking something.  Would you please tell me
whether and where I might find additional information about him?  Your agents must at least have a
phone number, since he did appear at your office for an interview.

The report that I have does not provide any biographical information other than his name.

Thanks,
Andrea
[Quoted text hidden]

---

**Reynolds, Terra (USAILN) <Terra.Reynolds@usdoj.gov>**          **Mon, Oct 24, 2011 at 2:44 PM**
To: "agambinolaw@gmail.com" <agambinolaw@gmail.com>, "Block, Steven (USAILN)"
<Steven.Block@usdoj.gov>, "Tracy, Tiffany (USAILN)" <Tiffany.Tracy@usdoj.gov>
Cc: "matt@mjmaddenlaw.com" <matt@mjmaddenlaw.com>

Andrea,

We have not included antonio zepeda-contreras on our witness list. As such, I don't believe
we are obligated to turn over his contact information that may be contained in other reports
or a law enforcement database.

Thanks.
Terra

---

**From**: Andrea Gambino [mailto:agambinolaw@gmail.com]
**Sent**: Monday, October 24, 2011 03:17 PM
**To**: Reynolds, Terra (USAILN); Block, Steven (USAILN); Tracy, Tiffany (USAILN)
**Cc**: Matthew Madden <matt@mjmaddenlaw.com>
**Subject**: Re: Antonio Zepeda Contreras

[Quoted text hidden]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, *et al*. | ) | |

## GOVERNMENT'S CONSOLIDATED MOTIONS *IN LIMINE*

The UNITED STATES OF AMERICA, by and through its attorney, PATRICK J.

FITZGERALD, United States Attorney for the Northern District of Illinois, hereby moves *in limine* as

follows:

## I.  MOTION TO BAR ARGUMENT & EVIDENCE REGARDING WITNESS MISCONDUCT OUTSIDE THE SCOPE OF RULES 609 & 608(b)

The government has produced to defense counsel, and will continue to produce to defense

counsel as necessary, materials setting forth potential impeachment material for the witnesses in this

case.  In an abundance of caution, the government has produced various materials that do not constitute

admissible impeachment.  Of course, the mere fact that the government has produced to the defense a

fact or an allegation does not render it admissible at trial.  By this motion, the government moves this

Court to preclude defense counsel from introducing at trial, during the cross-examination of government

witnesses, improper impeachment questioning or evidence.

### A.      Convictions of Government Witnesses

Several of the government's witnesses have been convicted of felony offenses.  Federal Rule of Evidence 609(a) permits the admission of evidence that a witness has been convicted of a felony, for the purpose of attacking that witness' credibility, only "if the court determines that the probative value of the evidence outweighs its prejudicial effect."  Fed. R. Evid. 609(a).  Federal Rule of Evidence 609(b) bars the admission of evidence of a conviction over 10 years old "unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect."  Fed. R. Evid. 609(b).  Furthermore, evidence of a conviction more than 10 years old "is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence."  *Id*.

In this case, several of the government's witnesses have convictions that are more than 10 years old.  Defense counsel have not given the government written notice of its intent to use evidence of those witnesses' convictions.  As such, the government asks that this Court bar defense counsel from arguing or presenting evidence of those witnesses' convictions that are more than 10 years old.  To the extent that defense counsel intends on offering evidence of a witness' conviction (other than a conviction stemming from the instant case) under Rule 609(a), it should present that evidence to the Court so that it may determine whether the probative value of the conviction substantially outweighs its prejudicial effect.

2

### B.        Arrests of Government Witnesses

Several of the government's witnesses have been arrested on prior occasions.  Evidence of a

prior arrest should be precluded in accordance with the strictures of Rules 609 and 608.[1]  Federal Rule

of Evidence 609 allows for the admission of a witness' felony conviction for purposes of impeachment

under certain specified circumstances.  Under the Rule, "[f]or the purpose of attacking the credibility

of a witness, evidence that a witness other than an accused has been convicted of a crime shall be

admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one

year under the law under which the witness was convicted . . ."  Fed. R. Evid. 609.  By its express

terms, Rule 609 permits evidence only of convictions, not arrests.

Nor are arrests admissible under Federal Rule of Evidence 608(b).  Rule 608(b) provides that

specific instances of past conduct may be inquired into on cross-examination if and only if they concern

the witness's character for truthfulness.[2]  Courts have not construed Rule 608(b) to permit cross-

examination on prior *arrests* absent special facts bearing on the witness' character for the specific trait

of truthfulness.  Thus, in *United States v. Dennis*, 625 F.2d 782 (8th Cir. 1980), the Eighth Circuit held

---

[1]The government will elicit testimony from three government witnesses regarding certain
arrests because they constitute evidence of the racketeering and drug conspiracies.  First, the
government will elicit testimony from Refugio Ruiz-Cortez about his 1999 arrest by defendant Glenn
Lewellen on drug charges.  The arrest forms the basis of one of the instances in which Glenn
Lewellen obstructed justice in furtherance of the racketeering conspiracy.  Second, the government
will elicit testimony from David Venegas about his 2003 arrest by the Chicago Police Department
for the kidnapping of Victim H.  The arrest constitutes part of his conduct as an unindicted co-
conspirator in the racketeering conspiracy.  Third, the government will elicit testimony from Saul
Rodriguez about his 1996 arrest on drug charges by Glenn Lewellen and subsequent arrests by the
Chicago Police Department on weapons and drug charges.  The government has disclosed these
arrests, which do not appear on Saul Rodriguez' criminal history, to defense counsel as they
constitute part of his conduct as a co-conspirator in the racketeering and drug conspiracies.

[2]Even then, these past instances may not be proved by extrinsic evidence.  *See* Fed. R. Evid.
608(b).

3

that a witness may not be cross-examined about an arrest except where Rule 608(b) would permit inquiry into specific acts leading up to the arrest that related to crimes of falsity – *e.g.*, perjury, subornation of perjury, or false pretenses.  *See also United States v. Sellers*, 906 F.2d 597, 603 (11th Cir. 1990).  Unless and until defendants can demonstrate that the conduct underlying the arrest implicates a witness's character for truthfulness, defendants should be precluded from inquiring into the conduct.  The government moves for an order precluding the defense from inquiring into any arrest that did not result in a conviction.

### C.        Other Bad Acts of Government Witnesses

Under Federal Rules of Evidence 611 and 608(b), a defendant is permitted to inquire into specific bad acts of the witness only if these acts are probative of truthfulness.  *See, e.g., United States v. Van Dorn*, 925 F.2d 1331, 1336-37 (11th Cir. 1991) (threats made by witness to judicial officers in a prior drug prosecution not relevant to a witness' truthfulness); *United States v. McNeill*, 887 F.2d 448, 453 (3d Cir. 1989) (solicitation to commit a crime of violence is not probative of truthfulness); *United States v. Bentley*, 706 F.2d 1498, 1509-10 (8th Cir. 1983) (evidence of witness' involvement in drug operation not proper impeachment under Rule 608(b)); *United States v. Fortes*, 619 F.2d 108, 117-18 (1st Cir. 1980) (affirming trial court's refusal to allow cross-examination concerning witness' involvement in sale of cocaine on ground that selling cocaine is not probative of truthfulness or untruthfulness under Rule 608(b)); *United States v. Young*, 567 F.2d 799, 803 (8th Cir. 1977) (disallowing cross-examination of government witness concerning her alleged offer to pay $10,000 to have her husband killed, because "the proposed question was not relevant to veracity and honesty and would have been highly prejudicial").  Accordingly, defendants should be precluded from inquiring into specific bad acts of a witness without first demonstrating how those acts are probative of truthfulness.

## II.    MOTION TO RECALL WITNESSES

The government moves this Court pursuant to Fed. R. Evid. 611(a) to permit the government

to recall the case agent, David Reynolds, the case task force officer, James Healy, and medical examiner

Dr. J. Scott Denton, so that testimony can be presented to the jury in an orderly and understandable

manner and in a manner most effective for ascertaining the truth.[3]

Federal Rule of Evidence 611(a) provides:

> The Court shall exercise reasonable control over the mode and order of interrogating witnesses
> and presenting evidence so as to (1) make the interrogation and presentation effective for the
> ascertainment of the truth. . . .

Fed. R. Evid. 611(a).  Moreover, the mode and order of interrogation are within the discretion of the

trial court, *see United States v. Jackson*, 549 F.2d 517, 528 (8th Cir.), *cert. denied*, *Muhammad v.*

*United States*, 430 U.S. 985 (1977), and allowing the sequential presentation of testimony is entrusted

to a district court's discretion under Fed. R. Evid. 611(a), *see United States v. Butera*, 677 F.2d 1376,

1381 (11th Cir. 1982), *cert. denied*, 459 U.S. 1108 (1983).  The procedure of permitting witnesses to

testify in episodal or chronological order has been approved in complex conspiracy cases.  *See Jackson*,

549 F.2d at 528 (undercover agent recalled from time to time to testify about individual transactions

in chronological order); *see also Butera*, 677 F.2d at 1381 (recalling principal witness was proper since

the witness was subject to cross-examination at each appearance as to the matters covered during that

portion of direct examination).

This racketeering and drug conspiracy case involves a years-long investigation of the Saul

Rodriguez Enterprise and the Saul Rodriguez Drug Trafficking Organization.  At trial, some of the

---

[3]As of this time, the government only anticipates recalling these three witnesses.  Should this change,
however, the government will advise the court and believes that the analysis set forth in the motion would
apply to any additional recalled witnesses.

evidence will be presented through the testimony of law enforcement and expert witnesses. For the jury

to fully understand the agents', officers', and experts' testimony, it is necessary to present the evidence

in an episodal manner, proceeding from event to event and defendant to defendant. Agent Reynolds

and Task Force Officer Healy have been involved in the investigation of defendants since its inception

and will provide testimony regarding several matters that occurred at different times and that involved

different defendants. With respect to Dr. Denton, he performed the autopsies of Michael Garcia and

Miguel De La Torre, two of the murder victims in this case. The murders of Michael Garcia and

Miguel De La Torre are two separate events and involve different defendants and witnesses.

Accordingly, the government respectfully requests that the Court permit the government to

recall Agent Reynolds and Task Force Officer Healy from time to time to testify to events in an episodal

manner, and Dr. Denton to testify about the two autopsies he performed in this case. To safeguard the

rights of defendants, the government further proposes that after each discrete episode, and after each

instance of direct examination, defendants be permitted to cross-examine Agent Reynolds, Task Force

Officer Healy, and Dr. Denton fully about any and all matters presented during the direct examination.

## III.    MOTION TO BAR ARGUMENT & EVIDENCE OF LAWFULNESS & NON-CORRUPT CONDUCT

The government moves the Court to exclude all evidence offered by defendants of their

lawfulness and/or non-corrupt conduct, except reputation or opinion evidence offered by character

witnesses strictly in accord with the limitations of Federal Rule of Evidence 405(a).[4]   Other than

---

[4]Even evidence offered under Rule 405(a), of course, cannot include specific instances of good conduct:  it is limited to a description of the subject's reputation or to a brief statement of opinion, without support from specific instances of conduct.  *See* Advisory Committee Notes to Rule 405 (The rule "contemplates that testimony of specific instances is not generally permissible on direct examination of an ordinary opinion witness to character . . . .  [O]pinion testimony on direct
(continued...)

testimony from character witnesses fitting within the narrow confines of Rule 405(a), no such evidence is admissible.

Under Federal Rules of Evidence 404(a)(1) and 403, a defendant is only entitled to offer evidence of a "pertinent trait of [his own] character," though such evidence can be excluded if its "probative value is substantially outweighed by the dangers of unfair prejudice." The Seventh Circuit has defined "character trait" in this context as "elements of one's disposition, 'such as honesty, temperance, or peacefulness.' McCormick on Evidence § 195," *United States v. West*, 670 F.2d 675, 682 (7th Cir. 1982). If defendants seek to introduce evidence of a non-pertinent character trait, such as whether they are good husbands, fathers or friends, that evidence should be excluded. *See, e.g., United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming district court's decisions to exclude proposed testimony from defendant's mother and girlfriend that he was a family man who was not predisposed to have or deal drugs). The Seventh Circuit has cast doubt as to whether "law-abidingness" is a pertinent character trait. *See United States v. Hill*, 40 F.3d 164, 169 (7th Cir. 1994). Moreover, district courts have excluded evidence that a defendant engaged in law-abiding activity on other occasions. *See United States v. Warner*, 396 F.Supp.2d 924, 941-42 (N.D. Il. 2005) (finding that a defendant's "personal integrity" was not a pertinent character trait, as the fact that a defendant was conducting some legitimate activities did not exclude him committing criminal activities at the same time).

To the extent that the defendants do seek to introduce evidence admissible under Federal Rule of Evidence 404(a)(1), they can do so only in accord with the limitations of Rule 405(a), which states

---

[4](...continued)
in these situations ought in general to correspond to reputation testimony as now given, *i.e.* be confined to the nature and extent of observation and acquaintance upon which the opinion is based").

that "proof may be made by testimony as to reputation or by testimony in the form of an opinion" and

which allows testimony about "relevant specific instances of conduct" only upon cross-examination.

In an effort to distract the jury from the charges the defendants face, defendants may seek to have

witnesses testify that on some prior occasions the defendants engaged in legitimate transactions, or in

defendant Glenn Lewellen's case acted lawfully in the scope of his duties as a Chicago police officer,

or was an otherwise law-abiding citizen at times.  Any evidence or argument of this sort is inadmissible,

and the Court should exclude it.  The law is clear:  "A defendant may not seek to establish his

innocence . . . through proof of the absence of criminal acts on [other] specific occasions."  *United*

*States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990) (excluding taped proof that defendants met regularly

and did not discuss criminal activity).  Evidence of other lawful behavior is irrelevant because acts of

honesty do not prove an absence of dishonest acts.  *See, e.g., id.; United States v. Beno*, 324 F.2d 582,

589 (2d Cir. 1963) ("Evidence of noncriminal conduct to negate the inference of criminal conduct is

generally irrelevant."); *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978) (upholding

exclusion of evidence that used car dealer paid for some cars instead of stealing them); *United States*

*v. Stokes*, No. 07 CR 590, 2011 U.S. Dist. LEXIS 73113, *5-6 (N. D. Il. July 7, 2011) (Pallmeyer)

(excluding evidence of law-abiding activity after the execution of a search warrant).

To hold otherwise would be to eviscerate the carefully drafted limitations of Rule 405, which

forbids proof of good character through evidence of specific acts where character is not an element of

the charge or defense.  *See Beno*, 324 F.2d at 584, 587.  Like Rule 403, Rule 405 is intended to prevent

the series of wasteful "mini-trials" which would inevitably ensue if the defendant were allowed to

pursue this irrelevant line of inquiry.  The Advisory Committee Notes for Rule 405 conclude that proof

of character by means of specific acts "possesses the greatest capacity to arouse prejudice, to confuse,

to surprise, and to consume time." *See, e.g., Grimm*, 568 F.2d at 1136 (evidence of lawful transactions "could have complicated the case and confused the jury").

## IV.    CONCLUSION

WHEREFORE, the government respectfully requests that this Court grant the foregoing motions *in limine*.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:    s/ Terra Reynolds_____
TERRA REYNOLDS
STEVEN A. BLOCK
TIFFANY J. TRACY
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300


Date: October 31, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, *et al*. | ) | |

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

### GOVERNMENT'S CONSOLIDATED MOTIONS *IN LIMINE*

was served pursuant to the district court's ECF system.

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney

By:    s/ Terra Reynolds
TERRA REYNOLDS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL  60604
(312) 353-3148

Dated: October 31, 2011

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No. 09 CR 332-2 |
| v. | ) |
| | ) Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION TO DISCLOSE THE SPECIFIC TIME, DAY & LOCATION OF THE
## <u>CHARGED KIDNAPPING ON SEPTEMBER 11, 2001</u>

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United

States Attorney for the Northern District of Illinois, hereby responds to defendant Glenn Lewellen's

motion to disclose the specific time of day and location of the charged kidnapping on September 11,

2001.

On October 24, 2011, the government requested pursuant to Federal Rule of Criminal

Procedure 12.1(a)(1) that defendant Glenn Lewellen provide notice of any intended alibi defense

pertaining to the kidnapping of Victim A and Victim B on September 11, 2001. The government

anticipates that Saul Rodriguez and Fares Umar will testify about their involvement and the

involvement of defendant Glenn Lewellen in this kidnapping, which resulted in the seizure of at least

80 kilograms of cocaine. On Monday, October 31, 2011, the government met with Fares Umar, who

informed the government that the kidnapping occurred during the daylight hours of September 11,

2011. The government has previously disclosed to defense counsel that the kidnapping took place

in Will County.

Based on the foregoing information, the government respectfully requests that this Court

order defendant Glenn Lewellen to provide the government with notice of an alibi defense as to this

kidnapping no later than end of business on November 15, 2011 as required by Federal Rule of

Criminal Procedure 12.1(a)(2).

Respectfully submitted,


PATRICK J. FITZGERALD
United States Attorney


By:      /s Terra Reynolds
         TERRA REYNOLDS
         STEVEN A. BLOCK
         TIFFANY J. TRACY
         Assistant United States Attorneys
         United States Attorney's Office
         219 S. Dearborn St., 5th Floor
         Chicago, Illinois  60604

Dated: November 1, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332-2 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO DISCLOSE THE SPECIFIC TIME, DAY & LOCATION OF THE
CHARGED KIDNAPPING ON SEPTEMBER 11, 2001**

was served pursuant to the district court's ECF system.

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney


By:     s/ Terra Reynolds
TERRA REYNOLDS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL  60604
(312) 353-3148


Dated: November 1, 2011

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA          ) | |
| ) | No. 09 CR 332-2 |
| v.                    ) | |
| ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN                   ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION TO DISCLOSE BRADY/GIGLIO INFORMATION

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby responds to defendant Glenn Lewellen's motion to disclose Brady/Giglio information about Antonio Zepeda Contrearas and asks that the motion be denied.

As set forth in the government's *Santiago* proffer (Doc. 531 at 44-48), in or around 2001 Saul Rodriguez' brother-in-law, Andres Torres, told Saul Rodriguez that he was collecting and delivering cocaine proceeds for Antonio Zepeda Contreras.  Working with Andres Torres, Saul Rodriguez, Fares Umar, and defendant Glenn Lewellen conducted surveillance of Antonio Zepeda Contreras' money courier to whom Andres Torres delivered the cocaine proceeds.  That surveillance resulted in the identification of the home in which the money courier stored the cocaine proceeds Andres Torres delivered to him.  Saul Rodriguez, Fares Umar, and defendant Glenn Lewellen subsequently entered the home by force, restrained the money courier inside, and took two duffle bags containing approximately $1,500,000 in cocaine proceeds.  Saul Rodriguez, Fares Umar, Andres Torres, and defendant Glenn Lewellen each received a share of the cocaine proceeds.

The government expects that cooperating co-conspirators Saul Rodriguez, Fares Umar, and Andres Torres will testify against defendant Glenn Lewellen about the foregoing incident.  On

November 18, 2010, the government met with Antonio Zepeda Contreras, who denied having directed Andres Torres to collect and deliver drug proceeds on his behalf.  Antonio Zepeda Contreras further denied having ever been involved in selling drugs.  The government complied with its obligations pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), by providing defense counsel a copy of the report of the government's interview of Antonio Zepeda Contreras.[1]  In addition, the government has tendered to defense counsel numerous reports documenting Antonio Zepeda Contreras' last known address.  Based on the undersigned's conversations with law enforcement involved in this case, the government does not have a current telephone number for Antonio Zepeda Contreras.

The government does not believe that it possesses the information defendant seeks.  Thus, if the Court were to grant defendant's motion, the government would be required to affirmatively investigate and identify Antonio Zepeda Contreras' current contact information – a task defendant can and should complete with the assistance of his paid investigator.  Even if the government had the current contact information for Antonio Zepeda Contreras, *Brady* does not create an obligation to provide contact information for all witnesses to a case.  *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably.  There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one."); *see also*, *United States v. Ruiz*, 536 U. S. 622, 630 (2002) ("But the Constitution does not require the prosecutor to share all useful information with the defendant."(citing *Weatherford v.*

---

[1] The government also disclosed to defense counsel an August 2008 interview of Antonio Zepeda Contreras in which he admitted to DEA agents that he had delivered $70,000 in narcotics proceeds to an unknown male in the western suburbs of Chicago.

2

*Bursey*)).  Although the defense might find the information requested helpful, there is no underlying

constitutional right of access to it.  *United States v. Reyes*, 270 F.3d 1158, 1166 (7th Cir. 2001)

("*Brady* does not require a prosecutor to divulge every scintilla of evidence that might conceivably

inure to a defendant's benefit.").

       Based on the foregoing, the government respectfully requests that this Court deny defendant's

motion.

