APPEAL,COX,PROTO

# United States District Court
# Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1 (Chicago)
# CRIMINAL DOCKET FOR CASE #: 1:09–cr–00332–2
# *Internal Use Only*

Case title: USA v. Rodriguez et al

Date Filed: 04/16/2009
Date Terminated: 06/03/2013

| Date Filed | # | Page | Docket Text |
|------------|-----|------|-------------|
| 09/13/2011 | 506 | 2 | MOTION by Glenn Lewellen to suppress *Statements Made During Execution of Search Warrant Based on False Statements* (Attachments: #1 Exhibit Frankfort Police Report, #2 Exhibit Sanchez Proffers, #3 Exhibit Search Warrant, #4 Exhibit Lewellen Search Interview)(Gambino, Andrea) (Entered: 09/13/2011) |

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*DEFENDANT GLENN LEWELLEN'S MOTION TO SUPPRESS STATEMENTS MADE DURING EXECUTION OF SEARCH WARRANT BASED ON FALSE STATEMENTS*

Defendant GLENN LEWELLEN, by his attorneys SCOTT J. FRANKEL and ANDREA E. GAMBINO, pursuant to *Wong Sun v. United States,* 371 U.S. 471(1963) and *Brown v. Illinois,* 422 U.S. 590 (1975), respectfully request that this Court enter an Order, suppressing statements alleged to have been made by Glenn Lewellen, during the execution of a search warrant that was knowingly based on false statements, Mr. Lewellen's statements are the "fruit of the poisonous tree." In support of this Motion, Glenn Lewellen, through counsel, states the following:

I.    Chicago Police obtained a search warrant based on false statements and
      elicited statements from Glenn Lewellen during the execution of the warrant.

On May 23, 2006, at 7:00 p.m., officers of the Chicago Police Department, Special Operations Section [SOS] and Organized Crime Unit, and the Frankfort Police Department executed a search warrant at 9218 Corsair Road, Unit #2, a

storage unit owned by Glenn Lewellen. The search warrant was issued on May 23, 2006. *See, Exhibit 1,* Frankfort Police Incident Report.

Upon entry into Unit #2, located in a multi-unit commercial building, the police found three older model collector vehicles: 1 1994 red Ford Mustang, and 2 motorcycles. A Chicago Police Canine Unit searched the interior of the storage area and alerted to the red Ford Mustang. Officers searched the Mustang and found a plastic bag containing currency, two empty cardboard boxes, loose stacks of currency, two rolls of clear packaging tape, one roll of silver duct tape, one empty plastic package for the duct tape, one "Irwin" brand utility knife, six cardboard boxes, and two fingerprint lifts. *See,* Exhibit 1. The total amount of currency recovered from the search was $67,949.00. *See,* Exhibit 2, Asset Forfeiture Report. The government has represented in open court, on August 19, 2011, that none of these items will be introduced into evidence.

Chicago Police Officer J. Downes, Star 10739, reported that he interviewed Glenn Lewellen at the time the search warrant was being executed and reported that "his [Lewellen's] responses and statements are as follows":

> Subject related Unit #2 is a 4000 square foot Commercial Condominium with a concrete floor, overhead door and an interior office of approximately 100 square feet. Title to this property is held By [sic] Glenn Lewellen. The purchase price was $324,000 and the mortgage is $243,000. The deed was recorded in the Will County Recorders office on 22Dec05.
>
> Glenn Lewellens [sic] had been employed by the Chicago Police Dept. till June of 2002. At which time he took a leave of absence and stated he froze his pension till he turned 50. He related to I/O that he and his

partner got into the land developing business after he left the Police
Dept., he also related they were building single family homes.  He
formed his corporation, Lewellen Home Builders in November of 2000
and his is the President and Registered Agent for the corporation.  The
Corporation is currently in good standing with the State of Illinois.  I/O
asked Lewellen who his partner was and he stated "If your going to put
the cuff's [sic] on me I'll tell you, if you not I'd rather not say at this
time."

