APPEAL,COX,PROTO

# United States District Court
# Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1 (Chicago)
# CRIMINAL DOCKET FOR CASE #: 1:09–cr–00332–2
## *Internal Use Only*

Case title: USA v. Rodriguez et al

Date Filed: 04/16/2009
Date Terminated: 06/03/2013

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 09/12/2012 | 1002 | 6 | MOTION by Noel Sanchez, City Of Chicago to modify as to Glenn Lewellen *and Intervene the September 6, 2011 Protective Order* (Attachments: # 1 Exhibit A–G)(McDonald, Mary) (Entered: 09/12/2012) |
| 09/12/2012 | | 40 | MOTION by Noel Sanchez, City Of Chicago to intervene (Omitted relief from motion #1002). (yap, ) (Entered: 09/14/2012) |
| 09/20/2012 | 1011 | 46 | SUPPLEMENT by Glenn Lewellen to motion for judgment of acquittal 863 *or Motion for a New Trial* (Attachments: # 1 Exhibit Mikhail Interview, # 2 Exhibit Kato notes, # 3 Exhibit "Joe" notes, # 4 Exhibit Glenn wouldn't notes, # 5 Exhibit Rodriguez Interview, # 6 Exhibit Cell phone incident notes, # 7 Exhibit Scorza Letter)(Gambino, Andrea) (Entered: 09/20/2012) |
| 09/26/2012 | 1016 | 78 | MINUTE entry before the Honorable Joan B. Gottschall: Motion hearing held on 9/26/2012 regarding motion to modify 1002 . The City of Chicago and Noel Sanchez's petition to intervene and motion to modify the September 6, 2011 Protective Order 1002 is granted pursuant to the parties' agreement as to Glenn Lewellen (2). United States agrees to modify the protective order to permit the United States to provide documents to the parties in the civil suit before Judge Leinenweber. Mailed notice (rj, ) (Entered: 09/27/2012) |
| 10/15/2012 | 1040 | 79 | RESPONSE by USA as to Hector Uriarte, Jorge Uriarte, Tony Sparkman, Glenn Lewellen regarding MOTION by Glenn Lewellen for judgment of acquittal *or New Trial* 863 , MOTION by Glenn Lewellen to adopt *and Join Co–Defendant Uriarte's Motion to Supplement Post–trial Motions* 956 (Attachments: # 1 Exhibit)(Block, Steven) (Entered: 10/15/2012) |
| 10/16/2012 | 1041 | 100 | MOTION by USA for leave to file brief in excess of fifteen pages as to Glenn Lewellen *Government's Motion To File Oversized Brief* (Block, Steven) (Entered: 10/16/2012) |
| 10/16/2012 | 1043 | 102 | MINUTE entry before the Honorable Joan B. Gottschall:as to Hector Uriarte, Jorge Uriarte, Tony Sparkman, Glenn Lewellen. Any reply briefs to the supplemental post trial motions are due by Friday, October 19, 2012, no later than 4:00PM. Mailed notice (rj, ) (Entered: 10/16/2012) |
| 10/17/2012 | 1046 | 103 | MINUTE entry before the Honorable Joan B. Gottschall: Government's Motion To File Oversized Brief 1041 is granted as to Glenn Lewellen (2). Mailed notice (rj, ) (Entered: 10/18/2012) |

| 10/19/2012 | 1049 | 104 | MINUTE entry before the Honorable Joan B. Gottschall as to Glenn Lewellen (2): Sentencing set for 11/2/2012 at 9:30AM is stricken and reset to 11/30/2012 at 9:30AM. Sentencing memoranda and/or objections to PSR due by 11/14/2012. Responses by 11/21/2012. No sentencing memoranda or objections to presentence reports or responses will be considered if filed out of time unless a motion to file late is made no less than one week prior to the date set for sentencing. No sentencing hearing will be continued unless the courtroom deputy is notified of the need to change in writing at least one week (7 days) prior to the date set for sentencing. Failure to comply with this standing order will result in counsel being sanctioned in the amount of $100.00 which shall be paid to the Clerk of Court, 219 South Dearborn, 20th Floor, Chicago, Illinois 60604. Mailed notice (yap, ) (Entered: 10/19/2012) |
| --- | --- | --- | --- |
| 10/22/2012 | 1056 | 105 | REPLY by Glenn Lewellen to response to motion, 1040 (Gambino, Andrea) (Entered: 10/22/2012) |
| 10/26/2012 | 1064 | 127 | MINUTE entry before the Honorable Joan B. Gottschall as to Glenn Lewellen : Defendant Glenn Lewellens motions for new trial or for judgment of acquittal 780 , 863 are denied, except that the court reserves ruling on the issue of unexplained wealth. Cross–briefs on that issue are due 11/2/2012; responses are due 11/7/2012. Mailed notice (rj, ) (Entered: 10/26/2012) |
| 10/26/2012 | 1065 | 128 | ORDER as to Glenn Lewellen. Signed by the Honorable Joan B. Gottschall on 10/26/2012. Mailed notice (rj, ) (Entered: 10/26/2012) |
| 11/02/2012 | 1072 | 142 | RESPONSE by USA to MOTION by Glenn Lewellen for judgment of acquittal *or New Trial* 863 (Attachments: # 1 Exhibit Government Exhibit A)(Reynolds, Terra) (Entered: 11/02/2012) |
| 11/02/2012 | 1073 | 158 | BRIEF by Glenn Lewellen *on Unexplained Wealth* (Gambino, Andrea). (Entered: 11/02/2012) |
| 11/07/2012 | 1083 | 170 | Brief by USA as to Saul Rodriguez, Glenn Lewellen, Hector Uriarte, Jorge Uriarte, Manuel Uriarte, Andres Flores, Tony Sparkman, Fares Umar, Walter Johnson, Jorge Lopez, Robert Cardena *Government's Response to Defendant Lewellen's Brief on Unexplained Wealth* (Reynolds, Terra) (Entered: 11/07/2012) |
| 11/13/2012 | 1090 | 180 | MOTION by Glenn Lewellen for extension of time *to file Sentencing Memorandum and Objections to the Presentence Investigation Report* (Gambino, Andrea) (Entered: 11/13/2012) |
| 11/13/2012 | 1094 | 183 | REPLY by Glenn Lewellen to response 1072 *Government's Unexplained Wealth Brief* (Gambino, Andrea) (Entered: 11/13/2012) |
| 11/14/2012 | 1095 | 201 | MOTION by Glenn Lewellen for leave to *File Instanter Reply to Government's Unexplained Wealth Brief, Doc. 1094* (Gambino, Andrea) (Entered: 11/14/2012) |
| 11/14/2012 | 1097 | 205 | MINUTE entry before the Honorable Joan B. Gottschall:as to Glenn Lewellen, Defendant's unopposed motion to extend time for filing sentencing memorandum and objections to the presentence investigation report 1090 is granted. The court grants defendant leave to file an oversized |

|  |  |  |  |
|---|---|---|---|
|  |  |  | brief. ( Sentencing set for 11/30/2012 at 9:30AM is stricken and reset for 1/17/2013 at 09:30 AM.) Sentencing memoranda and/or objections to PSR due by 12/13/2012. Responses by 12/20/2012. No sentencing memoranda or objections to presentence reports or responses will be considered if filed out of time unless a motion to file late is made no less than one week prior to the date set for sentencing. No sentencing hearing will be continued unless the courtroom deputy is notified of the need to change in writing at least one week (7 days) prior to the date set for sentencing. Failure to comply with this standing order will result in counsel being sanctioned in the amount of $100.00 which shall be paid to the Clerk of Court, 219 South Dearborn, 20th Floor, Chicago, Illinois 60604. Mailed notice (rj, ) (Entered: 11/14/2012) |
| 11/19/2012 | 1114 | 206 | MINUTE entry before the Honorable Joan B. Gottschall:as to Glenn Lewellen, ( In Court Conference (brief) set for 11/20/2012 at 10:00 AM.) Mailed notice (rj, ) (Entered: 11/19/2012) |
| 11/21/2012 | 1126 | 207 | RESPONSE by USA to MOTION by Glenn Lewellen for judgment of acquittal *or New Trial* 863 (Reynolds, Terra) (Entered: 11/21/2012) |
| 11/23/2012 | 1127 | 213 | *Response to Court's Inquiries on Waiver Issue by Glenn Lewellen* (Gambino, Andrea) (Entered: 11/23/2012) |
| 11/23/2012 | 1128 | 221 | REPLY by Glenn Lewellen to response 1126 *by Government on Unexplained Wealth* (Gambino, Andrea) (Entered: 11/23/2012) |
| 11/27/2012 | 1151 | 230 | MINUTE entry before the Honorable Joan B. Gottschall:as to Glenn Lewellen. Order entered as to Lewellen. Lewellen's motion for judgment of acquittal or new trial 863 is denied. See separate order. Mailed notice (rj, ) (Entered: 11/27/2012) |
| 11/27/2012 | 1152 | 231 | ORDER as to Glenn Lewellen Signed by the Honorable Joan B. Gottschall on 11/27/2012. Mailed notice (rj, ) (Entered: 11/27/2012) |
| 12/05/2012 | 1180 | 244 | MINUTE entry before the Honorable Joan B. Gottschall: as to Glenn Lewellen, ( Sentencing set for 1/17/2013 is stricken and reset to 1/22/2013 at 10:15 AM.) No sentencing memoranda or objections to presentence reports or responses will be considered if filed out of time unless a motion to file late is made no less than one week prior to the date set for sentencing. No sentencing hearing will be continued unless the courtroom deputy is notified of the need to change in writing at least one week (7 days) prior to the date set for sentencing. Failure to comply with this standing order will result in counsel being sanctioned in the amount of $100.00 which shall be paid to the Clerk of Court, 219 South Dearborn, 20th Floor, Chicago, Illinois 60604. Mailed notice (rj, ) (Entered: 12/05/2012) |
| 12/06/2012 | 1185 | 245 | MINUTE entry before the Honorable Joan B. Gottschall: as to Glenn Lewellen. Sentencing PSR memoranda and/or objections to PSR due by 12/21/2012. Responses by 1/4/2013. No sentencing memoranda or objections to presentence reports or responses will be considered if filed out of time unless a motion to file late is made no less than one week prior to the date set for sentencing. No sentencing hearing will be continued unless the courtroom deputy is notified of the need to change in writing at least one week (7 days) prior to the date set for sentencing. Failure to comply with this standing order will result in counsel being sanctioned in the amount of |

| | | | |
|---|---|---|---|
| | | | $100.00 which shall be paid to the Clerk of Court, 219 South Dearborn, 20th Floor, Chicago, Illinois 60604 Mailed notice (rj, ) (Entered: 12/06/2012) |
| 01/02/2013 | 1197 | 246 | MINUTE entry before the Honorable Joan B. Gottschall: as to Glenn Lewellen, ( Sentencing set for 1/22/2013 is stricken and reset to 2/20/2013 at 10:15 AM.) Sentencing memoranda and/or objections to psr due by 2/4/2013. Responses by 2/11/2013. No sentencing memoranda or objections to presentence reports or responses will be considered if filed out of time unless a motion to file late is made no less than one week prior to the date set for sentencing. No sentencing hearing will be continued unless the courtroom deputy is notified of the need to change in writing at least one week (7 days) prior to the date set for sentencing. Failure to comply with this standing order will result in counsel being sanctioned in the amount of $100.00 which shall be paid to the Clerk of Court, 219 South Dearborn, 20th Floor, Chicago, Illinois 60604. Mailed notice (rj, ) (Entered: 01/02/2013) |
| 01/03/2013 | 1199 | 247 | MOTION by Glenn Lewellen Release Funds or Appoint Counsel *Nunc Pro Tunc to January 2012* (Gambino, Andrea) (Entered: 01/03/2013) |
| 01/03/2013 | | 252 | MOTION by Glenn Lewellen to appoint counsel nunc pro tunc beginning January 2012 (Omitted relief from motion 1199 ). (yap, ) (Entered: 01/04/2013) |
| 01/30/2013 | 1243 | 256 | MINUTE entry before the Honorable Joan B. Gottschall as to Glenn Lewellen(2): Motion hearing held. On an interim basis, the court will appoint Ms. Gambino and Mr. Madden as Defendant's counsel, based on Defendant's representation that he has no additional assets outside those in escrow. Defendant is ordered to submit an affidavit to that effect. In order for the court to consider Defendant's motion to appoint counsel nunc pro tunc or release funds 1199 , Defendant will have to provide a legal justification for the court taking that measure. Should Defendant provide such a justification, the Government may respond within 7 days as to whether it opposes Defendant's motion. Mailed notice (yap, ) (Entered: 01/31/2013) |
| 01/31/2013 | 1233 | 255 | MINUTE entry before the Honorable Joan B. Gottschall:as to Glenn Lewellen. By agreement of the parties, Sentencing memoranda and/or objections to psr extended and due by 2/6/2013. Responses by 2/13/2013. Sentencing date to stand. No sentencing memoranda or objections to presentence reports or responses will be considered if filed out of time unless a motion to file late is made no less than one week prior to the date set for sentencing. No sentencing hearing will be continued unless the courtroom deputy is notified of the need to change in writing at least one week (7 days) prior to the date set for sentencing. Failure to comply with this standing order will result in counsel being sanctioned in the amount of $100.00 which shall be paid to the Clerk of Court, 219 South Dearborn, 20th Floor, Chicago, Illinois 60604. Mailed notice (rj, ) (Entered: 01/31/2013) |
| 02/06/2013 | 1247 | 257 | MOTION by USA for forfeiture as to Glenn Lewellen *Motion of the United States for Entry of Preliminary Order of Forfeiture* (Reynolds, Terra) (Entered: 02/06/2013) |

| 02/06/2013 | 1248 | 264 | SENTENCING MEMORANDUM as to Glenn Lewellen (Attachments: #1 Exhibit Letter from Ashley Lewellen, #2 Exhibit Letter from Sandra Flores, #3 Exhibit Letter from Tiffany Dukes, #4 Exhibit Letter from Cynthia Cissell, #5 Exhibit Letter from Joe Cissell, #6 Exhibit Letter from Eric Buckler, #7 Exhibit Letter from Stephen Gartlan, #8 Exhibit Letter from Tom Monday, #9 Exhibit Letter from Jean Beauvais, #10 Exhibit Letter from Linda Hentsch)(Gambino, Andrea) (Entered: 02/06/2013) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.      09 CR 332 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| SAUL RODRIGUEZ *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## THE CITY OF CHICAGO AND NOEL SANCHEZ'S PETITION TO INTERVENE AND MOTION TO MODIFY THE SEPTEMBER 6, 2011 PROTECTIVE ORDER

The City of Chicago (the "City"), by its attorney, Stephen R. Patton, Corporation Counsel, and Noel Sanchez ( "Sanchez"), by one of his attorneys, Mary McDonald, Senior Counsel, petitions this Honorable Court for permission to intervene, solely to modify the protective order entered by this Court on September 6, 2011 to allow the City's and Sanchez's use of the materials produced by the United States and other parties during discovery in the *U.S. v. Lewellan, et al.* case (No. 09 CR 332).  In support of their motion, the City and Sanchez state:

## ARGUMENT

(1)      In April 2009, Glen Lewellen ("Lewellen") was indicted for alleged criminal conduct in his capacity as a Chicago Police Officer and charged with multiple criminal acts in the *United States v Lewellen*, *et al.* case (No. 09 CR 332).  This criminal case has gone to trial and post-trial motions are currently pending.

(2)      Lewellen is also a defendant in the *Refugio Ruiz-Cortez v. the City of Chicago et al.* case (No. 11 C 1420), a civil  matter pending before the Honorable Judge Harry D. Leinenweber.  This civil lawsuit was filed on March 1, 2011 against the City, Sanchez and Lewellen.  It arises from Refugio Ruiz-Cortez's ("Ruiz-Cortez") arrest on

July 8, 1999, and from his alleged wrongful conviction related to that arrest. Plaintiff alleges that his arrest and conviction were based on a false statement by Lewellen and/or false testimony given by Lewellen at Ruiz-Cortez's December 1999 criminal trial.

(3)     While the criminal case against Lewellen was proceeding before this Court, Judge Leinenweber stayed discovery in the civil case. This stay was lifted on December 15, 2011. The City and Sanchez again asked Judge Leinenweber to stay discovery until the post-trial motions in the criminal case had been ruled upon. This request was denied by Judge Leinenweber on July 17, 2012.

(4)     The parties are now engaging in discovery. Civil discovery will entail investigation into the conduct of Lewellen that was a partial basis for the criminal charges which were filed against him.

(5)     As part of the discovery in this case, Sanchez served subpoenas on the United States Attorney's Office, the Drug Enforcement Administration, Andrea Gambino, Lewellen's criminal attorney and others  *See* Exhibits A-E.

(6)     In response to this subpoena, Lewellen's criminal defense counsel, Andrea Gambino, contacted the attorneys for Sanchez and indicated that a protective order ("Order"), restricting disclosure of materials produced by the parties in the *United States v. Lewellen, et al.* case, had been entered. (Document # 496, 09-CR-00332). The terms of that Order specifically prohibited the criminal defendants and their attorneys in the *United States v. Lewellen, et al.* case from using or disclosing protected materials in connection with any other proceeding and for no purpose other than defending the instant criminal matter.

(7)     In the interest of expediency and judicial economy, the City and Sanchez seek to intervene in the instant case to modify the Order to allow them to use the

materials produced by the parties during the criminal proceeding in the pending civil

matter of *Ruiz-Cortez v. the City of Chicago*, *et al.*

(8)    Permissive intervention is a procedurally appropriate device for bringing a

third-party challenge to a protective order during ongoing litigation.  *Bond v. Utreras*,

585 F.3d 1061, 1068 (7th Cir. 2009).  The City and Sanchez have standing to intervene in

this matter because the Order inhibits the City's and Sanchez's respective rights to

discovery under the Federal Rules of Civil Procedure in the civil suit.  *See Panzy v.*

*Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994) (finding standing for third-party

intervenor because there was a claim of right under the Federal Rules of Civil Procedure

to discovery and the protective order had interfered with attempts in another court to

exercise that right); *see also Doe v. Lansal, Inc.,* 2012 WL 707112 (N.D. Ill. 2012)

(same); *Bond*, 585 F.3d 1061.

(9)    The Seventh Circuit has not articulated a definitive standard to modify a

blanket protective order in a criminal case when a party seeks discovery to which access

is restricted by the protective order.  In the civil context, however, the Seventh Circuit

has approved the modification of a protective order under similar circumstances by

employing the following standard:

> Where an appropriate modification  . . . can place private litigants
> in a position they would otherwise reach only after repetition of
> another's discovery, such modification can only be denied where it
> would tangibly prejudice substantial rights of the party opposing
> modification. Once such prejudice is demonstrated, however, the
> district court has broad discretion in judging whether that injury
> outweighs the benefits of any possible modification of the
> protective order.

*Wilk v. Am. Med. Ass'n*., 635 F.2d 1295, 1299 (7th Cir. 1980) (allowing access to

discovery by a third-party intervenor who was suing defendant in another case in another

jurisdiction); *see also Grove Fresh Distribs., Inc. v. Everfresh Juice Co.,* 24 F.3d 893,

898 (7th Cir. 1994); *Griffith v. University Hospital, L.L.C.*, 249 F.3d 658 (7th Cir. 2001);

*Doe*, 2012 WL 707112 at *4; *Murata Mfg. Co., Ltd. v. Bel Fuse, Inc.*, 234 F.R.D. 175,

180 (N.D. Ill. 2006).

(10)    Lewellen has been criminally charged and tried for the same wrongful

conduct alleged by Ruiz-Cortez in the civil suit; consequently, modifying the order is

appropriate.  Given the substantial nexus between the two proceedings, access by the

civil  litigants to the discovery in the criminal matter will conserve litigation and judicial

resources.

(11)    Furthermore, the circumstances in the criminal proceedings under which

the Order was entered have now changed:  discovery is over and the matter is now in the

post-trial stage.  Specifically, following completion of his trial, Lewellen has filed a

motion for a judgment of acquittal or a new trial as to Count 13 of the Third Superseding

Indictment, which contains allegations similar to, but broader than, the specific allegation

of false testimony in Count I (the racketeering conspiracy) that form the basis of Ruiz-

Cortez's claim. Lewellen's motion does not contend that private discovery material

supports an acquittal or a new trial as to Count 13.  Rather, the purported basis for

Lewellan's acquittal rests with evidence already presented to the jury and contained in the

public record.  Thus, disclosure of unfiled discovery materials in the civil matter will not

impact Lewellen's chances of success on his pending motions.

(12)    Moreover, the Order was a broad one, and although such orders may be

useful in expediting the flow of pretrial discovery materials, they are by nature

overinclusive.  Consequently, it is difficult to fathom that all of the documents produced

still require protection. The United States and Lewellen should not be allowed to rely on an unreasonable expectation that such an order will never be altered.

(13)    Any legitimate interest that the United States and Lewellen have in continued secrecy against the public at large can be accommodated by imposing the restrictions on the use and disclosure of documents contained in the original Order on the City and Sanchez.  In the event that the City and Sanchez are required to release information protected by the Order, the parties to this civil suit will seek this Court's approval for disclosure.  Moreover, the protective order entered in the civil suit adds a layer of protection to the disclosures permitted by a modification of this Order.

## <u>CONCLUSION</u>

Accordingly, the City and Sanchez request that this Court modify the September 6, 2011 order to permit the disclosure of protected material pursuant to the terms of the protective order entered by Judge Leinenweber in the *Ruiz-Cortez v. The City of Chicago, et al.* case or for such other relief as this Court deems appropriate.

Respectfully submitted,

*Mary S. McDonald*
Mary S. McDonald
Attorney for Noel Sanchez
30 N. LaSalle St. #900
Chicago, IL 60602
(312) 744-8307 (P)
Atty No. 06199995

Stephen R. Patton
Corporation Counsel of the City of Chicago

By:    /s/ George *J. Yamin, Jr.*
Attorney for the City of Chicago
30 N. LaSalle St. #900
Chicago, IL 60602
(312) 744-0454
Atty No. 06217483

# EXHIBIT A

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
__Northern__   District of __Illinois__

| | |
|---|---|
| Rufugio Ruiz-Cortez,<br>_____<br>Plaintiff | )<br>)<br>) |
| v. | ) |
| City of Chicago, et al.<br>_____<br>Defendant | )<br>)<br>) |

Civil Action No. **11 C 1420**

(If the action is pending in another district, state where:
_____ District of _____ )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  **Frankel & Cohen**
      **53 W. Jackson Blvd., Suite 1615, Chicago, IL 60604**

☒ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

### SEE ATTACHED RIDER

| Place: **Corporation Counsel's Office**<br>     **30 N. LaSalle St., Suite 900, Chicago, IL 60602**<br>     **Attn: Jill Antonucci White, Paralegal** | Date and Time:<br><br>**July 29, 2011 at 4:00 p.m.** |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  **July 6, 2011**

CLERK OF COURT

_____
         _Signature of Clerk or Deputy Clerk_

OR

_Mary McDonald_
         _Attorney's signature_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_ **Defendants**
_____ , who issues or requests this subpoena, are:
**Mary McDonald, Assistant Corporation Counsel**
**Corporation Counsel's Office, 30 N. LaSalle St., Suite 900, Chicago, IL 60602**
**312-744-8307**

AO 38B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* Frankel & Cohen

was received by me on *(date)* 7/7/11 .

☑ I served the subpoena by delivering a copy to the named person as follows:

Robert Cohen                                      on *(date)* 7/11/11 ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____

I declare under penalty of perjury that this information is true.

Date: 7/11/11

_____
*Server's signature*

Tiffany Barefield Sr Legal Investigator
*Printed name and title*

33 N. LaSalle, Ste 200, Chicago, IL
*Server's address*

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Rufugio Ruiz-Cortez, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No.    11 C 1420 |
| | ) | |
| City of Chicago, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

## <u>RIDER</u>

Any and all records arising out of the investigation resulting from the criminal

proceedings in the case of **<u>People v. Rufugio Ruiz-Cortez</u>, 99 CR 493 &  09 CR 332**,

including but not limited to affidavits, notes, audio tapes, video tapes, pleadings, motions,

discovery, orders, correspondence, e-mails, attorney notes, photographs, medical records,

employment records, school records, police department records, crime lab records, medical

examiner records, depositions, statements, transcripts, any other computer created or generated

documents and any other documents in the file.

# <u>COMPLIANCE BY MAIL IS SUFFICIENT.</u>
# <u>NO PERSONAL APPEARANCE IS REQUIRED.</u>

RETURN TO: Anthony Cook / Mary McDonald Document: 7-10  Filed: 07/11/2013 ROOM 330 N. LaSalle St. #900

# AFFIDAVIT OF SERVICE

Case Number: **11 C 1420** ____ ; Filed Date: **6 July 2011** ____ ; Die Date: **13 July 2011** ____ ; Inv # ____

Name of deponent: **Frankel & Cohen**  _201167194_

Address: **53 W. Jackson Blvd., Suite 1615, Chicago, IL 60604**

DOB: _____ / SSN: _____

Additional info: _____

*********************************************************************************

(A)  I, the undersigned, being over eighteen years of age, not a party to the action and duly sworn on oath, certify that I served this **subpoena** on the deponent as follows:

☑ **(1) PERSONAL SERVICE:** By leaving a copy of the **subpoena** with the named deponent personally.

☐ **(2) SUBSTITUTE SERVICE:** By leaving a copy of the **subpoena** at the deponent's usual place of abode with some person of the family, of age of 13 years or upwards, and informing that person of the contents thereof and in addition to this service, a copy of such subpoena has been mailed to the usual place of abode in a sealed envelope postage prepaid to the deponent.

☐ **(3) SERVICE ON:** Corporation _____ Company _____ Business _____ Partnership _____ by leaving a copy of the **subpoena** with the registered agent, authorized person or partner of deponent.

☐ **(4) CERTIFIED MAIL #** _____

(B)  The party served is described as follows:

Name: _Robert Cohen_

Sex: _Male_   Race: _White_   Age: _60_

Date: _7/11/11_   Time: _1:15_ am/pm

Location: _53 W. Jackson Blvd, Ste 1615_

Additional Remarks: _____

(A)  I am a duly authorized to serve process in this cause and complete this return of service pursuant to 735 ILCS 5/2-202 and state that the information contained in (A) and (B) above is the truth.

By: _Jeffry Binfield, #2866_
                    (signature of server)

# I HAVE ALSO TENDERED TO THE WITNESS FEES FOR ONE DAY'S ATTENDANCE, AND THE MILEAGE ALLOWED BY LAW, IN THE AMOUNT OF $ _____ .

☐ **THE NAMED DEPONENT WAS NOT SERVED:**

| | ATTEMPTED SERVICES: | | |
|---|---|---|---|
| TYPE OF BUILDING:_____ | DATE | TIME | AM/PM |
| NEIGHBORS NAME:_____ | ____ | __:__ | ____ |
| ADDRESS:_____ | ____ | __:__ | ____ |
| *REASON NOT SERVED*: | ____ | __:__ | ____ |
| ☐ MOVED  ☐ WRONG ADDRESS | ____ | __:__ | ____ |
| ☐ DECEASED  ☐ BUILDING VACANT | ____ | __:__ | ____ |
| ☐ NO SUCH ADDRESS | ____ | __:__ | ____ |
| ☐ VACANT LOT  ☐ NO CONTACT | ____ | __:__ | ____ |
| ☐ UNABLE TO GAIN ENTRY | | | |

ADDITIONAL REMARKS: _____

_TK# 611805_

# EXHIBIT B

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

<u>Northern</u>  District of <u>Illinois</u>

| | |
|---|---|
| <u>Rufugio Ruiz-Cortez,</u> | ) |
| *Plaintiff* | ) |
| v. | ) |
| | ) |
| <u>City of Chicago, et al.</u> | ) |
| *Defendant* | ) |

Civil Action No. **11 C 1420**

(If the action is pending in another district, state where:

_____ District of _____ )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: **Andrea E. Gambino**
    **53 W. Jackson Blvd., Suite 224, Chicago, IL 60604**

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

### SEE ATTACHED RIDER

| Place: **Corporation Counsel's Office** | Date and Time: |
|---|---|
| **30 N. LaSalle St., Suite 900, Chicago, IL 60602** | |
| **Attn: Jill Antonucci White, Paralegal** | **July 29, 2011 at 4:00 p.m.** |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: <u>July 6, 2011</u>

         *CLERK OF COURT*

                                              OR     *Mary McDonald*
_____                  _____
   *Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* **Defendants**
_____ , who issues or requests this subpoena, are:

**Mary McDonald, Assistant Corporation Counsel**
**Corporation Counsel's Office, 30 N. LaSalle St., Suite 900, Chicago, IL 60602**
**312-744-8307**

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*   Andrea E Gambino Law Firm

was received by me on *(date)*   7/7/11 .

☑ I served the subpoena by delivering a copy to the named person as follows:

     Andrea E Gambino      on *(date)* 7/11/11   ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: 7/11/11

            _Server's signature_

       Tiffany Barcfield, Sr Legal Investigator
            _Printed name and title_

       33 N. LaSalle, Ste 200, Chicago, IL
            _Server's address_

Additional information regarding attempted service, etc:

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Rufugio Ruiz-Cortez,                    )
                                        )
                    Plaintiff,          )
                                        )
        vs.                             )    Case No.    11 C 1420
                                        )
City of Chicago, et al.,                )
                                        )
                    Defendants.         )

---

## **RIDER**

Any and all records arising out of the investigation resulting from the criminal proceedings in the case of <u>**People v. Rufugio Ruiz-Cortez**</u>, **99 CR 493 & 09 CR 332**, including but not limited to affidavits, notes, audio tapes, video tapes, pleadings, motions, discovery, orders, correspondence, e-mails, attorney notes, photographs, medical records, employment records, school records, police department records, crime lab records, medical examiner records, depositions, statements, transcripts, any other computer created or generated documents and any other documents in the file.

## **COMPLIANCE BY MAIL IS SUFFICIENT.**
## **NO PERSONAL APPEARANCE IS REQUIRED.**

RETURN TO:   Anthony Cook / Mary McDonald   7-10      Filed: 07/11/2013   ROOM 30 N LaSalle St. #900

## AFFIDAVIT OF SERVICE

Case Number: **11 C 1420**          ;   Filed Date: **6 July 2011**          ;   Die Date: **13 July 2011**          ;   Inv #

Name of deponent:   **Andrea E. Gambino Law Firm**          Z01107195

Address:   **53 W. Jackson Blvd., Suite 224, Chicago, IL 60604**

DOB:                                                    /   SSN:

Additional info:

******************************************************************************************************

(A)     I, the undersigned, being over eighteen years of age, not a party to the action and duly sworn on oath, certify that I served this **subpoena** on the deponent as follows:

[✓]   **(1) PERSONAL SERVICE:** By leaving a copy of the **subpoena** with the named deponent personally.

[ ]   **(2) SUBSTITUTE SERVICE:** By leaving a copy of the **subpoena** at the deponent's usual place of abode with some person of the family, of age of 13 years or upwards, and informing that person of the contents thereof and in addition to this service, a copy of such subpoena has been mailed to the usual place of abode in a sealed envelope postage prepaid to the deponent.

[ ]   **(3) SERVICE ON:** Corporation_____ Company_____ Business_____ Partnership_____ by leaving a copy of the **subpoena** with the registered agent, authorized person or partner of deponent.

[ ]   **(4) CERTIFIED MAIL #**

(B)     The party served is described as follows:

Name:   Andrea Gambino

Sex:   Female          Race   White          Age   40

Date:   7/11/11          Time:   1:10   am/pm

Location:   53 W. Jackson Blvd, Ste 224

Additional Remarks:

(A)     I am a duly authorized to serve process in this cause and complete this return of service pursuant to 735 ILCS 5/2-202 and state that the information contained in (A) and (B) above is the truth.

By:   _____ #2866_
        (signature of server)

## I HAVE ALSO TENDERED TO THE WITNESS FEES FOR ONE DAY'S ATTENDANCE, AND THE MILEAGE ALLOWED BY LAW, IN THE AMOUNT OF $ _____ .

[ ]   **THE NAMED DEPONENT WAS NOT SERVED:**

TYPE OF BUILDING:_____

NEIGHBORS NAME:_____

ADDRESS:_____

*REASON NOT SERVED*:
☐ MOVED          ☐ WRONG ADDRESS
☐ DECEASED     ☐ BUILDING VACANT
☐ NO SUCH ADDRESS
☐ VACANT LOT   ☐ NO CONTACT
☐ UNABLE TO GAIN ENTRY

| ATTEMPTED SERVICES: | | |
|---|---|---|
| DATE | TIME | AM/PM |
| ____ | __:__ | ____ |
| ____ | __:__ | ____ |
| ____ | __:__ | ____ |
| ____ | __:__ | ____ |
| ____ | __:__ | ____ |
| ____ | __:__ | ____ |
| ____ | __:__ | ____ |

ADDITIONAL REMARKS:_____

TK# 511 806

EXHIBIT C

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

__Northern__   District of __Illinois__

| | | |
|---|---|---|
| **Rufugio Ruiz-Cortez,** | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. **11 C 1420** |
| | ) | |
| **City of Chicago, et al.** | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | _____ District of _____ ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: **Aurora Police Department**
    **1200 E. Indian Trail Rd., Aurora, IL 60505; 630-256-5000**

    ☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:
**Any and all records concerning RUFUGIO RUIZ-CORTEZ for the arrest date of July 8, 1999, including but not limited to Arrest Reports, Case Reports, Forensic results, photographs, mugshots, etc.**

| Place: Corporation Counsel's Office | Date and Time: |
|---|---|
|     30 N. LaSalle St., Suite 900, Chicago, IL 60602 | |
|     Attn: Jill Antonucci White, Paralegal | **July 29, 2011 at 4:00 p.m.** |

    ☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

---

    The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: **July 6, 2011**

        *CLERK OF COURT*

                            OR    *Mary McDonald*

_____        _____
     *Signature of Clerk or Deputy Clerk*                 *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*  **Defendants**
_____ , who issues or requests this subpoena, are:
**Mary McDonald, Assistant Corporation Counsel**
**Corporation Counsel's Office, 30 N. LaSalle St., Suite 900, Chicago, IL 60602**
**312-744-8307**

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

&#9744; I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

&#9744; I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Case 1:09-cr-00332 Document 1002-1 Filed 09/12/12 Page 16 of 29 PageID 4777
Case: 13-2321 Document: 7-10 Filed: 07/11/2013 Pages: 310
AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

# EXHIBIT D

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

__Northern__   District of __Illinois__

| | | |
|---|---|---|
| __Rufugio Ruiz-Cortez,__ | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No. __11 C 1420__ |
| | ) | |
| __City of Chicago, et al.__ | ) | (If the action is pending in another district, state where: |
| _Defendant_ | ) | _____ District of _____ ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Andrea E. Gambino
    53 W. Jackson Blvd., Suite 224, Chicago, IL 60604

☒ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

### SEE ATTACHED RIDER

| Place: **Corporation Counsel's Office** | Date and Time: |
|---|---|
| **30 N. LaSalle St., Suite 900, Chicago, IL 60602** | |
| **Attn: Jill Antonucci White, Paralegal** | **July 29, 2011 at 4:00 p.m.** |

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: __July 6, 2011__

_CLERK OF COURT_

OR   _Mary McDonald_

_____                    _____
_Signature of Clerk or Deputy Clerk_                 _Attorney's signature_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_ __Defendants__
_____ , who issues or requests this subpoena, are:

**Mary McDonald, Assistant Corporation Counsel**
**Corporation Counsel's Office, 30 N. LaSalle St., Suite 900, Chicago, IL 60602**
**312-744-8307**

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. _____

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 88B  (Rev.  06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Rufugio Ruiz-Cortez, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No.      11 C 1420 |
| | ) | |
| City of Chicago, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

## RIDER

Any and all records arising out of the investigation resulting from the criminal proceedings in the case of **People v. Rufugio Ruiz-Cortez,** 99 CR 493 & 09 CR 332, including but not limited to affidavits, notes, audio tapes, video tapes, pleadings, motions, discovery, orders, correspondence, e-mails, attorney notes, photographs, medical records, employment records, school records, police department records, crime lab records, medical examiner records, depositions, statements, transcripts, any other computer created or generated documents and any other documents in the file.

## COMPLIANCE BY MAIL IS SUFFICIENT. NO PERSONAL APPEARANCE IS REQUIRED.

# EXHIBIT E

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

__Northern__   District of __Illinois__

| | | |
|---|---|---|
| Rufugio Ruiz-Cortez, | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No. **11 C 1420** |
| | ) | |
| City of Chicago, et al. | ) | (If the action is pending in another district, state where: |
| _Defendant_ | ) | _____ District of _____ ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: **US Attorney's Office**
   **219 S. Dearborn St., 5th Floor, Chicago, IL 60604**

☒ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

### See Attached Rider and Relevancy Statement

| Place: **Corporation Counsel's Office** | Date and Time: |
|---|---|
| **30 N. LaSalle St., Suite 900, Chicago, IL 60602** | |
| **Attn: Jill Antonucci White, Paralegal** | **July 29, 2011 at 4:00 p.m.** |

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

   The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: **July 7, 2011**

|                    _CLERK OF COURT_                    | OR |                      |
|---|---|---|
| _____ | | _Mary S McDonald_ |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_ __Defendants__
_____ , who issues or requests this subpoena, are:
**Mary McDonald, Assistant Corporation Counsel**
**Corporation Counsel's Office, 30 N. LaSalle St., Suite 900, Chicago, IL 60602**
**312-744-8307**

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* US ATTORNEY's OFFICE

was received by me on *(date)* 11 July.

☑ I served the subpoena by delivering a copy to the named person as follows:

Linda Dickerson ( RECEPTIONIST )

_____ on *(date)* 11 July ; or

☐ I returned the subpoena unexecuted because:

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: 11 July

_____  # 8770
Server's signature

Alexander Vu∞BRAND
Printed name and title

33 r. Lasalle rm 7, Chgo, IL
Server's address

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Rufugio Ruiz-Cortez, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No.    11 C 1420 |
| | ) | |
| City of Chicago, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

## <u>RIDER</u>

Any and all records arising out of the investigation resulting from the criminal

proceedings in the case of **People v. Rufugio Ruiz-Cortez, 09 CR 332**, including but not

limited to affidavits, notes, audio tapes, video tapes, pleadings, motions, discovery, orders,

correspondence, e-mails, attorney notes, photographs, medical records, employment records,

school records, police department records, crime lab records, medical examiner records,

depositions, statements, transcripts, any other computer created or generated documents and any

other documents in the file.


# <u>COMPLIANCE BY MAIL IS SUFFICIENT.</u>
# <u>NO PERSONAL APPEARANCE IS REQUIRED.</u>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Rufugio Ruiz-Cortez, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | Case No.      11 C 1420 |
| City of Chicago, Chicago Police officers Glenn | ) | |
| Lewellen, Noel Sanchez and Unknown | ) | |
| Chicago Police Officers, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>AFFIDAVIT</u>

I, Mary McDonald, being first duly sworn on oath, state as follows:

1.      I am an Assistant Corporation Counsel with the City of Chicago Law Department. In that capacity, I represent Defendant Chicago Police Officer Noel Sanchez, in the above-captioned case.

2.      On July 7, 2011, Defendant Noel Sanchez executed a subpoena on the United States Attorney's Office ("USAO"), requesting that the USAO produce: "Any and all records arising out of the investigation resulting from the federal prosecution in the case of <u>USA v. Glenn Lewellan, et al</u>, 09 CR 00332, including but not limited to pleadings, motions, discovery, orders, correspondence, photographs, videos, police ATF records, FBI records, crime lab records, depositions, statements, transcripts, felony review notes and/or jacket and any other documents in the file." (See attached subpoena.)

3.      Plaintiff Rufugio Ruiz-Cortez has sued the defendant Noel Sanchez in this case alleging violations of his constitutional rights arising from his arrest on July 8, 1999.  However,

1

the Defendant Glen Lewellen is presently being prosecuted by the USAO under a federal indictment in criminal case 09CR332. The USAO records are directly relevant to plaintiff's allegations in the present civil case as they represent information related to his arrest and prosecution, which are the primary foundation for his claims against the defendant officer Noel Sanchez.

4.    The requested records are crucial to Defendant Sanchez's discovery and his defense of these allegations. Documents relating to Plaintiff's federal investigation and prosecution by the USAO are relevant because they provide information and/or evidence which impacts a determination whether Plaintiff can establish that Defendant Sanchez violated his constitutional rights.

**FURTHER AFFIANT SAYETH NOT.**

Mary S. McDonald
Assistant Corporation Counsel

Subscribed and Sworn to
before me this 7th day
of July, 2011.

NOTARY PUBLIC

Official Seal
Jill Antonucci White
Notary Public State of Illinois
My Commission Expires 03/11/2012

2

Case 1:09-cr-00332  Document 1002-1  Filed 09/12/12  Page 29 of 29  PageID 4790
Case: 13-2321    Document: 7-10    Filed: 07/11/2013    Pages: 310

# AFFIDAVIT OF SERVICE

Case Number: **11 C 1420** ; Filed Date: **7 July 2011** ; Die Date: **13 July 2011** ; Inv #

Name of deponent: **US Attorney's Office**                    *201r07-276*
Address:              **219 S. Dearborn St., 5th Floor, Chicago, IL 60604**
DOB: _____ / SSN: _____
Additional info: _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(A)  I, the undersigned, being over eighteen years of age, not a party to the action and duly sworn on oath, certify that I served this **subpoena** on the deponent as follows:

☐  **(1) PERSONAL SERVICE:** By leaving a copy of the **subpoena** with the named deponent personally.

☐  **(2) SUBSTITUTE SERVICE:** By leaving a copy of the **subpoena** at the deponent's usual place of abode with some person of the family, of age of 13 years or upwards, and informing that person of the contents thereof and in addition to this service, a copy of such subpoena has been mailed to the usual place of abode in a sealed envelope postage prepaid to the deponent.

☑  **(3) SERVICE ON:** Corporation _____ Company _____ Business _____ Partnership _____ by leaving a copy of the **subpoena** with the registered agent, authorized person or partner of deponent.

☐  **(4) CERTIFIED MAIL #** _____

(B)  The party served is described as follows:
Name: *LINDA DICKERSON*
Sex: *F*              Race *B*              Age *40's*
Date: *11 July 2011*              Time: *3:45* am/**pm**
Location: *219 S. Dearborn St. 5th Floor*
Additional Remarks: _____

(A)  I am a duly authorized to serve process in this cause and complete this return of service pursuant to 735 ILCS 5/2-202 and state that the information contained in (A) and (B) above is the truth.

By: _____  *# 8770*
                    (signature of server)

## I HAVE ALSO TENDERED TO THE WITNESS FEES FOR ONE DAY'S ATTENDANCE, AND THE MILEAGE ALLOWED BY LAW, IN THE AMOUNT OF $ *40⁰⁰* .

☐  **THE NAMED DEPONENT WAS NOT SERVED:**
TYPE OF BUILDING: *Federal office / Court Bldg*
NEIGHBORS NAME: _____
ADDRESS: _____

*REASON NOT SERVED:*
☐ MOVED          ☐ WRONG ADDRESS
☐ DECEASED      ☐ BUILDING VACANT
☐ NO SUCH ADDRESS
☐ VACANT LOT    ☐ NO CONTACT
☐ UNABLE TO GAIN ENTRY

**ATTEMPTED SERVICES:**

| DATE | TIME | AM/PM |
|------|------|-------|
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

ADDITIONAL REMARKS: _____

```
MIME-Version:1.0
From:usdc_ecf_ilnd@ilnd.uscourts.gov
To:ecfmail_ilnd@ilnddb.ilnd.circ7.dcn
Bcc:
--Case Participants: Kent R. Carlson (kentrcarlson@sbcglobal.net), Heather Lynn Winslow
(hlwinslow@gmail.com), Lawrence S. Beaumont (l.beaumont@sbcglobal.net), Douglas J. Rathe
(djrathe@sbcglobal.net), Eugene Steingold (steingoldlaw@mac.com), Catharine D. O'Daniel
(col117@aol.com), Cynthia Louise Giacchetti (cgiacchett@aol.com), Michael Joseph Monaco
(marcisahinoglu@gmail.com), Robert A. Loeb (robertloeb@att.net), Matthew Joseph Madden
(matt@mjmaddenlaw.com), Andrea Elizabeth Gambino (agambinolaw@gmail.com), Keith Allan
Spielfogel (spielfogel@sbcglobal.net), Steven Shobat (jshobat@gmail.com,
steven.shobat@sbcglobal.net), Tiffany Jacqueline Tracy (johnie.browne@usdoj.gov,
tiffany.tracy@usdoj.gov), Damon Matthew Cheronis (damoncheronis@yahoo.com,
dcheronislaw@yahoo.com), Probation Department (intake_docket_ilnp@ilnp.uscourts.gov),
Molly Emma Armour (mearmour@gmail.com), John M. Beal (johnmbeal@att.net), Terra Reynolds
(barbara.robertson@usdoj.gov, terra.reynolds@usdoj.gov, usailn.ecfausa@usdoj.gov), Michael
James Falconer (mfalconer@prodigy.net), Robert G. Clarke (prestidigitate@sbcglobal.net),
Ellen R. Domph (edomph@gmail.com), Steven Saltzman (saltzcases@gmail.com), AUSA
(ecfl.ausa@usdoj.gov, uasiln.ecfausa2@usdoj.gov, usailn.ecfausa@usdoj.gov), Michael B.
Mann (mannfam23@comcast.net), Pretrial Services
(ilnptdb_court_action_notice@ilnpt.uscourts.gov), Steven Andrew Block
(sablockus@yahoo.com, steven.block@usdoj.gov), Honorable Joan B. Gottschall
(e-filing_gottschall@ilnd.uscourts.gov)
--Non Case Participants: os (olga_serrano@ilnpt.uscourts.gov), pm
(pace_morrison@ilnpt.uscourts.gov), Brian Kolbus (brian_kolbus@ilnpt.uscourts.gov)
--No Notice Sent:

Message-Id:10641594@ilnd.uscourts.gov
Subject:Activity in Case 1:09-cr-00332 USA v. Rodriguez et al motion for leave to
```
Content–Type: text/html

<div align="center">

**United States District Court**

**Northern District of Illinois – <span style="color:red">CM/ECF LIVE, Ver 5.0.3</span>**

</div>

**Notice of Electronic Filing**

The following transaction was entered on 9/14/2012 at 5:57 PM CDT and filed on 9/12/2012

| | |
|---|---|
| **Case Name:** | USA v. Rodriguez et al |
| **Case Number:** | 1:09–cr–00332 |
| **Filer:** | Dft No. 8888 – Noel Sanchez |
| | Dft No. 8888 – City Of Chicago |
| **Document Number:** | No document attached |

**Docket Text:**
<span style="color:blue"> **MOTION by Noel Sanchez, City Of Chicago to intervene (Omitted relief from motion #1002). (yap, )**</span>

**1:09–cr–00332–1 Notice has been electronically mailed to:**

AUSA   USAILN.ECFAUSA@usdoj.gov, ecfl.ausa@usdoj.gov, UASILN.ECFAUSA2@usdoj.gov

Pretrial Services   ilnptdb_Court_Action_Notice@ilnpt.uscourts.gov

Probation Department   Intake_Docket_ILNP@ilnp.uscourts.gov

Catharine D. O'Daniel   co1117@aol.com

Lawrence S. Beaumont   l.beaumont@sbcglobal.net

Michael B. Mann   mannfam23@comcast.net

Steven Andrew Block   steven.block@usdoj.gov, sablockus@yahoo.com

Terra Reynolds    terra.reynolds@usdoj.gov, barbara.robertson@usdoj.gov, USAILN.ECFAUSA@usdoj.gov

Tiffany Jacqueline Tracy   tiffany.tracy@usdoj.gov, johnine.browne@usdoj.gov

**1:09−cr−00332−1 Notice has been delivered by other means to:**

Jeffrey B. Steinbeck
Law Offices of Jeffrey B. Steinback
53 W. Jackson Blvd
#1420
Chicago, IL 60604

**1:09−cr−00332−10 Notice has been electronically mailed to:**

AUSA   USAILN.ECFAUSA@usdoj.gov, ecfl.ausa@usdoj.gov, UASILN.ECFAUSA2@usdoj.gov

Pretrial Services   ilnptdb_Court_Action_Notice@ilnpt.uscourts.gov

Probation Department   Intake_Docket_ILNP@ilnp.uscourts.gov

Catharine D. O'Daniel   co1117@aol.com

Michael B. Mann   mannfam23@comcast.net

Steven Shobat    steven.shobat@sbcglobal.net, jshobat@gmail.com

Steven Andrew Block   steven.block@usdoj.gov, sablockus@yahoo.com

Terra Reynolds    terra.reynolds@usdoj.gov, barbara.robertson@usdoj.gov, USAILN.ECFAUSA@usdoj.gov

Tiffany Jacqueline Tracy   tiffany.tracy@usdoj.gov, johnine.browne@usdoj.gov

**1:09−cr−00332−10 Notice has been delivered by other means to:**

**1:09−cr−00332−3 Notice has been electronically mailed to:**

AUSA   USAILN.ECFAUSA@usdoj.gov, ecfl.ausa@usdoj.gov, UASILN.ECFAUSA2@usdoj.gov

Pretrial Services   ilnptdb_Court_Action_Notice@ilnpt.uscourts.gov

Probation Department   Intake_Docket_ILNP@ilnp.uscourts.gov

Cynthia Louise Giacchetti   cgiacchett@aol.com

John M. Beal   johnmbeal@att.net

Michael B. Mann   mannfam23@comcast.net

Molly Emma Armour   mearmour@gmail.com

Robert G. Clarke   prestidigitate@sbcglobal.net

Steven Andrew Block   steven.block@usdoj.gov, sablockus@yahoo.com

Terra Reynolds    terra.reynolds@usdoj.gov, barbara.robertson@usdoj.gov, USAILN.ECFAUSA@usdoj.gov

Tiffany Jacqueline Tracy   tiffany.tracy@usdoj.gov, johnine.browne@usdoj.gov

**1:09−cr−00332−3 Notice has been delivered by other means to:**

**1:09−cr−00332−4 Notice has been electronically mailed to:**

AUSA   USAILN.ECFAUSA@usdoj.gov, ecfl.ausa@usdoj.gov, UASILN.ECFAUSA2@usdoj.gov

Pretrial Services   ilnptdb_Court_Action_Notice@ilnpt.uscourts.gov

Probation Department   Intake_Docket_ILNP@ilnp.uscourts.gov

John M. Beal   johnmbeal@att.net

Michael B. Mann   mannfam23@comcast.net

Michael James Falconer   mfalconer@prodigy.net

Steven Andrew Block   steven.block@usdoj.gov, sablockus@yahoo.com

Terra Reynolds    terra.reynolds@usdoj.gov, barbara.robertson@usdoj.gov, USAILN.ECFAUSA@usdoj.gov

Tiffany Jacqueline Tracy   tiffany.tracy@usdoj.gov, johnine.browne@usdoj.gov

**1:09−cr−00332−4 Notice has been delivered by other means to:**

**1:09−cr−00332−6 Notice has been electronically mailed to:**

AUSA   USAILN.ECFAUSA@usdoj.gov, ecfl.ausa@usdoj.gov, UASILN.ECFAUSA2@usdoj.gov

Pretrial Services   ilnptdb_Court_Action_Notice@ilnpt.uscourts.gov

Probation Department   Intake_Docket_ILNP@ilnp.uscourts.gov

Ellen R. Domph   edomph@gmail.com

Michael B. Mann   mannfam23@comcast.net

Steven Saltzman    Saltzcases@gmail.com

Steven Andrew Block    steven.block@usdoj.gov, sablockus@yahoo.com

Terra Reynolds    terra.reynolds@usdoj.gov, barbara.robertson@usdoj.gov, USAILN.ECFAUSA@usdoj.gov

Tiffany Jacqueline Tracy    tiffany.tracy@usdoj.gov, johnine.browne@usdoj.gov

**1:09–cr–00332–6 Notice has been delivered by other means to:**

Federal Defender Program


Andres Flores
#22758–424
Metropolitan – MCC
71 West Van Buren Street
Chicago, IL 60605

**1:09–cr–00332–7 Notice has been electronically mailed to:**

AUSA    USAILN.ECFAUSA@usdoj.gov, ecfl.ausa@usdoj.gov, UASILN.ECFAUSA2@usdoj.gov

Pretrial Services    ilnptdb_Court_Action_Notice@ilnpt.uscourts.gov

Probation Department    Intake_Docket_ILNP@ilnp.uscourts.gov

Douglas J. Rathe    djrathe@sbcglobal.net

Eugene Steingold    steingoldlaw@mac.com

John M. Beal    johnmbeal@att.net

Michael B. Mann    mannfam23@comcast.net

Steven Andrew Block    steven.block@usdoj.gov, sablockus@yahoo.com

Terra Reynolds    terra.reynolds@usdoj.gov, barbara.robertson@usdoj.gov, USAILN.ECFAUSA@usdoj.gov

Tiffany Jacqueline Tracy    tiffany.tracy@usdoj.gov, johnine.browne@usdoj.gov

**1:09–cr–00332–7 Notice has been delivered by other means to:**

**1:09–cr–00332–2 Notice has been electronically mailed to:**

AUSA    USAILN.ECFAUSA@usdoj.gov, ecfl.ausa@usdoj.gov, UASILN.ECFAUSA2@usdoj.gov

Pretrial Services    ilnptdb_Court_Action_Notice@ilnpt.uscourts.gov

Probation Department    Intake_Docket_ILNP@ilnp.uscourts.gov

Andrea Elizabeth Gambino    agambinolaw@gmail.com

Matthew Joseph Madden   matt@mjmaddenlaw.com

Michael B. Mann   mannfam23@comcast.net

Steven Andrew Block   steven.block@usdoj.gov, sablockus@yahoo.com

Terra Reynolds    terra.reynolds@usdoj.gov, barbara.robertson@usdoj.gov, USAILN.ECFAUSA@usdoj.gov

Tiffany Jacqueline Tracy   tiffany.tracy@usdoj.gov, johnine.browne@usdoj.gov

**1:09–cr–00332–2 Notice has been delivered by other means to:**

**1:09–cr–00332–5 Notice has been electronically mailed to:**

AUSA   USAILN.ECFAUSA@usdoj.gov, ecfl.ausa@usdoj.gov, UASILN.ECFAUSA2@usdoj.gov

Pretrial Services   ilnptdb_Court_Action_Notice@ilnpt.uscourts.gov

Probation Department   Intake_Docket_ILNP@ilnp.uscourts.gov

Keith Allan Spielfogel   spielfogel@sbcglobal.net

Michael B. Mann   mannfam23@comcast.net

Robert A. Loeb   robertloeb@att.net

Steven Andrew Block   steven.block@usdoj.gov, sablockus@yahoo.com

Terra Reynolds    terra.reynolds@usdoj.gov, barbara.robertson@usdoj.gov, USAILN.ECFAUSA@usdoj.gov

Tiffany Jacqueline Tracy   tiffany.tracy@usdoj.gov, johnine.browne@usdoj.gov

**1:09–cr–00332–5 Notice has been delivered by other means to:**

Manuel Uriarte
#15131–111
Metropolitan – MCC
71 West Van Buren Street
Chicago, IL 60605

**1:09–cr–00332–8 Notice has been electronically mailed to:**

AUSA   USAILN.ECFAUSA@usdoj.gov, ecfl.ausa@usdoj.gov, UASILN.ECFAUSA2@usdoj.gov

Pretrial Services   ilnptdb_Court_Action_Notice@ilnpt.uscourts.gov

Probation Department   Intake_Docket_ILNP@ilnp.uscourts.gov

Kent R. Carlson   kentrcarlson@sbcglobal.net

Michael B. Mann   mannfam23@comcast.net

Steven Andrew Block    steven.block@usdoj.gov, sablockus@yahoo.com

Terra Reynolds    terra.reynolds@usdoj.gov, barbara.robertson@usdoj.gov, USAILN.ECFAUSA@usdoj.gov

Tiffany Jacqueline Tracy    tiffany.tracy@usdoj.gov, johnine.browne@usdoj.gov

**1:09–cr–00332–8 Notice has been delivered by other means to:**

**1:09–cr–00332–9 Notice has been electronically mailed to:**

AUSA    USAILN.ECFAUSA@usdoj.gov, ecfl.ausa@usdoj.gov, UASILN.ECFAUSA2@usdoj.gov

Pretrial Services    ilnptdb_Court_Action_Notice@ilnpt.uscourts.gov

Probation Department    Intake_Docket_ILNP@ilnp.uscourts.gov

Damon Matthew Cheronis    damoncheronis@yahoo.com, dcheronislaw@yahoo.com

Michael B. Mann    mannfam23@comcast.net

Steven Andrew Block    steven.block@usdoj.gov, sablockus@yahoo.com

Terra Reynolds    terra.reynolds@usdoj.gov, barbara.robertson@usdoj.gov, USAILN.ECFAUSA@usdoj.gov

Tiffany Jacqueline Tracy    tiffany.tracy@usdoj.gov, johnine.browne@usdoj.gov

**1:09–cr–00332–9 Notice has been delivered by other means to:**

**1:09–cr–00332–11 Notice has been electronically mailed to:**

AUSA    USAILN.ECFAUSA@usdoj.gov, ecfl.ausa@usdoj.gov, UASILN.ECFAUSA2@usdoj.gov

Pretrial Services    ilnptdb_Court_Action_Notice@ilnpt.uscourts.gov

Probation Department    Intake_Docket_ILNP@ilnp.uscourts.gov

Heather Lynn Winslow    hlwinslow@gmail.com

Michael B. Mann    mannfam23@comcast.net

Steven Andrew Block    steven.block@usdoj.gov, sablockus@yahoo.com

Terra Reynolds    terra.reynolds@usdoj.gov, USAILN.ECFAUSA@usdoj.gov

Tiffany Jacqueline Tracy    tiffany.tracy@usdoj.gov, johnine.browne@usdoj.gov

**1:09–cr–00332–11 Notice has been delivered by other means to:**

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| | ) | |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*DEFENDANT LEWELLEN'S SUPPLEMENT TO POST-TRIAL MOTIONS*

The government is not permitted to knowingly use false testimony to secure a conviction. *United States v. Freeman*, 650 F.3d 673 (7th Cir. 2011). In this case, the government has repeatedly allowed Saul Rodriguez to lie: to government agents, prosecutors, Grand Jurors, and finally to the jury who heard this case. Saul Rodriguez continues to proudly tell others about the lies he has told. At least one of these others has also told the government about Rodriguez's claims. The *Freeman* court has made clear that false testimony is not limited to perjurious statements, but also includes ""half-truths" and vague statements that could be true in a limited, literal sense but give a false impression to the jury." *Id.* at 680.

*Freeman* reiterated the finding of many courts that "[i]t is the government's duty to assure the accuracy of its representations…..This means that when the government learns that part of its case may be inaccurate, it must investigate." *Id.* As will be discussed in the sections that follow, the government knew that

Rodriguez was lying, did not correct some of his lies at all, and corrected others only after the harm had been done.  The government also has failed to investigate when it has had reason to know that Rodriguez was not telling the truth.

The government also has an obligation under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny to provide defendants with exculpatory and impeaching material.  That obligation is on-going and "applies even when the evidence is known only to [law enforcement] and not to prosecutors."  *Youngblood v. West Virginia,* 547 U.S. 867, 869 -70 (2006).  As will be discussed below, the defendants have reason to question whether this responsibility has been fully met in this case.

I.      Saul Rodriguez is so unreliable as a witness that the government's use of his testimony rises to the level of a violation of the Due Process and Sixth Amendment right to a fair trial.

        A.      Rony Mikhail provided information to the government about Saul Rodriguez that was withheld from defense counsel until counsel learned about the debriefing from other sources.

On May 22, 2012, the government interviewed Rony Mikhail, a cellmate of Saul Rodriguez and someone who was unrelated to Mr. Rodriguez' criminal case.  *See,* Exhibit 1.  Present at the meeting were the Assistant United States Attorneys who prosecuted Mr. Lewellen and his co-defendants, as well as TFO James Healy and SA Don Wood, who were also involved in the instant case. Provided the following information that is relevant to the instant case:

        1.      Saul Rodriguez used Mikhail's pin number and telephone to make calls to his wife, Cecelia, and a boxer that works for him.

Saul Rodriguez solicited Mr. Mikhail's assistance in making calls that could

2

and would not be traced or traceable to him.  He did this by providing the phone number he wanted to call to Mikhail, having Mikhail use his own phone account to make the call and then pass the phone to Rodriguez.  This conduct is against the rules governing phone use in the institution where Mikhail and Rodriguez were held.  More importantly for the instant case, Mr. Rodriguez was cross-examined about his use of the telephones to make calls to his wife and others for the purpose of directing their testimony and cooperation with the government and for conducting illegal business without fear of getting caught.  Mr. Rodriguez denied this conduct.

Mr. Mikhail also reported that Mr. Rodriguez used his phone account to extort money from a boxer that worked for Rodriguez, by telling the boxer that Rodriguez would inform the immigration authorities about the boxer's illegal presence in the country, if the boxer would not provide Rodriguez with money.  Such threats, if made, constitute extortionate behavior – new criminal conduct for which Rodriguez apparently has neither been investigated nor charged.

2.     Rodriguez told Mikhail about a murder that he had ordered, and for which he was not held responsible.

Mr. Mikhail described a conversation in which Rodriguez told him about a man in a wheel chair with whom Rodriguez had done business and asked Mikhail if Mikhail knew the individual.  Mikhail did not know the man in the wheelchair. Rodriguez went on to tell Mikhail that he – Rodriguez – had done a million dollars worth of business with this man and that he had once used the man to "take

somebody out."

Rodriguez was cross-examined about an incident involving the murder of "Cato", who had allegedly kidnapped Rodriguez' father.  This man was killed by individuals who worked with a man in a wheel chair.  When cross-examined about the murder, Rodriguez disclaimed any knowledge of it.  If true, this is a significant example of Rodriguez having lied during his testimony at trial and of having withheld information about his own criminal conduct from the government.

Agent notes of Rodriguez's proffer indicate that Rodriguez did know about the Kato killing and that he told agents that "Jesse" – a possible reference to Jesse Guajardo, a Latin King and government informant – hired some members of the Four Corner Hustlers to kill Kato.  Exhibit 2, NOTES__003__293.

3.     Rodriguez told Mikhail that "Joe", a connection in the Cook County State's Attorney's office, "let him know that the police were coming at him."

A central part of the government's case against Glenn Lewellen was the contention that Glenn Lewellen obstructed justice by telling Rodriguez about the pending federal investigation into Rodriguez' illegal activities.  Mr. Lewellen refuted this claim, based on his own lack of connection with law enforcement at the time the investigation into Rodriguez began, by highlighting the fact that "Joe" had provided a confidential DEA report to Rodriguez and had connections with the DEA team that was, in fact, investigating Rodriguez, and by eliciting testimony from TFO Healy about the secrecy and security around DEA wiretap activities.

When cross-examined on the topic, Rodriguez insisted that it was Glenn Lewellen and not "Joe" – presumably Joe DiGiaccomo – who tipped him off about the federal investigation.  This allegation is directly at odds with the claim he made to Mr. Mikhail.

Agent notes from one of Rodriguez' proffer sessions indicate that Rodriguez was told by "Joe" that the DEA wanted to work with Rodriguez, that he met a DEA agent, he had a 908 phone number, and that "Joe" approached Rodriguez and told him not to work for the DEA, but to work for "us" through Cook County.  Exhibit 3, NOTES__003__0326.  These notes give credence to Mr. Mikhail's claim that Rodriguez told him that it was "Joe" who tipped Rodriguez off about the federal investigation into his illegal conduct – not Glenn Lewellen.

Agent notes also indicate that Rodriguez told the agents that "Glenn: *wouldn't* have told Andre to get rid of phone." [emphasis added]  Exhibit 4, NOTES__003__0376. This is completely contrary to the government's theory and the testimony they elicited from witnesses at trial – yet another instance of knowing misrepresentation, but consistent with the claims of Mr. Mikhail.

4.    Rodriguez offered Mikhail a job as a "debt-collector" when Mikhail was released from custody.

Rodriguez attempted to persuade Mikhail to agree to work for him, collecting unpaid debts owed to Rodriguez by people who were still at liberty. In return for this service, Mikhail would receive a percentage of the money he recovered.  The

manner in which he would accomplish this was to "see this man [referring to a Jewish man who owed Rodriguez $850,000] and tell him that he was Rodriguez's partner and that he wanted his money back." The implication of this was that mention of Rodriguez should be sufficient to move the man to pay his debt.

In connection with this conversation, Rodriguez told Mikhail that he had 7-8 million dollars that the government never found. If true, this would be additional evidence of Rodriguez' lack of candor with the government and the government's willingness to turn a blind eye to such information. Rodriguez apparently is not being investigated for this and other disclosures, nor has he been held to account either for withholding information from the government or lying outright.

     5.    Rodriguez wanted Mikhail's wife to help Cecelia by finding her a job and made Mikhail's wife feel threatened when she was unable to do so.

Mikhail reported that Rodriguez asked Mikhail to ask Mikhail's wife to help find Cecelia Rodriguez a job. Incredibly, Mikhail provided Rodriguez with Mikhail's wife's cellular phone number. Rodriguez contacted Mr. Mikhail's wife and she claimed to be frightened by the call. This, too, is an example of Rodriguez's ability and willingness to continue to coerce or intimidate people into doing his bidding. The fact that he is incarcerated puts no brakes on his scheming and undertaking illegal conduct.

Counsel for the defense learned of this interview in early June. As reported to counsel, Rodriguez also told Mikhail that he had lied about some of the people

against whom he testified at trial in this case.  This allegation was not noted in the report counsel received from the government, covering the interview of Mr. Mikhail. Counsel for the defense, in order to begin an investigation of the allegations that were reported to her, asked Mr. Mikhail's attorney – both orally and in writing – for permission to interview Mr. Mikhail about his meeting with the government.  Mr. Mikhail's attorney did not respond to requests to interview Mr. Mikhail.

On June 11, 2012, defense counsel sent a written request to the government for confirmation that Mr. Mikhail was, indeed, interviewed by the government, and requesting any report or further information that resulted from any such interview. Counsel did not receive an immediate response to the request. Rather, we now know that on June 13, 2012, Saul Rodriguez was interviewed by the Assistant United States Attorneys Reynolds and Tracy, and agents TFO Adam Zieminski and SA David Reynolds.  Neither of the two agents who interviewed Saul had been present when Mr. Mikhail was interviewed.

Agent Reynolds' report of the interview of Saul Rodriguez, regarding the allegations raised by Mr. Mikhail, began with Rodriguez's claim that he did not speak with other inmates about his case.  Rodriguez admitted that he and Mikhail spoke to each other daily and had become friendly, since "Mikhail was housed in bunk next to Rodriguez' cell for approximately one and a half months."  *See,* June 13 Report, Exhibit 5.  Rodriguez admitted that he may have spoken with Mikhail regarding general aspects of his case, but Rodriguez did not tell Mikhail about the

other defendants or crimes that were charged.  Such general denials are belied by

the particular facts that Mikhail knew and would not have known unless he had

spoken to Rodriguez about them.  Mikhail was housed in Kankakee, not the MCC,

where other defendants in this case were located.

Rodriguez substantially admitted to the claims that Mikhail made about

their conversations: (1) he admitted to the unauthorized use of Mikhail's phone,

claiming that Mikhail allowed him to do this when Rodriguez beat Mikhail playing

cards; (2) Rodriguez admitted discussing a boxer with Mikhail and to mentioning

threatening to have a boxer deported; (3) he admitted and provided more detail

about his efforts to have Mikhail's wife hire Cecelia Rodriguez to work in a car

dealership.

Agent Reynolds assumed that the Mikhail's reference to "a guy in a

wheelchair" was about Walter Johnson.  Rodriguez denied talking about a guy in a

wheel chair or about Walter Johnson.  He also denied ever using Walter Johnson or

one of his associates to "take somebody out."   In fact, the reference to the guy in the

wheel chair was more likely Saul's involvement in having someone hired to murder

of "Kato" or "Cato", a Latin King who allegedly was responsible for the kidnapping

of Saul's father.  This incident was discussed by Saul and reported in the agents'

notes from the proffer sessions with Saul, with the omission of Saul's solicitation of

the murder.  *See,* Exhibit 2.

According to the report tendered by the government, no one asked Rodriguez

about his claim that "Joe" from the Cook County State's Attorney's office was the one who had told him that the police were coming at him; nor did they ask about the $850,000 debt owed by a Jewish man, the 7-8 million dollars that Rodriguez is alleged to have withheld or hidden from the government, or the threatening call to Mikhail's wife.  The agents who interviewed Rodriguez were not the same as the agents who interviewed Mikhail, but the prosecutors were present for both meetings.  It is unclear why Rodriguez was not confronted about allegations that yet again he had lied to the government and lied when he testified at trial.

Oddly, Rodriguez denied asking Mikhail for help collecting debts – not because he did not want debts collected – but because, in Rodriguez' assessment, Mikhail was "incapable of using the force that would be necessary to collect such debts."  June 13 Report, p. 2.

The two reports raise more questions than they resolve and point to a continued pattern of illegal activity conducted by Rodriguez, additional evidence that Rodriguez has lied to the government and to the jury, and that the government is willing to turn a blind eye to Rodriguez' conduct, no matter what it is or what it reveals about his lack of integrity and inability to tell the truth.

B.    Saul Rodriguez appears to have testified falsely about the manner in which cell phones were smuggled into the Metropolitan Correctional Center.

Defense counsel has learned that a long-time employee of the Bureau of

Prisons,[1] who worked as an officer at the Metropolitan Correctional Center, was walked out of the institution earlier this month, due to his involvement in assisting inmates in smuggling telephones, alcohol, cigarettes, and drugs into the facility. The officer, who was nearing retirement, has not been charged with any crime, as far as counsel is able to determine.  This officer was working at the institution during the time when Saul Rodriguez obtained an unauthorized cell phone and used it while in the institution.

More information is required to determine whether Saul Rodriguez also used this officer to obtain his phone and whether he did, in fact, smuggle other items into the Metropolitan Correctional Center, contrary to his denial when questioned about such conduct during cross-examination at trial.

Agent notes about Rodriguez' smuggling of a cell phone into the Metropolitan Correctional Center,  taken on December 2, 2009, do not mention that Cecelia Rodriguez brought the phone into the Metropolitan Correctional Center and taped it to the sink in the bathroom in the lobby for some unknown person to retrieve on Rodriguez' behalf – as Rodriguez testified, incredibly, at trial.[2]  Rather the notes taken by the agents indicate the involvement of Rodriguez' cellmate, two inmates

---

[1] Defense counsel has the name of this individual and will provide it to the government and the Court upon request.  To counsel's knowledge no charges have yet been made public, so the name is not included in this filing.

[2] Even if it were true that Cecelia had taped a phone to the sink in the bathroom of the lobby of the Metropolitan Correctional Center, it is highly unlikely that an inmate could have brought it to the upper floors without detection, since any inmate permitted to be in the lobby would have to pass through the metal detector before returning to his floor.

from the 25th floor who worked outside the institution, a warehouse on Archer
[where inmates in the urban job corps were sometimes permitted to work], and a
list of items including cigarettes, phones, drugs – coke and weed, and a fourth
category of items that is not possible to decipher.  Exhibit 6, NOTES__003__0286.
The list of items in the agents' notes is the same as the items allegedly smuggled
into the institution by the guard who was recently relieved of his job.

    C.    At least one other inmate who was an associate of Mr. Rodriguez has
           relevant information, but under advice of counsel and out of fear of Mr.
           Rodriguez, will not voluntarily cooperate with defense counsel.

An inmate and associate of Saul Rodriguez provided information to the
government about some of Rodriguez' illegal conduct while Rodriguez was housed in
Adminstrative Detention at the Metropolitan Correctional Center.  This individual
has made known that he has additional information that could assist in counsel's
investigation of Rodriguez' misconduct before and during trial, while under the
supervision of the government.  Unfortunately, this person will not voluntarily
cooperate with defense counsel's investigation. The individual's counsel has advised
that the individual does not want to be involved because he fears for his family's
safety.

    D.    The government knowingly permitted several of its witnesses to be
           represented by the same lawyer, apparently without informing them of
           the potential and actual conflicts of interest.

The lawyer who represented Rony Mikhail works for the lawyer who also
previously represented Saul Rodriguez – a fact Rodriguez mentioned in his June 13

interview that he purposefully hid from Rony Mikhail. *See,* Exhibit 5, p. 2, para. 6.

This lawyer also currently represents the inmate referenced in section C, above.

The same lawyer also represents Alfonso Soria, a government witness who was

present, but not called to testify at trial.  Other individuals involved with this case

who were represented by this lawyer include Maria Saldovar - Lisette Venegas'

grandmother, Lisette and David Venegas, Benjamin Manteca, Fares Umar, Juan

Luevano [Baby G], Jorge Lopez [Oso], and the Flores Twins – whom he currently

represents.

II.   The government appears to have knowingly permitted Saul Rodriguez to
      testify falsely before the Grand Jury for 13 months  -- until all defendants
      had been indicted – before "correcting" the record about the Juan Luevano
      murder.

On at least one major issue – the murder of Juan Luevano – the government

appears to have knowingly permitted Saul Rodriguez' false testimony to go

uncorrected for 13 months – until all defendants were indicted, before "correcting"

the record.  A review of the agent notes from the proffer sessions with Saul

Rodriguez and Andres Flores and a comparison of the notes to the Grand Jury

testimony, indicates that Saul Rodriguez began discussing Andres Flores'

involvement in the Luevano murder on July 9, 2009, as indicated by the notations

in the upper left hand corner of NOTES_003_0107:  Guns? Turtle?.  *See,* Exhibit 7.[3]

On August 26, 2009, Saul Rodriguez was interviewed and again the topic of

---

[3]  Exhibit 7 includes Agent Notes and Grand Jury testimony and will be filed with Court with a
request to file under seal.

the Luevano murder was discussed.  One of the agents wrote under the heading

Baby G – Juan Luevano's nickname – Turtle [Andres Flores' nickname] may have

been 2nd shooter? Saul communicate about Baby G's movement.

NOTES__003__0200.

During the November 3, 2009, proffer session, agents notes indicate, "Manny

w/someone, Flores w/him" under the heading "Day of Murder".

NOTES__003__0264.   On the following page the reference is even clearer: Turtle

helped with surveillance, May have been @ shooting, Brother-in-laws.  NOTES__

003__265.

Although Flores' involvement in the murder of Juan Luevano was discussed

in each proffer session preceding the December 10, 2009, Grand Jury appearance of

Saul Rodriguez, when his statement was presented to the Grand Jury, Saul agreed

that he had reviewed the statement and was given an opportunity to make "any and

all changes that [he] wanted to make," Dec. 10 GJ, p. 7, and then testified that,

"Manny then told me that he would get someone to begin to watch the house.

Manny did not inform me who he, Manny, would ask to help him with the murder."

*Id.,* p. 54.  This statement is directly at odds with the agents' notation on November

3, 2009, that "Turtle helped with surveillance, May have been @ shooting."

Rodriguez repeated his lie, "Manny told me that he and another unidentified male

were going to drive toward Baby G's home. I did not know who assisted Manny".

This statement was inconsistent with the information contained in the agents notes

from the preceding proffer sessions.

Rodriguez' first Grand Jury statement contained at least two other statements the government had reason to know were untrue and which went uncorrected.  The most significant of which involved Rodriguez's relationship with an uncharged co-conspirator.  The person who allegedly asked Rodriguez to kill – or commission the murder of -- Juan Luevano was Benjamin Monteca, also known as "Moras".  Rodriguez testified before the Grand Jury that "I have not spoken with Moras since Baby G's murder."  *Id.*, p. 57.  The government had reason to know – based on Monteca's visit history inquiry, printed on January 10, 2010 – one month after the Grand Jury testimony – that, in fact, Rodriguez had not only talked to Moras after "Baby G's" murder, but had been to visit him in prison on several occasions from 2000 to 2004.  Rodriguez cannot be trusted to tell the truth about any fact, no matter its significance, and the government knew or had reason to know this.

Saul was given the opportunity to correct his statement when he again testified before the Grand Jury on December 17, 2009, January 14, 2010, and January 21, 2010.  Similarly, the government could have, but chose not to correct the statement on any of these occasions.  Even after Andres Flores provided a proffer on January 25, 2010, and testified before the Grand Jury on February 4, 2010, that he shot and killed "Baby G", the government did not correct the lie that it knew Rodriguez had told.

When Saul Rodriguez participated in a proffer session on February 22, 2010, agent notes make clear that the Luevano murder was discussed and that Saul admitted that Flores was involved in the murder.  Rodriguez also talked about Flores' involvement in two other murders Rodriguez wanted to have done. NOTES__003__0332-334.  Despite this unmistakable acknowledgment by both Rodriguez and those taking notes at his proffer that Rodriguez knew that Flores was involved with Luevano murder, when Rodriguez returned to the Grand Jury on September 30, 2010, neither Rodriguez nor the government corrected the record on this point.

Before Rodriguez' statement was read to the Grand Jury on September 30, 2010, he did admit to having lied in previous statements.   He admitted the following:

(1)     while he had said that Gordo was involved in the killing of Miguel, he no longer had "a clear memory as to where Gordo was that day";

(2)     while previously he could not remember who made the first ransom call about a kidnapped twin, on that day he remembered that it was Margarito Carmona, also known as "Yito";

(3)     while previously he had identified Fares Umar, or "Sumo", as the person who conducted surveillance for the kidnapping of one of the twins' couriers, on that day he believed that it really was Gordo and Lefty; and,

(4)     while previously he told the Grand Jury that Gordo had introduced him to

Turtle, on that day he believed that it was actually Manny.

Sept. 30, 2010, Grand Jury, p. 5-9. Even though Rodriguez talked about a relatively minor misrepresentation he had made about "Turtle", or Andres Flores, Rodriguez did not take the opportunity – nor did the government – to admit the greater omission – that Rodriguez knew about Flores' involvement in Luevano's murder.

It was not until the proffer of January 12, 2011, and the Grand Jury statement presented on January 13, 2011, that Rodriguez and agents explicitly discussed what had been evident to both parties all along – that Rodriguez lied to the Grand Jury about the Luevano murder. Only after all defendants were indicted, did the government correct the record it apparently had known to be false since 2009.

III.   The government withheld exculpatory information that was provided by a government witness' attorney.

One of the government's contentions at trial was that during May 2006 there were telephone communications among Glenn Lewellen, Joe DiGiaccomo and Al Pappalito, that supported the government's theory that Glenn Lewellen was the person who provided Saul Rodriguez with information about a pending federal investigation into Rodriguez' illegal conduct. After trial, defense counsel learned that one of the government's potential witnesses, Al Pappalito, had provided information through his attorney, suggesting an alternative and exculpatory explanation for the telephone communications among Lewellen, DiGiaccomo, Pappalito, and others.

When asked, the government claimed not to have received any such information.  Counsel for Al Pappalito provided a letter, detailing the nature of the conversations he and the government had had on this topic. *See,* Exhibit 8, Scorza letter.  Prior to trial, Al Pappalito told his attorney, and asked his attorney to tell AUSA Reynolds, that May 6, 2006, had been the date of the annual party for retired CPD narcotics officers. *See,* Exhibit 8, Scorza Letter. This information was conveyed to AUSA Reynolds, but was not conveyed to defense counsel.  Having had this information, would have enabled counsel for Mr. Lewellen to investigate this claim and present evidence to counter the government's argument that the jury could infer from the telephone records that Mr. Lewellen had no other reason to contact his former fellow officers, other than to obtain information to provide to Saul Rodriguez in his alleged role as "guardian angel" for Rodriguez and his illegal conduct.

IV.    One of the alternate jurors maintained telephone contact with active jurors during their deliberations, requiring a hearing to determine whether deliberating jurors were improperly influenced by external sources during their deliberations.

Alternate juror, Hans Lim, apparently was in telephone contact with at least one of the deliberating jurors, while the jury was deliberating.  Counsel requests permission of the court to interview Mr. Lim and any other juror with whom he communicated while the jury was deliberating, for the purpose of determining whether or not the jury was subject to external information or influence while in the course of deliberating.

17

WHEREFORE, GLENN LEWELLEN, through counsel, respectfully requests that this Court find that Saul Rodriguez' repeated misconduct and admitted failures to be truthful tainted the proceedings to such an extent that the defendants were not properly indicted and did not receive a fair trial.

Defendant LEWELLEN further requests that the case be remanded for a new trial, and that Saul Rodriguez be barred from testifying, because his extended pattern of lying and engaging in manipulative and illegal conduct, without consequence, rise to such a level, that he makes it impossible for any jury to fairly assess the value of his testimony and for the defendants to receive a fair trial.

In the alternative, defendants request a hearing to determine the following:

(1)     Did Saul Rodriguez use the services of the Officer at the Metropolitan Correctional Center who recently lost his job because he helped inmates obtain phones, alcohol, drugs, cigarettes, and other unauthorized items into the Metropolitan Correctional Center, did the government know about this investigation before, during or after trial, and why was this information not provided to defense counsel;

(2)     Is there any additional *Brady* or *Giglio* information in the government's possession, or that could be discovered by reasonable investigation, that has not been provided to defense counsel;

(3)     Do Rony Mikhail and the second individual have relevant information that has not been revealed to defense counsel; and,

18

(3)      Did Hans Lim's communications with the jury during its deliberations

interfere with or improperly influence in any way the jury's decision-making

process?

DATE:            September 20, 2012            Respectfully submitted,

                                              By:      s/Andréa E. Gambino
                                                       Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014


                       CERTIFICATE OF SERVICE

        I hereby certify that on September 20, 2012, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which sent

notification of such filing to the following:

        John Beal
        Counsel for Jorge Uriarte

        Cynthia Giachetti
        Molly Armor
        Counsel for Hector Uriarte

        Keith Spielfogel
        Robert Loeb
        Counsel for Manuel Uriarte

        Eugene Steingold
        Counsel for Tony Sparkman

        Heather Winslow
        Counsel for Robert Cardena

Terra Reynolds
Steven Block
Tiffany Tracy
Assistant United States Attorneys

and I hereby certify that I have mailed by United State Postal Service the document

to the following non-CM/ECF participants: [not applicable in this case].

DATE:        September 20, 2012       Respectfully submitted,

                                      By:    s/Andréa E. Gambino
                                             Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

**U.S. Department of Justice**
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 4

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| | ☐ | | | |
| 5. By: James A Healy, TFO | ☐ | | 6. File Title | |
| At: Chicago FDO | ☐ | | | |
| | ☐ | | | |
| 7. ☐ Closed ☐ Requested Action Completed | ☐ | | 8. Date Prepared | |
| ☐ Action Requested By: | | | 05-29-2012 | |
| 9. Other Officers: SA Don Wood | | | | |
| 10. Report Re: Interview of Rony Mikhail | | | | |

### DETAILS

1. On May 22, 2012, TFO James Healy and SA Don Wood attended an
   interview of Rony Mikhail at the United States Attorney's Office in
   Chicago. Also present at the interview were AUSAs Terra Reynolds,
   Steven Block, Tiffany Tracy, and Mikhail's attorney Stephanie
   Linares. Mikhail was not provided a proffer letter.

2. Mikhail is in federal custody for a theft case unrelated to this
   investigation. Mikhail has been housed at the MCC in Chicago, and at
   the Kankakee County Jail. Mikhail was interviewed regarding contact
   he has had with Saul RODRIGUEZ while in custody.

3. Mikhail related that in March of 2012, he was moved from an older
   facility at Kankakee County Jail to a newer facility there. The
   section he was housed in is called B Dorm. Mikhail related that this
   is where he met RODRGUEZ. Mikhail described B Dorm as a 48 man unit
   with numerous bunk beds in a large room. RODRIGUEZ was in the bunk
   next to Mikhail. Mikhail stated that RODRIGUEZ had a small group of
   inmates that he would hang out with regularly.

4. Mikhail stated that for the first few days there, he talked to
   RODRIGUEZ only a few times, just making small talk. Mikhail stated
   that he (Mikhail) worked out in the dorm, and after about six or seven
   days there, RODRIGUEZ asked to join Mikhail working out. While
   working out, RODRIGUEZ threw out a question that took Mikhail by

| 11. Distribution: | 12. Signature (Agent) | | 13. Date |
|---|---|---|---|
| Division | | | 05-29-2012 |
| | James A Healy, TFO | | |
| District | 14. Approved (Name and Title) | | 15. Date |
| | Charles A Baumgartner | | 05-29-2012 |
| Other | | | |

| DEA Form - 6 | DEA SENSITIVE |
|---|---|
| (Jul. 1996) | Drug Enforcement Administration |

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** | ▮▮▮▮▮▮ | ▮▮▮▮▮ |
| *(Continuation)* | 3. File Title | |
| | ▮▮▮▮▮▮▮▮▮▮ | |
| 4. Page 2 of 4 | | |
| 5. Program Code | 6. Date Prepared 05-29-2012 | |

surprise. Mikhail stated that RODRIGUEZ asked him if he knew anyone who had committed any major crimes involving "bodies." RODRIGUEZ said he wanted information that could help him(RODRIGUEZ). Mikhail believed that RODRIGUEZ wanted information about unsolved crimes so that he could get credit from the government. Mikhail stated that he did not know anyone like that, and had no such information for RODRIGUEZ. RODRIGUEZ asked Mikhail not to say anything about this request around his(RODRIGUEZ's) regular friends he hung out with in the dorm.

5. Mikhail stated that a few days later, RODRIGUEZ again approached him and said that even if Mikhail knew anyone that committed any major fraud, RODRGUEZ would like the information. Mikhail stated that RODRIGUEZ talked about his charges, the fact that he cooperated with the government, and the fact that he testified against other people involved in his crimes. RODRIGUEZ stated that he(RODRIGUEZ) had "bodies." Mikhail understood that this meant RODRIGUEZ was involved in murders.

6. Mikhail stated that after a few weeks, RODRIGUEZ wanted to call his(RODRIGUEZ's) wife, and requested Mikhail's assistance. Mikhail agreed to use his account to make the phone call for RODRIGUEZ. Mikhail stated that he dialed a number given to him by RODRIGUEZ, and handed RODRIGUEZ the phone. Mikhail stated that RODRIGUEZ later said that he talked to a boxer that worked for RODRIGUEZ, and threatened to call INS on the boxer if the boxer did not give RODRIGUEZ money. RODRIGUEZ said that the boxer owed RODRIGUEZ money. Mikhail stated that he remembers the telephone number that RODRIGUEZ called and believes that it is (312)505-4489. It is noted that this telephone number is known by DEA to be used by Bobby Hitz, a boxing manager who worked with RODRIGUEZ and his boxers.

7. Mikhail stated that RODRIGUEZ asked him if he knew a guy in a wheelchair that RODRIGUEZ used to do business with. Mikhail did not know the man. Mikhail stated Rodriguez told him that he had done 1 million dollars in business with the man in the wheelchair, and that RODRIGUEZ had once used the man to "take somebody out."

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION** | 1. File No. | 2. G-DEP Identifier |
| *(Continuation)* | 3. File Title | |
| 4. Page  3  of  4 | | |
| 5. Program Code | 6. Date Prepared 05-29-2012 | |

8. Mikhail stated that RODRIGUEZ also bragged that he had connections
   with people who could make his sentence reduced.  RODRIGUEZ also told
   Mikhail that he had a connection in the Cook County State's
   Attorney's Office who let him know that the police were coming at
   him.  RODRIGUEZ stated that this man's name was Joe.

9. Mikhail stated that RODRIGUEZ spent much of his time writing letters
   to his wife and kids, and sometimes would have other inmates help
   write the letters.

10. Mikhail stated that he asked Mikhail if he(Mikhail) wanted to work
    for him on the outside.  Mikhail stated that RODRIGUEZ said that
    he(RODRIGUEZ) had made several bad investments, and that a lot of
    people owed him money. Rodriguez stated that Mikhail could possibly
    help RODRGUEZ in getting money back from the people that owed money
    to him. RODRIGUEZ stated that he would pay Mikhail a percentage of
    the money.  Mikhail stated that RODRIGUEZ described one of these
    investments as a $1.5 million in a coffee company. Mikhail said that
    RODRIGUEZ also described a loan given to a Jewish man for $850,000.
    RODRIGUEZ stated that he needed someone to see this man, and tell him
    that he was RODRIGUEZ's partner and that he wanted his money back.
    RODRIGUEZ stated that he wanted to recover the money so that his
    brother in law and other family members could open a car lot and take
    care of RODRIGUEZ's family.  Mikhail stated that RODRIGUEZ stated
    that he had 7 to 8 million dollars that the government never found.

11. Mikhail stated that RODRIGUEZ once asked Mikhail to ask Mikhail's
    wife to help find a job for RODRIGUEZ's wife.  Mikhail stated that he
    eventually gave RODRIGUEZ his wife's cellular telephone number.
    Mikhail stated that his wife did not feel she could find a job for
    RODRIGUEZ's wife, and referred RODRIGUEZ's wife to a staffing agency.

12. Mikhail stated that on May 18, 2012, Mikhail's wife was contacted
    by RODRIGUEZ who called from the jail.  At this time, Mikhail had
    been transferred to the MCC.  Mikhail stated that RODRIGUEZ asked his
    wife how Mikhail was doing and asked where he(Mikhail) was,  Mikhail
    stated that RODRIGUEZ once told Mikhail his (Mikhail's) exact address

DEA Form    - 6a                          **DEA SENSITIVE**
(Jul. 1996)                        **Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

DEA6_034_0008

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. File Title | |
| 4.<br>Page  4  of  4 | | |
| 5. Program Code | 6. Date Prepared<br>05-29-2012 | |

so that Mikhail would know RODRIGUEZ knew where Mikhail lived.
Mikhail stated that his wife was frightened by the telephone call.



DEA Form       - 6a                                **DEA SENSITIVE**
(Jul. 1996)                                 Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

DEA6_034_0009

KATO Killing

Jesse Afvd

4 corner Holler to do 2



GLENN

- Would call and ask 63rd / Cicero
- Do you know anyone
- 1st told Sur Ho cold Fid out
➡ Never ran #'s
⟹ ADDRESS'S
⟹ Glenn Hd check to see
   if Isting to Have TV

⟹ Glenn: wouldn't Have told
   Andre to get rid of Phone

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | Page 1 of 3 | | |
|---|---|---|---|---|
| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
| 5. By: David M Reynolds II, SA<br><br>At: Chicago FDO | ☐<br>☐<br>☐<br>☐<br>☐ | | 6. File Title | |
| 7. ☐ Closed  ☐ Requested Action Completed<br>☐ Action Requested By: | | | 8. Date Prepared<br>06-18-2012 | |
| 9. Other Officers: TFO Adam Zieminski | | | | |

10. Report Re: Proffer with Saul RODRIGUEZ on June 13, 2012.

## DETAILS

1. Reference is made to all previous DEA-6 Reports of Investigation written under this file title and file number.

2. On June 13, 2012, it was arranged that Saul RODRIGUEZ along with his attorney, Rachel Katz would meet at the United States Attorney's Office to conduct a proffer. Assistant United States Attorney (AUSA) Terra Reynolds, AUSA Tiffany Tracy, TFO Adam Zieminski, and SA David Reynolds were also present during the proffer. The following report documents the proffer interview.

3. After testifying in at the trial of Glenn Lewellen and others, SAUL RODRIGUEZ was transported from the Metropolitan Correctional Center (MCC) to the Kankakee County Jail. Once at Kankakee County Jail, RODRIGUEZ observed that the inmates in the section that he (RODRIGUEZ) was being housed did not know RODRIGUEZ or that RODRIGUEZ was cooperating with law enforcement. RODRIGUEZ did not want to be transferred to isolation, so RODRIGUEZ did not speak with other inmates or guards about specifics regarding of his (RODRIGUEZ') case.

4. RODRIGUEZ was asked if Ronnie MIKHAIL was incarcerated with RODRIGUEZ in the Kankakee County Jail. RODRIGUEZ indicated that MIKHAIL was housed in bunk next to RODRIGUEZ' cell for approximately one and a half months. During that time period RODRIGUEZ and MIKHAIL became friendly and spoke to each other on a daily basis. During the numerous conversations, RODRIGUEZ never told MIKHAIL specifics regarding RODRIGUEZ' case or his cooperation with the government. RODRIGUEZ may have spoken with MIKHAIL regarding general aspects of his (RODRIGUEZ') case but RODRIGUEZ did not tell MIKHAIL about the other defendants or crimes that were charged in the case. RODRIGUEZ does not recall if he (RODRIGUEZ) told MIKHAIL regarding the fact that RODRIGUEZ testified. RODRIGUEZ did not ask MIHAIL for information that RODRIGUEZ could

| 11. Distribution:<br>Division<br><br>District<br><br>Other | 12. Signature (Agent)<br>David M Reynolds II / SA | 13. Date<br>06-18-2012<br>6-18-12 |
|---|---|---|
| | 14. Approved (Name and Title)<br>Charles A Baumgardner - GS | 15. Date<br>6/25/12 |

| DEA Form    - 6<br>(Jul. 1996) | DEA SENSITIVE<br>Drug Enforcement Administration | |
|---|---|---|

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

DEA6_034_0003

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. File Title | |

| 4. Page 2 of 3 | |
|---|---|
| 5. Program Code | 6. Date Prepared 06-18-2012 |

use to further reduce his sentence. RODRIGUEZ understood that MIKHAIL was in jail on a probation violation.

5. RODRIGUEZ was asked if he told MIKHAIL about having done $1,000,000 in business with a guy in a wheelchair who RODRIGUEZ once used to "take somebody out." RODRIGUEZ denied having talked to MIKHAIL about a guy in a wheelchair generally, or about Walter Johnson specifically. RODRIGUEZ further denied ever having used Walter Johnson or Johnson's associates to "take somebody out."

6. During one conversation with MIKHAIL, RODRIGUEZ indicated that he (RODRIGUEZ) needed a lawyer to assist in collecting money associated with RODRIGUEZ' boxing company. RODRIGUEZ told MIKHAIL that one boxer, Carlos Molina, was a good fighter and that he could make RODRIGUEZ money but that Molina had found a different promoter. RODRIGUEZ never asked MIKHAIL to assist in getting money from Molina that is owed to RODRIGUEZ. MIKHAIL suggested that RODRIGUEZ should call MIKHAIL'S attorney, Bob Rascia. RODRIGUEZ did not tell MIKHAIL that RODRIGUEZ knew Mr. Rascia and that Mr. Rascia had represented RODRIGUEZ and RODRIGUEZ' criminal associates in the past.

7. RODRIGUEZ and MIKHAIL often discussed financial investments and other money related topics. At one point, MIKHAIL indicated that his (MIKHAIL'S) family owns a car dealership and that his (MIKHAIL'S) wife works at a Honda in Elgin. RODRIGUEZ told MIKHAIL that a couple of his family members worked at car dealerships. RODRIGUEZ later asked MIKHAIL if his wife would hire Cecilia RODRIGUEZ at the dealership. MIKHAIL took Cecilia RODRIGUEZ' telephone number to give to his wife, but Cecilia RODRIGUEZ never spoke with MIKHAIL'S wife. RODRIGUEZ did speak with MIKHAIL's wife on at least one time on the phone. RODRIGUEZ had obtained the number for MIKHAIL's wife from MIKHAIL. RODRIGUEZ asked how MIKHAIL was doing and where he was at, given that MIKHAIL had recently been transferred away from Kankakee. RODRIGUEZ also discussed the possibility of MIKHAIL's wife getting a job for Cecilia RODRIGUEZ. To RODRIGUEZ' knowledge, MIKHAIL's wife did not hire Cecilia RODRIGUEZ. RODRIGUEZ did not discuss opening a car dealership with MIKHAIL. RODRIGUEZ did not ask for MIKHAIL's help in collecting other debts RODRIGUEZ incurred from bad investments. RODRIGUEZ perceived MIKHAIL to be incapable of using the force that would be necessary to collect such debts.

8. RODRIGUEZ and MIKHAIL would play cards often on at least one occasion, when RODRIGUEZ won the game as payment, MIKHAIL let RODRIGUEZ talk on the phone under MIKHAIL'S account. While using MIKHAIL'S minutes, RODRIGUEZ called one of his boxers but RODRIGUEZ does not

---

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION<br>*(Continuation)* | 1.  | 2. G-DEP Identifier |
|---|---|---|
| | 3. File Title | |
| 4.<br>Page 3 of 3 | | |
| 5. Program Code | 6. Date Prepared<br>06-18-2012 | |

recall if the boxer picked up the phone. RODRIGUEZ may have discussed with MIKHAIL his willingness to contact the INS and have his boxers deported.

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

RODRIGUEZ

12-2-09

- KOTZ, J.H., BROWN, DR, Rod-g...
- Jeff Stein Beck VA + x

Cell Phone incident

- Telephone Conversation -

915-339-0033

- Cell Mate.        Gonzalez
  ° San Jose De Garcia
  ° Sopies
  ° 300 Klos
  ° Roscia Reparts
  ° 9 Years
  ° Knew how to get stuff in
Relenson   ← ° Drew CNU / AL LNU
  ° 25th Floor
Warehose  Anclee/Lanehouse   ° Workers onside
Moinfinre   ° Get all items Clean Ledr

° Cell Mate
  °After Indians
  ° till he left
  ° 5/10-
  ° Another person

° Items
  ° Cigarettes
  ° tis
  ° Drugs → coke, weed
  ° Leonardez / Rodigez slaves

NOTES_003_0286

THOMAS J. SCORZA

ATTORNEY

5490 S. SOUTH SHORE DRIVE

CHICAGO, ILLINOIS 60615

Tel.: (773) 493-7775       Fax: (773) 493-7775       TomScorza@aol.com

July 14, 2012

Andrea E. Gambino, Attorney
53 West Jackson Boulevard
Suite 224
Chicago, Illinois 60604                    *Re*: Alfred Pappalito

Dear Ms. Gambino:

I'm writing in response to your request that I detail to you once again certain information
I provided to Assistant U.S. Attorney Terra Reynolds prior to the commencement of the trial in
*United States v. Rodriguez, et al.*, No. 09 CR 332 (N.D. Ill.).

On November 2, 2011, my client, Alfred Pappalito (a former CPD narcotics officer), and
I appeared for a trial-preparation interview with AUSA Reynolds and the DEA case agent in
*Rodriguez*. The interview focused principally on telephone records that showed three, four, or
five instances on May 5 and 6, 2006 where there had been contact or attempted contact from the
cell phone then registered to your client, Glenn Lewellen, to the cell phone then assigned to
Pappalito as a Cook County State's Attorney's Investigator. AUSA Reynolds told us that
Lewellen and other targets of a 2006 DEA investigation (which included court-authorized
wiretaps) had begun discarding their cell phones on May 7, 2006, so she was investigating
whether there had been an intentional leak of the existence of the DEA investigation. Pappalito,
however, did not recall having received any telephone call from, or having had any telephone or
in-person conversation with, Lewellen in or around May 2006. (As you know, the government
did not call Pappalito as a witness in the ensuing *Rodriguez* trial.)

On November 5, 2011, Pappalito called me and told me he had just acquired information
that he thought should be passed on to AUSA Reynolds. Pappalito related that a friend, CPD
officer Brad Williams, had located his (Williams') calendar book for 2006 and that an entry for
May 6th indicated that May 6, 2006 had been the date of the annual party for retired CPD
narcotics officers. In response to my questions, Pappalito explained that, despite the new
information, he could not recall speaking to Lewellen in early May 2006 about the upcoming
police party or any other matter. Later on November 5, 2011, or the next day, I provided AUSA
Reynolds with the information I had received from Pappalito, and I told her that Pappalito still
had no recollection of Lewellen's contacting him about any matter in or around May 2006.

Sincerely,

Tom Scorze

Cc: Al Pappalito

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3
### Eastern Division

UNITED STATES OF AMERICA

                              Plaintiff,

v.                                        Case No.: 1:09–cr–00332
                                        Honorable Joan B. Gottschall

Saul Rodriguez, et al.

                              Defendant.

# NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, September 26, 2012:

      MINUTE entry before the Honorable Joan B. Gottschall: Motion hearing held on 9/26/2012 regarding motion to modify [1002]. The City of Chicago and Noel Sanchez's petition to intervene and motion to modify the September 6, 2011 Protective Order [1002] is granted pursuant to the parties' agreement as to Glenn Lewellen (2). United States agrees to modify the protective order to permit the United States to provide documents to the parties in the civil suit before Judge Leinenweber. Mailed notice (rj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )  | |
| ) | No. 09 CR 332 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN *et al.* ) | |

### GOVERNMENT'S RESPONSE TO DEFENDANTS' SUPPLEMENT TO POST-TRIAL MOTIONS

Defendants' supplement to their post-trial motions is long on rhetoric but short on meaningful facts and law.[1]  The supplement, which generally rehashes issues regarding witness credibility already decided by the jury, does not provide any basis for the Court to grant defendants a new trial.  Nor does defendants' wild speculation about rogue alternate jurors, mysterious jail guards, and unnamed MCC inmates.  To the contrary, it is now apparent that defendants finally realize that they face long prison sentences as a result of their violent conduct and are desperately trying to distract the Court and delay sentencing.  But when the Court cuts through the bluster, it is plain that there is no reason to disturb the carefully considered decision the jury arrived at in this case.  Defendants' post-trial motions should be denied.[2]

### I.  Many of Defendants' Arguments in the Supplemental Filings Are Untimely and Must be Denied

Federal Rule of Criminal Procedure 33(b) mandates that a motion for new trial for any reason

---

[1]  For example, the agent notes, reports of interview, and grand jury testimony defendants attach as Exhibits 1-7 of their supplement filing, were produced to defendants prior to trial.

[2]  Defendants Hector Uriarte, Jorge Uriarte, and Tony Sparkman have joined in defendant Lewellen's supplement to his post-trial motions, and in addition, Hector Uriarte filed his own supplement.  The government has previously responded to the post-trial motions of each defendant who was convicted at trial.  This response is limited to the arguments set forth in defendants' supplemental filings.

other than newly discovered evidence must be filed within 14 days after the verdict. F.R.C.P. 33(b).

A court may, as it did in this case, grant an initial extension beyond the 14 day time period. F.R.C.P.

45(b). Here, the Court extended the deadline for filing post-trial motions to April 2, 2012.

R. 808. All convicted defendants filed post-trial motions by that date. On July 3, 2012, four months

after the date set by the Court for the filing of post-trial motions, defendant Jorge Uriarte sought

leave of the Court to "supplement" his post-trial motion, which the Court granted. R. 947. Jorge

Uriarte sought several additional extensions to file his "supplement," finally filing a motion to join

defendant Lewellen's supplement on September 19, 2012. R. 1009. On September 19, 2012, Hector

Uriarte filed his own motion to supplement and the next day sought leave to join Lewellen's

supplement. Finally, on September 27, 2012, Sparkman also moved to join Lewellen's supplement.

Five months after the deadline for post-trial motions set by the Court, it is now clear that

defendants' latest filings include arguments that are not supplements to their post-trial motions at

all and do not address newly discovered evidence. Rather, the "supplements" raise issues that were

raised or could have been raised in the post-trial motions that were due on April 2, 2012. The Court

may not consider these arguments. *See Eberhart v. United States*, 126 S.Ct. 403, 403, 407 (2005)

(the time limits for filing of post-trial motions are "inflexible claim processing rule[s]" that mandate

denial of an untimely petition so long as the government does not waive or forfeit the timeliness

objection). *See also United States v. Ogle*, 425 F.3d 471, 476 (7th Cir. 2005) (district court properly

denied Rule 33 motion filed after time limit, and where "new evidence" exception did not apply);

*United States v. Holt*, 170 F.3d 698, 702-03 (7th Cir. 1999) (defendant is not permitted to raise

additional arguments in an untimely motion by characterizing that motion as a "supplemental" or

"amended" pleading because "allow[ing] an amended or supplemental motion to relate back to the

original date would defeat the express language of the rule, and would create a back door through

which defendants could raise additional grounds for a new trial long after the [14-day] period had

expired.").

Here, many of the issues raised by defendants in the supplemental filing are time-barred.

These include the following issues:  (1) Rodriguez lied about smuggling a cell phone into the MCC;

(2) a purported conflict existed because several witnesses involved in the case were represented by

the same attorney; (3) Rodriguez testified falsely before the grand jury; and (4) the government

purportedly withheld *Brady* information regarding an alleged May 2006 party for former narcotics

officers.[3]   The Court should dismiss each of these arguments out of hand.

### A.    There is no New Evidence Regarding Rodriguez's Use of a Smuggled Cell Phone at the MCC

Defendants now contend that Rodriguez "appears" to have testified falsely at trial regarding

how – not whether – he smuggled a cell phone into the MCC.  R.1011 at 9-11.  As the Court will

recall, Rodriguez testified on direct and cross-examination that his wife smuggled a cell phone into

the MCC by taping it to the underside of a sink.  Rodriguez was subjected to extensive cross-

examination regarding how he obtained the phone and his use of it.  Every defense closing argument

referenced Rodriguez's unlawful use of the cell phone while at the MCC, and defendant Lewellen's

entire theme was that Rodriguez's "family," including his wife, had helped him orchestrate a massive

conspiracy to frame Lewellen.  *See, e.g.,* Tr. 5099-5100, 5112.  The jury rejected this argument and

convicted defendants.

---

[3]   Defendants also suggest that there is another inmate, whose name defendants do not provide, who has
information that defendants do not specify.  R.1011 at 11.  It goes without saying that this does not constitute new
evidence.

Now, more than five months after post-trial motions were due, defendants have changed their theory and argue that Rodriguez's wife did not smuggle in the phone after all.  Defendants theorize, without any factual support whatsoever, that Rodriguez must have been aided by an unnamed MCC guard and not his wife.  The sole new "fact" defendants include in their supplement is the rumor that an MCC guard was terminated for helping inmates smuggle items into the MCC.  This new "fact," even if true, has nothing to do with Rodriguez's use of a cell phone, defendants' ability to cross-examine Rodriguez or advance their theory of the case, or defendants' guilt.  Accordingly, there is no new evidence that permit defendants to even raise this issue months after the post-trial motions deadline.

### B.    There is no New Evidence Regarding Purported Conflicts of Interest

Defendants argue that they are entitled to a new trial because several witnesses involved in the case were, at various times, represented by the same attorney.  R.1011 at 11-12.  Putting the merits of such an argument to one side, there is nothing new here.  Defendants knew before trial that the same attorney had represented several witnesses.  Defense counsel cross-examined several witnesses regarding their relationship with this particular attorney, and  Lewellen's counsel even referenced the attorney during closing argument, saying, "We know that Saul used the same lawyer as he recommended to a bunch of his cohorts, the Flores brothers, Jorge Lopez, Maria Saldivar, the Venegases and Fares Umar. Another case of the way this family stays together.  Another case of the way this family communicates with each other." Tr. 5121-22.[4]  This argument is untimely and must be rejected.

--------

[4]  Of course, Lewellen's argument is inconsistent with this same attorney representing Rony Mikhail, who provided information about Rodriguez.

4

**C.     There is no New Evidence Regarding Rodriguez's Testimony in the Grand Jury**

Defendants argue in their supplemental filing that they are entitled to a new trial because Rodriguez testified falsely in the grand jury.  R.1011 at 12-16.  Obviously, Rodriguez's grand jury testimony concluded long before trial and defendants were provided transcripts of his testimony. Rodriguez was subjected to days of questioning at trial where both government and defense lawyers picked apart his grand jury testimony and the lies he had initially told before coming clean. Defendants' supplemental filing on this issue includes no new evidence whatsoever, is untimely, and must be denied.[5]

**D.     Lewellen Was Aware of Information Regarding the Purported Annual CPD Narcotics Party Prior to the April 2012 Post-Trial Motions Deadline**

Defendant Lewellen argues that he is entitled to a new trial because the government withheld information that supposedly shows that there was a party for former narcotics officers in May 2006, which was during the same time period that Lewellen tipped off two of his conspirators, Saul Rodriguez and Andres Torres, to the existence of a federal wiretap.  The government will address the merits of this argument below and explain why the information is not *Brady* material.  However, the Court should not reach the merits of defendant's argument because defendant failed to raise this issue in his post-trial motions, which were due on April 2, 2012.

Defendant's "supplement" fails to mention that Pappalito's attorney provided defense counsel with the second-hand information regarding the May 2006 narcotics officers party by mid-February

---

[5] Defendants also contend, without any factual support, that the government learned that Rodriguez had lied in the grand jury in 2009 yet purposely waited to inform the grand jury until all defendants were indicted.  This statement is incorrect.  The government regularly confronted Rodriguez when it learned of instances when he had not been truthful and presented that information to the grand jury as soon as practicable.  The government produced all of Rodriguez's grand jury transcripts, agent notes, and reports of interview, which support the government's position.

2012, which was six weeks *before* the April 2012 motion deadline. *See* Ex. A. Moreover, Lt. Noel Sanchez testified at trial regarding the fact that he would occasionally talk to Lewellen regarding the narcotics officers party. Tr. 879. Not only did Lewellen's attorneys have information regarding the narcotics officers parties prior to the post-trial motion deadline, they also had it during the trial yet apparently chose not to make use of it until now. There is no "new evidence" here that was not in defendant's possession at the time he filed his post-trial motions in April 2012. It would be error for the Court to entertain defendant's untimely "supplemental" motion on this issue.

II.   **The Post-Trial Information Obtained From Rony Mikhail is Not *Brady* or *Giglio* Material Entitling Defendants to a New Trial**

The majority of defendants' supplemental filing is an attempt to convince the Court that Saul Rodriguez was so unreliable of a witness that allowing the jury to even hear his testimony resulted in a constitutional violation. This is the same argument that defendants advance in their original post-trial motions. The law is clear that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences." *United States v. Hagan*, 913 F.2d 1278, 1281 (7th cir. 1990). The Court is not permitted to re-weigh the evidence. *United States v. Hale*, 448 F.3d 971, 983 (7th Cir. 2006). Defendants now try to bolster their unsupported argument by relying on information received by both the government and defense post-trial regarding conversations Rodriguez had with fellow inmate Rony Mikhail. The government did not withhold this information. Moreover, none of the information provided by Mikhail, even if true, is material.

6

### A. The Government Did Not Suppress *Giglio* or *Brady* Material

The government has an obligation to disclose to the defense material information which might undermine the reliability of its trial witnesses. *Giglio v. United States*, 405 U.S. 150, 153 (1972). To show that the government violated that obligation, a defendant is required to demonstrate that the government suppressed material impeachment evidence favorable to the defense. *United States v. Jumah*, 599 F.3d 799, 808 (7th Cir. 2010). It is axiomatic that the government does not have an obligation to disclose potentially impeaching evidence if it does not know of that evidence. *See United States v. Earnest*, 129 F.3d 906, 910 (7th Cir.1997) ("[The] obligation to disclose exculpatory or impeaching information under *Brady* is limited to information which is then known to the government"); *United States v. Young*, 20 F.3d 758, 764 (7th Cir.1994) ("As a general rule, the prosecution's obligation in a criminal proceeding to disclose information is limited to information known to the prosecution"); *United States v. Senn*, 129 F.3d 886, 893 (7th Cir.1997) ("*Brady* and its progeny do not require the government to conduct an investigation for the defense"); *Ienco v. Angarone*, 291 F.Supp.2d 755, 760 (N.D.Ill. 2003) ("The rule requiring prosecutors in criminal proceedings to disclose information is limited to information known to the prosecution.").

In this case, the government first learned that Rony Mikhail had any conversations with Rodriguez long after conclusion of the trial – indeed, the conversations themselves did not take place until after trial. After learning that Mikhail purported to have information regarding Rodriguez, the government interviewed Mikhail on May 22, 2012. After interviewing Mikhail, the government interviewed Rodriguez at the first opportunity. It goes without saying that the government could not have turned over information from Mikhail before he had even spoken to Rodriguez.

**B.      The Information Provided by Mikhail is not Material**

Even had the information provided by Mikhail been known to the government prior to or during trial it still is not *Giglio* or *Brady* because it is not material.  In order for non-disclosed information to be considered material to the defense, there must be a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.  *See United States v. Bagley*, 473 U.S. 667, 682 (1985); *Jumah*, 599 F.3d at 808**.**  "A 'reasonable probability' is that sufficient to undermine confidence in the outcome. The materiality standard is not met by 'the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial.'"  *Lieberman v. Washington*, 128 F.3d 1085, 1092 (7th Cir.1997) (quoting *United States v. Agurs*, 427 U.S. 97, 109-10 (1976)).  Thus, evidence is [deemed] material . . . if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987).  "Thus, *Brady* does not require a prosecutor to divulge every scintilla of evidence that might conceivably inure to a defendant's benefit."  *Lieberman*, 128 F.3d at 1092 (citing *United States v. Hamilton*, 107 F.3d 499, 509 (7th Cir.1997)).  The unsubstantiated information provided by Mikhail is not material and certainly would not have changed the outcome of the trial.

**1.      Rodriguez's Use of Mikhail's Phone PIN**

Rodriguez's contact with Mikhail did not take place until Rodriguez was transferred to Kankakee County Jail after his testimony at trial concluded.  Rodriguez acknowledged that while housed with Mikhail, the two inmates would play cards and, if Rodriguez won, Mikhail would allow Rodriguez to use some of his phone minutes to make calls.  There is certainly nothing impeaching about this behavior.  Moreover, it is not material because it is inconceivable that this information

8

would have changed the outcome of the trial (even if the activity took place before trial, which it did

not). Rodriguez testified at trial about his use of a smuggled cell phone at the MCC and Lewellen

called another inmate who testified about Rodriguez's use of the cell phone. The fact that Rodriguez

used Mikhail's phone minutes while in jail *after his trial testimony* is immaterial.

### 2.     Rodriguez Purportedly Told Mikhail About an Additional Murder

According to Mikhail, Rodriguez told him that he did a large volume of narcotics trafficking

with a man in a wheelchair. Mikhail contends that Rodriguez told him that he had used the man in

the wheelchair to "take somebody out."    The Court is aware that Rodriguez's wheelchair-bound

contact in the drug trade is Walter Johnson, who the Court recently sentenced. Rodriguez has denied

that he solicited Walter Johnson to commit a murder. Furthermore, there is no evidence that Johnson

ever committed a murder. Apart from the fact that it makes no sense that Rodriguez would solicit

a disabled individual to commit a murder, the unsubstantiated information provided by Mikhail is

not material. Rodriguez admitted at trial that he had been involved in three murders, including the

murder of his best friend, Juan Luevano, the murder-for-hire of Michael Garcia, and the brutal

torture and murder of narcotics trafficker Miguel Delatorre.[6]   It is not "reasonably probable" that the

outcome of the trial would have been different had Mikhail testified that Rodriguez had told him

about an additional murder. *Washington*, 128 F.3d at 1092. Moreover, it bears repeating that

Rodriguez had not spoken to Mikhail until after his trial testimony concluded and, therefore, the

government did not know about Rodriguez's conversations with Mikhail until after the trial.

---

[6]   At trial, Rodriguez denied any involvement in the murder of an individual named "Kato," to which
defendants refer in their supplemental filing. Indeed, Rodriguez had denied involvement in the murder of Kato prior
to trial as reflected in the agent's notes defendants attach to their supplemental filing.

### 3. Rodriguez Purportedly Told Mikhail About His Connection in the Cook County State's Attorney's Office

According to Mikhail, Rodriguez told him that Rodriguez had a connection in the Cook County State's Attorney's Office ("CCSAO") named "Joe," who provided him with information to help him avoid detection by law enforcement. This is nothing new, and is certainly not impeaching or material. Prior to trial, the government provided defense counsel with a report detailing the information provided by Rodriguez over many proffer sessions. The report states that Rodriguez had a handler at the CCSAO named Joseph DiGiacomo who did provide information to Rodriguez from time to time. Most notably, Rodriguez said that DiGiacomo had given him a draft DEA report showing that another individual with whom Rodriguez had been involved in drug trafficking, Alex Estrada, was cooperating with the DEA. DEA6_026_0100. Lewellen's attorney made use of this information during trial, both crossing Rodriguez about his relationship with DiGiacomo and using it during her closing argument. Tr. 3545 (Q: The DEA report "was a report that you obtained from Joe DiGiacomo?" A: "Correct."); Tr. 3428 (Q: "On at least one occasion when you were concerned about somebody that was following you, you asked [DiGiacomo] to run a license plate for you?" A: "Yes."); Tr. 5126 ("The 2005 DEA report he got not from Glenn Lewellen but from somebody else, Joe DiGiacom[o]"). Even if Rodriguez did tell Mikhail about "Joe," the information was disclosed prior to trial and is not impeaching or material. To the contrary, it is consistent with Rodriguez's trial testimony.

### 4. Rodriguez Discussed His Finances With Mikhail

According to Mikhail, Rodriguez discussed his finances with him. R.1011 at 5-7. According to Mikhail, Rodriguez told him that he had seven to eight million dollars hidden away that the

10

government has never found.  Oddly, Mikhail also says that Rodriguez was so desperate for money that Rodriguez asked Mikhail to have his (Mikhail's) wife help Rodriguez's wife find a job.  Odder still, Mikhail contends that Rodriguez wanted to employ Mikhail as a debt collector after Mikhail was released from jail.  Rodriguez acknowledges that he asked Mikhail's help to find his wife a job, but denied that he has millions of dollars hidden away or asked Mikhail to collect debts.  The government conducted an exhaustive financial investigation in this case and turned over thousands of pages of Rodriguez's financial records to defendants prior to trial.  Rodriguez acknowledged at trial that he had made millions of dollars from his work as in informant and his illegal activities, lost millions of dollars gambling and through unsuccessful business ventures, and even owed some of his conspirators money.  Tr. 3231, 3235-36, 3308-09.  Another inmate's general and unsupported testimony that Rodriguez had hidden away money, even if admissible, would be highly unlikely to change the result of the trial.  Therefore, the information provided by Mikhail is not material.

III.    **The Government Did Not Withhold Exculpatory Information From Defendant Lewellen Regarding Al Pappalito**[7]

A.    **Facts**

In April and May 2006, the DEA conducted a wiretap investigation of Saul Rodriguez drug trafficking courier ("Rodriguez DTO") courier Andres Torres.  During that same time, Saul Rodriguez and Andres Torres had each asked Glenn Lewellen to find out if law enforcement was investigating their activities.  Lewellen subsequently reached out to former colleagues at the Chicago Police Department ("CPD"), including Al Pappalito, Noel Sanchez and Joe DiGiacomo.  On the afternoon of May 6, 2006, Lewellen met with Torres near Lewellen's warehouse in Frankfort,

---

[7]  This issue pertains to defendant Glenn Lewellen only.

Illinois.  During the meeting, Lewellen told Torres that the government was conducting a wiretap investigation of his activities.

Within hours of his May 6, 2006 meeting with Lewellen, Torres met with a person to whom he had distributed cocaine.  Unbeknownst to Torres, that person was a cooperating source ("CS") with the Drug Enforcement Administration ("DEA").  During Torres' conversation with the CS, which was recorded, Torres explained that his phones were being monitored.  Torres also told the CS that he had obtained the information from "ex-DEA . . . ex-Narcotics police."  Torres stopped using the phone that was the subject of the wiretap and law enforcement's investigation, thereby limiting law enforcement's ability to investigate the Rodriguez DTO.

Following law enforcement's arrest of Rodriguez on April 9, 2009, the government interviewed Pappalito about his relationship with Lewellen.  A copy of the interview was provided to defense counsel prior to trial.  During the interview, Pappalito claimed that the last time he spoke to Lewellen was at that time of their respective retirements from the Chicago Police Department ("CPD") in the early 2000s.  Prior to trial, the government filed a witness list identifying Pappalito as a potential government witness.  Lewellen subsequently filed a witness list identifying former CPD colleagues Pappalito, Sanchez and DiGiacomo as potential defense witnesses.

On or about November 2, 2011, the government met with Pappalito to discuss phone records reflecting certain calls between Pappalito and Lewellen in May 2006.[8]  Pappalito had no recollection of speaking to Lewellen about any matter in or around May 2006.  On or about November 5, 2011, Pappalito's attorney, Tom Scorza, left a voice mail message for AUSA Reynolds indicating that

---

[8]  The phone records and a summary of those records was provided to defense counsel prior to trial.  At trial, the government admitted the summary of the records as Government Exhibit 162.

Pappalito had spoken to former CPD colleagues about the phone records the government had shown

to him on November 2, 2011.  According to Pappalito's attorney, Brad Williams, a former CPD

colleague of Pappalito and Lewellen, told Pappalito that the annual CPD narcotics reunion was

scheduled for May 6, 2006 and suggested that was the reason Glenn Lewellen called Papplito.

Pappalito's attorney explained that despite having been provided with this information, Pappalito

had no recollection of the annual narcotics reunion and still had no recollection of having spoken to

Glenn Lewellen about the annual narcotics reunion or any other matter.  The government did not

disclose the information it received from Pappalito's attorney to Lewellen's attorney because

Pappalito had no recollection of the annual narcotics reunion or, more importantly, of having spoken

to Lewellen.  Simply put, there was nothing to disclose.

At trial, neither the government nor the defense called Pappalito or DiGiacomo as a witness.

The government called Noel Sanchez to testify.  On November 28, 2011, Sanchez testified that he

kept "in touch" with Lewellen "every once in a while" after Lewellen left the police force.  R. 879.

Sanchez explained, "we would get together for – we have a narcotics reunion every year.  He made

a couple of those after he left, but not on a regular basis." Tr. 879.  Sanchez also testified that after

Lewellen had left the CPD, Sanchez had never provided Lewellen with information about police

business.  *Id*.

On January 5, 2012, the government called Lewellen's former CPD colleague, Brad Williams

to testify about his work with Lewellen and CPD officer James Entress in the narcotics unit in the

late 1990s.[9]  R. 4414-15.  Both the government and Lewellen's attorney met with Lewellen's

attorney prior to his testimony.  At no time did Williams tell the government about a May 6, 2006

---

[9] Lewellen also listed Brad Williams as a potential defense witness.

13

annual narcotics reunion.  During his testimony, neither the government nor Lewellen's attorney

asked Williams about the annual narcotics reunion about which Sanchez had already testified.  R.

4414-24.

In his defense case, Lewellen did not call Pappalito, DiGiacomo, Sanchez or Williams to

testify. At the close of trial, Lewellen's attorney discussed the May 2006 phone records reflecting

Lewellen's calls to former CPD colleagues.  Lewellen's attorney argued to the jury, "You also know

that there are legitimate reasons for Glenn Lewellen to be talking to other narcotics police because

they were friends.  There's absolutely no evidence that there was anything illegal or untoward about

Glenn Lewellen calling his former narcotics cop buddies."  Tr. 5137.

Within two weeks of the jury's verdict, Pappalito's attorney contacted Lewellen's attorney

to inquire about the government's intent to retry Lewellen on the racketeering charge on which the

jury had failed to return a verdict.  According to Pappalito's attorney, he told Lewellen's attorney

about the substance of Pappalito's meeting with the government on November 2, 2011 and the

information Pappalito's attorney provided to the government on or about November 5, 2011.  A copy

of a letter from Pappalito's attorney documenting the date on which he first shared the foregoing

with Lewellen's attorney is attached as Government Exhibit A.  Despite having the foregoing

information in February 2012, Lewellen's attorney failed to include it in Lewellen's April 2, 2012

motion for a new trial.

On June 11, 2012, Lewellen's attorney wrote to the government explaining, "I also have

learned that Al Pappalito told you – either directly or through counsel – that there were phone calls

between he and Glenn Lewellen and others in April/May 2006 because of the narcotics' team's

annual reunion.  As far as I have been able to determine, we did not receive this information from

14

you.  If you can identify a report which contains it, I'd appreciate it."  On June 26, 2012, the government responded in writing by explaining that "Pappalito did not tell the government, either directly or through counsel, that there were phone calls between he and Glenn Lewellen and others in April or May 2006 because of a narcotics' teams's annual reunion."  Indeed, Al Pappalito had no recollection of having spoken to Lewellen in May 2006 about any matter.  On July 14, 2012, Pappalito's attorney wrote to Lewellen's attorney "detail[ing] to you once again" the information Pappalito's attorney initially provided to Lewellen's attorney in February 2012.  On September 20, 2012, Lewellen filed his untimely motion for a new trial based on the information Pappalito's attorney provided to Lewellen's attorney in February 2012.  R. 1011 at 16-17.

### B.    Analysis

As set forth in greater detail above, Lewellen's claim that the government withheld exculpatory information from him is untimely.  Lewellen could have raised this issue in his post-trial motion that was due on April 2, 2012.  Thus, the Court may not consider the issue.  *See Eberhart*, 126 S.Ct. at 407.  Should this Court find that Lewellen's claim is not untimely, it should find that the government did not suppress exculpatory evidence from Lewellen.  The Court should further find that even if the government suppressed exculpatory evidence, Lewellen was not prejudiced in a manner warranting a new trial.

In *Brady*, the Supreme Court held, "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.  To prove a *Brady* violation, Lewellen must prove that: "(1) the evidence at issue is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence has been suppressed by the

15

government . . .; and (3) the suppressed evidence results in prejudice." *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002). "Evidence is suppressed for *Brady* purposes only if (1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 739 (7th Cir. 2001). "[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999).

Here, the evidence at issue was neither exculpatory or impeaching. On or about November 5, 2011, Al Pappalito's attorney told the government that despite having spoken to a former CPD colleague, Pappalito had no recollection of having spoken to Lewellen in May 2006. That was consistent with the information Pappalito had previously provided to the government. In April 2009, Pappalito told that the government that he had not spoken to Lewellen after their respective retirements from CPD. The government provided a copy of that interview to defense counsel prior to trial. The evidence about the date of the annual CPD narcotics reunion is similarly not exculpatory because it is immaterial to whether Lewellen obstructed justice by disclosing the existence of a federal wiretap to co-conspirators Rodriguez and Torres. In fact, if there was an annual narcotics party around May 2006, that information is just as likely to be inculpatory as exculpatory. A jury could have certainly inferred, when taking into account the other evidence that Lewellen exposed the federal wiretap, that Lewellen used the narcotics party as a convenient excuse to reach out to his former colleagues in law enforcement in order to learn about the wiretap. Either way, evidence that CPD had an annual narcotics party is far from exculpatory.

To the extent that this Court views the evidence regarding the annual CPD narcotics reunion to be exculpatory in nature, it should find that it was not suppressed.  First, information regarding the annual narcotics reunion was disclosed "before it was too late for the defendant to make use of the evidence."  *Boss*, 263 F.3d at 739.  On November 28, 2011, the government called CPD Lieutenant Noel Sanchez, with whom Lewellen had served at CPD, as a witness.  Sanchez testified that he kept "in touch" with Lewellen "every once in a while" after Lewellen left the police force.  R. 879.  Sanchez explained, "we would get together for – we have a narcotics reunion every year.  He made a couple of those after he left, but not on a regular basis."  Tr. 879.  Although Lewellen called Sanchez on May 5, 2006 and May 6, 2006, Sanchez claimed he did not provide information to Lewellen about police business.  Tr. 879.  Lewellen used Sanchez's testimony in closing to argue, "You also know that there are legitimate reasons for Glenn Lewellen to be talking to other narcotics police because they were friends.  There's absolutely no evidence that there was anything illegal or untoward about Glenn Lewellen calling his former narcotics cop buddies."  Tr. 5137.

Second, the evidence about the annual CPD narcotics reunion was "available to defendant." *Boss*, 263 F.3d at 739.  At trial, there was no dispute that Lewellen was a former CPD officer who served in the narcotics unit.  Similarly, there was no dispute that Lewellen attended at least "a couple" of the annual narcotics reunions and was therefore generally aware of when they were held. Finally, there was no dispute that Lewellen called former CPD colleagues Sanchez and Pappalito on May 5, 2006 and May 6, 2006.  The evidence provided to the government by Pappalito's attorney – that there was an annual narcotics reunion on May 6, 2006 – was known to Lewellen by virtue of his status as a former CPD narcotics officer who occasionally attended the annual narcotics reunion. Even if Lewellen had forgotten the date of the annual narcotics reunion, he could have, "through the

exercise of reasonable diligence," determined the date of the reunion in 2006 and how that date related, if at all, to the calls he made to his former colleagues.

Should this Court find that the government suppressed evidence for *Brady* purposes, it should find that there is no *Brady* violation because Lewellen was not prejudiced. On January 31, 2012, following a two-month trial, a jury found defendant Lewellen guilty of the drug conspiracy charge contained in Count Thirteen of the third superseding indictment. The jury was unable to reach a verdict on the racketeering conspiracy charge contained in Count One of the indictment. The government's evidence against Lewellen included: (1) the testimony of Lewellen's co-conspirators, including Saul Rodriguez, Fares Umar, Andres Flores, Pedro Victoria, Andres Torres, Lisette Venegas, and David Venegas; (2) the testimony of law enforcement officers and agents; (3) documents reflecting Lewellen's relationship in his role as a police officer with Saul Rodriguez; (4) a recording between Andres Torres and a CS regarding Lewellen's disclosure of a wiretap to Torres; (5) evidence regarding Lewellen's use of the illicit proceeds obtained as a result of his criminal activities; (6) Lewellen's perjured testimony in a prior federal case; and (7) Lewellen's post-arrest statements to law enforcement agents in the instant case. The evidence established Lewellen's involvement in the Rodriguez drug trafficking organization ("Rodriguez DTO") beginning no later than 1998 and continuing until at least 2007. Given the sheer volume and weight of evidence introduced at trial against Lewellen there is no "reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281.

## IV.   The Purported Jury Issue Raised By Defendants Is Undeveloped, Has No Factual Support, And Does Not Necessitate a Hearing

Defendants' last argument is that counsel should be permitted to interview an alternate juror

whom they contend was in contact with one of the jurors while the jury was deliberating. Defendants provide no factual support whatsoever for this allegation, going so far as to weakly allege that the alternate juror "apparently" had contact with a deliberating juror. R. 1011 at 17. In addition to providing no factual support for their contention, defendants also offer no legal support for their position that they should be permitted to interview jurors and alternate jurors over nine months after the trial ended without even a preliminary showing that any contact (let alone, inappropriate contact) occurred. Without even a scintilla of factual support, the Court should not permit such a classic fishing expedition. Moreover, this argument is perfunctory and undeveloped and is therefore waived. *United States v. Andreas*, 150 F.3d 766, 769-70 (7th Cir. 1998) ("Perfunctory and undeveloped arguments (even constitutional ones) are waived."); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."). In addition, to the extent defendants learned of a purported jury issue prior to April 2, 2012, this argument is untimely.

**V.      Conclusion**

For the reasons stated above, and as set forth in the government's responses to defendants' post-trial motions, the government asks that the Court deny defendants' motions for judgment of acquittal or new trial.

Respectfully submitted,

GARY S. SHAPIRO
Acting United States Attorney


By:     s/ Steven A. Block
        TERRA L. REYNOLDS
        STEVEN A. BLOCK
        TIFFANY J. TRACY
        Assistant United States Attorneys
        United States Attorney's Office
        219 S. Dearborn St., 5th Floor
        Chicago, Illinois  60604

**THOMAS J. SCORZA**
ATTORNEY
5490 S. SOUTH SHORE DRIVE
CHICAGO, ILLINOIS 60615

Tel.: (773) 493-7775     Fax: (773) 493-7775     TomScorza@aol.com

October 12, 2012

Terra Reynolds
Assistant United States Attorney
219 South Dearborn Street
Suite 500
Chicago, Illinois 60604                *Re*: Alfred Pappalito

Dear AUSA Reynolds:

I'm writing in response to your email and telephone inquiries earlier today.

In my July 14, 2012 letter to Attorney Andrea E. Gambino, I detailed certain information that I had previously provided to Attorney Gambino, and you have now asked if I can provide you the date of my original transmission of that information to Attorney Gambino.

My recollection is that I provided the cited information to Attorney Gambino ten-days-to-two-weeks after the jury verdict in the *Rodriguez* case (No. 09 CR 332). While I do not see a notation in my calendar as to the date of my relevant conversation with Attorney Gambino, I do see that I had a lunch meeting with my client, Alfred Pappalito, on February 17, 2012, and I recall that we discussed my relevant conversation with Attorney Gambino at that time.

Sincerely,

Thomas J. Scorza

GOVERNMENT
EXHIBIT

A

CARDELS 800-783-0399

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | )   No. 09 CR 332 |
| v. | ) |
| | )   Judge Joan B. Gottschall |
| GLENN LEWELLEN *et al.* | ) |

## <u>GOVERNMENT'S MOTION TO FILE OVERSIZED BRIEF</u>

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby moves the Court to permit it to file a brief in excess of 15 pages.  In support of this motion, the government states as follows.

1.      On September 26,2 012, defendant Hector Uriarte filed a supplement to his post-trial motions.  On September 27, 2012, Glenn Lewellen filed a supplement to his post-trial motions in which defendants Hector Uriarte, Jorge Uriarte, and Tony Sparkman joined.

2.      The briefs filed by defendants raise multiple legal and factual issues to which the government must respond.  Despite its best efforts, the government is unable to respond to each of defendants' arguments within the fifteen pages allotted by the local rules.  Accordingly, the government respectfully requests that it be permitted to file a 20 page brief in response to defendants' supplemental motions.

WHEREFORE, the government respectfully requests that the Court permit it to file an

oversized brief.

Respectfully submitted,

GARY S. SHAPIRO
Acting United States Attorney

By:    s/ Steven A. Block
       TERRA L. REYNOLDS
       STEVEN A. BLOCK
       TIFFANY J. TRACY
       Assistant United States Attorneys
       United States Attorney's Office
       219 S. Dearborn St., 5th Floor
       Chicago, Illinois  60604

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3**
**Eastern Division**

UNITED STATES OF AMERICA

                              Plaintiff,

v.                                                Case No.: 1:09–cr–00332
                                                  Honorable Joan B. Gottschall

Saul Rodriguez, et al.

                              Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Tuesday, October 16, 2012:

        MINUTE entry before the Honorable Joan B. Gottschall:as to Hector Uriarte,
Jorge Uriarte, Tony Sparkman, Glenn Lewellen. Any reply briefs to the supplemental post
trial motions are due by Friday, October 19, 2012, no later than 4:00PM. Mailed notice (rj,
)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3**
**Eastern Division**

UNITED STATES OF AMERICA
                                        Plaintiff,

v.                                                      Case No.: 1:09–cr–00332
                                                        Honorable Joan B. Gottschall

Saul Rodriguez, et al.
                                        Defendant.
_____

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Wednesday, October 17, 2012:

        MINUTE entry before the Honorable Joan B. Gottschall: Government's Motion To
File Oversized Brief [1041] is granted as to Glenn Lewellen (2). Mailed notice (rj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

Case 1:09-cr-00332   Document 1049   Filed 10/19/12   Page 1 of 1   PageID 4980
Case: 13-2321     Document: 7-10       Filed: 07/11/2013     Pages: 310

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 332 - 2 | **DATE** | 10/19/2012 |
| **CASE TITLE** | USA vs. Glenn Lewellen | | |

**DOCKET ENTRY TEXT**

Sentencing set for 11/2/2012 at 9:30AM is stricken and reset to 11/30/2012 at 9:30AM. Sentencing memoranda and/or objections to PSR due by 11/14/2012. Responses by 11/21/2012. No sentencing memoranda or objections to presentence reports or responses will be considered if filed out of time unless a motion to file late is made no less than one week prior to the date set for sentencing. No sentencing hearing will be continued unless the courtroom deputy is notified of the need to change in writing at least one week (7 days) prior to the date set for sentencing. Failure to comply with this standing order will result in counsel being sanctioned in the amount of $100.00 which shall be paid to the Clerk of Court, 219 South Dearborn, 20th Floor, Chicago, Illinois 60604.

Docketing to mail notices.

| | Courtroom Deputy Initials: | RJ |
|---|---|---|

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| | ) | |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*DEFENDANT GLENN LEWELLEN'S REPLY TO THE GOVERNMENT'S
RESPONSE TO POST-TRIAL MOTIONS*

Defendant GLENN LEWELLEN, through counsel, respectfully
submits the following reply to the government's response to his post-trial
filings. The government's hyperbole and dismissive commentary aside, newly
discovered evidence in this case indicates that Saul Rodriguez lied at trial,
that the government knew or should have known that he was lying, and that
the government recklessly and unfairly used Rodriguez' lies to obtain
convictions in violation of the Fifth and Sixth Amendment rights of Glenn
Lewellen, Jorge Uriarte, Hector Uriarte, Tony Sparkman, and Robert
Cardena to Due Process of Law and a fair trial.

I.    Newly discovered evidence was not available at the time of filing the
      original post-trial motions and is not untimely.

The government avoids addressing the substantive claims made in the
defendants' post-trial motions, instead interposing the incorrect claim that
the motion is untimely.  It is not.  Pursuant to Federal Rule of Criminal
Procedure 33, "the court may vacate any judgment and grant a new trial if

the interest of justice so requires." The time limit for raising newly discovered

evidence claims is 3 years.  Fed. R. Crim. P. 33(b)(1).

To obtain a new trial based upon newly discovered evidence, the

defendant ordinarily is responsible for showing that the evidence: "(1) was

discovered after trial; (2) could not have been discovered sooner with due

diligence; (3) was material and not simply impeaching or cumulative; and (4)

if presented at a new trial would 'probably result in acquittal.' " *United States*

*v. Reyes,* 542 F.3d 588, 595 (7th Cir.2008). When the basis for the new trial

request is the government's knowing presentation of false testimony,

however, the standard is more flexible:

> where a criminal defendant does allege that the government
> *knowingly* presented false testimony, however, we remain bound
> by the standard enunciated by the Supreme Court in *United*
> *States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342
> (1976). Under the *Agurs* standard, a new trial is warranted
> when: "1) the State presented perjured testimony; 2) the State
> knew or should have known of the perjury; and 3) there is some
> likelihood that the testimony could have affected the verdict."
> *Martin v. Evans,* 384 F.3d 848, 855 (7th Cir.2004) (citing *Agurs,*
> 427 U.S. at 103, 96 S.Ct. 2392). In devising this rule, the
> Supreme Court reasoned that "a conviction obtained by the
> knowing use of perjured testimony is fundamentally unfair, and
> must be set aside if there is any reasonable likelihood that the
> false testimony could have affected the judgment of the jury."
> *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392.

*United States v. Ogle*, 425 F.3d 471, 476 (7th Cir. 2005).  As will be discussed

below, the information presented in the supplement to the post-trial motions

meets each of these criteria.

The government points to *Ogle* in support of its position that the district court should deny the defendants' motion because it was untimely. Govt. Resp. at 2. The circumstances surrounding defendant Ogle's claim were markedly different than those found in this case. Defendant Ogle relied on inconsistencies between pre-trial statements and trial testimony in urging the Court to find that the government had knowingly presented false testimony. The Court of Appeals determined that defendant Ogle was not relying on newly discovered evidence to support her claim, so the stricter time limits applied to the filing of her *pro se* motion. The *Ogle* court also found that the defendant did not offer evidence that was sufficient to demonstrate that the witness complained of actually lied during his trial testimony. *Id., at* 477-478.

The government's reliance on *United States v. Holt,* 170 F.3d 698, 702-03 (7th Cir. 1999), is equally misplaced. In *Holt*, the defendant's motion raised new issues that were not included in the initial timely-filed post-trial motion. *United States v. Holt*, 170 F.3d 698, 703 (7th Cir. 1999). The Court also noted that at least one of the issues raised could have been considered newly discovered evidence, and thereby subject to the longer filing deadline. Unfortunately for defendant Holt, he did not raise this issue on appeal and so the court did not address it. *Id.,* fn. 1. In this case, the issues raised in the Supplemental Motion are based on newly discovered evidence, so the finding in *Holt* is inapplicable.

3

A.    Rony Mikhail's statements constitute newly discovered evidence.

The information that arose from the proffer of Rony Mikhail about his conversations with Saul Rodriguez constitutes newly discovered evidence. The interview with Rony Mikhail took place on May 22, 2011, five months after the conclusion of the defendants' trial.  It could not have been discovered sooner with due diligence, because Mikhail did not come forward with the information any sooner than May 22, 2011.  The information Mikhail provided – not all of which is contained in the government's report of the interview -- is material in at least two respects: (1) it provides new evidence that Saul Rodriguez knowingly committed perjury at trial, and (2) it supports the defendants' contention, raised in its original post-trial motion, that the government knowingly used perjured testimony at trial.

 The government did not provide the defense with this information and apparently had no intention of doing so, based on its incorrect assessment that the information was neither *Brady* nor *Giglio* information. Apart from this concern, we also have an incomplete account of the information that Mr. Mikhail provided and incomplete responses by Saul Rodriguez to the assertions of Mr. Mikhail.  The interests of justice in this case require a hearing to determine exactly what information was provided to the government and when.

If this Court were to find that the information provided by Mr. Mikhail is true and credible, then Mr. Rodriguez provided materially false testimony

4

at trial and the government knew or had reason to know that his testimony was false. Had the jury known these two facts, there is "some likelihood that the testimony could have affected the verdict." *United States v. Agurs,* 427 U.S. 97, 103 (1976).

The jury did not convict on the RICO charge against Mr. Lewellen and Mr. Uriarte, suggesting that the jury was unable to agree on the credibility of Mr. Rodriguez' testimony which would have been necessary to convict Mr. Lewellen of the RICO charge. The government escaped responsibility for Rodriguez' false testimony by asserting incorrectly that it was unaware of the lies Rodriguez told at the time he told them. If the jury was to have learned that the government knew about Rodriguez' lies and relied on them anyway, the result probably would have been different for some - or all - of the defendants in this case.

Finally, Rony Mikhail's report about Saul Rodriguez' claims belies the government's claim that Rodriguez did in fact "come clean" about his involvement in the crimes charged, or about the involvement of any other person, including, and especially, the defendants on trial.

B.   The fact that an MCC guard was recently removed from his employment for smuggling phones, drugs, and other contraband into the MCC for inmates, constitutes newly discovered evidence.

That an MCC guard was removed from his post for smuggling phones and other contraband into the MCC on behalf of inmates is neither "mysterious" nor a "rumour". Govt. Resp. 1 and 4. As noted in the

5

supplementary filing, counsel was willing to provide the name to the government and the Court upon request, and did not include the name in the original filing out of concern for publicly disclosing the name of an individual who, as far as counsel has been able to determine, has yet to be charged with any crime as a result of his conduct.  The government did not request the name of the individual, nor is there any indication that the government investigated the circumstances surrounding this person's condut to determine whether or not it was, in fact, through a prison guard that Rodriguez was able to obtain at least one cell phone while in the MCC.   This failure was in contravention of its obligations under *Brady* and *Freeman.*

The guard, Tony Henderson, was a long-time employee of the Bureau of Prisons and had worked at the MCC for a good portion of his career, including the time period during which Saul Rodriguez was able to obtain his cell phone or cell phones.  The government mistakenly claims that it was the defendant's theory that Rodriguez obtained the phone through his wife, Cecelia.  Govt. Resp. 4. In fact, it was never the *defendants'* theory that Rodriguez had obtained the cell phone he testified about through his wife. This was Rodriguez' or the government's story.  From a review of the notes taken during Rodriguez' proffers to DEA agents, it appears that Rodriguez did not tell the government about Cecelia Rodriguez' involvement in the phone incident until shortly before or during trial.

It was the defendants' belief that Rodriguez obtained the phone

through guards and inmates who were part of the work cadre and were able to leave the MCC building and work in a warehouse near Midway, where they were able to have access to deliveries of phones, drugs, alcohol, cigarettes, and other contraband.  Counsel cross-examined on this belief, which was based on counsel's pre-trial interviews of other inmates. Rodriguez denied the involvement of work cadre members or others and denied smuggling in drugs, alcohol, cigarettes or other contraband.  Agent notes – attached to the defendants' supplemental filing -- appear to support counsel's investigation results and do not appear to support the story that Rodriguez actually told at trial.

The removal of Tony Henderson was accomplished with the assistance of inmates who were cooperating with the government. It is not unfair or unreasonable to attribute some knowledge of this to the government, its agents, or employees.  It is more likely than not that an investigation had been on-going into the conduct of this individual and that the set-up transaction that resulted in his dismissal was the last of a series of other investigative steps – not the first. These circumstances legitimately raise the question of whether Rodriguez lied about how he obtained the cell phone he used while in the MCC, whether the government knew that Rodriguez was being untruthful when he testified about how he acquired his cell phone, and whether the government failed in its obligation to investigate Rodriguez' stories, particularly when they were facially untenable -- as was the claim

that Cecelia could leave a cell phone taped to a sink in a public restroom in the lobby of the MCC and that it would somehow magically get transported through the metal detectors up to the floor where Rodriguez was housed.

If it is true that Rodriguez lied about how he obtained a phone, that he also lied when he denied also obtaining drugs, alcohol, cigarettes, and other contraband for distribution at the MCC, and that the government knew about these lies and used his testimony without disclosing this information to the defense, then it would have made a significant difference in how the jury viewed Mr. Rodriguez' credibility and the integrity of the government's case.

This information, if available at the time of trial, could have been investigated independently, despite the government's refusal to do so, and brought to the court's and the jury's attention to support the defendants' theory that Rodriguez lied about the defendants' on trial, that he used the contraband phones to orchestrate the testimony of others in support of his own, that he was able to deceive the government at every step of the investigation to serve his own ends, and that his illegal conduct – through the manipulation of government employees – continued unabated.

At the very least, this newly discovered information requires a hearing to determine whether Rodriguez lied about how he obtained the phone, whether he told agents a different story about how he obtained it than the one to which he testified, and whether the government, its agents, or employees, knew or had reason to know that Tony Henderson was, in fact,

8

the person who helped Rodriguez smuggle the phone and other contraband

into the institution.

C.   Rony Mikhail's lawyer's conflict of interest is relevant to
     defendants' ability to investigate and provide relevant evidence
     to the court in support of its post-trial motion.

The undisputed fact that the same lawyer who at one time represented

Saul Rodriguez also represented Rony Mikhail, who was providing

information against Rodriguez, is new evidence of an actual conflict of

interest. This conflict only came to light at the same time - and in the same

way - that the statements of Rony Mikhail were discovered – through defense

counsel's independent investigation – rather than through disclosure by the

government in accordance with its *Brady* obligations.

The actual conflict of interest is significant in this case because it

interferes with defense counsels' ability to obtain truthful information about

what Mikhail told the government; why he sought to cooperate against Saul

Rodriguez; what benefits, if any, he received in return for his information;

and, why the government chose not to disclose this information to defense

counsel.

The other conflicts concerning this same lawyer within the context of

this same case, while known about and used in cross-examination, are

referenced here as supplemental examples of the government's lack of

integrity and lack of concern for actual and potential conflicts of interest in

the representation of its own witnesses. The fact that one person represents

or has ties to multiple witnesses makes all doubly beholden to the government – no information that is detrimental to any government witness can be obtained or used without permission of the witness' counsel, who has every reason to ensure that the government's case remains free from challenge.  The revelation of lying on the part of one witness subjects the others to inquiry and doubt – particularly when all are -- or were -- represented by the same individual.

The issue here is not only that the government improperly tolerates conflicts of interest among its witnesses, but also that it fails to disclose the conflicts and the negative information that one of its witnesses provides about another witness.  Moreover, this impedes the defense in its ability to ascertain the truth of the government witnesses' wrongdoing.  This unethical practice also facilitates the ability of government witnesses to coordinate testimony for the benefit of each other and the government, at the expense of the defendants on trial and the quest for truth.  The argument is not untimely as the government claims, but subject to newly discovered evidence analysis, and well within the three-year limit established by the Federal Rules.

II.   Pappalito evidence was newly discovered and was withheld by the government.

The government learned prior to trial, through the attorney for one of its witnesses, Thomas Scorza, that the subject matter of the telephone calls between Al Pappalito, Glenn Lewellen, and Joe DiGiacomo, on May 6, 2006,

was an annual Narcotics Unit reunion party.  It is undisputed that the government was provided with this information and did not convey it to defense counsel.  Nor did the government elicit the testimony of Al Pappalito at trial.

Defense counsel learned about this information after trial.  The significance of this information is that the government -- knowing this information-- told the jury that the subject matter of those telephone communications was the transfer of information about a federal investigation from these individuals, through Glenn Lewellen, to Saul Rodriguez.  The government did not investigate the information it was provided, because it was contrary to their theory of the case, and then failed to inform defense counsel about the matter, eliminating any possibility of the defense calling Al Pappalito, or his source, to testify about the event or Pappalito's lack of memory about any conversations with Mr. Lewellen, and to rebut the government's claims.

In accordance with the Rules and the case law, this evidence is newly discovered, because it "(1) was discovered after trial; (2) could not have been discovered sooner with due diligence; (3) was material and not simply impeaching or cumulative."  Newly discovered evidence can be brought before the court within the three-year limit provided for in the rule.[1]  The

---

[1] The government's claim that counsel was provided with the information by counsel for Mr. Pappalito by mid-February may or may not be accurate.  In any case, it is not relevant.  Counsel did not have consent from Mr. Pappalito

information was presented to the court when counsel had evidence in the form of Mr. Scorza's letter to substantiate the claim.

This information is material because it demonstrates that the government knowingly allowed Saul Rodriguez to lie, in order to obtain a conviction. Not only was the information not disclosed to defense counsel, it was disclosed to the government who did not investigate the information, as required by *Freeman*.   Instead the government chose to ignore the information because it contradicted the government's theory, which was that communication among Pappalito, DiGiacomo, and Lewellen had no other explanation than the one the government put forward through Rodriguez – that they must have been discussing the federal investigation into Rodriguez' continued drug trafficking activities.

III.   There is no bar to supplementing issues raised in the initial post-trial motions.

The government's reliance on *United States v. Holt*, 170 F.3d 698 (7th Cir. 1999) to bar consideration of additional information that relates to issues raised in the initial post-trial motions is misplaced.  In the first instance, the issues complained of in *Holt* were new and additional grounds – not based on newly discovered evidence – that were labeled supplemental, but were not truly supplemental.  The holding in *Holt* prohibits relating back to the date of the original post-trial motion as a way of boot-strapping additional issues into

---

and his lawyer to use the information and evidence of the same until counsel received Mr. Scorza's letter in July 2012.  Def. Supp., Exhibit 8.

the filing.

In this case, the information provided in the supplemental motion, outlining Saul Rodriguez' lies to the Grand Jury, and the fact that agent notes support a finding that the government knew about Rodriguez' lies long before disclosing them to the Grand Jury, supplements the original claim that Saul Rodriguez' lies, and the government's knowing use of the lies, was so egregious that it infected the integrity of the trial and constituted a violation of the Due Process and Fair Trial rights of the defendants.  Def. Motion for Judgment of Acquittal or New Trial, R. 863, at 9-10.

The government claims that it regularly confronted Rodriguez about his lies and presented that information to the Grand Jury as soon as practicable.  Govt. Resp. at 5, fn. 5.  This claim is contradicted by the agent notes revealing that with respect to the murder of Juan Luevano, a predicated act for the RICO charge, as well as the basis for a substantive charge, the government knew about Rodriguez' lies in July 2009 and waited until all defendants had been indicted before correcting those lies before the Grand Jury in January 2011.  Def. Supp. 12-16.

IV.  The government violated its obligations pursuant to *Brady* and *Giglio* and their progeny.

The government's obligation under *Brady* and *Giglio* is ongoing.  The government's narrow view of its obligations notwithstanding, the Seventh Circuit has repeatedly held that prosecutors have "a continuing *Brady* obligation to reveal material evidence to the defense until [defendant's]

conviction [becomes] final, as the ongoing judicial process continue[s] to evolve. *See Imbler,* 424 U.S. at 427 n. 25, 96 S.Ct. 984; *Agurs,* 427 U.S. at 111, 96 S.Ct. 2392 (noting "special significance to the prosecutor's obligation to serve the cause of justice")." *Fields v. Wharrie*, 672 F.3d 505, 516 (7th Cir. 2012).  Not only is the obligation on-going, but the "prosecutors "have an affirmative duty to disclose such evidence and a duty to 'learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' " *Crivens v. Roth,* 172 F.3d 991, 996 (7th Cir.1999) (quoting *Kyles,* 514 U.S. at 432, 115 S.Ct. 1555)."  *United States v. Jumah*, 599 F.3d 799, 809 (7th Cir. 2010).

With respect to the veracity of the claims made by Saul Rodriguez about himself and his co-defendants, the government has consistently avoided its *Brady* obligations by selectively investigating some of his lies, while ignoring others, and by failing to make timely disclosures of the information in their possession in an effort to protect the indictment and to achieve convictions at the expense of the integrity of the process, without regard to its obligation to "serve the cause of justice."

The late revelation of the Rony Mikhail and Al Pappalito information – only after a specific request by counsel – is the most recent example of the government's failure to honor its *Brady* obligations.  Had defense counsel not learned of the existence of this information independently of the government and then made the specific request for it, the information would not have

been provided.  This is evident both through the timing of the disclosure[2] –
set out in the defendant's supplemental motion – and the fact that the
government incorrectly believes that the information is immaterial.

The government further asserts that it could not have provided the
information it received from Rony Mikhail before interviewing Rodriguez
about it.  This is nonsensical.  The information provided by Mikhail is *Brady*
material, whether or not Rodriguez agrees that it is true.  This claim is
further undermined by the fact that when Rodriguez was interviewed about
Mikhail's information, different agents conducted the Rodriguez interview –
specifically the case agent who has an interest in maintaining Rodriguez'
credibility – and the agents did not ask Rodriguez about all of the
information provided by Mikhail.  Specifically, agents did not ask Rodriguez
about: (1) his claim that it was Joe who informed him of the federal
investigation – not Glenn Lewellen; (2) about any money Rodriguez might
have withheld from the government; (3) the money owed to Rodriguez that he
asked Mikhail to help him collect; or (4) Rodrigeuz' allegedly threatening
communications with Mikhail's wife.

The government seeks to escape its obligation by claiming that it did
not learn about the information until after trial – in the case of the Mikhail

---

[2] Mikhail was interviewed on May 22, 2012.  Defense counsel learned of the
interview and sent a letter to the government inquiring about the interview
on June 6, 2012.  Rodriguez was not interviewed until after the request from
defense counsel, on June 13, 2012.  The information provided by Mikhail was
in the government's possession on May 22, 2012, and could have been
tendered to counsel upon request, on June 6, 2012.

information -- and, in any event, the information that it learned from Rony
Mikhail and Thomas Scorza was not material.  The information provided by
Mikhail -- if the Court were to find it credible after a hearing-- demonstrates
that Rodriguez told several material lies during his testimony at trial that
could have affected the outcome of the case.

Rodriguez' use of Mikhail's pin number to make phone calls that could
not be traced to him is material information.  Rodriguez admitted to this
claim, but the government did no further investigation to determine what
calls he made and whether these calls were in furtherance of criminal
activity. The fact that he did this with Mikhail leads to the question of
whether he also did this while he was at the MCC cooperating with the
government – in addition to using the illegal cell phone he smuggled into the
institution.  Rodriguez was questioned about his use of phones to orchestrate
corroboration for his trial testimony and for other purposes – all of which he
denied and which denial the government had reason to believe was false.

Mikhail's assertion that Rodriguez talked to him about an undisclosed
murder is material because, if true, this provides evidence that Rodriguez
lied to the government and lied at trial when he denied his involvement in
the Kato murder and others.  Had the jury been presented with the fact that
Rodriguez was involved in other murders, that he had not disclosed his
involvement in other murders, or that he had disclosed this information and
it was withheld by the government, the jury's evaluation of his credibility as

16

a witness could have been affected.  In view of the critical role Rodriguez'

testimony played, particularly against Glenn Lewellen, it is probable that the

outcome would have been different.

   The government attempts to avoid the implications of Mikhail's

statement about "Joe", by generalizing the specific comment he made:

```
8. Mikhail stated that RODRIGUEZ also bragged that he had connections
   with people who could make his sentence reduced.  RODRIGUEZ also told
   Mikhail that he had  a connection in the Cook County State's
   Attorney's Office who let him know that the police were coming at
   him.  RODRIGUEZ stated that this man's name was Joe.
```

It has been the government's contention that it was not "Joe" but that it was

Glenn Lewellen.  The government persists in this claim, seeking a sentencing

enhancement against Mr. Lewellen for obstruction of justice.  The claim that

Glenn Lewellen – not Joe DiGiacomo – obstructed justice in a federal

investigation was also part of the government's RICO charge.  This

information is material – not only to the truth of Rodriguez' trial testimony,

but to the government's continued reliance on Rodriguez' credibility in

seeking enhanced punishment for Glenn Lewellen at sentencing.

   The government points to Torres' trial testimony that "ex-DEA … ex-

narcotics police" provided information with respect to the federal

investigation in support of its claim that Mikhail's statements are not

material.  In fact, Torres' testimony supports the defendant's position.  This

testimony supports Mikhail's claim that Rodriguez reported his informant

was "Joe".  The only ex-narcotics officer who had also been a part of a DEA

task force at or near the time in question – 2006 – was Joe DiGiacomo.  Glenn

Lewellen had not been involved with law enforcement for at least 3 years by the time the alleged obstruction occurred.

Mikhail's claim that Rodriguez has money hidden away and undisclosed to the government – a claim the government rejects based on their misplaced reliance on Rodriguez' word – is material in that, if true, it is further evidence of Rodriguez' lack of candor with the government, lies to the Grand Jury, and lies at trial.

As discussed in Section II, above, the information in the government's possession about the likely subject of the telephone communications between Al Pappalito, Joe DiGiaccomo and Glenn Lewellen, was material.  Not only was the information material, but it undermines the government's theory that the officers could only be discussing information that was later passed on to Rodriguez, allegedly by Glenn Lewellen, suggesting that the government knowingly allowed Saul Rodriguez and Andres Torres to testify falsely on this issue.  Had counsel for Mr. Lewellen known about this information prior to trial, counsel could and would have investigated the source of the information and called the source, Mr. Pappalito and, or, Mr. Scorza, to testify about it at trial.

V.      Jury issue requires permission of the court to develop the facts.

This District's local rules of criminal procedure, specifically, rule 31.1, prohibits attorneys and others from communicating with, or attempting to communicate with jurors at the conclusion of a case. In this case, defendants

overheard jurors and others discussing communications between the alternate juror and unnamed jurors.  Defense counsel requires permission of the court to communicate with the alternate juror to determine whether the communication occurred, and if so, what was said.

WHEREFORE, GLENN LEWELLEN, through counsel, respectfully requests that this Court find that Saul Rodriguez' repeated misconduct and admitted failures to be truthful tainted the proceedings to such an extent that the defendants were not properly indicted and did not receive a fair trial.

Mr. Lewellen also requests that this Court find that the government has failed to meet its obligations under *Freeman* and knowingly used false testimony to obtain the second and third superseding indictments and convictions at trial.

Defendant LEWELLEN further requests that the case be remanded for a new trial, and that Saul Rodriguez be barred from testifying, because his extended pattern of lying and engaging in manipulative and illegal conduct, without consequence, rise to such a level, that he makes it impossible for any jury to fairly assess the value of his testimony and for the defendants to receive a fair trial.

In the alternative, defendants request a hearing to determine the following:

(1)     (a) Did Saul Rodriguez use the services of the Officer at the Metropolitan Correctional Center who recently lost his job because he helped

inmates obtain phones, alcohol, drugs, cigarettes, and other unauthorized

items into the Metropolitan Correctional Center; (b) did the government

know about this investigation before, during or after trial; and (c) why was

this information not provided to defense counsel;

(2)     Is there any additional *Brady* or *Giglio* information in the

government's possession, or that could be discovered by reasonable

investigation,that has not been provided to defense counsel;

(3)     Do Rony Mikhail and the second individual have relevant information

that has not been revealed to defense counsel; and,

(3)     Did Hans Lim's communications with the jury during its deliberations

interfere with or improperly influence in any way the jury's decision-making

process?

DATE:        October 22, 2012          Respectfully submitted,

                                       By:     s/Andréa E. Gambino
                                               Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014


<u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on October 22, 2012, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which sent

notification of such filing to the following:

John Beal
Counsel for Jorge Uriarte

Cynthia Giachetti
Molly Armor
Counsel for Hector Uriarte

Keith Spielfogel
Robert Loeb
Counsel for Manuel Uriarte

Eugene Steingold
Counsel for Tony Sparkman

Heather Winslow
Counsel for Robert Cardena

Terra Reynolds
Steven Block
Tiffany Tracy
Assistant United States Attorneys

and I hereby certify that I have mailed by United State Postal Service the

document to the following non-CM/ECF participants: [not applicable in this

case].

DATE:        October 22, 2012        Respectfully submitted,

                                     By:    s/Andréa E. Gambino
                                            Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 0332 - 2 | **DATE** | 10/26/2012 |
| **CASE TITLE** | United States vs. Lewellen | | |

**DOCKET ENTRY TEXT**

Defendant Glenn Lewellen's motions for new trial or for judgment of acquittal [780], [863] are denied, except that the court reserves ruling on the issue of unexplained wealth. Cross-briefs on that issue are due 11/2/2012; responses are due 11/7/2012.

■ [ For further detail see separate order(s).]

Docketing to mail notices.

| | Courtroom Deputy Initials: | RJ/JKF |
|---|---|---|

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| | ) | Judge Joan B. Gottschall |
| v. | ) | |
| | ) | Case No. 09 C 0332-2 |
| GLENN LEWELLEN, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR JUDGMENT**
**OF ACQUITTAL OR NEW TRIAL**

Defendant Glenn Lewellen was found guilty by a jury of Count 13 of the Third

Superseding Indictment. Lewellen now moves for judgment of acquittal or a new trial,

arguing that (1) the government did not produce sufficient evidence to support the

conviction, (2) the government violated his Fourth, Fifth, and Sixth Amendment rights,

(3) the government's use of Saul Rodriguez as a cooperating witness violated his right to

due process, and (4) the court violated his Fourth, Fifth, and Sixth Amendment rights.

Lewellen has also filed a supplement to his post-trial motions, in which he builds on his

argument that the use of Saul Rodriguez as a witness violated Lewellen's right to a fair

trial. He further claims that the government did not meet its *Brady* or *Giglio* obligations,

and that one of the alternate jurors may have tainted the deliberations. In addition,

Lewellen has requested that he be permitted to adopt any and all of his co-defendants'

post-trial motions to the extent the motions are applicable to his case, which this court has

allowed.[1]

---

[1]        As the government has pointed out, many of Lewellen's arguments have been raised in an entirely
perfunctory manner, without case citation or supporting detail. Moreover, it appears Lewellen waived some
of his arguments, either by failing to raise objections during trial or by failing to re-raise issues at the close

The court disagrees with Lewellen's position that there was insufficient evidence to sustain his conviction. In addition to Rodriguez, multiple witnesses testified and provided evidence to support Lewellen's involvement in the drug trafficking organization described in Count 13. Some of these witnesses testified that Lewellen would pretend to be on official police business in order to steal drugs or obtain money from his victims. The evidence firmly established the continuing nature of the relationship between Rodriguez and Lewellen, which dated back to Lewellen's use of Rodriguez as a confidential informant. Viewed in the light most favorable to the government, the evidence also established the nature of the single drug trafficking organization conspiracy described in Count 13. Lewellen has not carried his burden of establishing that, viewing all of the evidence in the light most favorable to the government, no reasonable jury could convict him of Count 13. *See United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009).

The next two issues raised in Lewellen's motions have already been addressed in detail. In particular, Lewellen argues that the government abused the court process by obtaining a search warrant for the Dukes residence in order to obtain Lewellen's business records, and by obtaining a search warrant to collect hair samples from Lewellen. These issues were fully argued before the court in advance of trial, the court made its ruling, and Lewellen brings no new argument to the table which would cause the court to reconsider its decisions. The same is true with respect to Lewellen's arguments with regard to the court's alleged errors: in deciding not to grant Lewellen a severance, in admitting coconspirator testimony pursuant to the *Santiago* proffer, in admitting testimony relating

---

of evidence. Because the court finds the arguments to be without substantive merit, the court does not rely on these bases in denying Lewellen's motion unless specifically noted.

to Lewellen's partner James Entress, and in instructing the jury. Lewellen raises no new substantive points on these matters, and the court's earlier rulings stand.

Lewellen then argues that the government violated his right to due process when the government took witnesses to the courtroom window in advance of their testimony to determine whether they could identify any defendant. The court found this troubling, and put a stop to the practice upon learning of it. Such a procedure could violate a defendant's due process rights because it could lead to an unconstitutionally suggestive identification procedure. *See United States v. Kord*, 836 F.2d 368, 372-73 (7th Cir. 1988) (holding that the government's conduct in taking the witness to the window was inappropriate and unduly suggestive, but did not render the identification unconstitutionally unreliable). *But see United States v. Wade*, 740 F.2d 625, 628 (8th Cir. 1984) ("To inquire of a witness in a nonleading fashion, shortly before she takes the stand, whether she can identify a person, which is the same question she will be asked while testifying, is not a procedure that we believe to be impermissibly suggestive."). It also makes the identification that takes place before the jury nothing more than a charade.

Here, however, the court concludes that there was no due process violation. The government represented that no witness misidentified or failed to identify someone that the witness previously had identified.[2] The government also represented that the witnesses who were brought to the courtroom window and then successfully made in-court identifications were people who had "social and business relationships with these

---

[2]     The government has represented that the following witnesses were brought to the door: Salvador Hernandez, Lisette Venegas, David Venegas, Roy Cockriel, Andres Torres, and Maria Saldivar. The agents could not recall whether Eric Herrera was also brought to the door, but he was unable to identify Manual Uriarte while on the witness stand. During an October 18, 2012 hearing on Jorge and Hector Uriarte's motions for new counsel, the court inquired as to whether any video recording existed that could establish precisely which witnesses were brought to the door. On the record and under oath, a representative of the U.S. Marshals Service informed the court that there was no video recording of the courtroom door during the trial.

defendants for months and years and years and years"; in other words, these witnesses were not victims or people who would have seen the defendants only fleetingly.[3] The government agreed to make a disclosure to defense counsel of precisely which witnesses were brought to the courtroom door in this fashion, and Lewellen today raises no issue with respect to any particular witness. On this record, the court cannot conclude that a due process violation occurred.

Lewellen then argues that some type of Confrontation Clause violation transpired when the government introduced a photograph of his previous partner, James Entress, and argued that Entress engaged in criminal conduct with Lewellen. But Lewellen has not identified any testimonial statement by Entress which was introduced at trial. *United States v. Vallone*, --- F.3d ----, 2012 WL 4465230, at *43 (7th Cir. 2012) ("As *Crawford* [*v. Washington,* 541 U.S. 36 (2004),] recognizes, the Confrontation Clause only applies to testimonial statements.").

Briefly, the relevant evidence concerning Entress was as follows. Rodriguez testified that he was found with a loaded gun during a traffic stop in 1997, at which point he called Lewellen for help, and Lewellen agreed to assist. According to Rodriguez, an unknown officer then appeared (based on a subsequent interaction, Rodriguez later concluded it had been Lewellen's partner), and that officer escorted Rodriguez from the station. Rodriguez stated that he was not charged with having a loaded weapon. Officer John Conneely then testified that he conducted the traffic stop, that he had proposed felony charges, and that those charges were rejected by the Cook County State's

---

[3]     In fact, when an agent brought Hernandez, an alleged victim of a kidnapping, to the window, Hernandez—despite having identified defendants in photos before the grand jury three years prior—was unable to make any identification. Ms. Giachetti, defense counsel for Hector Uriarte, raised the issue during Hernandez's cross-examination.

Attorney's Office. He noted that the misdemeanor charges were later dropped as well.

Finally, Assistant State's Attorney John Brassil testified that his office's business records

indicated that Entress called into felony review following Rodriguez's arrest, and that

after that call, the felony charges against Rodriguez were rejected. At no point was any

statement by Entress introduced, and Lewellen had a full opportunity to cross-examine all

of the witnesses described above. The court fails to understand how the Confrontation

Clause is implicated in this scenario.[4]

      Lewellen also claims that the government misrepresented the evidence during

closing arguments, but certain of the issues raised simply have to do with the fact that he

does not like the inferences that the government was asking the jury to draw. Such is the

case when Lewellen claims that the government misrepresented evidence by stating that

Lewellen sent Entress to assist Rodriguez after Rodriguez's arrest. Statements like these

are not misrepresentations, but simply differences in the inferences that counsel would

have the jury draw from the evidence. In any event, the jury was instructed not to regard

counsels' closing statements as evidence. Lewellen also argues that the government

misrepresented his position with regard to his taking a vacation, but he provides no clue

as to what the misrepresentation was. Instead, he simply states that "[t]hat was not the

argument, but another misrepresentation." (Lewellen Mot. for New Trial at 7.) Lewellen

---

[4]      To the extent that Lewellen is arguing that the subject matter of Lewellen's alleged statement to Entress or Entress's statement to the State's Attorney's office can be necessarily implied, Lewellen has cited no case to support the notion that these types of implied statements trigger the protections of the Confrontation Clause. Moreover, with regard to Entress's statement to felony review, the truth of that statement is irrelevant, and does not implicate the Confrontation Clause. *See United States v. Van Sach*, 458 F.3d 694, 701 (7th Cir. 2006) ("[T]he Confrontation Clause of the Sixth Amendment is not violated if the statements are non-testimonial and are not offered for the truth of the matter asserted."). The Confrontation Clause also is not triggered by Lewellen's alleged conversation with Entress, as that conversation was not testimonial in nature. *See id.*; *United States v. Ellis*, 460 F.3d 920, 924-25 (7th Cir. 2006) ("Whether a statement was made with an eye toward prosecution, that is, with the knowledge or for the purpose that it would be used later for prosecution, is an important aspect of delineating between testimonial and nontestimonial evidence.").

does not show that the statement was incorrect, nor does he point out how this statement prejudiced him in any way.

Lewellen next points to a variety of potential problems with the government's discussion of "unexplained wealth" during closing arguments. First, Lewellen claims that the government's focus upon his allegedly unexplained wealth shifted the burden onto him to prove his innocence and violated his Fifth Amendment privilege against self-incrimination. Lewellen also argues that his wealth was not "unexplained" at all. Finally, Lewellen takes issue with the government's representation during closing arguments that he paid $80,000 in cash for a luxury automobile and gave $140,000 in cash to start a construction business.

Evidence of unexplained wealth, "high living," or a lavish lifestyle is probative and admissible in drug conspiracy cases as long as: "(1) the evidence presented creates an inference that the defendant was involved in drug trafficking; (2) the unexplained wealth was acquired during the period in which the drug crime allegedly occurred; and (3) the government presents other evidence to support the charge, *including evidence that the income was not obtained through legitimate means*." *United States v. Carrera*, 259 F.3d 818, 829 (7th Cir. 2001) (emphasis added); *see United States v. Harris*, 536 F.3d 798, 811 (7th Cir. 2008), *overruled on other grounds*, *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010); *United States v. Smith*, 308 F.3d 726, 737 (7th Cir. 2002). Here, the government did present evidence that Lewellen's allegedly unexplained wealth was acquired during the same period that the drug trafficking organization was up and running, and the evidence presented created an inference that Lewellen was involved in drug trafficking. But when the issue was first raised, the government indicated to the

6

court that specific evidence would establish that the income in question was not obtained through legitimate means. In particular, the government indicated that it would introduce tax returns or other evidence from the Internal Revenue Service. (*See* Tr. 3784-85.) Relying in part upon that representation, the court allowed evidence of unexplained wealth to be introduced at trial. (*See* Tr. at 3852-53.) The issue was raised again at the conclusion of the government's closing statement by counsel for Hector Uriarte. At that time, the court noted that it recalled the government's representation and did not remember any tax evidence being introduced. The government then indicated that it had declined to introduce this evidence, but that it would look through the record and file a written response. (*See* Tr. at 5021-22.) To the best of the court's knowledge, no such brief was ever filed, and counsel for both Hector Uriarte and Lewellen attempted to rebut the allegations of unexplained wealth in their closing statements.

Thus, the court has a serious concern with regard to whether the government established the requisite basis for introducing evidence of unexplained wealth. In addition, Lewellen claims that the government completed a financial analysis of Lewellen's businesses, but chose not to introduce the results of that analysis into evidence. The court cannot discern from the briefs whether the results of this analysis were withheld from Lewellen; if so, this could create a potential *Brady* issue. The court therefore orders Lewellen and the government to file concise simultaneous cross-briefs addressing the unexplained wealth evidence. In particular, Lewellen must address whether he believes that the government should not have been permitted to introduce this evidence, and—assuming *arguendo* that the unexplained wealth evidence should not have been introduced—why the introduction of this evidence was harmful to his case.

The government should also address these issues, paying particular attention to the question of whether it introduced sufficient evidence that Lewellen's income "was not obtained through legitimate means." *See Carrera*, 259 F.3d at 829. The court will rule on the matter in advance of Lewellen's sentencing date.

Next, Lewellen focuses upon the government's use of Saul Rodriguez as a witness. Lewellen claims that the government used Rodriguez knowing that he had and would continue to perjure himself, and that the government failed to disclose certain additional benefits that it gave to Rodriguez in violation of *Brady* and *Giglio*. In his supplement, Lewellen highlights interactions between Rodriguez and another inmate at the Metropolitan Correction Center ("MCC"), Rony Mikhail, and argues that the relationship between these two men further supports Lewellen's claim that the government violated his due process and Sixth Amendment rights by relying upon Rodriguez's testimony.[5]

The court is sympathetic to the argument that the government's use of Rodriguez as its key witness is distasteful, and this case clearly raised an issue as to whether our "culture of cooperation" ultimately served the ends of justice. Rodriguez was so impeached in the course of this trial that the court doubts it would have believed anything he said, unless corroborated by more credible witnesses, were it the trier of fact. But the record indicates that every time the government became aware of yet another perjured statement or illegal act by Rodriguez, the government disclosed that information in a timely fashion to the parties and to the court. And the jury heard voluminous evidence

---

[5]        The interview with Mikhail took place in May 22, 2012, well after the trial was concluded. In Lewellen's initial supplement, he states that he became aware of the Mikhail interview in early June 2012—in other words, just a few days or perhaps weeks after the evidence came into existence. Not only does the court conclude that the Mikhail evidence would not have had any measureable impact on the outcome of the trial, but the evidence did not even exist at the time of trial.

establishing Rodriguez's lack of integrity. During trial, the jury learned that Rodriguez had already perjured himself under oath before a grand jury, that he had violated his plea agreement in numerous ways (including by smuggling a cellular telephone into the MCC and using the phone to communicate with witnesses in this case), and that he had arranged to provide information to another inmate who very likely was attempting to order the murder of individuals involved in that inmate's upcoming case. And all of this was in addition to the fact that Rodriguez had confessed to orchestrating acts of theft, drug trafficking, kidnapping, torture, and murder. The jury could not possibly have been under any illusion of Rodriguez's merit as a human being, much less as a creditable witness, and the court simply cannot comprehend how the additional bad acts described in Lewellen's briefs would have made any difference.[6]

Lewellen also argues that the government may have violated its *Brady* obligations by failing to disclose evidence relating to the government's intervention in the potential deportation of Rodriguez's mother. The government has persuasively argued that it in fact complied with its obligation, and that the report referenced by Lewellen was turned over to the defense in advance of trial. Lewellen failed to address the issue in his reply, and the court considers the matter closed.

Finally, Lewellen raises a host of new issues in his supplemental briefing. For the first time, Lewellen claims that one of the alternate jurors may have maintained contact with the active jurors during their deliberations. In addition, Lewellen argues that an untenable conflict of interest existed because the same attorney who represented

---

[6]      While the court cannot grant relief on this ground—the issue of Rodriguez's credibility was extensively aired before the jury, and deciding credibility is the jury's role—the court notes that the government claims that its use of Rodriguez as a witness was "proper." The court cannot go so far, and indeed is deeply troubled by the government's dependence on a witness whom it knew was dishonest not only in his underlying conduct, but in his dealings with the government after he agreed to cooperate and who also committed perjury prior to trial in the course of this prosecution.

Rodriguez also represented various witnesses in the case, including the Venegas family, Fares Umar, and Rony Mikhail. Lewellen also states that a certain unnamed individual has information about Rodriguez but will not cooperate with the defense investigation for fear of reprisal, and that the government withheld exculpatory evidence surrounding Lewellen's conversations with Al Pappalito. The government objects to these arguments, pointing out that none of these issues was raised in the initial post-trial motion.

The court must begin by addressing the briefing in this case. This court clearly communicated to defense counsel that the reply briefs in support of the supplements were due on Friday, October 19, 2012 at 4:00 p.m. On Thursday, October 18, 2012, Lewellen's counsel indicated that she would not be prepared to file a timely reply brief. The court responded that it could not guarantee that it would be able to consider a reply brief filed out of time. In response, counsel represented that she would file the reply brief by the morning of October 22, 2012. Instead, without advance notice of the further delay, the reply brief was not filed until after the close of business on October 22, 2012.

Not only was the reply brief untimely, but it also contains new arguments: for the first time, Lewellen argues that the claims raised in the supplement are based on newly discovered evidence. But Lewellen did not establish in his opening supplemental brief why he was unable to bring these issues to light earlier. By waiting to claim that this evidence was "newly discovered" until his reply brief, he has waived the argument. Moreover, in some instances (such as the potential conflict with the same counsel representing multiple witnesses), it appears that Lewellen was aware of the basis for any potential objection during the trial. Lewellen was obliged to raise these issues within the timeframe set by the court after receiving the jury's verdict (here, sixty days). *See* Fed. R.

Crim. P. 33(b). While the deadline is not jurisdictional, it is mandatory "in the sense that if invoked by a party in timely fashion the court is bound by it." *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 485 (7th Cir. 2012) (citing *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam)).

In addition, the majority of the new issues raised in the supplement are completely cursory, undeveloped, and speculative. For instance, the entirety of Lewellen's argument relating to alleged juror impropriety is as follows:

> One of the alternate jurors maintained telephone contact with active jurors during their deliberations, requiring a hearing to determine whether deliberating jurors were improperly influenced by external sources during their deliberations.
> Alternate juror, Hans Lim, apparently was in telephone contact with at least one of the deliberating jurors, while the jury was deliberating. Counsel requests permission of the court to interview Mr. Lim and any other juror with whom he communicated while the jury was deliberating, for the purpose of determining whether or not the jury was subject to external information or influence while in the course of deliberating.

In his reply, the only further support Lewellen provides is that "defendants overheard jurors and others discussing communications between the alternate juror and unnamed jurors." A few vague sentences alleging that there was "apparently" telephone contact between an alternate juror and the deliberating jurors, attributed only to unnamed "defendants," does not suffice to raise an issue. The court has no basis for concluding that anything improper, prejudicial, or contrary to the court's instructions took place— particularly as Lewellen has not even established that this allegedly impermissible contact actually took place. Although Lewellen requests the ability to develop the facts, this amounts to nothing but an impermissible fishing expedition. The argument is waived.

So, too, is Lewellen's argument with respect to the potential conflict of interest created by a particular counsel's decision to represent multiple witnesses in the case. Again, the entirety of Lewellen's argument consists of two scant paragraphs:

> The government knowingly permitted several of its witnesses to be represented by the same lawyer, apparently without informing them of the potential and actual conflicts of interest.
> The lawyer who represented Rony Mikhail works for the lawyer who also previously represented Saul Rodriguez—a fact Rodriguez mentioned in his June interview that he purposefully hid from Rony Mikhail. This lawyer also currently represents the inmate referenced in section C, above. The same lawyer also represents Alfonso Soria, a government witness who was present, but not called to testify at trial. Other individuals involved with this case who were represented by this lawyer include Maria Saldovar – Lisette Venegas' grandmother, Lisette and David Venegas, Benjamin Manteca, Fares Umar, Juan Luevano [Baby G], Jorge Lopez [Oso], and the Flores Twins—whom he currently represents.

Not only does Lewellen fail to establish any conflict, harm, or prejudice to the witnesses, but it is not at all clear that Lewellen has standing to raise this issue. The argument is insufficient.

Lewellen next raises a new issue relating to some unnamed "other inmate" who associated with Saul Rodriguez in the MCC and "has relevant information" about Rodriguez's misconduct, but refuses to cooperate with defense counsel. Just how this raises any issue relevant to these post-trial motions is beyond the court's understanding. In any case, as the court has already explained above, the court cannot imagine what this unnamed inmate could say about Saul Rodriguez that could be worse than the evidence already introduced at trial. This argument is untimely, undeveloped, and unsuccessful.

The only new issue raised in the supplement that warrants any significant discussion is Lewellen's claim that the government withheld exculpatory evidence relating to communications between Lewellen, Joe DiGiacomo, and Al Pappalito. At

trial, the government introduced evidence to suggest that in May 2006, Lewellen, Pappalito, and DiGiacomo (all of whom had been with the Chicago Police Department, and two of whom—Pappalito and DiGiacomo—were working as State's Attorney's investigators) were in communication, which is how Lewellen learned that the defendants were under investigation and subjected to wiretapping. According to the government, Lewellen then used this information to alert Rodriguez and others that they were being watched. Lewellen now argues that he learned "after trial"[7] that Pappalito "had provided information through his attorney suggesting an alternative and exculpatory explanation for the telephone communications among Lewellen, DiGiaccomo, Pappalito, and others." That information was that there was a party for retired Chicago Police Department narcotics officers on May 6, 2006; Lewellen suggests that this party could have been the innocent subject matter of any phone calls that took place between the three men. Lewellen also argues that, according to Pappalito's counsel, Pappalito has no recollection of having been contacted by Lewellen around this time. Lewellen argues that the government violated *Brady* by failing to disclose these facts.

The court fails to see how this presents a *Brady* issue. At trial, the government introduced phone records as evidence of contact between Lewellen's and Pappalito's phones. The government also introduced evidence of contact between Lewellen's and Andres Torres' phones, which took place during the same time. Defense counsel cross-examined the government's agent and established that the phone contacts were too short to establish that any conversation took place; in fact, the agent introducing the phone

---

[7] Lewellen does not indicate when "after trial" he discovered this evidence. There is no indication in Lewellen's submissions that the Pappalito information could not have been included in his initial round of post-trial motions. In short, Lewellen not only fails to show that the Pappalito evidence is *Brady* evidence, but he also fails to show that it is "newly-discovered," such that it could not have been raised in his initial post-trial motion.

records could not even testify that contact had been made. (Tr. 1760.) In addition, the fact that Pappalito does not remember talking with Lewellen is to some extent belied by the phone records, which indicate that at least there were at least attempts at contact.

Defense counsel established at trial that the government had no evidence that any conversations actually took place, much less what the alleged conversations were about. That the content of these conversations could have been exculpatory is obvious. Given the cross-examination at trial regarding this subject, it is incomprehensible that Pappalito's lack of recall and a potential innocent subject of discussion could have made a difference. In sum, none of the issues raised in Lewellen's supplement raise any issues that would support a new trial or judgment of acquittal.

## IV. CONCLUSION

For the reasons stated above, Lewellen's motions for a new trial or judgment of acquittal are denied, except that the court reserves ruling on the issue of unexplained wealth. To the extent that Lewellen has adopted his co-defendants' post-trial motions, the court's rulings, which are set out in separate orders relating to the specific co-defendant who substantively raised each issue, apply with equal force to Lewellen's case. With regard to the issue of unexplained wealth, the parties are ordered to file cross-briefs addressing that issue. These briefs shall not exceed 15 pages, and shall be filed with the court within seven days of the date of this order. Response briefs of 10 pages or less are due five days later.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
DATED:   October 26, 2012          United States District Judge

14

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 09 CR 332-2 |
| v. ) | |
| ) | Hon. Judge Joan B. Gottschall |
| GLENN LEWELLEN ) | |

## GOVERNMENT'S SUPPLEMENTAL BRIEF IN RESPONSE TO DEFENDANT GLENN LEWELLEN'S POST-TRIAL MOTION

The UNITED STATES OF AMERICA, by its attorney, GARY S. SHAPIRO, Acting United States Attorney for the Northern District of Illinois, pursuant to the Court's October 26, 2012 order, respectfully submits the following supplemental brief in response to defendant Glenn Lewellen's post-trial motion.

## I.    BACKGROUND

The Court has ordered supplemental briefing regarding the government's introduction at trial of evidence pertaining to defendant Glenn Lewellen's financial situation during the conspiracy period and the government's argument regarding that evidence.  To be clear, Lewellen has *never* objected to the admission of the evidence pertaining to his finances at trial; indeed, he objected to the government's arguments regarding some of that evidence for the first and only time in his post-trial motion.  Accordingly, because defendant waived or forfeited any objection to the admission of financial evidence, and because, as set forth in greater detail below, the Court properly admitted the evidence regarding Lewellen's finances and the government made proper arguments regarding the evidence, this Court should deny Lewellen's post-trial motion.

## II.    THE COURT PROPERLY ADMITTED EVIDENCE OF LEWELLEN'S FINANCES

### A.    Facts

At trial, the government presented certain evidence regarding Lewellen's finances, with no

objection from Lewellen.[1]   That evidence included: (1) testimony of individuals to whom Lewellen

made cash payments in Lewellen's role as the owner of a construction business; (2) testimony of an

individual regarding Lewellen's use of cash to pay for classic cars; (3) testimony and records from

the City of Chicago documenting that Lewellen was never paid more than $5,126 per month as a

Chicago Police Department ("CPD") officer; and (4) testimony of cooperating witnesses Saul

Rodriguez, Fares Umar, and Andres Torres about cash Lewellen earned by participating in criminal

activities with Rodriguez and his crew ("the crew").[2]

---

[1]Lewellen did not object to the admission of any of the foregoing evidence, or any other evidence
related to Lewellen's finances, on any ground, and instead made use of the evidence in support of his
defense.  In contrast, co-defendant Hector Uriarte filed a motion *in limine* to bar certain financial
evidence on the ground that it was improper evidence of "unexplained wealth."  R. 741; Tr. 3784-85,
3852-53.  Lewellen did not join in Hector Uriarte's motion.  Indeed, by the time Hector Uriarte filed and
argued his motion, the government had already presented all of its evidence with respect to Lewellen's
finances.  Thus, Lewellen waived or forfeited any objection to the admission of financial evidence.

[2]In its opinion dated October 26, 2012, the Court stated that, prior to the admission of financial
evidence related to Lewellen, the government indicated that it would introduce relevant tax returns or
other evidence from the Internal Revenue Service.  R. 1065 at 7.  This is incorrect.  Although the
government indicated that it would introduce such evidence with respect to Hector Uriarte (Tr. 3784-85),
the issue of Lewellen's tax returns were never discussed.
      With respect to Lewellen's claim that the government completed a financial analysis of
Lewellen's businesses, but chose not to introduce the results of that analysis into evidence, R. 1065 at 7,
referenced in the Court's opinion, the government did not withhold the results of this analysis from
defense counsel.  To the contrary, on December 17, 2011, the government provided a draft copy of the
financial analysis via e-mail counsel for Lewellen.  A copy of the e-mail is attached as Exhibit A.  The
financial analysis constituted a summary of certain records the government had obtained and previously
provided to defense counsel, and certain records that defense counsel had tendered to the government.
Thus, there was no *Brady* violation because the government tendered both the financial analysis and the
underlying documents to defense counsel.
      Furthermore, contrary to Lewellen's argument, the draft financial analysis did not show an
absence of unexplained wealth.  R. 863 at 8.  To the contrary, the draft financial analysis demonstrated
that, between 1998 and 2002 (the years on which the financial analysis focused), Lewellen's

## 1.     <u>Testimony of Construction Business Associates</u>

At trial, the government called James Millner, Michael Thompson, Ken Klauzek, Matt Klabisch to testify about their receipt of cash from Lewellen between in connection with his construction business.  According to the witnesses' testimony, which was received without objection, between 1999 and 2002, they received a total of approximately $213,000 in cash from Lewellen. Lewellen included these same individuals on his witness list prior to trial.  R.652.

### a.     Testimony of James Millner

James Millner testified, without objection from Lewellen, that he met Lewellen in or around 1999 or 2000 when he served as a superintended on one of Lewellen's construction projects. Tr. 2686.  Millner further testified that Lewellen gave him $40,000 in cash to pay contractors on the project.  Tr. 2687.  Millner observed that the money did not look like new money that one would get from a bank.  *Id*.  In his years in the construction business, Millner had never received cash like that from a home builder to pay for contractors.  Tr. 2688.  Indeed, both Millner and the contractors were typically paid by check.  Tr. 2698.  Lewellen subsequently gave Millner another $35,000 to $40,000 in cash to pay the contractors on the project.  Tr. 2691.  Millner later served as the superintendent on a second project for Lewellen.  Tr. 2692.  Lewellen gave Millner at least $20,000 in cash to pay the contractors on the second project.  *Id*.  In 2000, after working on the second project, Lewellen hired Millner as his full-time superintendent.  Tr. 2694.

Over the next four years, there were times that Lewellen gave Millner cash to pay

---

expenditures—even excluding Llewellen's cash expenditures to construction business associates and daily living expenses such as food, gas, and clothing—exceeded the funds available to him from legitimate means by at least $178,000.  Thus, between 1998 and 2002, the excess of Lewellen's expenditures over available legitimate funds was arguably much greater than $178,000.

subcontractors working on various projects. Tr. 2695. Among the projects Millner worked on during this time was the construction of Saul Rodriguez' home in Countryside, Illinois. *Id*. As Millner continued to work for Lewellen, Lewellen continued to give cash to Millner to pay subcontractors. *Id*. During this time, Lewellen gave Millner up to $40,000 at a time. *Id*.

b.      Testimony of Michael Thompson

Michael Thompson testified, without objection, that he met Lewellen in or around 2001 while working in the flooring business, Tr. 2713-14, and that, over the next several years, he worked on several projects for Lewellen. *Id*. During that time, Lewellen typically paid Thompson by check. *Id*. However, on one occasion, Lewellen paid Thompson between $4,000 and $6,000 for work Thompson had completed. Tr. 2715. Lewellen was able to pay Thompson in cash on short notice. Tr. 2718.

c.      Testimony of Ken Klauzek

Ken Klauzek testified that he met Lewellen in or around 2001 while working as an excavation contractor, Tr. 2720-21, that he worked on projects for Lewellen for the next three years, Tr. 2728, and that during that time, Lewellen typically paid Klauzek by check. *Id*. However, in or around 2002, Klauzek testified, without objection, that Lewellen paid Klauzek $9,000 in cash for two jobs, including the excavation of Saul Rodriguez' home in Countryside. Tr. 2723-25.

d.      Testimony of Matt Klabisch

Matt Klabisch testified that he met Lewellen in the late 1990s while developing subdivisions with his father-in-law Mike Harper. Tr. 2748-50. In the early 2000s, Klabisch and Harper also owned property that they planned on developing into a subdivision. *Id*. Lewellen purchased 70 lots in that subdivision from Klabisch and Harper. *Id*. Klabisch then found a buyer for the 70 lots before

Lewellen had to build homes on them.  Tr. 2760. Klabisch testified, without objection, that Lewellen

paid Klabisch $60,000 in cash as a fee for finding a buyer for the 70 lots, and that Lewellen delivered

the cash to Klabisch in a brown paper bag.  Tr. 2760-61.  Klabisch testified that he never received

that much cash in any other transaction he completed in the construction business.  Tr. 2760-61.

> **2.      Testimony Regarding Lewellen's Use of Cash to Purchase Classic Cars**

Mike Harper testified about Lewellen's 2006 purchases of classic cars using a total of

$145,000 in cash.  Lewellen did not object to Harper's testimony.  Harper testified that he met

Lewellen in or around 1999 while developing subdivisions with his son-in-law Matt Klabisch.

Tr. 2729-30.  Harper continued to do business related to the construction industry with Lewellen

until in or around 2007.  Tr. 2742-43.  By in or around 2006, Lewellen told Harper about his interest

in classic cars.   In 2006, Lewellen asked Harper to come with him to look at a 1957 Chevy

convertible ("'57 Chevy") that Lewellen was interested in buying.  Tr. 2734.  Harper, Lewellen and

a third person, Ernie Juder, went together to see the '57 Chevy.  *Id*.  The seller was asking $84,900

for the car.  Tr. 2736.  Lewellen agreed to buy the '57 Chevy for $80,000.  Tr. 2737.  Harper saw

Lewellen get a bag of cash from the car in which they had arrived, give the bag of cash to the

salesman, and complete the transaction.  *Id*.  Harper testified that he had never seen someone pay

$80,000 in cash for a car before.  *Id*.

> **3.      Testimony & Records Regarding Lewellen's Employment with CPD**

Diane Sojka testified about Lewellen's payroll records on file with the Human Resources

Department for the City of Chicago.  Tr. 3673-74.  Lewellen did not object to Sojka's testimony or

the admission of the records.  According to those records, which were introduced at trial as

Government Exhibit 365, Lewellen worked as a CPD officer between December 22, 1986 and May

31, 2002. Tr. 3677. Lewellen took a leave of absence between June 1, 2002 and June 4, 2003, at which time his employment was terminated. *Id*. Between December 22, 1986 and May 31, 2002, Lewellen never made more than $5,126 in gross income per month from his employment with the CPD.

### 4.    Testimony of Cooperating Witnesses Regarding Lewellen's Receipt of Cash in Exchange for his Participation in Criminal Activities

At trial, Saul Rodriguez, Fares Umar, and Andres Torres testified about Glenn Lewellen's receipt of money in exchange for his participation in the crew's criminal activities. Lewellen did not object to the testimony of Rodriguez, Umar, or Torres on the basis that they were impermissibly testifying about Lewellen's finances or access to cash. Saul Rodriguez testified that he and Lewellen began engaging in criminal activities together in 1998. That year, acting on information provided by Rodriguez, Lewellen stole $500,000 from cocaine dealer Alex Estrada. Tr. 2909-15. Lewellen gave Rodriguez $160,000 of the money, and kept the remainder for himself. *Id*. Later that same year, acting on information provided by Rodriguez, Lewellen and his partner James Entress stole $800,000 from a stash house. Tr. 2915-21. The men subsequently split the money three ways. *Id*. Between 2001 and 2003, Lewellen participated in a series of kidnappings with various members of the crew, including Rodriguez, Fares Umar, and Andres Torres.[3] Rodriguez, Umar, and Torres testified about their acquisition of cocaine and/or money during these kidnappings. Rodriguez

---

[3]The kidnappings included the following: (1) September 11, 2001 kidnapping of two men in Will County resulting in the possession of 80 kilograms of cocaine worth $1,200,000 (Tr. 2994-3004 (Rodriguez), 907-27 (Umar)); (2) Early 2000s kidnapping of woman and man resulting in the possession of $30,000 (Tr. 3013-18 (Rodriguez), 928-31 (Umar)); (3) Early 2000s kidnapping of drug courier resulting in the possession of at least $1,000,000 (Tr. 3004-13 (Rodriguez), 932-46 (Umar), 1587-92 (Torres)); (4) Summer 2003 kidnapping of "the Twin" resulting in the possession of at least 100 kilograms worth at least $1,500,000 (Tr. 3072-91 (Rodriguez), 1029-55 (Umar)).

testified that he paid Lewellen hundreds of thousands of dollars as his share of the profits from the kidnappings. In 2004, Lewellen participated in the theft of 70 kilograms of cocaine with Rodriguez and Torres. Tr. 3129-35 (Rodriguez), 1595-1608 (Torres). Lewellen received hundreds of thousands of dollars from Rodriguez' sale of the cocaine stolen in this incident. Rodriguez further testified about his investment of millions of dollars in proceeds from the affairs of the crew with Lewellen. Tr. 2991-93, 3164-70.

**B.    Analysis**

As noted above, to date, Lewellen has never objected to the admission of evidence regarding his finances or cash transactions he engaged in during the course of the conspiracy. To the contrary, Lewellen used the evidence to support his defense during trial. First, Lewellen used the evidence to argue that his cash expenditures stemmed from his success in the construction business rather than his involvement in the charged drug conspiracy. Second, Lewellen used the evidence to argue that his relationship with Rodriguez was limited to a business partnership rather than a partnership in crime. There simply was no error in the admission of the government's evidence regarding Lewellen's finances.

"[I]t is well settled in this circuit that evidence of an unexplained, lavish lifestyle is probative of the existence of income derived from a drug conspiracy." *United States v. Smith*, 308 F.3d 726, 737 (7th Cir. 2002) (citing *United States v. Penny*, 60 F.3d 1257, 1263 (7th Cir. 1995)). Accordingly, evidence of such wealth is admissible in drug cases as long as: (1) the evidence presented creates an inference that the defendant was involved in drug trafficking; (2) the unexplained wealth was acquired during the period in which the drug crime allegedly occurred; and (3) the government presents other evidence to support the charge, including evidence that the income

was not obtained through legitimate means. *United States v. Harris*, 536 F.3d 798, 811 (7th Cir. 2008); *Penny*, 60 F.3d at 1263.

In this case, the evidence introduced by the government met all three prongs of the applicable standard. First, as this Court found, the government presented evidence of Lewellen's unexplained wealth that created an inference that Lewellen was involved in drug trafficking. R. 1065 at 1-2, 6. Second, as this Court found, the government presented evidence that "Lewellen's allegedly unexplained wealth was acquired during the same period that the drug trafficking organization was up and running." *Id.* at 6. Third, the government presented sufficient evidence that large amounts of cash received and used by Lewellen were not obtained through legitimate means. For example, the evidence showed that between 1999 and 2002, Lewellen paid construction associates approximately $213,000 in cash for work they performed on various projects. Many of those associates testified that it was highly unusual to be paid in cash for their work. Furthermore, the evidence showed that in 2006, Lewellen paid $80,000 in cash for a classic car. Mike Harper, the government witness who testified about Lewellen's purchase, testified that in his years buying and selling classic cars, he had never seen someone purchase a car with that amount of cash. The foregoing evidence established, as the government argued, a direct link between Lewellen's receipt of proceeds from the sale of stolen drugs and his use of those proceeds in that it showed that Lewellen received large amounts of cash (typical of the drug business), and spent large quantities of cash (demonstrating an interest in concealing the source of his income). The jury could reasonably infer from Lewellen's use of large amounts of cash in these circumstances that the cash came from drug trafficking and related criminal conduct, rather than from his legitimate income from the CPD or his construction business.

8

Moreover, the evidence was admissible more generally as "unexplained wealth" which tended to show Lewellen's involvement in the Rodriguez crew's criminal activities. Because the evidence of defendant's unexplained cash expenditures tended to show that defendant received income from the charged drug conspiracy, the evidence was admissible as relevant circumstantial evidence of drug trafficking and related criminal activities conducted as a member of the Rodriguez crew. *See Smith*, 308 F.3d at 737 ("[E]vidence of an unexplained, lavish lifestyle is probative of the existence of income derived from a drug conspiracy."); *see also* Fed. R. Evid. 401 (evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Although, unlike many of his co-conspirators, Lewellen had legitimate sources of income, those sources were insufficient to account for the large amounts of cash that Lewellen used during the course of the conspiracy—much less for the fact that Lewellen chose to make cash payments in circumstances that do not typically involve cash. Therefore, the Court properly admitted the evidence regarding Lewellen's finances.

## III.   THE GOVERNMENT'S CLOSING ARGUMENTS REGARDING LEWELLEN'S FINANCES WERE PROPER

As set forth in greater detail below, in its closing arguments, the government focused on Lewellen's participation in the charged offenses, and made limited mention of Lewellen's possession and expenditure of cash as proof that Lewellen received proceeds from the Rodriguez crew's criminal activities, including the sale of stolen drugs. The government's seconds-long reference to Lewellen's "unexplained wealth" was proper and did not impermissibly shift the burden to Lewellen or constitute a comment on Lewellen's failure to testify.

9

A.     **Facts**

1.     The Government's Closing Argument

In closing, the government primarily argued that evidence concerning Lewellen's use of large quantities of cash was direct evidence of the criminal proceeds Lewellen had obtained for participating in the Rodriguez crew's kidnapping and drug trafficking activities.  The government's argument spend a lot of time on a generalized "unexplained wealth" argument but, rather, focused on specific expenditures that showed Lewellen obtained cash by participating in the criminal activities of the Rodriguez crew.  For example, after discussing the two instances in which Lewellen and Rodriguez robbed drug traffickers of a total of $1,300,000 in 1998, the government argued,

> Now, you heard about what happened to some of the money that Glenn Lewellen earned by robbing and kidnapping drug dealers with Saul Rodriguez.  You heard from these men. James Millner, Michael Thompson, Ken Klusnick and Matt Klabisch. These men are not convicted felons. They do not have a motive to lie. They are in the construction business, and they told you about their interactions with Glen Lewellen between 1999 and 2002.  What they told you is that during that time, Glen Lewellen paid them a total of $213,000 in cash. You know where that money was coming from. It was coming from Glen Lewellen's acts with Saul Rodriguez. It certainly wasn't coming from the City of Chicago because that's what you have seen in evidence, and he was only making tens of thousands of dollars per year doing that.  Glen Lewellen ended up making enough money with Saul Rodriguez that he didn't even need to be a Chicago police officer anymore.

Tr. at 4591-4592.

During one sentence of the nearly eight-hour closing argument, the government did briefly refer to Lewellen's "unexplained wealth":

> The other things that corroborate the testimony that you heard from the insiders is the evidence that you've seen and heard about the money, basically the unexplained wealth, the unexplained wealth of Hector Uriarte, the unexplained wealth of Glenn Lewellen, the hundreds of thousands of dollars that these men were spending that there just is no other explanation for, no other explanation for the cash coming anywhere except from the crew's activities and their participation in it.

10

Tr. 5013.

At the close of the government's closing argument, counsel for Hector Uriarte moved for

a mistrial based on the government's "saying there's unexplained wealth, that Hector Uriarte has

unexplained wealth." Tr. 5016-17.  Hector Uriarte subsequently filed a written motion for a mistrial.

R. 786.  Lewellen did not join in either Hector Uriarte's oral motion or written motion for a mistrial.

2.      Defendant's Closing Argument

In his closing argument, counsel for Lewellen included an argument that made affirmative

use of the evidence the government had presented regarding Lewellen's involvement in the

construction business beginning in the late 1990s:

> [A]t the time that Glenn Lewellen decided to start his home-building business, credit was
> easy, loans were being practically given away by the bank, the market for homes was going
> up through the roof, and you could buy a piece of property one day, and a couple of months
> or less than a year later you could sell it, and the price would be expanded, and you would
> make money.  And that's what [Lewellen] started to do.  Little by little by little.

Tr. at 5071-5072.  Counsel concluded with a response to the government's argument, asserting that

"[t]here is no unexplained wealth in this case.  The wealth that Mr. Lewellen came by was legitimate

money that he made through legitimate businesses."  Tr. at 5073.

With respect to Glenn Lewellen's construction-related cash payments, counsel reasoned:

> The other thing that you heard from Jim Millner, who had a business of his own also, was
> that he would sometimes do side jobs for cash, as many contractors do.  And ladies and
> gentlemen, you all know that people do jobs for cash and give you a better price.  And that's
> not an uncommon happening in life.  We all know that, we've all experience it.  And Mr.
> Millner told you about that.

Tr. at 5074.  At the close of the argument, counsel reiterated that there was not "a single shred of

evidence that there was anything illegitimate about any money that Glenn Lewellen had."  Tr. at

5146.

11

3. The Government's Rebuttal Argument

In rebuttal, the government responded directly to Lewellen's closing argument by saying "it is not a common happening in life to pay for a luxury car with a bag filled with $80,000 in cash." Tr. at 5373. Counsel for Lewellen objected, arguing that the government's argument misstated the evidence. *Id*. The Court overruled the objection. Indeed, Mike Harper, who witnessed Lewellen pay for a luxury car with over $80,000 in cash, testified that in his years in world of buying and selling classic cars, he had never seen someone pay cash for a car like that before. Tr. at 2737. The government further argued that "[i]t is not a common happening in life for a police officer to fund his new construction business by giving $140,000 to someone he just met." Tr. at 5374. Counsel for Lewellen objected on the same basis. *Id*. Again, the Court overruled the objection, telling the jury to "rely on its collective recollection" of the evidence. *Id*. James Millner was among the witnesses who testified about having received construction-related cash payments from Lewellen. Millner testified that he had received $40,000 in cash from Glenn Lewellen on one occasion to pay subcontractors. Tr. at 2687. James Millner testified that he had never before seen that much money in cash or received that much money in cash to pay subcontractors. Tr. at 2688.

**B. Analysis**

The evidence having been properly admitted, without objection, it was appropriate for the government to comment on it in argument, and to ask the jury to infer that Lewellen made certain expenditures using the proceeds of his criminal activities. Tr. 4988. Lewellen's counsel failed to object to the government's closing argument and her objections to the government's rebuttal argument were limited to the claim that government counsel purportedly had misstated the evidence. Lewellen, for the first time, argued in his post-trial motion, that the government impermissibly

commented on Lewellen's failure to testify and shifted the burden of proof to Lewellen.  Both of these claims lack merit.

Contrary to Lewellen's contention, Lewellen was not the only person capable of contradicting or rebutting the government's evidence and arguments linking Lewellen's cash expenditures to the charged offenses.  There were many available sources of evidence establishing that he had sources of income other than drug trafficking, such as his employment with the CPD, his ownership of a construction business, and records of his investments in real estate.  Thus, the jury could not have naturally or necessarily understood the government's evidence or arguments concerning unexplained wealth as an indirect comment on the defendant's failure to testify.  *See United States v. Jones*, 600 F.3d 847, 857 (7th Cir. 2010) (where testimony of non-defendants could theoretically have been offered to contradict the government's evidence, it was not improper to note the lack of contradictory evidence) (citing *Yancey v. Gilmore*, 113 F.3d 104, 106 (7th Cir. 1997) (statements concerning the ability of the defense to contradict the government's evidence improper only if a defendant is the "only person capable of contradicting, denying, rebutting, disputing, challenging, or controverting the evidence at issue."), *United States v. Alanis*, 265 F.3d 576, 586–87 (7th Cir. 2001) (same), and *United States v. Harris*, 271 F.3d 690, 701 (7th Cir. 2001) (("[W]here a witness other than the defendant could have, but does not, contradict the government's proof, references to 'uncontested' evidence are not improper.")).  *See also Sblendorio*, 830 F.2d at 1391.

Similarly, the use of the term "unexplained" in this context did not result in impermissibly shifting the burden of proof.  *See Smith*, 308 F.3d at 737; *Snook*, 366 F.3d at 444.  This is particularly true in light of the government's repeated comments regarding the proper burden, and the instructions given to the jury at the end of the case.  *See Snook*, 366 F.3d at 444-45; *United States*

*v. Wilson*, 237 F.3d 827, 835 (7th Cir. 2001) (juries assumed to follow instructions). *See* Tr. 5025 ("As I said on Tuesday, it is the Government that has the burden of proving the defendants guilty beyond a reasonable doubt"). For all of these reasons, the government's seconds-long reference to Lewellen's unexplained wealth were not improper.

## IV.   ANY ERROR IN THE ADMISSION OF THE FINANCIAL EVIDENCE OR ARGUMENT REGARDING UNEXPLAINED WEALTH WAS HARMLESS

Even if evidence or argument regarding unexplained wealth should have been excluded, any error was harmless. In determining whether an evidentiary error is harmless, the Court should consider whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded. *United States v. Emerson*, 501 F.3d 804, 813 (7th Cir.2007); *United States v. Owens*, 424 F.3d 649, 656 (7th Cir.2005); *United States v. Eskridge*, 164 F.3d 1042, 1044 (7th Cir.1998). The financial evidence regarding Lewellen was a minor part of a trial that involved dozens of witnesses – many of whom testified extensively about Lewellen's participation in numerous criminal acts. The government's evidence focused on defendant's participation in extensive criminal violence, rather than his finances.[4] Thus, the government's case would not have been significantly less persuasive had the financial evidence been excluded.

With respect to the government's arguments, even if the government's use of the term "unexplained" was incorrect, the statement did not "infect the trial with unfairness to such a degree as to make the resulting conviction a denial of due process." *United States v. Carrera*, 259 F.3d 818, 829 (7th Cir. 2001) (citing *United States v. McClinton*, 135 F.3d 1178, 1188) (7th Cir. 1998)). In

---

[4]A summary of that evidence is contained in the government's initial response to Lewellen's post trial motions. R. 900 at 2.

reality, the situation here was one in which the parties presented the jury with competing inferences to be drawn from the evidence. "So long as 'the jury has evidence in its possession and is equipped to ascertain whether the government's characterization is accurate, a statement characterizing that evidence is not improper.'" *Carrera*, 259 F.3d at 829 (citing *United States v. Velez*, 46 F.3d 688, 692 (7th Cir. 1995)). Here, the jury had the evidence in its possession and was equipped to ascertain whether the government's characterization was accurate. Thus, the government's statement regarding that evidence was not improper.

Moreover, in light of the limited nature of the financial evidence and argument, and the substantial evidence establishing defendant Lewellen's guilt, any error related to the financial arguments was clearly harmless.

## V.      CONCLUSION

Based on the foregoing, the government respectfully requests that the Court deny defendant Glenn Lewellen's motion for a new trial.

Respectfully submitted,

GARY S. SHAPIRO
Acting United States Attorney

By:      /s Terra Reynolds
         TERRA REYNOLDS
         STEVEN A. BLOCK
         TIFFANY J. TRACY
         Assistant United States Attorneys
         United States Attorney's Office
         219 S. Dearborn St., 5th Floor
         Chicago, Illinois  60604

Dated: November 2, 2012

15

**Reynolds, Terra (USAILN)**

| | |
|---|---|
| **From:** | Block, Steven (USAILN) |
| **Sent:** | Saturday, December 17, 2011 2:00 PM |
| **To:** | Matthew Madden |
| **Cc:** | Reynolds, Terra (USAILN) |
| **Subject:** | Lewellen Draft Summaries |

Matt:

Attached please find drafts of the summaries the government intends to introduce pursuant to Federal Rule of Evidence 1006.  Pursuant to our agreement, these summaries are only drafts and you have agreed not to use these drafts for any in-court purpose, as they are being provided to you in an early form merely to aid you in your preparation for the upcoming week.  Indeed, I fully expect that there will be changes to these drafts in the coming days, particularly with regard to how the information is presented.  We will provide final versions of the summaries once they are available.  In the meantime, please contact me if you have any questions or would like to discuss the information we plan to present.

Best,

Steven Block

Lewellen
Summary 12-17...


GOVERNMENT
EXHIBIT

A

1

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| | ) | |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*DEFENDANT GLENN LEWELLEN'S BRIEF ON UNEXPLAINED
WEALTH*

I.    Government did not meet requirements for presenting or arguing
unexplained wealth.

    A.    The government failed to establish that Glenn Lewellen's wealth
was, in fact, "unexplained wealth".

In this case, the government did not meet each of the three requirements for introducing wealth evidence.  In order to admit alleged "unexplained wealth" the government must show that (1) the evidence presented creates an inference that the defendant was involved in drug trafficking; (2) the unexplained wealth was acquired during the period in which the drug crime allegedly occurred; and (3) the government presents other evidence to support the charge, *including evidence that the income was not obtained through legitimate means." United States v. Carrera,* 259 F.3d 818, 829 (7th Cir. 2001) [emphasis added].

    1. The evidence presented did not create a reasonable inference
that Mr. Lewellen was involved in drug trafficking.

The inference created by the wealth evidence must be reasonable.

*United States v. Penny*, 60 F.3d 1257, 1263 (7th Cir. 1995) [evidence of unexplained wealth is probative and therefore admissible if it "creates a *reasonable* inference of the defendant's involvement in the drug conspiracy or trafficking."] [emphasis added]. In Mr. Lewellen's case the inference is not reasonable because the evidence presented by the government was a tiny fraction of the evidence it had regarding the legitimate sources of Mr. Lewellen's wealth.

Unexplained wealth presupposes the lack of any legitimate source, or an excess of expenditures over legitimate income that is not explainable – for example, by legitimately acquired debt: personal loans, business loans, lines of credit, among others. In the typical case where "unexplained wealth" is introduced into evidence, the defendant is unemployed, underemployed, or has possessions that he could not have obtained through legitimate means, based on the evidence of his income. *See, e.g., United States v. Harris,* 536 F.3d 798 (7th Cir. 2008)(defendant unemployed during time he possessed luxury vehicles registered in someone else's name); *United States v. Carrera,* 259 F.3d 818 (7th Cir. 2001)(defendant unemployed at time of arrest when $928 found in wallet).

Unlike the typical case, Mr. Lewellen had gainful employment, a successful business, gambling winnings, a working wife, the benefits of a law suit that his wife had won, investment income, pensions, insurance policies, and access to loans and credit lines. In short, the Lewellens had a broad

portfolio of legitimate wealth earned in various ways over the course of the

charged conspiracy.  The government failed to demonstrate that the cash

money the government's witnesses testified about came from illegitimate,

rather than legitimate sources.

> The government claimed in closing argument that:
>
> The other things that corroborate the testimony that you heard
> from the insiders is the evidence that you've seen and heard
> about the money, basically the *unexplained wealth*, *the
> unexplained wealth of Hector Uriarte, the unexplained wealth of
> Glenn Lewellen*, the hundreds of thousands of dollars that these
> men were spending that there *just is no other explanation for, no
> other explanation for the cash coming anywhere except for from
> the crew's activities and their participation in it.*

Tr. 27:5013.  This argument was false and the government knew it.

There was another explanation for Glenn Lewellen's wealth that the

government chose not to admit into evidence.

Prior to trial, the government provided notice of its intent to put on

expert testimony from IRS Agent Killian, to provide a financial analysis of

Mr. Lewellen's legitimate sources of income and expenditures throughout the

time span covered by the charged conspiracy.  R. 559, 571.  Neither Agent

Killian, nor the results of his financial analysis were presented at trial.  The

report, in the last draft stage received by the defendant covered the years

1998 through 2002 and included bank account balances, salaries and wages

for Mr. Lewellen and his wife, net wages for Lewellen Homebuilders, interest

and dividend income, capital gain dividends, tax refunds-Federal, tax refunds

–state, net rental income, IRA/Pension distributions, gambling winnings, and

sales of real estate.  In the case of a defendant like Mr. Lewellen, who has

provable sources of legitimate income, it is simply not enough to assert that

any funds spent must come from illegitimate sources.  The government must

show how the wealth it seeks to admit is "unexplained."  This it failed to do.

> 2.   The government failed to tie the "unexplained wealth" to any
>      particular illegal source.

The government must make some showing that a person's legitimate

income cannot account for the display of wealth, whether the display is in the

form of cash payments, luxury cars, houses, classic cars, or some other form.

*United States v. Edwards,* 885 F.2d 377, 390 (7th Cir.1989) (holding in

forfeiture context that "where a defendant's verifiable income cannot possibly

account for the level of wealth displayed and where there is strong evidence

that the defendant is a drug trafficker, then there is probable cause to believe

that the wealth is either a direct product of the illicit activity or that it is

traceable to the activity as proceeds"). *United States v. Penny*, 60 F.3d 1257,

1263 (7th Cir. 1995).

The government made no attempt to demonstrate Glenn Lewellen's

verifiable income and the difference between it and the alleged "unexplained

wealth."  The government did not use either a net worth[1] approach or a cash

expenditure[2] approach to demonstrating Glenn Lewellen's "unexplained

---

[1] The government uses the net worth approach in cases where specific items
[2] The cash expenditures method, as explained by Judge Coffin in *Taglianetti,*
determines the amount of unreported income by "establishing the amount of
[the defendant's] purchases of goods and services which are not attributable

4

wealth."  Both methods are well-known and commonly used by the

government in tax cases, another arena where "unexplained wealth" evidence

is used.  *See, e.g., United States v. Marrinson*, 832 F.2d 1465, 1469 (7th Cir.

1987); *Schoenauer v. United States,* 759 F.Supp.2d 1090 (S.D. Iowa

2010)(government used auditor expert to compare investments and income to

establish unexplained wealth).

Nor did the government do in this case what it has done in other cases

in this district – seek leave to file the financial evidence in support of an

"unexplained wealth" claim.   For example, in *United States v. Miranda*, 94

CR 714 (N.D.Ill. Sept. 22, 1997), the government sought to admit evidence of

a defendant's finances.  In order to do so, the government proposed

presenting the aggregate value of defendant's real estate and his equity in

the properties, defendant's bank records, tax returns, mortgage applications,

and the fact that defendant used cash to purchase various automobiles.

Similar information was available to the government in this case, but the

government chose not to take the direct and proper approach.  Rather, the

government depended on the admission of a woefully incomplete financial

---

to the resources at hand at the beginning of the year or to non-taxable
receipts during the year." *Id.* The government must establish beginning and
ending net worth positions "with sufficient particularity to rule out or account
for the use of a taxpayer's capital to pay for his purchases." *Id.* at 563; *see
also United States v. Citron,* 783 F.2d 307, 310 (2d Cir.1986). *United States v.
Marrinson,* 832 F.2d 1465, 1469 (7th Cir. 1987).

information, admitted under another pretext and evidence of cash payments

made to some contractors and business partners.  The government based its

"unexplained wealth" claim almost entirely on the word of Saul Rodriguez

that Glenn Lewellen received funds from an illegitimate source – namely

Rodriguez.  The government made no effort to demonstrate how any funds

allegedly received from Rodriguez compared with Glenn Lewellen's true and

multiple legitimate sources of income.

The government's witnesses, contractors or business partners who

worked with Glenn from the late 1990s to 2005, and received cash and check

payments from him, also testified that Glenn had legitimate – not illegitmate

– sources of funds from contracting, rental properties, settlement from a law

suit, and home building, bank loans or payouts, as well as his job as a police

officer.  Tr. 15:2693; 2700; 2705-9; 2714; 2732-34.

Similarly, the alleged "unexplained wealth" used to purchase the

classic cars, referred to the government's closing argument, occurred in 2006

when Glenn Lewellen was no longer regularly communicating with Saul

Rodriguez, let alone engaged in criminal conduct with him.  Tr. 15:273.  One

of the cars Mr. Lewellen purchased was paid for by check and cash. Tr.

15:2738.  Witness Harper provided no testimony about the source of any of

the money he received, but did testify about his own investments with Glenn

Lewellen in 2007.  Tr. 15:2743.  At least one government witness testified

that builders and developers had large amounts of cash to negotiate the

signing of easements and other rights of way with homeowners or business

owners.  Tr. 15:2761.  None of this evidence supported the government's

contention that Glenn Lewellen had unexplained wealth.

II.   Glenn Lewellen was prejudiced (1) in the preparation and presentation
      of his defense; (2) by the false impression created by the government
      that Glenn's wealth could not be explained; and, (3) by the burden
      shifting and comment on the defendant's silence in closing argument.

     The government did not seek to admit its financial analysis of Glenn

Lewellen's legitimate sources of income and expenditures and demonstrate

on a year-by-year basis that his expenditures exceeded his sources of funds.

Instead, it chose to admit selected cash payments and used them to paint a

picture that was as damning as it was false.  The prejudice to Glenn Lewellen

was three-fold:  (1) Mr. Lewellen was prejudiced in the preparation of his

defense; (2) the government used the misleading financial evidence to bolster

the otherwise incredible testimony of Saul Rodriguez; and, (3) by shifting the

burden of proof to Glenn Lewellen in the course of closing argument, calling

on the defendant to explain himself when the time has passed for him to take

the stand, implicitly and impermissibly inviting the jury to infer guilt from

silence.

     1.     Glenn Lewellen was prejudiced in the preparation of his defense.

     Glenn Lewellen spent significant financial, legal, and time resources

preparing to respond to the government's financial expert, building a trial

strategy around the expectation that a legitimate battle about his sources of

income and expenditures would be fought.  *See,* R. 559 and 571. When the

government decided to forego the use of its financial expert, it in effect shifted the burden of proof, requiring Mr. Lewellen to prove a negative. When the government failed to identify the sources of income upon which it was relying to measure excess wealth, did not present proof of the amount of "unexplained wealth", and did not tie cash payments to any specific illegal source of funds, it created a false impression for the jurors that was not moored in facts or specifics that could be rebutted by evidence.

2.     The government used the improperly admitted evidence to bolster a weak witness.

As this Court has already noted, Saul Rodriguez was thoroughly impeached at trial.  He admitted to having lied to agents, the Grand Jury, the government, Bureau of Prisons officials, the court, and jury.  Yet, it was almost exclusively on his word that the government's case against Mr. Lewellen turned.  The fact that the jury was unable to find Mr. Lewellen guilty of the RICO conspiracy, the predicate acts of which relied almost exclusively on Rodriguez' word, provides support for the weakness of his testimony.

There were no "victim" witnesses to the robberies or kidnappings in which Mr. Lewellen was alleged to have participated, nor were there any independent witnesses to any wrong-doing by Glenn Lewellen, apart from the other cooperating co-defendants – each of whom had his own motives to lie and who maintained contact with Rodriguez, directly or through family members, throughout the preparation of the case.

8

As the government stated in its rebuttal closing argument:

Money doesn't lie.  Luxury cars don't lie. Classic cars paid for
with cash. That doesn't lie.  A huge house after retiring from
police department. That doesn't lie either.

Tr. 30: 5368.  This argument encapsulates the prejudice to Mr.

Lewellen in allowing the wealth evidence without introducing any

proof or expert analysis.  No matter what one thinks of the witnesses'

motivations for telling the truth or lies, the financial evidence is

perceived to be objective and unassailable.

The jury cannot properly evaluate such claims without the proof

the government was required to provide.  Cash is only evidence of

illegality if there is no legitimate source for it. The purchase of a huge

house is only evidence of illegality if there were no antecedent property

sales, no ability to obtain financing, and no legitimate source of income

to support a mortgage.  The government had the information from

which to construct a legitimate case for determining whether wealth

was truly "unexplained", but it made a strategic decision not to use it;

thereby, creating a false and damaging impression, rather than

presenting actual evidence.  The government admitted as much to the

Court when it conceded that it had tax returns and did not introduce

them into evidence.  Tr. 28: 5021.

3.    The government engaged in impermissible comment on Glenn Lewellen's privilege against self incrimination when it argued that his "unexplained wealth" supported a finding of guilty.

The United States Supreme Court made clear, in *Griffin v. California*, 380, U.S. 609 (1965), that it is reversible error for a federal prosecutor to comment on a defendant's silence at trial:

> We . . . hold that the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.

*Griffin v. California,* 380 U.S. 609, 615 (1965).

The government's claim, in closing, that Glenn Lewellen's unexplained wealth supported a finding of guilty, impermissibly shifted the burden of proof to the defendant, implicitly highlighting his choice to remain silent and inviting the jury to draw a negative inference from that silence.  The Seventh Circuit has reversed a defendant's conviction because the prosecutor claimed that its evidence was "uncontroverted" when the defendant was the only one who could have rebutted the evidence.  *United States v. Cotnam*, 88 F.3d 487, 497 (7th Cir. 1996). The *Cotnam* court held that:

> A prosecutor's comment that the government's evidence on an issue is "uncontradicted," "undenied," "unrebutted," "undisputed," etc., will be a violation of the defendant's Fifth Amendment rights if the only person who could have contradicted, denied, rebutted or disputed the government's evidence was the defendant himself. *Freeman v. Lane,* 962 F.2d 1252, 1261 (7th Cir.1992) (repeated remarks that evidence was "unrebutted and uncontradicted" violated Fifth Amendment);

> *United States ex rel. Burke v. Greer,* 756 F.2d 1295, 1302 (7th Cir.1985) (same for "uncontradicted and undenied"); *United States v. Buege,* 578 F.2d 187, 189 (7th Cir.) (same for "uncontradicted"), cert. denied, 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978); *United States v. Fearns,* 501 F.2d 486, 490 (7th Cir.1974) (same for "undisputed"); *United States v. Handman,* 447 F.2d 853, 855 (7th Cir.1971) (same for "unchallenged" and "uncontradicted").

In this case, the prosecutor's reference to Glenn Lewellen's "unexplained wealth" in both its closing and rebuttal arguments, focused the jury's attention on the fact that Glenn Lewellen did not testify and provide the explanation called for, suggesting that his silence is evidence of guilt – or, at the very least, evidence that there truly is no explanation other than the "only one" suggested by the government.

        WHEREFORE, defendant GLENN LEWELLEN, respectfully requests that the Court grant him a mistrial, judgment of acquittal, new trial, or any other relief the Court sees fit.

DATE:        November 2, 2012        Respectfully submitted,

                                By:    s/Andréa E. Gambino
                                       Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 2 2012, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which sent

notification of such filing to the following:

> Steven Block
> Terra Reynolds
> Tiffany Tracy
> Assistant United States Attorneys

and I hereby certify that I have mailed by United State Postal Service the

document to the following non-CM/ECF participants: [not applicable in this

case].

DATE:        November 2, 2012        Respectfully submitted,

                                     By:    s/Andréa E. Gambino
                                            Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014
agambinolaw@gmail.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332-2 |
| v. | ) | |
| | ) | Hon. Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

## GOVERNMENT'S RESPONSE TO GLENN LEWELLEN'S
## BRIEF ON UNEXPLAINED WEALTH

The UNITED STATES OF AMERICA, by its attorney, GARY S. SHAPIRO, Acting United

States Attorney for the Northern District of Illinois, pursuant to the Court's October 26, 2012 order,

respectfully submits the following response to defendant Glenn Lewellen's Brief on Unexplained

Wealth.

## I.   THE COURT PROPERLY ADMITTED THE EVIDENCE OF LEWELLEN'S FINANCES

In its opinion, the Court directed Lewellen to specify the evidence which, in his view, the

government should not have been permitted to introduce.  R. 1065 at 7.  Instead of doing so,

Lewellen has challenged the government's characterization of his large cash expenditures as

"unexplained wealth," and argued that additional evidence related to Lewellen's finances should also

have been admitted.  See R. 1072 at 2-7.  As noted in the government's supplemental brief, evidence

concerning Lewellen's finances and large cash expenditures was introduced by the government

without objection from Lewellen.  R. 1072 at 2-7.  Lewellen himself used the evidence to support

his defenses at trial.  R. 1073 at 6.  Even in his post-trial motions, rather than challenging the

government's introduction of financial evidence, Lewellen challenged the government's arguments

concerning that evidence.  *See* R. 863 at 6-9.  Given Lewellen's repeated waiver or forfeiture of any

objection to the admission of financial evidence, as well as the fact that such evidence was clearly

relevant and admissible to show his participation in the criminal activities of the Rodriguez crew, as well as to show unexplained wealth, there is no basis for this Court to reconsider the issue.

Contrary to Lewellen's assertion in his most recent brief, R. 1073 at 1-4, this Court correctly found that "the government did present evidence that Lewellen's allegedly unexplained wealth was acquired during the same period that the drug trafficking organization was up and running, and the evidence presented an inference that Lewellen was involved in drug trafficking." R. 1065 at 6. As described in more detail in the government's supplemental brief, that evidence included testimony showing that Lewellen participated in the Rodriguez's crew's crimes and received cash proceeds from that participation.

Lewellen attempts to deflect focus from that evidence by complaining that the government did not admit *additional* financial evidence, including the testimony of Bruce Killian, a former IRS agent who, in preparation for trial, prepared a summary of certain of Lewellen's financial records for the period 1998 and 2002. R. 1073 at 2-3.[1] Lewellen suggests that the government was obligated to introduce these records since they showed that Lewellen's legitimate income included "a successful business, gambling winnings, a working wife, the benefits of a law suit that his wife had won, investment income, pensions, insurances policies, and access to loans and credit lines" which refuted the government's suggestion that Lewellen's cash expenditures were made with the criminal proceeds. R. 1073 at 2. To the contrary, although Killian's draft analysis showed that Lewellen had legitimate income from the above-listed sources, it also showed that Lewellen's expenditures during the relevant period exceeded his legitimate income from all sources. *See* R. 1072 at 2, n. 2.

---

[1] Anticipating the possibility of calling Mr. Killian as a summary witness, the government provided the defense with a copy of Killian's draft financial analysis during trial. R. 1072 at 2, n. 2. As Lewellen concedes, he received the analysis and documents and, thus, *Brady* is not implicated.

2

Lewellen suggests that the government was required to tie his "unexplained wealth" to particular illegal sources, and to present a thorough analysis of a defendant's finances using a "net worth approach or cash expenditure approach."[2]  R. 1073 at 4-5.  Lewellen cites, and research reveals, no case requiring such proof in context at issue here.  To the contrary, the cases upon which Lewellen relies address the question of proof in support of tax charges.  *Id*. at 4-5.  There simply is no requirement that the government introduce any particular type of evidence or analysis to establish that a defendant has unexplained wealth creating an inference of involvement in criminal activity.  Rather, the test is whether the government presented "at least some evidence that the unexplained wealth was not derived from legitimate means."  *United States v. Carrera*, 259 F.3d 818, 829 (7th Cir. 2001).

Lewellen suggests that the government's evidence was insufficient to show that large amounts of cash received and used by Lewellen were not obtained through legitimate means on the ground that the evidence was based "almost entirely on the word Saul Rodriguez."  R. 1073 at 6.  This is incorrect.  While Rodriguez was certainly the primary witness on this issue, his testimony did not constitute the sole evidence of Lewellen's receipt of cash from his criminal activities.  The government presented substantial evidence, including testimony from multiple members of the Rodriguez crew, showing that Lewellen participated in the crew's criminal activities which this

---

[2]  Lewellen also suggests that the government was required to "seek leave to file the financial evidence in support of an 'unexplained wealth' claim."  R. 1073 at 5.  There is no such requirement.  In support of his claim, Lewellen cites to *United States v. Miranda*, 94 CR 714 (N.D.Ill. Sept. 22, 1997).  The government accessed the *Miranda* case on ECF, but was unable to locate any filing on September 22, 1997 or otherwise access any documents filed in the case.  The government identified the appeal resulting from the *Miranda* case as *United States v. Mojica*, 185 F.3d 780 (7th Cir. 1999).  The opinion upholding the conviction of defendant Miranda and others does not address the admissibility of or argument regarding evidence of "unexplained wealth."

Court found to be sufficient to prove Lewellen's participation. *See* R. 1065 at 1-2. This evidence, in itself, provided a basis for the jury to infer that Lewellen would not have committed crimes with the crew unless he was receiving remuneration. In addition, however, the government presented evidence from Andres Torres, as well as Rodriguez, who testified about having paid Lewellen for his participation in the 2004 robbery of cocaine from a drug supplier.

Lewellen argues that evidence of cash payments made to construction associates actually showed that the expenditures were made from legitimate, rather than illegitimate, sources of funds. R. 1073 at 6. Not so. None of the witnesses testified that the cash came from the construction business or any other legitimate source. Rather, their testimony established that the payments that comprised the $213,000 in U.S. currency paid by Lewellen for work done by various subcontractors between 1999 and 2002 were highly unusual. That was so even in the context of the testimony of one witness—Matt Klabisch—who said that builders and contractors used large amounts of cash to negotiate the signing of easements and other rights of way with homeowners or business owners. R. 1073 at 6-7 (citing Tr. 2761). None of the payments at issue in this case involved the negotiation or signing of easements and other rights of way. Thus the evidence was undisputed that it was unusual for the type of payments Lewellen was making to be made with cash. And the use of unusually large amounts of cash creates the inference that the user has a reason to avoid conducting financial transactions that leave a paper trail—*i.e.*, to conceal the source of that cash.

Moreover, no evidence undermined Mike Harper's testimony that Lewellen's use of $80,000 to pay for a classic car was highly unusual. Harper testified that his observation of Lewellen paying that sum for a classic car was unique in his many years of experience in buying and selling classic cars. Lewellen's attempt to refute the link between this cash payment and his participation in the

4

Rodriguez crew's crimes is contradicted by the record.  Lewellen asserts that at the time of the purchase, Lewellen was no longer regularly communicating with Saul Rodriguez, let alone engaging in criminal activity with him. R. 1073 at 6.  The evidence showed that by 2006, Lewellen had earned hundreds of thousands of dollars participating in the activities of the Rodriguez crew.  In 2006, Lewellen continued to participate in the affairs of the crew.  Specifically, testimony, phone records, and undercover recordings, demonstrated that, in 2006, Lewellen continued to protect the Rodriguez crew by alerting both Rodriguez and Torres to the existence of a wiretap investigation into the crew's activities.  Furthermore, Lewellen helped launder Rodriguez' proceeds of his criminal activities by accepting money from Rodriguez for investments in real estate.[3]  Rodriguez' testimony about his investments with Lewellen was corroborated by financial records documenting the millions of dollars Rodriguez invested with Lewellen.

In sum, although, unlike many of his co-conspirators, Lewellen had legitimate sources of income, those sources were insufficient to account for the large amounts of cash that Lewellen used during the course of the conspiracy—much less for the fact that Lewellen chose to make cash payments in circumstances that do not typically involve cash.  Therefore, even if Lewellen had challenged the admission of the government's financial evidence, that challenge would have properly been rejected.

---

[3]  In his opening statement, Lewellen's counsel asserted that the evidence would show that Lewellen cut off his relationship with Rodriguez immediately following Lewellen's discovery that Rodriguez was storing cocaine in Lewellen's warehouse.  The evidence at trial demonstrated that when in 2004 Lewellen learned that Rodriguez was storing cocaine in Lewellen's warehouse, Lewellen neither contacted law enforcement nor discontinued his dealings with Rodriguez until 2007.  Instead, he continued to participate in the crew's activities into 2007.

## II.   THE GOVERNMENT'S ARGUMENTS DID NOT IMPERMISSIBLY SHIFT THE BURDEN OF PROOF TO LEWELLEN OR COMMENT ON HIS RIGHT NOT TO TESTIFY

Lewellen further argues that the government's reference to Lewellen's "unexplained wealth" impermissibly shifted the burden of proof to Lewellen and improperly commented on his right not to testify.  R. 1073 at 10-11.  Lewellen contends that the Seventh Circuit's decision in *United States v. Cotnam*, 88 F.3d 487 (7th Cir. 2006) in instructive in the instant case.  In *Cotnam*, the Seventh Circuit found that a prosecutor's repeated reference to evidence as being "uncontroverted" violated the defendant's Fifth Amendment rights because the defendant was the only person who could have "contradicted, denied, rebutted, or disputed the government's evidence." 88 F.3d at 497.  The circumstances involved in *Cotnam* are easily distinguished from those presented here, as can be seen from Lewellen's own arguments.  Lewellen contends that there were voluminous records that could have established that he had sources of income other than drug trafficking—including his construction business, his wife's lawsuit, investment income, pensions, insurance policies, and loans and credit lines.  R. 1073 at 2, 6.  The existence of these records demonstrates conclusively that the Lewellen was not the only source of evidence that could be used to contradict the government's attempt to link Lewellen's large cash expenditures to his involvement in the Rodriguez crew's criminal activities.  Nor is there any reason to believe that the jury could not have naturally or necessarily understood the government's evidence or arguments concerning unexplained wealth as an indirect comment on the defendant's failure to testify.  *See United States v. Jones*, 600 F.3d 847, 857 (7th Cir. 2010) (where testimony of non-defendants could theoretically have been offered to contradict the government's evidence, it was not improper to note the lack of contradictory evidence) (citation omitted).

6

Similarly, the use of the term "unexplained" in this context did not result in impermissibly shifting the burden of proof. *See Smith*, 308 F.3d 726, 737 (7th Cir. 2002); *Snook*, 366 F.3d 439, 444 (7th Cir. 2004). As discussed in the government's supplemental brief, this is particularly true in light of the government's repeated comments regarding the proper burden, and the instructions given to the jury at the end of the case. *See Snook*, 366 F.3d at 444-45; *United States v. Wilson*, 237 F.3d 827, 835 (7th Cir. 2001) (juries assumed to follow instructions). For all of these reasons, the government's seconds-long reference to Lewellen's "unexplained wealth" were not improper.

## III.   ANY ERROR IN THE ADMISSION OF THE FINANCIAL EVIDENCE OR ARGUMENT REGARDING UNEXPLAINED WEALTH WAS HARMLESS

In its opinion, the Court instructed Lewellen to explain why the introduction of the "unexplained wealth . . . evidence was harmful to his case." R. 1065 at 7. In determining whether an evidentiary error is harmless, the Court considers whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded. *United States v. Emerson*, 501 F.3d 804, 813 (7th Cir.2007); *United States v. Owens*, 424 F.3d 649, 656 (7th Cir.2005); *United States v. Eskridge*, 164 F.3d 1042, 1044 (7th Cir.1998). As discussed in the government's supplemental brief, the government's evidence focused on defendant's participation in extensive criminal violence, rather than his finances. Furthermore, the financial evidence regarding Lewellen was a minor part of a trial that involved dozens of witnesses—many of whom testified extensively about Lewellen's participation in numerous criminal acts. Thus, the government's case would not have been significantly less persuasive had the financial evidence been excluded. In light of the limited nature of the financial evidence and argument, and the substantial evidence establishing defendant Lewellen's guilt, any error related to the introduction of the evidence

was harmless.   With respect to the government's arguments, even if the government's use of the term "unexplained" was incorrect, the statement did not "infect the trial with unfairness to such a degree as to make the resulting conviction a denial of due process." *United States v. Carrera*, 259 F.3d 818, 829 (7th Cir. 2001) (citing *United States v. McClinton*, 135 F.3d 1178, 1188) (7th Cir. 1998)).   Moreover, in light of the limited nature of the financial evidence and argument, and the substantial evidence establishing defendant Lewellen's guilt, any error related to the financial arguments was clearly harmless.

Instead of addressing the appropriate legal standard, Lewellen advances—for the first time in his reply brief—extraneous arguments based on the government's failure to admit *additional* financial evidence.   As a matter of law and fact, these arguments do not hold water.   First, Lewellen could not have been prejudiced as a result of the government's decision not to call Bruce Killian as a witness.   As an initial matter, Killian's testimony was not favorable to the defense; although it showed that Lewellen had legitimate income from various sources, it also showed that, during the relevant time frame, Lewellen's expenditures exceeded his legitimate income from all sources.   *See* R. 1072 at 2, n. 2.   Moreover, as noted above, there is no requirement that the government present evidence of a defendant's "unexplained wealth" through the use of a detailed financial analyses or expert witnesses.   Nor did the government's failure to present additional evidence create a false or misleading impression of the facts.   The government fully acknowledged, and presented evidence concerning, legitimate income received by Lewellen, but argued that Lewellen's large cash expenditures were made with criminal proceeds.   Lewellen possessed all of the financial evidence possessed by the government; indeed, some of the documents that were summarized by Killian were actually produced to the government by Lewellen.   Had Lewellen believed that additional evidence

8

would have shed favorable light on the issue, he could have introduced it, and could also have called Killian as his own witness. Similarly, Lewellen could have called his own expert witness, Robert Kennealy, who also reviewed certain records pertaining to Lewellen's finances. *See* R. 652 (witness list), R. 559 (government's motion to bar expert testimony based on delayed disclosure), R. 571 (Lewellen's response to government's motion), R. 581 (Court order denying government's motion to bar expert testimony). Lewellen's assertion that the jury was misled by the government's failure to introduce additional financial evidence is belied by the fact that he also chose not to introduce any of that evidence. There was no prejudice.[4]

Second, there was nothing improper about the government's use of financial evidence to corroborate the testimony of witnesses, including Rodriguez. To the extent that Lewellen suggests that the government's evidence was insufficient because it relied too heavily on Rodriguez's testimony, this Court has already rejected that claim. *See* R. 1065 at 1-2 (holding that the government presented sufficient evidence to support the jury's finding Lewellen guilty of the drug conspiracy charged in Count Thirteen). The jury was well equipped to evaluate Rodriguez's credibility, and specifically to decide whether Lewellen's large cash expenditures corroborated Rodriguez's testimony. *See Carrera*, 259 F.3d at 829 (citing *United States v. Velez*, 46 F.3d 688, 692 (7th Cir. 1995)) ( "So long as 'the jury has evidence in its possession and is equipped to ascertain whether the government's characterization is accurate, a statement characterizing that evidence is not improper.'"). Moreover, Lewellen used that same evidence to argue that Lewellen's cash expenditures were explained by his success in the construction business. Lewellen's

---

[4] Lewellen argues that the government conceded that "it had tax returns and did not introduce them into evidence." R. 1073 at 9 (citing Tr. 5021). The transcript to which Lewellen cites does not pertain to Lewellen; it pertains to Hector Uriarte.

characterization of the challenged evidence as helpful to the defense further supports a finding that

any error in the admission of financial evidence or in the government's arguments was harmless.

IV.     **CONCLUSION**

      For all the foregoing reasons, and the reasons set forth in the government's supplemental

brief, the government respectfully requests that the Court deny defendant Glenn Lewellen's motion

for a new trial.


                              Respectfully submitted,

                              GARY S. SHAPIRO
                              Acting United States Attorney

By:    /s Terra Reynolds
                              TERRA REYNOLDS
                              STEVEN A. BLOCK
                              TIFFANY J. TRACY
                              Assistant United States Attorneys
                              United States Attorney's Office
                              219 S. Dearborn St., 5th Floor
                              Chicago, Illinois  60604

Dated: November 7, 2012

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*DEFENDANT GLENN LEWELLEN'S UNOPPOSED MOTION TO EXTEND TIME
FOR FILING SENTENCING MEMORANDUM AND OBJECTIONS TO THE
PRESENTENCE REPORT*

Defendant GLENN LEWELLEN, respectfully requests that this Court extend
the time for filing the sentencing memorandum and objections to the presentence
investigation report by one week, from November 14 until November 21, 2012.
Defendant Lewellen does not request a change in the hearing date, and the
government does not oppose the motion, provided that the hearing date is
unchanged.  In support of this motion, defendant LEWELLEN, through counsel,
states the following:

(1)     Counsel for Mr. Lewellen was out of the office with the flu during the week of
November 5, 2012, and as a consequence is behind with respect to filing deadlines
in this case.

(2)     In addition to preparing for sentencing, counsel for Mr. Lewellen has been
involved with briefing post-trial motions and so has not been able to devote the
entirety of her time to sentencing preparation.

(3)     The presentence investigation report proposes the application of sentencing guidelines that yield a life sentence in this case.  The PSI relied, in part, upon information outside that which was presented at trial to support its recommendations.  Preparing the objections involves reviewing the trial transcripts, especially in view of the Supreme Court's grant of certiorari to review its earlier holdings in *Harris*  and *McMillan*.

(4)     The current date for the filing of sentencing memoranda and objections to the presentence investigation report is November 14, 2012.

(5)     Counsel requests an additional week to complete the sentencing memorandum and objections to the presentence investigation report for Mr. Lewellen.

(6)     The government does not object to this request, provided that it does not result in changing the November 30, 2012, sentencing date.

WHEREFORE, defendant GLENN LEWELLEN, respectfully requests that this Court extend the time for filing objections to the presentence investigation report and the sentencing memorandum until November 21, 2012.

DATE:          November 13, 2012                    Respectfully submitted,

                                                                       By:     s/Andréa E. Gambino
                                                                                 Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 13, 2012, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which sent notification of

such filing to the following:

Steven Block, Esq.
Terra Reynolds, Esq.
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604


and I hereby certify that I have mailed by United State Postal Service or hand

delivered the document to the following non-CM/ECF participants: N/A.


DATE:        November 13, 2012        Respectfully submitted,

                                      By:    s/Andréa E. Gambino
                                             Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

3

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,           )
                          Plaintiff, )
              v.                     )        No. 09 CR 332
                                     )        Judge Joan B. Gottschall
                                     )
GLENN LEWELLEN,                      )
                         Defendant.  )

*DEFENDANT GLENN LEWELLEN'S REPLY TO THE GOVERNMENT'S
UNEXPLAINED WEALTH BRIEF*

Defendant GLENN LEWELLEN, through counsel, submits the

following in reply to the Government's position on the issue of unexplained

wealth.

Glenn Lewellen did not object to the admission of testimony by the

employees and contractors about alleged cash payments that they received

from Glenn Lewellen.  At the time this evidence was admitted, the

government had represented that it intended to seek admission of a financial

expert who would testify about Glenn Lewellen's entire financial history.

Such testimony would have been the proper and admissible form in which to

introduce an unexplained wealth theory of guilt. The testimony about cash

payments would have been a relevant part – but not the entirety – of such

evidence.

Toward the end of the government's case-in-chief, the government

decided not to use the expert, Agent Killian, and not to introduce evidence of

Glenn Lewellen's entire relevant financial history.  With this decision the defense was led to believe that the government could not and would not be arguing for conviction based on an unexplained wealth theory, since it had chosen not to put Glenn Lewellen's legitimate financial history before the jury, and so had not established the basis for an unexplained wealth claim. Lewellen's counsel did object during closing argument, when the government incorrectly included Glenn Lewellen in its claim that a finding of guilty was supported by the fact that the alleged use of cash payments was an example of unexplained wealth.

Glenn Lewellen raised the issue as soon as it became apparent that there was an issue – based on the government's trial strategy and the unexpected argument at the time of closing.  The government did not present the information that it was required to present to make the unexplained wealth argument in good faith.  If Lewellen had known that the government intended to argue the case based on the selective choice of evidence it presented, rather than the entire record within its possession, Lewellen could and would have introduced his own expert to rebut such claims.

The government should not now be permitted to short-circuit the requirements in order to facilitate a conviction that is not well-grounded in fact.

I.   The government's evidence of Lewellen's financial condition was misleading and incomplete based on its own analysis.

In order to present an argument that Mr. Lewellen had "unexplained

wealth", the government was required to show Mr. Lewellen's sources of wealth, so that the income and expenditures could be compared, and any differential attributed to illegal conduct.  Logic and the law require this. "The mere presence of wealth, however, is only marginally relevant without a concomitant showing that the defendant's material possessions were not derived from legitimate sources. *See United States v. Terzado–Madruga,* 897 F.2d 1099, 1120 (11th Cir.1990) (the fact that defendant wears gold jewelry, boasts of his financial worth, and drives a luxury automobile is in itself not highly probative of his drug involvement). Thus, in order to create a permissible inference of drug operations, evidence relating to unexplained wealth should consist of two components: the defendant's substantial wealth, and the legitimate sources of his income."  *United States v. Davis*, 789 F. Supp. 1130, 1132 (D. Kan. 1992).  The government failed to fulfill either part of the equation.

The government had in its possessions thousands of pages of financial records for Glenn Lewellen, none of which were introduced at trial.  Prior to trial, the government engaged an expert to conduct a financial analysis of Glenn Lewellen's income and expenditures, based on records it obtained from Mr. Lewellen and from other sources.  In its draft form, the analysis covered only the years of 1998-2002, and, by the government's own admission showed a discrepancy of only $178,000 during that time period.  The draft analysis did not cover the entire range of the charged conspiracy – 1996-2009 – nor did

it account for the entirety of the resources available to Glenn through
Lewellen Homebuilders.

The government's analysis suffered from a further defect. It did not
include relevant records from the time period in issue, because many of those
records were too old and had been destroyed by the financial institutions that
maintained them.  At best, the analysis did not support the government's
theory that Glenn Lewellen had hundreds of thousands of dollars in
unexplained wealth.  One could infer that this was the reason that the
government declined to use its own analysis, preferring to cherry-pick the
evidence favorable to its theory instead.

For example, for the year 2000, the government's chart listed a $55,000
expenditure for a property at 611 Walker Way, but it did not list a
subsequent $233,230 mortgage Lewellen obtained against that property as a
source of funds available.  This omission alone would have negated the
alleged $178,000 discrepancy.  In addition, that property was sold in 2002 for
$300,000, with net proceeds to Lewellen Homebuilders of $58,000.  This
amount also was not included in the analysis of funds available to Glenn
Lewellen.

The government knew from reviewing the bank records it had
available for Lewellen Homebuilders that Glenn often withdrew large
amounts of cash from these accounts.  Based on the records available to the
government there were over 70 checks written to cash between 2001 and

4

2007, including some for tens of thousands of dollars.

As with the Walker Way property, Glenn Lewellen purchased two properties, known as the Buckboard properties in 2000.  The government's chart lists the purchase price of $130,665 as an expenditure against Mr. Lewellen in the year 2000. In 2001, however, Lewellen took out mortgages in the amount of $161,500, against these properties.  These funds were not included in the calculation of funds available to Glenn Lewellen.  When one of the Buckboard properties was sold in 2001, Lewellen Homebuilders received a net profit of approximately $130,000, which also was omitted from the chart's list of funds available.  The second Buckboard property was sold in February 2002 for a profit of almost $115,000, excluding closing costs.  None of these funds was credited to Mr. Lewellen in the government's list of funds available in 2002.

In addition, the analyst's chart appears to repeat certain expenditures incurred in 2000, 2001, and 2002, unduly inflating the expenditures credited to Glenn Lewellen.[1]  There is inconsistency in crediting Glenn Lewellen with expenditures made by Lewellen Homebuilders, but in failing to credit him

---

[1] For example, under the Application of Funds section of the chart, p. 3, a $7508 expense is listed twice: once in 2000 as rental improvement to Hickory property, and a second time as an expense for improvements to a property on Hickory in 2001.  Similarly, there is an $8,000 expenditure for investments in 2000 that is also listed as 2 purchases of Schwab and a purchase of First Clearing Corp, totaling $8,000.  A $4,000 expenditure for Roth IRA contributions in 2000 is also listed as $4,000 to general IRAs in 2000.  In 2001, $4825 is listed as an investment expenditure and also as "purchase securities Schwab."  Similarly, in 2002, a $6050 expenditure is listed as investments and again as "purchase securities AIM."

with proceeds received by Lewellen Homebuilders, as described above.  In 2002, for example, the purchase of 2 lots on Rosemary Street were listed as expenditures totaling $168,000, against Glenn Lewellen, when the lots were purchased by Lewellen Homebuilders.

The most serious problem with the government's financial analysis was the time period it chose to present as a snapshot of Glenn Lewellen's available resources and known expenditures.  While the chart begins in 1998, it is based on information taken from a loan application for the 37th Place property.  This application is not a complete record of the Lewellens' financial picture for that year. Bank records for that year were unavailable, so there is no record of funds in and out of any account for 1998.

Records also were not complete for 1999. Glenn Lewellen had accounts in Founder's Bank, Southwest Federal, TCF, Liberty, and Standard Bank, but none of these records was available for 1998 and 1999, or any of the preceding years.  Without bank records, it is not possible and certainly not fair to draw sweeping conclusions about sources of income, loans from family, investments, or other available funds.  As early as 1994, for instance, there was documentation that Deborah Lewellen received a settlement check in the amount of $195,000.  There is no record of what happened to these funds or how that amount of money may have carried over into the years relevant to the charges in the indictment.

In addition to missing bank records, Mr. Lewellen's tax records for

2002 indicated that he had loans from Bank of America, Founder's Bank, and

NLSB.  This information was apparent from the schedule A, itemized

deduction for interest paid on home mortgages and commercial loans.  No

loan amounts were included.  Consequently, this information, too, was not

included in the government's financial analysis.

Because the government had done a financial analysis based on the

records that were available to it, and because that analysis did *not* show that

Mr. Lewellen had unexplained wealth to match the size of the payments

Rodriguez allegedly made to Lewellen, the financial analysis was not

presented at trial.  Instead, the government focused on presenting testimony

about the receipt of cash payments and disingenuously relied only on the

presentation of Mr. Lewellen's police salary to justify its closing argument

that Mr. Lewellen's unexplained wealth was reason to convict.

II.    By presenting only selected parts of the complete picture, the
       government distorted the facts in order to bolster the incredible
       testimony of its cooperating witnesses.

The government intentionally presented only partial and incomplete

evidence of Glenn Lewellen's financial condition, such that a jury's

conclusions would not be reasonable and permissible inferences based on an

accurate and complete record.  The evidence presented by the government

concerned only a few alleged cash payments, and only one of many sources of

income available to Glenn Lewellen during the time period under

consideration.   The information presented at trial did not include any tax

records or evidence of the loans, properties, sales proceeds, or other sources of

cash and income to Lewellen Homebuilders or the other investment projects

in which Mr. Lewellen participated.  Nor did the government's presentation

include gambling proceeds for Mr. Lewellen and his wife, his wife's income,

proceeds from the sale of their homes, or a settlement received as a result of

an accident, loans to the business from family, or any other source, apart

from Mr. Lewellen's salary as a police officer.

As will be discussed below, the evidence presented had several

deficiencies:  (1) the testimony from individuals to whom Glenn Lewellen

made cash payments as part of his construction business, did not include

evidence of the construction and property loans Lewellen obtained, nor did

the dates of payments correspond to any alleged receipt of money from

Rodriguez; (2) the use of cash to pay for classic cars was neither specific, nor

associated with any alleged payment to Lewellen by Rodriguez; (3) Mr.

Lewellen's salary from the Chicago Police Department was only one of

several sources of income Mr. Lewellen had during the time covered by the

indictment and the testimony of the witnesses who received cash payments;

(4) the testimony of Rodriguez, Umar, and Torres was non-specific and

incredible.

A.    The testimony of contractors and others without more does not
      support an argument that Mr. Lewellen had unexplained
      wealth.

Unexplained wealth cases typically involve the government presenting

evidence in the form of tax records, employment records, bank records, and other sources – or certifications from the IRS that no records exist or testimony by an investigator that no employment or other financial records can be found – that an individual had money or possessions the purchase of which could not have been accomplished with the legitimate resources at hand.  *See, e.g., United States v. Terzado-Madruga,* 897 F.2d 1099, 1120 (11th Cir. 1990)(government could have attempted to show that appellant's expenditures exceeded his reported earnings by introducing into evidence his tax returns for the years covered by the indictment); *United States v. Carrera,* 259 F.3d 818, 829 (7th Cir. 2001)(government showed defendant unemployed at time he had $928.28 in his wallet); *United States v. Harris,* 536 F.3d 798, 811 (7th Cir. 2008)(government put on defendant's girlfriend to testify that defendant Harris was not employed from 2003 to 2006 when defendant owned luxury vehicles not registered in his own name).

Contractors and employees of Lewellen Homebuilders testified only about occasional cash payments – dwarfed in comparison to payments by check or payroll – over the course of several years, during a time in which Mr. Lewellen was the beneficiary of substantial loans, proceeds from the sale of properties, rental income, gambling proceeds, as well as a regular salary for part of the time in question.  In short, the wealth was explainable, the government knew this, and the government failed in its obligation to show that the cash was not from a legitimate source.

9

1.    James Milner's testimony did not support a claim of
      "unexplained wealth".

James Milner worked for Glenn Lewellen over the course of four years.
He was unable to provide dates for any of the cash he received from Mr.
Lewellen, apart from agreeing with the government's suggestions that these
payments occurred in 1999 and 2000.  Nor did the government introduce
evidence of Mr. Milner's use of his safe deposit box, or any other evidence
that would corroborate its suggestions.  Furthermore, Mr. Milner testified
that he believed the sources of Mr. Lewellen's income to be legitimate,
including rental income, his police salary, and settlements received by Mr.
Lewellen's wife and Mr. Lewellen. Tr. 15:2693.  The government presented no
evidence to demonstrate that Mr. Milner's beliefs about Mr. Lewellen's
sources of funds were mistaken, incorrect, or inaccurate.

Mr. Milner testified that he was paid his $70,000 salary by payroll
check, that Lewellen Homebuilders also hired various members of Milner's
family who were also paid by check, and that Mr. Milner, himself, worked for
cash when he did side jobs, because he could offer a better price if paid in
cash.  Tr. 15:2698.  In fact, he testified that he built from 80-100 homes
during the 4-5 years he worked for Lewellen Homebuilders.  Tr. 15:2700.  All
of which suggested that Mr. Lewellen's source of funds was his legitimate
homebuilding business, not that he was the recipient of unexplained wealth.

2.     Michael Thompson's testimony does not support a conclusion
       that Mr. Lewellen had "unexplained wealth."

Michael Thompson's testimony not only did not support a claim that

Mr. Lewellen had "unexplained" wealth, his evidence led to the opposite

conclusion.  Thompson testified that he was typically paid by check over the

course of several years when he worked for Mr. Lewellen's business, Lewellen

Homebuilders.  Tr. 15: 2714.  When asked how Mr. Lewellen paid him,

Thompson testified, "Through a bank payout typically."  Tr. 15:2714.  When

the government asked him if he meant by check, Thompson replied, "[e]ither

company check or bank payout, title company.  When the home closed I

would get paid through the title company typically."  *Id.*

Thompson testified about a single occasion, upon which Thompson

wanted to be paid, and Mr. Lewellen brought him "somewhere between 4 and

6,000" dollars on short notice. Tr. 15:2715.  This single payment is probative

of nothing in the context of a legitimate request for the payment of funds

owed and payment produced by a contractor who was engaged homebuilding,

a legitimate business.  Thompson testified to having received over $160,000

in non-cash payments from Lewellen Homebuilders during the time period

from 2002 until 2005.  Tr. 15: 2718. Contrary to the government's assertion,

this evidence supports a finding that Mr. Lewellen had access to legitimate

sources of funds, through bank loans and his construction business.  This

evidence does not provide any support for the contention that Mr. Lewellen's

wealth was "unexplained."

3.  Ken Klauzek's testimony that he was paid by check provides no support for the government's "unexplained wealth" theory.

Ken Klauzek excavated foundations for Lewellen Homebuilders beginning in 2002.  Tr. 15:2722.  He was asked how he was normally paid when he was working for Mr. Lewellen, and he replied, "[b]y check."  Tr. 15:2723.  On two separate occasions, over the three to four years Klauzek worked for Mr. Lewellen, Mr. Lewellen paid Mr. Klauzek in cash -- $6,000 on one occasion and $3,000, on another.  One of the cash payments came when Klauzek was digging a foundation for Saul Rodriguez' house.  Klauzek testified that: "I have no idea where the money came from, just who handed it to me."  Tr. 15: 2727.

As with the other contractors, these payments were legitimate payments by a legitimate business for actual services rendered.  In fact, over the three and one half year time period, during which Klauzek worked for Lewellen Homebuilders, Klauzek received over $150,000 in checks.  Tr. 15:2728.  The fact that two payments - out of hundreds of transactions -- were made in cash, in relatively modest amounts, is not probative of the receipt of funds from an illegitimate source, especially when the legitimate source is evident and undisputed.

4.  Matt Klabisch's testimony is not probative of unexplained wealth.

Matt Klabisch and Glenn Lewellen were legitimate business partners who together bought and sold 70 lots in a single subdivision.  This

transaction was a legitimate business deal.  Klabisch received a payment of

$60,000 for his part in a flip sale of the properties.  Tr. 15:2760.  Klabisch

testified that it was not uncommon for builders and developers to have large

amounts of cash on hand:

> During that time, a lot of times, the builders and developers had
> large amounts of cash because we had to get right-of-ways and
> there was easements, dedications, and it made it a lot easier for
> a builder and developer to try to negotiate with – let's say it's a
> homeowner or business owner, to get those easements, to have
> them sign up it they had the cash.

Tr. 15: 2761.  Klabisch's testimony provides a context and explanation

for the legitimate source of the funds that were involved in the

transaction.  The probative value of the cash payment is rendered nil

by the size and legitimacy of the property transaction out of which the

payment came.

> 5.     Mike Harper's testimony about Mr. Lewellen's car
>        purchases did not support an unexplained wealth claim.

The purchase of classic cars, whether for cash or otherwise, has

no probative value without proof that the price of the cars exceeded

Mr. Lewellen's ability to pay for them with legitimate funds.  The

purchase also has no probative value if it was not conducted during a

time when Mr. Lewellen was supposed to have received illegitimate

funds from Saul Rodriguez.  Harper's evidence fails on both counts.

First, by the time Mr. Lewellen engaged in the transaction to

which Mike Harper testified, Mr. Lewellen had been building homes
and developing subdivisions for more than 7 years, during which time
he made and spent millions of legitimate dollars.  A purchase of
$80,000 for a classic car is more than covered by the legitimate sources
of funds available to Glenn Lewellen in 2006.

Even if the payment of cash for the car were relevant under
these circumstances, Mike Harper never testified about how much
cash was used to purchase the car.  When asked how much cash was in
a black bag Mr. Lewellen took into the dealer to pay for the car,
Harper responded, "Well, I don't know what amount was in the bag."
Tr. 15:2737. On cross-examination, Harper was clear that he was not
in the sales office when Mr. Lewellen purchased the car and he did not
know how much cash was used or whether the transaction was part
cash and part check.  Tr. 15:2747.

Secondly, in 2006, the government's evidence showed that Mr.
Lewellen and Saul Rodriguez were parting ways, and that Mr. Lewellen was
returning money to Rodriguez that Rodriguez had given to Lewellen to invest
in property development.  Lewellen was paying money to Rodriguez, not
receiving the proceeds of drug transactions from Rodriguez.  Furthermore,
the amount of money that Lewellen returned to Rodriguez could have been
explained by Rodriguez' legitimate earnings as an informant for the Chicago
Police Department, Rodriguez' gambling proceeds, or the returns from other

investments in property that Rodriguez had made over the years. The
government introduced no evidence to support Rodriguez' claims that he *ever*
gave the proceeds of drug transactions to Glenn Lewellen.

III.     The error in permitting the government to present an "unexplained
         wealth" theory in closing was not harmless.

      The evidence against Mr. Lewellen at trial consisted primarily of the
uncorroborated and incredible testimony of Saul Rodriguez.  Even the
government has essentially conceded that Saul Rodriguez is an incredible liar
by declining to use his testimony again at the retrial of Manuel Uriarte.  The
fact that the jury was unable to agree to convict Mr. Lewellen of the RICO
charge, which was based almost entirely on the "word" of Saul Rodriguez,
supports the conclusion that the jury rejected his testimony, or at best, could
not agree to convict based upon it.

      This renders the wrongful admission of other evidence far more
important than it might be in a garden-variety case.  Here, if the jury
believed the government's incomplete and misleading evidence that Mr.
Lewellen had "unexplained wealth", the jury may have based the guilty
verdict upon it.   The government told the jury "the money doesn't lie" – but,
in this case, the jury did not have before it the totality of the information in
the government's possession – and the government knew this when it asked
the jury to draw its conclusion from purposefully skewed evidence.  A jury is
permitted to make reasonable inferences, but an inference cannot be
reasonable if it is based on distorted or incomplete information.

The government's task is not to obtain a conviction at any price.  The government's burden is to see that justice is done.  In this case, by knowingly presenting an incomplete picture of Mr. Lewellen's financial resources and thereby failing to meet the requirements for a true "unexplained wealth" theory of guilt, the government erred and its error was anything but harmless.

WHEREFORE, defendant GLENN LEWELLEN, by his attorneys, respectfully requests that this Court declare that he was mistried, and that he is entitled to a judgment of acquittal or a new trial.

DATE:          November 13, 2012          Respectfully submitted,

By:     s/Andréa E. Gambino

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 13, 2012, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which sent

notification of such filing to the following:

John Beal
Counsel for Jorge Uriarte

Cynthia Giachetti
Molly Armor
Counsel for Hector Uriarte

Keith Spielfogel
Robert Loeb
Counsel for Manuel Uriarte

Eugene Steingold
Counsel for Tony Sparkman

Heather Winslow
Counsel for Robert Cardena

Terra Reynolds
Steven Block
Tiffany Tracy
Assistant United States Attorneys

and I hereby certify that I have mailed by United State Postal Service the

document to the following non-CM/ECF participants: [not applicable in this

case].

DATE:          November 13, 2012          Respectfully submitted,

                                          By:     s/Andréa E. Gambino
                                                  Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| | ) | |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*MOTION TO FILE INSTANTER DEFENDANT'S REPLY TO
GOVERNMENT'S UNEXPLAINED WEALTH BRIEF*

Defendant GLENN LEWELLEN, through counsel, respectfully

requests that this Court permit counsel to file *instanter  Defendant*

*Lewellen's Reply to Government's Unexplained Wealth Brief,* Doc. 1094.  In

support of this Motion, defendant Lewellen, through counsel, states the

following:

(1)     This Court ordered simultaneous extra briefing on the issue of

unexplained wealth.

(2)     Initial filings were submitted on Friday, November 2, 2012, with

replies due on November 7, 2012. Briefs for both parties were filed on

November 2, 2012.

(3)     Counsel for Mr. Lewellen was out of the office due to illness during the

week of November 5, 2012, and was unable to complete her reply to the

government's initial filing in time for the November 7, 2012, deadline.

(4)     Counsel has worked diligently to complete her reply as quickly as

humanly possible.

(5)      The Reply addresses only the information presented in the

government's November 2, 2012, filing.

(6)      Sentencing in the above-captioned matter is currently set for

November 30, 2012.  This date will not be disrupted by the *instanter* filing of

defendant Lewellen's Reply to the Government's Unexplained Wealth Brief.

      WHEREFORE, counsel for defendant LEWELLEN respectfully

requests that this Court accept the filing of Defendant's Reply, Document

1094, *instanter*.

DATE:          November 14, 2012          Respectfully submitted,

                                          By:     s/Andréa E. Gambino

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 13, 2012, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which sent

notification of such filing to the following:

      John Beal
      Counsel for Jorge Uriarte

      Cynthia Giachetti
      Molly Armor
      Counsel for Hector Uriarte

      Keith Spielfogel
      Robert Loeb
      Counsel for Manuel Uriarte

      Eugene Steingold
      Counsel for Tony Sparkman

      Heather Winslow
      Counsel for Robert Cardena

      Terra Reynolds
      Steven Block
      Tiffany Tracy
      Assistant United States Attorneys

and I hereby certify that I have mailed by United State Postal Service the

document to the following non-CM/ECF participants: [not applicable in this

case].

DATE:      November 14, 2012      Respectfully submitted,

                                  By:    s/Andréa E. Gambino
                                        Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

4

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3**
**Eastern Division**


UNITED STATES OF AMERICA
                                        Plaintiff,

v.                                                      Case No.: 1:09–cr–00332
                                                        Honorable Joan B. Gottschall

Saul Rodriguez, et al.
                                        Defendant.


**NOTIFICATION OF DOCKET ENTRY**


This docket entry was made by the Clerk on Wednesday, November 14, 2012:


        MINUTE entry before the Honorable Joan B. Gottschall:as to Glenn Lewellen,
Defendant's unopposed motion to extend time for filing sentencing memorandum and
objections to the presentence investigation report [1090] is granted. The court grants
defendant leave to file an oversized brief. ( Sentencing set for 11/30/2012 at 9:30AM is
stricken and reset for 1/17/2013 at 09:30 AM.) Sentencing memoranda and/or objections
to PSR due by 12/13/2012. Responses by 12/20/2012. No sentencing memoranda or
objections to presentence reports or responses will be considered if filed out of time unless
a motion to file late is made no less than one week prior to the date set for sentencing. No
sentencing hearing will be continued unless the courtroom deputy is notified of the need
to change in writing at least one week (7 days) prior to the date set for sentencing. Failure
to comply with this standing order will result in counsel being sanctioned in the amount of
$100.00 which shall be paid to the Clerk of Court, 219 South Dearborn, 20th Floor,
Chicago, Illinois 60604. Mailed notice (rj, )


**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3**
**Eastern Division**

UNITED STATES OF AMERICA

                                    Plaintiff,

v.                                                      Case No.: 1:09–cr–00332
                                                        Honorable Joan B. Gottschall

Saul Rodriguez, et al.

                                    Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Monday, November 19, 2012:

        MINUTE entry before the Honorable Joan B. Gottschall:as to Glenn Lewellen, ( In
Court Conference (brief) set for 11/20/2012 at 10:00 AM.) Mailed notice (rj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at *www.ilnd.uscourts.gov*.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 332-2 |
| v. | ) | |
| | ) | Hon. Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

## GOVERNMENT'S SUPPLEMENTAL BRIEF
## REGARDING UNEXPLAINED WEALTH

The UNITED STATES OF AMERICA, by its attorney, GARY S. SHAPIRO, Acting United

States Attorney for the Northern District of Illinois, pursuant to the Court's November 20, 2012

order, respectfully submits the following supplemental brief regarding whether the government

presented "at least some evidence that the unexplained wealth was not derived from legitimate

means." *United States v. Carrera*, 259 F.3d 818, 829 (7th Cir. 2001). As set forth below, it is the

government's position that it presented sufficient evidence to meet the third prong of *Carrera*. In

the alternative, the evidence of Lewellen's cash payments was admissible to show his access to large

amounts of cash during the conspiracy period, and the prosecutor's brief reference to unexplained

wealth in closing argument was harmless.

## I.    Evidence of Lewellen's Legitimate Income From 1999-2002

There is no dispute that, at some point, Lewellen began earning money from his legitimate

construction business. It is government's contention, however, that the construction business was

seeded with funds Lewellen obtained through his participation in the drug conspiracy and not funds

he had obtained from any legitimate source. Thus, in determining whether the government has

presented "at least some evidence" that Lewellen's wealth was not derived from legitimate means,

*Carrera*, 259 F.3d at 829, the relevant time period is approximately 1999 to 2002, which are the

years when Lewellen was still employed as a police officer but had begun working in the construction business. The evidence shows that Lewellen did not have sufficient legitimate income to explain his expenditures during those years, including the payments to James Millner, Michael Harper, Ken Klauzek, and Matt Klabisch.

### A.     Lewellen's Employment with CPD from 1986-2002

Diane Sojka testified about Lewellen's payroll records on file with the Human Resources Department for the City of Chicago. Tr. 3673-74. According to those records, which were introduced at trial as Government Exhibit 345, Lewellen worked as a CPD officer between December 22, 1986 and May 31, 2002. Tr. 3677. Lewellen took a leave of absence between June 1, 2002 and June 4, 2003, at which time he resigned. *Id*. Between December 22, 1986 and May 31, 2002, Lewellen never made more than $5,126 in gross income per month from his employment with the CPD. Tr. 3679. Though not part of the record, the Court may take judicial notice of the fact that Lewellen's net monthly income would have been substantially lower.

### B.     Lewellen's Purported Income From Real Estate From 1999-2002

During opening statements, Lewellen's attorney told the jury that Lewellen "was not just a Chicago Police officer. He was an entrepreneur." Tr. 40.   Lewellen's attorney told the jury that Lewellen's "first venture into [real estate], around 1999, it was he and four Chicago police officers. They got together, and they invested in an apartment complex building. That venture went well, and the next several ventures into real estate went well for him, and eventually he incorporated Lewellen Home Builders." *Id.*

According to Saul Rodriguez, in 1999 Lewellen told Rodriguez that he and other CPD officers had bought two lots on 37th Place and California Avenue in Chicago. Tr. 2934-35. No

2

evidence was introduced, however, (either by the defense or the government), regarding how much money Lewellen had contributed to the purchase of the apartment building in 1999, nor how much profit, if any, he earned when the building was sold. Nor was any evidence admitted about any income Lewellen received from the sale of real estate in the late 1990's or early 2000's. The only testimony in the record regarding Lewellen's legitimate income from real estate was from business associate Matt Klabisch, who testified about his business dealings with Lewellen "during the mid-2000s" when both he and Lewellen "earned a good quantity of money." Tr. 2771, 2775.

### C.   Lewellen's Other Purported Sources of Income

Similar to Hector Uriarte, who went to great lengths to fabricate legitimate employment, Lewellen tried to convince business associates that he had a legitimate source for the income that was used to seed his construction business (beyond a modest police officer's salary). James Millner testified that Lewellen told him that "he had some apartment buildings, unfortunately his wife had an auto accident, and he got some money [from a] settlement." Tr. 2693. Lewellen told Millner that he had received a million dollars from the settlement, which arose out of an incident while Lewellen was working as a police officer and had been kicked in a bar. *Id.* The government introduced Lewellen's CPD payroll and human resources records, which do not reflect any such settlement. G.Ex. 94, 345; Tr. 537, 3674. Lewellen told Millner that his wife had received "a couple million dollars" from the auto accident. *Id.* There was no other evidence introduced about the purported multi-million dollar settlement resulting from an auto accident, and the government need not prove the absence of a legitimate source. R.1116 at 5.

Mike Harper testified that Lewellen told him that he had a "Chinese investor" who funded part of his construction business. Tr. 2733. There is no other evidence that Lewellen had a Chinese

3

investor.   Rather, the evidence is that Lewellen's partner in the real estate business was Saul

Rodriguez, the same partner he had in the drug conspiracy for which he has been convicted.   Tr.

2753 (testimony of Matt Klabisch).

**II.     Analysis**

      **A.     The Government Introduced Sufficient Evidence to Satisfy the Third Prong of**
          ***Carrera***

      The evidence introduced at trial was sufficient to establish that Lewellen's wealth, during the

years 1999 through 2002, was not derived from legitimate means. *Carrera*, 259 F.3d at 829.   During

those years, Lewellen earned no more than $5,126 in gross income per month from his employment

with the CPD.   Tr. 3679.   At trial, the government called James Millner, Michael Thompson, Ken

Klauzek, and Matt Klabisch to testify about their receipt of cash from Lewellen in connection with

his construction business.   According to the witnesses' testimony, between 1999 and 2002, they

received a total of approximately $213,000 in cash from Lewellen.   R.1083.   The government has

established that Lewellen could not have made those payments from his legitimate funds.   There is

no evidence to support Lewellen's tales regarding other supposed sources of income, such as Chinese

investors and accident settlements.   To the contrary, Lewellen's efforts to convince his business

associates that he had legitimate access to large amounts of money further supports the conclusion

that Lewellen's wealth, evidenced by his cash expenditures, during the years 1999 through 2002 was

not derived through legitimate means.

**B.      Even if the Evidence of Cash Payments Should Not Have Been Admitted Under *Carrera,* It was Properly Admitted As Direct Evidence of Lewellen's Participation in the Drug Conspiracy**

As the government has set forth in its prior briefs, and as the Court has noted, the evidence of Lewellen's large cash payments is admissible wholly apart from the test for unexplained wealth set forth in *Carrera*.  11/20/12 Tr. at 7 ("I think the cash evidence was admissible quite apart from the issues we're having about unexplained wealth.").  Even if the Court finds that the government did not introduce "at least some evidence that the unexplained wealth was not derived from legitimate means," there is a separate basis for the admissibility of that evidence.  Moreover, as the Court noted during the November 20, 2012 hearing, Lewellen cannot identify *any* financial evidence – apart from the evidence of cash payments – to which he now belatedly objects.  11/20/12 Tr. at 25 ("The cash evidence was properly admitted.  Okay?  We're talking about some other evidence, but I don't know what evidence it is.").

**C.      If the Comment in Closing Argument Regarding Unexplained Wealth was Improper, the Error was Harmless**

As the government has set forth in its prior briefs, the only argument regarding unexplained wealth was in one sentence of the nearly eight-hour closing argument.  Even if the Court finds that the evidence of cash payments should not have been admitted as evidence of unexplained wealth under *Carrera* (and was, instead, properly admitted for another purpose), the brief reference to unexplained wealth in the closing argument was harmless.[1]  The phrase "unexplained wealth" was never mentioned again, as the government's rebuttal argument on this issue focused on rebutting

---

[1]  During the November 20, 2012 hearing, the Court also found that the government's closing arguments did not implicate defendant's Fifth Amendment Rights.  11/20/12 Tr. at 24 ("There is no Fifth Amendment problem.  Mr. Lewellen's testimony would have been the least useful way of proving where this money came from.").

defense counsel's argument that it was perfectly normal for Lewellen to pay people with bags of

cash.  Tr. 5373-74.  As set forth in the prior briefs, even if improper, the statement did not "infect

the trial with unfairness to such a degree as to make the resulting conviction a denial of due process."

*United States v. Carrera*, 259 F.3d 818, 829 (7th Cir. 2001) (citing *United States v. McClinton*, 135

F.3d 1178, 1188) (7th Cir. 1998)).

## III.     Conclusion

Based on the foregoing, the government respectfully requests that the Court deny defendant

Glenn Lewellen's motion for a new trial.

<div style="margin-left: 40%;">

Respectfully submitted,

GARY S. SHAPIRO
Acting United States Attorney

By:     /s Terra Reynolds
        TERRA REYNOLDS
        STEVEN A. BLOCK
        TIFFANY J. TRACY
        Assistant United States Attorneys
        United States Attorney's Office
        219 S. Dearborn St., 5th Floor
        Chicago, Illinois  60604

</div>

Dated: November 21, 2012

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| | ) | |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*DEFENDANT LEWELLEN'S RESPONSE TO THE COURT'S INQUIRIES
ON THE QUESTION OF WAIVER*

Defendant GLENN LEWELLEN submits the following in response to the Court's concern about waiver of the unexplained wealth issue. As will be set out in detail below, counsel did not waive any objection in this case, because from the beginning of trial, the objections and motions of one counsel were attributed to all. The issue was raised and the objection made as soon as it could have been done, first by counsel for Hector Uriarte and subsequently by counsel for Glenn Lewellen, each objection made for the first time before the case went to the jury.

In any event, there was no waiver of the objection by Mr. Lewellen. Waiver is the "intentional relinquishment or abandonment of a known right." *United States v. Williams,* 272 F.3d 845, 854-55 (7th Cir.2002) (citations and internal quotation marks omitted). Forfeiture "is simply the failure to make a timely assertion of a right." *Id.* Even if this Court were to determine now, contrary to the rulings at trial, that Mr. Lewellen's objection to the

unexplained wealth argument was untimely, the objection has been forfeit –

not waived, -- and, so subject to plain-error review on appeal – not barred

from consideration by this Court.

I.    The Court stated repeatedly that the objections of one counsel would
      be applied to all, unless counsel made clear that he or she did *not* join
      the objection.

      From the beginning of trial in this matter, due to the unwieldy number

of attorneys, the Court made it clear that an objection by one attorney would

be considered as if made by all:

MS. GIACCHETTI:       I had previously filed a written motion about them,
and I'm asking, can we -- do we need to join every objection?

THE COURT: No.

MS. GIACCHETTI: Okay.

THE COURT: No, I don't think so. I think it – why don't I just assume that if
one defendant makes an objection, it's everybody's objection unless you tell
me to the contrary.

MS. GIACCHETTI: That would be perfect. Thank you.

Tr. V.1: 191 [11/15/11].

      Further into the trial, the practice of treating an objection by one as an

objection by all is expanded to include evidentiary filings and rulings:

MS. GIACCHETTI: Your Honor, just -- I want it to be clear on the record. *I
know you have said previously that an objection made by defense counsel is an
objection of all.*

THE COURT: Right.

MS. GIACCHETTI: At this point, can we also say that evidentiary motions,
unless we opt out –

THE COURT: Yes, yes.

MS. GIACCHETTI: Thank you. I don't want to –

THE COURT: Let's say all -- so you don't have to all object to evidence coming in and everything else. I think at this point if one person makes it, it ought to just -- *I will assume that it's everybody's objection.*

MS. GIACCHETTI: So Mr. Beal's motion, for example, applies to Hector Uriarte?

THE COURT: Which means if you don't object to it, and you need the record to reflect that you don't object to it, you should tell me that.

Tr. V.6: 839-840 [11/28/11] [emphasis added].

The Court's concern for managing the number of objections was made

clear on more than one occasion:

THE COURT: So, again, tell me what -- I don't want
to have a million objections going on when this is happening.
I'd like to get some agreements about what the limits are
going to be.

Tr. V.18:3329 [12/16/11].

The ongoing nature of this practice during trial is evident during the

jury instruction conference when counsel of Hector Uriarte spoke for all

counsel when objecting to instructions.  Counsel for Mr. Lewellen interjected

with respect to the question of addressing the jury on punishment and the

following interaction reiterates the Court's position that an objection by one

was an objection for all:

MS. GAMBINO: Your Honor, for the record, I would object to this instruction.
I think when the jury is asked to find quantities that are going to set
mandatories that they should be informed of the consequences of their
findings.

THE COURT: I agree with you, and the law is to the contrary.
…
THE COURT: That's a big issue. But it doesn't matter what we think, because the law is clear.

MS. GIACCHETTI: Judge, an objection for one I assume will stand as an objection for all.

THE COURT: If the objection is that we ought to instruct the jury to nullify, I am refusing that, and everybody can make that -- it's assumed to be everybody's objection.

Tr. V.23:4036-4037 [01/04/12].

Similarly, Rule 29 motions were made orally and joined by all the

parties, with some counsel indicating an intention to also file a motion in

writing:

THE COURT: Okay. Who would like to join in that
3 motion on behalf of their client?

4 MS. GAMBINO: I would like to join in that motion on
5 behalf of Mr. Lewellen.

6 THE COURT: Okay. Who else?

7 MR. LOEB: Judge, on behalf of Manuel Uriarte, we
8 would join, and we're filing a separate written one tonight
9 that will be on the record. Mr. Spielfogel's issue is the
10 imminent one.

11 THE COURT: Okay. So you want to join in this, but
12 you're also going to file your own.

13 MR. LOEB: Yes.

14 THE COURT: Okay.

15 MR. STEINGOLD: Mr. Sparkman will join.

16 THE COURT: Mr. Sparkman wants to join.

17 MR. RAVITZ: I will file separately. I'm not charged
18 in Count 1. We'll file something based on insufficiency.

The practice of attributing the objections of one to all defendants continued

throughout the trial:

MS. GIACCHETTI: And all objections are held to be adopted by all
defendants.

THE COURT: And all objections are held to be adopted by all defendants.
Correct. That goes to each of these instructions.

Tr. V.26: 4792 [01/09/12].

The Court made clear that no motion for mistrial would be granted and that

this issue could be dealt with post-verdict.  Both parties raised it in the

context of post-trial motions.


THE COURT: I'm sorry, the motion for mistrial. So
sorry. I'm not convinced that anything that was said was
inappropriate. I think a lot of it was invited by the
opening statement actually, but be that as it may, I don't
see any good reason to take this case away from the jury.
We'll have plenty of time to consider it once there's a
verdict one way or another. The only thing that gave me some pause was on
the issue of unexplained wealth.

Tr. V. 28: 5021 [01/12/12].

At the actual close of the government's evidence Counsel for Hector Uriarte

made an oral Rule 29 motion and adopted all other motions made in writing

up until that time.  Counsel for Glenn Lewellen adopted this motion,

preserving all objections made until that time:


MS. GIACCHETTI: Judge, we make on behalf of Hector
Uriarte a Rule 29 motion based on the sufficiency of the

evidence as to all the counts, including the issue of
enterprise. I adopt all of the motions that have been filed
in writing before you.

THE COURT: Who would like to adopt that motion?

MS. GAMBINO: I would.

MR. LOEB: Everyone, Judge.

Tr. V. 25A:4725 [01/06/12].

To say at the conclusion of the trial, after repeatedly treating each objection

made by one counsel as one to be made by all, that counsel has waived an

objection, would be patently unfair.


II.    The "unexplained wealth" issue was raised after closing arguments,
       but before jury deliberations, so the argument was neither waived, nor
       forfeited.

Federal Rule of Criminal Procedure 29 permits the Court to reserve its

decision on a Motion for Judgment of Acquittal until after the jury has

returned its verdict – the procedure taken by the Court in this case.  Rule 33

permits the Court to order a new trial upon motion of the defendant "if the

interest of justice so requires."  Neither of these Rules provides restrictions

on the bases that may be raised in support of the motions.

Waiver and forfeiture are applications for the Court of Appeals when

deciding what standard of review to apply to errors that occurred in the

District Court.  An issue raised in a post-trial motion, but not through a

contemporaneous objection, will be deemed forfeit *on appeal* and so subject to

the lower, plain-error, standard of review –not barred from consideration at

all. *United States v. Wing,* 104 F.3d 986, 988 (7th Cir.1997) (issue was forfeited where the defendant could have made a contemporaneous objection but instead raised the issue for the first time in his post-trial motion) *United States v. Reese*, 666 F.3d 1007, 1020 (7th Cir. 2012).  In this case, the issue was raised before the jury began its deliberations and then, again, in the post-trial motions. There is no bar to this Court's consideration of the merits of the claim.

WHEREFORE, defendant GLENN LEWELLEN, respectfully requests that this Court find that the government did not meet its burden under *United States v. Carrera,* and that a judgment of acquittal, or new trial, must be granted.

DATE:          November 23, 2012          Respectfully submitted,

By:     s/Andréa E. Gambino
        Attorney for Glenn Lewellen


Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014

7

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 23, 2012, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which sent

notification of such filing to the following:

      Terra Reynolds
      Steven Block
      Tiffany Tracy
      Assistant United States Attorneys

and I hereby certify that I have mailed by United State Postal Service the

document to the following non-CM/ECF participants: [not applicable in this

case].

DATE:      November 23, 2012      Respectfully submitted,

                                  By:    s/Andréa E. Gambino
                                       Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| | ) | |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*GLENN LEWELLEN'S REPLY TO THE GOVERNMENT'S
SUPPLEMENTAL FILING ON UNEXPLAINED WEALTH*

Defendant GLENN LEWELLEN, through counsel, respectfully

submits the following in response to the government's supplemental filing:

I.     The government did not introduce sufficient evidence to allow the jury
       to make a reasonable or accurate assessment of the government's claim
       that Mr. Lewellen's wealth was unexplained.

The *Carrera* court clearly stated that so long as "the jury has evidence

in its possession and is equipped to ascertain whether the government's

characterization is accurate, a statement characterizing that evidence is not

improper. *United States v. Velez,* 46 F.3d 688, 692 (7th Cir. 1995)." *United

States v. Carrera*, 259 F.3d 818, 829 (7th Cir. 2001).  The jury in this case was

not equipped to ascertain whether the government's characterization was

accurate because the government did not provide the jury with sufficient

information to make that determination – and misled the jury with the

evidence it selectively presented.

A.    The time period covering the drug conspiracy for which the jury
found Mr. Lewellen guilty was 1996 to 2009.

Count 13 of the third superseding indictment alleges that Mr.

Lewellen participated in a conspiracy that began "no later than 1996, and

continu[ed] until at least April 9, 2009…".   R. 271 at 34.  The government's

evidence of Mr. Lewellen's sources of income was woefully inadequate, to the

point of being misleading, and included only a brief snapshot of the time

alleged in the count of conviction.  The government claims that the cash

payments occurred between 1999 and 2002, but the witnesses did not support

that narrowly drawn conclusion.

Timeline of Evidence Introduced

| | | |
|---|---|---|
| 1999-2004, | James Milner worked for Glenn Lewellen | Tr.15:2700 |
| | Milner recalls no specific dates for receipt of cash | |
| | Milner paid salary by payroll checks | |
| | Cash payments to contractors totaled | |
| | | |
| 2002-2005, | Michael Thompson typically paid through | |
| | bank payout | Tr.15:2714 |
| | single payment of $4-6,000 in cash, no date | Tr.15: 2715 |
| | received over $160,000 in non-cash payments | Tr.15:2718 |
| | | |
| 2002-2006, | Ken Klauzek normally paid by check | Tr.15:2722-3 |
| | two occasions received cash: $6,000 and $3,000 | |
| | no dates specified | Tr.15:2727 |
| | received over $150,000 in checks | Tr.15:2728 |
| | | |
| post 2002, | Matt Klabisch, legitimate business partners who | |
| | bought and sold 70 lots, received $60,000 | Tr.15:2760 |
| | "a lot of times, the builders and developers had large | |
| | amounts of cash because we had to get right of | |

ways…..it made it a lot easier… to have them sign up if
they had the cash."                                    Tr.15: 2761

2006-2007,   Mike Harper, cash for classic cars, amount of cash
                 unknown                                 Tr.15:2737

The Seventh Circuit in *Harris* stated that:

The district court articulated the proper legal standard in its
ruling on Harris's motion *in limine*, stating that the vehicle
evidence would "be relevant to show an unaccounted for source
of income *if the Government is able to introduce other evidence
that the defendant lacked a source of income.*" [emphasis added]

*United States v. Harris*, 536 F.3d 798, 811 (7th Cir. 2008), overruled on other

grounds by *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010).  The

government in *Harris* used the defendant's girlfriend who testified that,

during the relevant time period, the defendant – who had luxury vehicles

registered in other people's names -- was unemployed.  *See also, United

States v. Turner,* 651 F.3d 743, 746 (7th Cir. 2011) cert. denied, 132 S. Ct.

863, 181 L. Ed. 2d 562 (U.S. 2011) [The government had learned that Turner,

who had not been gainfully employed for some time, obtained Rueckert's

services by paying him $25,000 in cash, delivered by Turner's girlfriend while

he was in jail. Intending to make an issue of Turner's unexplained wealth,

including the attorney fee paid in cash, the government argued that Rueckert

had landed "front and center as a witness in this case" and therefore could

not continue to represent Turner.]  Mr. Lewellen's case is unlike any other

3

case[1] cited by the government in support of its use of "unexplained wealth" in

that the government did not and could not demonstrate that Mr. Lewellen

had no other source of income that could explain his cash expenditures.

Precisely the opposite was true.

II.    Evidence cannot be admitted as "cash evidence" because that is not
       how it was presented to the jury.

---

[1] Other Circuits and District Courts also uphold "unexplained wealth" evidence when the government provides proof of lack of legitimate income – unlike this case. *See, e.g., United States v. Thompson,* 686 F.3d 575, 580 (8th Cir. 2012)[the Government offered the IWDA record to corroborate Easter's testimony that Thompson had no regular, legitimate employment. The Government argued in closing that Thompson's lack of regular employment, together with the $740 in cash officers found on him at the time of his arrest, the $4,600 in cash Thompson used to purchase the Cadillac on May 13, 2010, and Easter's testimony that Thompson regularly carried large amounts of cash, demonstrated that Thompson had unexplained wealth. ]; *United States v. Davis*, 474 F. App'x 110 (4th Cir. 2012) [Davis's bank records show substantial deposits despite the fact that Davis reported no income. The issue was not unexplained expenditures, but unexplained wealth.]; *United States v. Shirley*, 1:10-CR-167-JEC/AJB, 2011 WL 3704940 (N.D. Ga. July 7, 2011) report and recommendation adopted, 1:10-CR-167-JEC, 2011 WL 3687577 (N.D. Ga. Aug. 22, 2011)[ Shirley did not have verifiable lawful employment, and yet he purchased a residence valued at over a half a million dollars and drove expensive automobiles.]; *McDaniel v. United States*, 3:09CV366, 2011 WL 940505 (W.D.N.C. Mar. 15, 2011) appeal dismissed, 440 F. App'x 218 (4th Cir. 2011) cert. denied, 132 S. Ct. 833, 181 L. Ed. 2d 539 (U.S. 2011)[ The government's introduction of tax records confirmed that Petitioner's escort business was unsuccessful. The government then established, through the introduction of Petitioner's gold chains, gold teeth, and photos of Petitioner with large amounts of cash, that Petitioner had unexplained wealth.]

The government claims that the cash could have been admitted

independently of the "unexplained wealth" theory as plain cash payments.

The problem with this argument is that is not what the government did.  In

the government's opening close, the government falsely claimed that there

was **no other explanation** for Mr. Lewellen's possession of cash:

> The other things that corroborate the testimony that you heard
> from the insiders is the evidence that you've seen and heard
> about the money, basically *the unexplained wealth of Hector
> Uriarte, the unexplained wealth of Glenn Lewellen*, the hundreds
> of thousands of dollars that these men were spending that there
> ***just is no other explanation for, no other explanation for
> the cash coming anywhere except for from the crew's
> activities and their participation in it.***

Tr. 27:5013.  This statement was false and the government knew it.  This was

not simply a statement in passing, this was the evidence the government

used to support the lies of Saul Rodriguez. There was another explanation for

the cash - the government knew it, the witnesses knew it, and the

government purposefully did not provide it to the jury. The rebuttal close

reinforced this false assertion:

> Money doesn't lie. Luxury cars don't lie. Classic cars paid for
> with cash. That doesn't lie.  A huge house after retiring from
> police department. That doesn't lie either.

Tr.30:5368.

> What did the evidence show? It showed that
> Lewellen was a police officer up until 2002; that between '99
> and 2000, *while he was still a police officer, he gave Jim
> Millner, his construction supervisor, at least $140,000 in
> cash. And the evidence shows Lewellen never made more than*

*about $5,000 a month as a police officer.* You know where
that cash came from that Lewellen gave to Jim Millner. You
know where the $145,000 in cash came from that Michael
Harper testified about Lewellen used to buy classic cars. It came
from kidnapping. It came from robberies. It came from drug
trafficking. Because that's the evidence you've seen in this
case.

Tr.30:5373. The government told the jurors to compare Lewellen's

police salary to the cash payments and conclude that the cash could

*only have been derived from illegal activity.* This false conclusion was

based on the misleading and incomplete evidence of Mr. Lewellen's

legitimate sources of wealth.

III.  The error in allowing misleading evidence and argument of
      unexplained wealth was not harmless in light of other problems with
      the government's evidence.

The Seventh Circuit has held that:

In determining whether an evidentiary error is harmless, we
consider whether, in the mind of the average juror, the
prosecution's case would have been significantly less persuasive
had the improper evidence been excluded. *Cooper,* 591 F.3d at
590; *United States v. Emerson,* 501 F.3d 804, 813 (7th Cir.2007);
*United States v. Owens,* 424 F.3d 649, 656 (7th Cir.2005); *United
States v. Eskridge,* 164 F.3d 1042, 1044 (7th Cir.1998).

*United States v. Thornton*, 642 F.3d 599, 605 (7th Cir. 2011). Applying this

standard to Mr. Lewellen's case, it is clear that the prosecution's case would

have been "significantly less persuasive had the improper evidence been

excluded."

This is not a case in which the evidence against Mr. Lewellen was

overwhelming.  The government's case rested almost entirely on the

testimony of Saul Rodriguez.  This Court has recognized that Saul Rodriguez

was not a credible witness. "The court is sympathetic to the argument that the government's use of Rodriguez as its key witness is distasteful, and this case clearly raised an issue as to whether our "culture of cooperation" ultimately served the ends of justice. Rodriguez was so impeached in the course of this trial that the court doubts it would have believed anything he said, unless corroborated by more credible witnesses, were it the trier of fact." R. 1065 at 8.

The government has conceded as much by declining to use him again in the re-trial of Manuel Uriarte.  This concession was highlighted by the government's claim that it would not use Saul Rodriguez in a re-trial of Glenn Lewellen, either.  Tellingly, the government did not say that it would try the case relying solely on the remaining witnesses, but would, instead, add a "new" witness, who was unavailable at the time of the original trial. Without the government's evidence and argument about the "unexplained wealth" of Mr. Lewellen, the government had and has precious little to support Rodriguez' allegations that Mr. Lewellen was involved in Rodriguez' drug conspiracy from 1996 until 2009.

WHEREFORE, defendant GLENN LEWELLEN, respectfully requests that this Court grant his motion for judgment of acquittal or new trial.

DATE:          November 23, 2012          Respectfully submitted,

                                          By:    s/Andréa E. Gambino
                                                 Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 23, 2012, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which sent

notification of such filing to the following:

      Terra Reynolds
      Steven Block
      Tiffany Tracy
      Assistant United States Attorneys

and I hereby certify that I have mailed by United State Postal Service the

document to the following non-CM/ECF participants: [not applicable in this

case].

DATE:      November 23, 2012      Respectfully submitted,

                                     By:    s/Andréa E. Gambino
                                          Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

9

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 0332 - 2 | **DATE** | 11/27/2012 |
| **CASE TITLE** | United States vs. Glenn Lewellen | | |

**DOCKET ENTRY TEXT**

Order entered as to Lewellen. Lewellen's motion for judgment of acquittal or new trial [863] is denied. For a full explanation, see separate order.

Docketing to mail notices.

| | Courtroom Deputy Initials: | RJ/KR |
|---|---|---|

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| GLENN LEWELLEN, | ) | Case No. 09 CR 0332 -2 |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Defendant Glenn Lewellen ("Lewellen") was found guilty by a jury of Count 13 of the Third Superseding Indictment.  Lewellen moved for judgment of acquittal or a new trial on several grounds.  The court denied Lewellen's motion on most grounds, but reserved ruling on the issue of unexplained wealth and ordered supplemental briefing. (Order Mot. J. Acquittal or New Trial entered Oct 26, 2012 at 14, ECF No. 1065.)  Now, after considerable briefing on the issue of unexplained wealth, the court denies Lewellen's motion for judgment of acquittal or a new trial.

Lewellen objects both to the admission of evidence related to his income and expenditures and the government's discussion of that evidence in closing arguments.  For reasons explained below, the court concludes that the evidence was not properly admitted under the theory of unexplained wealth, and that the closing arguments on that subject were therefore improper. However, the evidence of Lewellen's *cash* expenditures was independently admissible as circumstantial evidence of an illegitimate source of income.

1

Moreover, numerous government witnesses established that during the period from the late 1990's through the mid-2000's, Lewellen was running an active profit-making homebuilding business.  In light of all this evidence, as well as the other evidence of Lewellen's guilt, the evidence and argument concerning unexplained wealth did not constitute plain error and do not require a new trial.

## I.  BACKGROUND

Lewellen was convicted of participating in a conspiracy to distribute cocaine and heroin that lasted from 1996 through 2009.  (Third Superseding Indictment at 34, ECF No. 271.)  The indictment alleged that among other things, the conspirators employed kidnappings and robberies to acquire drugs and cash.  *Id*. at 35.

From 1986-2002, Lewellen was a police officer with the Chicago Police Department ("CPD").  (Tr. 3677.)  Starting in approximately 1999, and continuing after he left the CPD, Lewellen was also a housing developer.  (Tr. 40.)  According to the government's evidence, as early as 1998, Lewellen participated in the robbery and kidnapping of individuals involved in drug distribution. (*e.g.,* Tr. 2909-15, 2916-17.) Saul Rodriguez testified at trial that Lewellen participated in two robberies in 1998, and kept hundreds of thousands of dollars in cash from those robberies.  (Tr. 2909-15, 2916-21.)  Andres Torres, Fares Umar, and Rodriguez testified about multiple kidnappings during the early- to mid-2000's, in which Lewellen was involved, that resulted in the receipt of cash, drugs, or both. (*e.g.,* Tr. 928-31, 1587-92, 3009-12.)

The government presented some evidence about Lewellen's finances, including his CPD income (Tr. 3679), cash payments he made to contractors and associates in his homebuilding business in the late 1990's and early 2000's totaling about $200,000

2

(Tr. 2712, 2725, 2760), and the purchases of four classic cars in 2006-07 totaling $175,000, all of which purchases included some cash. (Tr. 2737-40.) Mike Harper testified that he sold Lewellen a 1970 Road Runner and a 1968 Dodge Coronet RT for $45,000, of which $15,000 was paid in cash. (Tr. 2738-39.) Lewellen also purchased a 1957 Chevy for $80,000, using a bag of cash, though the government's witness to this transaction was not certain that the entire purchase price was paid in cash. (Tr. 2737.) Lewellen bought a 1956 Chevy Nomad for $50,000, paid in cash. (Tr. 2740.) A number of individuals testified that, in their experience, the use of cash in these circumstances was unusual. (Tr. 2712, 2725, 2737, 2760.)

Most of the evidence about Lewellen's finances was presented on December 12, 2011. The evidence concerning Lewellen's CPD salary, the last piece of financial evidence concerning Lewellen, was presented on December 19, 2011.

No evidence established Lewellen's total legitimate income during the conspiracy, and there was limited evidence about the scope of his homebuilding business. The government brought out, without objection, that Lewellen Home Builders had an Hitachi brand excavator worth $125,000 (Tr. 2723), and Lewellen provided approximately $1.2 million down as part of a purchase of land for a subdivision. (Tr. 2763.) On cross-examination, the defense brought out that a carpentry contractor was paid over $500,000 in checks from Lewellen Home Builders between 2003 and 2005 (Tr. 2709), Fabian Flooring was paid over $160,000 in checks between 2002 and 2005 (Tr. 2718), and excavator Ken Klauzek was paid at least $150,000 in checks. (Tr. 2728.) Government witnesses testified that Lewellen told them that he had received a million dollars for a workplace injury at the CPD (Tr. 2693), that his wife received a several

million dollar award after a car accident (Tr. 2693-94), and that he had a Chinese

investor.  (Tr. 2733.)  Other than the government witnesses' testimony as to what

Lewellen had told them, there was no evidence introduced to support these reported

payments.

Lewellen never contemporaneously objected to any of the foregoing financial

evidence.  On December 20, 2011, after all the financial evidence about Lewellen had

been admitted without objection, codefendant Hector Uriarte filed a motion to exclude

financial information about him, arguing that it was irrelevant, barred by rule 404(b),

insufficiently comprehensive to be admissible as unexplained wealth, not inconsistent

with possible legitimate sources, and shifted the burden of proof to him to produce

evidence of a legitimate source.  (Mot. Limine Regarding Financial Evid. Offered

Against Hector Uriarte at 2-3, ECF No. 741.)  Before trial, in order to facilitate a trial

with so many defendants, the court and the parties had agreed that in general, motions

and objections made by one defendant would apply as relevant to all defendants.  (*See*

Tr. 191, 839-40.)

The government also made an explicit reference to unexplained wealth during the

opening closing statement:

> The other things that corroborate the testimony that you heard from the
> insiders is the evidence that you've seen and heard about the money,
> basically the unexplained wealth, the unexplained wealth of Hector Uriarte,
> the unexplained wealth of Glenn Lewellen, the hundreds of thousands of
> dollars that these men were spending that there just is no other explanation
> for, no other explanation for the cash coming anywhere except for from the
> crew's activities and their participation in it.

(Tr. 5013.)

Lewellen did not object to this unexplained wealth argument in closing.  Shortly

4

thereafter, however, Hector Uriarte moved for a mistrial based on the unexplained wealth

argument.  (Tr. 5016-18, 5021-23.)  Uriarte's motion did not, however, address the issue

which concerns the court here:  whether an unexplained wealth argument was factually

supportable in the case of Lewellen, given his substantial sources of legitimate income.

That argument was never made.

This foundational problem with the unexplained wealth theory was not raised by

Lewellen at the close of  the government's case, nor at the close of all the evidence.

Even more significantly, Lewellen never tendered an instruction which would have

allowed the court to focus on the unexplained wealth issues unique to Lewellen and

perhaps avoid the prejudice Lewellen now claims he suffered.

Finally, in a supplemental post-trial brief filed November 23, 2012, Lewellen

objects to an additional portion of the government's closing argument.  Both of the

following statements come from the government's rebuttal closing argument and both

arguably are referring to unexplained wealth.  Counsel objected at the time but not on the

basis of unexplained wealth.

> Money doesn't lie.  Luxury cars don't lie.  Classic cars paid for with cash.
> That doesn't lie.  A huge house after retiring from police department. That
> doesn't lie either.

(Tr. 5368.)

> You know where that cash came from that Lewellen gave to Jim Millner.
> You know where the $145,000 in cash came from that Michael Harper
> testified about Lewellen used to buy classic cars. It came from kidnapping.
> It came from robberies. It came from drug trafficking. Because that's the
> evidence you've seen in this case.

(Tr. 5373.)

## II.  LEGAL ANALYSIS
### A.  Unexplained Wealth

Evidence of unexplained wealth is probative and admissible in drug cases, provided that each of these three elements is satisfied:

> (1) the evidence presented creates an inference that the defendant was involved in drug trafficking; (2) the unexplained wealth was acquired during the period in which the drug crime allegedly occurred; and (3) the government presents other evidence to support the charge, including evidence that the income was not obtained through legitimate means.

*United States v. Carrera*, 259 F.3d 818, 829 (7th Cir. 2001)(citing *United States v. Penny*, 60 F.3d 1257, 1263) (7th Cir. 1995)).  As to Lewellen, the court concludes that the evidence presented failed to meet the third prong of *Carrera*, which requires "some evidence that the unexplained wealth was not derived from legitimate means."  *Carrera*, 259 F.3d at 829.

The government argues that Lewellen made implausible statements about the source of the money he spent on his homebuilding business, and that his implausible statements are sufficient to support the third part of the *Carrera* test.  For instance, the government points out that Lewellen's CPD employment records do not reflect any workplace injury or settlement.  (Tr. 3673-79.)  But it is not clear that they should, assuming such an injury had occurred; there was no evidence that a workplace injury would have been reported in the CPD records the government introduced in evidence. The government also notes that Lewellen's homebuilding business was just getting started in the late 1990's, and argues that that fact supports an inference that it wasn't producing any money; however, there is nothing in the record that justifies such an inference.  The government is correct that it need not foreclose every possible legitimate source of income.  Nevertheless, given that it is consistent with the evidence that

Lewellen had substantial legitimate sources of income, the government had an obligation to provide something to support its unexplained wealth argument.  In light of the real possibility that Lewellen's homebuilding business could have been generating substantial income during the period when he made the expenditures on which the government relied, the government failed to meet its burden to produce "some evidence" that the wealth was derived from that or other legitimate sources, and its wealth evidence and argument were improper.[1]

### B.  How Should This Erroneous Evidence and Argument Be Reviewed

As described in the Background section above, Lewellen made no contemporaneous objection to the admission of the financial evidence he now complains about.  Codefendant Hector Uriarte moved to exclude unexplained wealth evidence concerning him, but only *after* all of the evidence concerning Lewellen had been admitted.  With respect to the unexplained wealth argument in the government's opening closing argument, Hector Uriarte's motion for a mistrial probably adequately  preserved any general objections to this argument, but Uriarte's objections did not address the manner in which the *Carrera* test was not satisfied by the government's evidence as to Lewellen.  While the court had agreed to let each defendant adopt his codefendants' motions and objections, the court could not be expected to consider issues unique to

---

[1]Although no case explicitly so holds, it is possible that Lewellen's use of cash as testified to by the government's witnesses could satisfy the third prong of *Carrera*. Because the cash is itself circumstantial evidence of an illegitimate source, the court believes that something else should be required of the government, if it is proceeding not on an "excessive cash" theory but on an "unexplained wealth" theory, particularly in the case of a defendant such as Lewellen who clearly had access to substantial legitimate sources of wealth during the relevant time period.

Lewellen in a motion of Hector Uriarte, which did not even advert to Lewellen.

In light of Lewellen's failure to object to the evidence and arguments on the grounds he now advances, the court applies plain error review. Though this standard is generally applied by appellate courts in addressing issues raised for the first time on appeal, district courts have used the same standard when facing claims of error raised for the first time in motions for new trials. *See, e.g., United States v. Bradao*, 448 F. Supp. 2d 311, 318 (D. Mass. 2006); *United States v. Rapanos*, 895 F. Supp. 165, 168 (E.D. Mich. 1995) (holding the admission of certain evidence was plain error meriting reversal), *rev'd by* 115 F.3d 367 (6th Cir. 1997) (holding the admission of evidence was correct, and therefore not plain error); *United States v. Washington,* 263 F.Supp.2d 413, 426 n.7 (D. Conn. 2003); *United States v. Goodlow,* 910 F.Supp. 476, 478 (D.S.D. 1995) (briefly discussing and applying plain error review).

Federal Rule of Criminal Procedure 52(b) provides: "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." The Supreme Court has laid out the elements of plain error review. "There must be an 'error' that is 'plain' and that 'affect[s] substantial rights.'" *United States v. Olano*, 507 US. 725, 732 (1993). The error must have been prejudicial, and it must have affected the outcome of the district court proceedings. *Id*. at 734. While the reviewing court need not be certain that but for the error, the result would have been different, it must find "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004) (citation and quotation omitted).

### C. Taken in Context, The Unexplained Wealth Evidence and Argument Caused No Appreciable Prejudice

Much of the financial evidence introduced as to Lewellen was evidence of significant *cash* outlays, made in circumstances in which witnesses testified that they found the use of cash unusual. This evidence of Lewellen's possession of large amounts of cash was independently admissible as circumstantial evidence of drug dealing or another illegitimate source. *See, e.g., United States v. Adams,* 628 F.3d 407, 414 (7th Cir. 2010); *United States v. Jarrett,* 133 F.3d 519, 534 (7th Cir. 1998); *United States v. Wood*, 834 F.2d 1382, 1386 (8th Cir. 1987) ("It is axiomatic that evidence concerning the possession or expenditure of large amounts of currency is admissible where the defendant is charged with a crime in which pecuniary gain is the basic motive.") (collecting cases). To the extent the government was relying on the theory that only illegitimate sources could explain Lewellen's large expenditures, that theory was not adequately supported, but a significant amount of the wealth evidence, the most prejudicial in the court's judgment, would have been admissible on the "cash expenditure" theory anyway.

Further, the government's own witnesses significantly undermined its unexplained wealth theory, testifying at length about Lewellen's real estate and construction-related activities. While the government tried to emphasize Lewellen's cash dealings, there was considerable testimony on cross-examination about Lewellen's bank loans and financing (Tr. 2770), the "flipping" of real estate properties owned by Lewellen for profit (Tr. 2745), and the contractors Lewellen legitimately hired and paid (Tr. 2709, 2718, 2728), usually by check or bank payout. (Tr. 2714.)  It is inconceivable

that the jury did not find the government's unexplained wealth theory doubtful in the

case of Lewellen, just as the court found it doubtful.  There was simply too much

evidence, from the government's own witnesses, of substantial legitimate income made

by Lewellen during the relevant time period.

The court reaches this conclusion fully appreciating that the government must

have thought it needed this evidence to corroborate its significantly compromised

"insider" witnesses.  Indeed, all of the "insider" witnesses against Lewellen were

compromised to some extent by their significant legal jeopardy and their plea agreements

with the government.  Saul Rodriguez, the key "insider" witness against Lewellen, was

even more significantly compromised than the normal cooperator, not only by his plea

agreement with the government but by his proven history of perjury, possible obstruction

of justice, double-dealing and lack of integrity.  Nevertheless, the problems with the

government's unexplained wealth theory in the case of defendant Lewellen could not

have been a mystery to anyone watching this trial, and the court cannot accept that the

jury relied on a theory which was so significantly undermined by undisputed evidence.

### D.  Other Wealth-Related Issues

Lewellen objects to the government's statement in its rebuttal closing that he paid

$80,000 in cash for a vehicle and funded his homebuilding business with $140,000 in

cash.  Specifically, the government's statements were:  "It is not a common happening in

life to pay for a luxury car with a bag filled with $80,000 in cash" and "he gave Jim

Millner, his construction supervisor, at least $140,000 in cash. . . . It is not a common

happening in life for a police officer to fund his new construction business by giving

$140,000 to someone he just met."  (Tr. 5373-74.)  Lewellen made timely objections to

these statements.  His objections at trial were that the government's argument misstated

the evidence.  The court overruled the objection concerning the bag of cash and

instructed the jury to rely on its collective recollection of the evidence with respect to the

payments to Millner.

     With regard to the vehicle, Lewellen is correct that the testifying witness, Mike

Harper, did not specifically testify that Lewellen paid the entire purchase price in cash.

But Harper testified that he knew the purchase price was $80,000 for the vehicle, that he

saw Lewellen bring a bag full of cash into the dealer's and count it out on a countertop,

and that Lewellen received the vehicle on a later day. (Tr. 2737.)  The evidence proves

that Lewellen paid a significant sum of cash for this classic automobile. Whether there

was any mischaracterization at all was unclear; at most, the testimony was ambiguous on

the issue of what proportion of the purchase price was represented by the cash in the bag.

If indeed there was a mischaracterization, the court cannot conclude that this one

statement, perhaps incorrect but perhaps not, denied the defendant a fair trial.

     With regard to the $140,000 cash payments to Millner, whom the government

argued the defendant had just met, the record does not support the government's

statement.  The record reflects that Lewellen gave Millner at least $75,000 in cash to pay

subcontractors during Millner's first job as superintendent for Lewellen.  (Tr. 2685-87,

2691.)  Lewellen also gave Millner $20,000 to pay contractors on his next job, and

Lewellen gave him more money once Millner began working for Lewellen full-time.

(Tr. 2691-95.)  There is an obvious difference between a $140,000 lump sum paid at the

start of a relationship and smaller cash payments paid over time.  Nevertheless, the court

does not see how the difference would have harmed Lewellen, particularly in light of his

argument that he was a large and successful real estate developer.

> **E.** **The Government's Evidence and Argument Concerning Unexplained Wealth Did Not Comment on the Defendant's Failure to Testify or Improperly Shift the Burden of Proof to the Defendant**

On November 19, 2012, the court entered a Memorandum Opinion and Order (ECF No. 1116) denying Hector Uriarte's motion for a new trial, judgment of acquittal and mistrial which argued, among other things, that the government's evidence and argument concerning unexplained wealth commented on the defendant's failure to testify and improperly shifted the burden of proof to the defendant.  That opinion contains a full explanation of these issues, and the court incorporates it by reference here.

Briefly, the law in this circuit is clear that references to evidence which is uncontradicted or undisputed (unexplained seems a comparable descriptive) violate a defendant's Fifth Amendment rights only if the only person who could dispute (or explain) the government's evidence is the defendant himself.  *See United States v. Cotnam*, 88 F.3d 487, 497 (7th Cir. 1996).  In this case, Lewellen's own testimony would have been the least useful and effective way of countering the government's evidence. Rather, the government's evidence could have been disputed by evidence of the books and records of Lewellen's homebuilding business, bank records, court records relating to the settlement Lewellen told witnesses his wife had received and documentary evidence of the settlement Lewellen told witnesses that he had received.  Since such evidence could easily have been introduced without testimony from the defendant, the government's evidence and argument did not constitute commentary on defendant's failure to testify.

As was true in the case of Hector Uriarte, the jury in this case could not have

failed to understand that the burden of proof was on the government.  The jury was repeatedly instructed that the government bore the burden of proof beyond a reasonable doubt.  It was instructed at the beginning of the case, both during voir dire and in the court's preliminary instructions, it was so instructed by all or at least most of the closing arguments, and it was properly instructed in the court's final instructions on the law. The government's references to unexplained wealth cannot possibly have confused the jury as to where the burden of proof lay.

## **CONCLUSION**

For the reasons stated above, Lewellen's motion for a new trial or judgment of acquittal (ECF No. 863) is denied.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:  November 27, 2012

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3**
**Eastern Division**

UNITED STATES OF AMERICA

                         Plaintiff,

v.                                  Case No.: 1:09–cr–00332
                                  Honorable Joan B. Gottschall

Saul Rodriguez, et al.

                         Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, December 5, 2012:

      MINUTE entry before the Honorable Joan B. Gottschall: as to Glenn Lewellen, ( Sentencing set for 1/17/2013 is stricken and reset to 1/22/2013 at 10:15 AM.) No sentencing memoranda or objections to presentence reports or responses will be considered if filed out of time unless a motion to file late is made no less than one week prior to the date set for sentencing. No sentencing hearing will be continued unless the courtroom deputy is notified of the need to change in writing at least one week (7 days) prior to the date set for sentencing. Failure to comply with this standing order will result in counsel being sanctioned in the amount of $100.00 which shall be paid to the Clerk of Court, 219 South Dearborn, 20th Floor, Chicago, Illinois 60604. Mailed notice (rj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3**
**Eastern Division**

UNITED STATES OF AMERICA

                                    Plaintiff,

v.                                                    Case No.: 1:09–cr–00332
                                                      Honorable Joan B. Gottschall

Saul Rodriguez, et al.

                                    Defendant.


**NOTIFICATION OF DOCKET ENTRY**


This docket entry was made by the Clerk on Thursday, December 6, 2012:


        Illinois 60604 Mailed notice (rj, )MINUTE entry before the Honorable Joan B.
Gottschall: as to Glenn Lewellen. Sentencing memoranda and/or objections to PSR due by
12/21/2012. Responses by 1/4/2013. No sentencing memoranda or objections to
presentence reports or responses will be considered if filed out of time unless a motion to
file late is made no less than one week prior to the date set for sentencing. No sentencing
hearing will be continued unless the courtroom deputy is notified of the need to change in
writing at least one week (7 days) prior to the date set for sentencing. Failure to comply
with this standing order will result in counsel being sanctioned in the amount of $100.00
which shall be paid to the Clerk of Court, 219 South Dearborn, 20th Floor, Chicago,


**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1**
**Eastern Division**

UNITED STATES OF AMERICA

                       Plaintiff,

v.                                 Case No.: 1:09−cr−00332
                                 Honorable Joan B. Gottschall

Saul Rodriguez, et al.

                       Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, January 2, 2013:

      MINUTE entry before the Honorable Joan B. Gottschall: as to Glenn Lewellen, ( Sentencing set for 1/22/2013 is stricken and reset to 2/20/2013 at 10:15 AM.) Sentencing memoranda and/or objections to psr due by 2/4/2013. Responses by 2/11/2013. No sentencing memoranda or objections to presentence reports or responses will be considered if filed out of time unless a motion to file late is made no less than one week prior to the date set for sentencing. No sentencing hearing will be continued unless the courtroom deputy is notified of the need to change in writing at least one week (7 days) prior to the date set for sentencing. Failure to comply with this standing order will result in counsel being sanctioned in the amount of $100.00 which shall be paid to the Clerk of Court, 219 South Dearborn, 20th Floor, Chicago, Illinois 60604. Mailed notice (rj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at **_www.ilnd.uscourts.gov_**.

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | Judge Joan B. Gottschall |
| | ) | |
| GLENN LEWELLEN, | ) | |
| Defendant. | ) | |

*DEFENDANT GLENN LEWELLEN'S MOTION TO RELEASE FUNDS OR APPOINT COUNSEL NUNC PRO TUNC BEGINNING JANUARY 2012*

Defendant GLENN LEWELLEN, through his attorneys, Andréa E. Gambino and Matthew Madden, respectfully requests that this Court enter an Order directing the release of funds belonging to Mr. Lewellen which are currently in the custody of the United States treasury department, for the purpose of paying Mr. Lewellen's legal fees, incurred since January 2012.

In the alternative, counsel for Mr. Lewellen request that this Court appoint counsel *nunc pro tunc*, beginning January 2012, so that counsel may be paid for services rendered and for Mr. Lewellen's continued representation. In support of this motion, counsel for Mr. Lewellen state the following:

(1)     Mr. Lewellen signed a fee agreement retaining the services of Andréa E. Gambino and Matthew Madden for the purposes of representing him in the above-captioned matter. Mr. Lewellen paid for those services in full for the time period covering April 15, 2011, until January 1, 2012, for Ms.

Gambino, and October 10, 2011, until January 1, 2012, for Mr. Madden.

(2)      During the course of this case, Mr. Lewellen sought and received

permission from the court to sell properties belonging to him in order to pay

for his representation.

(3)      Mr. Lewellen sold the remaining properties in his possession and the

proceeds from this sale were turned over to an escrow account to be

maintained, pending disposition of the case and this court's determination of

whether it would impose a fine against Mr. Lewellen as part of the penalty to

be imposed for the count of conviction.  *See,* R. 892, Order regarding sale of

Tacoma Properties.

(4)      Counsel for Mr. Lewellen have worked diligently on Mr. Lewellen's

behalf since January 2012 without additional payment.

(5)      Counsel for Mr. Lewellen are owed payment for the following

conservative estimate of hours of work on Mr. Lewellen's behalf:

Andréa Gambino:   175 hours

Matthew Madden: 101 hours

WHEREFORE, counsel for Mr. Lewellen respectfully request that this

Court enter an Order, permitting the release of funds to pay for Mr.

Lewellen's attorney fees, or, in the alternative, that the Court appoint

counsel, *nunc pro tunc*, to permit court payment of attorneys' fees for services

rendered since January 2012 and going forward.

DATE:          January 3, 2013          Respectfully submitted,

                                        By:    s/Andréa E. Gambino
                                               Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 3, 2013, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which sent

notification of such filing to the following:

John Beal
Counsel for Jorge Uriarte

Cynthia Giachetti
Molly Armor
Counsel for Hector Uriarte

Keith Spielfogel
Robert Loeb
Counsel for Manuel Uriarte

Eugene Steingold
Counsel for Tony Sparkman

Heather Winslow
Counsel for Robert Cardena

Terra Reynolds
Steven Block
Tiffany Tracy
Assistant United States Attorneys

and I hereby certify that I have mailed by United State Postal Service the

document to the following non-CM/ECF participants: [not applicable in this

case].

DATE:        January 3, 2013          Respectfully submitted,

                                      By:    s/Andréa E. Gambino
                                             Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

```
MIME-Version:1.0
From:usdc_ecf_ilnd@ilnd.uscourts.gov
To:ecfmail_ilnd@ilnddb.ilnd.circ7.dcn
Bcc:
--Case Participants: Kent R. Carlson (kentrcarlson@sbcglobal.net), Heather Lynn Winslow
(hlwinslow@gmail.com), Lawrence S. Beaumont (l.beaumont@sbcglobal.net), Douglas J. Rathe
(djrathe@sbcglobal.net), Eugene Steingold (steingoldlaw@mac.com), Catharine D. O'Daniel
(col117@aol.com), Daniel Clinton Walters (dan.walters@il.cslegal.com), Cynthia Louise
Giacchetti (cgiacchett@aol.com), Michael Joseph Monaco (marcisahinoglu@gmail.com), Robert
A. Loeb (robertloeb@att.net), Matthew Joseph Madden (matt@mjmaddenlaw.com), Andrea
Elizabeth Gambino (agambinolaw@gmail.com), Keith Allan Spielfogel
(spielfogel@sbcglobal.net), Steven Shobat (jshobat@gmail.com,
steven.shobat@sbcglobal.net), Tiffany Jacqueline Tracy (johnine.browne@usdoj.gov,
tiffany.tracy@usdoj.gov), Damon Matthew Cheronis (damoncheronis@yahoo.com,
dcheronislaw@yahoo.com), Molly Armour (mearmour@gmail.com), Probation Department
(intake_docket_ilnp@ilnp.uscourts.gov), John M. Beal (johnmbeal@att.net), Terra Reynolds
(barbara.robertson@usdoj.gov, terra.reynolds@usdoj.gov, usailn.ecfausa@usdoj.gov), Michael
James Falconer (mfalconer@prodigy.net), Robert G. Clarke (prestidigitate@sbcglobal.net),
Ellen R. Domph (edomph@gmail.com), Steven Saltzman (saltzcases@gmail.com), AUSA
(ecfl.ausa@usdoj.gov, uasiln.ecfausa2@usdoj.gov, usailn.ecfausa@usdoj.gov), Pretrial
Services (ilnptdb_court_action_notice@ilnpt.uscourts.gov), Michael B. Mann
(mannfam23@comcast.net), Steven Andrew Block (marjorie.satten@usdoj.gov,
sablockus@yahoo.com, steven.block@usdoj.gov), Honorable Joan B. Gottschall
(e-filing_gottschall@ilnd.uscourts.gov)
--Non Case Participants: James M. Baranyk (james@lawsja.com), os
(olga_serrano@ilnpt.uscourts.gov), Christopher Rudolf Smith (chris@lawsja.com,
office@lawsja.com), Brian Kolbus (brian_kolbus@ilnpt.uscourts.gov)
--No Notice Sent:

Message-Id:11073652@ilnd.uscourts.gov
Subject:Activity in Case 1:09-cr-00332 USA v. Rodriguez et al motion to appoint counsel
Content-Type: text/html
```

## United States District Court

### Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1

## Notice of Electronic Filing

The following transaction was entered on 1/4/2013 at 12:03 PM CST and filed on 1/3/2013

| | |
|---|---|
| **Case Name:** | USA v. Rodriguez et al |
| **Case Number:** | 1:09–cr–00332 |
| **Filer:** | Dft No. 2 – Glenn Lewellen |
| **Document Number:** | No document attached |

**Docket Text:**
**MOTION by Glenn Lewellen to appoint counsel nunc pro tunc beginning January 2012
(Omitted relief from motion [1199]). (yap, )**

**1:09–cr–00332–2 Notice has been electronically mailed to:**

AUSA   USAILN.ECFAUSA@usdoj.gov, ecfl.ausa@usdoj.gov, UASILN.ECFAUSA2@usdoj.gov

Pretrial Services   ilnptdb_Court_Action_Notice@ilnpt.uscourts.gov

Probation Department  Intake_Docket_ILNP@ilnp.uscourts.gov

Andrea Elizabeth Gambino  agambinolaw@gmail.com

Catharine D. O'Daniel  co1117@aol.com

Cynthia Louise Giacchetti  cgiacchett@aol.com

Damon Matthew Cheronis  damoncheronis@yahoo.com, dcheronislaw@yahoo.com

Daniel Clinton Walters  dan.walters@il.cslegal.com

Douglas J. Rathe  djrathe@sbcglobal.net

Ellen R. Domph  edomph@gmail.com

Eugene Steingold  steingoldlaw@mac.com

Heather Lynn Winslow  hlwinslow@gmail.com

John M. Beal  johnmbeal@att.net

Keith Allan Spielfogel  spielfogel@sbcglobal.net

Kent R. Carlson  kentrcarlson@sbcglobal.net

Lawrence S. Beaumont  l.beaumont@sbcglobal.net

Matthew Joseph Madden  matt@mjmaddenlaw.com

Michael B. Mann  mannfam23@comcast.net

Michael James Falconer  mfalconer@prodigy.net

Molly Armour  mearmour@gmail.com

Robert G. Clarke  prestidigitate@sbcglobal.net

Robert A. Loeb  robertloeb@att.net

Steven Andrew Block  steven.block@usdoj.gov, Marjorie.Satten@usdoj.gov, sablockus@yahoo.com

Steven Shobat  steven.shobat@sbcglobal.net, jshobat@gmail.com

Steven Saltzman  Saltzcases@gmail.com

Terra Reynolds  terra.reynolds@usdoj.gov, barbara.robertson@usdoj.gov, USAILN.ECFAUSA@usdoj.gov

Tiffany Jacqueline Tracy  tiffany.tracy@usdoj.gov, johnine.browne@usdoj.gov

**1:09–cr–00332–2 Notice has been delivered by other means to:**

Federal Defender Program


Andres Flores
#22758–424
Metropolitan – MCC
71 West Van Buren Street
Chicago, IL 60605

Hector Uriarte
#22760–424
Metropolitan – MCC
71 West Van Buren Street
Chicago, IL 60605

Jeffrey B. Steinbeck
Law Offices of Jeffrey B. Steinback
53 W. Jackson Blvd
#1420
Chicago, IL 60604

Manuel Uriarte
#15131–111
Metropolitan – MCC
71 West Van Buren Street
Chicago, IL 60605

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1**
**Eastern Division**


UNITED STATES OF AMERICA

                                          Plaintiff,

v.                                                    Case No.: 1:09–cr–00332
                                                      Honorable Joan B. Gottschall

Saul Rodriguez, et al.

                                          Defendant.


# NOTIFICATION OF DOCKET ENTRY


This docket entry was made by the Clerk on Thursday, January 31, 2013:


        MINUTE entry before the Honorable Joan B. Gottschall:as to Glenn Lewellen. By
agreement of the parties, Sentencing memoranda and/or objections to psr extended and
due by 2/6/2013. Responses by 2/13/2013. Sentencing date to stand. No sentencing
memoranda or objections to presentence reports or responses will be considered if filed
out of time unless a motion to file late is made no less than one week prior to the date set
for sentencing. No sentencing hearing will be continued unless the courtroom deputy is
notified of the need to change in writing at least one week (7 days) prior to the date set for
sentencing. Failure to comply with this standing order will result in counsel being
sanctioned in the amount of $100.00 which shall be paid to the Clerk of Court, 219 South
Dearborn, 20th Floor, Chicago, Illinois 60604. Mailed notice (rj, )


**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 332 - 2 | **DATE** | 1/30/2013 |
| **CASE TITLE** | USA vs. Glenn Lewellen | | |

**DOCKET ENTRY TEXT**

Motion hearing held.
On an interim basis, the court will appoint Ms. Gambino and Mr. Madden as Defendant's counsel, based on Defendant's representation that he has no additional assets outside those in escrow. Defendant is ordered to submit an affidavit to that effect. In order for the court to consider Defendant's motion to appoint counsel nunc pro tunc or release funds [1199], Defendant will have to provide a legal justification for the court taking that measure. Should Defendant provide such a justification, the Government may respond within 7 days as to whether it opposes Defendant's motion.

Docketing to mail notices.

00:15

| | Courtroom Deputy Initials: | RJ |
|---|---|---|

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.  09 CR 332-2 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

MOTION OF THE UNITED STATES FOR ENTRY OF
PRELIMINARY ORDER OF FORFEITURE

The United States of America, through GARY S. SHAPIRO, United States Attorney for the

Northern District of Illinois, moves for entry of a preliminary order of forfeiture as to specific

property pursuant to the provisions of Title 21, United States Code, Section 853 and Fed. R. Crim.

P. 32.2, and in support thereof submits the following:

1.      On January 13, 2011, a third superseding indictment was returned charging defendant

GLENN LEWELLEN and others with violations of the Controlled Substances Act pursuant to the

provisions of 21 U.S.C. § 841(a)(1), among other violations.

2.      The third superseding indictment sought forfeiture to the United States of certain

property pursuant to the provisions of 21 U.S.C. § 853(a)(1) and (2).

3.      Beginning on November 15, 2011, a jury trial was held before this Court.

4.      On January 31, 2012, the jury returned a verdict of guilty against the defendant

GLENN LEWELLEN on Count Thirteen of the third superseding indictment, thereby making certain

property subject to forfeiture pursuant to the provisions of 21 U.S.C. § 853(a)(1) and (2).

5.      Defendant GLENN LEWELLEN waived his right to have the forfeiture allegations

in the third superseding indictment considered by the jury.  It was agreed instead that this Court

would consider the issues relating to the forfeiture.

6.     In consideration of all the evidence adduced at trial, the Court found that the Government had carried its burden of establishing the requisite nexus between the property listed above and the offense of conviction in Count Thirteen.  Accordingly, the United States requests that this Court enter a preliminary order of forfeiture against the defendant GLENN LEWELLEN including any and all right, title, and interest he may have in any property constituting, and derived from, proceeds obtained directly or indirectly as a result of the violation of conviction including, but not limited to, funds in the amount of $6,030,000 and further enter a preliminary order of forfeiture as to the foregoing property, pursuant to the provisions of 21 U.S.C. § 853(a)(1) and (2) forfeiting all right, title, and interest defendant GLENN LEWELLEN has in the foregoing property for disposition according to law.

7.     If any of the funds in the amount of the $6,030,000 money judgment entered against defendant GLENN LEWELLEN as a result of any act or omission of the defendant:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the court;

      d.     has been substantially diminished in value, or

      e.     has been commingled with other property which cannot be divided without difficulty;

the United States shall request that this Court order the forfeiture of any other property belonging to the defendant up to the value of $6,030,000 pursuant to 21 U.S.C. § 853(p) and Fed. R. Crim. P. 32.2, in order to satisfy the money judgment entered by the Court.

2

8.     The real properties listed below were identified in the third superseding indictment

as a substitute assets available to satisfy the forfeiture money judgment entered by this Court.

(a)     LOTS 66, 102, 105 AND 112 IN BRIDGES OF MOKENA, BEING A SUBDIVISION OF PART OF THE NORTHWEST QUARTER OF SECTION 30, TOWNSHIP 35 NORTH, RANGE 12 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED NOVEMBER 21, 2005, AS DOCUMENT NUMBER R2005205381, CERTIFICATES OF CORRECTION RECORDED DECEMBER 23, 2005, AS DOCUMENT NO. R2005-226863, FEBRUARY 6, 2006, AS DOCUMENT NO. R2006-023129, MARCH 16, 2006, AS DOCUMENT R2006-44613, AND APRIL 10, 2007, AS DOCUMENT R2007-054421, IN WILL COUNTY, ILLINOIS.

PIN: 09-30-103-003; Address: 11789 London Bridge Drive, Mokena, Illinois;
PIN: 09-30-105-016; Address: 21717 London Bridge Drive, Mokena, Illinois;
PIN: 09-30-105-019; Address: 21753 London Bridge Drive, Mokena, Illinois;
PIN: 09-30-105-026; Address: 21777  London Bridge Drive, Mokena, Illinois; and

(b)     LOT 110 IN SECOND ADDITION TO ARBURY HILLS, BEING A SUBDIVISION OF PART OF THE SOUTHWEST 1/4 OF SECTION 10, TOWNSHIP 35 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN WILL COUNTY, ILLINOIS.

PIN: 09-10-311-010-0000

Commonly known as: 19628 Walnut Street, Mokena, Illinois.

9.     On April 27, 2012, a protective order directing the sale of Lots 66, 105 and 112 in

Bridges of Mokena was entered.  Consequently, in lieu of forfeiting these properties, the government

is seeking forfeiture of the proceeds from the sales, specifically funds in the amounts of $23,388.20,

$20,017.18 and $19,973.53, as a substitute res for those properties.

10.     Additionally,  21 U.S.C. § 853(p) and Fed. R. Crim. P. 32.2,  the following property

has been identified as substitute assets available to partially satisfy defendant GLENN

LEWELLEN's forfeiture judgment:

  (a)     First National Bank of Illinois account number xxx7254 held in the name of

           Tacoma Narrows;

  (b)     First National Bank of Illinois account number xxx1238 held in the name of
           Deborah A. Lewellen;

  (c)     First National Bank of Illinois account number xxx0204 held in the name of
           Deborah A. Lewellen;

  (d)     First National Bank of Illinois account number xxx2112 held in the name of
           Glenn and Deborah A. Lewellen;

  (e)     Ameritrade account number xxx xxx 143 held in the name of Deborah
           Lewellen; and

  (f)     a 2010 Lexus VIN: 2T2BK1BA9AC007952.

11.     Because funds in the amount of $6,030,000 and the foregoing properties are subject

to forfeiture, the government requests that this Court enter a preliminary order of forfeiture so that

the property may be disposed of according to law.

12.     Upon entry of a preliminary order of forfeiture, pursuant to the provisions of 21

U.S.C. § 853(g), the Internal Revenue Service shall seize and take custody of the foregoing property

for disposition as the according to law.

4

13.     Further, pursuant to the provisions of 21 U.S.C. § 853(n)(1), the United States shall publish notice of this order and of its intent to dispose of the property according to law.  The government may also, to the extent practicable, pursuant to statute, provide direct written notice to any person known to have alleged an interest in the property that is the subject of the preliminary order of forfeiture as a substitute for published notice as to those persons so notified including but not limited to Deborah Lewellen.

14.     Pursuant to the provisions of 21 U.S.C. § 853(n)(2), if following notice as directed by this Court and 21 U.S.C. § 853(n)(1), any person other than the defendant, asserts an interest in the property which has been ordered forfeit to the United States, within thirty days of the final publication of notice or this receipt of notice under paragraph thirteen (13), whichever is earlier, and petitions this Court for a hearing to adjudicate the validity of this alleged interest in the property the government shall request a hearing.  The hearing shall be held before the Court alone, without a jury.

15.     Following the Court's disposition of all third parties interests, the Court shall, upon the government's motion, if appropriate, enter a final order of forfeiture as to the property which is the subject of this preliminary order of forfeiture, vesting clear title in the United States of America.

16.     The United States requests that the terms and conditions of this preliminary order of forfeiture be made part of the sentence imposed against defendant GLENN LEWELLEN and included in any judgment and commitment order entered in this case against him.

WHEREFORE, pursuant to the provisions of 21 U.S.C. §§ 853(a)(1) and (2), 853(p) and Fed.

R. Crim. P. 32.2, the United States requests that this Court enter a judgment against the defendant

GLENN LEWELLEN in the amount of $6,030,000 and further enter a preliminary order of forfeiture

as to the foregoing property in accordance with the draft preliminary order of forfeiture which is

submitted herewith.

<div style="margin-left:40%">

Respectfully submitted,

GARY S. SHAPIRO
United States Attorney

By:   /s/ Terra Reynolds        
       TERRA REYNOLDS
       Assistant United States Attorney
       219 S. Dearborn St., Room 500
       Chicago, Illinois  60604
       (312) 353-5300

</div>

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Assistant United States Attorney hereby certifies that in accordance with

FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing

(ECF), the following document:

### MOTION OF THE UNITED STATES FOR ENTRY OF
### PRELIMINARY ORDER OF FORFEITURE

was served pursuant to the district court's ECF system as to ECF filers on FEBRUARY 6, 2013.


    /s/ Terra Reynolds
TERRA REYNOLDS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-3148

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| Plaintiff, | ) | | |
| v. | ) | No. 09 CR 332 | |
| | ) | Judge Joan B. Gottschall | |
| GLENN LEWELLEN, | ) | | |
| Defendant. | ) | | |

### *GLENN LEWELLEN'S SENTENCING MEMORANDUM*

*It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States district judge.*

<u>*Koon v. United States*</u>*, 518 U.S. 81, 113 (1996).*

To those who know him best, GLENN LEWELLEN is a hard-working, generous, kind, and personable man; a devoted, supportive, and adoring father; and a loyal and true friend. Glenn also is a charitable and giving person to those in need, and a man who, in this stage of his life, is actively and fervently living according to his faith.

GLENN LEWELLEN, at the age of 56, is *not* a person who needs to be incarcerated for the rest of his life. Nor is he a person who must be incapacitated or deterred from criminal conduct by imprisonment. For at least the last 6 years, it is undisputed that Glenn has not been involved in any illegal activities at all. At the time of Glenn's arrest, he had been living in Las Vegas, Nevada, had not been in contact with any of his co-defendants for several years, and was planning to return

to the Chicago area.

For the past year, prior to his conviction of one count at trial, GLENN demonstrated to the Court, Pre-trial Services, the government, his family, his attorneys, and his co-defendants, that he is more than capable of living according to the rules set for him by the Court.  Glenn was compulsive -- and some might say an "overachiever" -- in terms of his assiduous compliance with the terms of his pre-trial supervision.  During trial he maintained his generally positive outlook and demeanor, and was fully engaged in his own defense.  He also was kind and encouraging with his co-defendants and their attorneys, often passing along his favorite scriptures at difficult moments.

As will be discussed in detail in the pages that follow, the totality of Glenn's life, the family and friends whom he loves and who love him, his ability to work hard, his entrepreneurial talents, his active involvement in church and community life, and the strength and importance of his relationship with his daughters, all militate in favor of imposing a sentence at the 10 year mandatory minimum in this case.

Policy considerations, too, support a sentence that includes the minimal period of incarceration with conditions of post-release supervision that encourage Glenn's own predilection for community service as an alternative way of "paying" the price of the jury's verdict.  There is no rational correlation between drug quantities and an individual's likelihood of recidivism, danger to the community, or

actual culpability in a given offense. Nor is there any objective evidence that prison terms of more than a decade promote any positive social objective for any but the most incorrigibly violent of offenders who have demonstrated by their repeated violent acts that they can be neither safely nor reliably integrated into society. Glenn is not among them – he has never been arrested –let alone convicted -- for any prior offense, and there is no evidence at all that Glenn is - or has been-engaged in violent or anti-social activities during the last six years.

In contrast to the lack of support for the social efficacy of extraordinarily long prison terms, there is a growing body of evidence that in addition to the prohibitive financial costs of incarceration – now at least $30,000 per year per inmate – there are significant costs to an incarcerated person in terms of the negative impact on his psychological and physical health, and to the incarcerated person's family, in terms of social, economic, emotional, and physical health and well-being.

Finally, neither the quantity nor the quality of the evidence presented at trial justifies the imposition of a life sentence in this case.  The jury was unpersuaded by the government's evidence that Glenn was involved in any of the Racketeering Acts alleged in count one – the more serious and detailed of the two counts against him -- as evidenced by the jury's failure to reach any verdict on that count.[1]  We are not privy to the basis for the jury's decision on the conspiracy count, but it is clear from the jury instructions, and the unreliable nature of much of the evidence, that the

---

[1] The government's decision not to retry the RICO count does not support its position that Glenn Lewellen should be held accountable for that charged conduct.

jury could have relied on very little to conclude that Glenn was involved in a

conspiracy – or agreement – to commit an illegal act.

I.    **Glenn Lewellen successfully overcame serious challenges in his early life to become a productive person and a devoted father to his daughters.**

Glenn Lewellen was raised in a tumultuous family environment, the center of

which was his father's alcoholism.  Glenn and his siblings learned early, as children

of alcoholics do, how to make themselves scarce and avoid any conduct likely to

provoke a violent outburst from their father.  At an early age, Glenn felt the burden

of having to protect his mother and his sister and brothers from his father's

drunken rages.  Some of his earliest memories are of having to escape to the homes

of his relatives, because Glenn's father had come home drunk and looking to take

out his anger on those who were must vulnerable – Glenn's mom and his siblings.

Glenn's mother was unable to protect herself or her children and eventually

lapsed into alcoholism herself – resulting in her estrangement from Glenn for many

years.  Glenn's youngest brother suffered so from his father's abuse that he took his

own life when he was just 17 years old.  Another of Glenn's brothers followed in the

alcoholic footsteps of his parents and died from liver failure when he was still a

young man of only 40 years.

Glenn, the responsible one, never drank or used drugs.  He did well in school

and worked hard from a very young age to help support himself and his family.

After graduating from Lincoln Way High School, in New Lenox, Illinois, in 1974,

Glenn took courses at Prairie State College to become an Emergency Medical

Technician and Paramedic.  Glenn worked during high school and continued on working in the construction business for several different Asphalt firms, beginning as a truck driver and working his way to becoming a paving foreman.  He left this business to fulfill one of his life's ambitions – to become a police officer.

He joined the Chicago Police Department in 1986 and worked there until 2002, when he took a leave of absence and then finally left the department in 2003.  Toward the end of his tenure at the Chicago Police Department, Glenn founded his own construction firm, Lewellen Home Builders, which he ran until he and Debbie separated and he went to live in Las Vegas.  He has always been a hard worker and has had success as a policeman and in his home building and development business.  There has never been a time in Glenn's life when he has not worked or otherwise contributed to the community.

While he was living in Las Vegas, prior to his arrest, Glenn became involved with the church, rediscovering his religious roots with the encouragement of his daughter, Ashley.  Not only did he become an active church-goer, but he did volunteer work through and for the church, working in a soup kitchen and in a shelter for battered women and their children.  As described more fully below Glenn also has acted as a mentor, employer, and friend to a great many people in his family and in his community.

II.   The strength, number, and quality of the relationships Glenn has created in
his life attest to his value as a contributing member of society and one who
does not need to be incarcerated to incapacitate him or deter him from future
illegal conduct.

Glenn's heart and soul are his daughters, Ashley Lewellen, 22, and Sandra

Flores, 39, and his grandchildren:  Samantha and Jacob.  While many men can be

assured of their children's love, fewer command the respect and admiration that

Glenn has earned from his daughters.  As Ashley says, "He was always my hero, my

rock and my support and he continues to be that today."  *See,* Exhibit 1, Letter from

Ashley Lewellen.  Ashley's esteem for her father inspired her to follow his footsteps

into law enforcement:

I remember as a child I would look at all of the newspaper articles that
highlighted my father's narcotics teams accomplishments and I'd flip
through all the commendations he received from the department and it
inspired me.  He inspired a passion in me for law enforcement and
from a young age I knew I wanted to work in that field.  By 6th grade, I
was reading law enforcement textbooks and training manuals.  When I
was fourteen I joined a Police Cadet/Explorer group that helps
teenagers learn more about law enforcement….His advice was
intensely valuable in helping me succeed in my internship with the
Las Vegas Metro Police and the New South Wales Supreme Court in
Australia.

*Id.*  Instead of participating in Brownies or Girl Scouts, Ashley jumped head first

into law enforcement, because of Glenn's influence.  In 2011, during this most

difficult year in her father's life, Ashley graduated from college.  With her father's

encouragement, she has now completed her Master's Degree in Law Enforcement

Administration, in Australia.

Children see the best and the worst in their parents.  Ashley has been most

impressed by her father's generosity, believing him to be "the most caring and generous man you will ever meet." *Id.* She characterizes her father as generous to a fault – often giving of himself to others who fail to appreciate or value his assistance:  "I cannot think of another person I've ever met that is willing to give so many people so many chances." *Id.* Such generosity and kindness are not the characteristics of a sociopath who must be kept away from society, rather they are the type of characteristics we seek to cultivate in our children and appreciate in others.

Ashley is not alone in her view of her father:  "I was always amazed at the number of people who knew my father and loved him…After he was arrested I was amazed at the number of people who contacted me hoping to find a way to support my Dad." *Id.* The Court had an opportunity to witness the support Glenn enjoys during the many hearings that were held in order to secure Glenn's pre-trial release.  Friends, family members, church members, and ministers came to address the court, support Glenn by their presence, or to offer assistance in other ways.

Glenn and Ashley share an incredibly close relationship, going to movies together, hanging out and talking, traveling, and attending church.  Unlike many fathers, Glenn was integrally involved in every aspect of his daughter's life:

> When I went away to college I realized how much I missed having close contact with my Dad.  For Christmas that first semester away I bought a book called "Why a Daughter Needs a Dad" which on each page gives a piece of wisdom on the importance of a father-daughter relationship. On each page I wrote a personal message about why my Dad is important to me.  There were 100 reasons.  I don't know if every

daughter could think of 100 reasons why their father is important to them but I certainly could think of many more.

*Id.*

In 2008, when Glenn and Ashley were living in Las Vegas, Glenn's relationship with Ashley was further enriched when he began to attend church with her.  This was two years after Glenn had ended his relationship with Saul Rodriguez and his compatriots and at least two years before Glenn's arrest.  Glenn's religious experience was not a "jailhouse conversion," but an independent decision he made in response to his daughter's encouragement.  Not only did he begin attending church, he became an active participant in the community life of the church, volunteering for a shelter, for the church, and considering the possibility of missionary work through the church.  *Id.* at 2.  When he returned to the Chicago area, Glenn also was involved with two churches, actively living in accordance with the beliefs and values of his church community.

Sandra Flores, Glenn's older daughter, was born when Glenn was only a teenager, himself.  Unlike many young men, Glenn did not turn his back on Sandra or her mother – he married Sandra's mother, Joan.  Until this day, although divorced many years, Joan and Glenn remain friends and Joan continues to support Glenn.  She was one of those who came to court on Glenn's behalf to support his release.

Sandra is a mother now and Glenn is involved in the lives of his grandchildren just as he was involved with his daughters.  Glenn continues to share

his enjoyment of movies with his grandson Jacob.  Sandra values Glenn's

participation, saying that "[h]e was a positive role model for Jacob, reinforcing the

importance of doing well in school and being a positive member of our family."  *See,*

Exhibit 2, Letter from Sandra Flores.

Glenn taught his granddaughter, Samantha, to drive when Sandra was too

nervous to do so.  He also helped Samantha "by emphasizing the need to go to

college" and telling her that "boys were an unneeded distraction" to her goals in life

right now.  *Id.*  Sandra and Glenn overcame their own father-daughter difficulties

and through that experience Glenn was able to show Sandra his persistence, "faith

and dedication to family".  *Id.*  He brought them back together.  Sandra describes

Glenn, saying "[h]e has been there to support me through the various rough patches

in my life, and I shake to think of what would have happened to me if I hadn't had

him around to help me."  *Id.*

Glenn is not selfish with his love.  Tiffany Dukes, married to one of Glenn's

cousins, characterizes Glenn as "a caring and respectable man" with a "loving and

joking personality."  *See,* Exhibit 3, Letter from Tiffany Dukes.  Not only is he

important to her, personally, but he has an important "grandfather role" for her

children:

> My boys love Glenn.  Most days when we go over their grandparent's
> house you could find them cuddled up on the couch with Glenn reading
> books or running around outside chasing bubbles.  It is sad to see
> Atticus' and Jack's faces now when they walk into the house to find
> that he is still not home.

*Id.* Glenn's cousin Tom Dukes is Atticus' and Jack's actual grandfather. Glenn was living with Tom and Susan Dukes while on pre-trial release. Glenn's absence also has negatively impacted Brian Dukes, Tiffany's husband. Brian "would often run career changing ideas by Glenn, and could trust in Glenn to give him the best advice could offer. Glenn has always been there for Brian, and with a new job change and another baby on the way, I know that Brian is missing his talks with Glenn." *Id.*

Glenn not only has the love and admiration of his children, but he maintains the support and good wishes of his ex-wife, Joan, and his wife, Debbie. Joan was present for Glenn's bond hearings and Debbie sat through most of the trial. Glenn and Joan were married as teens. Their marriage lasted for several years, when Joan decided to go her separate way, to Glenn's chagrin. Despite his own pain at their separation, Glenn and Joan parted as friends and remain on good terms to this day.

Until their separation, Debbie and Glenn had been married for 27 years. *See,* Exhibit 4, Letter from Debbie Lewellen. Glenn's penchant for the dramatic is not just reserved for his love of movies. When Glenn was wooing Debbie, he let his romantic imagination take hold and proposed marriage to her while he was dressed as a knight in shining armor, arriving at her house riding a most impressive white horse.

Debbie has suffered through many bouts of illness. Glenn supported her and

their daughter Ashley through these and other trying time periods in their

marriage.  Despite the difficulties that they have endured, their separation, and the

problems that have arisen as a result of this case, Debbie remains supportive of

Glenn and appreciative of the goodness in him and his great importance to their

daughter, Ashley.  *Id.*

Glenn has earned the love and praise of his in-laws – yet another mark of the

quality person before you.  Cynthia and Joe Cissell became the loving parents that

Glenn had always longed for.  It did not take him long to become a special part of

the Cissell family.  *See,* Exhibit 5, Letter from Cynthia Cissell.  Cynthia has known

Glenn for 27 years, during which time Glenn and Debbie lived within 30 minutes of

the Cissells' home.  Glenn got Cynthia's attention with the "knight on the white

horse" proposal and endeared himself to the family in short order:

> He always took time to go with us and our whole family to visit our
> parents in KY.  For several years, we all took vacations together in
> cabins on KY Lake.  Glenn was always a part of the fun, being a
> thoughtful caring person, taking time to help the kids fish and/or have
> fun water skiing or swimming.

*Id.*  Cynthia writes about one example of Glenn's thoughtfulness and willingness to

go out of his way for others.  "Once when my Mother from KY visited me, she

wanted to attend mass in one of the Cathedrals in Chicago.  Glenn insisted that he

would take us because it was not in a good neighborhood.  He drove us there and sat

in the car waiting for us almost two hours."  *Id.*

The Cissells think of Glenn more as a son than a son-in-law.  They, too, were

present throughout the trial, and one or both of them often accompanied Glenn when he came into Chicago for legal visits.  In her letter, Cynthia provides a brief list of examples of Glenn helping others- from finding someone a job, to offering financial help, housing assistance, and home repairs.  Glenn's generosity and willingness to help others is a thread that runs through all of the letters written on his behalf.

Glenn's brother-in-law, Joe Cissell, writes about Glenn giving him a ride to work every morning for a week, when Joe was changing jobs and waiting for his own car to arrive from Detroit.  *See,* Exhibit 6, Letter from Joe Cissell.  When Joe was between jobs, Glenn had Joe and his entire family living with him for a month until Joe was able to find a new job and secure a place for his family.  Joe's children, Luke, aged 10, and Ellie, aged 9 years, look up to their Uncle Glenn.  Joe describes Glenn as "a positive influence in both of my children's lives." *Id.*

Eric Buckler, another of Glenn's brothers-in-law, relates an incident that portrays Glenn's nature and "unique spirit":

> He'd just arrived at our house in Georgia from a 13 hour road trip barely an hour before, yet he insisted on joining us at our son's soccer game. "Wouldn't miss it for the world," he'd said.  And, he meant it.
>
> Before the 1st half ended, he had learned every single kid's name on our team, and was cheering each by name, non-stop, every play.  It was so much fun having him yelling encouragement not only to my son, but also all the other kids on the team, whom he'd never seen before in his life.  It was a good example to me and my wife as well, since we didn't even know all the kids names, and it was our son's team.

*See,* Exhibit 7, Letter from Eric Buckler.  Eric, too, talks about Glenn being a

positive role model for his children.  The picture of Glenn painted by his family members is especially loving, but his family members are not alone in their appreciation of his many gifts, or in their words of praise for the Glenn Lewellen they have known for decades.

Glenn not only inspired his daughter to pursue a career in law enforcement, he also influenced Ashley's friends, like Stephen Gartlan, who refers to Glenn as "Mr. Lew".  *See,* Exhibit 8, Letter from Stephen Gartlan.  Stephen writes about idolizing Glenn and about how Glenn welcomed Stephen into his home and treated him like Ashley's brother.  Stephen loved being around the Lewellen family so much that he would "be hanging around the house" even when Ashley was not home.  Stephen also talks about participating in the Cadets and Glenn's support for them, including donating new uniforms to the group when they were going to a state conference.  Stephen says, "I know Glenn is a great man I just hope you see how he has affected me greatly, and many of the lives of aspiring young Police Officers."  *Id.*

Friends like Tom Monday, who have known Glenn all of his life, and those like David Brown, who have known him for only 6 years, share their assessment of Glenn as a generous and helpful person.  *See,* Exhibits 9 and 10.  Everyone who knows Glenn, also attests to the beautiful and close relationship he has with his daughter Ashley.  Jean Beauvais met Glenn in 1994 when her daughter, Emily, and Ashley became close friends.  *See,* Exhibit 11.  Jean is grateful to Glenn for the friendship he showed her husband, Jeff, and like all of Glenn's friends, they remain

close to this date.  Glenn has a special talent, not only for making friends easily, but for maintaining close relationships with his friends over many years.

Members of Glenn's church community, too, are taken with Glenn and with his daughter, Ashley.  Ashley was the one who persuaded her father to go to church and develop his spiritual life.  *See*, Exhibit 12, Letter from Phillia Mitchell.  Ms. Mitchell witnessed Glenn's spiritual awakening, which began before he went to live in Las Vegas, and deepened while he was in Las Vegas.  Ms. Mitchell relates that Glenn "became like a second father to my daughter, and his church family grew to love him…. Glenn is a very unselfish, giving man.  He has a gentle spirit and a sincere heart."  *Id.*

Members of the business community who worked with or for Glenn when he was a builder and land developer describe him as a good business man, a generous builder, and someone who "employed many, many people and was responsible for a number of wonderful subdivisions in our area and putting many young families into their first homes."  *See,* Exhibit 13, Letter from Linda Hentsch.  Linda Hentsch worked with Glenn for five years and had an opportunity to see him as both a business man and a family man.  She says that "[f]rom the time the clients decided to build their home, to the day they closed, Glen had an open door and was always open to their questions and willing to help.  He is a talented man and a hard worker, always on site at this projects and available to his staff.  His projects helped many families."

III.    Glenn's performance while on pre-trial release further demonstrates that a
        long prison term is not necessary in this case.

        Glenn Lewellen knew from the time of his arrest and the indictment in this

case that, if convicted of both counts charged against him, he faced the possibility of

spending the rest of his life in prison.  Despite that knowledge, Glenn honored his

promise to the Court when he was released and complied fully with all of the

conditions imposed upon him.  This Court reduced the restrictions placed on Glenn's

movements on at least two occasions, in response to his compliance and with the

agreement of his Pre-trial Services Officer.  *See,* R. 432, 726, and 778-779.

        Glenn lived up to the trust placed in him by the Court at the time of his pre-

trial release, when he still had sufficient funds and plenty of incentive to flee, but

did not do so.  Glenn's behavior while on pretrial release for 10 months prior to and

during his trial is evidence that the Court can rely on to support a finding that

Glenn is more than capable of living according to the law and does not need to be

incapacitated in order to teach him to do so.

IV.     Glenn's status as a former police officer, medical issues, and age, will render
        a prison term of any length of time harsher for him than it would be for
        others convicted of a similar offense.

        A.      Former law enforcement offers are more susceptible to abuse in prison
                than other offenders.

        If this Court imposes a sentence of 20 years or more, Glenn Lewellen will be

designated to a United States Penitentiary  [USP] to serve his time. He is less likely

to survive imprisonment in a USP than an ordinary inmate due to his status as a

former police officer, which will make him a target of attack by other inmates. Due

to his age and physical condition, it will be more difficult for him to fend off attacks

by younger and stronger inmates who are serving life sentences and have little to

lose and something to gain by attacking a former police officer.

The United States Supreme Court –even before the advent of *Booker* -- found

that police officers' susceptibility to abuse in prison, combined with other factors, is

an appropriate reason for which to depart from the sentencing guidelines:

> The District Court did not abuse its discretion in considering these
> factors. The Court of Appeals did not dispute, and neither do we, the
> District Court's finding that "[t]he extraordinary notoriety and
> national media coverage of this case, coupled with the defendants'
> status as police officers, make Koon and Powell unusually susceptible
> to prison abuse," 833 F.Supp., at 785–786.

*Koon v. United States*, 518 U.S. 81, 111-12 (1996).  *See, also, Cayce v. George,* No.

1:11–00046, 2011 WL 6754067, at *3 (M.D.Tenn. Dec. 23, 2011) (collecting cases

noting that former law enforcement officers are at higher risk for violence in

prison).  *Parker v. United States*, CIV. 11-176-ART, 2012 WL 2414887 (E.D. Ky.

June 26, 2012).

The case of defendant Parker is illustrative.  Parker is a former police officer

who was sentenced to life in prison.  When inmates at the United States

Penitentiary in Big Sandy, Kentucky, found out that Parker had been a police

officer, after Parker was released into general population, "[t]wo inmates attacked

Parker the following day. [citation omitted] The assailants, who Parker claims not

to have recognized, stabbed Parker twenty-seven times in head, neck, and upper

and lower abdomen. [citation omitted] Prison officials transported Parker to

Highland Medical Center, where he was found to have a punctured lung and

multiple stab wounds." *Parker v. United States*, CIV. 11-176-ART, 2012 WL

2414887 (E.D. Ky. June 26, 2012).

In order to maintain the safety of a former police officer in custody,

institutions often place former officers in administrative detention, or segregation,

resulting in a sentence of solitary confinement. *See, e.g., United States v. Zuni,* 506

F.Supp.2d 663, 684 (D.N.M.2007) (noting that it was "very likely" that defendant

would have to serve his sentence in solitary confinement "because of his background

as a former law enforcement officer"); *Valentin v. Murphy,* 95 F.Supp.2d 99, 102

(D.Conn.2000) ("Having determined initially that [defendant] would be at risk in

the general state prison population, based on his status as an ex-law enforcement

officer, the defendants were not obliged to revisit that decision in the absence of

information that the risk had dissipated").   Having to spend a decade or more in

solitary confinement – in whole, or in part – renders Mr. Lewellen's potential

penalty much harsher than that of a typical defendant.

Solitary confinement, particularly when it is extended or long-term, has been

shown to have deleterious effects on an individual's mental health.[2]   This is

---

[2] "[I]f the particular conditions of segregation being challenged are such that they inflict a serious mental illness, greatly exacerbate mental illness, or deprive inmates of their sanity, then defendants have deprived inmates of a basic necessity of human existence—indeed, they have crossed into the realm of psychological torture.

especially true for people who have a history of mental illness, including chronic

depression.  Courts have found that:

> For these inmates, placing them in the SHU is the mental equivalent
> of putting an asthmatic in a place with little air to breathe. The risk is
> high enough, and the consequences serious enough, that we have no
> hesitancy in finding that the risk is plainly "unreasonable." *Helling,*
> 509 U.S. at ——, 113 S.Ct. at 2481. Such inmates are not required to
> endure the horrific suffering of a serious mental illness or major
> exacerbation of an existing mental illness before obtaining relief. *Id.* at
> —— – ——, 113 S.Ct. at 2480–81.

*Madrid v. Gomez,* 889 F. Supp. 1146, 1265-66 (N.D. Cal. 1995).  *See, also,*

*Sandin,* 515 U.S. 472, 484, 115 S.Ct. 2293 (1995); *Sims,* 230 F.3d at 23 (sentence of

one year was "of sufficient length to be atypical and significant"); *Colon,* 215 F.3d at

229 (a prisoner's SHU confinement for 305 days was 'atypical' and a 'severe

hardship'); *Morris v. Travisono,* 549 F.Supp. 291 (D.R.I.1982) *aff'd* 707 F.2d 28 (1st

Cir.1983) (solitary confinement for 8.5 years of prisoner who murdered a prison

guard and then engaged in minor acts of disobedience was without sufficient

penological justification and constituted cruel and unusual punishment); *Silverstein*

*v. Bureau of Prisons,* 704 F.Supp.2d 1077 (D.Colo.2010) (twenty-seven years of

---

Courts have recognized that conditions in segregation could cross this line, particularly, where the length of segregation is indefinite or long term. For example, in *Jackson,* the Court observed that "although depression, hopelessness, frustration, and other psychological states may well prove to be inevitable byproducts of lifelong incarceration, the threat of substantial, serious and possibly irreversible if not critical psychological illness together with prolonged or indefinite segregated confinement would increase the burden on prison authorities to explore feasible alternative custodial arrangements." [citations omitted]  *Madrid v. Gomez,* 889 F. Supp. 1146, 1264 (N.D. Cal. 1995).

solitary confinement for prisoner who murdered three people while in prison stated

a claim under the Eighth Amendment); *Carothers v. Follette,* 314 F.Supp. 1014,

1026 (S.D.N.Y.1970) (stating, in dicta, that placing a prisoner in solitary

confinement for 4.5 months for writing a letter to a judge criticizing the prison

administration would constitute grossly disproportionate and therefore

unconstitutional punishment); *Ruiz v. Johnson,* 37 F.Supp.2d 855 (S.D.Tex.1999)

(administrative segregation of inmates unconstitutional because of its impact on

their mental health), *cited in, Peoples v. Fischer*, 11 CIV. 2694 SAS, 2012 WL

2402593 (S.D.N.Y. June 26, 2012).

In addition to case law that has developed in the context of civil rights

challenges to prison conditions, legal, psychological, and psychiatric literature

addresses the detrimental impact of imprisonment, particularly in conditions of

solitary confinement, on those who must endure it.  *See generally* Craig Haney,

*Mental Health Issues in Long-term Solitary and "Supermax" Confinement,* 49 Crime

& Delinq. 124, 130–141 (2003) (describing the SHU syndrome and the long-term

effects of solitary confinement on prison inmates); Stuart Grassian, *Psychiatric*

*Effects of Solitary Confinement,* 22 Wash U. J.L. & Pol'y 325, 333–45 (2006) (same);

*see also Miller ex. rel. Jones v. Stewart,* 231 F.3d 1248, 1252 (9th Cir.2000) ("[I]t is

well accepted that conditions such as those present in SMU II ... can cause

psychological decompensation to the point that individuals may become

incompetent.").  *Hutchinson v. Florida*, 677 F.3d 1097, 1106 (11th Cir. 2012) *cert.*

*denied,* 133 S. Ct. 435, 184 L. Ed. 2d 266 (U.S. 2012).

> B.   Older offenders do not require lengthy prison sentences because they are less likely to become recidivists.

The age of a defendant is relevant to determining the appropriate length of any term of imprisonment.  Court have found that "under § 3553(a)(2)(C), age of the offender is plainly relevant to the issue of "protect[ing] the public from further crimes of the defendant." *See also Booker,* 543 U.S. at ----, 125 S.Ct. at 765." *United States v. Nellum*, 2:04-CR-30-PS, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005).

The current life expectancy for a healthy man who is 56 years old is approximately 24 years.  This number is reduced for those – like Glenn Lewellen -- who suffer from hypertension, and further reduced for those who have hypertension that is untreated.  Consequently, sentencing Mr. Lewellen to a term of imprisonment of 24 years or more is the rough equivalent of a life sentence. Nothing in his life up until now, nor any of the claims presented at trial justifies the imposition of a life sentence in Glenn Lewellen's case.

This is especially true when sentencing a person of Mr. Lewellen's age, when the Sentencing Commission and other researchers have determined that the likelihood of recidivism drops dramatically for those offenders over 50 years old, removing any compelling need to incapacitate or deter future criminal conduct on the part of the older offender. In its 2004 study, the Sentencing Commission has found that recidivism rates decline relatively consistently as age increases. *See* U.S. Sentencing Commission, Measuring Recidivism: The Criminal History Computation

of the Federal Sentencing Guidelines 12, ex. 9 (2004).  According to this study,

recidivism rates decline steadily with age, from 35.5% for offenders age 21 and

younger to 9.5% for offenders over age 50.  *Id.*

District Courts have considered this factor along with others in deciding to

impose a sentence that is lower than the applicable guideline range.  For example, a

district court in Wisconsin relied on the defendant's age – over 50 – along with

several other factors also relevant to this case:

> Further, given defendant's age, lack of any prior criminal record and
> otherwise positive character, I found a below range sentence sufficient
> to protect the public and deter defendant from re-offending. Unlike
> some who qualify for the safety valve, defendant was a true first-time
> offender, not just someone with 1 criminal history point or less.
> Statistically, the rate of recidivism for such defendants is quite low, *see
> United States v. Germosen,* 473 F.Supp.2d 221, 227 (D.Mass.2007)
> (citing studies), as is the rate for those, like defendant, in their fifties,
> *see* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal
> History Computation of the Federal Sentencing Guidelines* 12 (May
> 2004). Coupled with defendant's solid work record, good performance
> on pre-trial release, and strong family support, I saw a limited need to
> protect the public. *See* 18 U.S.C. § 3553(a)(2)(C). Likewise, because
> defendant had never before served any time in jail, I found a below
> range sentence sufficient to deter him from re-offending. *See* 18 U.S.C.
> § 3553(a)(2)(B).Under all the circumstances, I found a sentence of 24
> months sufficient but not greater than necessary.

*United States v. Aguilera*, 06-CR-336, 2008 WL 4830802 (E.D. Wis. Oct. 28, 2008).

*See, also, Cook v. Smith*, 1:08CV300, 2011 WL 1230793 (M.D.N.C. Mar. 28, 2011);

*United States v. Cannaday*, 08-CR-172, 2009 WL 1587183 (E.D. Wis. June 5, 2009);

*United States v. Nellum,* No. 2:04–CR–30–PS, 2005 WL 300073, at *3 (N.D.Ind.

Feb. 3, 2005) (unpublished) (imposing a term of incarceration of 108 months on a

57-year old defendant where the Guidelines recommended a minimum of 168

months).

Even the Seventh Circuit has recognized that lengthy sentences may be

inappropriate for the "average 58 year old. … [S]ince the tendency to commit

crimes, violent and otherwise, diminishes with age (which is true, U.S. Sentencing

Commission, "Measuring Recidivism: The Criminal History Computation of the

Federal Sentencing Guidelines" 12, 28 (May 2004); John H. Laub & Robert J.

Sampson, "Understanding Desistance from Crime," 28 *Crime & Just.* 1, 5 (2001);

Keith C. Owens, Comment, "California's 'Three Strikes' Debacle," 25 *Sw. U.L.Rev.*

129, 155 (1995); Christopher Slobogin, "Dangerousness and Expertise," 133 *U. Pa.*

*L.Rev.* 97, 121 (1984)), a 58 year old need not be given a 22-year sentence in order to

be kept out of circulation until he is safe. That may well be true of the average 58

year old. *United States v. Bullion*, 466 F.3d 574, 577 (7th Cir. 2006).

    C.    Older offenders with chronic health conditions have a more difficult
        experience in prison.

In 2000, the Department of Justice, National Institute of Corrections and

Criminal Justice Institute, conducted a study of elderly, chronically ill, and

terminally ill inmates in the prison system.  This study considered the term

"elderly" to apply to inmates beginning at age 50, because "several important

factors seem to speed the aging process for those in prison.  These factors include

the amount of stress experienced by new inmates trying to survive the prison

experience unharmed; efforts to avoid confrontations with correctional staff and

fellow inmates; financial stress related to inmates' legal, family, and personal

circumstances; withdrawal from chronic substance abuse; and lack of access to

adequate medical care prior to incarceration." What We Know About Elderly,

Chronically Ill, and Terminally Ill Inmates, National Corrections Institute (2000)

pp. 7-8. All of these factors – except for withdrawal from chronic substance abuse –

will apply in Glenn's case. After age 50, life in prison accelerates the aging process

to "an average of 11.5 years older than their chronological ages after age 50." *Id.* at

10.  This means that with an average life expectancy of 24 years at age 56, one-half

of those years will be lost in the accelerated aging associated with incarceration,

meaning that even a sentence of 10 years may prove to be a life sentence for Glenn

Lewellen.

For those who are experiencing incarceration for the first time at this

advanced age, problems such as adjusting to the new environment can cause

underlying stress and give rise to new stress-related health problems, or aggravate

existing ones.  The study found that this stress may also be increased because older

first-timers are "easy prey" for more experienced predatory inmates.  In Glenn's

case, he is currently being treated for hypertension, a condition that is susceptible

to aggravation by increased stress.

Committing Mr. Lewellen to imprisonment for a decade or more, knowing

that prison will shorten his life expectancy, that the stress of adjusting to prison life

will aggravate his chronic medical condition, and that he will be subjected to a

greater likelihood of abuse and harm in prison – both due to his status as a former

police officer and to his relatively advanced age in comparison to most inmates –

constitutes cruel and inhuman punishment – in reality, if not in law.

In addition to the personal cost to Mr. Lewellen and his health and well-

being, the fact that he is already being treated for a chronic illness makes is

incarceration more expensive for taxpayers to bear.  According to the Department of

Justice study, "[t]he annual cost of incarcerating this population has risen

dramatically to an average of $60,000 to $70,000 for each elderly inmate compared

with about $27,000 for others in the general population." *Id.* at 11.  At double the

cost, ten years imprisonment for Mr. Lewellen could cost as much as $600,000. He is

certainly not by any measure in the category of offender whose incapacitation is

worth this extreme cost.

V.     The 10-year mandatory minimum prison term in this case is more than
       sufficient and far greater than necessary to accomplish any humane basis for
       a sentence in this case.

A decade-long sentence of imprisonment for a 56 year old man, is far more

than sufficient to serve the purpose of punishment.  Glenn Lewellen has never been

to prison, nor has he spent any time in jail. A decade in prison may be a reasonable

punishment for a person who is a recidivist and has demonstrated that serving

prison time has no salutary effect on his or her behavior, but it is not reasonable for

a person, like Mr. Lewellen, who has never spent a day in prison or jail, much less a

year or more. *See, e.g., United States v. Villanueva*, 07-CR-149, 2007 WL 4410378

(E.D. Wis. Dec. 14, 2007) [I did, however, consider the fact that defendant had never

been to prison before; thus, a substantial term was not needed to deter him from re-

offending. *See United States v. Qualls,* 373 F.Supp.2d 873, 877 (E.D.Wis.2005)

["Generally, a lesser period of imprisonment is required to deter a defendant not

previously subject to lengthy incarceration than is necessary to deter a defendant

who has already served serious time yet continues to re-offend.").]

Prison is not designed to be rehabilitative, as clearly stated in Title 18,

United States Code, Section 3582:

> The court, in determining whether to impose a term of imprisonment,
> and, if a term of imprisonment is to be imposed, in determining the
> length of the term, shall consider the factors set forth in section
> 3553(a) to the extent that they are applicable, *recognizing that
> imprisonment is not an appropriate means of promoting correction and
> rehabilitation.*

In this case, where Glenn Lewellen has not been involved in any alleged illegal

conduct for seven years, and has essentially rehabilitated himself, prison will not

serve this purpose.  Nor is there any need for individual deterrence or

incapacitation in Mr. Lewellen's case.

The government has presented no evidence that imposing time beyond a

decade in prison results in any general deterrent effect at all, let alone that general

deterrence increases with the length of the sentence imposed.   In fact, scholars

suggest that, "Research to date generally indicates that increases in the *certainty* of

punishment, as opposed to the *severity* of punishment, are more likely to produce

deterrent benefits."  [emphasis in original] Valerie Wright, "Deterrence in Criminal

Justice: Evaluating Certainty vs. Severity of Punishment" The Sentencing Project
(2010) p. 1.

Deterrence is based on the dubious premise that individuals are rational
actors who make cost-benefit assessments when deciding to undertake a certain
behavior.  The deterrence theory also requires that the general public be aware of
the penalties for engaging in proscribed conduct. "In this regard, research
illustrates that the general public tends to underestimate the severity of sanctions
generally imposed." Michael Tonry, "Learning from the Limitations of Deterrence
Research" in Crime and Justice: A Review of Research, edited by Michael Tonry.
The University of Chicago Press, 2008.   Studies have also shown that longer prison
sentences lead to higher – rather than lower – rates of recidivism, because people
who are able to maintain family and community ties throughout a shorter prison
term are more likely to be successful during reentry.[3]

Even the Department of Justice's Bureau of Justice Statistics reports that
recidivism rates do not decrease when more severe sentences are imposed.  Patrick
Langan and David Levin. "Recidivism of Prisoners Released in 1994," U.S.
Department of Justice, Office of Justice Programs, Bureau of Justice Statistics,

---

[3] *See, e.g.,* Paul Gendreau, T. Little, and Claire Goggin, "A Meta-Analysis of Adult
Offender Recidivism: What Works!"Criminology, 34(3):575-607, 1996; Martin A.
Levin, "Policy Evaluation and Recidivism," Law and Society Review, 6(1):17-46,
1971; and Lin Song and Roxanne Lieb, "Recidivism: The Effect of Incarceration and
Length of Time Served," Olympia, WA:Washington State Institute of Public Policy,
1993, *cited in,* Valerie Wright, "Deterrence in Criminal Justice: Evaluating
Certainty vs. Severity of Punishment" The Sentencing Project (2010).

2002.  In short, "[e]xisting evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms. In fact, research findings imply that increasingly lengthy prison terms are counterproductive."  Valerie Wright, "Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment" The Sentencing Project (2010) p. 7.

When considering "just punishment," the question becomes how much is enough?  A sentence of 10 years will cost taxpayers at least $300,000,[4] and, as described above, possibly double that cost.  In view of Mr. Lewellen's age and his physical ailments, the cost is likely to be more than $300,000, with costs increasing as the sentence extends beyond 10 years and Mr. Lewellen continues to age. Without demonstrating a societal benefit that corresponds to the increased cost, it is unreasonable to contemplate a sentence of more than a decade in Mr. Lewellen's case.  Even a decade seems unjust and excessive.

What is "just" must also be considered within the context of the case itself. Glenn Lewellen was not charged with, nor accused of, being any part of the three murders that were alleged to have been committed by two of his co-defendants. Manuel Uriarte, though acquitted of two of the murders with which he was accused, was not acquitted of the third.  Rather than re-try Mr. Uriarte, the government

---

[4] The Administrative Office of the Courts suggests that the monthly cost of $2,467.78 be used for imprisonment [PSI, p. 20, ll. 559], resulting in a yearly cost of $29,613.36, or a total cost of $290,613.36 for 10 years of incarceration - without accounting for increases in the cost of living or inflation.

chose to offer him a plea agreement which limits his exposure to a fifteen-year

prison sentence  (180 months) and permits him to seek a sentence that does not

involve any prison time at all.  *See,* R. 1170, p. 11, para. 10.  Mr. Uriarte is not

being called upon to co-operate in return for this limit on his sentence.

Co-defendant Andre Flores, known as "Turtle", has admitted to killing two

people in cold blood, for money, at the request of Saul Rodriguez and with the help

of Manuel Uriarte, and to having attempted to murder a third person. In return for

these admissions, he is facing a sentence of only 175 months, or 14 ½ years.  *See,* R.

448-1, p. 29.  There is no "justice" or general deterrent value in rewarding the

taking of human life with sentences that are less than half of that which the

government is advocating for Mr. Lewellen[5], for whom there was no allegation of

murder, nor any reliable evidence of involvement in any violent crime whatsoever.

Courts have recognized that punishment is not the only concern that must be

served and that it must be balanced with consideration of rehabilitation and provide

for the needs of the defendant when he is released from prison:

> The Court also is mindful that the goals of punishment and deterrence
> must be balanced with the rehabilitation and improvement of the
> defendant. 18 U.S.C. § 3553(a)(2)(D); *Simon,* 361 F.Supp.2d at 49. As
> another sentencing court in this District has noted, **rehabilitation
> "cannot be served if a defendant can look forward to nothing
> beyond imprisonment**." *United States v. Carvajal,* No. 04 CR
> 222(AKH), 2005 WL 476125, at *6 (S.D.N.Y. Feb. 22, 2005)[emphasis
> added]; *see also Simon,* 361 F.Supp.2d at 49 ("It is doubtful whether a
> sentence of 324 to 405 months provides such hope.")

---

[5] The government advocates a guideline range of life, but has represented that it
intends to recommend a sentence of 30 years in Mr. Lewellen's case.

*United States v. Sanchez*, 99 CR. 338-12 (RWS), 2007 WL 60517 (S.D.N.Y. Jan. 8, 2007).

WHEREFORE, defendant GLENN LEWELLEN, through counsel, respectfully requests that this Court impose a sentence at the mandatory minimum of 10 years in the custody of the Bureau of Prisons.

In the alternative, defendant GLENN LEWELLEN respectfully requests that a prison term of 10 years be imposed, to be followed by a term of supervised release that may include a condition of home detention or community confinement if the Court determines that any further deprivation of liberty is needed to serve the interests of justice and fairness.

DATE:        February 6, 2012                    Respectfully submitted,

                                                 By:     s/Andréa E. Gambino

                                                         s/Matthew Madden
                                                         Attorneys for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois  60604
(312) 322-0014
agambinolaw@gmail.com

Case 1:09-cr-00332   Document 1248   Filed 02/06/13   Page 30 of 30   PageID 10068
Case: 13-2321      Document: 7-10      Filed: 07/11/2013      Pages: 310

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 6, 2012, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which sent notification of

such filing to the following:

Steven Block, Esq.
Terra Reynolds, Esq.
Tiffany Tracey, Esq.
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604


and I hereby certify that I have mailed by United State Postal Service or hand

delivered the document to the following non-CM/ECF participants: N/A.


DATE:          February 6, 2012          Respectfully submitted,

                                         By:     s/Andréa E. Gambino
                                                 Attorney for Glenn Lewellen

Law Offices of Andréa E. Gambino
53 W. Jackson Blvd., Suite 224
Chicago, Illinois 60604
(312)322-0014

May 23, 2012

The Honorable Joan B. Gottschall
United States District Court for the
Northern District of Illinois, Eastern Division
219 S. Dearborn Street
Chicago, Illinois 60604

Dear Judge Gottschall,

My name is Ashley Lewellen and I am Glenn Lewellen's daughter. I would like the opportunity to tell you about my father and what he means to me. From the time I was a small child, I was a Daddy's girl. He was always my hero, my rock and my support and he continues to be that today. I remember as a child I would look at all of the newspaper articles that highlighted my father's narcotics teams accomplishments and I'd flip through all the commendations he received from the department and it inspired me. He inspired a passion in me for law enforcement and from a young age I knew I wanted to work in that field. By 6th grade, I was reading law enforcement textbooks and training manuals. When I was fourteen I joined a Police Cadet/Explorer group that helps teenagers learn more about law enforcement. My father was always helping me, giving me tips and teaching me how to be a good police officer. His advice was intensely valuable in helping me succeed in my internship with the Las Vegas Metro Police and the New South Wales Supreme Court in Australia.

I would like the chance to tell you about the kind of man that my father is. My father is perhaps the most caring and generous man you will ever meet. I have gone my entire life watching him go out of his way to help people regardless of how they treated him. Many times people have come to him time and time again for money, for advice, for favors only to treat him poorly afterwards. Especially as I grew up I would always hassle him about giving to people who never gave back to him and often disappeared out of his life until they needed the next favor. It bothered me greatly to see my father taken advantage of time and time again. I just could not understand how he could continue to give and help people when he not only received nothing in return but often was disappointed and had his feelings hurt by these people's actions. I cannot think of another person I've ever met that is willing to give so many people so many chances. But he has a giving and caring personality down to the core and he could not let someone be in need if he could do something about it.

I was always amazed at the number of people who knew my father and loved him. He has this amazing ability to meet people and make them feel like they've known him for their entire life. He has this amazing presence when he walks into a room. Somehow he's able to show people his generous, caring and funny personality in just a few moments. After he was arrested I was amazed at the number of people who contacted me hoping to find a way to support my Dad. More than that I was amazed at how many people knew me because of my father. It was truly a testament to his love for me knowing that he must have talked everyone's ear off about me for them to know so much about me having never met me before.

Many people love and miss my father but his presence has and will continue to be greatly missed perhaps by no one more than me. I was always blessed with an incredibly close relationship with my Dad. He made an incredible effort to be a part of my life and to know what was going on with me. I always looked forward to spending time with my Dad in whatever we did. Our favorite thing to do was go to the movies together. During the previews we'd lean over and give each other the thumbs up or down on movies we wanted to see. But what I miss most are the long talks we'd have as we sat in the car in the parking lot of the movie theater.

Driving has always been a special time for us and often brought out some of the best conversations where he passed on advice and wisdom that I use to guide my life today. When my father was in Las Vegas I stayed with him for two summers between my school semesters. On both occasions we drove back from Las Vegas to Chicago. It takes about twenty-four hours if you stop only for gas. You learn a lot about a person when you're stuck in a car together for that long, twice. They were experiences I will never forget. We talked at length about our lives, our regrets, our future goals and more. It was an amazing experience to get to know my father and I'll cherish it forever. I greatly miss having the ability to sit next to my Dad and just talk.

As I think about the future and the things my Dad could potentially miss out on it upsets me greatly. I have made a wonderful life in Australia with the love of my life. Someday in the future we will get married and it is incredibly painful to think that my father may not be there to walk me down the aisle and be there to celebrate with us. When more could a father be missed by a daughter? Also, I will soon will join a police force and will graduate. My whole life I have imagined a proud father standing watching me live my dream and the thought of him missing out on that experience brings tears to my eyes as I write this. It is difficult for me to not be able to pick up the phone and talk to my Dad about things. I greatly miss the times where I could call him and celebrate my achievements or ask for advice on how to handle a problem.

When I went away to college I realized how much I missed having close contact with my Dad. For Christmas that first semester away I bought a book called "Why A Daughter Needs a Dad" which on each page gives a piece of wisdom on the importance of a father-daughter relationship. On each page I wrote a personal message about why my Dad is important to me. There were 100 reasons. I don't know if every daughter could think of 100 reasons why their father is important to them but I certainly could think of many more.

In 2008 my Dad started going to church with me. Over the next few years I would see a great change in him. If it was possible he seemed to be more giving and generous than ever. At Oasis Baptist Church in Las Vegas he volunteered at a homeless shelter, volunteered at the church and even considered becoming a missionary abroad. In some of our long talks over the years, he greatly expressed a desire to reconcile with many people in his life and to make amends where he could. He's even continued to do this since his arrest. When he was released on bond he was able to reconcile with his mother and his siblings and he hopes to continue to reconnect with them.

I hope that you will take this letter and the letters of others into consideration when making your decision. It is difficult to explain the character of a man and the importance of a father in a letter but I hope I've given you a picture of the loving and caring father that is Glenn Lewellen.

Thank you for taking the time to read my letter,
Ashley Lewellen

The Honorable Joan B. Gottschall
United States District Court for the Northern District of Illinois
219 S. Dearborn St.
Chicago IL 60604

Dear Judge Gottschall:

My name is Sandra Flores. I am writing to you on behalf of my father Glen Lewellen. The past 2 years
without my father have been heartbreaking and difficult for me and my children.  My father is a
wonderful grandfather. He found a common interest in movies with my youngest son Jacob.  Jacob
would look forward to their frequent movie dates, because he knew his grandfather would let him eat
all the popcorn and candy he could. They would stop after for a bite to eat and spend time discussing
the movie and all other things going on in Jacob's life. He was a positive role model for Jacob, reinforcing
the importance of doing well in school and being a positive member of our family.  This is greatly missed
by all of us.

My father also played a positive role in my daughter Samantha's, 16 life. When I refused to no longer
take my daughter to teach her to drive because of my nerves, he was the only one who gladly stepped in
to help her. He took her out time after time, with patience and praise. If he had not been there, it would
have taken her much longer to learn. He also reinforced good morals to her by emphasizing the need to
go to college and that boys were an unneeded distraction. She sincerely misses him, and wants to be
able to have his support again in the future.

As for what my father means to me. It's more than I can put into words.  He has helped me time and
time again in my life. We had made so many future plans.  He has been there to support me through the
various rough patches in my life, and I shake to think what would have happened to me if I hadn't had
him around to help me.  My father had a rough childhood, full of abuse and alcoholic parents. He had
me at 15 years old. He worked hard to build a life for our family and make sure we were taken care of
well, even though all the odds were against him. And he succeeded at doing so.  When we let an
argument stop us from talking for many years, I believe it was his faith and dedication to family that
brought us back together.  That period of not talking was devastating to me; I needed his love and
guidance and missed it greatly. I plead with you to not let me lose much more time with him. I need him,
I love him and he is desperately missed.


Respectfully,


Sandra Flores
847-714-2750
Flores.sandra72@yahoo.com

May 20, 2012

The Honorable Joan B. Gottschall
United States District Court for the
Northern District of Illinois, Eastern Division
219 S. Dearborn Street
Chicago, Illinois 60604

Dear Judge Gottschall:

My name is Tiffany Dukes and I am a kindergarten teacher and mother of two. Glenn is

my husband's cousin, and our family is extremely close to him. To me Glenn is a caring

and respectable man. He has always been there for our family and me.

Since Glenn has gone to jail, our family has had a hard time. Walking into my in-law's

house just is not the same without his smile there to greet us, or a joke or two.  The first

time I met Glenn was at my first Dukes' family holiday, Thanksgiving.  I was nervous

about meeting all of the family.  One family member that stands out to me the most on

that day is Glenn.  Glenn's loving and joking personality is one in a million. I can truly

say that he lightened the mood for me that day and made me feel like a part of the

family.

It is now almost 8 years later and Glenn now plays a different role in my life.  He is not

just the family member you can go to and count on getting a laugh, but he is my cousin,

friend, and a grandfather role to my children.  My boys love Glenn.  Most days when we

go over to their grandparent's house you could find them cuddled up on the couch with

Glenn reading books or running around outside chasing bubbles.  It is sad to see

Atticus' and Jack's faces now when they walk into the house to find that he is still not

home.  To a 3 year old and 1 ½ year old it is hard to explain to them where their

cousin/friend has gone.

Not only do I see my boys missing Glenn, but it has also affected my husband extremely.  He often would run career changing ideas by Glenn, and could trust in Glenn to give him the best advice he could offer.  Glenn has always been there for Brian, and with a new job change and another baby on the way, I know that Brian is missing his talks with Glenn.

As you can see Glenn is a huge part of our family that we are missing.  He is a standup guy that we could always count on.


Sincerely,


Tiffany Dukes

The Honorable Joan B. Gottschall                                      5-30-2012
United States District Court for the
Northern District of Illinois, Eastern Division
210 S. Dearborn Street
Chicago, Illinois 60604

Dear Judge Gottschall:

I am Cynthia Cissell, Glenn Lewellen's Mother-in-law, writing to you regarding his upcoming
sentencing on June 27, 2012.

The tasks that you perform.....sentencing a person for wrong doing.....what a grave responsibility!
You have been appointed to this position and I know you are a fair and compassionate person. This
was evident when you released Glenn on Bond in May, 2011. I also believe that God guides the
hand of people who hold such powerful positions. I have faith that you will judge Glenn fairly. This
letter is simply to give you more information about Glenn to help you make a more informed
decision.

Glenn has been married to my daughter Debbie for 27 years and during all of those years, they have
lived within thirty minutes of our home so we know Glenn well. From the very beginning, when
Glenn proposed to Debbie from a white horse in a knight's shining armor, we liked him and
accepted him into our family. He always took time to go with us and our whole family to visit our
parents in KY. For several years, we all took vacations together in cabins on KY Lake. Glenn was
always a part of the fun, being a thoughtful caring person, taking time to help the kids fish and/or
have fun water skiing or swimming.

After five years of marriage, Glenn and Debbie made us grandparents with a sweet baby girl,
Ashley. Glenn became a wonderful caring father. He was happy that Ashley was able to attend a
Catholic school even though he practices a different religion. He felt that she would be a better
person for the experience. He has always taken time to be with her and support her in her academic
achievements. After she graduated from college, he took her on a driving trip out west to see the
sights of our beautiful country. This trip strengthened the adult Father-Daughter bond between
them. He is such an important part of Ashley's life and she of his.

Once when my Mother from KY visited me, she wanted to attend mass in one of the Cathedrals in
Chicago. Glenn insisted that he would take us because it was not in a good neighborhood. He drove
us there and sat in the car waiting for us almost two hours. We apologized for the long wait but he
would hear none of it. He said he was happy to do it for her. This is the kind of caring person Glenn
is......always thoughtful and willing to help.

I have never seen Glenn take a drink of alcohol except his wedding toast. Once, I asked him about
this and he told me that both of his parents had problems with alcoholism. He said that he was not
going to take a chance that he would end up with the same problem, so he never touched alcohol. I
respect the courage it took to do this.

Over the years, we have come to think of Glenn more as a son than a son-in-law because of his caring nature.

Glenn went into General Contracting when the housing industry was booming.  He was always giving some one a helping hand:

> Once, when a young son of a former neighbor came to him with a sad story and asked for a job, Glenn gave him one and helped him straighten out his financial problems.

> His Aunt Diane, who was like a Mother to Glenn when he grew up, was having trouble making her mortgage payments.  Glenn was able to get her mortgage refinanced by putting his name on the loan and allowed her to make payments which were much lower than the original ones.

> One of his cousins was down on his luck and needed a place to live.  Glenn took him under his wing, found him a place to rent and helped him until he was on his feet again.

> Once when my husband and I needed a new roof on our house, Glenn took control, hired the roofing company he trusted, monitored the job, making sure it was done correctly. All we had to do was pay for it.

These are just a few of the occasions that I saw personally.  I know that there are many more that I was not personally involved in.

We miss Glenn very much and want him back in our lives as soon as possible.
I ask only that you consider all of the things that I have written today when the time comes to judge Glenn Lewellen.

Sincerely,

Cynthia Cissell

Cynthia Cissell
708-478-9182
cissell2@ameritech.net

May 31, 2012

The Honorable Joan B. Gottschall
United States District Court for the
Northern District of Illinois, Eastern Division
219 S. Dearborn Street
Chicago, Illinois 60604

Dear Judge Gottschall:

My name is Joe Cissell.  I'm 40 years old and work for Mazda as a Zone
Manager for the Midwest Region.  When I started this job over 5 years
ago, Glenn Lewellen drove me to work every morning at 6:30am for a
week straight as I waited for my car to arrive from Detroit.  He refused to
let me rent a car.  Glenn Lewellen has been my brother–in–law for over 25
years.  He is the Uncle of my 10 year old son Luke and 9 year old
daughter Ellie.

Glenn has always been a valuable member of our family and has always
gone out of his way to help us out whenever possible.  He does not have
a selfish bone in his body.  He allowed our whole family to live with him
for a month when I was in between jobs and always finds ways to make
his friends and families lives better.

Glenn has been a positive influence in both of my children's lives and
they have always looked up to him.  They really miss him a lot and ask
about him all the time.

There is a large void in all of our lives with Glenn gone.

I know you have a very difficult decision ahead of you but I wanted to
make sure you know the Glenn our family loves and wants to come home
as soon as possible.  Please feel free to contact me on my Cell phone if
you would like to hear more of how much of a positive impact Glenn has
had on our lives.

Sincerely yours,

1

Joe Cissell
630–596–6148
jcissell@mazdausa.com
11834 London Bridge Drive
Mokena, IL 60448

June 4, 2012

The Honorable Joan B. Gottschall
United States District Court for the
Northern District of Illinois, Eastern Division
219 S. Dearborn Street
Chicago, Illinois 60604

Dear Judge Gottschall:

I am writing to you on behalf of my brother–in–law, Glenn Lewellen.  He has
been part of my family for the past 29 years through marriage, and I would like
to tell you about this man's character from my perspective.

Glenn has always been helpful and respectful toward our mother and father–in–
law, and has been the most wonderful uncle to my children that anyone could
ask for.  I'd like to relate a specific incident that exemplifies Glenn's unique
spirit. He'd just arrived at our house in Georgia from a 13 hour road  trip barely
an hour before, yet he insisted on joining us at our son's soccer game.
"Wouldn't miss it for the world," he'd said.  And, he meant it.

Before the 1st half ended, he had learned every single kid's name on our team,
and was cheering each by name, non–stop, every play.  It was so much fun
having him yelling encouragement not only to my son, but also all the other
kids on the team, whom he'd never seen before in his life.
It was a good example to me and my wife as well, since we didn't even know all
the kids names, and it was our son's team.

This is just one example of the joy Glenn has brought to our lives.  His upbeat,
positive, can–do nature has always been a positive role model for my children.
We all miss having Glenn with us during family functions.

I hope you will take this into consideration while making your determination on
what debt to society Glen owes.  Thank you for your consideration.


Sincerely,


Eric K. Buckler

404–667–4951

buckler.eric@gmail.com

The Honorable Joan B. Gottschall
United States District Court for the
Northern District of Illinois, Eastern Division
219 S. Dearborn Street
Chicago, Illinois 60604

Dear Judge Gottschall:

My name is Stephen Gartlan I am a best friend with Ashley, Glenn's daughter.  I have
known the two since I was 14 years old starting out at the cadet program.  Ashley and me
immediately became friends when we knew we would have each other's back no matter
what.  A trait commonly seen among Law Enforcement, I wouldn't even have to say
anything I knew she and I were always on the same page.  I remember meeting Mr. Lew
my first time; being so young I was in awe to meet a real Chicago Policemen.  I
remember idolizing the fact that he did the exact job that I wanted to do.  He always
welcomed me to the home, and treated me as Ashley's brother.

First few times I met Mr. Lew he was helping the Cadets with training.  We would use
their house for building searches and domestics to enhance our training.  Years later it
was hard to get me to leave their house.  There were times when Ashley wasn't even
home and I would be hanging around the house.  I would always get teased for leaving
the cabinets open when I got food.  He would say I was like a brother to Ashley, which
always made me feel good that he trusted me as if I was in fact a member of the family.
Ashley and I have been to Louisiana, Las Vegas, Texas, New York, and all over the
Midwest together.  We went everywhere together. Which im sure as a father wasn't easy
to let her go with a boy whether best friends or not!

Glenn was always there for me too. When I traveled across the country he let me stay at
his house in Las Vegas so I had somewhere to stay and not have to pay for a room.  He
was always willing to help no matter what.  One time he made me stay at his house in
Mokena because cadets had me working over 12 hour days for a festival.  I told him I
would be okay to take the thirty-minute ride home but he insisted I stay in the guest room
over the four-day weekend to ensure my safety.   Things like this show the true character
of Glenn and how he is always caring for others.

 Mr. Lew even donated to the cadets to send us to the 2007 state conference in fresh new
uniforms sized to each member.  I remember going to the uniform shop getting all sized
up by the people just like I was going to be a real cop.  New pants, new hat, new shirts,
polo's, I felt a sense of pride in myself and a boost of confidence.  Always being the little
skinny guy in a baggy oversized uniform never helped my self-esteem, but when I got my
very own fitted gear because of Mr. Lew, I as ecstatic.  I was fortunate to be one of the
only ones that knew about Mr. Lew donating to the program to get us all squared away.
He wanted no thanks or recognition for his actions but I know he helped me, and every
member of the cadets in different ways.  This shows the true humble side of Mr. Lew
never wanting the thanks or appreciation he just wanted to make his daughter happy, and
all the members of the program.

Some of the best advice Mr. Lew ever gave me is that I am a great young man and that I
will eventually become a great Police Officer.  He knew this simply because of the way I

could and did talk to people.  He insisted that many young officers rely on the belt around their waist to handle problems that could be de-escalated simply by talking the offender down.  He always harped on use your tools don't abuse your tools.  The gun, taser, spray, are all there for a reason but if you can calm someone down using "verbal judo" you will be a very successful cop and supervisors and the department will notice that.   He truly believed in me and my future as a policeman, he always joked saying that he would rather see me do it than Ashley simply because no father wants to see their daughter exposed to things cops are exposed to, especially with what he has seen working in the city.

I hope this helps you understand who Mr. Lew really is.  I do believe in the criminal justice system and rely heavily on its workings.  I know Glenn is a great man I just hope you see how he has affected me greatly, and many of the lives of aspiring young Police Officers.  I hope that there is a way this can be sorted out to find the true nature of the offense.  Thank you for your time Honorable Joan B. Gottschall.  I hope this gives you an understanding on how he has truly impacted my life both past and future. If you would like to contact me for any reason feel free to.

Stephen Gartlan

(708) 646 5303

Sgg1033@yahoo.com

**Andrea Gambino <agambinolaw@gmail.com>**

---

## Glenn Lewellen
1 message

---

**Thomas Monday** <tmweekday@sbcglobal.net>                Wed, Jun 6, 2012 at 8:11 AM
To: agambinolaw@gmail.com

The Honorable Joan B Gottschall
United States District Court for the
Northern District of Illinois, Eastern Division
Chicago Illinois 60604


Dear Judge Gottschall.

    My name is Tom Monday.  I have been a friend of Tom Dukes, Glenn Lewellens
Uncle for 50 years.
    I have know Glenn almost all his life.  I watched him grow into a man.

    He has a strong bond with his daughters and his Church. He works hard with his
Church to help others.

    Your Honor, please show compassion. Glenn can and will help so many others.


Sincerely Yours.

        Thomas W Monday
        708 594 6371
        tmweekday@sbcglobal.net

April 13, 2011

The Honorable Joan B. Gottschall
United States District Court for the
Northern District of Illinois, Eastern Division
219 S. Dearborn Street
Chicago, Illinois  60604

Dear Judge Gottschall:

My name is Jean Beauvais. I have known Glen Lewellen, his wife Debbie and his daughter Ashley for many years. My daughter Emily and Ashley met in kindergarten in 1994 and remain close friends to this day.  We got to know the family as a result, taking part in many school functions and day to day interactions that friends and neighbors undertake together. I have a special gratitude to Glen for taking my husband Jeff "under his wing" at the many father and daughter activities Emily and Ashley were involved in, always taking care to include him and showing him friendship. Jeff always remarked on how accepted and welcomed Glen made him feel, not pretentious or arrogant in any manner.  And how we respected him as a member of law enforcement, after hearing him talk a little about some of the unpleasant things he had seen people do to each other. He never went into great detail, but living on the south side of Chicago and knowing other officers that reside here, it's not hard to read between the lines of how people in the law enforcement community  "see the worst of people, and people at their worst" and strive to shield  us from it, to the best of their ability.  I believe Glen Lewellen  was a good and conscientious member of that community.

I humbly and sincerely hope that Your Honor will take my good opinion of Glen into consideration at his sentencing, and return him to his beloved wife and daughter at the earliest opportunity.


Respectfully yours,

Jean Beauvais
10411 S. Sawyer Avenue
Chicago, Illinois  60655
(773) 881-3146
beauvaisjean@aol.com

Andrea Gambino <agambinolaw@gmail.com>

---

**letter for Glen Lewellen**
1 message

---

**Linda Hentsch** <lynbanker@aol.com>                                     Thu, Mar 1, 2012 at 8:56 AM
To: agambinolaw@gmail.com

My name is Linda Hentsch and I am a local Real Estate Broker in the Will County area. I had a 5 year working relationship with Glen Lewellen. I am writing this letter to let you know about the man that I know and care for.

Glen was a local builder and developer and built very nice homes. He was a good business man and a kind and generous builder. He employed many, many people ( including myself ) and was responsible for a number of wonderful subdivisions in our area and putting many young families into their first homes. From the time the clients decided to build their home, to the day they closed, Glen had an open door and was always open to their questions and willing to help. He is a talented man and a hard worker, always on site at his projects and available to his staff. His projects helped many families.

Then there is the personal man, he is a good husband and kind and attentive to his wife Debbie who has had numerous health issues. He built her a home that had no steps to ease her pain with walking and was always there for her. He is a great father and his face always lights up when telling about his grandchildren or his youngest daughters college experience. I also know that he has helped many family members find housing or provided it himself.

He is a man of faith, good friends and a wonderful family man. I am proud to call him my friend.  I have NEVER heard him raise his voice, speak ill of anyone or do or say anything derogative.  He is surrounded by a strong family and has the support of his community.

**Linda Hentsch**
**Coldwell Banker Honig Bell**
**815-485-3401**
lynbanker@aol.com
**View my listings and the MLS at www.lindahentsch.com**