APPEAL,COX,PROTO

# United States District Court
# Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1 (Chicago)
# CRIMINAL DOCKET FOR CASE #: 1:09–cr–00332–2
## *Internal Use Only*

Case title: USA v. Rodriguez et al

Date Filed: 04/16/2009
Date Terminated: 06/03/2013

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 05/13/2013 | 1326 | 2 | RESPONSE by USA to objection to presentence investigation report 1318 (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit)(Reynolds, Terra) (Entered: 05/13/2013) |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 09 CR 332-2 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE
PRESENTENCE INVESTIGATION REPORT**

THE UNITED STATES OF AMERICA, through its attorney, GARY S. SHAPIRO, United States Attorney for the Northern District of Illinois, respectfully submits its Response to Defendant Glenn Lewellen's Objections to the Presentence Investigation Report ("PSR").

## I.    LEGAL STANDARD

As this Court is well aware, the preponderance of the evidence standard is all that is required at sentencing.  *See United States v. Hines*, 449 F.3d 808, 815 (7th Cir. 2006) (stating "[t]his Court's case law clearly places upon the Government a 'burden to prove by a preponderance of the evidence that a particular sentencing enhancement is warranted.'"); *see also United States v. Hale*, 448 F.3d 971, 988 (7th Cir. 2006); *United States v. Sherrod*, 445 F.3d 980, 983 (7th Cir. 2006).  There is no support for Lewellen's request that this Court determine whether the government has proven that particular sentencing enhancements are warranted beyond a reasonable doubt.[1]  Def. Obj. 1-3.  This Court should therefore apply the preponderance of the evidence standard when determining whether certain sentencing

---

[1]  The case to which Lewellen cites, *Alleyene v. United States,* No. 11-9335, presents the question of whether any factor that increases the *statutory* minimum punishment faced by a defendant should be alleged in an indictment and found by a jury beyond a reasonable doubt.  The resolution of *Alleyne* is irrelevant to Lewellen's case.  Here, Lewellen faces a mandatory minimum term of 10 years imprisonment based on a factor, drug quantity, charged in the indictment and found by a jury beyond a reasonable doubt.  There is no factor that the Court must determine at sentencing that could further increase the statutory minimum punishment faced by Lewellen.

enhancements are warranted in this case.

## II.   RESPONSE TO LEWELLEN'S FACTUAL CORRECTIONS TO THE PSR[2]

Lewellen first asks that this Court make numerous factual corrections to the PSR. Def. Obj. 4-6, ¶¶ 2-9.

### A.   Agreed Factual Corrections to the PSR

The government agrees that the following factual corrections be made to the PSR.  First, on line 69, the PSR should read that the jury trial began on November 7, 2011.  Def. Obj. 4, ¶ 2. Second, on lines 105-107, the PSR should read that Saul Rodriguez and Fares Umar testified that Lewellen wore body armor but did not testify about the authenticity of the body armor.  Def. Obj. 4, ¶ 4.  Third, on line 128, the PSR should read in 2003, Lewellen was on a leave of absence and then resigned from the CPD.  Def. Obj. 5, ¶ 4.  Fourth, on line 335, the PSR should omit the reference to "and subsequent conviction."  Def. Obj. 6, ¶ 6.  Fifth, on line 444, the PSR should read that prior to trial, Lewellen was detained until May 23, 2011.  Def. Obj. 6, ¶ 8.  Sixth, lines 503-506 should be amended to read that the lots listed on lines 485, 486, and 488 have been sold, and that the proceeds from the sale of those lots are being held in escrow pending the outcome of this case. Def. Obj. 6, ¶ 9.

---

[2]   Lewellen objects to the PSR's inclusion of information obtained from government counsel and the case agent.  Def. Obj. at 3-4.  The Court should overrule Lewellen' s objection.  Lewellen cites to no authority in support of his contention that the inclusion of such information constitutes a due process violation.  The government drew the information it provided to the Probation Officer from the thousands of pages of discovery tendered to Lewellen and exhibits and testimony admitted at Lewellen's trial.  The PSR includes the Government's Version of the Offense, which the government also provided to Lewellen, as an attachment.  The PSR also identifies what information was drawn from conversations with government counsel and the case agent, and how that information factored into the calculation of Lewellen's guidelines range.

**B.      Disputed Factual Corrections to the PSR**

The government disagrees that other factual corrections be made to the PSR.  First, Lewellen asks the Court to strike the statement contained on line 115 of the PSR that Saul Rodriguez and his organization began trafficking wholesale quantities of cocaine in the Chicago area in 1998. Def. Obj. 4, ¶ 4.   The statement in the PSR does not reference Lewellen. Furthermore, it is undisputed that Rodriguez was trafficking wholesale quantities of cocaine in the Chicago area in 1998.  The Court should deny Lewellen's request to strike the statement from the PSR.

Second, Lewellen asks the Court to strike the statement on line 133 that Lewellen intervened in a 1996 DEA investigation of Rodriguez and a 1997 CPD investigation of Rodriguez. [3] Def. Obj. 5, ¶ 4.  As set forth in the Government's Version of the Offense, in 1996, Lewellen reached out to the DEA after learning that it was investigating Rodriguez for trafficking marijuana.  Gov't Ver. at 5-7.  It is undisputed that the CPD and Lewellen had not authorized Rodriguez to engage in the conduct that was the subject of the DEA's investigation. It is also undisputed that the DEA closed its investigation of Rodriguez at Lewellen's request. The statement regarding Lewellen's intervention in the 1996 DEA investigation of Rodriguez is accurate.  This Court should therefore deny Lewellen's request to strike the statement from the PSR.

With respect to Lewellen's intervention in the 1997 CPD investigation, the Government's Version of the Offense sets forth that in 1997, Lewellen and his former partner, James Entress,

---

[3]   The information regarding this matter is drawn from the DEA file of its 1996 investigation of Rodriguez, which includes reports of the DEA case agent's conversations with Lewellen.   The government provided a copy of the file to Lewellen prior to trial.  This event is relevant to Lewellen's history and characteristics, namely his willingness to protect Rodriguez without regarding to rules and regulations.  Indeed, pursuant to CPD policy, Lewellen should have arrested Rodriguez upon learning that Rodriguez was buying and selling drugs without the authorization of the CPD.  Tr. 774 (testimony of CPD Officer Carol Collins).

intervened in a CPD investigation of Rodriguez.  Gov't Ver. at 8-9.  At trial, Saul Rodriguez (Tr. 2905-07), former CPD Officer John Conneely (Tr. 4226-40), and Assistant Cook County State's Attorney James Brassil (Tr. 4241-58) testified regarding this event.  Officer Conneely arrested Rodriguez following a traffic stop that resulted in the seizure of a gun from Rodriguez' back pocket.  Tr. 4228-29.  It is undisputed that the CPD and Lewellen did not authorize Rodriguez to possess the gun.  Officer Conneely asked that the Cook County State's Attorney's Office approve felony charges against Rodriguez.  Tr. 4229-30.

Once at the CPD station, Rodriguez called Lewellen and told him about the arrest.  Tr. 2905.  Lewellen told Rodriguez that he would take care of it.  *Id*.  Lewellen sent his partner, Entress, to the CPD station.  Tr. 2905, 2920.  Entress called the Cook County State's Attorney's Office regarding the requested felony charges against Rodriguez and lied regarding the location in which the gun was found.  Tr. 4246-47, 4254-55.  The Cook County State's Attorney's Office rejected the felony gun charges against Rodriguez, and Rodriguez was able to continue to work for Lewellen as a confidential informant.  Tr. 4247.  The testimony at trial establishes by a preponderance of the evidence that Lewellen's intervened in the 1997 CPD investigation of Rodriguez.  This Court should therefore deny Lewellen's request to strike the statement regarding the matter from the PSR.

Third, Lewellen asks the Court to strike the statement on line 334 that Lewellen was "never subjected to any emotional abuse, but was mentally and physically abused."  Def. Obj. 5-6, ¶ 5.  Lewellen does not dispute the accuracy of his statement to the Probation Officer.  Furthermore, in his sentencing memorandum to the Court, Lewellen asks the Court to consider this very information when determining his sentence.  Def. Br. 4.  In fact, Lewellen's statement to the Probation Officer appears to be the sole evidence of the mental and physical abuse

4

Lewellen purportedly suffered as a child.  The Court should deny Lewellen's request to strike the statement from the PSR.

Fourth, Lewellen asks the Court to strike the statement of his wife Deborah Lewellen on lines 374-376 regarding Lewellen's motivation to commit the instant offense.  Def. Obj. 6, ¶ 6. Lewellen does not dispute that his wife made the statement to the Probation Officer.  *Id*.  Rather, Lewellen argues that his wife's opinion is irrelevant.  *Id*.  Yet in his sentencing memorandum, Lewellen asks that the Court consider his wife's opinion, as expressed in her letter to the Court. Def. Br., Ex. 4.  The statements of Lewellen's wife are relevant to this Court's assessment of Lewellen's characteristics.  The Court should deny Lewellen's request to strike his wife's statement from the PSR.

Fifth, Lewellen asks that the reference to the firearms seized from him at the time of his arrest be stricken from lines 391-393 of the PSR.  Def. Obj. 6, ¶ 7.  Lewellen does not dispute the accuracy of the statement.  The Court should deny Lewellen's request to strike the statement from the PSR.

Sixth, Lewellen asks that certain financial information contained in lines 484 and 498 be stricken from the PSR.  Def. Obj. 6, ¶ 9.  Although Lewellen's wife is the titled owner of the home on 19628 Walnut Street in Mokena, the property constitutes a marital asset that is subject to forfeiture.  Furthermore, Lewellen's claim that his net worth is negative is not supported by the evidence.  Lewellen failed to disclose hundreds of thousands of dollars in marital assets to the Probation Officer.  Those assets are identified in the government's motion for the entry of a preliminary order of forfeiture.  R. 1247.  The Court should deny Lewellen's request to modify or strike this financial information from the PSR.

### C.    Other Factual Corrections to the PSR

Lewellen requests that line 495 should be stricken because Lewellen has paid his debt to the IRS.   Def. Obj. 6, ¶ 9.   As of this filing, the government has been unable to confirm Lewellen's payment to the IRS.   Lewellen's remaining requested factual corrections are in fact objections to certain enhancements included in the PSR.   Def. Obj. 4-6, ¶¶ 3-4.   The government responds to those objections in Section III below.

## III.    RESPONSE TO LEWELLEN'S OBJECTIONS TO THE PSR

The PSR accurately found Lewellen's adjusted offense level to be 43 and his criminal history category to be I, resulting in a guidelines range of life imprisonment.   PSR at lines 513-514.   Lewellen objects to certain enhancements contained in the PSR.[4]   Def. Obj. 6-25, 28-37. Below, the government responds to Lewellen's objections by event, in chronological order.

### A.    December 1999 Obstruction of Justice

It is the government's position that Lewellen should receive a two-point enhancement for obstruction of justice based on Lewellen's perjured testimony at the 1999 trial in the matter of *United States v. Refugio Ruiz-Cortez*, 99 CR 493 (Judge Pallmeyer).[5]   Gov't Ver. 9-11. Lewellen objects.   Def. Obj. 31-34.   As set forth in the Government's Version, at trial, Lisette Venegas (Tr. 571-77), Noel Sanchez (Tr. 844-89), and Rodriguez (Tr. 2922-29) testified about the events giving rise to Lewellen's obstruction of justice.   Gov't Ver. at 9-11.

There is no dispute that Lewellen was in Aurora conducting surveillance on July 8, 1999

---

[4]   Lewellen's objections are focused on  attacking the credibility of the government's witnesses. Yet Lewellen credits the testimony of these very witnesses by detailing those kidnappings in which they testified that Lewellen did not participate.

[5]   The PSR appears to apply the enhancement for obstruction of justice solely on the basis of Lewellen's 2006 disclosure of the federal wiretap.   PSR at lines 303-307.   The government believes that Lewellen's false testimony in 1999 provides the Court with a separate basis on which to apply the enhancement.

because Rodriguez had told Lewellen that Rodriguez had arranged to have his courier pick up cocaine.  Nor is there any dispute that Lisette Venegas was the courier, and that Lewellen would try to seize the cocaine but not arrest Lisette Venegas.  The sole basis of Lewellen's objection is that the Court should not credit the testimony of Lisette Venegas regarding how the drug deal that led to Ruiz-Cortez' arrest unfolded.  It is true that Lisette Venegas was not initially truthful with the government about some of the more egregious aspects of her conduct, such as her involvement in the plot to kidnap Maria Saldivar, though she did come clean well before trial.  But it simply makes no sense that she would have an incentive to misrepresent this particular incident or even understand the significance of her testimony.

Lisette Venegas was always quite candid that she was a drug courier for Rodriguez.  Tr. 559.  Moreover, she admitted that in 1999, Rodriguez told her to drive to Aurora to pick up a shipment of drugs.  Tr. 571.  Lisette Venegas admitted to law enforcement, and testified at trial, that she was involved in an illegal drug transaction that day.  There would be no reason for her to know the significance of whether Lewellen took the drugs from her car (her version of events) or from the ground after Ruiz-Cortez dropped them (Lewellen's version).  Either way, Lisette Venegas would be just as culpable. There would be no reason for Lisette Venegas to say that she had taken possession of multiple kilograms of cocaine and placed them in her trunk if what really happened was she drove away before getting the cocaine.  If anything, one would expect Lisette Venegas to minimize her involvement by saying she never actually took possession of the cocaine.  Lisette Venegas is corroborated by Rodriguez, who testified that Lisette Venegas called her to say that a man had stopped her and forced her to open the trunk after she had received the cocaine. Tr. 2927.  Rodriguez further corroborated Lisette Venegas' testimony that he had told her not to worry about what happened and to just leave.  *Id.*  Finally, Lisette Venegas' testimony

is corroborated by information from Ruiz-Cortez himself.  When approached by investigators in May 2010, Ruiz-Cortez said that he handed the bag of cocaine to a female courier in his doorway, and that he was certain he did not walk outside during the drug transaction.  A copy of the interview of Ruiz-Cortez is attached hereto as Government Exhibit G.

Moreover, in light of all the information that has been gathered during this investigation, Lewellen's testimony at Ruiz-Cortez' trial is simply implausible.  Lewellen knew based on the information Rodriguez gave him that Lisette Venegas, Rodriguez' courier, would be meeting with Ruiz-Cortez to obtain the cocaine (though neither Lewellen, Rodriguez, or Lisette Venegas would have known his name at the time).  Lewellen, of course, knew from the beginning that he could not arrest Lisette Venegas because that would compromise his source, and partner in crime Rodriguez.  If Lewellen was to seize the cocaine, he had to do so in such a way that Lisette Venegas would be able to leave without other officers knowing that he had any contact with her. His perjured testimony that he saw Ruiz-Cortez drop the bag of cocaine and run back inside his house accomplished his goals of seizing the cocaine, arresting Ruiz-Cortez, letting Lisette Venegas leave, and protecting Rodriguez.  The testimony of Lisette Venegas and Rodriguez, and Ruiz-Cortez' statement to law enforcement, establishes Lewellen's perjury at the *Ruiz-Cortez* trial by a preponderance of the evidence.  As such, the Court should overrule Lewellen's objection to the PSR.

**B.      September 11, 2001 Kidnapping of Victims A & B**

The PSR found Lewellen responsible for the September 11, 2011 kidnapping of Victims A and B that resulted in the possession of at least 80 kilograms of cocaine and $80,000 in cocaine proceeds.  PSR at lines 150-153, 252-254.  The PSR includes the kidnapping of Victim A and B as one of several kidnappings warranting a two-level enhancement under Guideline

§ 3A1.3.  PSR at lines 252-254.  The PSR also includes the kidnapping of Victims A and B as one of the several kidnappings during which Lewellen possessed a firearm, warranting a two-level enhancement under Guideline §2D1.1(b)(1).  PSR at lines 231-239.  Lewellen objects, and argues that Umar's testimony is not credible, Lewellen was on an "extended vacation" on September 11, 2011, and that the kidnapping could not have occurred because Rodriguez was in Las Vegas.  Def. Obj. 7-9, 18-19, 28-29.

At trial, Umar (Tr. 896, 907-28) and Rodriguez (Tr. 2994-3004) testified regarding the kidnapping of Victims A and B.  Lewellen's objection focuses entirely on the testimony of Umar.  Umar, whose testimony this Court has credited, provided detailed and truthful testimony regarding the kidnapping of Victims A and B.  In particular, at Umar's sentencing, this Court recalled Umar's testimony regarding the timing of this kidnapping because his twins were born two days earlier.   Umar provided information regarding this kidnapping (and all the other incidents about which he testified) the very same day agents and prosecutors made an unannounced visit to Umar at a state prison.  A copy of the initial proffer report of Umar is attached hereto as Government Exhibit H.  A copy of Umar's sworn affidavit is attached hereto as Government Exhibit I.  Umar's testimony, further corroborated by Rodriguez, is sufficient for the Court to find that Lewellen participated in this kidnapping by a preponderance of the evidence.

Lewellen also asserts that he was on an "extended vacation," implying he was not in the Chicago area on September 11, 2001.  Def. Obj. 8.  These assertions are not supported by any evidence, and in the case of Lewellen supposedly being out of town, is an outright lie.

When the government interviewed Deborah Lewellen, Lewellen's wife, this is what she said about where defendant was on September 11, 2001:

> Deborah Lewellen recalls she was at home and Lewellen was working, he was employed as a police officer with the Chicago Police Department. She recalls he was out of the house by 8:15 a.m. She recalls Ashley Lewellen [Lewellen's daughter] was already in school and wanting to go pick her up because of the attack. She remembers calling Lewellen to tell him about the occurring in New York. She said Lewellen had no idea the attack had happened. She recalls Ashley Lewellen getting home from school, but does not remember when Lewellen got home.

Government Exhibit J, ¶ 27.

Despite Deborah Lewellen's clear recollection that Lewellen led her to believe he was working at CPD that day, prior to trial, Lewellen provided a notice of alibi defense that said, "Lewellen was at one of his building sites in or near New Lenox, Illinois, during the daylight hours on September 11, 2001." A copy of Lewellen's alibi notice is attached hereto as Government Exhibit K. The notice further stated that Lewellen intended to call two witnesses, Lewellen's former construction supervisor, James Millner and Lewellen's cousin, Jason Coday, to testify that Lewellen was at the building site. *Id.* At trial, Lewellen's counsel asked Millner the following questions:

> Q:   Now, on September 11th you were working -- on September of 2001, do you recall that date?
> A:   Yes.
> Q:   And you were working on a job site, that job site on Edmunds with Mr. Lewellen, were you not?
> A:   I was working on the job site – on 9/11 myself, yes.
> Q:   And you spoke with Mr. Lewellen on that date?
> A:   I tried to get ahold of him on the phone that day.
> Q:   And he, in fact, called you and told you he was going to meet you at the job site?
> A:   Originally, we were supposed to meet at the job site, yes.
>                                    …
>
> Q:   Did you have a conversation with Mr. Lewellen on that day?
> A:   My recollection is that I did not have a conversation that day.

10

Tr. 2701-02.  Coday did not testify.

Having not gotten the answer he was hoping for, Lewellen now contends he was on an extended vacation.  Def. Obj. 8.  That contention is contrary to the alibi defense Lewellen provided prior to trial and the thrust of the questions posed to Millner.  It is, of course, incredible to suggest Lewellen "forgot" whether he was at a construction site in Chicago or out of town on vacation on September 11, 2001.  Moreover, both of those attempted alibis are contrary to Lewellen's own wife's recollection.  It is simply inconceivable Lewellen does not know exactly where he was that day and that, under normal circumstances, many friends, family, and colleagues would also know his whereabouts and be able to vouch for him.  The Court can be sure that if Lewellen was out of town on vacation on September 11, 2001 as he now claims, Lewellen would have submitted with his objections to the PSR a witness affidavit, receipt, travel record or some other scintilla of evidence showing that to be true.  He has not done so because no such evidence exists.  Lewellen's stories have shifted throughout these proceedings.  His lies have caught up to him regarding this kidnapping, and the Court should overrule the objection.

Lewellen also argues that Rodriguez was in Las Vegas on September 11, 2001. But that too runs contrary to the evidence presented at trial.  The Court will recall the trial testimony of Henry Luna, a friend of Rodriguez, and Daniel Barber, the hotel operations manager at Mandalay Bay Hotel and Casino.  Luna testified that he was in Las Vegas gambling for Rodriguez and staying at Mandalay Bay in a room reserved under Rodriguez' name.  Tr. 3948.  Luna recalled speaking with Rodriguez on the telephone on the morning of September 11 because it was Rodriguez who told Luna about the events on the East Coast and asked Luna whether he (Luna) would be able to fly back to Chicago.  Tr. 3949-50.  Luna was unsure whether Rodriguez had been with him in Las Vegas over the prior weekend, but was unequivocal that he

was alone in Las Vegas on Tuesday, September 11, 2001.  *Id.*  Because of the terrorist attacks, Luna could not get a flight to Chicago and stayed in Las Vegas alone for the rest of the week. Tr. 3950.

Daniel Barber explained that the hotel records showed that the room in which Luna stayed was reserved by Rodriguez and that it was "comped," meaning that the casino paid for the hotel room.  Tr. 3964.  Barber further testified that the hotel records (Gov't Ex. 344) show that Henry Luna checked into the reservation made in Rodriguez' name, and that Rodriguez' name on the reservation does not mean that he actually checked into the room.  Tr. 3964-65.  The hotel would allow a VIP such as Rodriguez to authorize another individual to check in to his room. Tr. 3965.  Contrary to Lewellen's objection to the PSR, the evidence at trial decidedly did *not* show that Rodriguez was in Las Vegas on September 11, 2001.  Luna's testimony, corroborated by Daniel Barber, established just the opposite.

The testimony of Umar and Rodriguez establish Lewellen's involvement in the kidnapping of Victims A and B by a preponderance of the evidence.  As such, the Court should overrule Lewellen's objections to the PSR related to the kidnapping of Victims A and B on September 11, 2001.

### C.      2001/2002 Kidnapping of Victim C

The PSR found Lewellen responsible for the 2001/2002 kidnapping of Victim C that resulted in the possession of at least $1,000,000 in cocaine proceeds.  PSR at lines 153-155, 252-254.  The PSR includes the kidnapping of Victim C as one of several kidnappings warranting a two-level enhancement under Guideline § 3A1.3.  PSR at lines 252-254.  The PSR also includes the kidnapping of Victim C as one of the several kidnappings during which Lewellen possessed a firearm, warranting a two-level enhancement under Guideline §2D1.1(b)(1).  PSR at lines 231-

239.  Lewellen objects.  Def. Obj. 9, 19-20, 28-29.  As set forth in the Government's Version of the Offense, Fares Umar (Tr. 932-46), Andres Torres (Tr. 1584-91), and Saul Rodriguez (Tr. 3004-12) testified about this kidnapping at trial.  Gov't Ver. 15-16.

Lewellen's objection focuses entirely on the testimony of Umar.  Again, Umar, whose testimony this Court has credited, provided detailed and truthful testimony regarding the surveillance and kidnapping of Victim C.  Umar testified that Torres had provided information to Rodriguez about a drug trafficker to whom Torres was delivering drug proceeds.  Umar testified how he, Lewellen, and Rodriguez conducted surveillance of and kidnapped Victim C.  During the kidnapping, Umar and Lewellen held themselves out as police officers.  Tr. 941.  To that end, Lewellen possessed a gun and wore a vest and a badge.  *Id*.  After restraining Victim C, Umar and Lewellen recovered a bag containing what Umar estimated to be 50 pounds of cash from Victim C.  Tr. 941, 945.

Lewellen does not address Umar's testimony regarding the kidnapping.  Rather, Lewellen focuses on Umar's testimony regarding the events that followed the kidnapping.  Lewellen notes that Umar did not see Rodriguez count the money they had taken, or see Rodriguez pay Lewellen.  Def. Obj. 19-20.  Rodriguez testified that he counted the money inside the bag and found it to total at least $1,000,000.  Tr. 3011.  Rodriguez then paid Lewellen, Umar, and Torres for their participation in the kidnapping.  Tr. 3012.  Given Umar's role in the offense, it makes sense why Umar did not see Rodriguez engage in the foregoing conduct.  Umar testified that after the kidnapping, he waited outside of a garage in which Rodriguez and Lewellen counted the money the men had taken from Victim C.  Tr. 945-46.  Rodriguez then paid Umar in front of Lewellen.  Tr. 946.

