



Photo G





Photo I

96



Photo J

Photo



GJTR_005_1007

Photo M

GJTR_005_1008



GJTR 005 1009



Photo O



GJTR_005_1011





# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

## Memorandum of Proffer

| | | | |
|---|---|---|---|
| **Investigation #:** | 1000227992 | **Location:** | **United States Attorney's Office** |
| **Investigation Name:** | GLENN LEE LEWELLEN | | **219 S. Dearborn** |
| **Date:** | May 17, 2011 | | **Chicago, Illinois** |
| **Time:** | Appx. 1:25 p.m. to 2:49 p.m. | | |
| **Participant(s):** | DEBORAH A. LEWELLEN, Witness | | |

Thomas M. Breen, Defense Attorney
John Braveman
Tiffany Tracy, Assistant United States Attorney
Steven Block, Assistant United States Attorney
Bruce Killian, Contractor – United States Attorney's Office
David Reynolds, Special Agent – Drug Enforcement Administration
James Healey, Task Force Officer – Drug Enforcement Administration
Lilia Acosta, Special Agent – IRS-Criminal Investigation

1. On May 17, 2011, a second interview was conducted with DEBORAH A. LEWELLEN under the provisions of a proffer agreement with the United States Attorney's Office, in the presence of her attorney, THOMAS M. BREEN. The initial interview was conducted on January 6, 2011.

2. AUSA Steven Block introduced Tiffany Tracy, Assistant United States Attorney. AUSA Block informed DEBORAH LEWELLEN the government had additional questions and proceeded with the proffer.

3. The information in this memorandum is information DEBORAH A. LEWELLEN, in the presence of her attorney, provided both voluntarily and/or in response to questions she was asked.

4. AUSA Block commenced the proffer by asking DEBORAH LEWELLEN about bank accounts that were solely in her name. She stated she had two (2) bank accounts, in which one (1) was a checking account both solely in her name. She further stated there she also had joint bank accounts with GLENN LEWELLEN.

5. Specifically, DEBORAH LEWELLEN was asked when she went to the bank(s) and made the joint bank accounts she had with GLENN LEWELLEN to bank accounts solely in her name. She stated she did not recall when she did it, but recalls changing the bank accounts to solely her name after GLENN LEWELLEN's arrest. Specifically she was asked if she made the changes to the bank accounts within the last two (2) or three (3) weeks, in which she replied no. She stated she changed the bank accounts to reflect only herself for "simplicity" purposes. She stated it was done to divide the money because it was her money and she just

GOVERNMENT
EXHIBIT

J

CARDELS  800-763-0299

...sury Criminal Investigation

IRSR_005_0001

wanted to have it under her name.  DEBORAH LEWELLEN stated all the money in the First
National Bank checking account is all her money.  DEBORAH LEWELLEN stated the bank
account ending in **4680 is now solely under her name.  She stated she uses the money in
her bank accounts to pay for her current living expenses.   She stated she does not have any
incoming income.  She further stated nobody told her to put the joint bank accounts solely in
her name; it is something she did on her own.

6.  DEBORAH LEWELLEN stated GLENN LEWELLEN left to Las Vegas, NV in 2008 and they
    have been separated for at least three (3) years.  She stated that right before GLENN
    LEWELLEN's arrest in Las Vegas, NV, they had agreed about giving their marriage
    relationship one more chance.  She stated he never made it back to Illinois, as he was
    arrested.  She stated they had divided/split the money they had before GLENN LEWELLEN
    had left her the first time to Las Vegas, NV.

7.  Regarding GLENN LEWELLEN having access to her bank accounts, she stated he had
    access to the bank account with the approximate ending balance of $121,000 and $1,300.
    She further stated they are separated and she would not share her money with GLENN
    LEWELLEN.

8.  She stated she was currently still married to GLENN LEWELLEN, however they are "still
    separated" although they are not legally divorced.  She stated she has visited him while he
    has been incarcerated and supports him as he's a man she's known for twenty-eight (28)
    years.  Furthermore, she stated their marriage was not a typical marriage, as to he never told
    her what time he was going to be home, etc.

9.  Regarding GLENN LEWELLEN's bond, she stated she has not had any involvement with it.
    She stated she did not attend his bond hearing, although everyone (family) expected her to
    go.  She stated she did not put anything down for his bond.  She stated their daughter
    ASHLEY LEWELLEN is very loyal to GLENN LEWELLEN, which has put a strain on
    DEBORAH LEWELLEN's relationship with ASHLEY LEWELLEN.