                                  Respectfully submitted,


                                  PATRICK J. FITZGERALD
                                  United States Attorney


By:     /s Terra Reynolds
                                  TERRA REYNOLDS
                                  STEVEN A. BLOCK
                                  TIFFANY J. TRACY
                                  Assistant United States Attorneys
                                  United States Attorney's Office
                                  219 S. Dearborn St., 5th Floor
                                  Chicago, Illinois  60604

Dated: November 1, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332-2 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR DISCLOSURE OF
BRADY/GIGLIO INFORMATION**

was served pursuant to the district court's ECF system.

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney

By:    s/ Terra Reynolds
TERRA REYNOLDS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL  60604
(312) 353-3148

Dated: November 1, 2011

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | Case No. 09 CR 332-2 |
| v. | |
| | The Honorable Joan B. Gottschall |
| GLENN LEWELLEN | |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTIONS *IN LIMINE***

**I.    Evidence of lawful & non-corrupt conduct**

Counsel has no intention of taking the jury through a laundry list of benign activities that

Mr. Lewellen engaged in during his years of service with the Chicago Police Department, or in

any other facet of his life.  However if, as expected, the government alleges or implies that

certain lawful activity of Mr. Lewellen was unlawful or improper, counsel certainly intends to

elicit evidence rebutting that allegation.

For example the government has alleged in its filings that Mr. Lewellen's actions were

improper when he reached out to the DEA on behalf of government witness Saul Rodriguez, who

at that time was working as a confidential informant for the Chicago Police Department.  As an

informant Rodriguez was proven to be highly valuable to the CPD by consistently providing

information leading to large seizures of narcotics, primarily cocaine.  While working as a CPD

informant Rodriguez was still involved in illegal narcotics transactions.  In June 1996, the DEA

was involved in a large marijuana seizure that made it apparent to Rodriguez that the DEA

investigation was moving closer to ensnaring him.  Rodriguez told Mr. Lewellen about the

seizure.  Mr. Lewellen twice contacted DEA Agent Doescher, the agent in charge of the

investigation, and explained that he was a Chicago Police Officer and that Saul Rodriguez was a

valuable confidential informant against high-level narcotics distributors in the Chicago area.  He

further explained that the DEA's investigation threatened the valuable work that Rodriguez was

involved in with the CPD.  Mr. Lewellen simply provided information regarding Saul

Rodriguez's role as a confidential informant and obviously had no authority to force any agency

to terminate a federal investigation.  Agent Doescher relayed the information to the Assistant

United States Attorney in charge of the investigation.  The United States Attorney's Office in

Chicago concurred in the decision to terminate the DEA investigation into Rodriguez in order to

preserve the CPD's investigations in which Rodriguez was serving as an informant.

   Despite the fact that their own office signed off on the decision to terminate the

investigation, the prosecutors in this case have repeatedly cited this incident as evidence

supporting the charged conspiracies in this case.  This allegation has also been reported in the

news media covering this case.  Of course, the implication that Mr. Lewellen's actions in this

regard were illegal or in furtherance of the charged conspiracy is ludicrous, as it was the DEA

and U.S. Attorney's Office who made the ultimate decision to terminate the investigation, not

Mr. Lewellen.

   In the event that the government disingenuously frames the decision to terminate the

investigation as if it represents illegal or improper activity by Mr. Lewellen, the defense does

intend to present evidence of the lawful activity in this regard.  Evidence would be presented

through Agent Doescher and the former Assistant United States Attorney that the conduct

surrounding the decision to terminate the investigation does not represent illegal, improper, or

even particularly uncommon conduct by law enforcement.  If, on the other hand, the government

is actually alleging that Agent Doescher and the United States Attorney's Office were also

engaged in improper or illegal conduct in terminating the investigation, the analysis may be

different.

The government motion seeking to generally bar all evidence of lawful or non-corrupt

activity should be denied, as they have already telegraphed their intention, in at least one

instance, to frame evidence of Mr. Lewellen's lawful activity as unlawful or improper. Mr.

Lewellen is entitled to respond to this disingenuous implication by the government by pointing

out that his actions regarding the 1996 investigation were neither improper, nor illegal.

## II.    Evidence regarding Government witness misconduct

With a broad stroke in a canned section of the motion, and without specific facts, the

government seeks an order of the Court barring improper impeachment of government witnesses

regarding other bad acts. The absence of particularity creates the risk that any preliminary ruling

by the Court at this stage would constitute nothing more than a bland rendition of general rules

of law that would not provide any real guidance regarding the issue. Witnesses Saul Rodriguez,

David Venegas, Lisette Venegas, and others participated in a myriad of bad acts for which they

have not been charged. While these acts are certainly relevant to numerous issues in the case, it

is not clear what previous acts of government witnesses are intended to be included in the

government's vague request. Given the vagueness of the government's request, its motion

should be denied. To the extent the government's motion seeks compliance with Rule 608 and

611 of the Federal Rules of Evidence, the government's motion should be denied as moot

because Mr. Lewellen intends to comply with both Rules of Evidence.

As to the convictions of government witnesses from over ten years ago, counsel is aware

of the Rules of Evidence and will give proper notice to the government of any intention to cross

examine regarding an old conviction in the event that it become necessary.

Counsel is also aware of the general limits regarding cross-examination regarding

previous arrests and has no intention to violate those obvious restrictions.  However, a blanket

ruling instructing counsel to be in compliance of the Federal Rules of Evidence is not appropriate

in this case.  It is not beyond the realm of possibility that a prior arrest of a witness becomes

relevant based on what the specific testimony of the witness.  For example, the fact that certain

government witnesses know Glenn Lewellen because they were arrested by him when he worked

for the CPD may be relevant cross examination for an array of reasons.  The government's

motion in this regard should be denied.

## III.   Motion to recall witnesses

The government presented insufficient justification for the necessity of recalling

witnesses "from time to time."  They have numerous strategic options of how to present their

case-in-chief such as presenting agent testimony to the jury before the more sullied cooperators

testify, or presenting agent testimony near the close of their case to wrap up any loose ends, or

even utilizing different agent testimony interspersed agent to break up the more questionable

characters on their witness list.  However, they have not justified why it is necessary to call the

same agents over and over again at their convenience and whim.  While the government clearly

would prefer for a government agent to be the "face" of their evidence versus such witnesses

such as Saul Rodriguez or Fares Umar, they should be required to choose a strategy in presenting

their witnesses and stick to it, just as the defense would be required to do.

This trial is already going to be quite lengthy without the government having unfettered

discretion to call a case agent, who already testified, to chime in on any issue they feel could be

mildly bolstered.  Adding to the problematic nature of this request is the fact that the agents

mentioned in the motion are integral to the prosecution team and will be at counsel table for all

testimony in the case.  While defense counsel is making no negative inferences regarding any

agent involved in the case, their testimony is a far cry from the desired blind testimony

underlying the concept of barring witnesses from the courtroom prior to testifying.  The

government has made the decision to charge a wide-ranging case, and they have had years to plot

their strategy concerning how to cogently present the case to a jury.  They should not be allowed

the advantage of calling well-versed, favored witnesses "from time to time" without a specific

showing regarding why it is necessary in a given situation.

In the alternative, if the Court is inclined to allow the government to recall certain

witnesses, those specified witnesses should be barred from the courtroom when they are not

testifying in order to avoid the possibility and appearance that the agent's second or third round

of testimony was influenced in any way by the testimony of other witnesses.

Respectfully submitted,

*Matthew J. Madden*
Matthew J. Madden
Attorney at Law

MATTHEW J. MADDEN
Attorney at Law
53 West Jackson Blvd., Suite 703
Chicago, IL 60604
(312) 212-1900

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,       )
                           Plaintiff,    )
                                    )
        v.                 )     No. 09 CR 332
                                    )     Judge Joan B. Gottschall
GLENN LEWELLEN,             )
                   Defendant.  )

*GLENN LEWELLEN'S SUPPLEMENTAL RESPONSE[1] TO GOVERNMENT'S
SECOND SANTIAGO PROFFER*

Defendant GLENN LEWELLEN, through counsel, respectfully submits the

following in Response to the Government's Second Santiago Proffer.

I.    Evidence of Lewellen's legitimate law enforcement activities from 1996-2002,
does not support a finding that he and Saul Rodriguez entered into an
agreement to accomplish any unlawful purpose beginning in 1996.

        A.    No evidence supports Saul Rodriguez' naked claims that he and Glenn
Lewellen began a "conspiracy" to conduct illegal activities in 1996.

The government seeks to establish the "founding" of the enterprise in 1996,

characterizing the informant – law enforcement officer relationship between Glenn

Lewellen and Saul Rodriguez as the initiation of the "Enterprise".  The government

further alleges that the purpose of the "Enterprise" was to make money and that

Saul Rodriguez and Glenn Lewellen agreed to participate in drug trafficking.  To

---

[1]  Glenn Lewellen submitted a response to the Government's First Santiago
Proffer.  *See,* Document 548, filed on 10/08/11.

establish the "agreement" between Lewellen and Rodriguez, the government has only the word of Saul Rodriguez.  This is insufficient under the law.

"While the admissibility of conspirators' declarations "is not contingent on demonstrating by non-hearsay evidence either the conspiracy or a given defendant's participation," *United States v. Martinez de Ortiz,* 907 F.2d 629, 634 (7th Cir.1990) (en banc), the contents of the proffered co-conspirator statements "are not alone sufficient" to establish the existence of a conspiracy and a defendant's participation in it. Fed.R.Evid. 801(d)(2)(E). In addition to the co-conspirator statements themselves, the Court must consider the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was made, or the evidence corroborating the contents of the statement. *United States v. Zambrana,* 841 F.2d 1320, 1344-45 (7th Cir.1988)." *United States v. Azteca Supply Co.,* 10 CR 80, 2010 WL 4962828 (N.D. Ill. Dec. 1, 2010).

The other proposed evidence:  testimony of law enforcement officers, CPD payroll records, CPD informant file, unspecified photographs, and financial records, all constitute evidence of legal activity – not evidence that Lewellen agreed to participate in any illegal conduct.  Law enforcement officers will testify that  Saul Rodriguez was a paid informant, that he provided information to Lewellen and others, that many officers acted upon Rodriguez's information, that officers, including Lewellen, made arrests, seized drugs, guns, money and other contraband

2

as a result of the information Rodriguez reported, and that officers – not Lewellen – approved and made payments to Rodriguez in return for his assistance.

CPD payroll records will establish that Glenn Lewellen served the City of Chicago as a police officer from approximately 1986 until 2003.  This is not evidence of an agreement to participate in illegal activities.  The CPD informant file will show that Saul Rodriguez was a CPD informant and that he was paid for his work in that capacity.  There will be no photographs of Glenn Lewellen involved in any illegal activity, nor will there be financial records that reflect illegal activity. There will be no evidence of any connection or agreement between Glenn Lewellen and any other alleged participant in the charged "conspiracy" to engage in any unlawful activity.

Rodriguez' continued drug trafficking does not constitute evidence of Glenn Lewellen's agreement to participate in that conduct, even if –assuming *arguendo*-he knew about his activities.

> B.     No evidence apart from the word of Saul Rodriguez supports a finding
>        that Glenn Lewellen obstructed a federal investigation in 1996.

Glenn Lewellen told federal agent Al Doescher that Saul Rodriguez was a valuable informant for the Chicago Police Department, who provided the Chicago police with information about high-level cocaine and marijuana dealers.  Al Doescher was investigating a case in which Saul Rodriguez was responsible for the possession of marijuana.

Agent Doescher consulted with then-Assistant United States Attorney Haywood McDuffie, who was responsible for the decision not to pursue the marijuana investigation against Saul Rodriguez in favor of the Chicago Police Department's use of Rodriguez for cocaine and marijuana dealers. The decision to discontinue the investigation of Rodriguez was not made by Glenn Lewellen. It was made by Haywood McDuffie, an Assistant United States Attorney. He was not beholden to Glenn Lewellen and did not communicate with Glenn Lewellen about the issue. Presumably, an Assistant United States Attorney would have been well within his rights to deny the request, if he felt that his investigation was more important than the information provided by Rodriguez to the Chicago Police. This is not evidence of willful obstruction of a federal investigation in any respect. Unless the government proposes to claim that its own office was involved in illegal conduct when it decided to forgo prosecution of Mr. Rodriguez, its claim that Mr. Lewellen obstructed federal investigation rings hollow and must not be considered evidence of a "conspiracy" between Mr. Rodriguez and Mr. Lewellen.

C.    Glenn Lewellen's 1999 testimony at the trial of Refugio Ruiz Cortez does not constitute participation in a conspiracy to perform an illegal act.

Glenn Lewellen testified truthfully at the federal drug trial of Refugio Ruiz Cortez. No evidence of any agreement to provide false testimony will be presented in this case. If the testimony of Saul Rodriguez is taken at face value, then he arranged the seizure of his own drugs at great financial loss to himself. He was not

present at the time or place of the seizure and so does not know what happened or how the arrest of Mr. Ruiz Cortez took place. Similarly, Lisette Venegas provides testimony about a drug delivery she made, but provides no date, time, or location for the delivery. Nor does she provide any information that would support a finding that Glenn Lewellen agreed with her or anyone else to undertake any illegal conduct.

The law enforcement officers the government will call at Mr. Lewellen's trial will not testify differently than they did at the time of Mr. Ruiz Cortez' trial. Based on all the testimony at Ruiz Cortez' trial, including Mr. Lewellen's testimony, Mr. Ruiz Cortez was found guilty. Subsequently, during the course of this investigation, Mr. Ruiz Cortez admitted that he was in possession of the 20 kilograms of cocaine for which he was convicted. Not only was he in possession of the 20 kilograms, but he had been hired to store at least 100 kilograms of cocaine in his house – all of which had been distributed by the time of his arrest for the remaining 20 kilograms.

Allowing the introduction of this alleged incident will require the re-trying of Mr. Ruiz-Cortez' case in this case, essentially conducting a trial within in a trial, without any real likelihood of a different result, since Mr. Ruiz-Cortez admits to having had not only the 20 kilograms of cocaine that were seized by Mr. Lewellen and other law enforcement officers, but to having possessed and stored in his home an additional 80 kilograms of cocaine that were distributed prior to his arrest.

D.     No evidence supports a finding that Rodriguez and Glenn Lewellen
agreed to steal drug proceeds in 1998 or 1999.

The government's bare allegation that Mr. Lewellen participated in two

thefts of drug proceeds is an insufficient basis for finding that a conspiracy existed

between Saul Rodriguez and Glenn Lewellen to do so.  Saul Rodriguez does not

remember whose proceeds were stolen, from where the proceeds were stolen, how

the proceeds were stolen, who participated in the alleged thefts, or even the year –

let alone a day or month – when the alleged offenses occurred.  Even Rodriguez' own

words do not support a finding that Rodriguez and Lewellen had an agreement to

steal drug proceeds at any time.

The government alleges that financial records support a finding that

Lewellen and Rodriguez agreed to steal drug proceeds, but this is categorically

incorrect.  Mr. Lewellen's financial records from 1998 and 1999 are incomplete and

in no way substantiate a finding that Mr. Lewellen received over a half-million

dollars for which he cannot account.

Even if one were to assume *arguendo* that the above-listed acts occurred, they

do not support a finding that the conspiracy involving Mr. Lewellen and his co-

defendants exists.  Rather, these discrete incidents constitute- at best- 404(b)

evidence which could not properly be admitted because they are neither close

enough in time, related in character, indicative of any modus operandi, nor

otherwise subject to characterization as proper and admissible evidence of other bad

acts.  The Court must not permit the government to bootstrap allegations into an

alleged conspiracy when there is no evidence to support the existence of a

conspiracy, let alone a criminal enterprise, that began in 1996 and continued until

the arrest of Mr. Rodriguez in 2009.

II.   The alleged statements of Alex Estrada are not admissible as co-conspirator
      statements and their admission would violate Mr. Lewellen's right to
      confront the witnesses against him.

Alex Estrada did not conspire with Glenn Lewellen to possess cocaine.  The

alleged conspiracy involved stealing drugs that belonged to Alex Estrada.  Estrada

engaged in a separate conspiracy with Andres Torres and Saul Rodriguez to possess

drugs.  Since he is not a member of the charged conspiracy, but one of its alleged

victims, his statements are not admissible as co-conspirator statements.

Alex Estrada is dead.  After his indictment and release on bond, he fled the

United States, went to Mexico, and was murdered. He is not available to be called

as a witness and to be subject to cross-examination. His statements must not be

admitted for any purpose.  As the Supreme Court has held, " [t]he Sixth

Amendment to the United States Constitution……… provides that "[i]n all criminal

prosecutions, the accused shall enjoy the right ... to be confronted with the

witnesses against him." In *Crawford,* after reviewing the Clause's historical

underpinnings, we held that it guarantees a defendant's right to confront those

"who 'bear testimony' " against him. 541 U.S., at 51, 124 S.Ct. 1354. A witness's

testimony against a defendant is thus inadmissible unless the witness appears at

trial or, if the witness is unavailable, the defendant had a prior opportunity for

cross-examination. *Id.,* at 54, 124 S.Ct. 1354." *Melendez-Diaz v. Massachusetts*, 129

S. Ct. 2527, 2531 (2009).

III.    Statements by victims or conversations with victims are not co-conspirator
        statements and are not admissible under the co-conspirator exception to the
        hearsay rule.

        Statements allegedly made by "Victim G", who will not be a witness at trial,

are hearsay and not co-conspirator statements.  Govt. Br. 18. Since "Victim G" will

not testify at trial, admitting statements allegedly made by him would violate Mr.

Lewellen's right to confront the witnesses against him.  *Crawford v. Washington,*

541 U.S. 36 (2004).

        The government also offers as examples of the statements it seeks to admit,

statements made by "Individual N" about an alleged theft of 70 kilograms of cocaine

in 2004.  Govt. Br. 19.  Individual N is a "victim" of Saul Rodriguez.  His statements

or conversations with him are hearsay and not admissible as co-conspirator

statements.

        Glenn Lewellen requests that the Court find that the statements of alleged

victims of the charged offenses are not and cannot be considered co-conspirator

statements.  Such statements are hearsay and not admissible.  To the extent that a

"victim's" statements are admissible under any other rule or hearsay exception, the

individual must be presented at trial and subject to cross-examination in keeping

with *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny.

WHEREFORE, Glenn Lewellen, through counsel, respectfully requests that this Court find that the government has provided an insufficient basis for establishing the existence of a conspiracy, or Glenn Lewellen's participation in a conspiracy, beginning in 1996; that the discrete acts described in 1996, 1998, or 1999, do not constitute a conspiracy, but alleged prior bad acts; that statements of victims are not co-conspirator statements and are inadmissible under this exception to the hearsay rule; and that statements of victims, if admissible at all, must be offered through the victim and subject to cross-examination at trial.

DATE:          November 2, 2011                    Respectfully submitted,

                                                   By: s/Andréa E. Gambino
                                                   An Attorney for Glenn Lewellen


Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 2, 2011, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which sent notification of

such filing to the following:

Counsel for co-defendants

Steven Block, Esq.
Tiffany Tracy, Esq.
Terra Reynolds, Esq.
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604


and I hereby certify that I have mailed by United State Postal Service or hand

delivered the document to the following non-CM/ECF participants: N/A.


DATE:         November 2, 2011          Respectfully submitted,

                                        By:    s/Andréa E. Gambino
                                               Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 09 CR 332 |
| v.              ) | |
| ) | Judge Joan B. Gottschall |
| HECTOR URIARTE and     ) | |
| MANUEL URIARTE     ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION
## TO EXCLUDE EVIDENCE

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby responds to defendants Hector Uriarte and Manuel Uriarte's motion to exclude evidence relating to murders, torture, and kidnapping and asks that the motion be denied.

## I.      FACTUAL BACKGROUND

Defendants Hector Uriarte and Manuel Uriarte ("defendants") are charged in Count One of the third superseding indictment with having participated in a racketeering conspiracy involving obstruction of justice, drug trafficking and violent acts including murder, kidnapping and robbery. The murders that were committed in furtherance of the racketeering conspiracy include those of Juan Luevano, Michael Garcia, and Miguel De La Torre.  Defendant Manuel Uriarte is further charged in Counts Two and Three with the murders of Juan Luevano and Michael Garcia, respectively. Defendant Hector Uriarte is further charged in Counts Five, Seven, and Ten with kidnapping, and in Counts Eight and Eleven with having carried and used a firearm in furtherance of certain kidnappings.

At trial, the government will seek to admit testimony and other evidence pertaining to the murders of Juan Luevano, Michael Garcia, and Miguel De La Torre.  That evidence includes

photographs of the bodies of Juan Luevano, Michael Garcia, and Miguel De La Torre.   The

government intends to offer into evidence a mere fraction of the dozens of photographs of Juan

Luevano, Michael Garcia, and Miguel De La Torre the government has in its possession.[1]  Indeed,

the government has carefully considered the potential impact of the photographs on the jury, and

only seeks to introduce photos that are absolutely necessary to address the elements the jury must

consider, aid in the jury's understanding of events, and corroborate the testimony of witnesses.   At

trial, the government will also seek to admit testimony and other evidence pertaining to the

kidnappings of numerous victims of the racketeering enterprise.   The testimony will include that of

the kidnapping victims, who will explain how they were taken and held against their will.