Subject stated that he had purchased 100 acres of un-improved vacant
land in Mokena.  He would put sidewalks and roads in the
development then subdivide the land into ¼ acre separate build able
[sic] lots and then sell them to individual builders.  He had 153 total
lots in all and has sold and closed on 151 of them to date.  He stated
that he sold the lots for $160,000 each.  The name of the project was
called "Bridges of Mokena." He stated he made a lot of money.  I/O
asked subject who the vehicles in the storage unit belonged to he
stated that the 55 and 57 Chevy's are his but the other vehicles
belonged to Andres Torres.  I/O asked who Andres Torres was an what
kind of relationship he had with him.  He responded by saying Torres
was a painter and that he had met him about six years ago.  He had
contracted him to paint some of the houses that he had built.  He had
paid him by check from his corporation.  He stated that Torres had
bartered with him to use the space to store the vehicles.  The deal was
Torres would build-out and paint the interior office in lieu of paying
rent.  This had been going on since subject had bought the unit in
February of 06.  Subject stated there was another mustang in there
but Torres took it out approximately one month ago.  I/O asked when
subject had last talked to or seen Torres and he responded by saying
about a week to ten days ago before he left to go to Mexico for vacation.
Subject stated that he originally let Torres park his cars in unit #5 but
it has no security system in it because subject has it for sale and the
property gets viewed by prospective buyers.  Subject stated that
himself and Torres are the only individuals that have the security code
to gain access to the unit.  I/O asked subject what brought him out to
his unit today, and he responded by saying his neighbor John Bitter
who owns and operates PIP Printing which is next door called him at
approximately 1445 hrs. to let him know that the police were in front
of his door.  I/O would like to document an observation made on subject
when he was able to view the name on the warrant he stated that it
didn't surprise him and now he knows what this was all about.

*See,* Exhibit 2.

II.    The Chicago Police "John Doe" Search Warrant for 9218 Corsair Road, Unit
       2, was based on false statements attributed by police officer John Rizzi to the
       "John Doe" informant.

On May 23, 2006, Sesario Sanchez was arrested by the Chicago Police

Department in possession of 19 kilograms of cocaine.  Subsequent to his arrest, he

agreed to cooperate with law enforcement and told the officers the source of his

cocaine – Andres Torres.  He also showed the officers that Torres was storing his

cocaine in the warehouse at 9218 Corsair Road. The officers, however, did not put

Torres' name in the Affidavit in support of the search warrant.  Rather, they put the

name of Saul Rodriguez in the search warrant.  Sanchez also reported that he had

received his 20 bricks of cocaine from Andres Torres around the corner from his

house.  He stated that he did not use drugs and had not for approximately 5-6

years.

In a proffer with DEA agent Bill Conrad and TFO James Healy, conducted on

July 27, 2006, along with ASUA Stuart Fullerton and Sanchez's attorney, Sanchez

said that the following statements in the search warrant Affidavit were untrue:

(1)    He does not use cocaine, although the Affidavit says that he does;

(2)    He did not pick up any drugs at the warehouse, as stated in the Affidavit;

(3)    He did not meet with or see Saul Rodriguez at the warehouse; and,

(4)    He was not at the ware house on May 20, 2006, as stated in the Affidavit.

Sanchez told the TFO Healy and Agent Conrad that "as he was walking through the building to see the judge, he was told by a police officer that he should say that the last time he used drugs was three days ago." Sanchez also stated that "he was surprised when the judge read the affidavit to him, because he had never mentioned Saul's name to the police officers.[1]

Chicago Police Officer John Rizzi, Star 3808, swore out a "John Doe" warrant to search "Saul", m/4/35 yoa, 5'09, 180 lbs., light skin, and the premises "Unit #2 at the Southwick Storage, located at 9218 Corsair Rd., Frankford, Will County, Illinois." In support of this warrant, Officer Rizzi, an SOS officer, claimed that:

> John Doe #2 [Sesar Sanchez] stated that he obtained 19 kilograms of cocaine from "Saul", and that he received the cocaine on May 20 from the Saul at the warehouse located at 9218 Corsair, where "Saul" opened the door to unit #2 storage area and gave John Doe # 2 "some white powder substance from a clear and partially taped package. John Doe #2 ingested this white powder substance and received a euphoric high. John Doe #2 stated that this is the same euphoric high John Doe #2 gets from ingesting cocaine. John Doe #2 observed more similar taped "bricks" inside the storage unit. John Doe #2 stated to P.O. Joseph Rizzi #3808 that "Saul" had two hundred more "bricks", each containing white powder substance. "Saul" stated to John Doe #2 "see all these "bricks" I have to get rid of, and could you move and sell these "bricks" for some serious money." John Doe #2 stated to "Saul" no thanks, since John Doe #2 already took possession of 19 kilos of cocaine and then left storage unit #2. John Doe #2 related to P.O. Joseph Rizzi #3808 that John Doe #2 has been ingesting cocaine for the