The testimony of Umar, Torres, and Rodriguez establish Lewellen's involvement in the

2001/2002 kidnapping of Victim C by a preponderance of the evidence.  As such, the Court should overrule Lewellen's objections to the PSR related to the kidnapping of Victim C.

### D.      2001/2002 Kidnapping of Victim E

The PSR found Lewellen responsible for the 2001/2002 kidnapping of Victim E, which resulted in the possession of 20 kilograms of cocaine.  PSR at lines 153-155.  The PSR includes the kidnapping of Victim E as one of several kidnappings warranting a two-level enhancement under Guideline § 3A1.3.[6]  PSR at lines 252-254.  The PSR also includes the kidnapping of Victim E as one of the several kidnappings during which Lewellen possessed a firearm, warranting a two-level enhancement under Guideline §2D1.1(b)(1).  PSR at lines 231-239. Lewellen objects. Def. Obj. 9, 20, 28-29.  As set forth in the Government's Version of the Offense, in 2001 or 2002, Lewellen, Umar, and Rodriguez participated in the kidnapping of Victim E in Lyons, Illinois.  Tr. 17.  At trial, Umar (Tr. 985-1001) and Rodriguez (Tr. 3031-39) testified about the kidnapping of Victim E.

Lewellen's objection again focuses on Umar's testimony arguing that Umar was not credible.  Yet, Lewellen credits Umar's testimony that Lewellen was not personally involved in restraining or questioning Victim E.  Def. Obj. 20.  Lewellen further credits Umar's testimony that after failing to find cocaine in Victim E's home, Lewellen declined to transport Victim E to a garage in Chicago where Rodriguez and Umar questioned and beat Victim E.  *Id*.  Umar provided detailed and truthful testimony regarding the surveillance and kidnapping of Victim E. Umar's testimony makes clear that Lewellen: conducted surveillance of Victim E; participated in the kidnapping of Victim E at Victim E's home by holding himself out as a police officer;

---

[6]   The government is not seeking to attribute the 20 kilograms of cocaine obtained during the kidnapping to Lewellen because Rodriguez told Lewellen they did not find any cocaine.  This does not affect the PSR's calculation that the drug quantity attributable to Lewellen is over 150 kilograms of cocaine.  PSR at lines 220-230.

possessed a gun, wore a badge and vest; participated in the search of Victim E's home for cocaine; and placed Victim E in Umar's van to be transported to another location where Lewellen knew Rodriguez and Umar would further question Victim E in order to obtain kilogram quantities of cocaine.[7]  Tr. 985-1001.

The testimony of Umar and Rodriguez establish Lewellen's involvement in the kidnapping of Victim E by a preponderance of the evidence.  The Court should therefore overrule Lewellen's objections to the PSR related to the kidnapping of Victim E.

### E.     Kidnapping of Victims FF & GG

The PSR found Lewellen responsible for the kidnapping of Victims FF and GG, which resulted in the possession of $30,000.  PSR at lines 153-155.  The PSR includes the kidnapping of Victims FF and GG as one of several kidnappings warranting a two-level enhancement under Guideline § 3A1.3.  PSR at lines 252-254.  The PSR also includes the kidnapping of Victims FF and GG as one of the several kidnappings during which Lewellen possessed a firearm, warranting a two-level enhancement under Guideline §2D1.1(b)(1).  PSR at lines 231-239. Lewellen objects.  Def. Obj. 9, 19.  As set forth in the Government's Version of the Offense, in 2001 or 2002, Lewellen, Umar, and Rodriguez participated in the kidnapping of Victims FF and GG.  Gov't Ver. 19-20.  At trial, Umar (Tr. 928-31) and Rodriguez (Tr. 3012-18) testified about the kidnapping of Victims FF and GG.

Once again, Lewellen's objection focuses on Umar's testimony, and argues that Umar is not a credible witness.  At trial, Umar provided detailed and truthful testimony regarding the surveillance and kidnapping of Victims FF and GG.  After receiving a call from Rodriguez, Umar met with Lewellen near Victim FF's home.  Tr. 928-29.  The men agreed that Umar and

---

[7]   Rodriguez testified that he later told Lewellen that no cocaine was recovered during the subsequent questioning of Victim E.

15

Lewellen would pretend to be police officers, enter Victim FF's home, restrain anyone inside, and search the home for money and drugs. *Id*. Later that same day, Lewellen and Umar approached Victim FF and a woman, Victim GG, as they arrived at Victim FF's home. Tr. 929. Lewellen and Umar held themselves out as police officers, and Lewellen possessed a gun and wore a vest and badge. Tr. 930. After restraining Victim FF and Victim GG, Lewellen searched the home and found money inside. *Id*. Lewellen told Umar that he had found money inside of the house. *Id*. According to Rodriguez, Lewellen had found $30,000. Tr. 3018. Rodriguez testified that he, Lewellen, and Umar split the money Lewellen recovered from the house. *Id*.

The testimony of Umar and Rodriguez establish Lewellen's involvement in the kidnapping of Victims FF and GG by a preponderance of the evidence, and warrant the enhancements found in the PSR related to the kidnapping. Accordingly, the Court should overrule Lewellen's objections to the PSR related to the kidnapping of Victims FF and GG.

### F.     Summer 2003 Kidnapping of Peter Flores

The PSR found Lewellen responsible for the summer 2003 kidnapping of Peter Flores, which resulted in the possession of 100 kilograms of cocaine, worth at least $1,500,000. PSR at lines 160-165. The PSR includes the kidnapping of Peter Flores as one of several kidnappings warranting a two-level enhancement under Guideline § 3A1.3. PSR at lines 252-254. The PSR also includes the 100 kilograms of cocaine in its calculation of the drug quantity attributable to Lewellen. PSR at 220-230. Finally, the PSR also includes the kidnapping of Peter Flores as one of the several kidnappings during which Lewellen possessed a firearm, warranting a two-level enhancement under Guideline §2D1.1(b)(1). PSR at lines 231-239. Lewellen objects. Def. Obj. 10-12, 23-24, 28-29. As set forth in the Government's Version of the Offense, in 2001 or 2002, Rodriguez, Lewellen, Hector Uriarte, Jorge Uriarte, Umar, David Venegas, Lisette Venegas, and

16

others participated in the kidnapping of Peter Flores, also known as "the Twin."  Gov't Ver. at 20-25.  At trial, Umar (Tr. 1027-56), David Venegas (Tr. 1266-91), Lisette Venegas (Tr. 611-27), Jorge Lopez (Tr. 1908-18), and Rodriguez (Tr. 3071-91), testified about the kidnapping of Peter Flores.

Lewellen objections are seemingly based on four separate issues pertaining to the evidence against him.  First, Lewellen objects to the government's reliance on Flores' identification of Lewellen and Umar as the men who kidnapped him in the summer of 2003. Def. Obj. 12, 24.  Lewellen implies that the Court should not consider Flores' information because Flores did not testify at trial.  *Id.*  Of course, in determining whether a particular enhancement is warranted at sentencing, the Court  can consider a wide range of information provided that information is "reliable or includes sufficient indicia of reliability to support its probable accuracy."  *United States v. Westmoreland*, 240 F.3d 618, 630 (7th Cir. 2001) (internal quotations and citations omitted).

As set forth in the Government's Version of the Offense, Flores spoke to the government about his kidnapping in February 2009, months before Rodriguez and members of his crew were arrested.  Gov't Ver. Ex. A.  At that time, Flores identified photographs of Lewellen and Umar as the individuals who kidnapped him at gunpoint in the summer of 2003.  *Id.*  After the arrests of Rodriguez and certain crew members in April 2009, Rodriguez, Umar, and David Venegas each identified Lewellen and Umar as the individuals who kidnapped Flores in the summer of 2003. Rodriguez, Umar, and David Venegas also provided detailed accounts of the kidnapping which largely mirror Flores' account of the kidnapping.  Lopez, who was with Flores on the day of Flores' kidnapping, described having seen several men, including a white man in his forties, sitting in an unmarked police car within blocks of Flores' home shortly before Flores'

kidnapping.[8]  Tr. 1911-12.  The man Lopez saw sitting in the unmarked car was Lewellen, and

the unmarked car was the Crown Victoria in which Lewellen and Umar kidnapped Flores.

Flores' information identifying Lewellen and Umar as his kidnappers is sufficiently reliable to

support its probable accuracy.

Second, Lewellen blatantly attempts to mislead the Court by suggesting that Umar

"forgot" about Lewellen's involvement in the Peter Flores kidnapping until his testimony at trial.

Def. Obj. 10 (citing Tr. 1030).  As Lewellen is well aware, Umar has provided information about

Lewellen's involvement about Flores' kidnapping since law enforcement approached him in

September 2009 at a state prison.  *See* Gov't Ex. H.  During his first proffer, Umar admitted to

having kidnapped "the Twin" with someone he knew as "Murdock."  Gov't Ex. H, ¶¶ 74-88.

Umar identified a photograph of Lewellen from a large photo book as the person Umar knew as

"Murdock."  Gov't Ex. H, ¶ 21.  Umar explained that he and Lewellen pulled Flores over using a

Crown Victoria that appeared to be an unmarked police car.  Umar further explained that he and

Lewellen held themselves out as police officers, with Lewellen possessing a gun and wearing a

vest and badge.

Within weeks, Umar provided the government with a sworn affidavit in which he

provided consistent, detailed information about his participation in numerous acts of the

Rodriguez crew, including the kidnapping of Flores.  Gov't Ex. I.  Again, Umar identified

Lewellen as the individual with whom Umar kidnapped Flores.  At trial, Umar testified

consistently with his previous statements to the government regarding his involvement and the

involvement of Lewellen in the kidnapping of Flores.[9]  Lewellen's argument that Umar "forgot"

---

[8]  At the time, Jorge Lopez was friends with the Flores twins and was not involved in the
kidnapping of Peter Flores.  Tr. 1908-09.

[9]  In fact, Lewellen credits certain aspects of Umar's testimony regarding the Flores kidnapping,

about his participation in this kidnapping is simply unsupported and disingenuous.  The Court should credit Umar's testimony regarding Lewellen's involvement in the kidnapping of Flores.

Third, Lewellen contests David Venegas' identification of Lewellen as one of the individuals who kidnapped Flores.  Def. Obj. 11, 24.  Lewellen points out that David Venegas could not remember the date on which the kidnapping occurred.  At the same time, however, Lewellen does not dispute David Venegas' admission that Venegas was involved in the kidnapping of Flores. Def. Obj. 24.[10]  On the day of the kidnapping, David Venegas saw that a person he knew as "Murdock" and Umar kidnapped Flores by holding themselves out as police officers and using the Crown Victoria.  Tr. 1273-74.  David Venegas identified a photograph of Lewellen as the person he knows as Murdock.  Tr. 1232.  Following his arrest in November 2010, Lewellen identified a photograph of David Venegas, explaining that he knew Venegas, although not by name.  Gov't Ver., Gov't Ex. F, ¶ 15.  The only evidence that explains Lewellen's identification of David Venegas' photograph is Lewellen's participation in kidnappings, including that of Flores, with David Venegas.  Of course, David Venegas' testimony does not stand on its own.  Taken together with the other witnesses, the Court can and should find David Venegas to have reliably identified Lewellen as a participant in the kidnapping of Flores.

Fourth, Lewellen contests the PSR's finding that the Rodriguez crew obtained at least 100 kilograms of cocaine during the kidnapping.  Def. Obj. 11, 23-24.  There is no dispute that

---

including Umar's purchase of the Crown Victoria, Umar's meetings with others about the kidnapping, Lewellen's departure from the scene after Flores was transferred from the Crown Victoria to the van in which Flores was transferred to David Venegas' home, and Umar's role in making ransom calls to Flores' family.  Def. Obj. 11, 24.

[10]  Indeed, Lewellen credits certain aspects of David Venegas' testimony regarding the Flores kidnapping, including Venegas' meetings with others about the kidnapping, the use of the Crown Victoria in the kidnapping, and not having seen Lewellen after Lewellen transferred Flores to Venegas' van.

Flores' family delivered two separate shipments of cocaine in an effort to secure Flores' release. Though the witnesses have slightly different recollections regarding the exact quantity of cocaine provided, they all agree that the total quantity contained in the two deliveries was well in excess of 100 kilograms.  *See* Tr. 1051, 1054 (Umar's testimony that shipments totaled 140 kilograms of cocaine); Tr. 3083 (Rodriguez' testimony that shipments totaled at least 200 kilograms of cocaine); Gov't Ver., Gov't Ex. A (Flores' admission that his family provided shipments totaling over 150 kilograms of cocaine).   David Venegas and Lisette Venegas stored a mere portion, approximately 50 kilograms, of the cocaine obtained during the kidnapping in the trap compartment of their home.  Tr. 1285-91, 625-26.  Over time, David Venegas sold the cocaine for Rodriguez.  *Id*.  In total, Rodriguez' crew earned more than $1,500,000 from the sale of the cocaine.

Taken together, the testimony of Rodriguez, Umar, David Venegas, Lisette Venegas, and Lopez, and the information provided by Flores, establishes Lewellen's participation in the kidnapping of Peter Flores by a preponderance of the evidence.  As such, this Court should overrule defendant's objections to the PSR related to the kidnapping.

**G.     2004 Possession of Cocaine Stolen from Alfonso Soria**

The PSR found Lewellen responsible for the 2004 theft of 70 kilograms of cocaine belonging to Alfonso Soria, and included it in its drug quantity calculation under §2D1.1(c)(2). PSR at lines 166-168, 175-176, 225-230.  Lewellen objects. Def. Obj. 13.  Lewellen does not state the basis of his objection, other than to say that "there is insufficient credible evidence" tying Lewellen to the theft.  Def. Obj. 13.  As set forth in the Government's Version of the Offense, the evidence regarding this kidnapping comes from Torres' and Rodriguez' trial testimony, and information provided by Alfonso Soria, who did not testify at trial.  Gov. Ver. 25-

27.  Information from three witnesses proves Lewellen's involvement in this theft of cocaine by a preponderance of the evidence.

Rodriguez and Torres both testified that Lewellen was involved in this theft of cocaine (Tr. 1593-1609, 3129-35), while Soria's information corroborates Rodriguez and Torres' testimony regarding how the theft occurred.   Lewellen states in his objection that, "Soria provided a statement to the government in which he denied being involved in drug dealing." Def. Obj. 13.  That is false.  The government attached the report detailing Soria's interview to the Government's Version of the Offense as Exhibit B.  Far from denying his involvement in drug dealing, Soria described in detail how in 2004 he asked Rodriguez if he knew a location where cocaine could be unloaded from a semi-trailer truck.  Soria said Rodriguez told him he had access to a warehouse in Frankfort, which the evidence established at trial was Lewellen's warehouse (Tr. 1597, Gov't Ex. 160).  Soria said that on the day the truck with the cocaine was scheduled to arrive at the warehouse, he drove to the warehouse with Rodriguez, and Torres was supposed to meet them there to help unload the cocaine and deliver a portion of it to Rodriguez' customers.  Soria described how while he, Rodriguez, and Torres were unloading the cocaine, he saw a dark colored Ford Crown Victoria with emergency lights flashing enter the warehouse parking lot.  Rodriguez instructed Soria to run and he did so because he feared being arrested by the police.  Soria did not get a good luck at the person driving the Crown Victoria.  Soria said that as he ran from the area he told Rodriguez that something did not feel right, because if it was police in the Crown Victoria there would be more than one police car involved.

Soria's account is substantially similar to the testimony of Rodriguez and Torres regarding the theft of cocaine.   These three witnesses, taken together, establish by a preponderance of the evidence Lewellen's involvement with the theft.  As such, this Court

should overrule defendant's objections to the PSR related to the 2004 theft of 70 kilograms of cocaine from Alfonso Soria.

### H.    2005 Kidnapping of Drug Couriers

The PSR found Lewellen responsible for the 2005 kidnapping of drug couriers from an auto-auction near 169th and Cicero Avenue.  PSR at lines 170-174, 243-245.  The PSR includes the kidnapping of the drug couriers as one of several kidnappings warranting a two-level enhancement under Guideline § 3A1.3.  PSR at lines 252-254.  Additionally, the PSR also includes the 2005 kidnapping of the drug couriers as one in which Lewellen used violence, made a credible threat of violence, or directed the use of violence, warranting a two-level enhancement under Guideline §2D1.1(b)(1).  PSR at lines 243-245.  Lewellen objects.  Def. Obj. 29.  As set forth in the Government's Version of the Offense, in 2005, Rodriguez, Lewellen, Hector Uriarte, Jorge Uriarte, and David Venegas participated in the kidnapping of the drug couriers from an auto auction.  Gov't Ver. at 30-31.  At trial, Rodriguez and David Venegas (Tr. 1361-71) testified about the kidnapping during which Lewellen used a Taser on one of the victims.

Lewellen argues that David Venegas' testimony about the kidnapping is not credible, in particular because he had difficulty remembering dates and times.  Def. Obj. 29.  David Venegas' trouble recalling dates and times of events that occurred nearly eight years prior to his trial testimony does not discredit his testimony regarding more important and noteworthy aspects of the events.  Memories, particularly regarding discrete details, tend to fade over time.  *See e.g.*, *United States v. Welch*, 368 F3d 970, 974 (7th Cir. 2004) (noting that "it does not require an expert witness to point out that memory decreases over time") (vacated on other grounds; *United States v. Hall*, 165 F.3d 1095, 1101-03 (7th Cir. 1999).  Indeed, witnesses frequently make mistakes with respect to dates and times. *See*, *e.g.*, *United States v. Saadeh*, 61 F.3d 510, 523

(7th Cir. 1995); *United States v. Tingle*, 183 F. 3d 719, 728-29 (7th Cir. 1999) (witness who inaccurately approximated that he bought cocaine from defendant during period defendant was incarcerated did not commit perjury, as witness was approximating dates).

What is more important is that David Venegas had no difficulty recalling the significant details about this kidnapping.  His testimony regarding the critical information associated with the kidnapping, namely, who participated and what took place was detailed and vivid.  This Court should credit David Venegas' testimony and hold Lewellen accountable for his use of a Taser and threats of violence during the 2005 kidnapping.[11]  As such, this Court should overrule defendant's objections to the PSR related to the 2005 kidnapping of drug couriers.

## I.      May 2006 Obstruction of Federal Wiretap

The PSR found Lewellen responsible for the May 2006 obstruction of a federal wiretap investigation of Andres Torres and Saul Rodriguez.  PSR at lines 177-186.  As a result, the PSR applies a two-level enhancement for obstruction of justice under Guideline § 3C1.1.[12]  PSR at lines 303-307.  Lewellen objects.  Def. Obj. 4, 34-37.  At trial, DEA Task Force Officer James Healy testified about the wiretap investigation.  (Tr. 1727-71).  Torres (Tr. 1630-64) and Rodriguez (Tr. 3229-32) testified about Lewellen's role in compromising the wiretap.

---

[11]  Lewellen also argues that he would not have participated in a crime with Venegas after Venegas was arrested for the Teodoro Bueno kidnapping with Umar because Lewellen would have presumed Venegas was either cooperating with the authorities or confessed.  Def. Obj. 20-21, 29-30.  Lewellen's argument presumes that he was aware of Venegas' arrest in the Bueno case.  Venegas was released from custody and never charged with Bueno's kidnapping.

[12]  The PSR applies a two-point enhancement under 3B1.3 for abuse of position of trust and another two-point enhancement under 3C1.1 for obstruction of justice.  Lewellen objects, and argues that the PSR "uses the same conduct as the basis for both enhancements resulting in double counting."  Def. Obj. at 31.  Not so.  The facts supporting the enhancement for abuse of position of trust in the PSR are related to his employment with the CPD through his resignation in 2003.  PSR at lines 288-295.  The facts supporting the enhancement for obstruction of justice in the PSR are that Lewellen comprised a federal wiretap investigation wiretap investigation by DEA in 2006.  PSR at lines 303-307.

Lewellen's objection centers on three separate, but related issues.  First, Lewellen suggests that the existence of the federal wiretap investigation could not have been leaked.  Def. Obj. 36-37.  TFO Healy testified that based on various security protocols, only certain members of law enforcement and support staff should have known about the federal wiretap investigation in this case.  Tr. 1756-59.  According to TFO Healy, someone did not follow those protocols, because the existence of the wiretap was leaked to the very individuals who were the subject of the investigation.  Tr. 1766.  TFO Healy's testimony is corroborated by the May 6, 2006 recorded conversation during which Andres Torres explained that his phone was being wiretapped.  Tr. 1637-63 (citing to Gov't Ex. 158 and 159).  Torres' conversation was recorded at a time when Torres believed no one was listening.  Torres had no motive to lie about what he had learned about the wiretap.  In fact, Torres had every reason to be honest so as to evade detection and arrest by law enforcement.

Second, Lewellen contends that following his 2003 resignation from the CPD, aside from an annual reunion of the narcotics team, Lewellen "did not socialize or otherwise associate with law enforcement."  Def. Obj. 34.  Lewellen's contention is false.  In an April 10, 2009 interview with federal agents, DiGiacomo and Pappalito acknowledged they were privy to confidential information about ongoing investigations of Rodriguez in 2005 and 2006.  A copy of the interview of DiGiacomo and Pappalito is attached hereto as Government Exhibit L.  Contrary to Lewellen's assertion, he reached out to DiGiacomo and Pappalito during the time they had confidential information about Rodriguez.  Phone records reflect that between March and May 2006, Lewellen called DiGiacomo and Pappalito several times.  Gov't Ver., Gov't Ex. C.  Indeed, DiGiacomo admitted that Lewellen called and asked DiGiacomo to run a license plate through a law enforcement database.  Gov't Ex. L, ¶ 16.  Lewellen later told DiGiacomo that the

24

CPD had searched Lewellen's warehouse, but lied and said that the CPD had found nothing.[13]
*Id.* In fact, the CPD had recovered money and cocaine-laced packaging from Lewellen's
warehouse. Gov't Ver., Gov't Ex. E. At a minimum, the contact between Lewellen and
DiGiacomo demonstrates Lewellen's efforts to obtain confidential information from a current
member of law enforcement regarding investigations that pertained to Rodriguez in the spring of
2006.

Third, Lewellen characterizes Torres' testimony attributing the leak of the wiretap
investigation to Lewellen as "vague." Def. Obj. 35. To the contrary, Torres was clear that
Lewellen told him about the existence of the wiretap investigation. Tr. 1663. Torres further
testified that upon learning that information, he called a person who unbeknownst to him was
working with the DEA. Tr. 1637-63. In a conversation Torres had no idea was being recorded,
and at a time during which Torres had no motive to lie, Torres explained that he had just learned
about the existence of the wiretap investigation from "ex-DEA . . . ex-narcotics police." Tr.
1659-60.

According to Torres and the phone records introduced at trial, the *only* former member of
law enforcement with whom Torres was speaking was Lewellen. In fact, Lewellen appears to be
the only former member of law enforcement Torres knows.[14] Within minutes of his arrest in
September 2009, and while in the backseat of a squad car in San Antonio, Texas, Torres
admitted to his own role and the role of others, including Lewellen, in the activities of the
Rodriguez crew. At that time, Torres stated that Lewellen – no one else – disclosed the existence

---

[13] DiGiacomo believed that this conversation took place in or around November 2005. The
search of Lewellen's warehouse took place on May 23, 2006.

[14] Torres testified that he does not know DiGiacomo and never identified DiGiacomo's
photograph contained in the DEA's voluminous photographic lineup for this case.

of the federal wiretap to him.   Torres has provided detailed and consistent testimony on the matter since that time.

The testimony of TFO Healy, Torres, Rodriguez, and the exhibits introduced at trial prove Lewellen's involvement in the obstruction of the federal wiretap in 2006.   As such, the Court should overrule Lewellen's objection to the PSR regarding this event.