10. DEBORAH LEWELLEN further stated they evenly split up (50-50) the vacant lots, specifically
    there were four (4) lots, two (2) are now solely hers and the outstanding balances in their
    bank accounts.  She stated the dividing of lots and money was an agreement she and
    GLENN LEWELLEN made.

11. DEBORAH LEWELLEN stated that she found out that the four (4) vacant lots that were
    supposed to be owned by her and GLENN LEWELLEN are actually only owned and/or are
    only in his name.  She does not believe her name is in the title of those properties, but is not
    certain.  She stated those vacant lots are in a subdivision and/or development in Bridges of
    Mokena.  She further stated they were trying to sell the lots, using a real estate company.
    She believes they may have purchased the vacant lots three (3) or four (4) years ago for
    approximately $150,000 each, however she is not certain of the exact purchase price.

12. Regarding LEWELLEN HOME BUILDERS, INC., she stated she always believed she was the
    owner of the company too because she is married to GLENN LEWELLEN, 50-50.  However,
    she stated the paperwork indicates she is just the secretary of the company.  She stated
    LEWELLEN HOME BUILDERS, INC. was doing very well in the beginning years.  She
    assumed that if the business was too much for GLENN LEWELLEN, he would have brought it
    to her attention.

IRSR_005_0002

13. Regarding the construction of their previous residence located at 11600 Swinford Lane, in Mokena, IL she stated they bought a vacant lot and built the residence. DEBORAH LEWELLEN recalls the vacant lot was well under $200,000. DEBORAH LEWELLEN stated they did not obtain a mortgage loan for the residence, but a line of credit, approximately in the amount of $500,000, from Private Bank. She stated they made payments to the line of equity with checks from their personal bank account. After the house was sold they paid off the outstanding equity loan and deposited the proceeds from the sale of the house into their personal account. During the building of the residence, DEBORAH LEWELLEN picked the items needed for the construction of the residence. She stated GLENN LEWELLEN never said anything to her regarding if the items she was selecting were too expensive. She does recall seeing very expensive items, high dollar item, in to which she said was "ridiculous".

14. Regarding GLEEN/GLENN CODAY and DIANE CODAY, DEBORAH LEWELLEN stated she and GLENN LEWELLEN purchased their residence located at 19628 Walnut, in Mokena, IL. She stated GLENN/GLEEN CODAY is dead. The residence is currently only titled under DEBORAH LEWELLEN's name.

15. Regarding the construction of the first homes/residences by LEWELLEN HOME BUILDERS, INC. DEBORAH LEWELLEN stated she assumes were built using funds from construction loans. She does not have any knowledge how or what funding was used by GLENN LEWELLEN and/or LEWELLEN HOME BUILDERS, INC. to build those new homes. DEBORAH LEWELLEN stated she never made any payment for the construction of the new homes, including plumbing companies, etc.

16. DEBORAH LEWELLEN believes the first job GLENN LEWELLEN and/or LEWELLEN HOME BUILDERS, INC. worked on was rehab, "ripped off", a house that was for GLENN LEWELLEN's "loser cousins". DEBORAH LEWELLEN said that residence has been sold.

17. DEBORAH LEWELLEN also recalls GLENN LEWELLEN and/or LEWELLEN HOME BUILDERS, INC., either building or rehabbing a small house for GEORGE COLDAY. She stated GLENN LEWELLEN and/or the company ended up selling the property, they (referring to the CODAY's) didn't pay the mortgage. She, again, stated the whole side of his family has issues, including financial issues.

18. DEBORAH LEWELLEN does not have any knowledge as to GLENN LEWELLEN ever being sued while he was employed as a Chicago Police Officer.

19. DEBORAH LEWELLEN stated GLENN LEWELLEN's partner," ENTRESS" passed away on her birthday, in 2002. She does not consider ENTRESS' wife a close friend. DEBORAH LEWELLEN has not talked to her or seen her in years; however they are "Facebook" friends. DEBORAH LEWELLEN stated ENTRESS' wife gave ASHLEY LEWELLEN some tickets either to a White Sox baseball game or Bulls basketball game. She also stated they (GLENN LEWELLEN, ENTRESS, and his wife) went to Las Vegas, NV on a trip. DEBORAH LEWELLEN stated a bunch of guys went to Las Vegas, NV a lot together (referring to the GLENN LEWELLEN and his police officer co-workers).