Defendants have moved, pursuant to Rule 403 of the Federal Rules of Evidence, to exclude

all photographs of the murder victims as well as any evidence that murder victim Miguel De La

Torre was tortured by defendants.   Defendants have also moved for this Court to order the

government to question kidnapping victims in such a way as to "control their emotional reactions

on the stand." Mot. at 4.   As set forth below, defendants' motion lacks merit, and should be denied.

## II.    ANALYSIS

Rule 403 of the Federal Rules of Evidence states in pertinent part: "Although relevant,

evidence may be excluded if its probative value is substantially outweighed by the danger of unfair

prejudice . . . ." Fed. R. Evid. 403 (emphasis added).   Evidence may not be excluded merely because

it is graphic or disturbing.  *See United States v. Lightfoot*, 224 F.3d 586, 588 (7th Cir. 2000).   Rather,

the admissibility of such evidence hinges on whether the evidence is relevant to the resolution of a

---

[1]The government will provide those photographs to the Court and defense counsel under
separate cover on Thursday, November 3, 2011.

2

disputed issue or otherwise aids the jury in making a necessary factual determination.  *Id*.

**A.      The Evidence Defendants Seek to Exclude is Highly Probative**

Defendants are charged in Count One with having participated in a racketeering conspiracy that involved, in part, murder.  The government's evidence will show that defendant Manuel Uriarte participated in the murders of Juan Luevano and Michael Garcia.  The government's evidence will further show that defendants Manuel Uriarte and Hector Uriarte participated in the torture and murder of Miguel De La Torre.   The photographs of the murder victims and the evidence regarding defendants' torture of Miguel De La Torre are highly probative of the elements that the government must prove at trial, and thus their admission is crucial to the government's case.

First, the photographs of the murder victims are relevant because they tend to show that the crime charged by the indictment took place.  *Gonzalez v. DeTella*, 127 F.3d 619, 621 (7th Cir. 1997) ("Photographs of the decedent's body are relevant.  They tend to show that the crime charged by the indictment took place.").  It is immaterial that defendants do not dispute that the three victims were killed.  Mot. at 2.  The Seventh Circuit has held that when an element of an offense is uncontested, including when a defendant has offered to admit to the element, "no rule of law, and certainly no rule of constitutional law, limits the prosecutor to one piece of evidence in support of [this] element." *Id*.  Indeed, the Court of Appeals held that to "limit[] the proofs to clinically abstract propositions may prevent the jurors from acquiring an accurate picture of events, and . . . [that] may lead them to draw inaccurate inference about what actually happened (based on conjectures about why evidence is being hidden from their view)." *Id*. (*citing Old Chief v. United States*, 519 U.S. 172 (1997); *United States, v. Sampson*, 486 F.3d 13, 43 (1st Cir. 2007) (upholding the admission of autopsy photographs because "within reasonable limit, the prosecution–even in a capital case–is entitled to present it s

3

case through the evidence it deems most appropriate.")[2]

Other circuit courts have similarly held that the absence of dispute on a particular element does not bar the prosecution from introducing evidence with regard to that element. *See United States v. Fields*, 483 F.3d 313 (5th Cir. 2007) (upholding the admission of 32 post-mortem photographs and holding that "the fact to which the evidence is directed need not be in dispute" (*quoting United States v. Hall*, 152, F.3d 381, 401 (5th Cir. 1998)); *Rivers v. United States*, 270 F.2d 435, 436-39 (9th Cir. 1959) (upholding district court admission of gruesome evidence about the victim which included photographs and actual body parts even though defendant offered to stipulate and noting that "[i]f the mere gruesomeness of the evidence were grounds for its exclusion, then it would have to be said that the more gruesome the crime, the greater the difficulty of the prosecution in proving its case.").

Second, the photographs of the murder victims are highly probative because they support the prosecution's other evidence about who committed the crime and how the crime occurred. With respect to the murders of Juan Luevano and Michael Garcia, the photographs will corroborate the testimony of Saul Rodriguez and Andres Flores regarding who committed the murders and how the murders occurred. For example, Andres Flores will testify regarding where the murders took place, how many shots were fired, where the victims were standing when they were shot, and from what direction the shots were fired. Similarly, Saul Rodriguez will testify about his discussions with Manuel Uriarte that the victims would be shot to death outside their homes. The photographs the

---

[2]Notably, defendants are not stipulating to the murders of these victims nor are they stipulating to the manner in which the murders were committed. Even if they stipulated to these matters, the government is entitled to put on proof to support the elements of the charged offenses as discussed further above.

4

government seeks to introduce corroborate this testimony.  *See Gonzalez*; 127 F.3d at 621 (it was

not error to admit "graffic" and "grisly" photographs depicting multiple bullet wounds because they

corroborated the death of the victim and the testimony of a cooperating individual that Gonzalez

emptied a clip of ammunition into the drug dealers.)

With respect to the murder of Miguel De La Torre, defendants not only seek to exclude

photographs of De La Torre's body, but also seek to preclude any evidence that he was tortured.  The

photographs depicting De La Torre's body will corroborate the testimony of Saul Rodriguez in the

following ways:

- Saul Rodriguez, Hector Uriarte, Manuel Uriarte, and Jorge Uriarte agreed to restrain and torture De La Torre until he provided information about the location of cocaine or money that the men could steal (photographs of the gag over De La Torre's mouth and burns corroborate the agreement to restrain and torture);

- Saul Rodriguez gave Manuel Urinate and Jorge Uriarte an extension cord they could use to strangle Miguel (photographs of De La Torre corroborate strangulation by ligature);

- Saul Rodriguez, Manuel Uriarte, and Jorge Uriarte decided to place De La Torre's body inside of the trunk of De La Torre's Nissan, and leave the Nissan on the streets of Chicago (photographs corroborate that De La Torre's body was left the trunk of the Nissan, which was left on the streets of Chicago);

- Manuel Uriarte and Jorge Uriarte told Saul Rodriguez that when De La Torre refused to provide information to them, they strangled him to death (photographs corroborate cause of death);

The photographs will also corroborate medical examiner Dr. J. Scott Denton's testimony that

De La Torre died as a result of strangulation by ligature, was tortured pre-mortem by burning his

ears, and that his hands and fingers show signs that he was electrocuted.

**B.      None of the Evidence is Unfairly Prejudicial**

Because "most relevant evidence is, by its very nature, prejudicial, . . . evidence must be unfairly prejudicial to be excluded." *United States v. Curry*, 79 F.3d 1489, 1496 (7th Cir.1996) (*quoting United States v. Pulido*, 69 F.3d 192, 201 (7th Cir.1995)). "Evidence is unfairly prejudicial only if it will 'induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented.'" *United States v. Conley*, 291 F.3d 464, 473 (7th Cir.2002)(*quoting United States v. Pulido*, 69 F.3d 192, 201 (7th Cir.1995)). *See also* Fed. R. Evid. 403, Adv. Comm. Notes.  The potential of unfair prejudice must be evaluated in the context of the trial as a whole. *See United States v. Westmoreland*, 312 F.2d 302, 310 (7th Cir. 2002)(affirming district court's admission of witness's testimony that her husband came home covered in blood and told her he and defendant had just buried someone who had "talked too much," where evidence was probative and not overly prejudicial in context of trial involving murder of a potential witness). Where, as here, the nature of the charged offenses is disturbing, it is unavoidable that the evidence supporting those charges likewise will be disturbing.  This cannot be helped.  *See Lopez*, 271 F.3d at 482.

In any event, the challenged evidence is not nearly as inflammatory as evidence that has been admitted in countless other trials.  The government intends to offer into evidence a mere fraction of the dozens of photographs of Juan Luevano, Michael Garcia, and Miguel De La Torre the government has in its possession.  Indeed, the government has carefully considered the potential impact of the photographs on the jury, and only seeks to introduce photos that are absolutely necessary to address the elements the jury must consider, aid in the jury's understanding of events, and corroborate the testimony of witnesses.   Moreover, the photographs to be offered in evidence

6

have been selected to limit the amount of blood or flesh depicted, and the few photographs in which

burns or blood can be seen are photographs that contain additional important details relevant to the

offense conduct.  While the photographs of De La Torre do depict the burns on his hands and include

photographs of his head that show the ligature, burns, and thermal frost bite.  Those details, however,

are necessary for the reasons stated above.

The government's carefully limited selection of photographs pale in comparison to that found

admissible by other courts    *See United States v. Lightfoot*, 224 F.3d 586, 588 (7th Cir.

2000)(upholding admission of "revolting" evidence that defendant beat a female companion and

urinated in her mouth to refute defendant's claim that he was a "mere pawn" of the companion);

*United States v. Corley*, 519 F.3d 716, 726 (7th Cir 2008)(upholding the admission by the district

court during the penalty phase of a death penalty case of 2 out of 10 or 15 pictures that the

government had in its possession); *United States v. Fields*, 483 F.3d 313, 335-56 (5th Cir. 2007)

(upholding the admission of 32 photos some of which were described as "shocking" and finding that

"caselaw indicates that admitting gruesome photographs of the victim's body in a murder case

ordinarily does not rise to an abuse of discretion where those photos have nontrivial probative

value.").

The admission of post-mortem photographs of murder victims has been found not be unfairly

prejudicial in numerous circuits, including the Seventh Circuit, when that evidence is used to

corroborate other testimony (including that of the medical examiner), to prove the corpus delicti, to

show nature and location of injury, or to show cause of death.  *See Gonzalez*, 127 F.3d at 621

(indicating that "graphic depictions of multiple bullet wounds" supported the prosecution's evidence

provided by testifying witness about how the crime occurred); *United States v. Infelise*, 1992 WL

7

45023 (N.D. Ill. Feb. 5, 1992) (*citing United States v. De Parias*, 805 F.2d 1447, 1453-54 (11th Cir.

1984) ("Photographs of homicide victims are relevant in showing the identity of the victim, the

manner of death, murder weapon, or any other element of the crime . . ."); *United States v. Davidson*,

122 F.3d 531, 538 (8th Cir. 1997), cert. denied, 522 U.S. 1034, 118 S.Ct. 639 (1997) (upholding the

district court's admission of photos taken at the crime scene and during the autopsy and holding that

"a trial court has discretion to admit a relevant photograph unless it is so gruesome or inflammatory

that its prejudicial impact substantially outweigh[s] its probative value."); *United States v. Brown,*

441 F.3d 1330 (11th Cir. 2006) (upholding admission during the guilt phase of a capital case color

photographs of victim's body which had been stabbed multiple times, because these photos were

probative of the fact of victim's death, the number and nature of the stab wounds, and the heinous

and cruel manner of offense (an aggravating factor), and because the photos were not cumulative of

coroner's testimony about the cause of death); *United States, v. Sampson*, 486 F.3d 13, 43 (1st Cir.

2007) (upholding the admission of autopsy photographs because they provided evidence of the

manner in which each victim was killed); *United States v. Allen*, 315 F.3d 873, 897 (8th Cir. 2002)

(holding that the district court did not abuse its discretion in admitting gruesome photographs of

murder victim because they were highly probative of both the manner of death and the brutality of

the offense); *United States v. Allen*, 247 F.3d 767, 793-4 (8th Cir. 2001), rev'd on other grounds, 536

U.S. 953, 122 S. Ct. 2653 (2002) (upholding admission of autopsy photographs of every wound on

the victim because photographs were probative of intent, manner of death, and culpability).

In *Infelise*, the government sought to demonstrate that the victim had been tortured because

that was relevant to the government's theory about the culpability of certain co-defendants. *United*

*States v. Infelise,* 1992 WL 45023 *1.  Despite the fact that the photos were "rather bloody [in]

nature" and which demonstrated "rope burns," the district court found that the photos were not

overly prejudicial despite the fact that they were unpleasant and a medical examiner would be called

to testify about the various wounds). *Id*. at *2. The court found that the photographs would "aid the

jury in comprehending the medical examiner's testimony about the variety of wounds inflicted on

various parts of [the victim's] body." *Id*. Indeed, in one photograph showing blood inside of the

trunk of the victim's car, the court reasoned that the "large amount of blood"" corroborated the

testimony of a government witnesses that there was evidence that the murder scene had been

cleaned.

### C.    The Probative Value of the Evidence Far Outweighs Any Risk of Unfair Prejudice

Given the probative value of the challenged evidence, and the minimal degree to which the

evidence could be considered inflammatory, it is clear that the probative value of the evidence

defendant seeks to exclude far exceeds any risk of unfair prejudice. Even if there was an even

balance, admission of the evidence would be required. *See United States v. Krenzelok*, 874 F.2d 480,

482 (7th Cir. 1989)("[W]hen the trial judge is in doubt, Rule 403 requires admission (this is the force

of substantially outweighed) . . . ."); *see also* Christopher B. Mueller & Laird C. Kirkpatrick, 1

Federal Evidence § 93 (2d ed. 2002) (The language of Rule 403 "contemplates admitting rather than

excluding evidence when probative worth seems equally balanced against dangers like prejudice and

confusion of issues.") Thus, all of the challenged evidence should be admitted.

### III.    ANALYSIS OF DEFENDANT'S MOTION REGARDING KIDNAPPINGS

As stated above, defendants have been charged in a racketeering conspiracy that included acts

of kidnapping. In addition, defendant Hector Uriarte has been charged in Counts Five, Seven, Eight,

Ten, and Eleven with certain kidnappings and firearms offenses related to those kidnappings. Defendant asks this Court to order the government to question kidnapping victims "so as to control their emotional reactions on the stand" and moves to preclude the government from eliciting testimony regarding a victim's feelings as the victim was being kidnapped or robbed.  Certainly, whether those victims were taken by force, intimidated, threatened, and subjected to violence is relevant to the charges in this case.  Indeed, they are elements that the government must prove beyond a reasonable doubt.  Moreover, what the defendant asks is not only legally unsupported, but virtually impossible.  The government will follow the rules of evidence, including Federal Rule of Evidence 403, when it questions its witnesses, and defendants can raise objections when appropriate. Accordingly, the defendant's motion should be denied.

## IV.      CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendants' motion to exclude evidence.

Respectfully submitted,


PATRICK J. FITZGERALD
United States Attorney


By:     /s Terra Reynolds_____
         TERRA REYNOLDS
         STEVEN A. BLOCK
         TIFFANY J. TRACY
         Assistant United States Attorneys
         United States Attorney's Office
         219 S. Dearborn St., 5th Floor
         Chicago, Illinois  60604


10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332-3 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| HECTOR URIARTE | ) | |

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

## GOVERNMENT'S MOTION TO DISQUALIFY COUNSEL

was served pursuant to the district court's ECF system.

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney

By:   /s/ Terra Reynolds
TERRA REYNOLDS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL  60604
(312) 353-3148

Dated: February 25, 2011

Based on the foregoing, the government is seeking leave to file instanter its response to defendants Hector Uriarte and Manuel Uriarte's motion to exclude evidence.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:   /s Terra Reynolds _____
TERRA REYNOLDS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL 60604
(312) 353-5300

Dated: November 3, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| HECTOR URIARTE and | ) | |
| MANUEL URIARTE | ) | |

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

## GOVERNMENT'S MOTION TO FILE INSTANTER

was served pursuant to the district court's ECF system.

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney

By:     s/ Terra Reynolds
TERRA REYNOLDS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL 60604
(312) 353-3148

Dated: November 3, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| HECTOR URIARTE and | ) | |
| MANUEL URIARTE | ) | |

## GOVERNMENT'S MOTION TO FILE INSTANTER

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully submits its Motion to File Instanter.

On October 27, 2011, this Court ordered the parties to file their motions *in limine* by October 31, 2011.  On that same day, the Court ordered that any responses to the motions be filed by November 2, 2011.  With respect to defendants Hector Uriarte and Manuel Uriarte's motion to exclude evidence, the government missed the Court's deadline by just over one hour.  The government apologizes to the Court and the parties for the late filing, but believes that the delay will not cause undue harm to defendants.

Based on the foregoing, the government is seeking leave to file instanter its response to defendants Hector Uriarte and Manuel Uriarte's motion to exclude evidence.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:   /s Terra Reynolds_____
TERRA REYNOLDS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL 60604
(312) 353-5300

Dated: November 3, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| HECTOR URIARTE and | ) | |
| MANUEL URIARTE | ) | |

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

### GOVERNMENT'S MOTION TO FILE INSTANTER

was served pursuant to the district court's ECF system.

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney


By:     s/ Terra Reynolds
TERRA REYNOLDS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL  60604
(312) 353-3148

Dated: November 3, 2011

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332-5 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| MANUEL URIARTE | ) | |

## GOVERNMENT'S REPLY TO DEFENDANT'S RESPONSE TO GOVERNMENT'S SUPPLEMENTAL MEMORANDUM REGARDING THE ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS

On October 28, 2011, the government filed its supplemental memorandum regarding the admissibility of co-conspirator statements. R. 617. On October 31, 2011, defendant Manuel Uriarte ("defendant") filed a response to the government's supplemental memorandum in which he contends that statements made in connection with the murders of Juan Luevano and Michael Garcia were not made in furtherance of the charged racketeering conspiracy, and therefore that they should not be admitted in evidence pursuant to Fed. R. Evid. 801(d)(2)(E). R. 624. Because these statements were in fact made in furtherance of the conspiracy, and because they are admissible on other grounds, this Court should rule that the proffered statements are admissible.

## I.     APPLICABLE LAW

Under Rule 801(d)(2)(E), a statement is not hearsay if (a) [t]he statement is offered against a party, and (b) it is a statement by a co-conspirator made "during the course and in furtherance of the conspiracy." In seeking to admit statements under this rule, the government must establish by a preponderance of the evidence that "(1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the statement[s] sought to be admitted were made during and in furtherance of the conspiracy." *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009)

(quoting *United States v. Alviar*, 573 F.3d 526, 540 (7th Cir.2009)).

This Court has already found (and for purposes of determining the admissibility of the proffered statements relating to the Juan Luevano and Michael Garcia murders, Uriarte does not contest) that the government has presented sufficient proof of the existence of the charged conspiracy, and of the membership in the conspiracy of all makers of the proffered statements concerning the two murders: Saul Rodriguez, Manuel Uriarte, Andres Flores, and Jorge Lopez.[1] Uriarte's challenge here is limited to a single issue: whether the government has proffered sufficient evidence to prove, by a preponderance, that the proffered statements were made in furtherance of the conspiracy. Thus, the only issue requiring decision is whether the evidence proffered by the government is sufficient to establish, by a preponderance of the evidence, that the proffered statements related to the murders of Juan Luevano and Michael Garcia were made in furtherance of the racketeering conspiracy charged in Count One.

To resolve this issue, the Court must consider whether there is a reasonable basis upon which to conclude that the statement furthered the conspiracy. *United States v. Shoffner*, 826 F. 2d 619, 627-28 (7th Cir. 1987). A statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Id* at 628. The "statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Powers*, 75 F.3d 335, 340 (7th Cir. 1996).

---

[1] Saul Rodriguez and Andres Flores have pled guilty to the racketeering conspiracy charge and have agreed to cooperate against their co-defendants. Jorge Lopez has stipulated in a plea agreement to the existence of the racketeering conspiracy and his participation in it, and has agreed to cooperate against his co-defendants.

As demonstrated below, the evidence amply demonstrates that the murders of Juan Luevano and Michael Garcia were part of the racketeering conspiracy of which defendant was a member and that statements made by the conspirators pertaining to the murders were made in furtherance of the conspiracy.

## II.   ANALYSIS

As set forth in the government's previous pleadings, Count One of the third superseding indictment charges defendants Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, and Fares Umar with having participated in a racketeering conspiracy that involved drug trafficking, acts of violence, including murder, kidnapping, and robbery, and obstruction of justice.

### A.   June 3, 2000 Murder of Juan Luevano

The government seeks to admit statements of Saul Rodriguez, Manuel Uriarte, and Andres Flores related to the June 3, 2000 murder of Juan Luevano.  The following is a summary of the events leading to that murder, and the statements regarding the murder which the government seeks to admit.

In May 2000, a leader of the La Raza street gang, Individual D, asked Saul Rodriguez to coordinate the murder of fellow gang member Juan Luevano, aka "Baby G," and Rodriguez agreed. Saul Rodriguez was interested in retaliating against Juan Luevano because he believed that Luevano also had slept with his (Rodriguez's) ex-girlfriend.  In addition, however, Rodriguez wanted to curry favor with Individual D in order to obtain the protection of the La Raza street gang as he conducted the business of the Rodriguez Enterprise—drug trafficking and acts of violence, including murder, kidnapping, and robbery.  Rodriguez offered Uriarte money to commit the murder of Luevano.