---

[1] On August 23, 2006, a DEA Agent administered a polygraph test. Two series of questions were asked, each series contained relevant questions. The administrator stated that answers to the second series of questions resulted in "deception indicated." When confronted with this opinion, Mr. Sanchez remained adamant in the truthfulness of his statements, saying that "what the police officers did to him was "not right" and that he was angry with them but did not feel vengeful towards them." *See,* Exhibit 4.

past 3 years.  John Doe #2 also related to P.O. Joseph Rizzi #3808 that
John Doe #2 has been to the storage unit three times in the last month
and that "Saul" always has "bricks" inside the storage unit."

*See,* Exhibit 3, Search Warrant.

Much of the above information was untrue, according to Sesar Sanchez in the

interview with TFO Healy and Agent Conrad.  Yet, all of this information was

presented to Judge Paul Biebel, who issued a warrant on May 23, 2006, at 4:05

p.m..  Pursuant to this warrant, officers of the Chicago and Frankfort Police

Departments went to Glenn Lewellen's storage facility at 9218 Corsair Road in

Frankfort, Illinois, searched Unit 2 and questioned Mr. Lewellen.

III.   The Search Warrant was based on false information, in violation of the
       Fourth Amendment, and the statements made during its execution were fruit
       of the poisonous tree.

       A.   The search warrant was based on information the swearing officer and
            informant knew to be false.

The Supreme Court held in *Franks v. Delaware* that intentionally or

recklessly submitting false statements in an affidavit supporting a search warrant

violates the Fourth Amendment. In order to obtain a hearing on a claim, a

defendant must make a substantial preliminary showing that a "false statement

knowingly and intentionally, or with reckless disregard for the truth, was included

by the affiant in the warrant affidavit, and the allegedly false statement is

necessary to the finding of probable cause." *Franks v. Delaware,* 438 U.S. 154, 155-

56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). A defendant may also challenge an

affidavit by demonstrating that the affiant intentionally or recklessly omitted

material information. *United States v. Harris*, 464 F.3d 733, 738 (7th Cir.2006).

*United States v. Hoffman,* 519 F.3d 672, 675 (7th Cir. 2008).

In this case, the John Doe #2 told TFO Agent Healy and Agent Conrad that

the police officer who submitted the Affidavit in support of the search warrant and

who presented John Doe to the judge who issued the warrant, changed his words

around and had him swear to a false affidavit.  The Seventh Circuit has held that

an affiant acts with reckless disregard for the truth when he or she "in fact

entertained serious doubts as to the truth of his allegations." *United States v. A*

*Residence Located at 218 Third Street, New Larus, Wisconsin,* 805 F.2d 256, 258

(7th Cir.1986), *cited in, United States v. Lowe*, 516 F.3d 580, 584 (7th Cir. 2008).  In

this case, a police officer deliberately changed information provided by an informant

and the informant knowingly swore to information he knew to be untrue.  Both the

police officer and the informant acted in reckless disregard for the truth.

    B.      Statements obtained as a result of the illegal search must be
             suppressed as fruit of the poisonous tree.

The Supreme Court established in *Wong Sun v. United States,* 371 U.S. 471,

487–88 (1963), when there is a violation of the Fourth Amendment, the statements

made by the defendant as a result of the illegal search must be suppressed unless

the government proves the subsequent incriminating statements were not fruit of

the illegal conduct of the police, but rather were obtained by "means sufficiently

distinguishable to be purged of the primary taint."  In *Brown v. Illinois,* the

Supreme Court identified four factors as relevant when determining whether statements made to police after an illegal seizure are admissible: (1) whether *Miranda* warnings were given; (2) the temporal proximity of the statements and the Fourth Amendment violation; (3) the existence of intervening causes between the violation and the statements; and (4) the purpose or flagrancy of the official misconduct. 422 U.S. 590, 603–04 (1975).

In this case, application of all four factors supports a finding that Mr. Lewellen's statements are inadmissible.  First, the interviewing officer did not make a record of giving any *Miranda* warnings to Mr. Lewellen.  Secondly, the statements were made at the time of the search.  There were no intervening events or factors between the violation and the statements.  The official misconduct, deliberately presenting false information to a judge in order to obtain a search warrant, was flagrant and must not be tolerated.  The only meaningful way to discourage such violations of the law is to prohibit the use of any evidence or statements obtained as a result.