### J.      Enhancement for Leader/Organizer

The PSR assessed a four-point enhancement for Lewellen's role in the offense as a leader/organizer.   PSR at lines 255-287.   Lewellen objects.   Def. Obj. 14-18.   At trial, Rodriguez, Umar, and others testified regarding Lewellen's role in the offense—particularly, the role he played when the organization was formed, his leadership role during the kidnappings in which he participated, and his use of insider information to protect the organization from being discovered by law enforcement.   This Court should find that Lewellen's relative responsibility for the crime merits the adjustment.

Lewellen's objection is based on attacking the credibility of Umar and Rodriguez.   As set forth above, this court has credited Umar's testimony, and Lewellen's objection on this basis should be rejected. Umar's testimony establishes by a preponderance of the evidence that Lewellen was a leader/organizer of the Rodriguez crew. [15]   Section 3B1.1 of the Guidelines provides for an increase in the Guidelines range for a defendant who is found to be an organizer, leader, manager, or supervisor of criminal activity. *United States v. Figueroa*, 682 F.3d 694, 694-8 (7th Cir. 2012).   Application Note 4 states:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling.

---

[15]   Defendant argues that other co-conspirators testified that Rodriguez was the leader of the crew, (Def. Obj. 14), but "there can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *United States v. Grigsby*, 692 F.3d 778, 791 (7th Cir. 2012).

26

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* The determination of whether a defendant is an "organizer or leader" under § 3B1.1 "is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct). *United States v. Grigsby*, 692 F.3d 778, 791 (7th Cir. 2012); § 1B1.3(a)(1) (A)-(B). As recently articulated in *United States v. Reynolds*, "the 'central concern' of the adjustment is the defendant's relative responsibility for the crime." 2013 U.S. App. LEXIS 9294, *8-10 (7th Cir. May 8, 2013); citing *United States v. Mendoza*, 576 F.3d 711, 717 (7th Cir. 2009).

Lewellen and Rodriguez were the crew's founding members, and the knowledge, skills, and insider information that Lewellen acquired as a police officer played a vital role in the crew's decade of criminal activity. For example, Umar testified about Lewellen's significant level of planning, involvement in the crime, and degree of control over Umar during kidnappings. *See Reynolds*, 2013 U.S. App. LEXIS at *8-10 (the defendant's significant level of planning, involvement in the crime, and degree of control over others demonstrated his leadership role in the conspiracy). Indeed, Umar said that after he joined the crew in September 2001, he was told to "follow [Lewellen's] lead while Lewellen pretended to "be a cop." Tr. 896-97, 910, 914-919. Umar did as he was told, and copied Lewellen's tactics – namely, tricking drug dealers into believing they were being arrested, and then subduing them using the zip ties that Lewellen provided. Tr. 896-97, 910, 914-919. Umar also took instructions from Lewellen – giving Lewellen a gun Umar found during a home invasion and following Lewellen's instructions to stay behind as Lewellen searched the houses for drugs and money. Tr. 896-97, 910, 914-19, 921-22, 1022. Accordingly, the evidence showed that Lewellen took a leadership

role in the kidnappings. *See Reynolds*, 2013 U.S. App. LEXIS at *8-10; citing U.S.S.G. § 3B1.1 cmt. n.2 (the defendant must have organized or led at least one participant).

Lewellen co-founded the organization, used his skills as a police officer to subdue the crew's victims, imparted those skills to other crew members, and protected the organization from detection for nearly a decade. Lewellen should be held accountable for his greater relative responsibility that of his co-defendants, and this Court should overrule his objections to the PSR as to his leadership role.[16]

## IV.    CONCLUSION

The government respectfully requests that the Court rule on defendant's requests for corrections to the PSR and objections to the PSR in accordance with the foregoing arguments.

Respectfully submitted,

GARY S. SHAPIRO
United States Attorney

By:    s/ Terra Reynolds
TERRA REYNOLDS
STEVEN A. BLOCK
TIFFANY J. TRACY
Assistant U.S. Attorneys
U.S. Attorney's Office
219 S. Dearborn Street
Chicago, Illinois  60604
(312) 353-3148

---

[16]  Even if this Court finds that there is insufficient evidence to merit the enhancement, this Court has discretion to deviate upward by the same amount based on the aggravating nature of Lewellen's role in the offense given his status as a police officer and his pivotal role in founding and protecting the organization.

28

**U.S. Department of Justice**
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | | *Page* 1 of 4 |
|---|---|---|
| 1. Program Code | 2. Cross File     Related Files | |
| 5. By: SA David M. Reynolds II  At: Chicago Field Division | | |
| 7. ☐ Closed ☐ Requested Action Completed  ☐ Action Requested By: | ☐ ☐ | 8. Date Prepared  05/20/10 |
| 9. Other Officers: TFO Jim Healy | | |
| 10. Report Re: Interview with Refugio RUIZ-CORTEZ on May 17, 2010. | | |

## DETAILS

1. Reference is made to all previous DEA-6 Reports of Investigations
   written under the same file title and file number.

2. On May 18, 2010, Assistant United States Attorney (AUSA) Steven
   Block, TFO Jim Healy, and SA David Reynolds arrived at the Schuykill
   Federal Correctional Institute in Minnersville, Pennsylvania to
   interview Refugio CORTEZ-RUIZ regarding his arrest in Aurora,
   Illinois on July 8, 1999. Court authorized translator Caroleena Cole
   was also present during the interview.

3. Prior to asking CORTEZ-RUIZ questions, AUSA Steven Block explained
   that information has been recently obtained regarding the
   investigation that resulted in CORTEZ-RUIZ' conviction. AUSA Steven
   Block informed CORTEZ-RUIZ that his (CORTEZ-RUIZ') attorney has filed
   a motion with the circuit court to review the conviction and that the
   United States Attorney's Office has agreed to the filling. CORTEZ-
   RUIZ was informed that the process for his release from prison had
   been initiated, but a specific date for his release has not been
   determined.  AUSA Steven Block provided CORTEZ-RUIZ with copies of
   the paper work that had been filed and instructed the translator to
   read the motions. CORTEZ-RUIZ indicated that he understood the
   paperwork.

| 11. Distribution: | 12. Signature (Agent) | 13. Date |
|---|---|---|
| Division | SA David M. Reynolds II | 5-20-10 |
| District | 14. Approved (Name and Title) | 15. Date |
| Other | GS Wes Tabor  Group Supervisor | 5/20/10 |

DEA Form     - 6
(Jul. 1996)
  refugio/dr2

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

GOVERNMENT
EXHIBIT

G

ATYCSP_002_0002

U.S. Department of Justice
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION** <br> *(Continuation)* | 1. File No. | 2. G-DEP Identifier |
| 4. <br> **Page  2  of  4** | | |
| 5. Program Code | 6. Date Prepared <br> 05/20/10 | |

4. AUSA Steven Block informed CORTEZ-RUIZ that he (CORTEZ-RUIZ) did not have to speak with law enforcement regarding his arrest in 1999, but agents wanted to ascertain specifics about the circumstances surrounding July 8, 1999. CORTEZ-RUIZ agreed to speak with law enforcement. Before asking questions, AUSA Steven Block explained that he (CORTEZ-RUIZ) did not have to talk about his arrest or about any other criminal activity. AUSA Steven Block continued that his (CORTEZ-RUIZ) cooperation does not influence the process regarding his being released from prison. CORTEZ-RUIZ indicated that he understood and would be willing to speak with law enforcement. AUSA Steven Block then read the proffer agreement and showed CORTEZ-RUIZ that his attorney had signed the document. CORTEZ-RUIZ understood the proffer letter and agreed to speak with law enforcement.

5. Initially, CORTEZ-RUIZ explained that he returned home from work on July 8, 1999 and that a police officer knocked on the door of his residence. After opening the door, the police officer if CORTEZ-RUIZ had drugs or gun in the house and CORTEZ-RUIZ informed the police officer that he did not and agreed to allow the police search his residence. Although the police did not find guns or money in his house, CORTEZ-RUIZ was arrested and transported to the Metropolitan Correctional Center in Chicago, Illinois.  CORTEZ-RUIZ denied any involvement in drug trafficking activities.

6. CORTEZ-RUIZ denied having cocaine in his possession on July 8, 1999, but CORTEZ-RUIZ later admitted there was cocaine in his house and that he had given approximately 10 kilograms of cocaine to a female that arrived at his residence before being arrested. CORTEZ-RUIZ provided a summary of events prior to his arrest and details concerning the subsequent trial.

7. Approximately 3 or 4 weeks prior to his arrest, FNU LNU aka Primo asked CORTEZ-RUIZ to conceal 84 to 96 kilograms of cocaine at his (CORTEZ-RUIZ') residence in Aurora, Illinois. Primo explained that CORTEZ-RUIZ would be paid to hide the cocaine and give the cocaine to people that arrived at the house. CORTEZ-RUIZ agreed to receive the payment after all the cocaine was delivered from his house. CORTEZ-RUIZ agreed to hide the cocaine. CORTEZ-RUIZ could not recall if

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

ATYCSP_002_0003

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | |

| 4. Page   3   of   4 | |
|---|---|
| 5. Program Code | 6. Date Prepared 05/20/10 |

Primo delivered the cocaine to the house or if someone else brought the cocaine. Once the load arrived, CORTEZ-RUIZ hid the cocaine in a closet. Within days of receiving the cocaine, CORTEZ-RUIZ received telephone calls from Primo or others who would instruct him to give cocaine to individuals that arrived to the house. During the call, CORTEZ-RUIZ was informed to take a certain amount of kilograms of cocaine and place them into a bag and give the bag to the person that arrived at his (CORTEZ-RUIZ') house. Prior to his arrest, two or three different people arrived to his house and obtained cocaine. CORTEZ-RUIZ did not know anyone that arrived at the house to obtain the cocaine. On the day that he was arrested, a female arrived to the house but CORTEZ-RUIZ had never seen her prior to that day.

8.  On the day that he was arrested, CORTEZ-RUIZ received a telephone call from Primo or someone else. During the call, CORTEZ-RUIZ was informed that someone would be at his (CORTEZ-RUIZ) soon, and CORTEZ-RUIZ should give the person the remaining kilograms of cocaine. CORTEZ-RUIZ placed the last 10 kilograms of cocaine into a bag. Shortly after the phone call, CORTEZ-RUIZ heard a knock on the door of his residence. CORTEZ-RUIZ opened the door and invited the female inside the house. The female stood inside the doorway when he (CORTEZ-RUIZ) gave the female the bag that contained the cocaine. CORTEZ-RUIZ is certain that he did not walk outside during this transaction. The female exited the house after she received the bag. CORTEZ-RUIZ did not see which vehicle the female arrived or departed in.

9. Minutes after the female exited his house, CORTEZ-RUIZ heard a knock on the door. CORTEZ-RUIZ opened the door and an individual identified himself as a police officer asked CORTEZ-RUIZ where the cocaine was being hidden. CORTEZ-RUIZ informed the police officer that there was no cocaine in the house and allowed the police to search his house. Either during or after the police searched the house, CORTEZ-RUIZ was placed in handcuffs and informed that he was observed giving a bag that cocaine to an individual. CORTEZ-RUIZ recalled asking the person where the other person was located. The police stated that the other person had dropped the bag that contained the cocaine and ran from

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

ATYCSP_002_0004

**U.S. Department of Justice**
Drug Enforcement Administration

| | |
|---|---|
| **REPORT OF INVESTIGATION** <br> *(Continuation)* | 1. File No.             2. G-DEP Identifier |
| 4. <br> Page  4  of  4 | |
| 5. Program Code | 6. Date Prepared <br> 05/20/10 |

the police. The police officer stated that the police were unable to find the person that dropped the bag.

Agent's note: During the interview, CORTEZ-RUIZ indicated that he knew that the police officer was not telling the truth because CORTEZ-RUIZ did not give the bag to a male and that he (CORTEZ-RUIZ) never left his residence.

10.    After being arrested, CORTEZ-RUIZ was transported to the MCC in Chicago, IL. CORTEZ-RUIZ did not provide information to law enforcement regarding the Primo or the individuals that obtained cocaine from his house after his arrest. CORTEZ-RUIZ later informed his attorney regarding the discrepancies of law enforcement's account of what occurred on July 8, 1999. CORTEZ-RUIZ does not know why the inconsistencies were not presented at his trial.

**INDEXING**

  1. CORTEZ-RUIZ, Refugio -

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

ATYCSP_002_0005

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | Page 1 of 40 | |
|---|---|---|---|

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: SA David M. Reynolds II<br>At: Chicago Field Division | ☐<br>☐<br>☐<br>☐<br>☐ | | 6 ███████████ | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | | | 8. Date Prepared<br>10/08/09 | |
| 9. Other Officers: SA Don Wood | | | | |
| 10. Report Re: Proffer of Fares UMAR | | | | |

**SYNOPSIS**

    The following is a detailed summary of Proffer Sessions that were conducted at Muddy River Correctional Facility in Ina, Illinois with Fares UMAR. During the proffer sessions, UMAR indicated that he conducted several home invasions and kidnappings under the direction of Saul RODRIGUEZ. This report is a summary of the all Proffer Sessions conducted with UMAR.

**DETAILS**

1. Reference is made to all previous DEA-6 Reports of Investigations written under the same file title and file number.

2. SA Don Wood, Assistant United States Attorney Steve Block, and SA David Reynolds met with Fares UMAR at the Muddy River Correctional Facility in Ina, Illinois for the purpose of conducting a proffer session with UMAR. AUSA Block, SA Wood, SA Reynolds met with UMAR on September 30 and October 1, 2009.

3. Prior to asking UMAR questions, UMAR was presented with a Proffer letter from the Northern District of Illinois, which he signed. Agents explained that to UMAR the purpose of the interview was to ask questions regarding the Saul RODRIGUEZ Drug Trafficking Organization (DTO). UMAR indicated that he would assist in the investigation.

| 11. Distribution:<br>Division<br><br>District<br><br>Other | 12. Signature (Agent)<br>SA David N. Reynolds II | 13. Date<br>10-08-09 |
|---|---|---|
| | 14. Approved (Name and Title)<br>GS Wes Tabor<br>Group Supervisor | 15. Date<br>10/8/09 |

DEA Form - 6
(Jul. 1996)

umar proffer/dr2
4 - Extra

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.



GOVERNMENT EXHIBIT
H

U.S. Department of Justice
Drug Enforcement Administration

| | | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| **REPORT OF INVESTIGATION** | | 3 | |
| *(Continuation)* | | ████████████████████ | |

| 4. | |
|---|---|
| Page 2 of 40 | |
| 5. Program Code | 6. Date Prepared 10/08/09 |

4. UMAR first met Saul RODRIGUEZ when he (UMAR) was approximately 10 years old near RODRIGUEZ' house on S. Elizabeth in Chicago, IL. UMAR indicated that he (UMAR) and his brother, Kareem FARES, would play with Saul RODRIGUEZ and RODRIGUEZ' brother, Roberto RODRIGUEZ as young kids. UMAR lost contact with RODRIGUEZ until after UMAR'S release from prison in 1995. UMAR was in prison from 1989 to 1991 for Burglary and 1992 through 1995 for robbery.

5. Months after being released from prison in 1995, UMAR ran into RODRIGUEZ playing basketball in the area of 48th Avenue and Bishop Ave. in Chicago, IL. After re-meeting RODRIGUEZ, UMAR recalled that RODRIGUEZ was driving a new grey Lincoln Navigator and appeared to have a lot of money. Although not a member of La Raza street gang, UMAR had several friends that were members of La Raza, and UMAR would see them with RODRIGUEZ playing basketball. UMAR learned that RODRIGUEZ was a one time member of La Raza, but RODRIGUEZ still maintained a friendship with the La Raza street gang. UMAR understood that RODRIGUEZ needed La Raza for protection. Specifically, RODRIGUEZ used his (RODRIGUEZ') friendship with La Raza to be able to drive through the area controlled by the La Raza street gang without the risk of being robbed. UMAR did not know if RODRIGUEZ bought or sold narcotics with La Raza gang members.

6. UMAR met RODRIGUEZ several times before RODRIGUEZ asked UMAR to work on RODRIGUEZ' house located in the are of McKinley Park in Chicago, IL. UMAR worked on doors and locks and while working at that the house, UMAR observed several other workers fixing the house. UMAR later worked at several other houses for RODRIGUEZ.

7. While working at a house in Cicero for RODRIGUEZ, UMAR recalled that RODRIGUEZ wanted a pool table moved from the basement. Because the pool table was too large, UMAR had to remove the legs from the table. When UMAR removed the legs, he found a large amount of money secreted in the table. UMAR told RODRIGUEZ of the money, and RODRIGUEZ appeared surprised and said that he forgot that he hid the money in the leg. UMAR estimated that there was approximately $20,000 in two large bundles of money.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

4 - Extra

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** _(Continuation)_ | 3. ████████████████ | |

| 4. Page 3 of 40 | |
|---|---|
| 5. Program Code | 6. Date Prepared 10/08/09 |

8. On one occasion, RODRIGUEZ hired UMAR to replace the locks on each of the exterior doors of the house located on 37th Place near California in Chicago, IL. UMAR worked with FNU LNU aka Taco installing the locks, and while working in the garage, UMAR observed a vintage red car that belonged to RODRIGUEZ. UMAR could not recall the make or model of the car.

9. Days after installing the locks, UMAR was informed that RODRIGUEZ' vehicle was stolen from the garage. UMAR was told that RODRIGUEZ suspected that UMAR and FNU LNU aka Taco stole the vehicle and that RODRIGUEZ was looking for both of them. UMAR learned that RODRIGUEZ had FNU LNU aka Taco kidnapped and FNU LNU aka Taco informed RODRIGUEZ that UMAR was responsible for the theft of the car. UMAR was informed by an associate of RODRIGUEZ, Mario LNU that RODRIGUEZ wanted UMAR kidnapped and was offering a $1,000 reward for his capture.

10. UMAR and Mario LNU arranged to stage a kidnapping so that UMAR could explain to RODRIGUEZ that he did not steal the car. UMAR sat in a chair and had his hands placed behind his back to make it appear like his hands were tied. RODRIGUEZ entered the basement and spoke with UMAR. During the conversation, UMAR informed RODRIGUEZ that FNU LNU aka Taco is lying and that they did not steal the car. UMAR asked RODRIGUEZ to arrange a meeting with FNU LNU aka Taco. After a short conversation, RODRIGUEZ believed UMAR and it was arranged that UMAR would drive with Mario LNU and RODRIGUEZ to meet FNU LNU aka Taco. During the meeting with Taco, Taco informed RODRIGUEZ that he lied about UMAR stealing the car because he was scared. RODRIGUEZ believed UMAR and FNU LNU aka Taco about the car. UMAR never spoke to RODRIGUEZ again about the car. Mario LNU and UMAR later split the money that RODRIGUEZ had given to Mario LNU.

## SEPTEMBER 11, 2001 HOME INVASION

11. Months after the car incident, on September 11, 2001, RODRIGUEZ called UMAR without notice. UMAR recalled the date because he was at the hospital because his first wife had just given birth to their

---

DEA Form    - 6a
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**4 - Extra**

U.S. Department of Justice
Drug Enforcement Administration

| | | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| **REPORT OF INVESTIGATION** | | | |
| *(Continuation)* | | ███████████████████████ | |
| 4. | | | |
| Page   4   of   40 | | | |
| 5. Program Code | | 6. Date Prepared | |
| | | 10/08/09 | |

twin sons and because of the significant events that occurred on that
date. During the telephone conversation, RODRIGUEZ asked UMAR if he
wanted to make $100,000. UMAR said he needed the money and agreed to
meet RODRIGUEZ to discuss the deal. UMAR left the hospital and met
with RODRIGUEZ. During the meeting, RODRIGUEZ informed UMAR that he
(RODRIGUEZ) had paid someone money from a previous drug transaction,
and that he followed the individual who picked up the money to a
house that probably contained a large amount of money. RODRIGUEZ then
asked UMAR if he would "back up" a guy and go into the house and try
to steal the money. UMAR understood that RODRIGUEZ wanted UMAR to
assist in committing a home invasion. UMAR had not discussed
participating in home invasions or committing any other crimes with
RODRIGUEZ, but UMAR understood that RODRIGUEZ knew that UMAR had
spent time in prison for robbery and burglary.

12. RODRIGUEZ and UMAR drove in RODRIGUEZ' vehicle for approximately an
hour. UMAR could not recall the address where RODRIGUEZ drove to, but
believed that the house was south of Bolingbrook, Illinois. RODRIGUEZ
informed UMAR that another person would act like a police officer and
try to get into the residence. RODRIGUEZ instructed UMAR to follow
the other guy and act like a police officer. Before agreeing to
assist RODRIGUEZ, UMAR asked if he would have to kill anyone.
RODRIGUEZ told UMAR that he would not have to kill or injure anyone.
UMAR agreed to participate in the home invasion. UMAR believed that
RODRIGUEZ asked UMAR to participate in the home invasion, because
RODRIGUEZ knew that UMAR had spent time in prison for robbery.

13. Before exiting the vehicle, RODRIGUEZ informed UMAR that they needed
UMAR because the guy in the house only speaks Spanish and that the
guy "acting" like the police officer does not speak Spanish.
RODRIGUEZ drove UMAR to a parking lot where UMAR and RODRIGUEZ met a
white male that UMAR identified "Glenn" from a large photographic
array. UMAR identified a picture of Glenn LEWELLEN as Glenn, and UMAR
did not know Glenn's last name. For the purpose of this report,
LEWELLEN will be used to identify the individual that UMAR knew only
as Glenn. After UMAR was introduced a got to know LEWELLEN, UMAR
called LEWELLEN Glenn and Murdock.

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

**REPORT OF INVESTIGATION**

*(Continuation)*

| | |
|---|---|
| 1. File No. | 2. G-DEP Identifier |
| 3. ████████████████████████████ | |

4.
Page  5  of  40

5. Program Code

6. Date Prepared
10/08/09

14. During the meeting, it was arranged that UMAR would wait in a brown
van and that when the individual exited the house, UMAR and LEWELLEN
would approach the individual and direct him back into the house.
Once inside the house, UMAR and LEWELLEN would search for money or
cocaine. While in the van, UMAR would speak to RODRIGUEZ on a cell
phone and inform him what was being observed. UMAR assumed that
RODRIGUEZ was in communication with LEWELLEN. After two or three
hours, UMAR observed two Hispanic males exit the house and enter a
vehicle. UMAR called RODRIGUEZ and notified him of what he observed.
RODRIGUEZ arrived and picked up UMAR. RODRIGUEZ and UMAR drove to a
strip mall, where UMAR observed the vehicle that had just left the
house that he was watching. UMAR recalled that there was a Sears and
several other stores. UMAR recalled seeing LEWELLEN in a white
colored Chevy Monte Carlo parked near the vehicle that left the
house. RODRIGUEZ was on the phone with LEWELLEN while they drove to
the parking lot. UMAR believes that LEWELLEN conducted surveillance
after it departed the house.

15. After RODRIGUEZ parked, he(RODRIGUEZ)instructed UMAR to follow the
guy in the white car when he (LEWELLEN) gets out of his car. UMAR
recalled that the vehicle that left the house had males in the front
and a male in the backseat. While in the parking lot, UMAR observed
LEWELLEN exit the Monte Carlo and walk toward the vehicle. UMAR
recalled exiting RODRIGUEZ' car and walking toward LEWELLEN and the
car.  UMAR recalled that LEWELLEN had a black ballistic vest and a
badge hanging from a silver chain.

16. Once at the car, UMAR heard LEWELLN identified himself as a police
officer and instructed the occupants to put their hands against the
window. LEWELLEN then instructed the passenger in the front and back
to exit the vehicle. LEWELLEN then instructed both occupants to leave
the parking lot, and then LEWELLEN entered the car and instructed the
driver to move to the passenger seat. UMAR then entered the backseat
of the car, and LEWELLEN then drove back to the house that UMAR was
previously watching.