U.S. Treasury Criminal Investigation

20. Regarding the filing of their 2010 federal and state income tax returns, she stated their accountant was preparing it.

21. She believes LEWELLEN HOME BUILDERS, INC. is no longer in existence and believes it was closed in 2007 because it has not earned any income/money. She stated it has been several years since any construction was conducted by LEWELLEN HOME BUILDERS, INC. She stated she was on unemployment for a little over a year. She stated her job at LEWELLEN HOME BUILDERS, INC. included doing paperwork relating to notary service. DEBORAH LEWELLEN stated she and GLENN LEWELLEN received weekly paychecks, which were always in the same dollar amount. She does not recall making or being paid a profit. She stated GLENN LEWELLEN said profits were coming, but she does not recall getting paid a profit.

22. Regarding any investments and/or bank accounts overseas, DEBORAH LEWELLEN stated they did not have any. She stated she has a safe deposit box located at First National Bank of Illinois. However, she is not sure if it was opened and/or currently listing GLENN LEWELLEN as an owner/renter of the safe deposit box. Furthermore, DEBORAH LEWELLEN stated she does not know what contents, if any, are located inside the safe deposit box.

23. DEBORAH LEWELLEN stated she handled all the personal bills, day to day expenses, when they got married. She stated she was employed and deposited her paychecks into their bank account. She always used the bank account to pay for all the bills they had.

24. DEBORAH LEWELLEN was asked if she routinely, on a regular basis, provided cash to GLENN LEWELLEN. DEBORAH LEWELLEN stated she provided GLENN LEWELLEN with cash, but it was not a routine. She provided it to him if he needed and/or asked her. She believes GLENN LEWELLEN would also get cash from the business account. However, DEBORAH LEWELLEN stated it was not common and/or a habit where DEBORAH LEWELLEN would withdraw on a routine basis from a bank account to get cash for GLENN LEWELLEN. She also said it was not her practice to split the cash she did withdraw from bank accounts with GLENN LEWELLEN. She recalls giving him cash on occasion, but never on a routine schedule, since she deposited their payroll checks and made monthly payments for their bills. She is not aware where GLENN LEWELLEN got the cash he used for gambling, but is aware he did not withdraw cash used for gambling from her bank account. DEBORAH LEWELLEN stated the largest amount of cash she brought to Las Vegas, NV was less than $10,000. She also recalls bringing $2,500, cash, from Las Vegas, NV in cash back to Illinois.

25. Regarding GLENN LEWELLEN's purchases of classic cars, she stated it was obvious he purchased them because she would see him in them. DEBORAH LEWELLEN stated she does not know how (regarding to the funding) he purchased the cars, but assumes it was money from the business bank accounts. However, DEBORAH LEWELLEN stated she never saw the business bank accounts. She assumes the money was from the business accounts because LEWELLEN HOME BUILDERS, INC. was booming. She never saw a reason to ask GLENN LEWELLEN how he was purchasing the classic cars. She recalls approximately five (5) classic cars. She does not have any knowledge as to the purchase price of any of classic cars he purchased.

26. DEBORAH LEWELLEN likes jewelry. She used the money in her personal bank account to purchase jewelry. She stated GLENN LEWELLEN also purchased her jewelry.

27. Regarding her recollection of her day on September 11, 2001, DEBORAH LEWELLEN recalls she was at home and GLENN LEWELLEN was working, he was employed as a Police Officer with the Chicago Police Department. She recalls he was out of the house by 8:15 a.m. She recalls ASHLEY LEWELLEN was already in school and wanting to go pick her up because of the attack. She remembers calling GLENN LEWELLEN to tell him about the details occurring in New York. She said GLENN LEWELLEN had no idea the attack had happened. She recalls ASHLEY LEWELLEN getting home from school, but does not remember when GLENN LEWELLEN got home.

28. Regarding the insurance money she has received for the automobile accidents, she stated the first insurance money, sometime in 1993, a lot of it was used to finish the basement in their 103rd Street home. She believes she received less than $190,000 from the first insurance settlement. She recalls having surgery in 1994.

29. Regarding THOMAS DUKES, she stated she has not seen any firearms in his home nor has any knowledge he or his wife have any firearms. DEBORAH LEWELLEN stated she has been out on the firing range because she goes shooting, but has never been in company of THOMAS DUKES. DEBORAH LEWELLEN stated she highly doubts THOMAS DUKES' wife owns or has a firearm. DEBORAH LEWELLEN stated "his whole side of this family has issues" referring to GLENN LEWELLEN's family.