3

Uriarte told Rodriguez that he would commit the murder on the condition that Rodriguez provide

him and his brother, Hector, with opportunities to make money by selling drugs and committing

other illegal acts with Rodriguez.  Uriarte also told Rodriguez that he would be happy to shoot

Luevano because Luevano was a member of the La Raza street gang, which was a rival of Uriarte's

gang, the City Knights.  Uriarte reached out to his brother-in-law, Andres Flores, to help him commit

the murder requested by Rodriguez.  Flores will testify that he agreed to commit the murder with

Uriarte for the money.

Saul Rodriguez then met with Manuel Uriarte in the area of 48th and Wood Street in

Chicago.  Saul Rodriguez had first met Manuel Uriarte in high school.  Saul Rodriguez knew that

Manuel Uriarte was a member of the City Knights street gang who had committed acts of violence.

During the meeting, Saul Rodriguez told Manuel Uriarte about Individual D's request that Juan

Luevano be killed.  Manuel Uriarte told Saul Rodriguez that he would be happy to kill Juan Luevano

and that Andres Flores would be the other shooter.  Manuel Uriarte told Saul Rodriguez that in

exchange for killing Juan Luevano, he wanted Saul Rodriguez to "look out" for him and Hector

Uriarte.  Saul Rodriguez understood that Manuel Uriarte was asking him to sell Manuel Uriarte and

Hector Uriarte drugs or give them other opportunities to make money in the future in exchange for

killing Juan Luevano.

During his conversation with Manuel Uriarte, Saul Rodriguez gave Manuel Uriarte Juan

Luevano's address in Cicero, Illinois. Saul Rodriguez told Manuel Uriarte that a person close to Juan

Luevano would be giving Saul Rodriguez information about Juan Luevano's whereabouts. Saul

Rodriguez told Manuel Uriarte that he would pass that information along to him.

Prior to the murder, Rodriguez met with Uriarte and Flores at least once to discuss in detail

4

how the murder would be committed. Manuel Uriarte and Andres Flores informed Saul Rodriguez they had been conducting surveillance at Juan Luevano's house. Shortly before the murder, Rodriguez obtained information regarding Luevano's whereabouts and passed it on to Uriarte. After midnight on June 3, 2000, Uriarte and Flores shot Juan Luevano to death outside of Luevano's home in Cicero, Illinois. After the shooting, Uriarte called Rodriguez and reported, "It's done."

Manuel Uriarte later told Saul Rodriguez that he and Andres Flores had shot Juan Luevano as Juan Luevano was exiting a vehicle near his home. Manuel Uriarte explained that Juan Luevano then walked towards the front door of his home, where Manuel Uriarte and Andres Flores shot Juan Luevano again. Manuel Uriarte told Saul Rodriguez that Juan Luevano took it, meaning the shooting, like a gangster. Manuel Uriarte told Saul Rodriguez that he and Andres Flores had used revolvers to commit the crime. Saul Rodriguez understood that Manuel Uriarte used a revolver to commit the crime because the firearm would not discharge shell casings when it was fired. Manuel Uriarte told Saul Rodriguez that he and Andres Flores had dismantled the revolvers and disposed of them.

As previously agreed, after the murder had taken place, Rodriguez paid Flores $5,000,[2] and provided Uriarte and his brother opportunity to take part in the enterprise's activities, including additional murders, as well as kidnappings, robberies, and drug trafficking activities. In fact, following the murder, both Uriarte and Flores became regular participants in the activities of the enterprise.[3] Thus, the murder of Juan Luevano constituted Uriarte's and Flores' initiation into the

---

[2] Rodriguez gave Uriarte the money and directed him to give it to Flores.

[3] Uriarte remained actively involved until approximately 2004, when he relocated to California. Flores, on the other hand, remained involved in the Enterprise's activities until his arrest in 2009.

racketeering enterprise.

### B.     May 31, 2001 Murder of Michael Garcia

In 2001, Saul Rodriguez agreed to find someone to kill Michael Garcia, also known as "Snoop," in exchange for a payment of $10,000 from Jorge Lopez, a narcotics trafficker with access to large amounts of cocaine.  Lopez believed Garcia was responsible for killing Lopez's brother, Edwardo, and wanted to avenge his brother's death.

Rodriguez went to Manuel Uriarte, who had proven himself reliable by committing the Luevano murder.[4]  Uriarte and Flores agreed to murder Michael Garcia as Rodriquez requested. In the late evening hours of May 31, 2001, Uriarte drove Flores to the residence of Michael Garcia in Chicago, and then parked nearby.  Flores shot Garcia to death in front of Garcia's home, and then ran to the van in which Uriarte was waiting.  In the van, Flores told Uriarte what had happened, Uriarte said he would report what happened to Rodriguez.

Manuel Uriarte called Saul Rodriguez after the shooting and later met with him. Manuel Uriarte told Rodriguez that he (Manuel Uriarte) waited with Flores for Snoop to arrive at the house but that Flores was the person who shot Snoop as he was leaving his apartment. Uriarte said that Flores then got back in the car with him and they drove away.  Rodriguez reported to Lopez that Snoop had been killed, and Rodriguez shared the proceeds received from Lopez with Uriarte and Flores.

### III.    CONCLUSION

Both the above murders were directed by Rodriguez, the head of the Rodriguez Enterprise,

---

[4] Rodriguez will testify that, although he only discussed this murder with Uriarte, Uriarte told Rodriguez that Flores would also be involved.

and were committed by Uriarte and Lopez, individuals associated with the Enterprise.  The murders were acts of violence committed for pecuniary gain, and also to advance the conspirator's racketeering activities by obtaining La Raza gang protection for Rodriguez's Enterprise activities through Individual D, and by ingratiating Rodriguez to an individual with information regarding the location of large quantities of drugs and drug proceeds (which in fact led to the Enterprise's kidnaping and robbery of Giovanni Chimera in 2004).  Thus, it is clear that statements of Rodriguez, Flores, and Uriarte [5] are related to the murders of Juan Luevano and Michael Garcia and are admissible as co-conspirator statements made in furtherance of the charged conspiracy.  In addition, the statements are admissible, without reliance on the co-conspirator-statement rule, on other grounds, for example, as statements of a party-opponent, *see* Fed. R. Evid. 801(d)(2)(A), as non-hearsay orders and suggestions, *see United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985), and as verbal acts, or statements providing background for other statements, *see United States v. Robinzine*, 80 F.3d 246, 252 (7th Cir. 1996).

---

[5] Obviously, Uriarte's statements to Rodriguez and Flores are separately admissible as statements of a party opponent.

7

Therefore, the government respectfully requests that the Court grant its motion to admit co-conspirator statements.[6]

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:     s/ Steven A. Block
        TERRA L. REYNOLDS
        STEVEN A. BLOCK
        TIFFANY J. TRACY
        Assistant United States Attorneys
        United States Attorney's Office
        219 S. Dearborn St., 5th Floor
        Chicago, Illinois  60604

---

[6]Defendant attempts to combine his response to the government's motion to admit co-conspirator statements with a belated motion to strike parts of the indictment.  The time for such a motion has long since passed. In any event, as demonstrated above, there is no basis for finding that the murders were unrelated to the purposes of the Enterprise, or that the murders are not properly pled as racketeering acts.  *See United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006), *citing United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992); *see also H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239-40 (1989); *Boyle v. United States*, 129 S.Ct. 2237 (2009). If the Court desires a further discussion of this issue, the government will supply one.

8

Order Form (01/2005)

Case 1:09-cr-00332   Document 650   Filed 11/04/11   Page 1 of 2   PageID 2843
Case: 13-2321   Document: 7-6   Filed: 07/11/2013   Pages: 535

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 0332 - 2 | **DATE** | 11/04/2011 |
| **CASE TITLE** | United States vs. Lewellen | | |

**DOCKET ENTRY TEXT**

Petitioner City of Chicago's motion to quash [586] is granted.

■[ For further details see text below.]

Docketing to mail notices.

## STATEMENT

Defendant Glenn Lewellen served a subpoena on the City of Chicago ("the City") seeking disclosure of, *inter alia*, the name and last known address of a confidential informant who worked with City police. The information provided by this informant led to the arrest of Lisette Radanovich. Although the City has complied with the majority of the requests in the subpoena, the City filed a motion to quash that part of the subpoena directed to the confidential informant, arguing that (1) the informant's personal information should be withheld pursuant to the confidential informant privilege, (2) disclosure of this information could have safety consequences for the informant, and (3) Lewellen has not shown how the information would be relevant or necessary for his defense. Should the court be inclined to deny the City's motion, the City asks that the court conduct an *in camera* inspection of the files; if the court refuses to quash the subpoena, the City then asks that the court enter a protective order designating the files "Defendant's Counsel's Eyes Only" and requiring that the documents be returned to the City at the close of the case.

For his part, Lewellen responds that "counsel have reason to believe that this individual has information about the criminal conduct of the government's witnesses who will testify against Glenn Lewellen," which was withheld from the government, and that the informant may have participated in criminal conduct with Lisette Radanovich and Saul Rodriguez. Moreover, Lewellen claims that the concerns underlying the informant privilege are not implicated here, because the informant worked with the City in 1995 and "may not currently be working in that capacity."

While the government "possesses a limited privilege to withhold the identity of a confidential informant from a criminal defendant," the privilege evaporates where "a defendant proves that the disclosure of the informant's identity 'is relevant and helpful' to his defense 'or is essential to a fair determination of a cause.'" *United States v. Wilburn*, 581 F.3d 618, 622-23 (7th Cir. 2009) (quoting *Roviaro v. United States*, 353 U.S. 53, 59-60 (1957)). However, this privilege does not yield to "'bare speculation that the information may possibly

prove useful.'" *United States v. Valles*, 41 F.3d 355, 358 (7th Cir. 1994) (quoting *Dole v. Local 1942, Int'l Broth. of Elec. Workers*, 870 F.2d 368, 373 (7th Cir. 1989)). The court must balance the public interest in encouraging disclosure to the police with the individual's right to prepare a defense. *Wilburn*, 581 F.3d at 623 (citing *Roviaro*, 353 U.S. at 62). If the informant is a tipster, disclosure of his identity is almost never required, but if the informant played a central role in the alleged criminal transaction, his identity will likely be disclosed. *United States v. Harris*, 531 F.3d 507, 515 (7th Cir. 2008).

Lewellen's last point—that the informant "may" no longer act as an informant, making the need to protect him or her less pressing—is pure speculation. Further, Lewellen does not provide any authority to support the notion that lapse of time is relevant to the need to protect the informant's safety or has any effect on the court's balancing. For this reason, the court does not find this point persuasive. Frankly, certain defendants in this case are charged with obstruction of justice, kidnapping, and murder as part of a vast criminal network. There is reasonable cause to be concerned about the informant's safety should his or her identity be revealed on the eve of trial.

As to the relevance of the informant, Lewellen does not allege that the informant participated in the racketeering scheme in which Lewellen has been charged, nor does he allege that the informant participated in any of the predicate acts. Instead, Lewellen wishes to uncover the informant's identity only for impeachment purposes—"to demonstrate that Mr. Rodriguez has not lived up to the terms of his [plea] bargain by withholding information about his own criminal conduct," and to show that Radanovich also engaged in criminal activity. (*See* Lewellen's Resp., ECF No. 613, at 2.) First, the court does not find this evidence to be essential to a fair determination of Lewellen's case. *See United States v. Infelise*, No 90 CR 0087, 1991 WL 251652, at *1 (N.D. Ill. Nov. 6, 1991) (noting that casting doubt on the credibility of a government witness "'is normally an insufficient basis to overcome the informant's privilege'") (quoting *United States v. Russotti*, 746 F.2d 945, 950 (2d Cir. 1984)). In addition, the jury will have ample evidence of Rodriguez's criminal background; for instance, Rodriguez has already pleaded guilty to murder in aid of racketeering and numerous deceitful acts which illustrate his character. (*See* Plea Agmt., ECF No. 534.) And in any event, while Lewellen claims that the informant may have participated in criminal acts with Saul Rodriguez and Lisette Radanovich, Lewellen provides no specific support for this claim. He merely states that counsel "have reason to believe" that Rodriguez committed "at least one" violent crime which Rodriguez did not include in his grand jury testimony, and he provides no argument specifically directed toward Radanovich. This is insufficient to overcome the government's assertion of the privilege. For these reasons, the City's motion to quash is granted.

| | Courtroom Deputy Initials: | RJ/JKF |
|---|---|---|

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN *et al.* | ) | |

## GOVERNMENT'S MEMORANDUM REGARDING
## PROPOSED SUPPLEMENTAL VOIR DIRE

The Court has provided the parties with supplemental voir dire questions it intends to ask the panel.  The government raises the following objections and suggestions regarding the questions the Court may ask.

**Question 9:**

This case is expected to involve evidence of murder, beatings and torture.  Do you have any reactions to physical violence that would make it difficult for you to listen to the evidence and judge it fairly and impartially?

The government believes that this question should be simplified.  Most people would have a reaction to physical violence.  The government proposes the question be restated as follows:

This case is expected to involve evidence of murder, beatings and torture.  Would that make it difficult for you to listen to the evidence and judge it fairly and impartially?

**Questions 17 and 18:**

These questions seek information regarding the race of the defendants and prospective jurors' ability to be fair and impartial.  The government believes that question 17 should be stricken because it does not go to potential bias and there is no indication that race will be an issue in this trial.  Most anyone who is being forthright would have to acknowledge that they have had both good and bad

1

experiences with individuals of any race or ethnic group they have encountered.  If the Court is

inclined to ask questions about race, the government proposes that questions 17 and 18 be combined

into the following question:

> Have you or anyone close to you ever had an experience with a person of another
> race that would make it difficult for you to be fair and impartial in this case?

**Question 19:**

This question explains to the jury the government's burden of proof and seeks information

regarding whether a prospective juror can follow the Court's instructions on that issue.  The question

as worded is lengthy and duplicative, and makes certain assumptions regarding the attitudes of

prospective jurors that are unnecessary and may not be accurate (*e.g.*, in the juror's personal lives

they believe that someone charged with a crime must be guilty).  The government proposes striking

from the question the following sentences:

> In our personal lives, when we're watching TV or reading the paper, a lot of us think
> if someone is charged, surely they must be guilty of something, but the presumption
> of innocence means something different from this.  It means that in a criminal case,
> a person is not guilty UNLESS they are proven guilty by evidence at trial.  Does
> anyone have difficulty with that principle of law?

The revised question would still explain in a more neutral manner that defendants are presumed

innocent and ask whether they can abide by the Court's instructions regarding that issue.

**Question 21:**

The government objects to this question regarding law enforcement witnesses because it

injects bias into the proceeding.  If the Court would like to question prospective jurors about

potential bias for or against law enforcement, the government proposes that the question be reworded

using more neutral terms as follows:

Would you be more likely to believe or disbelieve a witness simply because he or she was a law enforcement officer?

If the Court decides to ask the previously-proposed question, the government suggests that the phrase "never tell the truth" at the end of the question be revised to read "often lie."

**Question 23:**

This question also seeks information regarding potential bias for or against law enforcement officers.  The government does not believe this question is necessary because it is duplicative.  If the Court decides to ask this question, the government asks that it be reworded in a more neutral manner as follows:

Have you or anyone close to you had any experiences that would make it difficult for you to fairly and impartially judge evidence involving a law enforcement officer?

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:   s/ Steven A. Block
      TERRA L. REYNOLDS
      STEVEN A. BLOCK
      TIFFANY J. TRACY
      Assistant United States Attorneys
      United States Attorney's Office
      219 S. Dearborn St., 5th Floor
      Chicago, Illinois  60604

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| SAUL RODRIGUEZ, et al, | ) | |
| Defendants. | ) | |

*FIRST AMENDED LIST OF POTENTIAL WITNESSES*

The defendants, through counsel, jointly file the following amended list of potential witnesses, who may or may not be called to testify in this matter.  Counsel for the defendants also may or may not call any person who has been identified by the government as a potential witness.

Counsel for the defendants respectfully request that when reading the list to prospective jurors no distinction be drawn between names provided by the government and defense counsel.

| | | |
|---|---|---|
| Felipe Adan | Felicitaz Cardena | Jason Coday |
| Michael Borden | Margarito Carmona | Antonio Zepeda Contreras |
| Ald. Edward Burke | Ramiro Casas | |
| | | John Cummings |
| Thomas Burke | Leobardo Cisneros-Acevedo | |
| | | Arnulfo Hernandez Delatorre |
| Vincent Calero | | |
| | Cynthia Cissell | |
| Carmen Cardena | | Joseph Digiacomo |
| | Joseph Cissell | |
| Catalina Cardena | | Al Doescher |

1

Susan Dukes

Thomas Dukes

Frank Farella

Mike Harper

Tommy Horton

Robert Kennealy

Matt Klabisch

Kenny Klusnick

Ashley Lewellen

Robert Lloyd

Elizabeth Mann

Jennifer Manteca

Ignacia Martinez

Haywood McDuffie

Brandy Melgoza

Jaime Mendez

Jim Millner

Tom Monday

Tyrone Muñoz

Robert Nelson

James Olguin

Al Pappalito

Francisco Pizarro

Cynthia Prus

Richard Ptak

Sandra Ramirez

John Rea

David Reynolds

Cecelia Rodriguez

Monica Rodriguez

Richard Rowan

Noel Sanchez

Melissa Schwartz

Rolando Ted Stewart

Michael Thompson

Javier Torres

Elsa Umar

Jose Urena

Sylvia Uriarte

Vanessa Vasquez

Jorge Vasquez

Ruben Villareal

James Wagner

Larnell Wheeler

Brad Williams

Brian Willie

DATE:          November 4, 2011                  Respectfully submitted,

                                                 By:    s/Andréa E. Gambino
                                                        One of the Attorneys


Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 4, 2011, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which sent notification of

such filing to the following:

Steven Block, Esq.
Tiffany Tracy, Esq.
Terra Reynolds, Esq.
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604


and I hereby certify that I have mailed by United State Postal Service or hand

delivered the document to the following non-CM/ECF participants: N/A.


DATE:          November 4, 2011          Respectfully submitted,

                                         By:     s/Andréa E. Gambino
                                                 Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

4

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332-2 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

## GOVERNMENT'S REPLY TO DEFENDANT'S RESPONSE TO GOVERNMENT'S SUPPLEMENTAL MEMORANDUM REGARDING THE ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS

On October 28, 2011, the government filed its supplemental memorandum regarding the admissibility of co-conspirator statements.  R. 617.  On November 2, 2011, defendant Glenn Lewellen ("defendant") filed a response to the government's supplemental memorandum in which he contends that certain statements were not made in furtherance of the charged racketeering conspiracy, and therefore that they should not be admitted in evidence pursuant to Fed. R. Evid. 801(d)(2)(E).  R. 642.  Defendant also uses his response brief as a de facto motion *in limine* to exclude evidence of certain acts that occurred during the conspiracy.  Because the statements were in fact made in furtherance of the conspiracy, and because they are admissible on other grounds, this Court should rule that the proffered statements are admissible.

## I.      APPLICABLE LAW

Under Rule 801(d)(2)(E), a statement is not hearsay if (a) "[t]he statement is offered against a party, and (b) it is a statement by a co-conspirator made "during the course and in furtherance of the conspiracy."  In seeking to admit statements under this rule, the government must establish by a preponderance of the evidence that "(1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the statement[s] sought to be admitted were made during

1

and in furtherance of the conspiracy." *United States v. Haynes*,  582 F.3d 686, 705 (7th Cir. 2009)

(quoting *United States v. Alviar*, 573 F.3d 526, 540 (7th Cir.2009)).

Lewellen's challenge here is limited to a single issue:  whether the government has proffered

sufficient evidence to prove, by a preponderance, that the proffered statements were made in

furtherance of the conspiracy.  Thus, the only issue requiring decision is whether the evidence

proffered by the government is sufficient to establish, by a preponderance of the evidence, that the

proffered statements relating to the following acts were made in furtherance of the racketeering

conspiracy: (1) Lewellen signing up Rodriguez as a source for the Chicago Police Department

("CPD") in 1996 but telling him that he could still sell drugs; (2) Lewellen asking a DEA agent to

stop investigating Rodriguez in 1996; (3) Lewellen and Rodriguez stealing drug proceeds in 1998

and 1999; and (4) Lewellen committing perjury in the 1999 trial of Refugio Ruiz-Cortez.[1]

To resolve this issue, the Court must consider whether there is a reasonable basis upon which

to conclude that the statement furthered the conspiracy. *United States v. Shoffner*, 826 F. 2d 619,

627-28 (7th Cir. 1987).  A statement may be susceptible to alternative interpretations and still be "in

furtherance" of the conspiracy.  *Id* at 628.  The "statement need not have been made exclusively, or

even primarily, to further the conspiracy" in order to be admissible under the co-conspirator

exception.  *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Powers*,

75 F.3d 335, 340 (7th Cir. 1996).

_____

[1]  Lewellen challenges the admission of other statements that the government does not
actually seek to admit as co-conspirator statements.  Any of Alex Estrada's statements the
government seeks to introduce will be offered as context for other statements or for another non-
hearsay purpose.  Any statements of Victim G the government intends to offer would also be
admitted for a non-hearsay purpose apart from the co-conspirator exception.  Individual N will
testify at trial so hearsay is not an issue.