The Seventh Circuit has followed *Wong Sun* in cases such as *United States v. Nafzger*, 965 F.2d 213, 217 (7th Cir. 1992) and *United States v. Nikrasch*, 367 F.2d 740, 744 (7th Cir. 1966).  In *Nafzger*, the Court found that officers had conducted an illegal search for a truck and that statements to the officers, including an admission that the defendant knew the truck was stolen, should have been suppressed because the admissions were a direct result of the illegal search.  *United States v. Nafzger*,

965 F.2d 213, 217 (7th Cir. 1992). In the earlier case, officers obtained evidence from an illegal search of a car. Statements made by the defendant when confronted with the evidence were characterized as "fruit of the poisonous tree" that should have been suppressed. *United States v. Nikrasch*, 367 F.2d 740, 744 (7th Cir. 1966). *See also, Hebert v. Reynolds*, 207-CV-91, 2009 WL 3010510 (N.D. Ind. Sept. 15, 2009)(officer's improper claim of authority weighs against finding consent, *citing Nafger*).

Similar holdings have been made in more recent cases in other districts and circuits. *See, e.g., United States v. Rodgers*, 10-30254, 2011 WL 3907115 (9th Cir. Sept. 7, 2011)( The search was unconstitutional. All the physical evidence seized and Rodgers' subsequent statements to police must be suppressed under the exclusionary rule.); *United States v. Hill*, 10-4320, 2011 WL 3626788 (4th Cir. Aug. 18, 2011)(applying *Wong Sun* and reversing for determination of whether taint dissipated); *United States v. Kirkley*, 11-10097-JTM, 2011 WL 3880908 (D. Kan. Sept. 1, 2011)(The government failed to show the stop was either a consensual encounter or a valid *Terry* stop. Therefore, the statements made by defendant must be suppressed unless the government proved the subsequent incriminating statements were not fruit of the illegal stop).

The courts do not make a distinction between evidence obtained or statements made when conducting an analysis to determine whether either the evidence or the statements are fruit of the poisonous tree. The government, in this

case, recognizes that there is no legal basis to admit the evidence found as a result

of the illegal search and does not seek to admit the evidence.  There is no principled

basis for keeping out the evidence but admitting the statements.  Glenn Lewellen's

statements to Officer Downes are fruit of the poisonous tree and must be barred

from admission at trial.

IV.    The government knowingly used the illegally obtained evidence in at least
       one affidavit and one court filing, providing a basis for inquiring into the
       information that was presented to the Grand Jury to secure an indictment
       against Mr. Lewellen.

       Despite the fact that DEA agents – including TFO James Healy, an agent

involved in this case -- and Assistant United States Attorneys have known at least

since July 2006 that the search warrant that was executed at Mr. Lewellen's

warehouse unit was based on false information, this information was used in the

following documents:

(1)    it was included in paragraph 17 of the original complaint that initiated this
       case.  *See,* Document 1, filed April 9, 2009;

(2)    This search and the alleged statements obtained – including specific
       reference to Saul Rodriguez – was also used in the government's response to
       the Defendant's Motion to Reconsider Detention.  *See,*  Document No. 340, f
       iled April 26, 2011, page 5, Section D, entitled "Raid of Lewellen's Warehouse
       and Efforts to Conceal Illegal Activity."

The government's inclusion of illegally obtained information in the complaint that

initiated this case, gives rise to the question of whether the government also used

this information to obtain an indictment against Glenn Lewellen.  Glenn Lewellen

respectfully requests that this Court enter an Order requiring the government to

provide the all grand jury testimony, transcripts, and information in any format that was used in obtaining the indictment against him.

WHEREFORE, GLENN LEWELLEN, through his attorneys, respectfully requests that this Court enter an Order barring the admission of statements allegedly made by Glenn Lewellen to Officer Downes during the illegal search of his warehouse unit on May 23, 2006, because the statements were fruits of the poisonous tree.