17. As the car approached the house, LEWELLEN asked the male if anyone
else was in the house. He indicated that one more person was asleep

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. ███████████ | |

| 4. Page  6  of  40 | |
|---|---|
| 5. Program Code | 6. Date Prepared 10/08/09 |

in the house.  UMAR recalled telling the guy in Spanish that he would
be shot first if there were more than one person in the house.
LEWELLEN entered the driveway and activated the garage door and
entered.  LEWELLEN entered the house first with his gun drawn and UMAR
walked into the house with the individual. Once inside the house,
UMAR tied up the driver of the vehicle. LEWELLEN and UMAR then found
the other male sleeping in the bedroom. He was also tied up and both
were placed in the bathroom of the house. UMAR placed plastic ties
around both individual's hands and feet and then tied their feet to
their hands. UMAR then placed a blanket over both male's heads.

18. After both males were secured, UMAR and LEWELLEN searched the house.
While searching the house, LEWELLEN called RODRIGUEZ to assist in the
search. While searching the house, UMAR located a handgun and placed
the gun into his waistband. LEWELLEN later observed UMAR with the
weapon and demanded UMAR to give it to him. UMAR then handed LEWELLEN
the handgun. An open safe was also located a closet and approximately
$60,000 was in the safe. Two large duffel bags were also found in the
house. UMAR observed that the bags were filled with kilograms of
cocaine. UMAR assisted RODRIGUEZ in placing the bags into RODRIGUEZ'
vehicle and estimated that each bag weighed over 200 pounds. UMAR
indicated that he is a weight lifter and is familiar with how much
things weigh and how much he is capable of lifting. UMAR continued
that he was not able to lift either bag on his own.

19. After the cocaine was loaded into the car, LEWELLEN took the car back
to the parking lot to retrieve his car, and UMAR left with RODRIGUEZ.
While driving back to UMAR'S vehicle, RODRIGUEZ gave UMAR $10,000
from the $60,000 that was found in the safe. RODRIGUEZ informed UMAR
that the cocaine would be sold in the next few days and that UMAR
would receive the rest of the payment. After leaving RODRIGUEZ, UMAR
drove back to the hospital to see his wife and newly born twins. At
the hospital UMAR showed his wife the money that RODRIGUEZ had just
given him.

20. Approximately four or five days after the home invasion, RODRIGUEZ
called UMAR and informed him that the money was ready. UMAR met
RODRIGUEZ at a gas station in the area of 63rd and Lawndale Ave. in

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION**<br>*(Continuation)* | 1. File No. | 2. G-DEP Identifier |
| | 3 | |
| 4.<br>Page  7  of  40 | | |
| 5. Program Code | 6. Date Prepared<br>10/08/09 | |

Chicago, Il. UMAR did not trust RODRIGUEZ and asked his brother to park near the gas station and to honk if he saw anything out of the ordinary. Shortly after arriving to the gas station, UMAR observed RODRIGUEZ arrive to the gas station. RODRIGUEZ drove near UMAR and directed UMAR to follow. RODRIGUEZ then exited the gas station at a high rate of speed and continued to drive recklessly throughout several alleys. After several minutes of driving, RODRIGUEZ stopped near a garage and opened the window to his car. RODRIGUEZ then threw a duffel bag into UMAR'S car and drove off. UMAR went home and counted the money. UMAR recalled that the money was mostly in $1, $5, and $10 bills, but that the amount money totaled $100,000. RODRIGUEZ had previously told UMAR that he (RODRIGUEZ) preferred larger bills. UMAR indicated that he understood that RODRIGUEZ made a larger sum of money but that he (UMAR) needed the money and that he did not have the risk in selling the cocaine.

21. UMAR identified the pictures below as Glenn and SAUL RODRIGUEZ. UMAR could not recall Glenn's last name. UMAR indicated that he called Glenn, Murdock.



Glenn LNU
AKA Murdock



SAUL RODRIGUEZ

## KIDNAPPING OF LISETTE VENEGAS' GRANDMOTHER

22. UMAR could not recall when this kidnapping occurred, but remembered that it was conducted prior to the kidnapping of the "Rim Shop Guy". RODRIGUEZ called UMAR and the two later met with Lisette VENEGAS to discuss the kidnapping. RODRIGUEZ informed UMAR that Lisette VENEGAS' grandmother has been in the "game" for several years and has earned a

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

4 - Extra

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. ███████████████ | |

| 4. Page **8** of **40** | |
|---|---|
| 5. Program Code | 6. Date Prepared 10/08/09 |

substantial amount of money. UMAR understood that in the "game" meant that Lisette's Grandmother was buying or selling drugs. RODRIGUEZ continued that Lisette VENEGAS' believed that her (L. VENEGAS') grandmother had $1,000,000 hidden in the floor at her residence. Lisette VENEGAS approached RODRIGUEZ about kidnapping her grandmother and holding her for ransom. UMAR did not know Lisette VENEGAS' grandmother's name. Through the course of this investigation, her name has been discovered but for the purpose of this report Lisette VENEGAS' grandmother will be referred to as Lisette's Grandmother.

23. During the first meeting, RODRIGUEZ stated that Hector URIARTE and Jorge URIARTE had already tried to kidnap Lisette's Grandmother, but they were unable to get her into the van. RODRIGUEZ told UMAR that Hector URIARTE and Jorge URIARTE had a gun but that Lisette's Grandmother was still able to escape. RODRIGUEZ stated that he (RODRIGUEZ) contacted UMAR because he (RODRIGUEZ) knew that UMAR could develop a good plan to kidnap Lisette's Grandmother. While talking to RODRIGUEZ about the kidnapping, Lisette VENEGAS told UMAR that she (Lisette VENEGAS) would be with the family when the ransom demands were made and she would make sure that the family would not call the police. Lisette VENEGAS told UMAR that there was no risk in conducting the kidnapping, and the only demand Lisette VENEGAS had was that her grandmother would not be hurt. UMAR assured Lisette VENEGAS that her grandmother would not be injured.

24. After discussing the kidnapping with RODRIGUEZ and Lisette VENEGAS, UMAR conducted surveillance on Lisette's Grandmother's bar. UMAR used the brown van, but UMAR could not recall if the middle seat was taken out of the van or not. UMAR watched the bar and observed that Lisette's Grandmother used the door near alley and that it would be easy for him to approach her and have someone else drive in the alley with the van.

25. UMAR later arranged for Hector URIARTE, Jorge URIARTE, Manuel URIARTE, and FNU LNU aka Turtle to assist in the kidnapping. UMAR recalled that Turtle may have been a relative of Jorge URIARTE and Hector URIARTE. UMAR and the others sat in the van near the alley and waited for Lisette's Grandmother to exit. UMAR recalled that Lisette

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**4 - Extra**

U.S. Department of Justice
Drug Enforcement Administration

| | | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | | |
| | | 3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | |
| 4. Page 9 of 40 | | | |
| 5. Program Code | | 6. Date Prepared 10/08/09 | |

VENEGAS may have assisted with the surveillance. UMAR later observed Lisette's Grandmother throw garbage in a dumpster in the alley. The driver of the van (either Hector or Jorge URIARTE) then drove the van into the alley. When the van stopped, UMAR exited and grabbed Lisette's Grandmother from behind and placed her into a bear hug and forced her into the van. UMAR then recalled that Lisette's Grandmother attempted to fight, but UMAR was able to control her and place her into the van.

26. Initially, Lisette's Grandmother was combative and would not allow one of the URIARTE brothers to tie her hands. UMAR then observed one of the URIARTE brothers place a knife near Lisette's Grandmother's eyes and instructed her not to move or that she would be hurt. Lisette's Grandmother complied and did not move.

27. UMAR recalled that Lisette's Grandmother was driven to the garage near McKinley Park. Once at the garage, UMAR watched Lisette's Grandmother for several hours as the others made the ransom demands. UMAR did not hear the telephone conversations, but observed one of the URIARTE brothers take Lisette's Grandmother's cellular telephone. Lisette's Grandmother stayed in the van over night while the ransom demands were coordinated. On the following day he was informed that the money was obtained that that Lisette's Grandmother could be released. UMAR and FNU LNU aka Turtle then drove Lisette's Grandmother's to an alley and dropped her off.

28. UMAR learned later that the ransom was $200,000 and that RODRIGUEZ paid a portion of it. UMAR was later paid approximately $20,000 for his involvement in the kidnapping. UMAR learned that Lisette's Grandmother repaid RODRIGUEZ over an unknown amount of time.

29. UMAR identified the following individuals as Jorge URIARTE aka Lefty, Hector URIARTE aka Gordo, Manuel URIARTE aka Manny, Lisette VENEGAS. UMAR did identify a picture of Lisette VENEGAS' grandmother, but the photograph will not be included within this report.

DEA Form     - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | | |
| 4. Page  10  of  40 | | | |
| 5. Program Code | | 6. Date Prepared 10/08/09 | |

   

Jorge URIARTE Aka Lefty    Hector URIARTE aka Gordo    Manuel URIARTE aka Lefty    Lisette VENEGAS

## HOME INVASION NEAR 31st/KOSTNER

30. RODRIGUEZ informed UMAR that he (RODRIGUEZ) could possibly identify a house that contained a large amount of money. RODRIGUEZ continued that his brother in law was delivering money for a Mexican Cartel and that RODRIGUEZ and LEWELLEN wanted to follow the person that met with the brother-in-law in anticipation of identifying the money stash house. UMAR could not recall RODRIGUEZ' name, but UMAR identified a photograph of Andres TORRES as RODRIGUEZ' brother in law. UMAR stated that Cecilia TORRES is Andres TORRRES' sister.

31. RODRIGUEZ instructed UMAR to meet in the area of 59th Ave. and Kedzie Ave., because TORRES had planned to meet with a money courier later that day. UMAR understood that TORRES had a large amount of drug proceeds that needed to be delivered to an unknown individual. UMAR further understood that RODRIGUEZ, LEWELLEN, and he(UMAR) would follow the person that TORRES met with.

32. UMAR recalled watching a Walgreen's parking lot in the area of 59th Ave. and Kedzie Ave., and later following a vehicle to the area of 31st and Kostner Ave. Chicago, IL . UMAR recalled that a Home Run Inn Pizza restaurant was located blocks away from the house where the money was later recovered. During the first surveillance, the vehicle was lost as it exited 31st and turned northbound into a residential area. After two or three different times conducting surveillance, UMAR identified the house.

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | |

| 4. Page 11 of 40 | |
|---|---|
| 5. Program Code | 6. Date Prepared 10/08/09 |

33. After identifying the house, UMAR met with RODRIGUEZ and LEWELLEN. It was determined that RODRIGUEZ and LEWELLEN would park the van near the garage in the alley and then exit the van. UMAR would then lay on the ground under the van and appeared to be working on the van. UMAR was positioned to see when the vehicle entered the garage, and once he observed the money courier who met previously with TORRES exit the garage, he would knock on the van above him.

34. UMAR later observed the vehicle back into the garage and the driver exit the side door carrying a large duffel bag. UMAR struck the van and LEWELLEN exited the van and approached the driver. UMAR recalled that LEWELLEN identified himself as a police officer as he (LEWELLEN) walked toward the Hispanic male. LEWELLEN was wearing a ballistic vest with a badge hanging from a silver chain. UMAR walked behind LEWELLEN and LEWELLEN then informed the Hispanic male that he needed to walk toward the house. UMAR recalled that RODRIGUEZ also approached the males, but did not say anything. UMAR recalled asking, in Spanish, if anyone was in the house. The male indicated that no one was in the house. LEWELLEN and UMAR then guided the male inside the house. Before going into the three flat, and the first floor resident opened the door and asked what was happening. LEWELLEN told the female, "police" business go back inside.

35. Once inside the house, UMAR searched a couch for weapons then instructed the male to sit down after UMAR placed plastic ties on the individual. UMAR and LEWELLEN then searched the house. RODRIGUEZ and LEWELEN searched the house as UMAR watched the money courier. UMAR found a handgun hidden in a cabinet while watching the money courier, but did not tell RODRIGUEZ and LEWELLEN about the gun. RODRIGUEZ placed the bag of money that the money courier in the van and UMAR drove to RODRIGUEZ' residence located on 37th Place. UMAR recalled that LEWELLEN and RODRIGUEZ drove in LEWELLEN'S Chevy Monte Carlo and that LEWELLEN was running red lights and driving recklessly as he (LEWELLEN) followed UMAR. UMAR believed that LEWELLEN and RODRIGUEZ were concerned that he (UMAR) was going to try to steal the money. After UMAR arrived to RODRIGUEZ' house, RODRIGUEZ instructed UMAR to stay outside the garage and "look out" for the police. UMAR

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | | 2. G-DEP Identifier |
|---|---|---|---|
| **REPORT OF INVESTIGATION** | | | |
| *(Continuation)* | 3 | | |

| 4. Page 12 of 40 | |
|---|---|
| 5. Program Code | 6. Date Prepared 10/08/09 |

understood that LEWELLEN and RODRIGUEZ did not want him (UMAR) to see how much money was stolen, but UMAR wanted to continue to assist RODRIGUEZ in future robberies and stayed outside the garage.

36. RODRIGUEZ later exited the garage and paid UMAR approximately $50,000 for assisting LEWELLEN and RODRIGUEZ. UMAR indicated that he did not get a close look at either duffel bag and could not estimate how much money was found during the search. UMAR recalled that during the first surveillance, RODRIGUEZ stated that TORRES was dropping off $100,000 to the money courier.

37. UMAR identified the below picture from a large photograph book as RODRIGUEZ' brother in law. UMAR could not recall the person's name.



RODRIGUEZ' brother in law

## ATTEMPTED KIDNAPPING OF FNU LNU#1

38. UMAR could not recall when this attempted kidnapping took place. UMAR recalled that he received a telephone call from RODRIGUEZ who advised that a large scale drug trafficker has been working out at a gym located at 31st Ave. and Harlem Ave. in Berwyn, IL. RODRIGUEZ wanted UMAR to meet in the area of the gym with Jorge URIARTE and Hector URIARTE and attempt to "get" the drug dealer. UMAR understood that RODRIGUEZ wanted UMAR to kidnap the individual from the gym. For the purpose of this report the drug trafficker will be referred to as FNU LNU aka #1 throughout this report. RODRIGUEZ continued that he (RODRIGUEZ) would be working out with FNU LNU#1 and that he (RODRIGUEZ) would call when FNU LNU#1 exited the gym.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

**4 - Extra**

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

*(Continuation)*

| | |
|---|---|
| 1. File No. | 2. G-DEP Identifier |
| 3. ■■■■■■■■■■■■■ | |

4.
Page  13  of  40

5. Program Code

6. Date Prepared
10/08/09

39. UMAR later met with Hector URIARTE and FNU LNU aka TURTLE near the gym. UMAR recalled that Jorge URIARTE was also in the area in another vehicle. UMAR did not know FNU LNU aka TURTLE'S name, but indicated that FNU LNU aka TURTLE is the same individual that assisted in the kidnapping of Lisette VENEGAS' grandmother.

40. UMAR developed a plan and instructed Hector URIARTE to drive the brown van into the parking lot of the gym and park by FNU LNU#1'S vehicle. UMAR wanted to act like he (UMAR) was working under the vehicle and when FNU LNU#1 tried to get into the car, UMAR would try to grab him and force him into the van.

41. While in the parking lot, RODRIGUEZ would call UMAR and provide updates on FNU LNU#1'S movement. Eventually, RODRIGUEZ called and advised that FNU LNU#1 was exiting the gym. UMAR was lying on the ground blocking FNU LNU#1'S movement. UMAR recalled that he had a wire hanger in his hand and acted like he was securing the muffler. As FNU LNU#1 approached his (FNU LNU#1'S) car, UMAR attempted to grab FNU LNU#1. UMAR recalled that he tried to put his arms around FNU LNU#1 and force him into the van. FNU LNU#1 would not comply and was placing his feet on the van so UMAR could not push him in. UMAR started punching FNU LNU#1 hoping that FNU LNU#1 would give in and fall into the van. After several punches, UMAR became concerned because there were several people in the parking lot and RODRIGUEZ had previously told UMAR that members of law enforcement frequently works out at the gym.

42. Fearing that someone called the police, UMAR let FNU LNU#1 go and the van fled the area. While driving through neighborhood streets, UMAR instructed Hector URIARTE to park the van because if the police were called, they would be looking for the van. Hector URIARTE then parked the van, and UMAR, Hector, and FNU LNU aka TURTLE fled on foot. UMAR ran into a cemetery and remained there for several hours before calling someone for a ride home.

43. UMAR learned later that RODRIGUEZ gave FNU LNU#1 a ride home after the van departed the parking lot. RODRIGUEZ told UMAR that FNU LNU#1 had appeared to have been punched in the face several times. While

DEA Form      - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 3. ████████████ | ████████████ |

| 4.  Page  14  of  40 | |
|---|---|
| 5. Program Code | 6. Date Prepared  10/08/09 |

still at the gym, RODRIGUEZ volunteered to drive him (FNU LNU#1) home. UMAR related that RODRIGUEZ only wanted to find out where FNU LNU#1 lived and was not concerned with FNU LNU#1's health.

44. After the incident at the gym, UMAR met with RODRIGUEZ, who advised that FNU LNU#1 is a large scale dealer and that FNU LNU#1 has a ranch located in Indiana. RODRIGUEZ wanted to wait to kidnap FNU LNU#1 again until FNU LNU#1 had received a large shipment of cocaine before attempting to kidnap him. Although RODRIGUEZ did not specifically tell UMAR, he (UMAR) assumed that RODRIGUEZ was purchasing cocaine from FNU LNU #1 and would know when FNU LNU#1 would receive the next shipment.

45. Approximately one month after the gym incident, RODRIGUEZ called UMAR and directed him to meet in the area of 67th Ave. and Keeler Ave., Chicago, IL. Once in the area, UMAR met with Manuel URIARTE, Hector URIARTE and FNU LNU aka New Guy. UMAR stated that he (UMAR) had seen FNU LNU aka New Guy before, but he could not recall his name. RODRIGUEZ called UMAR and advised that he (RODRIGUEZ)was with FNU LNU#1 and that they were driving back from Indiana and should be at FNU LNU#1'S house soon. UMAR developed a plan to have Hector URIARTE and UMAR would kidnap FNU LNU#1 and once they held him, the van would drive next to them and they would force FNU LNU#1 in. It was determined that FNU LNU aka New Guy would drive the van. UMAR instructed FNU LNU aka New Guy not to drive recklessly and obey all traffic signals once FNU LNU#1 was in the van.

46. UMAR later observed FNU LNU#1 driving a truck and park. UMAR did not see RODRIGUEZ in the truck and assumed that FNU LNU#1 had previously dropped RODRIGUEZ off. Once FNU LNU#1 exited, UMAR and Hector URIARTE approached FNU LNU#1 and UMAR tried to hold onto him, but FNU LNU#1 fought. During the struggle Hector URIARTE pointed a handgun at FNU LNU#1 and instructed him to get into the van. As UMAR was holding onto FNU LNU#1, the van arrived and struck UMAR. When the van hit UMAR, FNU LNU#1 was able to escape. UMAR and Manuel URIARTE then tried to get FNU LNU #1 into the van. As they were pushing FNU LNU#1 into the van, FNU LNU aka New Guy drove away. UMAR stated that the FNU LNU#1'S body was in the van, but that his legs were hanging out

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3 ▮▮▮▮▮▮▮▮▮▮▮ | |
| 4.<br>Page  15  of  40 | | |
| 5. Program Code | 6. Date Prepared<br>10/08/09 | |

of the van. As FNU LNU aka New Guy is driving away, the van increased speed and UMAR recalled that the sliding door of the van was open because FNU LNU#1'S legs were still hanging out. UMAR, Hector URIARTE, and Manuel URIARTE were pulling on FNU LNU#1 trying to get him inside so the door could close.

47. While trying to get FNU LNU#1 into the van, FNU LNU aka new guy continued to drive erratically. Eventually, the door was forced opened and Manuel URIARTE, Hector URIARTE, UMAR, and FNU LNU#1 were ejected from the van. UMAR recalled that several garbage cans broke his fall. When UMAR stood up, he observed FNU LNU#1 running down the alley with one shoe yelling, "Socorro, Socorro…" UMAR then watched Manuel URIARTE point a handgun at FNU LNU#1 and say that "I'm going to shoot him". UMAR stopped Manuel URIARTE and told him that they would attempt to kidnap FNU LNU#1 at another time.

48. UMAR entered the van and drove to meet RODRIGUEZ. UMAR was so upset that he punched FNU LNU aka new guy and left after a brief conversation with RODRIGUEZ. UMAR does not know if RODRIGUEZ attempted to kidnap FNU LNU#1 again.

## PURCHASE OF VAN AND "POLICE" VEHICLE

49. UMAR met with RODRIGUEZ in 2002 or 2003 and RODRIGUEZ instructed UMAR to buy a large work type van. UMAR related to RODRIGUEZ that the van needed to be empty because it would be easier to force someone into the van. UMAR later went with an individual that RODRIGUEZ knew that owed a car lot. UMAR identified a photograph of Roy CORRAL as the person that purchased the van for RODRIGUEZ. UMAR could not recall the individual's name. UMAR later instructed the individual to buy a white work styled van with sliding doors. UMAR recalled that "Sears" could be seen on the side, but the sticker had been removed.

50. Around the same time that the van was purchased, UMAR met with RODRIGUEZ and instructed him to buy a vehicle that appeared like an undercover police car or a "narc car". UMAR later test drove a dark colored "police car" that had had a spot light and a push bar over the front grill. UMAR drove the vehicle throughout neighborhoods in

---

DEA Form      - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION<br>*(Continuation)* | 1. File No. | 2. G-DEP Identifier |
|---|---|---|

| 4.<br>Page   16   of   40 | |
|---|---|
| 5. Program Code | 6. Date Prepared<br>10/08/09 |

Chicago and UMAR observed individuals run away from the vehicle when
he turned on the street. UMAR instructed RODRIGUEZ to buy the vehicle
and to install flashing lights that would help convince kidnapping
individuals that they are being stopped by law enforcement. RODRIGUEZ
gave UMAR approximately $5,000 to $6,000 to purchase the vehicle.
RODRIGUEZ later arranged for the vehicle to be equipped with
emergency lights and RODRIGUEZ also rented a garage near 35th Ave. to
conceal the vehicle.

## KIDNAPPING OF "RIM SHOP GUY"

51. UMAR estimated that this kidnapping occurred in 2003 prior to the
BUENO kidnapping. During the preliminary discussions, RODRIGUEZ
informed UMAR that an individual that owned at a rim shop on the
north side of Chicago had access to a large amount of money and that
the Rim Shop Guy also owned several buildings. When describing the
individual, UMAR informed RODRIGUEZ that he (UMAR) had purchased rims
at the store that the individual worked at. RODRIGUEZ and UMAR later
determined that the individual would not remember UMAR. Through the
course of this investigation the kidnapping victim has been
identified but will be referred to as Rim Shop Guy throughout this
report.

52. During the discussion with RODRIGUEZ, it was determined that the Rim
Shop Guy would be kidnapped and held for ransom. RODRIGUEZ informed
UMAR that if the Rim Shop Guy could not find anyone who would pay the
ransom, that RODRIGUEZ would "pay" the ransom. Upon being released
LOPEZ would repay RODRIGUEZ the ransom money along with interest.
RODRIGUEZ believed that he (RODRIGUEZ) could have LOPEZ sign over
property as payment. RODRIGUEZ told UMAR that LOPEZ owns several
rental properties and a large condominium.

53. After the meeting with RODRIGUEZ, UMAR met with Jorge URIARTE and
Hector URIARTE. UMAR coordinated that surveillance would be conducted
on the Rim Shop. UMAR rented a white van and placed a magnet display
on the side of the van that said "ABC Construction." UMAR stated that
he placed a hard hat in window of the van. UMAR believed that
neighbors would not call the police if the van remained parked for

DEA Form     - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3 | |
| 4.<br>Page   17   of   40 | | |
| 5. Program Code | 6. Date Prepared<br>10/08/09 | |

several hours at a time if it looked like a construction van. After a few days of not seeing the Rim Shop Guy, RODRIGUEZ demanded that UMAR return the van because RODRIGUEZ did not want to pay for additional days. UMAR also rented the van because UMAR believed that it would be easier to push the Rim Shop Guy into the van because there were no seats in the back.