30. DEBORAH LEWELLEN stated ASHLEY LEWELLEN and THOMAS DUKES flew to Las Vegas, NV to bring back to Illinois some of GLENN LEWELLEN's stuff GLENN LEWELLEN wanted, ie. clothes, memorabilia, old cards, sentimental, personal items, etc. DEBORAH LEWELLEN never saw the all items they brought back because they went straight to Uncle Tom's (THOMAS DUKES) house and dropped off the items. ASHLEY LEWELLEN brought back some clothes to DEBORAH LEWELLEN's Mokena home. DEBORAH LEWELLEN stated they drove back all the items and brought GLENN LEWELLEN's car back from Las Vegas, NV. She told ASHLEY LEWELLEN to put the stuff in the basement.

31. Regarding payment for ASHLEY LEWELLEN's college/tuition DEBORAH LEWELLEN stated it was paid with a Bright Star account, an account they opened when ASHLEY LEWELLEN was a preteen. DEBORAH LEWELLEN stated ASHLEY LEWELLEN's tuition bill from her attendance to a junior college, while she was a sophomore in high school, was made using funds from their bank account. She stated ASHLEY LEWELLEN is currently obtaining a master's degree and is paying for it on her own.

32. Regarding BETH MANN and GLENN LEWELLEN's business relationship, DEBORAH LEWELLEN stated she did not know if they were ever business partners. She did not know if GLENN LEWELLEN was a partner in the company named "LHB, INC."

33. DEBORAH LEWELLEN stated she does not believe GLENN LEWELLEN did any of the crimes he was charged with, but if he did do them, she does not want to know. She does not believe he is that kind of a person that would do those things and furthermore, he has told her the allegations are all lies.

U.S. Treasury Criminal Investigation

34. DEBORAH LEWELLEN stated she asked GLENN LEWELLEN why the government thought
    he had a million dollars ($1,000,000). She told him she had met with the government. She
    also told THOMAS DUKES (GLENN LEWELLEN's uncle) and ASHLEY LEWELLEN she was
    coming on May 17, 2011 to meet with the government.

I prepared this memorandum after refreshing my memory from notes made during and
immediately after the Proffer conducted on May 17, 2011.


Memorandum Author

Lilia Acosta
IRS-CI Special Agent

☑ Double click here to sign
David Reynolds
DEA Special Agent



53 W. Jackson Boulevard
Suite 224
Chicago, Illinois 60604

312.322.0014   Fax: 312.341.9696

November 18, 2011

Terra Reynolds
Steven Block
Tiffany Tracy
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois  60604

RE:   *United States v. Lewellen, 09 CR 332, Notice of Alibi Defense*

Dear Counsel:

Pursuant to Federal Rule of Criminal Procedure 12.1, in response to your
contention that Fares Umar will testify to the participation of Glenn Lewellen in a
kidnapping that took place during the daylight hours on September 11, 2001, we
intend to call the following two individuals to establish that Mr. Lewellen was at
one of his building sites in or near New Lenox, Illinois, during the daylight hours on
September 11, 2001:

(1)   James Millner, who is already listed on your witness list, and who is
      represented by Michael Mann, whose contact information you already have in
      your possession; and,

(2)   Jason Coday, who is currently in the custody of the Illinois Department of
      Corrections, his information is as follows:

      Jason Coday
      B70825
      Lawrence Correctional Center
      10940 Lawrence Road
      Sumner, Illinois  62466
      (618) 936-2064

Andréa E. Gambino
*Attorney at Law*
*Abogada*


GOVERNMENT
EXHIBIT

K

A writ of habeas corpus ad testificandum will be necessary for Mr. Coday.  Please let us know whether you are willing to arrange this, or whether we will need to make these arrangements.

Sincerely,

Andréa E. Gambino

Matthew J. Madden
Attorneys for Glenn Lewellen

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 8

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: SA Jeanna Bryant<br>At: Chicago Field Division | ☐<br>☐<br>☐ | | ██████████ | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | ☐<br>☐ | | 8. Date Prepared<br>04-14-2009 | |