As demonstrated below, the evidence amply demonstrates that Lewellen's obstruction and thefts of drug proceeds with Rodriguez were part of the racketeering conspiracy of which defendant was a member and that statements made by the conspirators pertaining these acts were made in furtherance of the conspiracy.

## II.     RELEVANT FACTS AND PROFFERED STATEMENTS

As set forth in the government's previous pleadings, Count One of the third superseding indictment charges defendants Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, and Fares Umar with having participated in a racketeering conspiracy that involved drug trafficking, acts of violence, including murder, kidnapping, and robbery, and obstruction of justice.

### A.     The 1996 Proffered Statements

#### 1.     Lewellen's Statements to Rodriguez in 1996 Regarding CPD Cooperation

The government seeks to admit statements of Rodriguez and Lewellen regarding Lewellen signing up Rodriguez as a CPD source in 1996.  The following is a summary of the events and statements that the government seeks to admit.

On February 8, 1996, officers from the CPD arrested Rodriguez.  One of the arresting officers was Lewellen.  After Rodriguez' arrest, Lewellen drove Rodriguez to an apartment on Lawndale Avenue that Rodriguez used to store drugs and drug proceeds.  CPD officers searched the apartment and recovered 13 pounds of marijuana and approximately $8,000.

After Rodriguez saw CPD officers search the apartment, Lewellen drove Rodriguez to an unmarked warehouse-type building two blocks away from U.S. Cellular Field.  Lewellen told Rodriguez that if he cooperated with the CPD, charges would not be filed against him.  Lewellen

3

also told Rodriguez that he could cooperate with the CPD in exchange for payment.  Lewellen gave

Rodriguez his phone number and instructed him to call the next day.

The next day, Rodriguez called Lewellen and met with him and another CPD officer.

Lewellen and the other CPD officer drove Saul Rodriguez throughout the Chicago area.  As they did

so, Rodriguez pointed out homes in the Chicago area belonging to people Rodriguez knew to be

involved in the drug business.

In the next few weeks, Rodriguez provided Lewellen with information regarding two or three

separate drug-related matters.  After doing so, Lewellen told Rodriguez that he would not be

formally charged with any offenses stemming from my arrest or the CPD's search of his stash

apartment.  Lewellen told Rodriguez that he could continue to work for the CPD as a paid informant.

Lewellen claimed that Rodriguez could be paid up to $1,000 per kilogram of cocaine that was seized

as a result of the information he provided. On February 28, 1996, Rodriguez signed a CPD

cooperating individual agreement.  The agreement bears the signatures of Rodriguez and Lewellen.

Lewellen did not review the agreement with Rodriguez or otherwise explain it to him before

Rodriguez signed it.

Under the agreement, Rodriguez agreed not to "sell or deliver any controlled substance,

dangerous drug, marijuana, or any substance purported to be same to anyone."  Rodriguez also

agreed to "not engage in any illegal or improper conduct" while working with CPD.  During the

same meeting that Rodriguez signed the cooperating individual agreement, Lewellen instructed

Rodriguez to call him when he had information pertaining to drug-related matters in Chicago.  In

contrast to what was contained in the agreement, however, Lewellen told Rodriguez that he should

continue doing what he was doing.  Rodriguez understood Lewellen to be telling him that he should

4

continue to buy and sell drugs so that he would have information pertaining to drug-related matters to give to Lewellen. Lewellen also instructed Rodriguez to call him when and if he was arrested by law enforcement. Lewellen told Saul Rodriguez that he would help him out of such a situation.

### 2.    Lewellen's 1996 Obstruction of a Federal Investigation

In 1996, the DEA was investigating Rodriguez's drug trafficking organization.  Between May 1996 and September 1996, a confidential source installed and repaired trap compartments in two cars for Saul Rodriguez. During the investigation, the DEA seized approximately 154.6 pounds of marijuana from one of Rodriguez's cars after agents observed a courier park the car in a public area.

Rodriguez told Lewellen about the seizure because he wanted to find out what had happened and whether he was being investigated. Lewellen told Rodriguez that he would make some calls to figure out what had happened. Lewellen never told Saul Rodriguez who he called or what he found out about the seizure. Lewellen also never told Saul Rodriguez to stop buying and selling drugs. Instead, Lewellen contacted DEA Special Agent Al Doescher. Lewellen identified himself as a narcotics investigator with the CPD. Lewellen told Agent Doescher that Rodriguez was serving as a confidential informant in investigations of high level marijuana and cocaine distributors. Lewellen explained that the DEA's continued investigation of Rodriguez would hamper the CPD's investigations in which Rodriguez was providing information. Based on the foregoing information, Agent Doescher informed Lewellen that upon concurrence of the prosecutor assigned to the case, the DEA would terminate the investigation of Rodriguez in order to further the CPD's investigation. Lewellen never told Agent Doescher of his directions to Rodriguez that he should continue to sell drugs while acting as a CPD informant.

5

### 3.    The 1996 Statements Are Admissible As Co-Conspirator Statements And, Alternatively, For Other Reasons

The statements at issue should be admitted as co-conspirator statements because the statements further the illegal agreement between Rodriguez and Lewellen whereby Rodriguez would provide Lewellen information and Lewellen would allow Rodriguez to continue distributing drugs and protect him.  Even if the Court were to find that these statements are not admissible as co-conspirator statements, Lewellen's statements regarding the 1996 agreement and his statements to DEA Agent Doescher are admissible, without reliance on the co-conspirator-statement rule, on other grounds, for example, as statements of a party-opponent, *see* Fed. R. Evid. 801(d)(2)(A), as non-hearsay orders and suggestions, *see United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985), and as verbal acts, or statements providing background for other statements, *see United States v. Robinzine*, 80 F.3d 246, 252 (7th Cir. 1996).

Moreover, even if the Court determines that the conspiracy period began after 1996, for example, in 1998 when Lewellen and Rodriguez began stealing together, Lewellen's and Rodriguez's earlier statements, as well as other evidence, would be relevant to the charged conspiracy.  If, as Lewellen argues, there was nothing illegal or conspiratorial about the 1996 agreement between Lewellen and Rodriguez or Lewellen's call to Agent Doescher, the evidence would still be relevant.  According to Federal Rule of Evidence 401, "[r]elevant evidence means evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." In this case, the statements of Lewellen and Rodriguez regarding Rodriguez's initial arrest, Lewellen's statements to Rodriguez about being a source, his instructions to Rodriguez to keep

selling drugs, and his intervention to end the DEA's investigation of Rodriguez are relevant for several reasons.

The testimony would explain how Lewellen and Rodriguez met and under what circumstances, therefore making it more probable that the conspiracy existed. The absence of this testimony would leave a large void in the story of the conspiracy because the jury would not understand how Lewellen and Rodriguez met, what they discussed at the time, and Lewellen's understanding that Rodriguez would continue to sell drugs. The testimony would also explain why Lewellen and Rodriguez formed the conspiracy to steal, rob, and kidnap to obtain drugs and money. The testimony would show Lewellen's knowledge of the fact that Rodriguez was a large-scale drug trafficker with information about the location of money and narcotics that he was willing to share with Lewellen. In addition, Lewellen's phone call to Agent Doescher is probative of Lewellen's knowledge that Rodriguez continued to distribute drugs even after he signed the CPD informant agreement and show Lewellen's willingness to intervene with law enforcement to protect Rodriguez, which he did several times later during the conspiracy.

Alternatively, testimony and evidence regarding the 1996 agreement between Lewellen and Rodriguez and Lewellen intervening to end the DEA investigation would be admissible as other bad acts evidence under Rule 404(b). Among the list of purposes other acts evidence may be admissible are opportunity, preparation, plan, and knowledge. Fed. R. Evid. 404(b). The Seventh Circuit has repeatedly instructed that, under Rule 404(b), evidence of other bad acts is admissible so long as the evidence is not introduced to show the defendant's bad character. *United States v. Taylor*, 522 F.3d 731, 734-36 (7th Cir. 2008). Here, the statements and evidence would be admissible for several non-propensity purposes. For example, the evidence would show Lewellen's opportunity to later enter

into the racketeering conspiracy with Rodriguez because Lewellen knew Rodriguez was continuing to sell drugs and was willing to provide information about the location of drugs and money. Similarly, the evidence would show Lewellen's knowledge that Rodriguez still sold drugs and therefore had information regarding drugs and money that could be stolen. The evidence would further show Lewellen's preparation to enter the conspiracy by gaining the trust of Rodriguez and ensuring he would have continued contact with him. The evidence regarding Lewellen's intervention with the DEA investigation would also show Lewellen's knowledge of Rodriguez's continued illegal activities as well as his preparation and plan to enter into the racketeering conspiracy.

In sum, even if the Court were to find that the 1996 statements were not in furtherance of the racketeering conspiracy, they are still admissible as relevant to the charged conspiracy or other bad acts evidence.

### C.    Lewellen and Rodriguez Steal Drug Proceeds in 1998 and 1999

By 1998, Saul Rodriguez was upset that CPD was paying him less money for drug seizures than what Lewellen had promised to pay him. Rodriguez's CPD file reflects that in or around 1998, the CPD started paying him less than $1,000 for every kilogram of cocaine that was seized as a result of the information he provided. Rodriguez complained about this to Lewellen. Lewellen assured him that he would do something to address Rodriguez's concerns. Shortly after that, Lewellen gave Rodriguez two kilograms of cocaine. Rodriguez understood that Lewellen was giving him the cocaine to address his concerns that he was not being paid enough for his cooperation with the CPD.

Soon after Lewellen gave Rodriguez two kilograms of cocaine, Rodriguez met with Glenn Lewellen and gave him the information about a drug dealer, Alex Estrada, who told Rodriguez where

he was storing a large amount of money.  Lewellen suggested that they should just take the money from Estrada.  Lewellen said that he would execute a traffic stop of the car in which Estrada was transporting the money and then steal the money from Estrada.  Lewellen and Rodriguez agreed to divide up whatever money Lewellen stole.  Shortly thereafter, Rodriguez provided Lewellen information regarding where and when Estrada would be transporting the money.  Later that same day, Lewellen called Rodriguez and asked to meet.  Lewellen and Rodriguez evenly split the money Lewellen had stolen.  Saul Rodriguez's share was approximately $160,000, which was  around $90,000 less than what he expected to receive.  Rodriguez figured that Lewellen had taken a portion of the money he had stolen from Estrada before he split the money with Rodriguez.

Soon after Lewellen stole the money from Estrada, Rodriguez told Lewellen about a home where a large amount of drug proceeds were being stored.  Lewellen told Rodriguez that he and another police officer would go into the home, identify themselves as police officers, restrain anyone in the home, and then steal any cocaine or money from inside the home.  Lewellen  and Rodriguez agreed that Lewellen, the other police officer, and Rodriguez would split up the money.

Lewellen told Rodriguez the day on which he and the other officer were going to go into the stash house.  Rodriguez rented a room at a hotel in the area of 63rd and Harlem in Chicago. Rodriguez stayed there until Lewellen and the other officer arrived.  Once Lewellen and the other officer arrived at the hotel room, they counted the money they had obtained from the home, approximately $800,000, and divided it into thirds.

Statements regarding the 1998 and 1999 thefts of cocaine are plainly in furtherance of the conspiracy as stealing drugs and drug proceeds is one of the hallmarks of the charged conspiracy. Defendant's argument seems to be that the government cannot put on evidence regarding these

incidents because Rodriguez is the only witness that will testify about them.  It is up to the jury to

decide whether to credit Rodriguez and decide that defendant participated in these two thefts.  At this

point, the Court need only decide whether the government has proven by a preponderance of the

evidence that a conspiracy existed and that co-conspirator statements were made in furtherance of

the conspiracy.  In addition to being admissible as co-conspirator statements, these statements are

admissible on other bases, including as statements of a party-opponent, *see* Fed. R. Evid.

801(d)(2)(A).

### D.    Lewellen's Perjury During 1999 Trial of Refugio Ruiz-Cortez

On December 21, 1999, Lewellen testified during the federal drug trial of Refugio Ruiz-

Cortez, an individual Lewellen arrested based on information provided by Rodriguez.  Lewellen was

the only eye witness to testify regarding Ruiz-Cortez's possession of cocaine.  Lewellen testified

falsely in order to protect Rodriguez.  Lewellen testified that on July 8, 1999, at approximately 3:00

p.m., he and another officer began surveillance of an apartment building in Aurora.  Both officers

were in unmarked police cars and were dressed in civilian clothing.  Lewellen watched the rear of

the apartment building, while the other officer watched the front of the building.

Lewellen testified that between 3:00 p.m. and 7:25 p.m., he saw Ruiz-Cortez repeatedly on

the back porch of the apartment.  According to Lewellen, at approximately 7:25 p.m., a silver car

without license plates pulled into the parking lot of the apartment building so that the car's trunk was

facing the back door of the house.  Lewellen testified that shortly after the silver car pulled into the

parking lot, Ruiz-Cortez returned to the back porch. Lewellen claimed that Ruiz-Cortez motioned

to the silver car and returned inside the building.  Lewellen testified that because police backup for

the officers had not arrived, he informed the officer watching the front of the house over their Nextel

mobile phones that they would have to seize the drugs before the drugs reached the silver car.

Lewellen testified that Ruiz-Cortez then walked onto the back porch carrying a large bag and looked around.  Lewellen testified that Ruiz-Cortez walked down the porch stairs and toward the silver car.  Lewellen explained that in order to break up the drug deal, he pulled his unmarked car into the parking lot of the apartment building.  Lewellen stated that he stopped his car next to the silver car and directly in front of Ruiz-Cortez.  According to Lewellen, Ruiz-Cortez looked at Lewellen, dropped the bag, and ran back into the house.  Lewellen stated that the silver car fled the scene.   Lewellen testified that he retrieved the bag from where Ruiz-Cortez had dropped it in the parking lot.  According to Lewellen, the bag contained approximately 10 kilograms of cocaine. Lewellen then radioed the other officer to come to the back of the building, and the two officers knocked on Ruiz-Cortez's door and placed him under arrest.

According to Ruiz-Cortez, on the day he was arrested a woman came to his apartment building in Aurora to pick up 10 kilograms of cocaine he was storing.  The woman came into his house to get the cocaine and he never brought it outside.  Shortly after the woman took the cocaine, Lewellen and another officer knocked on Ruiz-Cortez's door and placed him under arrest.

According to Lisette Venegas, in 1999 she was acting as a drug courier for Rodriguez. Rodriguez asked her to pick up 10 kilograms of cocaine from a man at an apartment building in Aurora.  She drove to the apartment building in a gray car and knocked on the door.  A man gave her a bag containing the cocaine, which she then placed in the trunk of her car.  As she went to open up the driver's side door, an unmarked police car pulled in front of her and blocked her in the parking lot.  The police officer, a white man in his 40's with gray hair, got out of his car and told her to open the trunk.  She opened the trunk and put her hands on the hood of the car believing she was being

11

arrested.  The police officer then took the cocaine out of her trunk, closed the trunk and told her to leave.  She got in her car and drove away.  Venegas was extremely scared and called Rodriguez to tell him what happened.  Rodriguez told her not to worry about it.  Rodriguez will testify that he was not worried about the seizure because he knew in advance that Lewellen would be seizing the cocaine and neither he nor his courier, Venegas, were actually being investigated.

By the time Lewellen committed perjury at Ruiz-Cortez's trial, the racketeering conspiracy had been formed and Lewellen and Rodriguez had begun stealing drugs proceeds.  Lewellen's obstruction of justice furthered the enterprise by protecting Rodriguez, his co-conspirator, so that they could continue to participate in the racketeering conspiracy.  Similar to the other categories of statements defendant challenges, these statements are also admissible for reasons other than the co-conspirator exception, including as statements of a party-opponent.

## III.   CONCLUSION

All of the statements defendant challenges were either in furtherance of the charged conspiracy or are  admissible without reliance on the co-conspirator-statement rule.  For example, as statements of a party-opponent, *see* Fed. R. Evid. 801(d)(2)(A), as non-hearsay orders and suggestions, *see United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985), and as verbal acts, or statements providing background for other statements, *see United States v. Robinzine*, 80 F.3d 246, 252 (7th Cir. 1996).

Therefore, the government respectfully requests that the Court grant its motion to admit co-conspirator statements.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:     s/ Steven A. Block
        TERRA L. REYNOLDS
        STEVEN A. BLOCK
        TIFFANY J. TRACY
        Assistant United States Attorneys
        United States Attorney's Office
        219 S. Dearborn St., 5th Floor
        Chicago, Illinois  60604

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, *et al*. | ) | |

## GOVERNMENT'S SUPPLEMENTAL LIST OF POTENTIAL WITNESSES

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States

Attorney for the Northern District of Illinois, respectfully submits this Supplemental List of Potential

Witnesses it may call during its case-in-chief in the above captioned matter:

- Joseph Daou

- Tony Souri

- Elsa Umar


Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:   s/Terra Reynolds
      TERRA REYNOLDS
      STEVEN BLOCK
      TIFFANY TRACY
      Assistant United States Attorneys
      219 South Dearborn Street
      Chicago, Illinois 60604
      (312) 353-5300

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, *et al*. | ) | |

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

### GOVERNMENT'S SUPPLEMENTAL WITNESS LIST

was served pursuant to the district court's ECF system.

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney

By:      s/ Terra Reynolds
TERRA REYNOLDS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL  60604
(312) 353-3148

Dated: November 7, 2011

### United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 0332 | **DATE** | 11/4/2011 |
| **CASE TITLE** | United States vs. Rodriguez | | |

**DOCKET ENTRY TEXT**

Pretrial status hearing held 11/4/11. Cardena's motion to exclude [620] is denied. Lewellen's motion to disclose [622] is denied; Lewellen to provide alibi defense by 11/18/11. Lewellen's motion for disclosure [627] is denied as moot in light of the government's representations in open court. Hector Uriarte's motion for extension of time [628] is taken under advisement pending. The government's combined motions *in limine* [631] are granted in part and denied in part as stated on the record. Hector Uriarte's motion for clothing [632] is granted; defense counsel to provide clothes, including clip-on ties. Hector Uriarte's motion to adopt [636] is granted. The government's motions to file *instanter* [644] and [645] are granted. Jorge Uriarte's motion to sever [649] is denied for the reasons stated in open court. The parties should provide their proposed cautionary jury instructions by 11/9/11.

Docketing to mail notices.

:50

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 332 - 2, 3, 4, 5, 7, and 11 | **DATE** | 11/7/2011 |
| **CASE TITLE** | USA vs. Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Tony Sparkman, Robert Cardena | | |

**DOCKET ENTRY TEXT**

Voir Dire Begun. Jury selection commenced and continued.  Jury Trial continued to 11/8/2011 at 10:00AM. Oral motion by United States to change the caption of the case to read USA v. Glenn Lewellen is granted in part and denied in part.  The court will call the case as discussed in open court.

Docketing to mail notices.

7:00

| | Courtroom Deputy Initials: | RJ |
|---|---|---|

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

**GOVERNMENT'S PROPOSED LIMITING INSTRUCTION**
**REGARDING JUAN LUEVANO AND MICHAEL GARCIA MURDERS**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby proposes the following limiting instruction be read to the jury regarding evidence of the murders of Juan Luevano and Michael Garcia.

> You are about to hear evidence regarding the alleged murders of Juan Luevano and Michael Garcia. You may consider this evidence only for limited purposes, namely, (1) to show the existence of the racketeering conspiracy alleged in Count One; (2) a particular defendant's membership in the racketeering conspiracy; and (3) as evidence of the crimes charged in Counts Two and Three of the indictment. You should not consider this evidence for any other purpose.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:     s/ Steven A. Block
TERRA L. REYNOLDS
STEVEN A. BLOCK
TIFFANY J. TRACY
Assistant United States Attorneys
United States Attorney's Office
219 S. Dearborn St., 5th Floor
Chicago, Illinois  60604

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

**GOVERNMENT'S PROPOSED JURY INSTRUCTION**
**REGARDING POTENTIAL PENALTIES FACED BY DEFENDANTS**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United

States Attorney for the Northern District of Illinois, hereby proposes the following instruction be

read to the jury regarding the potential penalties faced by the defendants.