DATE:      September 12, 2011          Respectfully submitted,

By:    s/Andréa E. Gambino
       s/Scott J. Frankel
       Attorneys for Glenn Lewellen

Frankel and Cohen
53 W. Jackson Blvd., Suite 1615
Chicago, Illinois  60604
(312) 759-9600
sfrankel@frankelandcohn.com

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

11

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 12, 2011, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which sent

notification of such filing to the following:

Counsel for Co-defendants

Steven Block, Esq.
Tiffany Tracy, Esq.
Terra Reynolds, Esq.
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604


and I hereby certify that I have mailed by United State Postal Service or hand

delivered the document to the following non-CM/ECF participants: N/A.


DATE:          September 12, 2011               Respectfully submitted,

                                        By:     s/Andréa E. Gambino
                                                Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

## FRANKFORT POLICE INCIDENT REPORT

| REPORTING AGENCY | SUPPLEMENTAL REPORTS | | INCIDENT REPORT NO |
|---|---|---|---|
| FRANKFORT | Crime Scene Photo Log; Digital Photo Disc | | 2006-01727 |

| ZONE | SUB-ZONE | DAY/DATE TIME OCCURED | DAY/DATE TIME REPORTED | STATUS |
|---|---|---|---|---|
| South | SI003 | Tuesday, May 23, 2006 19:00 | Tuesday May 23, 2006 19:00 | |

| UCR | CIRC | OFFENSE | | LOCATION | | |
|---|---|---|---|---|---|---|
| 6004 | 009 | Assist other PD | ☐ F | 9218 Corsair Road, Unit #2 | | |
| | | | | TYPE OR PLACE OF OCCURANCE | | CODE |
| | | | | Southwick Storage | | 140 |
| | | | | WEAPON OR TOOL USED | CODE | BIAS CODE |
| | | | | None | 99 | 99 |
| | | | | DOCUMENT CONTROL NUMBER/DCN | | |

| TYPE | COLOR | YEAR | MAKE | MODEL | BODY STYLE | LICENSE | STATE | YEAR |
|---|---|---|---|---|---|---|---|---|
| O | RED  RED | 1994 | Ford | Mustang | 2 DR | None | | |

| VIN | DISTINGUISHING MARKS | VALUE | TOWED/HOLD |
|---|---|---|---|
| 1FALP42T8RF162241 | | | |

On 05/23/06 at 1900 hours, I was notified by Sergeant Potter #305 to assist the Chicago Police Department with the execution of a Search Warrant. I met with Lieutenant Blake #454 of the Chicago Police Department's Special Operations Section at the rally point, Peace Community Church. Lt. Blake advised that members of the Special Operations Section, along with members of the Chicago Police Department's Organized Crime Unit, were going to execute a Search Warrant at 9218 Corsair Road, Unit #2. Lt. Blake advised that they expected to locate large amounts of narcotics, currency or both. Lt. Blake advised that he would like me to assist with evidence processing at the scene. Lt. Blake gave me a copy of the Search Warrant which was issued on 05/23/06 by a Cook County Judge.

I escorted the Chicago Police units to 9218 Corsair Road, which is a multi-unit commercial building. Upon our arrival, the Chicago Police executed the Search Warrant and secured the scene without incident. I took various photographs of the scene. Inside unit #2, were located three(3) older model collector vehicles, one(1) red 1994 Ford Mustang and two(2) motorcycles. Chicago Police Department Canine units conducted a search of the interior of unit #2, indicating on the 1994 Ford Mustang parked inside the unit. Chicago Police, along with members of the Metropolitan Area Narcotics Squad, conducted a search of the Ford Mustang locating large amounts of currency, in plain view, in the rear of the passenger compartment. The M.A.N.S. officers conducting the search of the vehicle were wearing gloves and did not handle any items. After completing their search of the unit, Lt. Blake advised me that he would like me to process the items of evidence and the inside of the Ford Mustang for fingerprints. I photographed the Ford Mustang and its contents.

In the interior of the vehicle, I observed the following: A plastic bag containing currency and two(2) empty cardboard box laying on the rear drivers side floorboard. Two(2) empty cardboard boxes and loose stacks of currency laying on the rear drivers side seat. A plastic bag containing currency and stacks of loose currency laying on the rear passenger side floorboard. Two(2) cardboard boxes containing vehicle parts laying on the rear passenger side seat.

In the trunk of the vehicle, I observed the following: Two(2) empty cardboard boxes each containing a white powdery residue along with plastic packing material. Two(2) rolls of clear packaging tape. One(1) roll of silver Duct Tape. One(1) empty plastic package for the duct tape. One(1) "Irwin" brand utility knife.