54. UMAR later developed another plan to kidnap the Rim Shop Guy. UMAR dressed in old clothes and pushed a shopping cart in the alley behind the Rim Shop Guy's house. The plan was for UMAR to sit on a milk crate and appear to be drinking alcohol and maintain a visual on the rear door of the residence. When UMAR observed the Rim Shop Guy exit the house, UMAR would push the grocery cart into the alley and Jorge URIARTE and Hector URIARTE would drive down the alley in the brown van, and UMAR would force the Rim Shop Guy into the van.

55. UMAR later sat in the alley until he observed the Rim Shop Guy exit the house and walked toward three parking places. UMAR recalled that the Rim Shop Guy shook his head as he walked by. The Rim Shop Guy walked toward a black Cadillac Escalade (pickup style) that was parked near the alley. As the rim guy approached the Cadillac, UMAR pushed the grocery cart into the alley as the Rim Shop Guy passed UMAR.

56. As the Rim Shop Guy passed, UMAR ran behind him and placed the Rim Shop Guy into a bear hug. UMAR held the Rim Shop Guy until the van arrived and UMAR was able to push the Rim Shop Guy into the van.

57. Once the Rim Shop Guy was in the van, Jorge URIARTE and Hector URIARTE watched the Rim Shop Guy in the back seat, while UMAR drove the van. As UMAR drove, Jorge URIARTE and Hector URIARTE tied the Rim Shop Guy's hands and feet and placed a blanket over his head. UMAR then drove to his residence and parked the van into the garage. At the time UMAR lived at 3515 N. Nagel Ave. Chicago, IL. RODRIGUEZ wanted the Rim Shop Guy to be kept on the North side of Chicago, away from where RODRIGUEZ lived. Once the van was parked, Hector and Jorge URIARTE spoke with the Rim Shop Guy and advised him that the ransom for his release would be $800,000. Later in the garage, UMAR had his

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | | |

| 4. | |
|---|---|
| **Page 18 of 40** | |
| 5. Program Code | 6. Date Prepared |
| | 10/08/09 |

pet pit bull sniff the Rim Shop Guy. UMAR stated that his dog is
friendly, but he wanted to scare the Rim Shop Guy so he would not try
to escape.

58. While Hector URIARTE and Jorge URIARTE continued to speak with the
Rim Shop Guy, UMAR met with RODRIGUEZ in the basement and discussed
the ransom demands. After a brief conversation, UMAR returned to the
garage and opened the Rim Shop Guy's phone and started reading the
contact list. The Rim Shop Guy stated that his family will not have
access to that much money and that he does not know anyone that could
obtain the money to pay the ransom. UMAR then threatened to kill the
Rim Shop Guy if he was not able to pay the ransom.

59. While the Rim Shop Guy was in the van, he offered to give his
$20,000 Rolex as payment for his release. Jorge URIARTE and Hector
URIARTE then informed the Rim Shop Guy that they were "professionals"
and that they were not petty thieves. UMAR later took the Rolex from
the Rim Shop Guy.

60. UMAR later read several names from the Rim Shop Guy's cellular
telephone. The Rim Shop Guy would instruct UMAR to call the person
and ask for the money. UMAR would then dialed "send" and then hit
"end" right away. UMAR wanted to make sure that if the Rim Shop Guy
checked the cell phone record it would appear as if UMAR tried to
contact the Rim Shop Guy's contacts. UMAR dialed several numbers
before getting to "Saul" on the contact list. The Rim Shop Guy
directed UMAR to call Saul RODRIGUEZ.

61. UMAR then gave the phone to the Rim Shop Guy and UMAR heard the Rim
Shop Guy inform RODRIGUEZ that he was in trouble and needed a large
amount of money. The Rim Shop Guy then gave the phone to UMAR who
spoke with RODRIGUEZ. UMAR walked away from the Rim Shop Guy and
appeared to have a conversation with RODRIGUEZ. UMAR later returned
and gave back the phone to the Rim Shop Guy. RODRIGUEZ assured the
Rim Shop Guy that the money would be obtained and that he would be
released. UMAR took the phone and informed RODRIGUEZ that they would
call back in an hour and check on the money. The Rim Shop then
informed UMAR that he (Rim Shop guy) could have gotten $1,000,000 for

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. | 2. G-DEP Identifier |
| 4.<br>Page 19 of 40 | | |
| 5. Program Code | 6. Date Prepared<br>10/08/09 | |

his release. UMAR then gave the phone back to the Rim Shop Guy again and instructed him to call back his friend for $1,000,000. After the Rim Shop Guy asked RODRIGUEZ for the additional money, UMAR called RODRIGUEZ and the two decided not to inform Jorge URIARTE and Hector URIARTE that the ransom increased by $200,000.

62. A few hours later, UMAR informed the Rim Shop Guy that his friend was able to obtain the money and that after the money was counted he would be released. After approximately one or two hours, UMAR drove the Rim Shop Guy to the area of Pulaski Ave. and Addison Ave. in Chicago, IL. UMAR then left the Rim Shop Guy in a nearby alley.

63. After the release, UMAR met with RODRIGUEZ. During the meeting, RODRIGUEZ informed that UMAR would be paid $250,000 for his assistance. UMAR deposited several thousand dollars into his personal banking account at $5^{th}/3^{rd}$ bank. UMAR stated that he was paid in $50,000 installment over approximately one or two years. UMAR received the last payment prior to starting his prison sentence for the kidnapping of Teodore BUENO, which is documented later in this report.

## LYONS, IL HOME INVASION/KIDNAPPING

64. UMAR did not recall the date of this home invasion and kidnapping, but recalled it was before the TWINS' kidnapping, which is documented later within this report. UMAR received a telephone call from RODRIGUEZ who instructed UMAR to get the brown van and meet in the area of I55 and 1st Ave. near Lyons, Illinois. UMAR recalled that the van was stored at an apartment that RODRIGUEZ owned near McKinley Park. Once UMAR arrived to the area, he met with RODRIGUEZ and LEWELLEN. RODRIGUEZ explained that he (RODRIGUEZ) had been purchasing cocaine from an individual and LEWELLEN had followed the individual to the house. UMAR did not know the person's name, but for the purpose of this report the victim will be referred to as FNU LNU #2. RODRIGUEZ wanted to find out where the person was purchasing the cocaine. It was determined that UMAR would conduct surveillance on the individual and try to ascertain where he (FNU LNU#2) obtained the loads of cocaine. When the location was found, it was UMAR'S

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**4 - Extra**

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** | | |
| *(Continuation)* | 3. ██████████ | |

| 4. | |
|---|---|
| Page   20   of   40 | |
| 5. Program Code | 6. Date Prepared |
| | 10/08/09 |

understanding that he (UMAR) and LEWELLEN would then conduct a home invasion on the house.

65. Over the next month, UMAR sat in the brown mini van and watched FNU LNU#1's residence. During the surveillance, UMAR determined that the cocaine was being hidden in the FNU LNU#2'S residence. UMAR later met with RODRIGUEZ and informed him that FNU LNU#2 was using his residence as a stash house. While conducting surveillance, UMAR took detailed notes of his observations. UMAR documented when residents left and arrived at the house during the day. RODRIGUEZ and LEWELLEN would assist in the surveillances, but UMAR did most of them. RODRIGUEZ would call UMAR and tell UMAR that he (RODRIGUEZ) had just spoken to FNU LNU#2 and RODRIGUEZ ordered a load of cocaine. RODRIGUEZ wanted UMAR to find out where FNU LNU#2 went to obtain the cocaine. UMAR discovered that FNU LNU#2 would leave the house and drive directly to RODRIGUEZ. UMAR informed RODRIGUEZ that the cocaine was being stored at FNU LNU#2's house.

66. It was later determined that RODRIGUEZ, UMAR, and LEWELEN would watch the residence and when FNU LNU#2 arrived home from work, UMAR and LEWELLEN would approach him. During UMAR'S surveillance, UMAR noted that FNU LNU#2 left the house at a certain time during the week and would return home at the same time. UMAR remembered that FNU LNU#1 wore a landscaping uniform when he left for work.  UMAR recalled that RODRIGUEZ was sitting in a car near the van and was not concerned if FNU LNU#2 saw RODRIGUEZ' face. UMAR assumed that RODRIGUEZ had never met with FNU LNU#2.

67. During the surveillance, UMAR observed FNU LNU#2 arrive home. Once the vehicle was parked, FNU LNU#2 exited that vehicle and checked the mail at the end of the driveway. As FNU LNU#2 walked toward the house, UMAR and LEWELLEN exited the van. LEWELLEN and UMAR walked toward FNU LNU#2, while FNU LNU#2 was standing near the side door, LEWELLEN identified himself as a police officer. UMAR recalled that LEWELLEN was wearing a ballistic vest and had a badge displayed on a silver chain.

---

DEA Form      - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

*(Continuation)*

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|

4.
Page   21   of   40

5. Program Code

6. Date Prepared
10/08/09

68. Once LEWELLEN identified himself, UMAR and LEWELLEN walked FNU LNU#2 into the house. Once inside the house, UMAR walked FNU LNU#2 into the bathroom and placed plastic ties on FNU LNU#2'S hands. After FNU LNU#2 was secured, LEWELLEN and RODRIGUEZ searched the house for drugs and money. UMAR recalled that after not finding anything in the house, LEWELLEN exited the house and searched the detached garage. When nothing was found, RODRIGUEZ instructed UMAR to ask FNU LNU#2, where the drugs and money was being hidden. FNU LNU#2 refused to talk to UMAR. RODRIGUEZ was angry that FNU LNU#2 was not cooperative and asked UMAR if they should "take" him. UMAR understood that RODRIGUEZ wanted to kidnap FNU LNU #2 and hold him until FNU LNU#2 cooperated. LEWELLEN informed RODRIGUEZ that he did not want to be involved if FNU LNU#2 was kidnapped. UMAR agreed to assist RODRIGUEZ.

69. UMAR then moved the van closer to the residence, and LEWELLEN assisted UMAR in placing FNU LNU#2 into the van and then left. UMAR placed a blanket over FNU LNU #2'S head and drove to the garage near McKinley Park in Chicago, IL. UMAR recalled that RODRIGUEZ followed the van to the garage. Once at the garage, UMAR placed FNU LNU#2 into a chair and tried to make him (FNU LNU#2) talk about where the cocaine was being stored. After talking to FNU LNU#2 for 10-15 minutes, UMAR stopped and told RODRIGUEZ that he (UMAR) did not think that FNU LNU#2 would talk. RODRIGUEZ then handed UMAR a pair of large rusty sheers and told UMAR to threaten to cut FNU LNU#2'S toes off if he did not talk. UMAR then gave the sheers back to RODRIGUEZ and asked him to do it. RODRIGUEZ nodded his head and would not take the shears from UMAR. UMAR then walked toward FNU LNU #2 and showed FNU LNU#2 the shears. UMAR then threaten to cut off FNU LNU#2'S toes if he did not talk. FNU LNU#2 would not provide the information.

70. UMAR and RODRIGUEZ then had a discussion about what to do next. RODRIGUEZ stated that he would call Margarito CARMONA aka Yito, because CARMONA would get FNU LNU#2 to talk. UMAR told RODRIGUEZ not to call CARMONA that he (UMAR) would get him to talk. UMAR then tied FNU LNU#2'S hands behind his back and told FNU LNU#2 that he (UMAR) was going to punch him in the ribs until FNU LNU#2 talked. UMAR estimated that he punched FNU LNU#2 in the ribs approximately 3 to 5

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

4 - Extra

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | |
| | 3. ▉▉▉▉▉▉▉▉▉▉ | |
| 4. Page  22  of  40 | | |
| 5. Program Code | 6. Date Prepared 10/08/09 | |

times before FNU LNU#2 said that the cocaine was being stored in a vehicle in the garage at his residence.

71. UMAR and RODRIGUEZ initially thought that LEWELLEN had stolen the cocaine from the garage when he (LEWELLEN) searched the garage earlier. FNU LU#1 told UMAR that the keys to the car were in the kitchen at the house. UMAR told FNU LNU#2 that someone would be watching and that FNU LNU#2 should not move. FNU LNU#2 was then left in the brown van in the garage.

72. UMAR and RODRIGUEZ then drove back to Lyons, IL. During the surveillance that UMAR had previously conducted, he noted that FNU LNU'S wife arrived home at a certain time every day. UMAR told RODRIGUEZ that they had only one hour before FNU LNU#2'S wife arrived home. Once at the house UMAR found the keys and then ran into the garage, where he and RODRIGUEZ found approximately 20 kilograms of cocaine located in the trunk of an older vehicle. UMAR recalled that the older "junk" that contained the cocaine was parked next to a new vehicle. UMAR could not recall the make or model of either vehicle. The cocaine was placed into RODRIGUEZ' vehicle and they drove back to the garage where FNU LNU#1 was located. Once back at the garage, UMAR drove the van to the area of lower Wacker Drive in Chicago and released FNU LNU#2. UMAR met RODRIGUEZ days later and was paid $100,000 for kidnapping FNU LNU#2.

73. UMAR identified the below photograph as Margarito LNU aka Yito.



Margarito LNU
Aka Yito

DEA Form     - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION** | 1. File No. | 2. G-DEP Identifier |
| *(Continuation)* | 3. | |
| 4. Page 23 of 40 | | |
| 5. Program Code | 6. Date Prepared 10/08/09 | |

## KIDNAPPING OF ONE OF THE TWINS

74. UMAR could not recall the month, but stated that the kidnapping of the TWINS occurred in 2003. UMAR did not recall the name of the individual kidnapped, but UMAR was able to identify the photograph of two photographs as individuals that UMAR knows as the "Twins" and stated that one of the identical Twins was kidnapped under the direction of RODRIGUEZ.

75. Prior to the kidnapping, UMAR met with RODRIGUEZ, who indicated that two brothers were selling large amounts of cocaine and had access to millions of dollars. RODRIGUEZ directed UMAR to conduct surveillance on both Twins in an effort to identify money or drug stash houses that the Twins used. Prior to the first surveillance, RODRIGUEZ called UMAR and related that he (RODRIGUEZ) had planned to meet the Twins to play basketball at a gym near Oprah's Studio.

76. UMAR drove to the area and while sitting in his car, UMAR received a telephone call from Lisette VENEGAS, who advised that one of the TWINS' associates had seen UMAR sitting in the car. UMAR recalled that Lisette and David VENEGAS were sitting in another car watching the Twins, when RODRIGUEZ called Lisette VENEGAS and instructed her to call UMAR and inform him (UMAR) to stop the surveillance. UMAR discontinued surveillance that day, and UMAR attempted conducting surveillances on several other days, but was never able to maintain surveillance.

77. UMAR received a telephone call from RODRIGUEZ, and during the call, RODRIGUEZ indicated that one of the TWINS' stash house had been located. RODRIGUEZ instructed UMAR to bring the police car to the area of Keeler Ave. UMAR could not recall the cross street. UMAR recalled that he (UMAR) was wearing a dark blue hat, blue windbreaker, and a fake vest which he (UMAR) normally wore during home invasions/kidnappings when he posed as a police officer. Upon arriving to the area, UMAR met with LEWELLEN, and it was coordinated that UMAR would drive the car. RODRIGUEZ later met with UMAR and LEWELLEN and explained that he (RODRIGUEZ) would watch the house and call LEWELLEN when one of the TWINS exited the house, and after the

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**4 - Extra**

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | |

| 4. Page  24  of  40 | |
|---|---|
| 5. Program Code | 6. Date Prepared 10/08/09 |

call, LEWELLEN and UMAR would turn the lights on the "police" car and try to stop one of the TWINS. David VENEGAS was driving the white van and was parked near the alley.

78. While in the car, LEWELLEN received a telephone call from LEWELLEN explaining that the TWIN had exited the house and entered a Lexus SUV. After receiving the telephone call from RODRIGUEZ, UMAR drove toward the Lexus and activated the lights in the "police" car. The Lexus stopped and LEWELLEN and UMAR approached the driver. UMAR identified the driver from the photograph book, but UMAR could not decipher between the two photographs of the identical twins.

79. As UMAR approached the vehicle, he heard LEWELLEN instruct the driver of the Lexus to place his hands on the steering wheel. After a brief conversation, LEWELLEN instructed the driver to exit the vehicle. For the purpose of this report the driver of the Lexus that was kidnapped will be referred to as TWIN #1.

80. After a brief conversation while TWIN#1 remained in the vehicle, LEWELLEN instructed TWIN#1 to exit the vehicle. As TWIN#1 exited the vehicle, UMAR placed plastic ties around his (TWIN#1) hands. After UMAR tied the hands, UMAR placed TWIN#1 into the rear of the "police" car. Once TWIN#1 was in the car UMAR sat in the backseat, and LEWELLEN backed up the vehicle from the alley. After the van departed the alley, LEWELLEN drove to a nearby empty lot, where VENEGAS had parked the white van. Once LEWELLEN and UMAR arrived to the parking lot, TWIN#1 was placed into the rear of the white van. UMAR entered the van with TWIN#1 and UMAR explained that other officers are searching for more suspects in the area.

81. UMAR placed TWIN#1 facing the floor of the van, and VENEGAS drove toward VENEGAS' house. UMAR continued that the van had a divider between the back and front seat and that TWIN#1 could not see where the van was driving. UMAR could not recall which city VENEGAS lived, but recalled that the house was a newer house located near Ford City Mall. It was arranged that VENEGAS' house would be used because it was close and it had an attached garage. While driving to VENEGAS' house, UMAR tied TWIN#1'S hands and feet together. UMAR assumed that

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**4 - Extra**

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3 ████████████████ | |
| 4.<br>Page 25 of 40 | | |
| 5. Program Code | 6. Date Prepared<br>10/08/09 | |

TWIN#1 realized that he (TWIN#1) was not being transported to a
nearby police station. UMAR also recalled that he placed a tire in
the van so he could sit while watching the kidnapping victim. While
driving to VENEGAS' house, UMAR heard TWIN#1 praying to himself as
the van drove. UMAR informed TWIN#1 that they only wanted money and
that he (TWIN#1) would not be hurt if the ransom was paid. UMAR
indicated that he purposely used "they" and "he" to direct the
responsibility to someone else.

82. Once in the garage, TWIN#1 was brought to the basement of VENEGAS'
house and placed into a chair. UMAR recalled that TWIN#1 was
cooperative and UMAR allowed TWIN#1 to use the restroom when needed.
UMAR recalled watching TWIN#1 while David VENEGAS, Jorge URIARTE, and
Hector URIARTE talked upstairs in the house. Prior to making
telephone calls asking for the ransom, UMAR placed TWIN#1's phone
into a plastic bag. UMAR estimated that TWIN#1 had approximately 10
cellular phones on his person. UMAR recalled that he discovered a
phone with gold and diamonds. Hector URIARTE and Jorge URIARTE
believed that the phone was not made of expensive materials, but UMAR
took the phone anyway. UMAR later sold the phone for $2,000 to a pawn
shop in Chicago, IL.

83. While looking at the phone, TWIN#1 explained that one phone has the
numbers that he needs to attempt to receive the ransom for his
release. During prior conversations, RODRIGUEZ instructed UMAR to ask
for $1,000,000 or a large amount of cocaine for TWIN#1'S release.
During the first call, TWIN#1 called an unknown person and UMAR heard
TWIN#1 demand that the person obtain the money or cocaine so that he
could be released. UMAR then took the phone and informed the
individual that they would call back with specific demands.

84. During a later telephone call it was arranged that a large amount of
cocaine and money would be left in a vehicle. UMAR'S job was to stay
with TWIN#1 and UMAR could not provide details of how the delivery
was arranged. UMAR recalled that RODRIGUEZ, Lisette VENEGAS, Hector
URIARTE, and Jorge URIARTE picked up the cocaine. While watching
TWIN#1, UMAR received a telephone call from RODRIGUEZ, who advised
that TWIN#1'S criminal associates were following the people that

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

4 - Extra

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION
*(Continuation)*

| 1. File No. | 2. G-DEP Identifier |
|---|---|

| 4. Page 26 of 40 | |

| 5. Program Code | 6. Date Prepared 10/08/09 |

picked up the cocaine and money. RODRIGUEZ instructed UMAR to call the TWIN#1'S people and tell them not to follow the vehicle with the money and cocaine. UMAR gave TWIN#1 his cell phone and TWIN#1 instructed the person on the other end not to follow the car or that he (TWIN#1) would be killed.

85. A short time after UMAR spoke with RODRIGUEZ regarding the surveillance, RODRIGUEZ called again and advised that the cocaine that was used as payment was of very poor quality. UMAR learned later that approximately 90 kilograms of cocaine left to pay for the ransom. RODRIGUEZ instructed TWIN#1 to call his associates back and inform them to bring better cocaine.

86. UMAR learned later that RODRIGUEZ, Hector URIARTE, and Jorge URIARTE received 60 kilograms cocaine and an unknown amount of money. UMAR could not recall if the "bad" cocaine was sent back before obtaining the second load of cocaine. RODRIGUEZ later called and informed UMAR to release TWIN#1. UMAR then placed TWIN#1 into the van and released TWIN#1. UMAR found a secluded location and left TWIN#1 on the street. UMAR stayed in the back of the van with TWIN#1 while someone else drove. UMAR could not recall who drove the van.

87. Days after the kidnapping was completed, UMAR met with RODRIGUEZ who advised that UMAR would be paid $100,000. UMAR estimated that RODRIGUEZ paid the money over the next several months.

88. UMAR identified the pictures below as the TWINS and FNU LNU, the individual that assisted in buying the dark colored police car.

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | | | 1. File No. | | 2. G-DEP Identifier |
|---|---|---|---|---|---|
| **REPORT OF INVESTIGATION** | | | | | |
| *(Continuation)* | | | 3 | ███████████████ | |
| 4. Page 27 of 40 | | | | | |
| 5. Program Code | | | 6. Date Prepared 10/08/09 | | |



FNU LNU
TWIN



FNU LNU
TWIN



FNU LNU
Owner of car lot

## KIDNAPPING OF TEODORE BUENO

89. In fall of 2003, RODRIGUEZ approached UMAR about kidnapping Teodore BUENO. UMAR could not recall the month, but remembered that this kidnapping occurred after the Twin's kidnapping. RODRIGUEZ explained that Marco VALLADOLID aka Marco POLO had informed RODRIGUEZ that BUENO was selling a large amount of narcotics and would have access to a large amount of money. UMAR understood that VALLADOLID was not involved in the planning of the kidnapped, but unwittingly told RODRIGUEZ of his (VALLADOLID'S) dealings with BUENO.

90. RODRIGUEZ advised that BUENO had recently purchased a mini van with graphics on both side of the van from Hector URIARTE. The van had a hidden compartment in the van that Hector URIARTE had installed prior to selling the van to BUENO. It was understood by RODRIGUEZ that BUENO purchased the van because he (BUENO) needed a vehicle with a hidden compartment.

91. UMAR later met with RODRIGUEZ and attempted to conduct surveillance of BUENO meeting with VALLADOLID. UMAR did not know if BUENO was meeting with VALLADOLID to conduct a drug transaction or not. UMAR observed BUENO exit a restaurant in the area of 47th and Cicero in Chicago, IL. BUENO entered the van, and as BUENO left, UMAR, RODRIGUEZ, and LEWELLEN followed him (BUENO). After a brief time conducting surveillance they lost the van. RODRIGUEZ, UMAR, and

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | █████████ | █████████ |

| 4. Page 28 of 40 | |
|---|---|
| 5. Program Code | 6. Date Prepared 10/08/09 |

LEWELLEN conducted surveillance on several different occasions, but were never able to identify BUENO'S residence.

92. Months after first being informed about BUENO, UMAR was having lunch near his house when he observed BUENO'S van drive by. UMAR stated that the graphics were distinctive and that he recognized the van immediately. After seeing the van, UMAR ran from the restaurant and was able to observe the van enter a driveway.

93. UMAR then called RODRIGUEZ and informed him that he (UMAR) found BUENO'S house. RODRIGUEZ instructed UMAR not to call LEWELLEN and to develop a plan to kidnap BUENO. UMAR understood that by not including LEWELLEN, that he (UMAR) and RODRIGUEZ would receive a larger amount of money if BUENO was kidnapped without LEWELLEN.