9. Other Officers: ASAC Scott Ando and AUSA Terra Brown

10. Report Re: Interview with Joe Digiacomo, Al Pappalito, and John Cummings on 04-10-2009

### SYNOPSIS

On 04-09-2009, Saul RODRIGUEZ and other co-conspirators were arrested for conspiracy to attempt to possess cocaine (more than 5 kilograms) with intent to distribute. On 04-10-2009, ASAC Scott Ando contacted Investigator (Inv.) Joseph DiGiacomo of the Cook County States Attorney's Office (CCSAO) via telephone and informed him of RODRIGUEZ' arrest. DiGiacomo utilized RODRIGUEZ as a Confidential Source (CS) while DiGiacomo was employed by the Chicago Police Department (CPD) prior to his retirement. DiGiacomo has also utilized him as a CS at the CCSAO where DiGiacomo is currently employed. DiGiacomo agreed to meet with ASAC Ando, SA Jeanna Bryant and Assistant United States Attorney (AUSA) Terra Brown at the States Attorney's North Branch Office, located at 1228 North Branch, Chicago, IL, for an interview reference RODRIGUEZ.

### DETAILS

1. Upon arrival at Inv. DiGiacomo's office, ASAC Ando, SA Bryant and AUSA Brown met two other CCSAO Investigators, Al Pappalito and John Cummings, both of whom work in the CCSAO North Branch Office with Inv. DiGiacomo. Inv. Pappalito, Inv. Cummings, and Inv. DiGiacomo all previously worked together in the Narcotics Division at CPD and, upon retiring from CPD, were hired as investigators at the CCSAO. Inv. DiGiacomo sat down at a table set up in the office and Inv. Cummings

| 11. Distribution:<br>Division<br><br>District<br><br>Other | 12. Signature (Agent)<br>SA Jeanna Bryant | 13. Date<br>04-20-09 |
|---|---|---|
| | 14. Approved (Name and Title)<br>GS Wes Tabor<br>Group Supervisor | 15. Date<br>4/21/09 |

DEA Form    - 6
(Jul. 1996)
jmb
1 - Prosecutor

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

GOVERNMENT
EXHIBIT

L

U.S. Department of Justice
Drug Enforcement Administration

| | |
|---|---|
| **REPORT OF INVESTIGATION**<br>*(Continuation)* | |

| 4.<br>Page  2  of  8 | |
|---|---|
| 5. Program Code | 6. Date Prepared<br>04-14-2009 |

was seated at what appeared to be his work desk. Inv. Pappalito
decided to leave the room and Inv. DiGiacomo told Inv. Pappalito that
he could stay for the interview.  Inv. Pappalito told Inv. DiGiacomo
that he was going to leave unless Inv. DiGiacomo wanted him to stay.
Inv. DiGiacomo responded that he wanted him to stay. Inv. Pappalito
sat down at the table next to Inv. DiGiacomo and remained there for
the entire interview.  In addition, Inv. Pappalito, who was very
familiar with Saul Rodriguez and his role as a CS for the CPD
narcotics team to which he had been assigned with Inv. DiGiacomo,
participated in the interview and provided information about
RODRIGUEZ. Inv. Cummings, at one point, left the room for a short
period of time but then returned to his desk.  Inv. Cummings also
participated in the interview but did not have, or offer, nearly as
much information about RODRIGUEZ as did Inv. DiGiacomo and Inv.
Pappalito.

2. Inv. DiGiacomo stated that he first met RODRIGUEZ after the narcotics
team that Inv. DiGiacomo was working in at CPD arrested RODRIGUEZ
many years ago, when RODRIGUEZ was approximately 17 or 18 years old
and agreed to cooperate after his arrest.  Inv. DiGiacomo stated that
he was not the one that signed him up as a Confidential Source for
CPD and that he could not remember who did.  However, Inv. DiGiacomo
stated that, over the years, Glen LEWELLEN, with whom Inv. DiGiacomo
worked at CPD Narcotics, was the one that primarily handled
RODRIGUEZ.  Inv. Pappalito stated that he was not sure if LEWELLEN
was the officer that signed RODRIGUEZ up as a CS, but agreed that he
was RODRIGUEZ' handler until his (LEWELLEN's) retirement from CPD.

3. At the time of RODRIGUEZ' arrest by CPD, and during the time of his
subsequent cooperation, Inv. DiGiacomo and LEWELLEN worked in the
same narcotics team at CPD. However, Inv. DiGiacomo stated that some
time after that, LEWELLEN was transferred to a different narcotics
team. Inv. DiGiacomo stated that upon LEWELLEN's transfer, LEWELLEN
continued to utilize RODRIGUEZ as a CS. Inv. DiGiacomo stated that
because LEWELLEN handled RODRIGUEZ and was no longer in the same drug
unit as DiGiacomo, he did not have the opportunity to work with
RODRIGUEZ anymore at CPD.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor



U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | |
|---|---|
| *(Continuation)* | |

| 4. Page 3 of 8 | |
|---|---|
| 5. Program Code | 6. Date Prepared 04-14-2009 |

4. Inv. DiGiacomo, Inv. Pappalito and Inv. Cummings all agreed that RODRIGUEZ was utilized as a CS for CPD on numerous occasions over the years. All three stated that RODRIGUEZ would have earned an approximate total of several hundred thousand dollars as a CS for CPD.