> If you find a defendant guilty, it will then be my job to decide what
> punishment should be imposed. In considering the evidence and arguments
> that will be given during the trial, you should not guess about the punishment.
> It should not enter into your consideration or discussions at any time. This is
> not a death penalty case.

Shannon v. United States, 512 U.S. 573, 579 (1994)

Rogers v. United States, 422 U.S. 35, 40 (1975)

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:     s/ Steven A. Block
        TERRA L. REYNOLDS
        STEVEN A. BLOCK
        TIFFANY J. TRACY
        Assistant United States Attorneys
        United States Attorney's Office
        219 S. Dearborn St., 5th Floor
        Chicago, Illinois  60604

1

IN THE
UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. |
| | ) | Gottschall |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*DEFENDANT LEWELLEN'S PROPOSED PRELIMINARY JURY
INSTRUCTIONS*

Defendant GLENN LEWELLEN, through counsel, respectfully

requests that the following preliminary instructions be given to avoid the

unfair prejudice of trying Glenn Lewellen in the same case with the alleged

murders of Juan Luevano, Michael Garcia, and Miguel de la Torre, as set out

in detail in defendant Glenn Lewellen's Motion for Severance.  *See,* Doc. No.

456.  Mr. Lewellen is not alleged to have been involved in these alleged

offenses and no evidence will be introduced to show that he joined a

conspiracy to commit these offenses or that he had any knowledge of the

offenses.

Glenn Lewellen also asks that preliminary instructions be given with

regard to the presumption of innocence, the burden of proof, and the

testimony of witnesses:

## I.      INDIVIDUAL CONSIDERATION

As you know, there are six defendants on trial here. Each defendant is entitled to have his case decided solely on the evidence which applies him. Some of the evidence in this case is limited to certain of the defendants, and cannot be considered against others.

The evidence you are about to hear, which concerns the alleged murder of an individual named Juan Luevano [Michael Garcia], charged in Counts One and Count Two [Count Three in the case of Garcia], cannot be considered against defendant Glenn Lewellen, who is not charged with these offenses. You must not consider this evidence when you are deciding if the government has proved beyond a reasonable doubt its case against defendant Glenn Lewellen.

## II.      PRESUMPTION OF INNOCENCE AND BURDEN OF PROOF

The defendant is presumed to be innocent of [each of] the charge[s]. This presumption continues during every stage of the trial and your deliberations on the verdict. It is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty as charged. The government has the burden of proving the guilt of the defendant beyond a reasonable doubt.
This burden of proof stays with the government throughout the case. The defendant is never required to prove his innocence or to produce any evidence at all.

## III.      TESTIMONY OF WITNESSES

You are to decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all, as well as what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, you may consider, among other things: [- the witness's age;]

- the witness's intelligence; - the ability and opportunity the witness had to see, hear, or know the things that the witness testified about; - the witness's memory; - any interest, bias, or prejudice the witness may have; - the manner of the witness while testifying; and - the

reasonableness of the witness's testimony in light of all the evidence in the case.

You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number. You need not accept the testimony of the larger number of witnesses.

WHEREFORE, defendant GLENN LEWELLEN respectfully requests

that the above-listed preliminary instructions be given.

DATE:        November 14, 2011        Respectfully submitted,

By:     s/Andrea E. Gambino
        s/Matthew J. Madden
        Attorneys for Glenn Lewellen

Law Offices of Andrea E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014

Law Office of Matthew J. Madden
53 W. Jackson Blvd.
Chicago, Illinois  60604
(312) 212-1900

CERTIFICATE OF SERVICE

I hereby certify that the above document has been filed using the CM/ECF

system.  Electronic notice has been sent to the following parties:

Counsel for co-defendants

Terra Reynolds
Steven Block
Tiffany Tracy
Assistant United States Attorneys


DATE: November 14, 11                    Respectfully submitted,

                                         By:     s/Andrea E. Gambino
                                                 An Attorney for Glenn Lewellen


Law Offices of Andrea E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.2
### Eastern Division

UNITED STATES OF AMERICA

                                        Plaintiff,

v.                                                        Case No.: 1:09–cr–00332

                                                         Honorable Joan B. Gottschall

Saul Rodriguez, et al.

                                        Defendant.

---

# NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, November 14, 2011:

     MINUTE entry before the Honorable Joan B. Gottschall:as to Hector Uriarte, Jorge Uriarte, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Robert Cardena, Jury selection held on 11/14/2011 and concluded, Jury impaneled and sworn. ( Jury Trial set for 11/15/2011 at 10:00 AM. ) Mailed notice (rj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

**GOVERNMENT'S REVISED PROPOSED LIMITING INSTRUCTION**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United

States Attorney for the Northern District of Illinois, hereby proposes that the following limiting

instruction be read to the jury during trial.

> You have heard and will hear evidence regarding murders.  You may consider this
> evidence only for limited purposes, namely, (1) to show the existence of the
> racketeering conspiracy alleged in Count One; (2) particular defendants' participation
> in the racketeering conspiracy; and (3) as evidence of the crimes charged in Counts
> Two and Three of the indictment.  You should not consider this evidence for any
> other purpose.

> Robert Cardena is not charged in the racketeering conspiracy alleged in Count One
> of the indictment.  Cardena is charged with possession of narcotics with intent to
> distribute in Count Four of the indictment, and conspiracy to possess with intent to
> distribute narcotics in Count Thirteen of the indictment.  Evidence regarding
> kidnappings that did not involve the possession of narcotics and murders may not be
> considered as evidence against Cardena.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:     s/ Steven A. Block
        TERRA L. REYNOLDS
        STEVEN A. BLOCK
        TIFFANY J. TRACY
        Assistant United States Attorneys
        United States Attorney's Office
        219 S. Dearborn St., 5th Floor
        Chicago, Illinois  60604

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.2
### Eastern Division

UNITED STATES OF AMERICA

                                    Plaintiff,

v.                                                      Case No.: 1:09–cr–00332
                                                        Honorable Joan B. Gottschall

Saul Rodriguez, et al.

                                    Defendant.

# NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, November 15, 2011:

          MINUTE entry before the Honorable Joan B. Gottschall:as to Hector Uriarte,
Jorge Uriarte, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Robert Cardena, Jury
trial held on 11/15/2011, ( Jury Trial set for 11/18/2011 at 09:30 AM. ) Mailed notice (rj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.2
### Eastern Division

UNITED STATES OF AMERICA

       Plaintiff,

v.            Case No.: 1:09–cr–00332

            Honorable Joan B. Gottschall

Saul Rodriguez, et al.

       Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, November 16, 2011:

   MINUTE entry before the Honorable Joan B. Gottschall:as to Hector Uriarte, Jorge Uriarte, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Robert Cardena, Jury Instruction Conference held on 11/16/2011. Mailed notice (rj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.2
### Eastern Division

UNITED STATES OF AMERICA

                                        Plaintiff,

v.                                               Case No.: 1:09–cr–00332

                                              Honorable Joan B. Gottschall

Saul Rodriguez, et al.

                                         Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, November 18, 2011:

      MINUTE entry before the Honorable Joan B. Gottschall:as to Hector Uriarte, Jorge Uriarte, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Robert Cardena, Jury trial held on 11/18/2011, ( Jury Trial set for 11/21/2011 at 01:00 PM. ) Mailed notice (rj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

IN THE
UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. |
| | ) | Gottschall |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*GLENN LEWELLEN'S MOTION FOR PERMISSION TO SPEND
THANKSGIVING AT THE CISSELL HOME*

GLENN LEWELLEN, through his counsel, respectfully requests that this Court enter an Order, permitting him to go to his in-law's home from 11 a.m. until 9:00 p.m. on Thanksgiving Day.  In support of this Motion, Mr. Lewellen, through counsel, states the following:

(1)   Mr. Lewellen's in-laws live in Orland Park.  He will provide the exact address to his Pre-Trial Services Officer.

(2)   Mr. Lewellen's release order does not list his in-law's home as one he is permitted to visit.

(3)   Mr. Lewellen's Pre-Trial Services Officer requires a Court Order to permit him to spend Thanksgiving with his family.

WHEREFORE, Mr. Glenn Lewellen respectfully requests that this Court enter an Order permitting him to go to the Cissell home in Orland Park from 11:00 a.m. until 9:00 p.m., on Thanksgiving Day, Thursday, November 24, 2011.

DATE:          November 21, 2011              Respectfully submitted,

                                             s/Andréa E. Gambino
                                             Attorney for Glenn Lewellen

Law Offices of Andrea E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that the above document has been filed using the CM/ECF

system.  Electronic notice has been sent to the following parties:

Counsel for co-defendants

Terra Reynolds
Steven Block
Tiffany Tracy
Assistant United States Attorneys


DATE: November 21, 2011                Respectfully submitted,

                                       By:     s/Andrea E. Gambino
                                               An Attorney for Glenn Lewellen


Law Offices of Andrea E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 09 CR 332-5 |
| v. | ) | Honorable Joan B. Gottschall |
| | ) | |
| MANUEL URIARTE | ) | |

## **PROPOSED JURY INSTRUCTION AS TO TESTIMONY OF LISETTE VENEGAS**

NOW COME THE DEFENDANTS, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Tony Sparkman, and Robert Cardena, by and through their respective attorneys, and propose the attached jury instruction be given during the testimony of Lisette Venegas.

The instruction is Seventh Circuit Pattern Instruction 3.13.  The only modifications are consistent with the format of Instruction 3.13; the tendered instruction limits the subparagraphs to those grounds which apply specifically to the particular witness.

The Committee Comments to Seventh Circuit Pattern Instruction 3.13 specifically state3s: "At the request of the defendant this instruction **should** be given **immediately** after the plea is admitted **and repeated** with the general instructions at the end of the trial." (emphasis added).

The testimony of Ms. Venegas has reached the stage where she has admitted that she is receiving immunity, and she has admitted that she was involved in the commission of the offense.

Finally, this request has been brought in a timely manner.  First, on November 21, the date that the direct examination of Ms. Venegas began, the trial day was abbreviated

1

to an afternoon session.  Since the jurors were traveling from their respective homes and

businesses, defense counsel assumed that the time spent when the jury was present should

be maximized with witness testimony in the courtroom, and not *in limine* motions with

the jury confined to the jury room.  Additionally, and related to maximization of jury

time, was the fact that the defense did not anticipate that Ms. Venegas would be testifying

on Monday, November 21.  That is because on Friday, November 18, after court was

adjourned, the government sent an email to the defense attorneys which said: "The

government plans on calling the following witnesses next week:  Monday, November 21,

2011.  Jamie Bartolotta, Natalie Morgan, Records custodian CPD OC, Records custodian

CPD HR, Maria Saldivar.  Tuesday, November 22, 2001, Lisette Venegas.  In reliance on

this representation from the government, the defense justifiably reasoned that the proper

time to raise this instruction would be before testimony began on the day on which h the

government said they would be calling Lisette Venegas.

<div style="text-align:center">Respectfully submitted,</div>

/s/ Robert A. Loeb


/s/ Keith A. Spielfogel
Attorneys for Manuel Uriarte

Robert A. Loeb
190 S. LaSalle St., Suite 520
Chicago, IL 60603
312-368-0611
ARDC No. 1681990

Keith A. Spielfogel
190 S. LaSalle St. Suite 520
Chicago, IL 60603
312-236-6021
ARDC No. 2689537

<div style="text-align:center">2</div>

You have heard testimony from Lisette Venegas, who:

    (a) received immunity; that is a promise from the government that any testi mony or other information she provided would not be used against her in a criminal case;

    (b) stated that she was involved in the commission of the offense as charged against the defendants.

    You may give his/her testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care.

Seventh Circuit 3.13
Modified for the individual circumstances of the witness

CERTIFICATE OF SERVICE

I hereby certify that on the 21sr day of November, 2011, I electronically filed the foregoing Proposed Jury Instruction as to the Testimony of Lisette Venegas with the Clerk of the Court using the ECF and Pacer system which will send notification of such filing to all parties pursuant to the District Court's system for ECF filers.

_____/s/_____
Robert A. Loeb

Robert A. Loeb
190 S. LaSalle St.
Suite 520
Chicago, IL 60603
312-368-0611
robertloeb@att.net

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| SAUL RODRIGUEZ, et al, | ) | |
| [Glenn Lewellen] | ) | |
| Defendants. | ) | |

*GLENN LEWELLEN'S PETITION FOR A WRIT OF HABEAS CORPUS
AD TESTIFICANDUM*

GLENN LEWELLEN, by his attorneys, Andréa E. Gambino and Matthew J. Madden, respectfully request that this Court enter an Order requiring that the United States Marshal's Service arrange for the presentment of an inmate, JASON L. CODAY, number B70825, currently in the custody of the Illinois Department of Corrections, to be a material witness at trial in the above-captioned matter.  In support of this Petition, Mr. Lewellen, through counsel, states the following:

(1)     Counsel have provided the government with proper alibi notice, pursuant to Federal Rules of Criminal Procedure 12.1(2).

(2)     One of the witnesses named in the notice is JASON L. CODAY.

(3)     Mr. Coday is currently in the custody of the Illinois Department of Corrections, Lawrence Correctional Center, 10940 Lawrence Road Sumner, Il 62466.  His inmate number is B70825.

(4)     Mr. Coday will be a material witness for the defense of Mr. Lewellen.

WHEREFORE, GLENN LEWELLEN respectfully requests that this Court

grant his petition and enter an Order, requiring that Mr. JASON L. CODAY,

number B70825, be brought to the Northern District of Illinois, to be a material

witness at trial in the above-captioned matter, on January 9, 2012.

DATE:          November 23, 2011               Respectfully submitted,

                                               By: s/Andréa E. Gambino

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 23, 2011, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which sent notification of

such filing to the following:

Steven Block, Esq.
Tiffany Tracy, Esq.
Terra Reynolds, Esq.
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604


and I hereby certify that I have mailed by United State Postal Service or hand

delivered the document to the following non-CM/ECF participants: N/A.


DATE:          November 23, 2011          Respectfully submitted,

                                          By:     s/Andréa E. Gambino
                                                  Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

3

4

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 09 CR 332 |
| v. ) | |
| ) | Hon. Judge Joan B. Gottschall |
| GLENN LEWELLEN ) | |

## GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE INTRODUCTION OF EVIDENCE OF ABDUCTION AND SEXUAL ASSAULT OF A DRUG COURIER

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby moves this Court, *in limine*, to preclude defendant Glenn Lewellen ("Lewellen") from attempting to introduce as substantive evidence, or otherwise question any witness, concerning an alleged abduction and sexual assault of one of Saul Rodriguez's drug couriers in the mid-1990's. Such evidence is inadmissible as substantive evidence because it is both (a) outside the scope of the indictment, and (b) not independently admissible under Federal Rule of Evidence ("Rule") 404(b) because Lewellen is offering it merely as improper propensity evidence. Further, since the facts of the alleged incident are not probative of truthfulness, they may not be properly used to impeach Rodriguez (or any other witness) under Rule 608(b).

### BACKGROUND

In the mid-1990's, government witness Saul Rodriguez ("Rodriguez") was involved in narcotics trafficking and employed others to act as couriers of narcotics for him. At some time in or about 1996 or 1997, Rodriguez used the services of a courier (hereinafter "Courier A") to transport drugs for Rodriguez. At some point in time, Rodriguez suspected Courier A of having stolen from Rodriguez some marijuana that Courier A was supposed to have transported for Rodriguez. Rodriguez directed another person to abduct Courier A so that Courier A could be

questioned about the marijuana.  After Courier A was abducted, she was held against her will at a

house where she was interrogated about the marijuana.  Rodriguez was not present in the house

during any of the interrogation.  Courier A  denied that she had stolen the marijuana.  At some point,

a male individual forced Courier A to perform oral sex upon him.  Rodriguez at no point directed

that Courier A be sexually assaulted and only learned about the incident after Courier A managed

to escape from the house in which she was detained.  After escaping from the house, Courier A

maintained a relationship with Rodriguez and never informed him about the sexual assault.

  During his opening statement, Lewellen told the jury that it would be presented with evidence

of the abduction and assault of Courier A.  In particular, Lewellen first claimed that the evidence

would show that Rodriguez believed that Lewellen had stolen $400,000 from Rodriguez while they

were (lawful) business partners.  Trial Transcript ("Tr.") at 47.  Later, Lewellen claimed that the jury

would "hear Rodriguez has a very ugly history of exacting revenge on people that he thinks stole

from him" and that "[s]ome of these descriptions will sound like they should be out of a bad horror

movie." *Id.*  After describing the circumstances surrounding the abduction and sexual assault of

Courier A, Lewellen argued that such evidence was probative of both (a) Rodriguez' character for

committing such assaults; and (b) Rodriguez's bias to testify falsely by implicating Lewellen in the

offense conduct:

> Now, that's what Rodriguez does to someone that he believes stole from him.  If he's
> willing to go to those horrific lengths over missing marijuana, what lengths would
> he go to to [sic] someone that he believes stole $400,000 from him?
>
> So when Rodriguez was arrested in this case and his secret life came crumbling down
> around him, predictably he was ready with a plan to try and sidestep the
> consequences yet again.  And he thought, this kind of case, he not only needed
> cooperation, he needed major cooperation.

> And I think you're going to hear that Rodriguez believed major cooperation was either giving up a politician, or giving up a cop. Well, he wasn't able to get any politicians charged as part of this case, but when it came time to get his deal, he gave them the name Glen Lewellen. He gave them a cop. And he claimed to the Government that Glen was involved in a series of thefts, robberies, and kidnappings of drug dealers.

Tr.49. Since the government does not intend to present any evidence concerning the abduction and assault of Courier A, Lewellen's opening statement suggests that Lewellen will attempt both to introduce substantive evidence concerning the abduction and assault (*e.g.*, by calling Courier A as a witness and/or questioning other witnesses about the incident) and cross-examine Rodriguez about his knowledge of the incident for the purpose of bias impeachment.[1]

However, since the facts related to the abduction and sexual assault of Courier A are neither relevant to the charges, nor probative of Rodriguez's character for truthfulness, Lewellen should be prohibited from both (a) presenting to the jury with evidence about the abduction and sexual assault, and (b) mentioning such facts by including them in questioning or argument. Even if the Court concludes that such evidence of the abduction of Courier A is admissible for a legitimate purpose, this Court, at the very least, should prohibit defendants from introducing evidence of the sexual assault of Courier A because that assault occurred entirely without Rodriguez' knowledge or direction.

---

[1] Only Lewellen has expressed his intention to present facts about Courier A's abduction to the jury. For the reasons given herein, any similar attempt by a co-defendant should likewise be precluded.

3

<u>**ARGUMENT**</u>

I.   <u>**Substantive Evidence of Courier A's Abduction and Sexual Assault Is Irrelevant Because it Falls Outside the Charged Conspiracy.**</u>

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Rule 401.

Under that basic standard, the evidence concerning Courier A's abduction and sexual assault is clearly irrelevant.  Lewellen has argued – and the Court has for now agreed – that the conspiracy in this case did not begin until 1998, when Lewellen and Rodriguez began to steal cocaine and money together.  The alleged marijuana theft by Courier A took place in late 1997 or 1998, and did not involve any defendants.  Thus, the evidence of what happened to Courier A does not in any way tend to prove that the defendants at trial engaged in the charged offenses; likewise, none of that evidence tends to exculpate the defendants with respect to any of the charges.[2]  Accordingly, the facts concerning the Courier A abduction and sexual assault are inadmissible because they are plainly irrelevant.  *See* Rule 402 ("Evidence which is not relevant is not admissible."); *United States v. Neapolitan*, 791 F.2d 489, 501 (7th Cir. 1986) ("actions outside the scope of the specific RICO conspiracy charged . . . are . . . irrelevant to establishing that [the defendant is guilty of the racketeering and other charges] defined by the . . . indictment.").

II.   <u>**Rule 608(b) Does Not Permit Inquiry Concerning Courier A's Abduction and Sexual Assault.**</u>

Under limited circumstances, Rule 608(b) allows parties to inquire about specific instances

---

[2] Notably, Lewellen in his opening statement did not suggest that such facts were directly probative of Lewellen's guilt or innocence on the charged offenses.

4

of conduct by a witness for the purpose of supporting the defendant's character for truthfulness or

untruthfulness:

> Specific instances of the conduct of a witness, for the purpose of attacking or
> supporting the witness' character for truthfulness, other than conviction of crime
> as provided in rule 609, may not be proved by extrinsic evidence. They may, however,
> in the discretion of the court, ***if probative of truthfulness or untruthfulness***, be
> inquired into on cross-examination of the witness (1) concerning the witness'
> character for truthfulness or untruthfulness, or (2) concerning the character for
> truthfulness of untruthfulness of another witness as to which character the witness
> being cross-examined has testified.

Rule 608(b) (emphasis added). Even if specific incidents of conduct are probative of truthfulness

or untruthfulness, this Court can prohibit such inquiry under Rule 403 upon a finding that the

probative value of the evidence is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, misleading the jury confusion or undue delay. *See United States v. Holt*, 486

F.3d 997, 1002 (7th Cir. 2007); *United States v. Miles*, 207 F.3d 988, 993 (7th Cir. 2000).