After photographing the evidence, the plastic bags were opened and the currency was removed. All currency was

| OFFICERS AT SCENE - REPORTING OFFICER FIRST | SIGNATURE/BADGE | SUPERVISOR | TIME ON CALL |
|---|---|---|---|
| Miller, Phil 326 | | | 4 hrs. |
| OTHER AGENCIES INVOLVED | | | |
| Chicago Police Department | | | |

## FRANKFORT POLICE INCIDENT REPORT

| REPORTING AGENCY | | SUPPLEMENTAL REPORTS | | INCIDENT REPORT NO | |
|---|---|---|---|---|---|
| FRANKFORT | | Crime Scene Photo Log; Digital Photo Disc | | 2006-01727 | |
| ZONE | SUB-ZONE | DAY/DATE TIME OCCURED | DAY/DATE TIME REPORTED | | STATUS |
| South | SI003 | Tuesday, May 23, 2006 19:00 | Tuesday May 23, 2006 19:00 | | |

turned over to and packaged by the Chicago Police Department. I processed the interior of the vehicle with silver/gray carbon fingerprint powder, locating fingerprint ridge detail on the interior side of the drivers door window and on the glass face of the rear view mirror. I collected the fingerprint ridge detail on two(2) fingerprint hinge lifters. I was unable to locate fingerprint ridge detail on the vehicle parts inside the cardboard boxes from the rear passenger side seat.

I packaged the items of evidence as follows: Item #1 - Plastic bag from the rear passenger side floorboard; Item #2 - Plastic bag from the rear drivers side floorboard; Item #3 - Two(2) cardboard boxes and plastic packaging material from the trunk;
Item #4 - Two(2) rolls of clear packaging tape, One(1) roll of silver Duct Tape and One(1) plastic package for the duct tape; Item #5 - One(1) "Irwin" brand utility knife;
Item #6 - Six(6) cardboard boxes from the rear passenger compartment; Item #7 - Two(2) fingerprint lifts taken from the interior drivers side window(7A) and the glass face of the rear view mirror(7B).

At 2230 hours, I turned over custody of the packaged items of evidence to Chicago Police Officer H. Desch #17136, evidence technician. Officer Desch advised me that his case number would be #369076. Lt. Blake thanked me for my assistance. No further.

| OFFICERS AT SCENE - REPORTING OFFICER FIRST | SIGNATURE/BADGE | SUPERVISOR | TIME ON CALL |
|---|---|---|---|
| Miller, Phil 326 | | | 4 hrs. |
| OTHER AGENCIES INVOLVED | | | |
| Chicago Police Department | | | |

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | | | Page 1 of 4 |
|---|---|---|---|---|

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: S/A Paulette L. Origel At: Chicago Division Office | ☒ ☐ ☐ ☐ ☐ | ████ | ███████ | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | | 8. Date Prepared 08/23/2006 | |

9. Other Officers: S/A Billy Conrad and TFO Daniel Matuszak

10. Report Re: Polygraph Examination of Sesario SANCHEZ on 08/23/2006
    Results:  DI

## SYNOPSIS

On May 23, 2006, Sesario SANCHEZ was arrested by the Chicago Police
Department for possession with intent to distribute approximately 19
kilograms of cocaine. SANCHEZ cooperated with officers after his arrest.

In July of 2006, DEA agents in Group 21 of the Chicago Division Office
interviewed SANCHEZ under Proffer. SANCHEZ informed the DEA agents that
the CPD officers had placed an incorrect name on a search warrant, which
caused him to provide a false swearing to the complaint before the judge.

On August 23, 2006, Special Agent/Polygrapher Paulette Origel administered
an exam to SANCHEZ in Chicago, IL. The first issue held in question was
whether or not SANCHEZ provided the CPD officers with the correct name of
his supplier. The second issue was whether he had obtained the cocaine
from Andres Torres.  The results of the exam showed Deception Indicated.
SANCHEZ was adamant that he was stating the truth.