94. RODRIGUEZ later called UMAR and advised that he (RODRIGUEZ) wanted UMAR to include David VENEGAS and another individual. UMAR later identified a photograph of Charles DURR as the individual that RODRIGUEZ wanted UMAR to include in the kidnapping. UMAR understood that RODRIGUEZ wanted to use VENEGAS and DURR because RODRIGUEZ would not have to pay them as much as he (RODRIGUEZ) would have to pay LEWELLEN, Jorge URIARTE, or Hector URIARTE. Although RODRIGUEZ never directly informed UMAR, he (UMAR) believed DURR owed RODRIGUEZ money from a previous drug transaction and that DURR was assisting in the kidnapping to "work off" his debt.

95. UMAR coordinated that he (UMAR) and DURR would drive the green "police car" and when BUENO was seen in the driveway, UMAR and DURR would approach BUENO. UMAR would then identify himself as a police officer and handcuff BUENO. BUENO would then be transported to the garage near McKinley Park.

96. On the day of the kidnapping, UMAR directed VENEGAS to park the police car near BUENO'S house and call UMAR when BUENO was observed in the driveway. UMAR recalled that RODRIGUEZ was also parked on the street but that he was not going to be involved with approaching BUENO. RODRIGUEZ told UMAR that he (RODRIGUEZ) would look out for law enforcement.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**4 - Extra**

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
| **REPORT OF INVESTIGATION** | | |
| *(Continuation)* | ████████████ | |
| 4. | | |
| Page  29  of  40 | | |
| 5. Program Code | 6. Date Prepared |
| | 10/08/09 |

97. VENEGAS later called UMAR and advised that BUENO was outside of the
house and was placing something into the red van. BUENO then
activated that lights on the "police" car and entered the driveway.
Once parked, UMAR and DURR exited the vehicle and approached BUENO.
UMAR was wearing a blue colored windbreaker and had a hand gun drawn
pointing at BUENO. UMAR then identified himself as a police officer
and instructed BUENO not to move. As UMAR was talking to BUENO, a
female exited the residence and demanded to know what was occurring
with her husband. UMAR informed the female that it was "police"
business and to go back into the house. UMAR then directed BUENO into
BUENO'S van, and attempted to back up. BUENO'S wife would not allow
UMAR to leave. UMAR eventually was able to exit the driveway. VENEGAS
departed in the police car. As UMAR departed that area, he (UMAR)
took BUENO'S phone and instructed BUENO to tell his wife not to call
the police.

98. As UMAR departed the area, VENEGAS followed in the police car. The
initial plan was to drive to the garage located near McKinley Park,
but because BUENO'S wife observed the kidnapping, UMAR was concerned
that the police may be looking for BUENO'S van. Because the van had a
distinctive graphic on the side, UMAR decided to drive the van to his
(UMAR'S) residence and hide the van in the garage.

99. Once the van was placed into the garage, DURR told UMAR that he did
not want to continue to assist in the kidnapping. DURR then walked
away from the garage, and UMAR had not seen DURR since. Before
leaving the garage, UMAR had his pit bull smell BUENO. UMAR then
informed BUENO not to move because the dog would bite him.

100.     After the van was parked in the garage, UMAR met with
RODRIGUEZ in UMAR'S residence. RODRIGUEZ directed UMAR to inform
BUENO that $800,000 or a large amount of cocaine would be needed for
his release. After talking to RODRIGUEZ, UMAR went back into the
garage, and searched the van. During the search of the van, UMAR
discovered approximately $20,000 located in a hidden compartment.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**4 - Extra**

`U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | ██████████ | ██████████ |

| 4. Page 30 of 40 | |
|---|---|
| 5. Program Code | 6. Date Prepared 10/08/09 |

101.    Once the money was found, UMAR informed BUENO that he (BUENO) needed to contact someone that could pay ransom in money or narcotics. BUENO informed UMAR that he would be able to obtain the $800,000. UMAR then dialed BUENO'S wife's number and placed the phone next to BUENO'S ear. BUENO informed his wife that she needed to call people and try to retrieve the money.

102.    Shortly after the telephone call with BUENO'S wife, UMAR received a telephone call from RODRIGUEZ who advised that VALLADOLID had just called and advised that BUENO'S wife is trying to borrow money because BUENO was kidnapped. RODRIGUEZ informed UMAR that he (RODRIGUEZ) would be meeting VALLADOLID later to lend him $50,000. RODRIGUEZ assured UMAR that everything was going to plan and that BUENO'S wife had not called the police.

103.    After speaking with RODRIGUEZ, UMAR called BUENO'S wife to ascertain if she had obtained the money. BUENO'S wife informed UMAR that she has not been able to obtain the money and that she does not think that she can find that amount of money. She indicated that she could only get $500,000. During the next telephone call, BUENO'S wife stated that she had obtained the money. UMAR had a feeling that BUENO'S wife had contacted law enforcement because she "found" the $300,000 in a short amount of time. As a result of being suspicious, UMAR informed BUENO'S wife that if he observed law enforcement while picking up the ransom money, BUENO would be killed.

104.    UMAR was concerned that BUENO'S wife had contacted the police and decided that he would instruct BUENO'S wife deliver the money at a house that was for sale. UMAR then drove toward downtown Chicago and used a payphone to provide exact instructions to BUENO'S wife. UMAR believed that if law enforcement was involved that they would discover that the kidnapper was close to downtown Chicago and direct their efforts away from the "drop location."

105.    When UMAR returned to the area of his residence, UMAR thought he observed approximately 10 unmarked police vehicles UMAR informed RODRIGUEZ of the police vehicles, but RODRIGUEZ informed UMAR that the police were not involved. UMAR then called BUENO'S wife and

---

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

`U.S. Department of Justice
Drug Enforcement Administration

| | |
|---|---|
| **REPORT OF INVESTIGATION** <br> *(Continuation)* | 1. File No. ███ 2. G-DEP Identifier ███ |
| 4. <br> Page 31 of 40 | |
| 5. Program Code | 6. Date Prepared <br> 10/08/09 |

directed her to leave the money in the passenger seat of the vehicle and leave it parked near the house that was for sale. UMAR could not recall the address of the residence that was for sale.

106.     Prior to the call being made to BUENO'S wife, RODRIGUEZ drove to the area to "look out" for law enforcement. During the telephone call, UMAR directed BUENO'S wife to drive the money directly to the location. UMAR related to BUENO'S wife that that money should be there in less than 5 minutes, because UMAR knew where BUENO'S house was located. UMAR waited for over thirty minutes and while waiting, UMAR called RODRIGUEZ and told RODRIGUEZ to call off the money drop because BUENO'S wife called the police. RODRIGUEZ did not think that the police were contacted and directed UMAR to get the money once the car was parked near the house for sale.

107.     UMAR later observed a car arrive and UMAR watched two females exit. UMAR then drove into an alley near the car and parked before VENEGAS exited.  VENEGAS ran through the alley toward the vehicle with the money. Once VENEGAS retrieved the money, VENEGAS returned to UMAR'S vehicle. UMAR then departed the area and observed that he was being followed by law enforcement.  UMAR tried to elude law enforcement before he stopped the vehicle and was subsequently arrested. After being arrested, the police officers physically hit UMAR and demanded to know where the "vic" was located. UMAR understood that the police officers wanted to know where BUENO was being hidden. UMAR recalled that a police officer placed a gun to his head and yelled to know where BUENO was being hidden. UMAR was then transported to the Chicago Police Department where he was questioned. UMAR informed the police that BUENO was being hidden in the garage at his residence.

108.     UMAR informed the police that BUENO owed him (UMAR) money from a previous drug transaction. UMAR stated that he lied to law enforcement because he wanted to protect VENEGAS and RODRIGUEZ from being arrested. While at the police station, UMAR heard two detectives talking about an individual that was seen in the are of UMAR'S arrest in a grey van. One detective stated that they spoke to the individual but that the driver was not involved. UMAR believes

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

`U.S. Department of Justice
Drug Enforcement Administration

**REPORT OF INVESTIGATION**

*(Continuation)*

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| | ███████████████ | |

4.
Page  32  of  40

5. Program Code

6. Date Prepared
10/08/09

that the detectives were referring to RODRIGUEZ, who was parked in
the area in a grey van.  Detectives later showed UMAR a photographic
array and asked UMAR to identify that individual that he (UMAR)
kidnapped. UMAR then pointed out a photograph of BUENO. While at the
police station, Attorney Don Angellini, arrived and advised UMAR that
he was his lawyer.

109.     Days after being arrested, UMAR received a bond which was paid
by his (UMAR'S) brother, Kareem UMAR. UMAR discovered later that
RODRIGUEZ gave the money to Kareem UMAR to pay for UMAR'S bond.

110.     Upon being released from jail, UMAR met with RODRIGUEZ. During
the meeting, RODRIGUEZ informed UMAR that if UMAR went to prison,
that he (RODRIGUEZ) would financial support UMAR'S family and would
help pay for UMAR'S attorney, Bob Rascia. UMAR believed that
RODRIGUEZ wanted to pay for Mr. Rascia because RODRIGUEZ would know
if UMAR was cooperating with law enforcement. UMAR later met with Mr.
Rascia who informed UMAR that he (Mr. Rascia) had influence with the
prosecutor's office and Cook County Judges. During the initial
meeting Mr. Rascia explained to UMAR that if BUENO "happened" to get
hit by a bus, UMAR probably would not be prosecuted. UMAR believed
that Mr. Rascia was joking when he made the comment. UMAR was later
informed by Mr. Rascia that RODRIGUEZ had paid $20,000 to Mr. Rascia
for UMAR'S case.

111.     While out of jail on bond, RODRIGUEZ informed UMAR that he
(RODRIGUEZ) had spoken with VALLADOLID and RODRIGUEZ directed
VALLADOLID to speak with BUENO about not cooperating with law
enforcement. RODRIGUEZ wanted VALLADOLID to inform BUENO that he
(RODRIGUEZ) would pay $50,000 to BUENO if he refused to cooperate.
VALLADOLID later met with BUENO who declined RODRIGUEZ' offer.

112.     Days after learning that VALLADOLID approached BUENO, a private
investigator arrived at UMAR'S residence. The private investigator
wanted to know who the boss of the BUENO kidnapping was was. The
private investigator related the he knew UMAR was not the person in
charge and BUENO wanted to know who wanted to kidnap him. UMAR
declined to speak with the private investigator and UMAR later

DEA Form      - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

`U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | |

| 4. Page 33 of 40 | |
|---|---|
| 5. Program Code | 6. Date Prepared 10/08/09 |

observed the private investigator in court. UMAR later plead to an armed robbery charge.

113.    UMAR identified the below photographs as Teodore BUENO, Marco Polo, FNU LNU (black male that assisted), David VENEGAS.

   

TEODORE BUENO          Marco LNU          FNU LNU          David VENEGAS
                       Aka Marco POLO

## HOME INVASION 60th KEDZIE CHICAGO, IL

114.    UMAR could not recall the date of this home invasion, but recalled that RODRIGUEZ called and directed him (UMAR) to meet. Once with RODRIGUEZ, a plan was coordinated about approaching a residence that RODRIGUEZ learned had a large amount of money. UMAR and LEWELLEN later knocked on the door and spoke with a female who allowed UMAR and LEWELLEN to enter the house. LEWELLEN identified himself as a police officer and UMAR recalled that that female believed LEWELLEN. During the search of the house, only an electronic money counter was found. UMAR and LEWELLEN departed the house and met with RODRIGUEZ. UMAR recalled that LEWELLEN was extremely mad that nothing was found.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

4 - Extra

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | ███████ | ███████ |
| 4.<br>Page  34  of  40 | | |
| 5. Program Code | 6. Date Prepared<br>10/08/09 | |

## HOME INVASION IN SOUTH SIDE CHICAGO

115.     UMAR recalled that this home invasion was one of the last home invasions/kidnapping that he conducted. UMAR was unable to remember the date of this incident. UMAR received a telephone call from RODRIGUEZ who advised that they were following someone and they followed him to a house. UMAR understood that RODRIGUEZ and LEWELLEN were conducting surveillance and have identified a residence that contained either drugs or money. RODRIGUEZ called UMAR several times as UMAR drove toward RODRIGUEZ, because RODRIGUEZ wanted UMAR to hurry.

116.     UMAR later met with RODRIGUEZ and LEWELLEN in the area of 50th or 60th Ave. on the south side of Chicago. UMAR could not recall the north/south street. Once with RODRIGUEZ, the plan was for LEWELLEN and UMAR to approach when the individual arrived in the driveway. The individual later arrived and UMAR and LEWELLEN approached the individual and his girlfriend. LEWELLEN identified himself as a police officer and escorted the male and female into the house. Once inside the house, UMAR walked both individuals to a bathroom where he tied both up with plastic ties. After a brief search, LEWELLEN told UMAR that there was some money, but nothing else found. Before exiting, LEWELLEN told UMAR to wait 3 minutes before leaving. UMAR realized that LEWELLEN wanted to make sure that he (LEWELLEN) was away from the house in case law enforcement was contacted. UMAR waited a few minutes and departed. UMAR later met with RODRIGUEZ and was given $10,000 for assisting in the home invasion. RODRIGUEZ informed UMAR that $30,000 was recovered during the search.

## KIDNAPPING OF TWIN MONEY COURIER

117.     UMAR could not recall the exact date but indicated that that last home invasion/kidnapping that he (UMAR) participated in is when one of TWINS' money courier was kidnapped.

118.     Prior to the kidnapping, RODRIGUEZ informed UMAR that the TWINS were hiding in Mexico because they were being investigated by either the Federal Bureau of Investigations (FBI) or Drug Enforcement

DEA Form     - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | ██████████ | |
| 4. Page  35  of  40 | | | |
| 5. Program Code | | 6. Date Prepared 10/08/09 | |

Administration (DEA). During the meeting, RODRIGUEZ explained that a criminal associate of  the TWINS', Jorge LOPEZ aka  Oso, provided information to RODRIGUEZ that would assist in identifying money and drug stash houses that the TWINS utilized in the Chicago land area. RODRIGUEZ stated that LOPEZ meets with a worker of the TWINS' on a frequent basis and that LOPEZ will contact RODRIGUEZ prior to the next money transaction. RODRIGUEZ wanted UMAR to assist in conducting surveillance on the person that met with LOPEZ in anticipation of identifying the money stash house.

119.    Days after the initial meeting with RODRIGUEZ, UMAR received a telephone call from RODRIGUEZ. During the call, RODRIGUEZ instructed UMAR to meet in downtown Chicago because LOPEZ had planned to provide money from a previous drug transaction to one of the TWINS' workers. Upon his (UMAR'S) arrival, UMAR met with Hector URIARTE, Jorge URIARTE, and RODRIGUEZ.  RODRIGUEZ informed UMAR that the plan was to follow the vehicle that met with LOPEZ and attempt to identify a money stash house. RODRIGUEZ then wanted UMAR and the URIARTES to kidnap the driver and hold him until he advised where the money or drugs were being hidden.

120.    UMAR recalled that LOPEZ met with an individual driving a red Chevy Trailblazer or Ford Explorer in the area of State Street and Roosevelt in Chicago, Il. As the red SUV departed that area, UMAR and the other individuals followed. The vehicle was followed to the area of I94 and Fullerton Ave. in Chicago, IL, but as the vehicle exited the expressway, the vehicle was lost. UMAR indicated that the vehicle used several counter-surveillance techniques which made it extremely difficult to maintain a visual on the vehicle.  UMAR advised that while following the SUV, he observed a camera at the rear of the vehicle and a large screen attached to the front dash of the vehicle. UMAR related that the camera was positioned for the driver to ascertain if the vehicle was being followed. UMAR also stated that LOPEZ advised that the vehicle had a hidden compartment located in the rear of the vehicle.

121.    Approximately one month after the first surveillance, UMAR was contacted again by RODRIGUEZ and it was arranged that surveillance

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | ████████ | ████████ |

| 4. Page 36 of 40 | |
|---|---|
| 5. Program Code | 6. Date Prepared 10/08/09 |

would be initiated again on the TWINS' money courier. UMAR met with RODRIGUEZ, Hector URIARTE, and Jorge URIARTE again in the area of LOPEZ residence. UMAR recalled that he (UMAR) drove his 1996 Monte Carlo during the surveillance.

122.     During this surveillance, the same vehicle met with LOPEZ before departing the area. The vehicle drove toward the same location, and UMAR stated that after the red SUV exited I94, he (UMAR) parked on the shoulder of the expressway and watched the neighborhood below. UMAR eventually observed the red SUV enter a detached garage in a gated complex.

123.     After identifying the house, UMAR met with RODRIGUEZ, Hector URIARTE, and Jorge URIARTE to coordinate how the home invasion would be committed. It was agreed that the home invasion would be conducted at a later time. RODRIGUEZ and UMAR wanted LOPEZ to order and pay for another load of cocaine to make certain that they identified the correct house. LOPEZ was concerned that the TWINS were going to become suspicious because LOPEZ normally does not purchase cocaine so frequently.

124.     Approximately one month after the second surveillance, UMAR received a telephone call from RODRIGUEZ. During the call, RODRIGUEZ directed UMAR to meet with Hector URIARTE, Jorge URIARTE, and another Hispanic Male, FNU LNU #3 that UMAR did not know. UMAR later met in the area of the stash house that was previously identified. RODRIGUEZ continued that he (RODRIGUEZ) would watch LOPEZ give the money courier the money and follow the vehicle back to the stash house. It was then organized that once the vehicle arrived to the garage, UMAR and Hector URIARTE would approach the drive in the garage and force him into the house.

125.     UMAR and Hector URIARTE waited in the gangway near the garage, and Jorge URIARTE and FNU LNU #3 waited near the front door of the house. UMAR recalled that he and Hector URIARTE were wearing ski masks while waiting near the garage. Hector URIARTE had a handgun and the plan called for Hector URIARTE to threaten the driver when he arrived. While waiting, UMAR observed an individual exit the house

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

4 - Extra

U.S. Department of Justice
Drug Enforcement Administration

**REPORT OF INVESTIGATION**

*(Continuation)*

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|

4.
Page  37  of  40

5. Program Code

6. Date Prepared
10/08/09

and walk toward the garage. As the individual exited the house, UMAR and Hector URIARTE ordered the male to the ground. UMAR recalled that he threatened the male and the male eventually laid on the ground. UMAR remained in the gangway while with the male from the house. The plan was for Jorge URIARTE, Hector URIARTE, and FNU LNU#2 to approach the driver after the SUV entered the garage. UMAR recalled that Jorge URIARTE had a handgun as he entered the garage, but UMAR could not recall if it was the same gun that Hector URIARTE had earlier. UMAR remembered that Jorge URIARTE was slow to enter the garage, and UMAR had to push Jorge URIARTE into the garage.

126.      As the garage opened, UMAR observed the red SUV enter the garage and moments later Jorge URIARTE and FNU #2 exited the garage with two Hispanic Males. The occupants from the vehicle and the male from the house where then lead to the house.

127.      While in the house, UMAR located one locked interior door and kicked it opened. In the room, UMAR observed an electronic money machine and a duffel bag of money. UMAR could not estimate how much money was in the bag. RODRIGUEZ later told UMAR that $80,000 was in the bag, but UMAR indicated that he does not trust RODRIGUEZ. After the bag was found, the driver of the vehicle was questioned about locations that may have more money or large amounts of cocaine. UMAR recalled that RODRIGUEZ arrived to the house after the person in the house and people in the vehicle were secured.

128.      RODRIGUEZ called UMAR outside and instructed UMAR to bring the money. UMAR met with RODRIGUEZ and placed the money into RODRIGUEZ' vehicle. UMAR recalled that Cecilia RODRIGUEZ was in the vehicle when UMAR gave RODRIGUEZ the money.

129.      After giving RODRIGUEZ the money, UMAR entered the house where Jorge and FNU LNU #3  were talking to the driver of the SUV. During a brief conversation, they learned that a storage unit nearby contained a large amount of cocaine. UMAR stated that he (UMAR) did not know if Jorge URIARTE physically hurt the driver during the "questioning".

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

**4 - Extra**

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 3. ████████████████ | |
| 4. Page 38 of 40 | | |
| 5. Program Code | 6. Date Prepared 10/08/09 | |

130.   It was coordinated that the driver of the red SUV would be tied up and placed back into the truck. Jorge URIARTE would drive the red truck and the others would follow. UMAR tied up the other two individuals before leaving and recalled that FNU LNU#3 may have stayed at the house to watch the two individuals.

131.   As they approached the storage unit, RODRIGUEZ called UMAR and was concerned about security cameras and law enforcement. As a result of RODRIGUEZ' concerns, Hector URIARTE remained at the front gate to watch law enforcement. Once at the storage unit, UMAR observed a large amount of kilograms of cocaine located in the storage unit. UMAR recalled that the kilograms of cocaine were placed into the red SUV and the driver of the truck was left in the storage unit.

132.   UMAR departed the storage unit and drove home. UMAR received a telephone call from RODRIGUEZ days later, and RODRIGUEZ advised that he (UMAR) was going to be paid approximately $250,000. UMAR indicated that over the next year he met with RODRIGUEZ and Jorge URIARTE who paid him approximately $180,000.

133.   UMAR identified the photographs below as the individual that was kidnapped, FNU LNU aka Oso, and Cecilia RODRIGUEZ.


FNU LNU
Victim of kidnapping


FNU LNU aka Oso
AKA Oso


Cecelia RODRIGUEZ

## HOMICIDE INFORMATION

134.   UMAR stated that he has known Rick LNU for several years and while UMAR was committing home invasions and kidnappings, Rick LNU

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.



U.S. Department of Justice
Drug Enforcement Administration

| | |
|---|---|
| **REPORT OF INVESTIGATION** | 1. File No. ████████ 2. G-DEP Identifier |
| *(Continuation)* | 3. ████████████ |
| 4.  Page   39   of   40 | |
| 5. Program Code | 6. Date Prepared  10/08/09 |

informed UMAR that he (Rick LNU) was upset with RODRIGUEZ. Rick LNU
informed UMAR that he (Rick LNU)once had a close relationship, but
that RODRIGUEZ has disrespected him by not asking him (Rick LNU) to
assist in the home invasions and kidnappings. Rick LNU continued that
he (Rick LNU) had committed a murder for RODRIGUEZ several years
before the conversation. Rick LNU related that RODRIGUEZ' "lady" was
having sex with someone and RODRIGUEZ found discovered the
relationship. Although Rick LNU never stated who Rick LNU was
referring to as RODRIGUEZ' lady, UMAR assumed it was Cecilia
RODRIGUEZ. During the conversation, Rick LNU was upset that RODRIGUEZ
would ask for assistance on something serious like a homicide, but
would not call him to assist in home invasions. UMAR recalled that
Rick LNU was angry that he (Rick LNU) was not making money like UMAR.
Rick LNU did not provide specific information of how he was involved
in the murder or who was killed.

135.    When UMAR was looking through the large photograph book, he
identified a photo of FNU LNU aka Baby G. UMAR stated that he had
heard that Baby G was murdered, but did not have any other
information.

136.    UMAR identified the two photographs as Baby G who was murdered
several years ago and Rick LNU.





FNU LNU  AKA Baby G.                    Ricky LNU

---

DEA Form      - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

**4 - Extra**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. ███████████████ | |
| 4.<br>Page   40   of   40 | | |
| 5. Program Code | 6. Date Prepared<br>10/08/09 | |

<u>INDEXING</u>



DEA Form      - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

4 - Extra

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

## Affidavit of Fares Umar

I, Fares Umar, being duly sworn, depose and state as follows:

My name is Fares Umar. I am 39 years old. I am presently incarcerated in an Illinois state prison for a 2006 armed robbery conviction. I was previously incarcerated between 1989 and 2001 for burglary and between 1992 and 1995 for robbery. I have been informed by the government that I am being investigated for conspiring with others to possess with the intent to distribute cocaine and for committing other criminal acts. I have not been charged with any federal crime. I have agreed to cooperate with the government in the hopes of receiving a reduced sentence should I ever be charged. I understand that this statement must be truthful or I may be charged with perjury.