5. Inv. DiGiacomo, Inv. Pappalito and Inv. Cummings stated they all knew and had worked with Armando Ramirez. All three stated that he was a great guy and that he had been the lieutenant on one of their narcotics teams before he retired from CPD. Inv. DiGiacomo stated that he thought Ramirez currently lived in San Jose, Texas. (NOTE: Ramirez currently resides in San Antonio, Texas, not San Jose, Texas.)

6. Subsequent to Inv. DiGiacomo's retirement from CPD in 1998, he was hired as an investigator at the CCSAO. According to Inv. DiGiacomo, after he and LEWELLEN retired from CPD, they did not remain in contact with each other. Inv. Pappalito also stated that he did not have contact with LEWELLEN subsequent to their retirements from CPD.

7. Inv. DiGiacomo stated that, in approximately 2001 or 2002, LEWELLEN contacted him at the CCSAO on behalf of RODRIGUEZ to see if they would be interested in utilizing RODRIGUEZ as a CS. Inv. DiGiacomo stated that they signed RODRIGUEZ up at that time as a CS. According to Inv. DiGiacomo, the CCSAO utilized RODRIGUEZ approximately 5 to 6 times as a CS and that RODRIGUEZ was paid approximately $20,000 total for his work/information. Inv. DiGiacomo stated that every case they made from information provided by RODRIGUEZ resulted in money seizures and not drug seizures.

8. According to Inv. DiGiacomo, Inv. Pappalito and Inv. Cummings, the last time they utilized RODRIGUEZ as a CS was approximately 2006. Inv. DiGiacomo stated that at that time, an order came down from CPD Narcotics Commander Cronin to the teams to stop utilizing RODRIGUEZ as a CS. Because the CCSAO works primarily with narcotics teams from CPD, they too were affected by the order and stopped using RODRIGUEZ. According to Inv. DiGiacomo, they also found out that RODRIGUEZ was under investigation.

---

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

U.S. Department of Justice
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION**<br>*(Continuation)* | 1. File No. | 2. G-DEP Identifier |
| | 3. ▮▮▮▮▮▮▮▮▮▮ | |

| 4.<br>Page 4 of 8 | |
|---|---|
| 5. Program Code | 6. Date Prepared<br>04-14-2009 |

9. According to Inv. DiGiacomo, shortly after the order to stop utilizing RODRIGUEZ, DiGiacomo passed on information obtained from RODRIGUEZ to DEA SA John Kennelly which resulted in a money seizure of approximately $200,000 in Will County.

10. Inv. DiGiacomo stated that subsequent to that case, he tried to pass on more information that was obtained from RODRIGUEZ to TFO Kennelly and his DEA Group Supervisor, Luis Miranda, but that they would not utilize RODRIGUEZ or his information anymore.

11. After being ordered not to utilize RODRIGUEZ, Inv. DiGiacomo stated that he continued to receive calls from RODRIGUEZ on a regular basis, but told RODRIGUEZ that he could no longer work as a CS. However, Inv. DiGiacomo acknowledged he still receives calls from RODRIGUEZ on a regular basis and continues to meet with him. Inv. DiGiacomo explained that he still obtains information from RODRIGUEZ such as the names of possible targets and license plates of possible target vehicles, and that he has attempted to work cases with information supplied by RODRIGUEZ. Inv. Pappalito added that RODRIGUEZ calls Inv. DiGiacomo all the time and does not call him (Inv. Pappalito) because RODRIGUEZ does not like Inv. Pappalito. Inv. Pappalito explained that he does not like to deal with RODRIGUEZ and that, unlike Pappalito, DiGiacomo has always been nice to RODRIGUEZ.