Based upon Lewellen's opening statement, the government anticipates that he may attempt

to conduct Rule 608(b) impeachment of Rodriguez by inquiring about Courier A's abduction and

sexual assault. Such an inquiry falls outside of the scope of Rule 608(b) for the simple reason that

the conduct, though admittedly brutal, is not probative of Rodriguez's character for truthfulness.

The Seventh Circuit has held that drug crimes and violent crimes are not offenses that are

inherently probative of character for truthfulness. For example, in *United States v. Salem*, 578 F.3d

682, 686 (7th Cir. 2009), the Court concluded that inquiry of a government cooperator concerning

an unrelated murder in which he had been implicated was not admissible under Rule 608(b).[3] *See*

---

[3] Notably, the *Salem* Court distinguished Rule 608(b) impeachment from specific bias
impeachment. The problem for Lewellen, however, is that Rodriguez has not denied that he
ordered the abduction of Courier A, so there is no basis for defendant to argue that the incident is
relevant to establishing Rodriguez's general bias - by admitting the conduct, he opens himself up

*also United States v. Collins*, 90 F.3d 1420, 1429 (7th Cir. 1996) (inquiring into witness' past drug dealing only allowed if related to specific bias of the witness). *See also United States v. Geston*, 299 F.3d 1130, 1137 (9th Cir. 2002) (affirming district court's decision to exclude evidence of violent prior acts because they did not constitutes conduct which was "probative of [defendant's] character for untruthfulness or his credibility"); *United States  v. Tate*, 633 F.3d 624, 631 (8th Cir. 2011) (holding that the fact that a police officer "may have assaulted the bartender is not probative of [the officer's] character for truthfulness, so any extrinsic evidence tending to show [that the assault occurred] would not be admissible"); *United States v. Parker*, 133 F.3d 322, 327 (5th Cir. 1998) (affirming district court's exclusion of evidence that defendant had pending state murder charges because "[v]iolent crimes . . . are irrelevant to a witness's character for truthfulness.") The abduction and assault of Courier A simply is not the type of conduct that relates to truth-telling and, therefore, inquiry about the conduct may not be had under Rule 608(b).

In this case, Lewellen's goal in pursuing this line of inquiry is not, of course, to establish Rodriguez's bias - it is merely to associate him with an act of brutality unrelated to the charged conspiracy for the purpose of generally attacking his character and to inflame the passions of the jury against the government for calling Rodriguez as a witness.   Conducting an examination to accomplish these goals is not permissible under the rules of evidence and would be improper.

---

to being charged with that offense (if within the governing statute of limitations).  There is likewise no evidentiary basis to conclude that Rodriguez is falsely denying that he ordered the sexual assault of Courier A, who testified before the grand jury that she did not even mention the assault to Rodriguez after she escaped from her confinement.  To the extent that this Court deems inquiry about the sexual assault as impeaching of Rodriguez's denial of having directed such activity, this Court should require Lewellen to make an offer of proof outside of the presence of the jury to demonstrate how the evidence it intends to admit actually impeaches Rodriguez on this point.

6

## III.   **Evidence Concerning Courier A's Abduction and Sexual Assault Is Not Admissible under Rule 404(b).**

Likewise, similar concerns preclude Lewellen from introducing the evidence of Courier A's abduction and assault.  Under Rule 404(b), a defendant may introduce evidence of other crimes and acts of other persons if such evidence "tends, alone or with other evidence, to negate [the defendant's] guilt of the crime charged against him." *United States v. Della Rose,* 403 F.3d 891, 901 (7th Cir. 2005).  In particular, Rule 404(b) provides:

> (b) Other Crimes, Wrongs, or Acts.– Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

By its plain language, however, Rule 404(b) bars evidence that is being introduced merely to show the character or propensity of a person to commit a particular bad act.  *See United States v. Knope*, 655 F.3d 647, 656 (7th Cir. 2011) ("Evidence of other crimes, wrongs, or acts is not admissible to prove that the defendant has a propensity to commit the crime charged."); *Agushi v. Duerr*, 196 F.3d. 754, 760 (7th Cir. 1999)  (citing *Huddleston v. United States*, 485 U.S. 681, 685-86 (1988)) (noting that the fact that the rule referenced "person" as opposed to "parties of the case" strongly suggested that Rule 404(b) should be applied to any actor, regardless of whether they are a party to the case); *see also United States v. McClure*, 546 F.2d 670, 672-73 (11th Cir. 1977) (affirming that defendant can seek to admit character evidence for non-propensity purposes under Rule 404(b)).

"Courts use a four-part test to determine the admissibility of other acts evidence: (1) the evidence must be directed toward establishing a matter in issue other than the defendant's propensity

to commit the crime charged; (2) the evidence must show that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence must be sufficient to support a jury finding that the defendant committed the similar acts; and (4) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice." *Knope*, 655 F.3d at 656-657.

In this case, any claim that Courier A's abduction and assault are admissible fails on the first part of the Rule 404(b) test because, as Lewellen expressly asserted at trial, he seeks to introduce that evidence for the sole purpose of generally establishing that Rodriguez has a propensity for engaging in violent abductions: "Now, that's what Rodriguez does to someone that he believes stole from him. If he's willing to go to those horrific lengths over missing marijuana, what lengths would he go to to [sic] someone that he believes stole $400,000 from him?" In other words, Lewellen appears to be conceding that the Courier A incident generally shows that Rodriguez has a propensity to retaliate against those whom he suspects of having cheated him in some way. Accordingly, he cannot satisfy the Rule 404(b) test. *See United States v. Williams*, 458 F.3d 312, 314 (7th Cir. 2006) (even though defendants are afforded more leeway in introducing "bad acts" evidence under one of the Rule 404(b) exceptions . . . this did not afford defendants more leeway in admitting propensity evidence in violation of the prohibition of Rule 404(b)).

Likewise, the Courier A evidence fails on the second part of the Rule 404(b) test because the facts surrounding the Courier A incident are completely different and unrelated to any valid Rule 404(b) purpose. Though not completely clear, Lewellen may be suggesting that, since Rodriguez retaliates aggressively against those who steal from him, he is now "retaliating" against Lewellen by testifying falsely against Lewellen, and, therefore, that the Courier A incident is relevant to

8

establishing Lewellen's *modus operandi* or motive for testifying against Lewellen.  If that is Lewellen's argument, it undermines his entire Rule 404(b) claim because one could hardly consider two more contrasting forms of retaliation (violent abduction versus testifying falsely against somebody).  As discussed above, by Lewellen's own theory of when the racketeering conspiracy started the abduction of Courier A is entirely unrelated to the charged offenses, and Lewellen has at no time suggested that Rodriguez abducted Lewellen or otherwise directed violence at him for any purpose.[4]

Furthermore, the fact that Rodriguez had Courier A kidnapped to determine what happened to the missing marijuana does not provide evidence of why he would have a motive to testify falsely against Lewellen at trial.  Defendant argues that Rodriguez is falsely implicating Lewellen in order to secure a favorable cooperation deal from the government, but it is clear that the Courier A assault occurred without any intent to secure a cooperation deal with the government.  At the end of the day, the Courier A abduction and defendant's relationship to Lewellen do not have a thing to do with each other.

## IV.   Even If Evidence of Courier A's Abduction Is Deemed Admissible, Evidence of Courier A's Sexual Assault Should Be Prohibited.

Finally, the government asks that, should this Court conclude that Lewellen is entitled to introduce evidence concerning Courier A's abduction, the Court should nonetheless bar Lewellen from inquiring, mentioning or otherwise presenting evidence related to Courier A's subsequent sexual assault.  As discussed above, Rodriguez did not order or direct anybody to sexually assault

---

[4] Indeed, Rodriguez never attempted to abduct Lewellen despite his alleged theft of $400,000 from Rodriguez; compared with the relatively much smaller value of the marijuana that Courier A was suspected of having stolen, the fact that Rodriguez never abducted Lewellen only highlights the differences and unrelatedness of the two incidents

Courier A and, to the government's knowledge, Lewellen has no evidence suggesting otherwise.

Since the sexual assault was not directed by Rodriguez, and he had no knowledge that it would take

place, the fact that it occurred is in no way probative with respect to any of the Rule 404(b), Rule

608(b) or general impeachment bases that Lewellen (wrongly) claims allow him to present such

evidence.  At a minimum, this Court should demand that Lewellen make an offer of proof outside

of the presence of the jury demonstrating that both (a) Rodriguez directed or had prior knowledge

of the sexual assault, and (b) how such direction or knowledge furthers a legitimate evidentiary use

under the Federal Rules of Evidence.

### CONCLUSION

Based on the foregoing, the government respectfully requests that this Court grant the

government's motion.

Respectfully submitted,


PATRICK J. FITZGERALD
United States Attorney


By:    /s Terra Reynolds
TERRA L. REYNOLDS
STEVEN A. BLOCK
TIFFANY J. TRACY
Assistant United States Attorneys
United States Attorney's Office
219 S. Dearborn St., 5th Floor
Chicago, Illinois  60604


Dated:  November 23, 2011

10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332-2 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following documents:

**GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE INTRODUCTION OF EVIDENCE OF ABDUCTION AND SEXUAL ASSAULT OF A DRUG COURIER**

was served pursuant to the district court's ECF system.

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney

By:     s/ Terra Reynolds
TERRA REYNOLDS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL  60604
(312) 353-3148

Dated: November 23, 2011

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| JORGE URIARTE | ) | |
| MANUEL URIARTE | | |

## GOVERNMENT'S MOTION *IN LIMINE* REGARDING
## ADMISSION OF CERTAIN EVIDENCE

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United

States Attorney for the Northern District of Illinois, hereby moves the Court *in limine* for the

admission of certain evidence related to defendants Jorge Uriarte and Manuel Uriarte.  In support

of its motion, the government states as follows.

## I.      Evidence Regarding Andres Flores's Arrests in 2002

During Manuel Uriarte's opening statement, counsel referred to the 2002 arrests of Andres

Flores, a government witness who will testify regarding the two charged murders and other acts in

furtherance of the conspiracy he committed with Manuel Uriarte, Jorge Uriarte, and other

defendants.  Counsel stated that in 2002, Flores was arrested for attempted murder because he tried

to kill someone and then got out on bond.  Tr. 91 (Ex. A).  Counsel also referenced Flores's arrest

for a separate incident in 2002 that occurred about a week later after he made bond.  *Id.*  By including

these assertions in his opening statement, counsel violated this Court's order barring evidence or

argument regarding the arrests of government witnesses.  R. 660.[1]  By referencing these two arrests

---

[1]  The Court granted the government's motion (R. 631) to bar evidence and argument
regarding the arrests of government witnesses.  Defense counsel further agreed to provide notice

1

during opening, defendant has plainly opened the door as to permit evidence regarding the circumstances that led to the arrests.

The first Flores arrest to which counsel referred stemmed from Manuel Uriarte and Flores' attempt to shoot and kill a member of a rival gang.[2]  Flores will testify that prior to the arrest, Manuel Uriarte contacted him to say that a rival gang had been hanging around the turf controlled by the City Knights, the gang in which Flores and the Uriarte brothers belonged.  Manuel Uriarte then drove Flores to the area where they saw members of the rival gang.  The vehicle with the rival gang members then tried to ram Manuel Uriarte's car.  Flores and Manuel Uriarte then got a firearm and drove back to the area.  When Flores and Manuel Uriarte saw the car with the rival gang members in it, Flores lowered the window and shot at the car.  Flores and Manuel Uriarte did not realize that a police car was nearby.  Flores and Manuel Uriarte tried to flee; Manuel Uriarte got away and Flores was arrested.

The second Flores arrest to which counsel referred stemmed from Jorge Uriarte and Flores' possession of a firearm in a vehicle and subsequent flight from law enforcement.  Flores will testify that about a week after his first 2002 arrest, he was driving in a car with Jorge Uriarte and they had a firearm.  The police attempted to pull over the car, which was driven by Jorge Uriarte, and Jorge Uriarte tried to flee.  Jorge Uriarte escaped on foot but Flores was arrested with the gun in his possession.

---

to the government and the Court of its intention to present evidence or argument of witness arrests or convictions more than 10 years old.  Defense counsel failed to provide both the government and the Court with notice of its intent to present evidence to the jury about Flores's arrests.

[2]  The facts underlying both of Flores' arrests were tendered to defense counsel as part of the discovery in this case.

The Seventh Circuit has held that "a party cannot be permitted on the one hand to introduce evidence that appears favorable to his arguments and then complain, after the circumstances are fully developed, because the evidence becomes detrimental to his cause." *United States v. Carter*, 720 F.2d 941, 948 (7th Cir. 1983). *See also United States v. Touloumis*, 771 F.2d 235, 241 (7th Cir. 1985) (collecting cases). So far, the jury has been left with the impression that in 2002 Flores was a one-man crime spree ("Andres Flores gets arrested for an attempt murder. He attempted to kill somebody"). Tr. 91. The government is entitled to elicit testimony regarding the actual circumstances of the arrests counsel referenced, which is that it was Flores *and* defendants Manuel and Jorge Uriarte who committed the crimes for which Flores was arrested.

The evidence regarding the circumstances of Flores's 2002 arrests should also be admitted because defendants have opened the door to the circumstances of the arrests through their statements and cross-examination regarding the Uriarte brothers' membership in the City Knights street gang. Defendants have suggested to the jury that the Uriarte brothers were members of a powerless gang, the City Knights. In opening statement, counsel stated that "[the Uriarte brothers] don't have a lot of power. They don't have a lot of sway. They're just guys from the neighborhood. He [Rodriguez] hangs out with these guys. He knows them from around the way. But that doesn't mean that Hector [Uriarte] is them. Unlike Saul, he doesn't have ties to big gangs like La Raza, or the gangs from the west side." Tr. 67. During the cross-examination of Lisette Venegas, counsel suggested that the Uriarte brothers were "hassled" by members of Rodriguez's gang, La Raza, because they are a member of a rival gang, the City Knights. Tr. 689. Counsel suggested that the gang to which the Uriarte brothers belonged was so weak and Hector Uriarte so incapable of defending himself that the Uriarte brothers could not even "be around to blow out birthday candles" at a party where La

3

Raza gang members were present.  Tr.  690.  To the contrary, the evidence regarding the Flores's

2002 arrests to which counsel already referred would show that Manuel Uriarte and Jorge Uriarte

were actively engaged in violence on behalf of the gang and were anything but weak and powerless.

The evidence is highly probative because it rebuts defendants' theory that the Uriarte brothers could

not have been engaged in a racketeering conspiracy with Rodriguez because Rodriguez was a

member of La Raza, a rival gang.  The statements and cross-examination by counsel have suggested

to the jury that the City Knights and the Uriarte brothers, were too weak to regularly associate with

La Raza members and, therefore, could not have been working together to commit the charged

crimes.  The evidence regarding Jorge and Manuel Uriarte's participation in the 2002 shooting and

attempted shooting is necessary to rebut those suggestions now that defendant's have opened the

door.

## II.    Evidence Regarding Manuel Uriarte's Move to California

During Manuel Uriarte's opening statement, counsel stated that in 2004, Manuel Uriarte had

a "very serious drug addiction" and moved to California.  Tr. 95-6.  Counsel then told the jury that

Manuel Uriarte stayed in California and became involved in a program counseling teens.  Tr. 97-8.

The government expects Saul Rodriguez to testify about the true reason that Manuel Uriarte left

Chicago for California in 2004.  Rodriguez will testify that in approximately 2003 or 2004, Manuel

Uriarte showed up at Rodriguez's house in Countryside unannounced and covered with blood.

Manuel Uriarte told Rodriguez that he had just stabbed a man near 51st and Ashland Avenue.

Rodriguez drove Manuel Uriarte to the Greyhound bus station and paid for a bus ticket for him to

travel to California.

The evidence regarding Manuel Uriarte's departure from Chicago is admissible for two

4

reasons. First, it is direct evidence of the charged racketeering conspiracy. The indictment charges that members of the racketeering enterprise "concealed and hid, and caused to be concealed and hidden, the purposes of the acts done in furtherance of the enterprise . . . to avoid detection and apprehension by law enforcement authorities and otherwise to provide security to members of the enterprise." Count One at ¶ 8(w). Though the evidence will not show that the stabbing itself was in furtherance of the enterprise (Manuel Uriarte did not provide any details to Rodriguez), it is probative of the enterprise's concealment activities that Manuel Uriarte went to Rodriguez to protect him when he was in trouble. It is also probative of the enterprise's efforts to avoid detection and apprehension by law enforcement. The evidence will show that Rodriguez, the leader of the enterprise, helped get Manuel Uriarte out of town in order to prevent Manuel Uriarte's apprehension by law enforcement. Having a member of the enterprise arrested obviously causes a significant risk that the enterprise's unlawful activities would be detected by law enforcement, and Rodriguez's assistance to Manuel Uriarte was designed to prevent such detection. In addition, the evidence regarding Manuel Uriarte showing up at Rodriguez's doorstep after a stabbing demonstrates the existence of the relationship between Rodriguez and Manuel Uriarte and the level of trust between them, both issues that the jury will consider when deciding whether the enterprise existed and whether Manuel Uriarte's was part of it.

Second, Manuel Uriarte opened the door to this evidence by telling the jury in opening statement about leaving Chicago for California in 2004 and the reasons he left. As it stands, the jury would be left with the mistaken impression that Manuel Uriarte left Chicago to deal with his drug habit and better himself. Though he may (or may not) have done that after leaving for California, it is certainly not the reason he left. In addition, the circumstances regarding Manuel Uriarte's flight

from Chicago is probative because it will rebut any withdrawal argument that he may make (counsel suggested at side bar during openings that he may later argue to the jury that Manuel Uriarte withdrew from the conspiracy when he left for California).  Without getting into a protracted discussion of the law of conspiracy withdrawal here, suffice it to say that leaving the area to avoid detection by law enforcement would be inconsistent with withdrawal.  Because evidence regarding Manuel Uriarte seeking out Rodriguez's help is direct evidence of the conspiracy – and because Manuel Uriarte has raised this issue – the government is entitled to have its witness, Saul Rodriguez, testify regarding his knowledge of why Manuel Uriarte left Chicago in 2004.

## III.    Conclusion

The government respectfully requests that the Court admit the foregoing evidence.


Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:    s/ Steven A. Block                        
TERRA L. REYNOLDS
STEVEN A. BLOCK
TIFFANY J. TRACY
Assistant United States Attorneys
United States Attorney's Office
Chicago, Illinois

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3    UNITED STATES OF AMERICA,         )

4                    Plaintiff,        )

5              -vs-                    )  No. 09 CR 332

6    GLEN LEWELLEN, HECTOR URIARTE,    )
     JORGE URIARTE, MANUEL URIARTE,    )
7    TONY SPARKMAN, and ROBERT CARDENA, )  Chicago, Illinois
                                       )  November 15, 2011
8                    Defendants.       )  10:00 a.m.

9                         VOLUME 1A
               TRANSCRIPT OF PROCEEDINGS - TRIAL
10       BEFORE THE HONORABLE JOAN B. GOTTSCHALL, and a jury

11   APPEARANCES:

12   For the Government:      MS. TERRA REYNOLDS
                             MR. STEVEN ANDREW BLOCK
13                           MS. TIFFANY JACQUELINE TRACY
                             ASSISTANT UNITED STATES ATTORNEYS
14                           219 South Dearborn Street
                             Chicago, Illinois  60604
15
     For Defendant
16   Glen Lewellen:           LAW OFFICES OF ANDREA E. GAMBINO
                             53 W. Jackson Boulevard, Suite 224
17                           Chicago, Illinois  60604
                             BY:  MS. ANDREA ELIZABETH GAMBINO
18
                             MR. MATTHEW JOSEPH MADDEN
19                           ATTORNEY AT LAW LLC
                             53 West Jackson Boulevard, Suite 703
20                           Chicago, Illinois  60604

21

22              COLETTE M. KUEMMETH, CSR, RMR, FCRR
                    OFFICIAL COURT REPORTER
23                   219 South Dearborn Street
                          Room 2328A
24               Chicago, Illinois  60604
                        (312) 554-8931
25

1  And the evidence will show you that Saul is just

2  one step ahead, telling tales, weaving stories, because you

3  never know when you just might need that golden parachute.

4  Saul set this up.  Why?  But why?  Because you need

5  someone to go down.  Saul knows.  He's worked these deals for

6  years.  You don't get a break unless some people get punished

7  for all of these violent acts.  But why Hector?  Why these

8  guys?  They don't have a lot of power.  They don't have a lot

9  of sway.  They're just guys from the neighborhood.  He hangs

10  out with these guys.  He knows them from around the way.  But

11  that doesn't mean that Hector is them.  Unlike Saul, he

12  doesn't have ties to big gangs like La Raza, or the gangs

13  from the west side.  No one but their families are going to

14  be upset if they go down.