## DETAILS

1. In July of 2006, agents of the DEA Chicago Division Office met on two
   separate occasions with Sesario SANCHEZ as part of a proffer through
   the United States Attorney's Office in Chicago, IL. During the course
   of the interview, SANCHEZ informed agents that he had cooperated with
   Chicago Police Officers after he was arrested on May 23, 2006 with 19
   kilograms of cocaine. According to SANCHEZ, he informed the officers

| 11. Distribution: Division ST - Polygraph Unit | 12. Signature (Agent) S/A Paulette L. Origel | 13. Date 8/31/06 |
|---|---|---|
| District | 14. Approved (Name and Title) Howard Oberst Group Supervisor | 15. Date 8/31/06 |
| Other | | |

| DEA Form    - 6 (Jul 1996) | **DEA SENSITIVE** Drug Enforcement Administration |
|---|---|

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

SNCHZ_001_0001

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** | ███████████ | |
| *(Continuation)* | | |

4.
                    Page  2  of  4

| 5. Program Code | 6. Date Prepared |
|---|---|
| | 08/23/2006 |

that his supplier for the cocaine was Andres Torres and showed them the warehouse where Torres was storing his supply of cocaine. SANCHEZ was then taken before a state court judge to swear to a search warrant for that warehouse. According to SANCHEZ, the police officers had falsified the document by inserting the name of "SAUL" as the source of supply, instead of Andres Torres. For further details, refer to this case file.

2. On July 11, 2006, S/A Paulette Origel, S/A Bill Conrad and TFO Daniel Matuszak met with SANCHEZ at the Chicago Division Office for the purpose of a polygraph examination. S/A Conrad spoke with the defense attorney earlier that morning. The defense attorney chose not to be present. At approximately 9:39 AM, S/A Origel read the Miranda Warnings to SANCHEZ in the company of the aforementioned agents. A consent form was then read to and signed by SANCHEZ as witnessed and signed by TFO Matuszak and S/A Conrad. All then left the room leaving only SANCHEZ and S/A Origel.

3. Prior to continuing with the polygraph examination, SANCHEZ was asked various questions in regards to his health. According to SANCHEZ, he had not consumed any alcoholic beverage or illegal drug in the preceding twenty-four hour period. SANCHEZ also stated that he had not used any type of illegal drug in approximately 5-6 years. Additionally, SANCHEZ informed S/A Origel that he was rested and in good health. SANCHEZ appeared to be alert and did not exhibit any detectable signs of pain or discomfort.

4. During the pretest interview, SANCHEZ stated the following information:

- SANCHEZ provided the same information that was previously stated during the proffer interviews.

- SANCHEZ stated that he did not supply the officers with the name of "Saul" at any time. SANCHEZ gave only the name of Andres Torres to the officers because that is the only person with whom he has had illegal drug transactions.

- SANCHEZ stated that "Saul" is Andres Torres' brother-in-law and business associate. SANCHEZ met him many years ago at a party, but has not spoken with him since then.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration
Neither it nor its contents may be disseminated outside the agency to which loaned

Previous edition dated 8/94 may be used.

SNCHZ_001_0002

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** <br> *(Continuation)* | | |
| 4. <br> Page  3  of  4 | | |
| 5. Program Code | 6. Date Prepared <br> 08/23/2006 | |

- SANCHEZ had received 20 "bricks" of cocaine from Andres Torres around the corner from his house. SANCHEZ did not let Torres into his home because his family was throwing a birthday party for him. According to SANCHEZ, there was no one else present during the transaction between him and Torres.

5. SANCHEZ was afforded a polygraph examination consisting of the following relevant questions:

SERIES I

1. On the date of your arrest, did you only give the name Andres?
   Answer - Yes

2. On the date of your arrest, did you only give the name Andres to the officers?
   Answer - Yes

SERIES II

1. Did you get those bricks of cocaine from Andres?
   Answer - Yes

2. Did you get those bricks of cocaine from Andres around the corner from your house?
   Answer - Yes

6. It is the opinion of the examiner that SANCHEZ's charts in Series II resulted in **Deception Indicated** (DI). SANCHEZ was advised of the examiner's opinion as to the results of the examination.

7. SANCHEZ remained adamant in the truthfulness of his statements previously given. SANCHEZ stated that what the police officers did to him was "not right" and that he was angry with them but did not feel vengeful towards them.