On September 30, 2009, I spoke with DEA agents and an Assistant United States Attorney at the state prison at which I am incarcerated. At that time, prior to being asked questions, the agents advised me that I had a right to remain silent and that any statements I made could be used against me. I was advised that I had a right to have an attorney present during questioning. I understood and agreed to waive my rights and speak with the government pursuant to the terms of a September 30, 2009 proffer agreement between me and the government. Other then the representations made in that proffer agreement, the government has not made me any promises in exchange for my cooperation. Prior to speaking with the agents and the Assistant United States Attorney today, the agents again advised me of my rights and I agreed to waive them. I understand that the terms of the September 30, 2009 proffer agreement apply to the statements I make in this affidavit.

I first met Saul Rodriguez when I was approximately 10 years old growing up in Chicago. My brother and I would play with Rodriguez and his brother in the neighborhood near South Elizabeth Street. In 1992, I was sentenced to a prison term for a robbery conviction and was released in 1995. I did not have any contact with Rodriguez from the time we were children until my release in 1995. Months after my release from prison, I ran into Rodriguez playing basketball in the area of 48th St. and Bishop Ave. in Chicago. Rodriguez is the individual pictured in Photograph A, which is attached to my affidavit. Rodriguez was driving a new Lincoln Navigator and appeared to have a lot of money. I knew from talking to people in the neighborhood that Rodriguez was a member of the La Raza street gang.

GOVERNMENT
EXHIBIT

1

CARDELS 800/769-0099

FU

I saw Rodriguez several times before Rodriguez asked me to do some home improvement work on his home near McKinley Park in Chicago. Rodriguez wanted me to make various repairs before he moved into the house with Cecilia Torres, who I believed was his girlfriend. Cecilia Torres is the individual pictured in Photograph B, which is attached to my affidavit. I worked on doors, locks, and did several other projects for Rodriguez over a period of a few years at his McKinley Park house and his other residences. I recall one time that Rodriguez wanted a pool table moved from the basement of his house on Austin Ave. in Cicero. Because the pool table was large, I removed the legs from the table to be able to move it. When I removed the legs, I found a large amount of money hidden in one of the legs. I believe that there was approximately $20,000 in two large bundles. I told Rodriguez about the money and Rodriguez appeared surprised. He said that he forgot that he had hidden it in the pool table.

On one occasion, Rodriguez hired me to replace the locks on each of the exterior doors and the detached garage at his residence near 37th Pl. and California Ave. in Chicago. I worked with an individual I knew as Taco to install the new locks. While we were working in the garage, I noticed a vintage red car that belonged to Rodriguez. A few days after Taco and I had installed the locks, an individual I knew as Omar told me that Rodriguez's car had been stolen from his garage. Omar told me that Rodriguez believed that Taco and I had stolen the car and he was looking for us. I then learned that Rodriguez had kidnapped Taco and that Taco had told Rodriguez that I had stolen his car. An individual I knew as Mario told me that Rodriguez was offering a $1,000 reward for kidnapping me and bringing me to him. Mario and I agreed to stage a kidnapping so that we could split the reward money and I could explain to Rodriguez that I did not steal his car. Mario and I went to Mario's basement and I sat in a chair and placed my hands behind my back to make it appear like my hands were tied. Mario called Rodriguez to tell him that he had me in his basement. Rodriguez entered the basement and I told him that Taco was lying and that he and I did not steal the car. After a short conversation, Rodriguez believed me and we arranged that I would drive with Mario and Rodriguez to find Taco. After we found Taco, Taco admitted to Rodriguez that he had lied about me stealing the car because he was scared. Mario and another individual who had pretended to kidnap me gave me approximately $400 from the money Rodriguez paid them. I continued to do home improvement work for Rodriguez after this incident.

Rodriguez called me on September 11, 2001. I recall the precise date because of the significant events that happened on that date and because my first wife was in the

2

*FU*

hospital after the birth of our twins two days earlier. I was at the hospital when I received Rodriguez's call. During the telephone conversation, Rodriguez asked me if I wanted to make $100,000. I said that I needed the money and agreed to meet Rodriguez to discuss the deal. I left the hospital and met with Rodriguez. Rodriguez told me that he had paid an individual money from a previous drug transaction and had followed the individual who had picked up the money to a house that probably contained a large amount of money. Rodriguez asked me to go to the house with another guy to steal the money. I understood that Rodriguez wanted my help in committing a home invasion in which we would attempt to steal a large amount of drug proceeds. Rodriguez and I then drove in Rodriguez's vehicle for approximately one hour. I cannot recall the exact address where we drove to, but I believe that it was a house south of Bolingbrook.

Rodriguez informed me that another person would act like a police officer and try to get into the residence. Rodriguez instructed me to follow the other guy and also act like a police officer. Before I agreed to assist Rodriguez, I asked him whether I would have to kill anyone. Rodriguez told me that I would not have to kill or injure anyone. I then agreed to participate in the home invasion. Before I got out of Rodriguez's vehicle, he told me that he needed me because the individual in the house with the money spoke only Spanish and the other individual who was going to be involved in the home invasion did not speak Spanish.

Rodriguez drove me to a parking lot where we met with a white male that I subsequently learned was named Glenn. Glenn is pictured in Photo C, which is attached to my affidavit. During this meeting, Rodriguez told me to wait in a brown van that he had parked near the house with the money. We agreed that when the individual in the house left, Glenn and I would approach the individual and direct him to go back into the house. Once we were in the house, Glenn and I would search for money and cocaine. We agreed that while I waited in the brown van, I would speak to Rodriguez on a cell phone and inform him what I was observing. I assumed that Rodriguez would then communicate the information to Glenn.

After I waited in the brown van for approximately two or three hours, I observed two Hispanic males exit the house and enter a vehicle. I called Rodriguez to tell him what I saw. Rodriguez arrived in his vehicle and I got in. Rodriguez was speaking with Glenn on the phone and I assumed that Glenn was following the car because we drove to a strip mall where I then saw the car that had just left the stash house. I recall that the mall had a Sears store, though I do not recall precisely where the strip mall was

3

*FU*

located. I saw that there were two males in the front of the car from the stash house and one other person in the back. I saw Glenn in a white Chevy Monte Carlo park near the car. Rodriguez instructed me to follow Glenn when he got out of his Monte Carlo. I saw Glenn get out of his Monte Carlo and walk toward the car with the three men. I got out of Rodriguez's car and walked toward Glenn. Glenn was wearing a black ballistic vest and a badge around his neck on a chain and had a gun.

Once Glenn and I got to the car with the three men, I heard Glenn identify himself as a police officer and instruct the occupants to put their hands against the windows. Glenn then instructed the individual in the front passenger seat and the individual in the back to get out of the car. Glenn told both of them to leave the parking lot. Glenn then instructed the driver (Victim A) to move to the front passenger seat and Glenn got in the driver's seat. I got in the back seat of the car, and Glenn drove back to the stash house that I had been previously watching.

As we approached the stash house, Glenn asked Victim A if anyone else was in the house. He said that one more person was asleep in the house. I told Victim A in Spanish that he would be shot first if there were more than one person in the house. Glenn entered the driveway and activated the garage door using a remote control in the car. Glenn entered the house first with his gun drawn. I walked into the house with Victim A. I tied up Victim A so he could not go anywhere. Glenn and I then found another Hispanic male sleeping in a bedroom. We tied him up and then placed the man from the bedroom and Victim A in a bathroom. I used plastic ties to tie their hands and feet and then tied their feet to their hands. I placed a blanket over both individual's heads so they could not see what we were doing.

After we had secured both individuals, Glenn and I searched the house. While searching the house, Glenn called Rodriguez to have him come inside and assist in the search. While I was searching the house, I found a handgun and placed it in my waistband. Glenn later saw that I had the gun and demanded that I give it to him, which I did. We found an open safe in a closet that contained approximately $60,000. We also found two large duffel bags that were filled with kilogram bricks of cocaine. I helped Rodriguez place the bags in Rodriguez's vehicle. I estimate that each bag weighed over 200 pounds, as I was not able to lift either bag by myself.

After the cocaine was loaded into Rodriguez's vehicle, Glenn took Victim A's car back to the mall parking lot to get his car and Rodriguez and I got on the expressway and headed back to the city. While we were driving, Rodriguez gave me

4

FU

$10,000 from the $60,000 that was found in the safe. Rodriguez told me that the cocaine would be sold in the next few days and that he would then give me the rest of the money he owed me. After I left Rodriguez, I drove back to the hospital to see my wife and newborn twins. At the hospital, I showed my wife the money that Rodriguez had given me.

Approximately four or five days after the home invasion, Rodriguez called and told me that my money was ready. I met Rodriguez at a gas station in the area of 63rd St. and Lawndale Ave. in Chicago. Because I did not trust Rodriguez, I asked my brother to park near the gas station and honk if he saw anything out of the ordinary. Shortly after I arrived at the gas station, I saw Rodriguez arrive. Rodriguez drove near me and directed me to follow him. Rodriguez then exited the gas station at a high rate of speed and drove through several alleys before stopping near a garage. Rodriguez opened the driver side window of his car and threw a duffel bag toward me and drove off. After I got home, I counted the money in the duffel bag, which amounted to approximately $100,000. The money consisted mostly of lower denomination bills, such as $5 or $10 bills. Rodriguez had previously told me that he preferred to keep larger bills.

In approximately 2002 or 2003, Rodriguez called me and asked to meet. We met with Lisette Venegas, who I knew because Rodriguez had previously introduced me to her so I could do landscaping work for her. Lisette Venegas is the individual pictured in Photo D, which is attached to my affidavit. Rodriguez told me that Lisette's grandmother had been involved in narcotics trafficking for several years and had earned a substantial amount of money. Rodriguez stated that Lisette believed that her grandmother had $1 million hidden in the floor at her residence. Rodriguez said that Lisette had approached him about kidnapping her grandmother and holding her for ransom. During this meeting, Rodriguez stated that two individuals I knew as Gordo and Lefty had already tried to kidnap Lisette's grandmother but were unable to get her into the van. Gordo is the individual pictured in Photo E and Lefty is the individual pictured in Photo F, which are attached to my affidavit. Rodriguez told me that Gordo and Lefty had a gun but Lisette's grandmother was still able to escape. Rodriguez stated that he contacted me because he knew that I could develop a good plan to kidnap Lisette's grandmother. Lisette told me that she would be with her family when the ransom demand was made and she would make sure that the family would not call the police. Lisette told me that there was no risk in conducting the kidnapping, but asked me to assure her that her grandmother would not be hurt. I assured Lisette that her grandmother would not be injured.

5

*FU*

GJTR 005 0977

After the discussion with Lisette and Rodriguez, I conducted surveillance on the bar that Lisette's grandmother owned in the area of 47th St. and Kedzie Ave. During my surveillance, I saw that Lisette's grandmother used the door near the alley and that it would be easy for me to approach her and have someone else drive in the alley with the van.

Rodriguez arranged for Gordo, Lefty, and two others, Manny and Turtle, to assist in the kidnapping. Manny is the individual pictured in Photo G, which is attached to my affidavit. On the day of the kidnapping, Gordo, Lefty, Manny, Turtle, and I sat in the brown van I used in the September 2001 home invasion on a street facing the side of Lisette's grandmother's bar.  I observed her throw away the garbage in the alley.  The van, which was driven either by Gordo or Lefty, then drove into the alley. When the van stopped, I got out of the van and grabbed Lisette's grandmother from behind and placed her in a bear hug and forced her into the van.  Lisette's grandmother attempted to fight me off but I was able to get her into the van.

Initially, Lisette's grandmother was combative and would not allow Gordo or Lefty to tie her hands. I saw either Gordo or Lefty place a knife near Lisette's grandmother's eyes and instruct her not to move or she would be hurt. Lisette's grandmother then complied and did not struggle further as Gordo and Lefty tied her up. We then drove Lisette's grandmother to Rodriguez's garage near McKinley Park. Once we drove the van into the garage, I watched Lisette's grandmother for several hours as others made the ransom demands. I did not hear the telephone conversations, but observed either Gordo or Lefty take Lisette's grandmother's cell phone. We held her in the garage overnight, and the next day I was told that money had been obtained and Lisette's grandmother could be released. Turtle and I drove Lisette's grandmother to an alley and dropped her off. I later learned that the ransom paid was $200,000 and that Rodriguez had lent Lisette's grandmother a portion of it. I understood that Lisette's grandmother would have to pay Rodriguez back over time. I was paid approximately $20,000 by Rodriguez for my involvement in this kidnapping.

In approximately 2002 or 2003, Rodriguez told me that he could possibly identify a house that contained a large amount of money that we could steal. Rodriguez told me that his brother in law was delivering money for a Mexican drug cartel and Rodriguez and Glenn wanted to follow the person that was meeting with Rodriguez's brother in law to identify the money stash house. I cannot recall the name of Rodriguez's brother in law, but he is the individual pictured in Photo H, which is attached to my affidavit.

6

*FU*

GJTR_005_0978

Rodriguez instructed me to meet him in the area of 59th St. and Kedzie Ave. in Chicago because his brother in law had planned to meet with a money courier later that day. I understood that Rodriguez's brother in law had a large amount of drug proceeds that he was going to deliver. I further understood that Rodriguez, Glenn, and I would follow the person that the brother in law met. I watched from a parking lot in the area of 59th St. and Kedzie Ave. and planned to follow the money courier that received money from Rodriguez's brother in law to see where he was going. During the first surveillance, we lost the money courier's vehicle when it turned into a residential area. After two or three different times conducting surveillance, Glenn was able to identify the house where the money courier went after picking up money from Rodriguez's brother in law. The house was near 31st St. and Kostner Ave. in Chicago. I recall that a Home Run Inn pizza restaurant was located a few blocks away from the house.

After identifying the money stash house, I met with Rodriguez and Glenn. We determined that Rodriguez and Glenn would park the same brown van we had used in the September 2001 home invasion and kidnapping of Lisette's grandmother near the garage in the alley behind the stash house. We planned that I would exit the van and lay on the ground under the van and appear to be working on it. I would be in a position to see when vehicles entered or exited the garage behind the stash house. Once I saw the money courier enter the garage, I would knock on the van above me to alert Glenn and Rodriguez.

At some point while I was conducting surveillance from under the van, I observed a vehicle back into the garage and the garage door begin to close. I struck the bottom of the van and Glenn and Rodriguez exited the van and approached the courier as he exited the garage. Glenn was wearing a ballistic vest and a badge on a chain around his neck and had his gun. I got out from under the van and joined Glenn and Rodriguez. Glenn directed the man to walk toward the house and I asked in Spanish if anyone else was inside. The man indicated that no one was in the house. Glenn, Rodriguez, and I then guided the man into the house. Once we were inside the house, I searched a couch for weapons and then tied the man's hands and instructed him to lay down. Glenn and Rodriguez then searched the house and I stayed near the man on the couch. In a cabinet a few feet behind me I found a handgun, which I kept. The money courier we tied up had a large amount of money in the bag that he was carrying when we grabbed him. After we searched the house, we placed a large duffel bag from the house into the van. We left the individual in the house tied up. I drove the van and Rodriguez and Glenn left separately in Glenn's Monte Carlo and Rodriguez's vehicle.

7

*F U*

We drove to Rodriguez's residence on 37th St. and California and I was paid approximately $50,000 for assisting Glenn and Rodriguez.

In approximately 2002 or 2003, Rodriguez told me that a large scale drug trafficker, Victim B, had been working out at a gym located near 31st Ave. and Harlem Ave. in Berwyn where Rodriguez also worked out. Rodriguez wanted to kidnap Victim B so we could hold him for ransom. I developed a plan in which Gordo would park the brown van we had previously used in the gym parking lot next to Victim B's car and Lefty would be in another vehicle near the gym. I would go underneath the brown van and act like I was working on the van and then grab Victim B when he walked toward his car.

On the day we planned to kidnap Victim B, I was on the ground near the brown van in the gym parking lot and Gordo was in the driver's seat. I had a wire hanger with me and acted like I was securing the van's muffler. Rodriguez called me periodically from inside the gym to give me updates regarding Victim B. Eventually Rodriguez called to tell me that Victim B was exiting the gym. As Victim B approached his car, I stood up and tried to grab him to force him into the van. Victim B fought back and placed his feet on the side of the van so I could not push him inside. I started punching Victim B hoping that he would give up. After I punched Victim B several times, I became concerned because there were several people in the parking lot and I recalled that Rodriguez had previously told me that members of law enforcement frequently worked out at the gym. I then let go of Victim B and Gordo and I fled in the van. After driving a short distance through a neighborhood, I instructed Gordo to park the van because if someone called the police they would be looking for the van. Gordo then parked the van and we fled on foot. I ran into a nearby cemetery and remained there for several hours. I learned later that Rodriguez had driven Victim B home from the gym after the kidnapping attempt. Rodriguez was therefore able to learn where Victim B lived.

Sometime after the attempted kidnapping at the gym, I met with Rodriguez who told me that Victim B had a ranch in Indiana. Rodriguez wanted to wait to try to kidnap Victim B again until Victim B had received a large shipment of cocaine. Approximately one month after the attempted kidnapping at the gym, Rodriguez called me and told me to go to the area of 67th St. and Keeler Ave. in Chicago. Once in the area, I met with Manny, Gordo, and another person I had seen before but whose name I did not know (Individual A). Rodriguez called to say that he was with Victim B and

8

*F U*

they were driving back from Indiana and Victim B should be at his house in Chicago soon.

A short time later, I observed Victim B driving a truck and park it at his house. Once Victim B got out of his truck, Gordo and I approached Victim B. I tried to grab Victim B but he struggled. During the struggle, Gordo pointed a handgun at Victim B and instructed him to get in the van. As I was holding on to Victim B, the van arrived driven by Individual A and accidentally struck me. When the van hit me, Victim B was able to escape my grasp. I tried to grab Victim B again and place him in the van, while Manny tried to pull Victim B into the van. As we were trying to get Victim B into the van, we had part of his body in the van but his legs were sticking out the open door. Gordo and I made it into the van, and Individual A then started driving the van at a high rate of speed as Manny, Gordo and I pulled on Victim B to get him entirely inside the van so we could close the door. While we tried to get Victim B in the van, Individual A continued to drive erratically. Eventually, the door was forced open and Victim B, Gordo, Manny, and I were thrown from the van. I recall that several garbage cans broke my fall. When I stood up, I saw Victim B running down the alley with one shoe on yelling for help in Spanish. I then saw Manny point a handgun at Victim B as he was running away and say words to the effect of, "I'm going to shoot him." I stopped Manny and told him that we would get Victim B another time. I got back into the van and we drove to meet Rodriguez. I was so angry with Individual A for his erratic driving that I punched him and left after talking to Rodriguez only briefly.

At some point in 2002 or 2003, I told Rodriguez to buy a car that looked like an undercover police car that we could use in our kidnappings and home invasions. Rodriguez told me to go buy a "narc car" and he would pay for it. Rodriguez gave me approximately $5,000 or $6,000 for the car. I went to a used car dealer on the west side of Chicago and purchased a green four door car with a bumper guard in the front and a spotlight by the driver's window. I drove the car through the neighborhood around the dealership and I saw numerous individuals running away. I believed that the people were running away because they thought I was driving a police car. After I purchased the car, I met up with Rodriguez to drop it off. Rodriguez had someone install flashing lights to make the car look even more like a police car.

In approximately 2003, Rodriguez informed me that an individual he knew owned a rim shop on the north side of Chicago and lots of real estate and had access to large amounts of money (Victim C). After hearing Rodriguez's description of Victim C, I realized that I had purchased rims for a truck at Victim C's rim shop. Rodriguez

9

*FU*

GJTR 005 0981

and I discussed whether Victim C would remember me and whether it would be alright for me to be involved in kidnapping Victim C. Rodriguez and I agreed that Victim C would not remember me and we would kidnap Victim C and hold him for ransom. Rodriguez told me that if Victim C could not find anyone who would pay the ransom, Rodriguez would purport to pay it for him, and after Victim C was released he would have to pay back Rodriguez with interest. Rodriguez told me that Victim C owned several properties and that he could pay Rodriguez by signing over some of the real estate.

Glenn and I conducted surveillance on Victim C's residence using the green car that looked like a police car. We planned to kidnap Victim C if we saw him that day and hold him for ransom. Victim C never appeared that day.

I later met with Gordo and Lefty in the area near Victim C's residence to discuss the kidnapping plan. I decided to dress like a bum and push a shopping cart in the alley behind Victim C's residence. I would sit on the ground and appear to be drinking alcohol while observing the rear door to Victim C's residence. When I observed Victim C exit his residence, I would push the shopping cart into the alley as a signal to Gordo and Lefty to drive down the alley in the brown van toward me. I would then approach Victim C and force him into the van.

On the day of the kidnapping, I sat on a milk crate in the alley dressed like a bum with a shopping cart until I saw Victim C exit his residence and walk toward the parking spaces behind the residence. Gordo and Lefty were parked down the alley in the brown van. Victim C saw me and shook his head as he walked toward a black Cadillac Escalade pickup. As Victim C approached the Escalade, I pushed the shopping cart into the alley. I then ran behind Victim C and placed him in a bear hug. I held on to Victim C until Gordo and Lefty pulled up in the brown van and I forced Victim C inside. Once Victim C was in the van, Gordo and Lefty jumped on top of Victim C and covered him with a blanket and I got into the driver's seat. As I drove, Gordo and Lefty tied up Victim C's hands and feet.

I drove to my residence on the northwest side of the city and parked the van in the garage. Rodriguez was already in the area and went into my basement. While Gordo and Lefty stayed and spoke with Victim C, I met with Rodriguez in the basement of my residence and discussed the ransom demands before coming back to the garage. Gordo and Lefty spoke with Victim C and Victim C told them that they could take his watch. Either Gordo or Lefty told Victim C that they were not petty

10

F U

GJTR_005_0982

criminals, and told him that the ransom for his release would be $800,000. I later took the watch and gave it to Rodriguez who said he would sell it for me. I received approximately $9,000 or $10,000 for it. I released my pit bull in the garage to run around, bark, and scare Victim C. Gordo and Lefty then left the garage.

After a brief conversation with Rodriguez, I returned to the garage and opened Victim C's phone and started reading him the contact list. Victim C stated that his family would not have access to that much money and that he did not know anyone that would be able to get $800,000 on his behalf. I told Victim C he would not leave if he did not come up with the ransom. I read Victim C several names from his phone's contact list. As Victim C told me to call an individual on the list, I would place the call and then quickly hang up, though I pretended to be waiting for an answer. I did this several times as Victim C told me to call several different individuals. I wanted to be sure that if Victim C later checked his cell phone records he would see that I actually attempted to call the individuals he asked me to. I then started reading Victim C names from his contact list and eventually read an entry for "Saul," who I knew to be Saul Rodriguez. At first, Victim C did not ask me to call Rodriguez, and I soon told Victim C that we would try calling names again in an hour. Victim C then told me to call Rodriguez to see if he would put up the ransom.

Rodriguez answered the phone and I handed the phone to Victim C. Rodriguez was still in the basement of my residence when he took the call. I heard Victim C inform Rodriguez that he was in trouble and needed a large amount of money. Victim C then gave me the phone and I spoke with Rodriguez so Victim C could hear me. I then walked back to Victim C and handed him the phone. Rodriguez assured Victim C that he would obtain the money and Victim C would be released soon. I then took the phone back and informed Rodriguez in front of Victim C that we would call back in an hour to check on the money. Victim C then told me that he would have paid $1 million for his release. I told Victim C that the ransom was now $1 million, and I called Rodriguez back from Victim C's phone and told him the ransom was now $1 million. A few hours later, I informed Victim C that Rodriguez had obtained the money and that after the money was delivered Victim C would be released. After about one or two more hours, I drove Victim C in the van to the area of Pulaski Ave. and Addison St. in Chicago and left him in an alley.

After I released Victim C, I met with Rodriguez. Rodriguez informed me that I would be paid $250,000 for my role in kidnapping Victim C. I was paid approximately $50,000 in installments over a couple years. I recall that I received the last payment in

11

*FU*

the summer of 2006, which was shortly before I began the prison sentence that I am currently serving.