12. DiGiacomo stated that RODRIGUEZ tells DiGiacomo that he is "straight," meaning that he no longer engages in criminal activity. However, in spite of RODRIGUEZ' claims, Inv. DiGiacomo stated that RODRIGUEZ always seems to know information involving the criminal activity of others. DiGiacomo stated that RODRIGUEZ mentioned to him during one conversation that the "TWINS" were cooperating with law enforcement. DiGiacomo knew that RODRIGUEZ' was referring to Margarite and Pedro FLORES, AKA "the TWINS". According to DiGiacomo, he asked RODRIGUEZ at the time of this conversation whether RODRIGUEZ was ever involved with the TWINS and RODRIGUEZ told him that he had not been involved with the TWINS.

---

**DEA SENSITIVE**
**Drug Enforcement Administration**

**1 - Prosecutor**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | REPORT OF INVESTIGATION<br>*(Continuation)* | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| 4.<br>Page 5 of 8 | | | |
| 5. Program Code | | 6. Date Prepared<br>04-14-2009 | |

13. Inv. DiGiacomo stated that RODRIGUEZ has previously asked him if he (Inv. DiGiacomo) has heard anything about him and that Inv. DiGiacomo has told him that he had not heard anything. Inv. DiGiacomo also stated that he has never given RODRIGUEZ information or ran license plates for him. Inv. DiGiacomo stated that the last time he met with RODRIGUEZ was approximately 3 weeks to a month ago, but that he does not remember what RODRIGUEZ wanted to meet him about. According to Inv. DiGiacomo, the last time he spoke to RODRIGUEZ on the phone was when Inv. DiGiacomo received a call from him on Monday, April 6, 2009. Inv. DiGiacomo stated that during that phone call, RODRIGUEZ told him about an individual named "SOSA," who RODRIGUEZ wanted to "set up." According to Inv. DiGiacomo, RODRIGUEZ told him that RODRIGUEZ had seen "SOSA" in a strip club and, after talking to "SOSA" at the club, RODRIGUEZ claimed he could set him up for Inv. DiGiacomo. Inv. DiGiacomo stated that he did not know the real name of "SOSA." According to Inv. DiGiacomo, he told RODRIGUEZ that he was unable to work with him and could not set "SOSA" up. (NOTE:"SOSA" is known to DEA as Jorge LLAMAS. DiGiacomo was not told the real name of "SOSA" or that ASAC Ando, SA Bryant or AUSA Brown knew the identity of "SOSA".)

14. Inv. DiGiacomo stated that RODRIGUEZ would only call him on his CCSAO cell phone because that is the only cell phone that he possesses. According to Inv. DiGiacomo, RODRIGUEZ has recently been calling him from different phone numbers.

15. Inv. DiGiacomo stated that he has rarely spoken with LEWELLEN since their retirement from CPD but that he was aware that LEWELLEN owned a company that builds houses. Inv. DiGiacomo, Inv. Pappalito and Inv. Cummings were asked if they were aware that LEWELLEN had built RODRIGUEZ' house and all three stated that they were not aware of that fact. Inv. Pappalito, in particular, was extremely vocal upon learning of this fact and stated that it looked "bad" and that, even if nothing inappropriate was going on, it made it look as if it were. All agreed that it was basically unheard of for a former police officer to have a business relationship with a CS. They were also informed that LEWELLEN and RODRIGUEZ had other real estate business together.

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

*(Continuation)*

| 4. | |
|---|---|
| Page 6 of 8 | |
| 5. Program Code | 6. Date Prepared |
| | 04-14-2009 |

16. Inv. DiGiacomo stated that the last time he spoke to LEWELLEN was in approximately November 2005 when he received a phone call from him. Inv. DiGiacomo described this call as "out of the blue" and stated that LEWELLEN told him "if anything happened to him," Inv. DiGiacomo should "run this M-plate" (a reference to a license plate for a vehicle registered to a municipality)and provided DiGiacomo with a plate number. Inv. DiGiacomo stated that subsequent to the call, LEWELLEN called him back and said that CPD had executed a search warrant on a warehouse that he owned, but, since they did not find anything, everything was alright. Inv. DiGiacomo stated that he felt it was odd that LEWELLEN would call him under circumstances like that since he and LEWELLEN were not close and had not been in contact with each other. According to Inv. DiGiacomo, prior to the November 2005 call, he had not spoke to LEWELLEN since receiving the phone call in 2001 or 2002 asking if the CCSAO would utilize RODRIGUEZ as a CS.