15  And this is pretty convenient for Saul, who the

16  evidence will show is orchestrating the story, and who the

17  evidence will show has ties to La Raza.  It's common sense.

18  But there is a motive to lie that's even bigger

19  than getting out of prison.  It's called staying alive.  We

20  believe you will see that Saul is protecting others.

21  MS. REYNOLDS:  Objection, your Honor, regarding the

22  penalty.

23  MS. ARMOUR:  Not regarding the penalty.  Regarding

24  La Raza.

25  THE COURT:  Overruled.

1    who they will ask you to believe beyond a reasonable doubt.

2    The star witness against Manny Uriarte -- and I'm

3    going to put Saul Rodriguez off to the side for now, and I'll

4    spend a minute on him later.  But the key witness, the star

5    witness against Manny Uriarte is going to be a man named

6    Andres Flores.

7    Here's what Mr.  Flores will tell you.  He will

8    take that witness stand and he will tell you I am a murderer.

9    I am a kidnapper.  I am a home invader who goes into people's

10    homes usually with my 357-magnum.  I take that gun, and I

11    will put it in the face of a pregnant woman.  I'll put it in

12    her face if there are four children who are in the house

13    yelling and screaming.  I don't care what I have to do.  If I

14    have to shoot somebody when I'm in that house, I'll do it.

15    All I care about is getting what I want to get.  That will be

16    the essence of his testimony from that witness stand.

17    You are going to learn that in 2002, Andres Flores

18    gets arrested for an attempt murder.  He attempted to kill

19    somebody.  He gets out on bond.  On the bond, when he gets

20    out, he promises, of course, not to commit any crimes, not to

21    flee.  And you will find out that in 2002 when he got

22    arrested in March, he was true to the conditions of that

23    bond.  He didn't commit any crimes for approximately a week.

24    A week later, he gets arrested on another gun

25    charge.  This time he can't get out of jail, and so you will

Case 1:09-cr-00332 Document 696-1 Filed: 11/23/11 Page 1 of 2 PageID 29809
Case: 13-2321    Document: 7-6    Filed: 07/11/2013    Pages: 535

92
517

 1  find out that he spends 2002, most of 2002, 2003, 2004, up

 2  until December, in the penitentiary.

 3         You will know -- and I'll get to this in one

 4  minute, but I just want to make the point now.  By the time

 5  he gets out in 2004, Manny Uriarte is living in California

 6  and never comes back to live in Chicago, okay?

 7         He gets out of jail, this star witness that the

 8  Government is going to call against Manny, he gets out of

 9  jail in 2000 -- the end of 2004, and he's looking for work.

10  He has got to find something to do to make some money

11  starting in 2005.

12         What does he do?  The evidence will show he goes to

13  his good buddy who has a job for him.  Saul Rodriguez has a

14  job for him.  He has got a job for him to go kill somebody.

15  Because Saul knows somebody who needs somebody else to get

16  killed, Saul goes to Andres Flores, their star witness, and

17  says how about it?  You want to kill somebody?  You can make

18  some money.

19         Flores meets with the guy who is going to hire him

20  to kill another victim, and, of course, he's very concerned

21  about something here because he's being asked to kill

22  somebody.  What is he concerned about?  He's concerned about

23  how much money he's going to get paid to do this.

24         So they wind up making an agreement, and they agree

25  that for between 15 and $20,000, he will go and kill this

1    there's agents all over the place.  Does that bother him?

2    One of the vans gets right in front of him.  He smashes into

3    it.  He's able to get past that van, and he starts driving

4    down the street.

5         Now, this happens pretty quickly, and you're

6    actually going to get to see it because it's on video because

7    they have got so many agents there.

8         He gets past the first one, and now another van

9    starts cutting him off.  What does he do this time?  He turns

10   to try to get around the van.  He's not very successful

11   because what happens is he winds up hitting two trucks and a

12   cinder block -- a bunch of cinder blocks, and he's done, and

13   he's arrested, and he says:  You got me.  Ladies and

14   gentlemen, let me tell you.  Here's who I am, officers.  My

15   name is Gilbert De La Cruz, and I just want to tell you you

16   got me here, but I'm just a guy that's in the wrong place at

17   the wrong time.

18        He's arrested on April the 9th, 2009.  He's brought

19   over to the MCC with his buddy and some other people in April

20   of 2009.

21        Now, let's just freeze him for one minute.  We've

22   got him a couple blocks away here in the MCC, and I want to

23   talk about what Manny Uriarte is doing from 2004 to 2010.

24        You're going to learn that Manny Uriarte in 2004

25   had a very serious drug addiction.  That is why we asked you

 1 │ that question during voir dire when we were questioning you,

 2 │ could you give a fair trial to a person who was a drug addict

 3 │ at the time that this all occurred.  That's why we asked that

 4 │ question.

 5 │        Ladies and gentlemen, you're going to see that in

 6 │ 2004, Manny left Chicago, and he went and he moved to

 7 │ California, and his wife Sylvia and his kids Vanessa and

 8 │ Vivian joined him a couple months later, okay?

 9 │        You're going to see that between 2005 and 2010 when

10 │ he is arrested in California, he is involved in a program at

11 │ a place called Teen Challenge.  Teen Challenge is --

12 │        MR. BLOCK:  Objection, your Honor.

13 │        Sidebar on this?

14 │        THE COURT:  All right.

15 │     (Proceedings heard at sidebar.)

16 │        MR. BLOCK:  I'm sorry to interrupt counsel's

17 │ opening, but what possible relevance is it of what the

18 │ witness did after he left the conspiracy?  How is it even

19 │ going to come in?

20 │        MR. SPIELFOGEL:  Well, it's going to be relevant

21 │ for so many reasons.

22 │        First of all, there may very well be a withdrawal

23 │ defense, from 2004 to 2010, the five-year statute on Count 1

24 │ is done.

25 │        The second thing is it's going to be relevant to

 1   show that he was not hiding during this entire period.  Part

 2   of this period is a period when he knows that Saul Rodriguez

 3   and Andres Flores are in custody and cooperating, and he

 4   didn't run, and he didn't hide.

 5          THE COURT:  Are you going to be able to prove this

 6   up?

 7          MR. SPIELFOGEL:  Oh, sure.

 8          MR. BLOCK:  Judge, the problem is the evidence is

 9   going to show he did leave the conspiracy in 2004.  Mr.

10   Spielfogel just said that, and that's fine.

11          Where he was working, what he was doing, the fact

12   that he's a good person after that time is not going to be

13   able to come in.

14          THE COURT:  I think it can come in to a limit as

15   long as you're going to be able to prove it.

16          MR. SPIELFOGEL:  We can.  We have witnesses, Judge.

17          THE COURT:  All right.

18          MR. SPIELFOGEL:  Thank you

19       (End of proceedings at sidebar.)

20          MR. SPIELFOGEL:  The evidence will show that from

21   2004 until 2010, starting actually in 2005, Manny Uriarte was

22   involved with a program at Teen Challenge which is in

23   California.

24          He started there as one of the inpatients.  You're

25   going to learn from the director of that program at Teen

1  Challenge that he went from being an inpatient, to being a

2  counselor, to being one of the leaders, to being one of the

3  teachers over at Teen Challenge in California.

4        And you're going to find out, ladies and gentlemen,

5  that even after Flores is arrested, a year and a half after

6  Flores is arrested, a year and a half after Saul Rodriguez is

7  arrested, you will see that Manny Uriarte, knowing all these

8  people are in custody, knowing they could be saying or doing

9  whatever it is they want to do to try to blame everyone for

10 everything, he does one thing.  He stays there in California

11 in Teen Challenge, and he works with people who are trying to

12 get rid of their addiction, and he works to build a better

13 life for his family.  That's what the evidence is going to be

14 on Manny Uriarte.

15       Now, ladies and gentlemen, let's go back to what

16 Andres Flores is doing.  He's back here.  We got him across

17 the street.  He's over in the MCC.

18       As he's sitting there in his cell, what is he

19 thinking about?  He's thinking about, number one, just on the

20 April the 9th arrest, just on the April 9, 2009 arrest, he is

21 looking at a sentence of 30 years to life just on that, but

22 this is a man who knows he has got even bigger problems than

23 facing 30 years to life because he knows he's killed people,

24 and he knows he's attempted to kill people but wasn't

25 successful.  He knows that if he winds up getting charged

1           IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3    UNITED STATES OF AMERICA,          )
                                        )
4                   Plaintiff,          )
                                        )
5              -vs-                      )  No. 09 CR 332
                                        )
6    GLEN LEWELLEN, HECTOR URIARTE,     )
     JORGE URIARTE, MANUEL URIARTE,     )
7    TONY SPARKMAN, and ROBERT CARDENA, )  Chicago, Illinois
                                        )  November 22, 2011
8                   Defendants.         )  10:30 a.m.

9                        VOLUME 5A
             TRANSCRIPT OF PROCEEDINGS - TRIAL
10      BEFORE THE HONORABLE JOAN B. GOTTSCHALL, and a jury

11   APPEARANCES:

12   For the Government:      MS. TERRA REYNOLDS
                              MR. STEVEN ANDREW BLOCK
13                            MS. TIFFANY JACQUELINE TRACY
                              ASSISTANT UNITED STATES ATTORNEYS
14                            219 South Dearborn Street
                              Chicago, Illinois  60604
15
     For Defendant
16   Glen Lewellen:           LAW OFFICES OF ANDREA E. GAMBINO
                              53 W. Jackson Boulevard, Suite 224
17                            Chicago, Illinois  60604
                              BY:  MS. ANDREA ELIZABETH GAMBINO
18
                              MR. MATTHEW JOSEPH MADDEN
19                            ATTORNEY AT LAW LLC
                              53 West Jackson Boulevard, Suite 703
20                            Chicago, Illinois  60604

21

22            COLETTE M. KUEMMETH, CSR, RMR, FCRR
                    OFFICIAL COURT REPORTER
23                 219 South Dearborn Street
                          Room 2328A
24                 Chicago, Illinois  60604
                        (312) 554-8931
25

1   Q.   They helped you out.

2        Let's talk about March of 1999.  Remember this?

3   Where you had picked up some cocaine?  I don't know if it was

4   liquid cocaine, but you had some cocaine in your car.

5   Remember that?

6   A.   Yes.

7   Q.   March, 1999.

8   A.   Approximately.  Around.

9   Q.   And as you drove away with that cocaine, you were

10  followed, weren't you?

11  A.   Yes.

12  Q.   You said by somebody in a Mercedes Benz.

13  A.   Yes.

14  Q.   And you knew they were following you with the cocaine in

15  your car, right?

16  A.   Yes.

17  Q.   So you called Saul Rodriguez for help, right?

18  A.   Yes.

19  Q.   You called Saul Rodriguez for the protection he could

20  give you, isn't that right?

21  A.   Yes.

22  Q.   And what he told you to do is he told you that when you

23  drove in to La Razas territory, the other car would stop

24  following you, isn't that right?

25  A.   Yes.

1   Q.   And that's what you did.  You were able to drive into an

2   area of the city, and these guys in their Mercedes Benz who

3   wanted that cocaine stopped and left, didn't they?

4   A.   Yes.

5   Q.   And then you went on to meet Saul and these people's

6   whose names you can't seem to remember who were all the La

7   Razas people, right?

8   A.   Yes.

9   Q.   The Uriarte brothers aren't La Razas, isn't that right?

10  A.   As far as I know.

11  Q.   As a matter of fact, they're in some gang, according to

12  you, that is so nothing you can't even remember the name of

13  it, isn't that right?  It has knights in the name, isn't that

14  right?

15  A.   Yes.

16  Q.   And when they even go to a birthday party at Saul

17  Rodriguez's house, they get hassled by these La Razas people,

18  don't they?

19  A.   In one occasion, they did, yes.

20  Q.   You remember that Hector was there for somebody's

21  birthday, and there was a shoving match between Hector and

22  members of the La Razas street gang?

23  A.   Yes.

24  Q.   Isn't that right?

25  A.   Yes.

1    Q.   Get out of here.  You're not even supposed to be around

2    to blow out birthday candles.  Isn't that what happened?

3    Isn't that what happened?

4    A.   There were no birthday candles.

5    Q.   But it was a social gathering.  It was a party.

6    A.   Yes.

7    Q.   That's what it was.  A social gathering.

8    A.   Yes.

9    Q.   And Hector and his brothers weren't even allowed there

10   because La Razas wanted them out, isn't that right?

11   A.   Saul protected them.  They were allowed to be wherever

12   they wanted to be.

13   Q.   There was a fight, wasn't there?

14   A.   There wasn't a fistfight.

15   Q.   There was a shoving match between the La Razas and

16   Hector Uriarte, right?

17   A.   Yes.

18   Q.   Okay.  You've told us that your deal depends on your

19   telling the truth here, is that right?

20   A.   Yes.

21   Q.   And you admitted it's the government who is going to

22   assess whether they think you told the truth for your deal,

23   isn't that right?

24   A.   Yes.

25   Q.   You took an oath to tell the truth to this jury,

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 09 CR 332-5 |
| v. | ) | Honorable Joan B. Gottschall |
| | ) | |
| MANUEL URIARTE | ) | |

## <u>PROPOSED JURY INSTRUCTION AS TO TESTIMONY OF</u> <u>DAVID VENEGAS</u>

NOW COMES THE DEFENDANTS, Glenn Lewellen, Hector Uriarte, Jorge

Uriarte, Manuel Uriarte, Tony Sparkman, and Robert Cardena, by and through their

respective attorneys, and propose the attached jury instruction to be given during the

testimony of David Venegas.

Respectfully submitted,


/s/ Robert A. Loeb


/s/ Keith A. Spielfogel
Attorneys for Manuel Uriarte

Robert A. Loeb
190 S. LaSalle St., Suite 520
Chicago, IL 60603
312-368-0611
ARDC No. 1681990

Keith A. Spielfogel
190 S. LaSalle St. Suite 520
Chicago, IL 60603
312-236-6021
ARDC No. 2689537

You have heard testimony from David Venegas, who:

    (a) received immunity; that is a promise from the government that any testimony or other information he provided would not be used against her in a criminal case.
    (b) stated that he was involved in the commission of the offense as charged against the defendants.

      You may give his testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care.

Seventh Circuit 3.13
Modified for the individual circumstances of the witness

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA    )
                                )        Case No. 09 CR 332-5
      v.                    )        Honorable Joan B. Gottschall
                                )
MANUEL URIARTE          )

## **PROPOSED JURY INSTRUCTION AS TO TESTIMONY OF ROY COCKRIEL**

     NOW COMES THE DEFENDANTS, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Tony Sparkman, and Robert Cardena, by and through their respective attorneys, and propose the attached jury instruction to be given during the testimony of  Roy Cockriel.

                     Respectfully submitted,


                     /s/ Robert A. Loeb


                     /s/ Keith A. Spielfogel
                     Attorneys for Manuel Uriarte

Robert A. Loeb
190 S. LaSalle St., Suite 520
Chicago, IL 60603
312-368-0611
ARDC No. 1681990

Keith A. Spielfogel
190 S. LaSalle St. Suite 520
Chicago, IL 60603
312-236-6021
ARDC No. 2689537

1

You have heard testimony from Roy Cockriel, who:

    (a) received immunity; that is a promise from the government that any testimony or other information he provided would not be used against her in a criminal case.

    (b) stated that he was involved in the commission of the offense as charged against the defendants.

    You may give his testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care.

Seventh Circuit 3.13
Modified for the individual circumstances of the witness

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA    )
                                       )       Case No. 09 CR 332-5
      v.                       )       Honorable Joan B. Gottschall
                                         )
MANUEL URIARTE               )

**<u>PROPOSED JURY INSTRUCTION AS TO TESTIMONY OF
FARES UMAR</u>**

NOW COMES THE DEFENDANTS, Glenn Lewellen, Hector Uriarte, Jorge

Uriarte, Manuel Uriarte, Tony Sparkman, and Robert Cardena, by and through their

respective attorneys, and propose the attached jury instruction to be given during the

testimony of Fares Umar.

Respectfully submitted,

/s/ Robert A. Loeb

/s/ Keith A. Spielfogel
Attorneys for Manuel Uriarte

Robert A. Loeb
190 S. LaSalle St., Suite 520
Chicago, IL 60603
312-368-0611
ARDC No. 1681990

Keith A. Spielfogel
190 S. LaSalle St. Suite 520
Chicago, IL 60603
312-236-6021
ARDC No. 2689537

1

You have heard testimony from Fares Umar, who:

(a) received benefits from the government in connection with this case, an agreement to a recommendation of a lesser sentence in exchange for his plea and testimony.
(e) has pleaded guilty to an offense arising out of the same occurrence for which the defendant is now on trial. His/ her guilty plea is not to be considered as evidence against the defendant.
You may give his/her testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care.


Seventh Circuit 3.13
Modified for the individual circumstances of the witness

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA  ) | |
| ) | No. 09 CR 332 |
| v.          ) | |
| ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, et. al.    ) | |

## GOVERNMENT'S MOTION FOR A DEPOSITION UNDER RULE 15(a)

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby moves to depose Forensic Examiner Courtney Melendez under Federal Rule of Criminal Procedure 15(a) and Federal Rule of Evidence 804(a) and (b)(1).  In support of its Motion, the United States states as follows:

1.      Courtney Melendez was a Forensic Scientist at the Illinois State Police Division of Forensic Services, in Chicago, Illinois, and is an expert in the examination and identification of fingerprints.  On January 27, 2003, Ms. Melendez received 15  items from the Chicago Police Department that were recovered from the vehicle in which the body of Miguel Delatorre was discovered.

2.      From June 17, 2004 to June 27, 2004, Ms. Melendez examined the items that were tendered to her by the Chicago Police Department to determine whether there were latent fingerprint impressions that were suitable for comparison.  It is anticipated that Ms. Melendez will testify consistent with her report that her examination of the items revealed that she did not find fingerprints of either Manuel Uriarte or Jorge Uriarte, or any other person, because there were no latent impressions that were suitable for comparison.

3.      After the Government issued a subpoena for Ms. Melendez's testimony, Ms. Melendez advised that she is on emergency bed rest pursuant to her doctor's orders, and that taking

her off bed rest could result in a miscarriage of her pregnancy.  Ms. Melendez is not due to give birth

until the Spring of next year.

4.       As a result of Ms. Melendez's medical condition, the Government forwarded a

proposed stipulation to the defense regarding her testimony on October 31, 2011.  On November 7,

2011, the Government sent follow-up E-mail correspondence to the defense regarding whether they

would agree to the proposed stipulation.

5.       On November 17, 2011, the Government proposed a revised stipulation regarding Ms.

Melendez's testimony, and to date, the defense has not responded to the proposed stipulation despite

several inquiries.

6.       Due to Ms. Melendez's existing medical infirmity, the government moves to preserve

her testimony pursuant to Federal Rule of Criminal Procedure 15(a) and Federal Rule of Evidence

804(a) and (b)(1). Rule 15(a) provides:

> A party may move that a prospective witness be deposed in order to preserve
> testimony for trial. The court may grant the motion because of exceptional
> circumstances and in the interest of justice. If the court orders the deposition to be
> taken, it may also require the deponent to produce at the deposition any designated
> material that is not privileged, including any book, paper, document, record,
> recording, or data.

Fed. R. Crim. P. 15(a).

7.       The Government may provide, on request, a letter from Ms. Melendez's physician,

in support of its motion that she is unavailable to testify at trial due to her existing physical infirmity.

See F.R.E. 804(a) and (b)(1).

## <u>CONCLUSION</u>

For all of the foregoing reasons, the government respectfully requests that the Court order

Courtney Melendez be deposed pursuant to Federal Rule of Criminal Procedure 15(a) and Federal

Rule of Evidence 804(a) and (b)(1).

Respectfully submitted,


PATRICK J. FITZGERALD
United States Attorney


By:    /s Tiffany J. Tracy_____
TERRA REYNOLDS
STEVEN A. BLOCK
TIFFANY J. TRACY
Assistant United States Attorneys
United States Attorney's Office
219 S. Dearborn St., 5th Floor
Chicago, Illinois  60604

Dated: November 23, 2011

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.2
### Eastern Division

UNITED STATES OF AMERICA

                              Plaintiff,

v.                                             Case No.: 1:09–cr–00332
                                               Honorable Joan B. Gottschall

Saul Rodriguez, et al.

                              Defendant.

# NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, November 28, 2011:

     MINUTE entry before the Honorable Joan B. Gottschall:as to Hector Uriarte, Jorge Uriarte, Tony Sparkman, Glenn Lewellen, Manuel Uriarte, Robert Cardena, Jury trial held on 11/28/2011, ( Jury Trial set for 11/29/2011 at 10:00 AM. ) Mailed notice (rj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.