8. At approximately 2:45 PM, the polygraph examination was concluded.

---

DEA Form    - 6a
(Jul 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

SNCHZ_001_0003

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION *(Continuation)* | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| 4. Page  4  of  4 | | |
| 5. Program Code | 6. Date Prepared 08/23/2006 | |

9. The polygraph charts were forwarded to the DEA Office of Investigative Technology (ST) in Lorton, VA, for review and safekeeping.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

SNCHZ_001_0004

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | | | Page 1 of 3 |
|---|---|---|---|---|
| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
| 5. By: TFO James Healy<br>At: Chicago Field Division | ☐<br>☐<br>☐ | | | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | ☐<br>☐ | | 8. Date Prepared<br>07/28/06 | |
| 9. Other Officers: SA Bill Conrad | | | | |
| 10. Report Re: Second Proffer of Sesario SANCHEZ on 7-27-2006 | | | | |

DETAILS

1. On July 27, 2006, TFO James Healy and SA Bill Conrad attended a proffer of Sesario SANCHEZ at the U.S. Attorney's Office. Also present were AUSA Stuart Fullerton, and SANCHEZ's attorney, Lee Shalgus. SANCHEZ related the following.

2. SANCHEZ related that he was the co-affiant of a search warrant prepared by Chicago Police after his arrest. SANCHEZ related that this was a search warrant for the warehouse in Frankfort, Illinois at which Andres TORRES once showed SANCHEZ approximately 200 kilograms of cocaine.

3. SANCHEZ related that some of the statements in the affidavit were not true. SANCHEZ stated that he did not use cocaine as stated in the affidavit. SANCHEZ related that he did not pick up any drugs at the warehouse. SANCHEZ stated that he did not meet with or see Saul RODRIGUEZ at the warehouse. SANCHEZ related that he never dealt directly with Saul RODRIGUEZ. SANCHEZ related that he was not at the warehouse on May 20, 2006. SANCHEZ related that he was at home with family members all day.

4. SANCHEZ related that, after his arrest he was brought to a police facility. SANCHEZ related that he was then driven to the courthouse

| 11. Distribution:<br>Division<br><br>District<br><br>Other | 12. Signature (Agent)<br><br>TFO James Healy | 13. Date |
|---|---|---|
| | 14. Approved (Name and Title)<br>Ken Wolters<br>Group Supervisor | 15. Date |

DEA Form    - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

SNCHZ_001_0005

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION**<br>*(Continuation)* | ███████████ | |
| 4.<br>Page  2  of  3 | | |
| 5. Program Code | 6. Date Prepared<br>07/28/06 | |

at 26th & California Avenue.  SANCHEZ related that as he was walking
through the building to see the judge, he was told by a police
officer that he should say that the last time he used drugs was three
days ago.  SANCHEZ related that he was surprised when the judge read
the affidavit to him, because, he had never mentioned Saul's name to
the police officers.

5. Regarding other drug dealers, SANCHEZ has dealt with in the past,
SANCHEZ related that approximately two years ago, he was at LALO'S
restaurant in Berwyn, Illinois when he ran into a cocaine dealer
named ALEX.  SANCHEZ related that ALEX is a chubby guy, about 220 or
230 pounds in weight, and about 27 years of age, with one swollen
arm.  SANCHEZ related that ALEX offered to supply SANCHEZ with 50
kilograms of cocaine at $18,500.00 each.  SANCHEZ related that at the
time, he told ALEX he was not interested.

6. SANCHEZ related that ALEX was with another Hispanic male with him at
LALO'S.  SANCHEZ related that this man later approached him, and
introduced himself as MANUEL.  SANCHEZ identified a photograph of
PEDRO VICTORIA as MANUEL.  SANCHEZ related that PEDRO VICTORIA
offered to supply multiple kilograms of cocaine to SANCHEZ at
$18,000.00 each and told SANCHEZ that he could have as many as he
wanted.  SANCHEZ related that he did not accept the offer.

7. SANCHEZ related that around the same time period, he again ran into
VICTORIA at a bar near 45th & Western Avenue in Chicago called SEGUNDO
DIVORCO.  SANCHEZ related that at that time, they had no conversation
about drugs.

8. SANCHEZ related that he and ALEX used to deal with a marijuana dealer
named TITO, who lived in a white brick apartment building on the
South East corner of 44th & Artesian Avenue in Chicago.  SANCHEZ
related that TITO's real name is JOSE LNU, and he is described as a
Hispanic male, 25 years of age, approximately 6 feet 2 inches in
height.  SANCHEZ stated that TITO drives a KIA with Indiana license
plates.  SANCHEZ related that TITO deals in thousand pound loads of
marijuana, and he would keep the marijuana in that building.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

SNCHZ_001_0006