In approximately 2003, Rodriguez called me and instructed me to get the brown van we had used in previous home invasions and kidnappings and meet him in the area of I-55 and 1st Ave. in Lyons. I believe that I retrieved the van from the garage of Rodriguez's McKinley Park house. Once I arrived at the area in Lyons, I met with Rodriguez and Glenn. Rodriguez explained that he had been purchasing cocaine from an individual (Victim D) and Glenn had followed the individual to his residence. Rodriguez wanted to find out where Victim D was purchasing the cocaine. We determined that I would conduct surveillance on Victim D to try to find out where he obtained the loads of cocaine. I understood that when I learned where Victim D obtained cocaine, Glenn and I would conduct a home invasion and steal the cocaine.

Over the next month or so, I used the brown van to conduct surveillance on Victim D's residence. Based on my surveillance and conversations with Rodriguez, I believed that Victim D was making deliveries of cocaine to Rodriguez directly from his residence. During my surveillance I had learned that Victim D left the house at a certain time during the week and would return home at the same time. I noticed that Victim D wore a landscaping uniform when he left for work. We decided that Rodriguez, Glenn, and I would watch the residence and Glenn and I would approach Victim D when he arrived home from work.

On the day we decided to conduct the home invasion, I observed Victim D arrive at his residence. Victim D parked his vehicle and then checked the mail in front of his house. As Victim D walked toward the side door of his residence, Glenn and I got out of the brown van. We walked toward Victim D while he was standing near the side door. Glenn identified himself as a police officer and once again wore a ballistic vest and a badge on a chain around his neck and had his gun. Once Glenn identified himself, we walked Victim D into the house. I then walked Victim D into a bathroom and placed plastic ties on his hands. After I secured Victim D, Rodriguez entered the house. I assumed that Glenn called Rodriguez to tell him Victim D was secure and Rodriguez could come in. It was clear to me that Rodriguez did not want Victim D to know that he was involved in the home invasion, and Rodriguez was careful not to have Victim D see his face or hear his voice. Glenn and Rodriguez searched the house for drugs and money. They did not find anything in the house, and Glenn then exited the house to search the detached garage. I spoke with Rodriguez and he told me to ask Victim D where the drugs and money were hidden. Victim D refused to tell me.

12

FU

GJTR_005_0984

Rodriguez was angry that Victim D would not cooperate and asked me if we should take him. I understood that Rodriguez wanted to kidnap Victim D and hold him until he cooperated. Glenn informed Rodriguez that he did not want to be involved if we kidnapped Victim D. I agreed to help Rodriguez kidnap Victim D.

I moved the brown van closer to the residence and Glenn helped me place Victim D into the van. I placed a blanket over Victim D's head and drove to Rodriguez's garage near McKinley Park in Chicago. Rodriguez followed the van in his own vehicle. Glenn left and did not come with us. Once we arrived at the garage, I tried to make him talk about where he was storing cocaine. Rodriguez was in the garage with me. After talking to Victim D for about 10 to 15 minutes, I told Rodriguez that I did not think that Victim D would tell us where the cocaine was being stored. Rodriguez then handed me a large rusty pair of garden shears and indicated that I should threaten to cut off Victim D's toes if he did not talk. I gave the shears back to Rodriguez and indicated to him that he should do it himself but he refused. I then walked back toward Victim D with the shears and threatened to cut off Victim D's toes if he did not talk. I placed the blades around Victim D's toes and applied some pressure to convince him that I would actually do it. Victim D still refused to provide information on where he was storing cocaine.

Rodriguez and I then had a discussion about what to do next. Rodriguez said that he would call Margarito Carmona, who I knew as Yito, because Yito would get Victim D to talk. Yito is the individual pictured in Photo I, which is attached to my affidavit. I told Rodriguez not to call Yito and that I would get Victim D to talk. I then tied Victim D's hands behind his back and told him that I was going to punch him in the ribs until he talked. I then punched Victim D in the ribs approximately 3 to 5 times before Victim D agreed to tell us where the cocaine was being hidden. He said that the cocaine was stored in a vehicle in the garage at his residence in Lyons. Victim D told me that the keys to the car were in the kitchen. I told Victim D that someone would be watching him and that he should not move. Rodriguez and I then left Victim D tied up in the brown van in the garage and drove back to the house in Lyons in Rodriguez's car.

During my previous surveillance, I learned that Victim D's wife arrived home around the same time every day. I told Rodriguez that we had only one hour before Victim D's wife arrived home. Once we arrived at the house I found the car keys in the kitchen and then ran into the garage, where Rodriguez and I found approximately 20 kilograms of cocaine in the car parked in the garage. We placed the cocaine in

13

F4

Rodriguez's vehicle and drove back to the garage near McKinley Park where we had left Victim D. I then drove Victim D in the brown van to an area on Lower Wacker Drive in Chicago and released Victim D. A few days later, I met up with Rodriguez and he paid me $100,000 for my role in kidnapping Victim D.

In 2003, Rodriguez told me about two twin brothers who were selling large amounts of cocaine and had access to millions of dollars in cash, who I knew as the Twins. Rodriguez told me to conduct surveillance on the Twins in an effort to identify money or drug stash houses that the Twins used. Before the first surveillance, Rodriguez called me and said that he planned to meet the Twins to play basketball at a gym near Oprah's studio. I drove to the area near the gym and sat in my car. Lisette and David Venegas were in another car also conducting surveillance. David Venegas is pictured in Photo J, which is attached to my affidavit. After a while, I received a call from Lisette who told me that the Twins' associates had seen me sitting in the car and I should stop the surveillance and leave. I then discontinued the surveillance that day. After leaving the area near the gym, I met up with Rodriguez and Lisette and David Venegas at a restaurant to discuss future plans to try to kidnap one of the Twins.

Some time after the day I first tried to conduct surveillance on the Twins, Rodriguez called me and said that he had located one of the Twins' houses. Rodriguez instructed me to bring the car that looked like a police car to an area near Keeler Ave. I cannot recall the cross street. I wore a dark blue hat, blue windbreaker, and a fake ballistic vest that I wore to look like a police officer. When I arrived in the area, I met with Glenn. Glenn sat in the passenger seat of the green car that looked like a police car and I drove. Rodriguez met Glenn and me and explained that Rodriguez would watch the Twins' house and call Glenn when one of the Twins exited the house. Glenn would then turn on the police lights and try to stop one of the Twins. David Venegas drove the white van and parked in an alley near the house.

While I was in the car that looked like a police car with Glenn, Rodriguez called Glenn and told him that one of the Twins had exited the house and gotten in a small truck. After Rodriguez called Glenn, I drove down the alley toward the Twins' truck. We activated the police lights and Glenn and I got out of the car. Glenn was wearing his black ballistic vest, a badge on a chain around his neck, and had his gun. Glenn and I approached the driver of the truck, who was one of the Twins (Victim E). Victim E is either the person in Photo K or Photo L, which are attached to my affidavit.

14

FU

As I approached the truck, I heard Glenn tell Victim E to place his hands on the steering wheel. After a brief conversation, Glenn instructed Victim E to exit the vehicle. As Victim E got out of the vehicle, either Glenn or I secured Victim E's hands. Glenn took a bag of cell phone from Victim E's truck. I then placed Victim E into the rear of the car that looked like a police car. Once Victim E was in the car, I sat in the backseat and Glenn got in the driver's seat and backed up the car from the alley. We drove to a nearby empty lot where David Venegas had driven the white van. Glenn and I then put Victim E in the white van. I got in the van with Victim E and I explained to Victim E that other officers were searching for more suspects in the area. Glenn did not get in the van.

I then put Victim E face down in the van and David Venegas drove to his house near Ford City mall. The van had a divider between the front and back, so that Victim E could not see where we were going. We had planned to use Venegas's house because it was close and had an attached garage. While driving to Venegas's house, I tied Victim E's hands and feet together. While we drove to Venegas's house, I heard Victim E praying to himself. I told Victim E that we only wanted money and that he would not be hurt if the ransom was paid.

Once we got to Venegas's garage, Victim E was brought out of the van and into the basement of Venegas's house and placed in a chair. While I watched Victim E, Venegas, Gordo, and Lefty talked upstairs. I placed Victim E's phones into a plastic bag. Victim E had about 10 mobile phones on him when we kidnapped him. Among the phones was a phone with a cover made of white gold and covered in diamonds. I took this phone and later received $2,000 for the cover at a pawn shop in Chicago. Victim E explained that only one of his phones had the numbers he needed to call to get the ransom. During prior conversations, Rodriguez had told me to ask for $1 million or a large amount of cocaine for Victim E's release.

I dialed the number of an unknown person for Victim E from his phone, and I heard Victim E demand that the person obtain the money or cocaine so he could be released. I then took the phone and informed the individual that we would call back with specific demands. During another call that Victim E made it was arranged that a large amount of cocaine would be left in a vehicle. I stayed with Victim E at Venegas's house. Rodriguez, Lisette Venegas, Gordo, and Lefty were involved in picking up the cocaine. While I was watching Victim E, Rodriguez called me and said that Victim E's associates were following the people picking up the cocaine. Rodriguez instructed me to call Victim E's people and tell them to stop following the

15

FU

GJTR_005_0987

people picking up the cocaine. I gave Victim E his cell phone and Victim E made a call and told the person on the other end of the line not to follow the people picking up the cocaine or he would be killed.

A short time after I spoke with Rodriguez regarding the fact that Victim E's associates were following the people picking up the cocaine, Rodriguez called again and said that the cocaine that was used as payment was of very poor quality. I told Victim E to call his associates back and tell them to bring better quality cocaine. I later learned that Rodriguez and the others received around 60 kilograms of cocaine but did not take the bad 90 kilograms of bad cocaine. Rodriguez later called and told me to release Victim E. I then placed Victim E into the van and drove somewhere to release him. I do not recall where I left him. Days after the kidnapping, I met with Rodriguez who advised that I would be paid $100,000. Rodriguez paid me the money in installments over the next several months.

In the fall of 2003, Rodriguez told me that Marco Polo, who I understood was a relative of Rodriguez, had told him about an individual, Victim F, who was selling a large amount of narcotics and would have access to a large amount of money. Marco Polo is pictured in Photo M, which is attached to my affidavit. Rodriguez told me that Victim F had recently purchased a reddish minivan with a "heartbeat" graphic on both sides from Gordo. The van had a hidden compartment that Gordo had installed before selling the van to Victim F. Rodriguez told me that Victim F purchased the van because Victim F needed a vehicle with a hidden compartment.

Sometime later, Glenn, Rodriguez and I conducted surveillance on Victim F to determine where he lived. The first time we did surveillance, I saw Victim F meet with Marco Polo near a banquet hall at 47th St. and Cicero in Chicago. I saw Victim F exit a restaurant and enter the reddish van and depart the area. We attempted to follow Victim F but lost him after a brief time.

A few months after first learning about Victim F, I was having lunch near my house when I saw Victim F's van drive by. I recognized the van immediately because of the distinctive graphics on the side. I quickly left the restaurant and was able to see the van enter a driveway. I then called Rodriguez and told him that I had found Victim F's house. Rodriguez told me not to call Glenn and to develop a plan to kidnap Victim F. I understood that by not including Glenn, Rodriguez and I would receive a larger share of the ransom money.

16

FU

Sometime later, Rodriguez told me that he wanted me to include David Venegas and another black male I did not know (Individual B) in the plan to kidnap Victim F. Individual B is pictured in Photo N, which is attached to my affidavit. I understood that Rodriguez wanted to use Venegas and Individual B because Rodriguez would not have to pay them as much as Glenn, Gordo, or Lefty. I planned that Individual B and I would drive the green car that looked like an undercover police car. We would wait until we saw Victim F in his driveway and then approach him. I would identify myself as a police officer and handcuff Victim F. We would then take Victim F to the garage near McKinely Park.

On the day that we planned to kidnap Victim F, I directed David Venegas to park near Victim F's house and call me when he saw Victim F in the driveway. Rodriguez was parked down the street looking out as well. Venegas called me to say that Victim F was outside of his house placing something in his reddish minivan. Individual B and I were in the green car that looked like a police car nearby. We activated the lights and drove onto Victim F's driveway. Individual B and I got out of the car and approached Victim F. I wore a blue colored windbreaker and had a handgun that I pointed at Victim F. I told Victim F that I was a police officer and instructed him not to move. As I was talking to Victim F, a woman got out of Victim F's house and wanted to know what was going on. I told her that it was police business and that she should go back into the house. I then directed Victim F into his reddish minivan and I got in the driver's and Individual B got in the back. Individual B put a coat over Victim F's head so he could not see where we were going. As we left the driveway, I handed Victim F his phone and told him to call his wife to tell her not to call the police. David Venegas drove away in the green car that looked like a police car.

Though our initial plan was to drive to Rodriguez's garage near McKinley Park, we decided not drive that far because Victim F's wife saw the kidnapping and I was concerned the police may be looking for Victim F's minivan. Because the minivan had a distinctive graphic on the side, I decided to drive the van to my residence, which was very close to Victim F's house, and hide it in the garage. Once we parked Victim F's minivan in my garage, Individual B told me he did not want to continue being involved in the kidnapping. Individual B then walked away from the garage and I have not seen him since. I told Victim F not to move because my dog would bite him. At some point, David Venegas came to my residence and stayed either in the basement or the garage.

17

FU

GJTR_005_0989

I met with Rodriguez inside my house. Rodriguez directed me to tell Victim F that he would need to get us $800,000 or a large amount of cocaine to be released. After I talked to Rodriguez, I went back to the garage and searched Victim F's minivan. I found approximately $20,000 in a hidden compartment. Once I found the money, I told Victim F that he needed to contact someone who could pay the ransom. Victim F told me that he would be able to get the $800,000. I then dialed Victim F's wife on his cell phone and placed the phone next to Victim F's ear. Victim F informed his wife that she needed to call people to try to get the money.

Shortly after the telephone call with Victim F's wife, I received a phone call from Rodriguez who told me that Marco Polo had just called him and said that Victim F's wife was trying to borrow money because Victim F was kidnapped. Rodriguez told me that he would be meeting with Marco Polo to lend Marco Polo $50,000 that would go toward Victim F's ransom. After speaking with Rodriguez, I used Victim F's cell phone to call Victim F's wife to see if she had obtained the money. Victim F's wife informed me that she had not been able to get the money and did not think she would be able to. She said she could probably get $500,000. During a later phone call, Victim F's wife said she had obtained the money. I told Victim F's wife that if I saw law enforcement while picking up the ransom money that Victim F would be killed.

I told Victim F's wife to deliver the money to a vacant house that was for sale near Victim F's house. I left Victim F in the minivan in my garage, and David Venegas and I drove my own truck toward downtown Chicago and used a pay phone to provide the exact instructions to Victim F's wife. When David Venegas and I returned to the area near my residence, I saw what I thought were numerous unmarked police cars. I called Rodriguez and told him that I had seen police cars, but he told me I was just being paranoid. I then called Victim F's wife and directed her to leave the money in the passenger seat of her car and park it in front of the house that was for sale, leave the keys in the car, and walk away. I told Victim F's wife that she should be there in less than 5 minutes because I knew where the house for sale was located in relation to Victim F's house.

David Venegas and I waited over 30 minutes near the house where we had directed Victim F's wife to drop the money. I then called Rodriguez and told him to call off the money drop because I believed that Victim F's wife had called the police. Rodriguez told me that the police had not been called and to pick up the money. I later saw a car arrive and two women get out. Venegas and I then drove into an alley near

18

FU

GJTR_005_0990

their car and parked. Venegas ran through the gangway of the house toward the car that should have had the money. Venegas then returned to my truck with a package that we believed had the ransom money. We then attempted to leave the area, but were stopped by law enforcement and placed under arrest. When I was questioned, I told the police that Victim F owed me money for a drug transaction and that I had paid David Venegas some money to help me out. These statements were not true and were made in an effort to protect Rodriguez and Venegas. I told the police where Victim F was being held.

Several days after I was arrested, my brother posted a bond and I was released from custody. I learned later that Rodriguez had contributed some of the money toward the bond. After I was released, I met with Rodriguez. Rodriguez told me that he had spoken with Marco Polo and Rodriguez told Marco Polo to speak with Victim F about not cooperating with law enforcement. Rodriguez wanted Marco Polo to tell Victim F that Rodriguez would pay Victim F $50,000 if he refused to cooperate. Rodriguez later told me that Marco Polo met with Victim F and Victim F declined the offer. In August 2006, I pleaded guilty to armed robbery as a result of the incident with Victim F.

While I was out on bond for kidnapping Victim F, Rodriguez told me that the Twins were hiding in Mexico because they were being investigated by the federal government. Rodriguez told me that a criminal associate of the Twins, Oso, gave information to Rodriguez about money and drug stash houses that the Twins utilized in the Chicago area. Oso is pictured in Photo O, which is attached to my affidavit. Rodriguez said that Oso meets with one of the Twins' workers (Victim G) on a frequent basis to receive cocaine and drop off money. Oso would contact Rodriguez the next time Oso planned to transfer money to Victim G. Rodriguez asked me to assist in conducting surveillance on Victim G to identify the Twins' stash house.

Days after meeting with Rodriguez I received another call from Rodriguez. During the call, Rodriguez instructed me to meet in downtown Chicago because Oso had planned to provide money from a previous drug transaction to Victim G. When I got downtown, I met with Rodriguez, Gordo, and Lefty. Rodriguez said that the plan was to follow Victim G's vehicle after he met with Oso and attempt to identify the stash house. Rodriguez wanted me, Gordo, and Lefty to kidnap Victim G and hold him until he told us where the money and drugs were being hidden. Oso had told Rodriguez that Victim G drove a red SUV that contained a trap compartment.

19

FU

GJTR_005_0991

For several months Gordo, Lefty, and I conducted surveillance when Oso picked up cocaine or delivered money to Victim G in an effort to find the stash house. We were not able to follow Victim G successfully because Victim G conducted counter surveillance measures and had a camera on the back of his red SUV that allowed him to see if he was being followed. I recall one time after we lost sight of Victim G, we met up with Oso who got in our van and expressed impatience that we had not yet been able to successfully kidnap Victim G.

Through surveillance, I was eventually able to determine that Victim G used a stash house off of I-94 near Fullerton Ave. After I identified the stash house, I met with Rodriguez, Gordo, and Lefty to coordinate how to steal cocaine or money from Victim G. We agreed to conduct a home invasion at a later time because Rodriguez wanted Oso to order and pay for another load of cocaine to make certain we had identified the correct house. Approximately one month later, I received another call from Rodriguez. During the call, Rodriguez directed me to meet with Gordo, Lefty, and another Hispanic male that I did not know (Individual C). Rodriguez said he would watch Oso give Victim G the money and follow his vehicle back to the stash house we had previously identified. We agreed that once the SUV arrived at the stash house, Gordo and I would approach Victim G and force him into the house. We later met in the area near the stash house to wait.

Gordo and I waited in a gangway near the garage to the stash house, and Lefty and Individual C waited in the alley behind of the house. Gordo and I were wearing ski masks while we waited. Gordo had a handgun and was going to threaten Victim G when he arrived. I then saw a Hispanic male (Victim H) exit the house. Gordo and I forced Victim H to get on the ground and asked him whether anyone else was in the house and he said there was not. I asked him who opened the door to the garage when a load of cocaine or money would arrive. Victim H said that he was the one who opened the garage door. Gordo and I forced Victim H to walk toward the garage and told him to use a button inside the garage to open the garage door. I then pulled Victim H back out of the doorway so we could not be seen. The red SUV then backed into the garage driven by two Hispanic males. Victim H's Nextel phone started chirping because one of the males in the SUV was trying to find out where Victim H was.

I then told Victim H to press the button to close the garage door, which he did. I instructed Gordo to enter the garage to confront the males in the SUV. Gordo refused to go in. As the garage door lowered, Lefty and Individual C ran in underneath the closing door and grabbed the guys in the SUV, one of whom was Victim G. Gordo

20

FU

and I then took Victim H back into the house and tied his hands and feet so he could not move and laid him on the floor. I then went back out of the house toward the garage and spoke with Rodriguez who was now in the back between the house and the garage. I spoke with Rodriguez and told him that I had one of the guys tied up, and Rodriguez told me to search the house. As Gordo and I searched the house, we opened a door in the basement and found a bag of money. I put the bag of money by the back door. I continued looking for cocaine in the house but did not find any. I came back out of the house and told Rodriguez that I did not find any cocaine in the house, and Rodriguez told me that Lefty and Individual C were trying to get Victim G and the other person in the SUV to tell them where the cocaine was hidden.

Eventually Rodriguez told me that Victim G said that the cocaine was hidden in a storage unit nearby. Cecilia Rodriguez then arrived and Rodriguez put a bag of money in the car she was driving and she took off. I left Victim H tied up inside the house and Lefty and Individual C left the passenger in the SUV tied up in the garage. Rodriguez and Lefty drove in the SUV with Victim G to the storage unit. I drove to the storage unit in my car and Gordo took a van. Once we arrived at the storage unit, Rodriguez and Lefty made Victim G let them into the storage unit and I stayed in my car to look out. I soon saw Rodriguez and Lefty leave in the red SUV and I then left the area and went home. Rodriguez later told me that he and Lefty had gotten cocaine from the storage unit. I assumed that they left Victim G at the storage unit. Rodriguez told me that I was going to be paid approximately $250,000 for my role in the theft of cocaine and money. Over the next year or so, Rodriguez and Lefty paid me approximately $180,000.

At some point during the period I was participating in home invasions and kidnappings with Rodriguez and the others, Rodriguez called me to say that he was had followed someone to a house. I understood that Rodriguez and Glenn were conducting surveillance and identified a residence that contained drugs or money. Rodriguez called me several times as I drove toward the house on the south side of Chicago. I met with Rodriguez and Glenn near 50th or 60th St. in Chicago. We planned that Glenn and I would approach the individual (Victim I) when he arrived in his driveway. We saw the Victim I arrive with a woman and Glenn and I approached them. Glenn identified himself as a police officer and escorted Victim I and the woman into a bathroom where we tied them up with plastic ties. We then searched the house, and Glenn told me he found some money but nothing else. Glenn then told me to wait 3 minutes before leaving and then he left. I understood that Glenn wanted to make sure he was away from the house and was not seen with me. I waited a few minutes and

21

F U

then left. I later met with Rodriguez and he gave me $10,000 for assisting in the home invasion. Rodriguez told me that $30,000 had been stolen during the home invasion.

On a few occasions during the time I was engaged in kidnappings and home invasions with Rodriguez and Glenn, we committed home invasions but did not find anything. During those incidents, the individuals we tied up were released the same day after we completed our search. I recall one incident when Rodriguez and I met to discuss conducting a home invasion at a residence near 60th St. and Kedzie Ave. in Chicago that Rodriguez believed contained a large amount of money. Glenn and I knocked on the door of the residence and spoke with a woman who answered the door. Glenn identified himself as a police officer and the woman allowed us inside. We searched the house and found only an electric money counter. Glenn and I then left the house and met with Rodriguez. I recall that Glenn was extremely angry that we did not find anything in the house.

During the time I was committing home invasions and kidnappings with Rodriguez, I was at a bar talking to an individual I knew as Rick. I had known Rick for several years. Rick is pictured in Photo P, which is attached to my affidavit. Rick told me that he was upset with Rodriguez because Rick once had a close relationship with Rodriguez but Rodriguez had disrespected him by not asking Rick to assist in home invasions and kidnappings. Rick said that he had committed a murder for Rodriguez several years before. Rick said that Rodriguez's girlfriend was having sex with someone named Baby G and Rodriguez had discovered the relationship. Baby G is pictured in Photo Q, which is attached to my affidavit. Rick said he was upset with Rodriguez for asking for his help on something as serious as a murder but no longer used him for other activities. Rick said he was angry that he was not making money with Rodriguez like I was.

22

FU

GJTR_005_0994

This affidavit is only a summary of and is not a complete statement of the incidents described above.  I have told the government other details about these and other events that are not contained in this affidavit.  If called upon to testify I could provide additional details regarding the information in this statement as well as other information.

I declare under penalty of perjury that the foregoing is true and correct.


_Fares Umar_

Fares Umar


Dated:  October 15, 2009


Witnesseth:

_Donald Wood_

SA Donald Wood

_David Reynolds_

SA David Reynolds


23

FU

GJTR_005_0995



Photo
A

GJTR_005 0996



GJTR 005 0997



GJTR 005 0998





Photo E