17. Inv. DiGiacomo, Inv. Pappalito and Inv. Cummings stated that they did not know RODRIGUEZ' brother-in-law and did not know or recognize that his name was Andres TORRES. When asked if they knew anyone associated with RODRIGUEZ that owned a painting company, both Inv. DiGiacomo and Inv. Pappalito recalled RODRIGUEZ talked about an individual who was a painter. Inv. DiGiacomo, Inv. Pappalito and Inv. Cummings stated they were unaware that LEWELLEN had allowed Andres TORRES to utilize his warehouse, the same one upon which CPD had executed the search warrant. They also stated that they had not heard that CPD had found approximately $65,000 and kilogram wrappers with cocaine residue as a result of that search warrant.

18. Inv. Pappalito appeared to be genuinely surprised and bothered about certain facts revealed about LEWELLEN and his relationship with RODRIGUEZ. Inv. Pappalito asked AUSA Brown if she was sure about the business relationship between the two and whether it was speculation, or did she "have it on paper." AUSA Brown answered that it was a fact and that there was proof of money transfers and real estate transactions between LEWELLEN and RODRIGUEZ. Inv. DiGiacomo appeared to be somewhat surprised about the relationship between LEWELLEN and

---

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

*(Continuation)*

| 4. Page 7 of 8 | |
|---|---|
| 5. Program Code | 6. Date Prepared 04-14-2009 |

RODRIGUEZ, but did not comment one way or the other about the situation.

19. Inv. DiGiacomo was asked if he recalled a telephone conversation that he had with SA Don Wood about RODRIGUEZ. Inv. DiGiacomo stated that he had never had a conversation with SA Wood about RODRIGUEZ. (Note: Reference is made to the DEA-6, dated 09-29-2008, written by SA Wood, and titled "Tx Call with Joe DiGiacomo on 08/26/08.") Inv. DiGiacomo stated that he had a conversation with SA Wood about a case that involved DEA making an arrest outside of a residence that Inv. DiGiacomo happened to be "spot checking" at the time. Inv. DiGiacomo explained that on that particular day, he was in his vehicle outside of a residence that a target of an investigation lived and was performing a "spot check." While parked on the street watching the residence, Inv. DiGiacomo observed police in unmarked cars, which he assumed were DEA vehicles, execute an arrest in front of the residence that he was watching. Inv. DiGiacomo stated he circled around and was subsequently stopped by the DEA at which time he identified himself and spoke to SA Wood. Subsequent to that, he and SA Wood had a phone conversation about what Inv. DiGiacomo had witnessed during the arrest because the person that was arrested was claiming that he was dragged out of his vehicle by his hair by the arresting DEA agents. As a result, two agents and an AUSA interviewed Inv. DiGiacomo at the CCSAO as to what he had witnessed that day. (NOTE: Reference is made to a DEA-6, dated 09-29-2008, written by SA David Reynolds titled "Interview with Joe DIGIACOMO on Sept 29, 2008.")

20. When asked, Inv. DiGiacomo denied recalling an incident in which DEA surveillance inadvertently followed him after observing him meet with RODRIGUEZ on 08/28/208. Surveillance units were not aware at the time that it was Inv. DiGiacomo meeting with RODRIGUEZ and followed his vehicle after departing the meeting with RODRIGUEZ. While following what ended up being Inv. DiGiacomo in his CCSAO vehicle, SA Bryant's vehicle plate was ran by the Cook County Sheriff's Office. (Note: Reference is made to a DEA-6, dated 10-01-2008, written by SA Jeanna Bryant titled "Surveillance on 08/28/2008 and SA Bryant's DEA Plate Ran by Cook County Sheriff".) Inv. DiGiacomo stated that he did not

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

1 - Prosecutor

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION
*(Continuation)*

4.
Page  8  of  8

5. Program Code

6. Date Prepared
04-14-2009

recall being followed by law enforcement or running a plate that he thought could be law enforcement. Inv. DiGiacomo explained that when CCSAO runs plates, that it almost always goes through CPD.  Inv. DiGiacomo said he would likely have called in the plate query using his Nextel cellular phone.

21. As the interview was coming to an end, Inv. DiGiacomo, Inv. Pappalito and Inv. Cummings were told that if LEWELLEN happened to call any of them that it was up to them if they spoke to him. Inv. Cummings stated that LEWELLEN has never called him and would have no reason to call him. Inv. DiGiacomo did not comment either way about LEWELLEN calling him. Inv. Pappalito stated that he could not speak for Inv. DiGiacomo, but, if LEWELLEN called him, he would not talk to him because he has nothing to say to him and that LEWELLEN could be "recording him."

**INDEXING**

DEA Form   - 6a
(Jul. 1996)

### DEA SENSITIVE
**Drug Enforcement Administration**

1 - Prosecutor

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.