**12-3683**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

TONY SPARKMAN,

Defendant-Appellant.

---

On Appeal from the United States District Court,
Northern District of Illinois, Eastern Division
Case No. 09 CR 332
The Honorable Joan B. Gottschall, Presiding

---

OPENING BRIEF AND SHORT APPENDIX OF DEFENDANT-APPELLANT
TONY SPARKMAN

---

Andrew S. Gable
Attorney for Defendant-
Appellant Tony Sparkman
Law Office of Andrew Gable
330 S. Wells, Suite 400F
Chicago, Illinois 60606
(312) 502-7877
andy@andygable.com

---

ORAL ARGUMENT REQUESTED

---

i

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

I, the undersigned counsel of record for the Defendant-Appellant, Tony Sparkman, furnish the following list in compliance with FED. R. APP. P. 26.1 and CIR. R. 26.1:

1. The name of the party represented by the undersigned is Tony Sparkman.

2. Andrew S. Gable was appointed by this Court to represent Mr. Sparkman.  Mr. Sparkman was represented in the district court by attorneys Eugene Steingold and Douglas Rathe.  Mr. Gable is the only person expected to appear in Court on behalf of Mr. Sparkman.

3. Mr. Sparkman is not a corporation.


/s/ Andrew S. Gable
Andrew S. Gable

i

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ................................................................. i

TABLE OF CONTENTS ....................................................................... ii

TABLE OF AUTHORITIES .................................................................. iii

STATEMENT OF JURISDICTION ......................................................... 1

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF THE CASE ............................................................... 3

SUMMARY OF THE ARGUMENT ....................................................... 17

ARGUMENT ..................................................................................... 18

I. ADMISSION OF EXHIBIT 376, THE PHOTO ARRAY INITIALED BY AVILA TWO YEARS AFTER THE KIDNAPPING AND TWO YEARS BEFORE TRIAL, VIOLATED DUE PROCESS ...................................................................... 18

    A. Standard of Review ............................................................... 18

    B. Argument ............................................................................ 18

        1. Identification Procedure Was Overly Suggestive ..................19

            a. Sparkman's photograph was improperly emphasized ....20

            b. Photo array presented by case agent ..........................22

            c. Government also failed to minimize suggestiveness .......23

        2. Identification Was Unreliable Under Totality of Circumstances ...............................................................25

            i) Avila's Opportunity to View Event ............................25

            ii) Avila's attention was distracted by stressful conditions ...25

            iii) Avila's description of event was inaccurate .................26

            iv) Avila's level of certainty is unknown ..........................26

v) Avila's identification occurred over two years after kidnapping………………………………………………….…27

C. Not Harmless Error ……………………………………………….... 28

II. IT WAS REVERSIBLE ERROR FOR AGENT HEALY TO TESTIFY ABOUT AVILA'S IDENTIFICATION WHERE AVILA DID NOT FORGET OR CHANGE HIS EARLIER IDENTIFCATION ……………………………………………………....…..30

A. Standard of Review ……………………………………………..30

B. Argument …………………………………………………..……… 30

1. Healy's testimony was hearsay ……………………..……… 31

2. Healy's testimony improperly bolstered Avila's prior identification ………………………………………………..… 32

C. Not Harmless Error ……………………………………….…..... 32

III. THE JURY, NOT THE TRIAL COURT, WAS REQUIRED TO FIND THAT SPARKMAN "BRANDISHED" A FIREARM DURING AVILA KIDNAPPING TO JUSTIFY AN INCREASE IN HIS MANDATORY SENTENCE FROM FIVE TO SEVEN YEARS…………………………………………………………..…… 34

A. Standard of Review …………………………………………… 34

B. Argument ……………………………………………………………35

C. Reversible Error ……………………………………………..…… 35

IV. THE TRIAL COURT ERRED IN SENTENCING SPARKMAN TO A MANDATORY CONSECUTIVE SENTENCE OF 25 YEARS UNDER 18 U.S.C. § 924(c) FOR COUNT 11 WHERE: 1) THERE WAS NO INTERVAL OF PUNISHMENT BETWEEN THE 924(C) OFFENSES IN COUNT 8 AND 11 AND 2) THE JUDGE AND NOT THE JURY FOUND COUNT 11 WAS A SUBSEQUENT CONVICTION TO COUNT 8 …………………... 36

A. Standards of Review ……………………………………………..… 36

1. Interval of Punishment Between Counts 8 and 11 ……………..…36

2. The Judge and Not the Jury Found Count 11 Was a Subsequent Conviction to Count 8 ………………………………………………. 37

B. Argument ……………………………………………………………… 37

1. The Count 11 conviction was not a second or subsequent 924(c)

conviction ……………………………………….………………..37

2. The jury was required to find that Count 11 was a second or

subsequent conviction ……………………………….………………… 38

C. Reversible Error …………………………………….……………….. 39

CONCLUSION ................................................................................ 40

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32 (a)(7) …………………41

CIRCUIT RULE 31(e)(1) CERTIFICATION …………………………………..42

PROOF OF SERVICE …………………………………………….…….43

CIRCUIT RULE 30(d) STATEMENT …………………………………..44

ATTACHED REQUIRED SHORT APPENDIX ……………………………..45

# TABLE OF AUTHORITIES

## CASES

*Alleyne v. United States*, 133 S. Ct. 2151 (2013) ………………………………34-36, 38-9

*Almendarez–Torres v. United States*, 523 U.S. 224 (1998) ………………………38-9

*Cossel v. Miller*, 229 F.3d 649 (7th Cir. 2000) ……………………………………26-7

*Deal v. United States*, 508 U.S. 129, 113 S.Ct. 1993 (1993) ………………………37

*Good v. Curtis*, 601 F.3d 393 (5th Cir. 2010) ……………………………………..21

*Gregory-Bey v. Hanks*, 332 F.3d 1036 (7th Cir. 2003) …………………………19, 22

*Manson v. Brathwaite*, 432 U.S. 98 (1977) …………………………………………..18, 32

*McFowler v. Jaimet*, 349 F.3d 436 (7th Cir. 2003) ……………………………..27

*McGowan v. Miller*, 109 F.3d 1168 (7th Cir. 1997) ………………………………19

*Neil v. Biggers*, 409 U.S. 188 (1972) ……………………………………………18, 25-7

*O'Brien v. Wainwright*, 738 F.2d 1139 (11th Cir. 1984) …………………………21

*Sheppard v. United States*, 544 U.S. 13, 125 S.Ct. 1254 (2005) …………………..38

*Simmons v. United States*, 390 U.S. 377 (1968) …………………………………18, 21, 22

*State v. Henderson*, 208 N.J. 208 (2011) ……………………………………………22

*United States v. Booker*, 543 U.S. 220 (2005) ……………………………………37-8

*United States v. Brink*, 39 F.3d 419 (3d Cir.1994) ………………………………30

*United States v. Brown*, 471 F.3d 802 (7th Cir. 2006) ……………………………..23

*United States v. Cord*, 654 F.2d 490 (7th Cir. 1981) ………………………….…25

*United States v. Cureton*, 739 F.3d 1032 (7th Cir. 2014) …………………………..36, 39

*United States v. Cunningham*, 462 F.3d 708 (7th Cir. 2006) ………………...33

*United States v. Downs*, 230 F.3d 272 (7th Cir. 2000) ……………………….18, 21

*United States v. Fernandez*, 456 F.2d 638 (2d Cir. 1972) …………………..……20

*United States v. Ford*, 683 F.3d 761 (7th Cir. 2012) …………………………..18, 20, 23

*United States v. Foster*, 652 F.3d 776 (7th Cir. 2011) …………. ……………… 30

*United States v. Harris*, 281 F.3d 667 (7th Cir. 2002) ………………………...18, 19

*United States v. Kaquatosh*, 242 F. Supp. 2d 562 (E.D. Wis. 2003) ……………31, 32, 33

*United States v. Kirklin*, 727 F.3d 711 (7th Cir. 2013) …………………………34, 36

*United States v. Mack*, 729 F.3d 594 (6th Cir. 2013) …………………….…..38

*United States v. Merkt*, 794 F.2d 950 (5th Cir. 1986) ……………………………20

*United States v. Moore*, 115 F.3d 1348 (7th Cir. 1997) ……………………….25

*United States v. O'Malley*, 796 F.2d 891 (7th Cir. 1986) …………………….…..31

*United States v. Rogers*, 387 F.3d 925 (7th Cir. 2004) ……………………….…..19, 28

*United States v. Sanders*, 708 F.3d 976 (7th Cir. 2013) …………………….…… 28

*United States v. Saunders*, 501 F.3d 384 (4th Cir. 2007) ………………….……. 21

*United States v. Segal*, 495 F.3d 826 (7th Cir. 2007) …………………….…… 34

*United States v. Seymour*, 519 F.3d 700 (7th Cir. 2008) …………………….…..34

*United States v. Traeger,* 289 F.3d 461 (7th Cir. 2002) ………………………….24

*United States v. Wade*, 388 U.S. 218 (1967) ………………………………….. 32

*United States v. Wiseman*, 172 F.3d 1196 (10th Cir. 1999) ………………..…… 21

*Watkins v. Sowders*, 449 U.S. 341 (1981) ………………………………….. 29

*Young v. Conway*, 698 F.3d 69 (2nd Cir. 2012) …………………………….…..25

**STATUTES**

18 U.S.C. § 924(c)(1)(A) …………………………………………………….35

18 U.S.C. § 924(c)(1)(C)(i) ………………………………………………..34-39

**RULES**

Federal Rule of Evidence 403 ……………………………………………... 31 32

Federal Rule of Evidence 801(d)(1)(c) ………………………………………30-33

**ARTICLES**

Sarah M. Greathouse & Margaret Bull Kovera, *Instruction Bias and Lineup Presentation Moderate the Effects of Administrator Knowledge on Eyewitness Identification*, 33 LAW & HUM. BEHAV. 70, 71 (2009)  ……………………………………………...…..22

Ryann M. Haw & Ronald P. Fisher, *Effects of Administrator–Witness Contact on Eyewitness Identification Accuracy*, 89 J. APPLIED PSYCHOL. 1106, 1107 (2004) ………....22

Nancy Mehrkens Steblay, A Meta–Analytic Review of the Weapon Focus Effect, 16 Law & Hum. Behav. 413, 414 (1992) …………………………………………………25

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over the matter under 18 U.S.C. § 3231.  The Court of Appeals for the Seventh Circuit has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Defendant Tony Sparkman was charged in eight counts of a Third Superseding Indictment filed on January 13, 2011.  He was tried before a jury which on January 31, 2012, returned a verdict of guilty on Counts 1, 7, 8, 10, 11, 12 and 13, and a verdict of not guilty on Count 4.

The final order and judgment of conviction as to Tony Sparkman was docketed on November 15, 2012.  (R. 1132, RA 1).  Sparkman's Notice of Appeal and Docketing Statement were timely filed on November 26, 2012.  (R. 1133, 1134).

# ISSUES PRESENTED FOR REVIEW

1. Whether the admission of Exhibit 376, a photo array with the alleged kidnapper's photograph emphasized and not identified by the victim until two years after the kidnapping violated Due Process.

2. Whether it was reversible error for a case agent to testify about the circumstances of the victim's identification where the victim did not forget or change his earlier identification at trial.

3. Whether the jury and not the trial court was required to find that the defendant "brandished" a firearm during a kidnapping to justify an increase in his mandatory sentence from five to seven years.

4. Whether the trial court erred in sentencing defendant to a mandatory consecutive sentence of 25 years under 18 U.S.C. § 924(c) for a successive conviction where: 1) there was no interval of punishment between the two 924(c) offenses, and 2) the judge and not the jury found that it was a subsequent conviction.

## STATEMENT OF THE CASE

Tony Sparkman was charged in eight counts of a thirteen-count superseding indictment against Saul Rodriguez and nine others. (R. 271).[1] In essence, the government alleged a vast racketeering conspiracy led by Rodriguez and that this conspiracy included murder, drug dealing, and kidnapping.

On January 13, 2011, Sparkman was charged in a third superseding indictment. (R. 271). Count One alleged his participation in the Rodriguez racketeering conspiracy; Count Four charged possession of cocaine with intent to distribute ("Joliet cocaine possession"), Count Seven charged kidnapping ("Pedro Avila kidnapping"); Count Eight charged the use of a weapon during the Avila kidnapping under 18 § USC 924(c), Count Ten charged a kidnapping ("Jose Carranza kidnapping"), Count Eleven charged the use of a weapon during the Carranza kidnapping under 18 § USC 924(c), Count Twelve charged the attempted possession of cocaine; and Count Thirteen charged a drug conspiracy. (R. 271).

On November 14, 2011, Sparkman, and the four remaining co-defendants, Robert Cardena, Jorge Uriarte, Hector Uriarte, and Glenn Lewellen, proceeded to a jury trial. (R. 674). On January 31, 2012, Sparkman was acquitted of Count 4 and convicted of the remaining counts. (R. 810).

---

[1] Citations in this brief are formatted as follows: (1) citations to the appendix are abbreviated "RA followed by the appropriate page number; (2) citations to the district court record are abbreviated "R." followed by the appropriate docket number; (3) citations to the trial transcript are abbreviated "Tr." followed by the appropriate page number; (4) citations to the sentencing transcript are abbreviate "Sent. Tr." followed by the appropriate page number.

On November 15, 2012, the trial court sentenced Sparkman to 504 months or 42 years incarceration.  (RA 1).  The sentence was based on 120 total months for counts 1, 7, 10, 12, and 13, plus 84 months (7 years) to run consecutive for "brandishing" a firearm in Count 8, plus another 300 months (25 years) for a subsequent conviction under 18 U.S.C. 924(c) for using a firearm in Count 11.  (RA 1).

As Sparkman's appeal deals primarily with the Avila and Carranza kidnapping and the mandatory minimum sentences that resulted from these convictions, the following will address facts relating to: 1) the possession of cocaine in Joliet (Count 4), 2) the Avila kidnaping (Counts 7 & 8), 3) the Carranza kidnapping (Counts 9 &10), and 4) Sparkman's sentence as a result of his convictions for the Avila and Carranza kidnappings.

## 1. <u>JOLIET COCAINE POSSESSION</u> (COUNT 4)

Count 4 charged that Sparkman, Saul Rodriguez, Andres Flores, Hector Uriarte, Jorge Uriarte, and Robert Cardena, possessed more than 5 kilograms of cocaine in Joliet, Illinois.  (R. 271).

At trial, the cooperating witnesses, Flores testified that he, Sparkman ("Black"), Hector Uriarte ("Gordo"), Jorge Uriarte ("Lefty"), and Robert Cardena ("Rob") went to a house in Joliet where they believed there was a large amount of cocaine.  (Tr. 2097). Flores brought a gun with him and believed there would be people in the home.  (Tr. 2095; 2097).  No one was home and inside the house and in a van in the garage they

found a large amount of what Flores assumed was cocaine.  (Tr. 2099).  Sparkman

helped load the cocaine into another car.  (Tr. 2100).

Flores testified pursuant to a cooperation agreement.  (Tr. 2033).  Flores admitted

to numerous prior crimes, including murder for hire, attempted murders, being

deported and illegally reentering, and kidnapping.  (Tr. 2050, 2071, 2079, 2150).  He also

admitted to speaking with Rodriguez in jail while they were both incarcerated.  (Tr.

2017).  Flores acknowledged that he was facing a possible life sentence but that based on

his cooperation was expecting a sentence of 175 months.  (Tr. 2033).

The jury acquitted Sparkman of Count Four.  (R. 810).


2.  **PEDRO AVILA KIDNAPPING** (Counts 7 and 8)

Count 7 of the indictment alleged that Sparkman, Saul Rodriguez, Andres Flores,

Hector Uriarte, and Jorge Uriarte kidnapped 5 individuals (Pedro Avilla and family) in

Summit, Illinois in October 2007.  Count 8 alleged that Sparkman, Hector Uriarte, and

Jorge Uriarte, "did use and carry" a firearm during this kidnapping.  (R. 271).  As for

Count 8, the indictment did not allege, and the jury was not instructed, to find that Mr.

Sparkman brandished a weapon.  (R. 271; Tr. 5461).

**Maria Gatlin**

Maria Gatlin, a Summit, Illinois police officer responded to a home invasion and

armed robbery call at Pedro Avila's home on October 20, 2007.  (Tr. 2850).  Avila told

her the perpetrators were one black and two Hispanic men and that "all three of them

were wearing Chicago police uniform type clothing."  (Tr. 2853).

5

**Michael Long**

Michael Long, a Summit, Illinois police detective testified that he we went to Pedro Avila's home on October 20, 2007. (Tr. 2857). He searched the home but did not find any items of evidentiary value except red markings on a broken back door that were consistent with a battering ram. (Tr. 2859-61). Based on the investigation, he began looking for three offenders. (Tr. 2862).

**Jessica Ipema**

Jessica Ipema, an intelligence research specialist with the Drug Enforcement Agency, worked with the DEA in their investigation of Saul Rodriguez, Hector Uriarte, Jorge Uriarte, Tony Sparkman, and Andres Flores. (Tr. 4190-91).

In connection with the investigation, she prepared a book of 122 photographs of potential suspects which included arrest and driver's license photos. (Tr. 4208). One of the photographs in the book was Tony Sparkman's arrest photograph from April 9, 2009. (Tr. 4208). Ipema gave this photo album to agents for use in interviewing witnesses. (Tr. 4208).

**Pedro Avila and Exhibit 376**

In October 2007, Pedro Avila, a music promoter, lived in Summit, Illinois with his wife and 5 children. (Tr. 3826). On three different occasions, Avila saw unknown people outside his home. One the first occasion, a Latino man rang his doorbell and asked to be let in. Avila did not know the person and pretended to call someone on his phone and the man left. (Tr. 3827-28).

6

During trial, the government asked Avila about the second occasion when he
saw men outside his home.  Avila testified that two days after the first occasion, the
Latino man he saw before was looking in his garage in the back of his house.  Avila
went outside and saw a tall, black man talking on a phone.  (Tr. 3830).

Avila further testified that, two years later, in December 2009, federal agents
came to his home, interviewed him, and showed him photographs regarding the
kidnapping.  (Tr. 3830).  During this interview, Avila was shown pictures of people of
different races.  (Tr. 3830).

The government then began asking Avila about photographs of African
Americans that the federal agents showed him in December, 2009.  (Tr. 3831).
Sparkman objected and a sidebar was held.  (Tr. 3831; RA 15-22).

At the sidebar, Sparkman argued that the government was improperly
suggesting that Avila was only shown pictures of African-Americans when the
government had not established that.  (Tr. 3831).  The government stated the agents
showed Avila an array of photographs, including a six-pack of African-American men.
(Tr. 3831).  The Court noted that if Avila was not shown only African-Americans there
would have been a motion to suppress.  (Tr. 3836).  The Court then stated "I think the
best way if there is going to be an objection to suggesting that the array was just
African-Americans, I don't understand it, but maybe just ask him if he -- what he was
shown. See what he says."  (Tr. 3836).

The government then asked Avila about Exhibit 376, a six person photo array. (RA 9-14, Tr. 3837). Avila testified that the police showed him several photographs and that he only remembered one photo because that was the person who put the gun to his head. (Tr. 3837). The government then moved to introduce Exhibit 376 and over another defense objection, the trial court permitted Exhibit 376 to be introduced. (Tr. 3838). Avila testified that he put his initial on the photo of the man who put a gun to his head. (Tr. 3881).

After the sidebar, Avila began testifying again about the second occasion when he saw men outside his home. (Tr. 3839). He saw the Latino man he had seen before as well as the man in Exhibit 376 and they both had guns in their hands. (Tr. 3839). Avila then went outside and struggled with the men. During the struggle Avila's son came home and the person in Exhibit 376 grabbed his son. (Tr. 3840). Avila's wife did not know there was a struggle or that Avila was outside but Avila told the men his wife was calling the police and they ran away. (Tr. 3841).

Avila then testified that about a week later, five men, including the Latino and black man he saw previously in his back alley, broke into his home, put his family in the basement, and demanded money and drugs. (Tr. 3878). Avila was in his basement when he heard pounding in the rear of his house. (Tr. 3842). His oldest daughter came downstairs crying that someone had broken the door of the house. (Tr. 3842). Avila grabbed a pipe and went upstairs. (Tr. 3842). When he went upstairs, the individual in Exhibit 376 put a gun to his head. (Tr. 3842). This individual then took him back

downstairs, put his knees on his back, and put a gun to his head. (Tr. 3843). All of the individuals who came in the home were wearing Chicago Police clothing. (Tr. 3844).

On cross examination, Avila stated that the person in Exhibit 376, "looked very similar" to the person who came into his home in 2007. (Tr. 3870). He also stated that he could not remember telling the Summit police that the man who put a gun to his head had no facial hair. (Tr. 3876). After being refreshed with the Summit police report, Avila stated that he meant the man did not have a beard. (Tr. 3877). The following exchange also occurred:

> Q: Okay. Mr. Avila, after you spoke to the police in 2007, did you ever see the person who put the gun to your head until you were shown pictures in 2009?
>
> A. I never saw nor have I seen that person again. I was simply asked to identify that person from the photos, and I did, but I have never seen that person after that.
>
> Tr. 3878.

On re-direct, Avila testified that he would never forget that the person in Exhibit 376 put a gun to his head. (Tr. 3882).

Earlier in the trial, government agents brought upcoming trial witnesses to the window in the back of the courtroom to identify witnesses before testifying. (Tr. 2323).

The government did not ask Avila to identify any of his kidnappers at trial. Avila was not asked and did not testify the man in Exhibit 376 was in the courtroom. Avila did not testify that he forgot making the identification or that his identification was wrong. The government did not call Avila's wife or children to testify.

**Case Agent Healy**

After Avila testified on December 20, 2011, the government recalled, Case Agent Healy on January 5, 2011.  (Tr. 4455).  Healy was one of the two main case agents investigating this case.  (Tr. 1730).

Healy testified that on December 1, 2009, he went to Avilla's home to question him about the kidnapping that occurred 2 years prior, in October 2007.  (Tr. 4455).  When the government began showing Healy Exhibit 376, Sparkman's counsel objected that Healy's testimony was hearsay.  (Tr. 4458).  During a sidebar, counsel again objected on hearsay grounds and co-defendant's counsel argued that it was improper "bolstering."  (Tr. 4462, RA 23, 24).  The trial court had earlier ruled that an objection by one counsel was an objection for all.  (Tr. 191).

During the sidebar (RA 23-32), the government argued that under "Rule 801(d)," Healy's testimony about Avila's prior identification was not hearsay and that defense counsel's cross examination of Avila had argued that the identification was suggestive.  (Tr. 4459-60).  The trial court then noted that: "that Sparkman "ought to have a 6th Amendment right to cross-examine about."  (Tr. 4459).  The government further argued that it was not hearsay because it was only a physical action.  (Tr. 4463).  The court initially stated it would sustain the objection as Rule 801 "was not written in English" and "I just don't know what [Rule 801] means, but the danger of allowing this kind of testimony without --the confrontation clause problems are just huge."  (Tr. 4464-65).

The trial court then stated: "You know what? I think -- I don't know what to do. I'm going to overrule the objection. I wish these rules were in English."  (Tr. 4466). Defense counsel argued that there "is no dispute [Avila] initialed it and picked the picture."  (Tr. 4466).  The court then ruled that "it seems to me you don't have to bolster or repeat the identification at this point. You just have to indicate what happened."  (Tr. 4467).

Agent Healy then testified that he put together the photo spread "from driver's license photos or mug shots that we had in the computer on this case."  (Tr. 4468). Healy then told Avila that the person or persons who entered his home may or may not be in the array and to "[t]o put his initials on the photo" of the person who entered his house.  (Tr. 4468).

**Andres Flores**

Andres Flores, the cooperating witness, testified that he, Tony Sparkman, Hector Uriarte and Jorge Uriarte were involved in the home invasion of individual known as the band manager.  (Tr. 2119).  They went to the band manager's home on three occasions.  On the first occasion, Flores rang the doorbell but the man inside the home would not open the door when Flores could not answer his questions.  (Tr. 2121).

About a week later, Flores attempted again and he and Sparkman brought guns with them.  (Tr. 2122).  While Flores and Sparkman were in the back of the house, the band manager approached Sparkman and started speaking to him.  (Tr. 2123).  Flores then grabbed the band manager and pulled out his gun.  (Tr. 2124).  The band

11

manager's son came over.  (Tr. 2124).  Avila's wife saw them and started knocking on

the window and said she was going to call the police.  (Tr. 2125).  Flores and Sparkman

ran away and Flores saw Sparkman throw his gun.  (Tr. 2125).

On the third attempt, Flores testified they dressed as police officers and

Sparkman used a battering ram to open the door.  (Tr. 2128).  Jorge Uriarte and Flores

had a gun.  (Tr. 2130).  Hector Uriarte stayed outside as a lookout and Jorge Uriarte and

Sparkman went downstairs.  (Tr. 2131).  When Jorge and Sparkman came up the stairs

they had the band manager with them.  (Tr. 2132).

### Saul Rodriguez

Rodriguez was indicted for murder and kidnapping and was originally facing a

death penalty sentence and then a life sentence penalty.  (Tr. 9045).  As a result of his

cooperation, he was eligible for a sentence between 30 and 40 years.  (Tr. 9046).

Rodriguez testified that he coordinated the attempted robbery of the band leader.

(Tr. 3298).  He spoke to Hector Uriarte about planning the robbery and was in contact

with him after the robbery.  (Tr. 3299, 3301).  Hector Uriarte told Rodriguez that he went

inside the house with Jorge Uriarte, Sparkman, and Flores.  Hector Uriarte told

Rodriguez that things got crazy in the home and asked him to pick up Sparkman

("Black") at a restaurant.  (Tr. 3302).  Rodriguez was told that Flores that the band

leader locked Flores ("Turtle") inside the house and others went in and get him.  (Tr.

3304).

12

**3. <u>CARRANZA KIDNAPPING</u>** (COUNTS 10 AND 11)

Regarding Count Ten, the government alleged that in or around 2008, Sparkman, Rodriguez, Hector Uriarte, and Jorge Uriarte kidnapped Jose Carranza and his friend Esteban in Lyons, Illinois.  (R. 271; Tr. 28).

For Count 11, the government alleged that Hector Uriarte, Jorge Uriarte, and Sparkman did "use and carry a firearm" in relation to Count 10 in violation of 18 U.S.C. 924(c).  (R. 271).  For Count 11, the jury was not instructed to find this conviction was successive to Count 8.  (Tr. 5462).

**<u>Jose Carranza</u>**

Jose Carranza testified he rented a house in Lyons, Illinois in March, 2008.  (Tr. 2521).  Without providing an exact date, he testified that one night he and his friend Esteban were out drinking and came home around 4 or 5 in the morning.  (Tr. 2523).  He was awoken by someone kicking in the door and pointing a gun at him.  (Tr. 2524). Someone then put a blanket over his head and he could not see what happened.  (Tr. 2524).  The intruders demanded his money and drugs.  (Tr. 2524).

Carranza was not asked at trial and did not identify Mr. Sparkman as one of his kidnappers.  Carranza was not asked at trial to identify any of his kidnappers.

**<u>Esteban</u>**

Esteban did not testify at trial.

**Andres Flores**

Flores testified that in the summer of 2008, he, Jorge Uriarte, Hector Uriarte, and Sparkman went to a house in Lyons, Illinois where Flores believed a drug dealer lived. (Tr. 2145-46). Flores brought a gun with him. (Tr. 2149). Sparkman kicked in the door. (Tr. 2149). Flores found a man sleeping and covered him with a blanket. (Tr. 2149). Flores found another man and also covered him with a blanket. (Tr. 2149). Sparkman watched the men while the others searched the house. (Tr. 2150). Flores then realized that he knew one of the men and that man was not a drug dealer. (Tr. 2151). The group eventually left after finding two guns, a watch, and a small amount of money. (Tr. 2152).

**4. SENTENCING**

**Sentencing Memorandum**

Prior to sentencing, Sparkman filed a sentencing memorandum in which he argued that 18 U.S.C. § 924(c)(1)(C)(i) ("924(c)") should be interpreted as a recidivist statute and that Sparkman as a first time offender should not be subject to two consecutive sentences as a repeat offender. (R. 935).

**Sentencing Hearing**

At his sentencing hearing, Sparkman argued that there was no evidence that a gun was brandished. (Sent. Tr. 12). Sparkman also argued that the total sentence was "longer than for offenders convicted of three aircraft hijackings, three second-degree murders, three kidnappings, or three rapes." (Sent. Tr. 24).

14

At the sentencing hearing, both the government and court noted the defendant was objecting to the two 924(c) convictions (Counts 8 and 11) running consecutive. (Sent. Tr. 5).   The trial court stated it understood that the objection was "that there shouldn't be a 25-year mandatory minimum for the second [924(c) conviction] since it wasn't successive, in fact, to the first one.  (Sent. Tr. 5).

**<u>Sentencing</u>**

Sparkman's guideline range was 292 to 365 months based on a criminal history category of I with an offense level of 40.  (Sent. Tr. 18).

On November 15, 2012, Sparkman was sentenced to 504 months or 42 years incarceration.  (R. 1132, RA 1).   This sentence was based on 120 total months for counts 1, 7, 10, 12, and 13, plus 84 months (7 years) to run consecutive for "brandishing" a firearm in Count 8, plus another 300 months (25 years) for a subsequent conviction under 18 U.S.C. 924(c) for using a firearm in Count 11.  (RA 1).

At sentencing, the court stated, "essentially applying a recidivist enhancement of a 25-year mandatory minimum when somebody is being convicted for the very first time of two gun charges. I think that kind of sentencing makes no sense" and "I can certainly say that if I were writing on a clean slate, if I were not compelled to apply it, I would not."  (Sent. Tr. 26).

The court also stated that "I think the sentence provided by the mandatory minimums in this case is -- I know this is not everybody's opinion -- in my view it's excessive. It certainly is required, though.  Whether it's too much, too little, or none of

15

the above, it's required" and "I don't see any reason in this case to go any higher than the mandatory minimum, and I don't see any way to go any lower than the mandatory minimum." (Sent. Tr. 17).

The sentencing court further stated that "the sentence required by the mandatory minimum in this case is far greater than necessary to accomplish the purposes of 3553, including the purpose of making clear the seriousness of the offense" and "it is not the sentence that I would impose if I had any discretion at all in this case." (Sent. Tr. 26-7).

## SUMMARY OF THE ARGUMENT

The trial court erred in allowing the government to introduce Exhibit 376, the photo array initialed by Avila two years after the kidnapping and two years before trial. This identification was the result of overly suggestive identification procedures. Avila was shown pictures of people of different races, Sparkman's picture had a different background than the others because it was an arrest photograph, and was one of only three with facial hair. Further, the identification was done by a case agent who knew Sparkman was a suspect and Avila was not asked and did identify Sparkman at trial. The identification was also unreliable under the totality of the circumstances, especially as the identification did not occur until two years after the kidnapping.

It was also error for Agent Healy to testify about the circumstances of Avila's identification. Avila did not change, recant, or forget his prior identification at trial. Thus, Healy's testimony was improper hearsay and bolstering.

Further, the jury and not the court was required to find that Sparkman "brandished" a firearm during the Avila kidnapping for Sparkman to be sentenced to a mandatory sentence of seven years.

Finally, the trial court erred in sentencing Sparkman to a mandatory consecutive sentence of 25 years under 18 U.S.C. § 924(c) for count 11. There was no interval of punishment between the 924(c) offense in count 11 and the 924(c) offense in count 8. Additionally, the jury, and not the trial, court should have made a determination that Count 11 was successive to Count 8.

17

# ARGUMENT

## I. ADMISSION OF EXHIBIT 376, THE PHOTO ARRAY INITIALED BY AVILA TWO YEARS AFTER THE KIDNAPPING AND TWO YEARS BEFORE TRIAL, VIOLATED DUE PROCESS

### A.  Standard of Review

A district court's decision to admit or suppress an identification is examined *de novo* with due deference to the district court's findings of historical fact.  *See United States v. Harris*, 281 F.3d 667, 670 (7th Cir. 2002); *United States v. Downs*, 230 F.3d 272, 275 (7th Cir. 2000).

Although Sparkman did not make a written motion to suppress Avila's prior out of court identification, he did object at trial to the introduction of Exhibit 376.  (Tr. 3831, 3838).

### B.  Argument

Avila's out of court identification from two years after the kidnapping was the result of suggestive procedures and unreliable under the totality of the circumstances. The introduction of Exhibit 376 created a "very substantial likelihood of irreparable misidentification" and violated due process.  *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (internal citations omitted); *United States v. Ford*, 683 F.3d 761, 766 (7th Cir. 2012).

Avila's identification was based on the 6 person photo array of only African-Americans in which Sparkman's arrest photograph had a distinct background from the

18

other photographs.  The array was created and shown by one of the main case agents and the identification was not corroborated by any confirmatory line-ups or even an in-court identification.  The reliability of Avila's identification was undercut by the length of time between the kidnapping and the identification, Avila's failure to identify a single assailants at trial, Avila's conflicting accounts of the event, and the lack of corroborating independent evidence.  *See United States v. Rogers*, 387 F.3d 925, 938 (7th Cir. 2004) (reversing drug conviction where identification procedure was suggestive and unreliable under the totality of circumstances).

The admissibility of a photo array is determined with a two part test.  *See McGowan v. Miller*, 109 F.3d 1168, 1173 (7th Cir. 1997).  First, the court examines whether the photo array procedure was unduly suggestive.  *See Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003) (internal citations omitted).  Second, if the procedure was unduly suggestive, the court then determines whether, under the "totality of the circumstances" the identification was nonetheless sufficiently reliable.  *United States v. Harris*, 281 F.3d 667, 670 (7th Cir. 2002).

Here, the trial court erred in allowing introduction of Avila's prior identification of Sparkman because it was: 1) the result of an overly suggestive photo array, and 2) unreliable under the totality of the circumstances.

## 1.  Identification Procedure Was Overly Suggestive

The unreliability associated with eyewitness testimony is well documented and as "awareness of the frequency of mistakes in eyewitness identification has grown … so

has the need for judges to be especially wary about *suggestive arrays*." *Ford*, 683 F.3d at 766 (emphasis added) (citing to numerous studies describing problems with eyewitness identification).

Here, the suggestive identification procedure involved: a) Sparkman's arrest photograph being improperly emphasized, b) one of the main case agent creating and performing the identification, and c) the government failing to cure the suggestiveness.

**a. Sparkman's photograph was improperly emphasized**

Sparkman objected that Avila was shown photographs of people of different races. (Tr. 3830). Officer Ipema also testified that she created a book of 122 photographs to show witnesses in this matter. (Tr. 4208). While Agent Healy testified that he showed Avila Exhibit 376, it appears Avila was also shown photographs of non-African-Americans, which improperly emphasized Sparkman's photograph. *See United States v. Fernandez*, 456 F.2d 638, 641-42 (2d Cir. 1972) (holding six-photo array impermissibly suggestive when only the defendant was light-skinned); *United States v. Merkt*, 794 F.2d 950, 958 (5th Cir. 1986), *cert. denied*, 480 U.S. 946 (holding photo array impermissibly suggestive because defendant was only Caucasian amongst photos of Hispanics).

Even if the photos in Exhibit 376 were the totality of photos shown to Avila, Sparkman's arrest photograph was unfairly emphasized as it had a different background than the other 5 photographs. Sparkman's photograph was the only one

without a uniform background; four of the others had solid blue backgrounds and one other had a solid blueish grey background.  (RA 9-15).

As the jury was told that Exhibit 376 contained mugshot and driver's license photos, this also created unnecessary emphasis on Sparkman's photo and may have suggested to Avila that it was an arrest photo.  *See Simmons*, 390 U.S. at 383-84 (stating that "hazards of initial identification by photograph" are increased if the police show a witness an array where one of the individual's photos is emphasized); *United States v. Wiseman*, 172 F.3d 1196, 1209 (10th Cir. 1999) ("[D]ifferences such as background color can make a picture stand out, and can act to repeatedly draw a witness's eye to that picture."); *O'Brien v. Wainwright*, 738 F.2d 1139, 1140–41 (11th Cir. 1984) (procedure unduly suggestive where witness was shown all black-and-white mug shots except for one color photograph, which was a photograph of the defendant).

Even if every photograph in Exhibit 376 were a mugshot, the contrast alone between Sparkman's and the others was unnecessarily suggestive.  *See United States v. Saunders*, 501 F.3d 384, 390 (4th Cir. 2007) (holding that photo array was impermissibly suggestive because suspect's photo darkly lit while control photos were brightly lit).

Further, Avila told the Summit police that his assailant did not have facial hair. (Tr. 3876).  In Exhibit 376, however, there were only three individuals, including Sparkman, with facial hair.  *See Downs*, 230 F.3d 272 at 273 (7th Cir. 2000) (finding a line up where the defendant was the only individual pictured without a moustache unduly suggestive); *Good v. Curtis*, 601 F.3d 393, 396, 401 (5th Cir. 2010) (noting that due process

21

rights were violated when an officer altered the light settings on a camera in order to make the picture of the defendant match the "dark tan" of the suspect);

### b. Photo array presented by case agent

Agent Healy, a case agent involved in the investigation and arrest of Sparkman, presented and conducted the identification with Avila. This created a serious risk of law enforcement "leak[ing] their hypotheses by consciously or unconsciously communicating to witnesses which lineup member is the suspect." *State v. Henderson*, 208 N.J. 208, 256-58 (2011) (citing to Sarah M. Greathouse & Margaret Bull Kovera, *Instruction Bias and Lineup Presentation Moderate the Effects of Administrator Knowledge on Eyewitness Identification*, 33 LAW & HUM. BEHAV. 70, 71 (2009); Ryann M. Haw & Ronald P. Fisher, *Effects of Administrator–Witness Contact on Eyewitness Identification Accuracy*, 89 J. APPLIED PSYCHOL. 1106, 1107 (2004).

Further, Agent Healy testified that he prepared the photo array from driver's license photos and mug shots. (Tr. 4468). Ipema testified that the photobook used by investigators contained Sparkman's arrest photo. (Tr. 4208). Thus, Healy's choice of photographs risked sending a signal to Avila. *See Gregory–Bey*, 332 F.3d at 1045 ("The danger to be avoided in identification procedures is that of *orchestrating* the procedure so that one particular suspect stands out from the others and the procedure implicitly suggests to the witness that 'this is the man.'") (emphasis in original); *see e.g. Simmons*, 390 U.S. at 383 (stating that the "chance of misidentification is also heightened if the

22

police indicate to the witness that they have other evidence that one of the persons pictured committed the crime").

While Healy testified that he told Avila his attacker may or may not be in the array, this is of little import.  It makes little sense for federal agents to come to your home two years after the event and show you photographs of non-suspects.  *See Ford*, 683 F.3d 761, 765 (7th Cir. 2012) ("A witness is likely to think that the array *must* include a suspect as otherwise there would be no point in showing it to the witness") (emphasis in original).

Any conscious or unconscious signaling by Agent Healy is especially troubling because of the length of time between the kidnapping and the photo array.  Here, it was over two years after the kidnapping when federal agents arrive and show Avila six photographs of African-American suspects.  *See Ford*, 683 F.3d at 766 (noting "the need for judges to be especially wary about suggestive arrays … [where] … a long time had elapsed between the crime and the display of the array").

### c. Government failed to minimize suggestiveness

Law enforcement did nothing to minimize the suggestiveness of the photo array shown to Avila.  There were no independent or uninvolved government agents presenting the array to Avilla, no confirmatory lineup was performed, and there was no evidence that a sequential rather than a simultaneous array was used.  *See Ford*, 683 F.3d at 765 (noting that sequential display is less suggestive); *United States v. Brown*, 471 F.3d 802, 805 (7th Cir. 2006) ("sequential display is most reliable when repeated … and when

23

the officer conducting the process does not know which, if any, is a suspect" and citing to numerous scientific articles).

The government agents investigating Sparkman created the photo array. They included photos of men without facial hair even though Avila told the Summit police that his assailant did not have facial hair. While authorities conducting lineups are "not required to search for identical twins in age, height, weight, or facial features" they are required to make reasonable efforts under the circumstances to conduct a fair and balanced presentation. *See United States v. Traeger,* 289 F.3d 461, 474 (7th Cir. 2002). Here, the failure to find 6 photos with facial hair essentially created a three person photo array. Exhibit 376 was not presented until two years after the kidnapping and the government had more than enough time to present a fair and non-suggestive photo array.

Finally, although Avila testified that he will never forget the day of his kidnapping, the government did not ask him to identify his kidnapper at trial. (Tr. 3882). This failure is particularly telling because of witnesses being brought to the window of courtroom. (Tr. 2323). While the record is silent on whether Avila was brought to window to identify Sparkman before testifying, the government's failure to ask him to identify Sparkman at trial raises serious questions about the reliability of his identification especially as Avila also testified that he has not seen his kidnapper since the day of his kidnapping despite Sparkman being present in the courtroom. (Tr. 3878).

**2. Identification Was Unreliable Under Totality of Circumstances**

Next, admission of Avila's prior identification through Exhibit 376 was

unreliable under the five factor "totality of the circumstances" test set out in *Biggers*, 409

U.S. 199-200.  These factors are: "(1) the opportunity of the witness to view the event

and the actor; (2) the degree of the witness's attention; (3) the accuracy of the witness's

description; (4) the witness's level of certainty; and, finally, (5) the time elapsed between

the crime and the identification." *Id.*; *United States v. Moore*, 115 F.3d 1348, 1360 (7th Cir.

1997).

The following will address unreliability under the *Biggers*' factor:

**i) Avila's Opportunity to View Event**

Despite having an excellent opportunity to view his assailants, Avila did not

provide a specific or detailed description of them.  For instance, he described one

African American kidnapper as a large, black man with a medium complexion and

earlier told the police that intruder did not have facial hair.  This description, however,

provides no corroboration for his identification in the photo array or anything specific

to distinguish Sparkman from many other similar individuals.

**ii) Avila's attention was distracted by stressful conditions**

Avila testified that a group of men forced their way into his home in front of his

children and pregnant wife and that a gun was displayed.  This is a terrifying and

horrible situation but nonetheless weighs against Avila's attention being focused and

reliable.  *See United States v. Cord*, 654 F.2d 490, 493 (7th Cir. 1981) (noting that witnesses

are more reliable when they are not distracted by a fear of violence); *Young v. Conway*, 698 F.3d 69, 80-81 (2nd Cir. 2012) (noting that the scientific literature indicates that the presence of a gun … 'will draw central attention, thus decreasing the ability of the eyewitness to adequately encode and later recall peripheral details'") (quoting Nancy Mehrkens Steblay, A Meta–Analytic Review of the Weapon Focus Effect, 16 Law & Hum. Behav. 413, 414 (1992)).

### iii) Avila's description of event was inaccurate

Avila's conflicting description of the kidnapping weighs heavily against reliability. For instance, Avila testified that 5 people came into his house. (Tr. 3878). On the day of the attack, however, he told the police that three men entered his house. (Tr. 2853, 2862). The government even acknowledged this major contradiction in its closing by arguing that under the stress of the situation, Avila must have perceived more people were actually there. (Tr. 5393). *See Cossel v. Miller*, 229 F.3d 649, 656 (7th Cir. 2000) (stating that eyewitness' misidentification undermined first two *Biggers* factors).

### iv) Avila's level of certainty is unknown

Next, Avila's certainty about his identification is unknown because he failed to identify Sparkman or, in fact, any of his kidnappers prior to or at trial. Although Avila testified about his identification of Sparkman's photo in Exhibit 376, this identification happened 24 months before trial and was not repeated at trial as the government did

not ask their witness to identify Sparkman at trial or even identify Sparkman as being

the man in Exhibit 376.

Even though the government spoke to Avila prior to trial and Sparkman was the

only African-American defendant at the table, the government could not risk a failed

identification attempt despite Avila stating that he would never forgot that day.  (Tr.

3882).

The government's decision to not ask Avila to identify his assailants at trial is

notable because identification at trial is often a foregone conclusion.  *See Rogers*, 387 F.3d

at 939 (stating that identifications of defendants at trial are of "little weight" and the

courts will view such certainty skeptically where it "is a product of suggestive earlier

identification"); *see also Cossel*, 387 F.3d at 655, n.4 (noting that a near certain

identification is of little relevance "where the level of certainty a witness demonstrates

is just as likely to be a product of a prior unduly suggestive crime").

### v)  Avila's identification occurred over two years after kidnapping

Finally, and most importantly, 26 months passed between Avila's kidnapping

and his identification of Sparkman's photograph.  *See Biggers*, 409 U.S. at 201 (finding a

seven-month lapse "a seriously negative factor in most cases").

Here, the delay between the kidnapping and the identification is over three times

the length of time the Supreme Court in *Biggers* found to be "problematic."  *See*

*McFowler v. Jaimet*, 349 F.3d 436, 450 (7th Cir. 2003) ("the passage of twenty-nine months

. . . detracts significantly from the weight to be given that identification); *Cossel*, 229 F.3d

27

at 656 (reversing denial of habeas and rejecting an identification as unreliable, in part, because three years elapsed between the crime and the lineup); *Rogers*, 387 F.3d at 939 (considering 11 month delay in finding identification unreliable).

## C.  Not Harmless Error

The improper admission of Exhibit 376 was not harmless.  Avila was the sole, non-cooperating witness against Sparkman.  His identification was the foundation of the government's kidnapping charge in Count Seven, its 924(c) charge in Count Eight, and the harsh mandatory minimum sentence Sparkman received as a result of these convictions.  When there is evidence whose admission is "so extremely unfair that its admission violates fundamental conceptions of justice, due process, like the sleeping giant, awakens" to exclude the evidence.  *United States v. Sanders,* 708 F.3d 976, 983 (7th Cir. 2013) (internal citations and quotations omitted).

The only other witness to identify Sparkman as a kidnapper was the government witness, Andres Flores.  (Tr. 2423).  Flores, however, was a seriously compromised witness and had a strong incentive to testify in a manner to obtain a deal.  Before cooperating, Flores was facing a life sentence and after agreeing to cooperate, his potential sentence was only 14 years.  Thus, in return for implicating Sparkman, Flores was able to avoid a sentence for much more serious crimes.

Flores also provided conflicting accounts of the incident, including that Avila spoke to Sparkman, that Avila's wife saw them, and that Sparkman threw his gun. There was also a major contradiction on who was carrying a gun on the third attempt as

Avila testified that the person in Exhibit 376 carried a gun while Flores testified he and

Jorge Uriarte carried the firearm. Avila also testified that his wife did not see what was

happening on the second attempt but Flores testified the wife was pounding on the

window. Avila also testified that one man brought him up from downstairs while

Flores testified that Sparkman and Uriarte brought him up.

The jury was clearly persuaded by Avila's prior identification. The jury

discounted Flores' testimony earlier as shown by their acquittal of Sparkman in Count

Four, the theft of cocaine from Joliet, in which Flores was the main witness to testify

against Sparkman.

Besides the incredible testimony of Flores, there was not a single corroborating

piece of evidence to support Avila's identification from two years after the event. While

Saul Rodriguez did testify that he picked up Sparkman after he was in the band

managers house, Rodriguez was not present at the kidnapping and not an eyewitness to

it. Further, Rodriguez's credibility is severely lacking.

Avila did not identify anyone at trial and while the kidnapping occurred in front

of Avila's wife and children, these people did not testify at trial or identify Sparkman as

one of the kidnappers. Additionally, there was no physical evidence, fingerprints,

DNA, or confession linking Sparkman to the kidnapping even though investigators

were at the scene the same day. This total lack of corroboration underscores the

dangers of eyewitness testimony and the need for heightened precautions. *See Watkins*

*v. Sowders*, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting) ("[D]espite its inherent

unreliability, much eyewitness identification evidence has a powerful impact on

juries"). Without Avila's prior out of court identification, Sparkman's conviction on

Count 7 and 8 must be reversed.


## II. IT WAS REVERSIBLE ERROR FOR AGENT HEALY TO TESTIFY ABOUT AVILA'S IDENTIFICATION WHERE AVILA DID NOT FORGET OR CHANGE HIS EARLIER IDENTIFCATION

### A. Standard of Review

Sparkman and a co-defendant objected to Agent Healy's testimony about the

circumstances of Avila's prior, out of court identification of Sparkman as hearsay and

improper bolstering.

A district court's evidentiary rulings are reviewed for an abuse of discretion. *See*

*United States v. Foster*, 652 F.3d 776, 783 (7th Cir. 2011).

### B. Argument

The trial court abused its discretion in allowing Agent Healy to testify about the

circumstances of Avila's prior identification because Avila did not testify that he forgot

or changed his prior identification. Thus, Agent Healy's testimony was: 1) hearsay and

2) improper bolstering.

#### 1. Healy's testimony was hearsay

Federal Rule of Evidence 801(d)(1)(c) creates an exception to the hearsay rules for

a declarant-witnesses' statement of prior identification. A statement of prior

identification includes "a person's oral assertion, written assertion, or nonverbal conduct." *Id.*

Under this exception, however, government agents may only testify to a witness' prior statement of identification when the witness "*forgets, or changes, his testimony at trial.*" *Foster*, 652 F.3d at 789 (emphasis added) (quoting *United States v. Brink,* 39 F.3d 419, 426 (3d Cir.1994)); *see also United States v. O'Malley,* 796 F.2d 891, 898-99 (7th Cir. 1986) (allowing FBI agent to testify regarding witness's prior identification of defendant after witness *recanted* at trial) (emphasis added).

Here, Avila did not forget, recant, or change his identification at trial and, therefore, Healy's testimony is not within the Rule 801(d)(1)(c) exception.  The trial court was unclear on the limitations on the rule, noting that the rule did not appear to be "written in English."  (Tr. 4464-65).  While the court did not allow Healy to testify that Avila identified Sparkman's photograph out of concern for the Confrontation Clause, Healy was permitted to testify that he asked Avila to initial his assailant's photograph.  The defense, however, never argued or suggested that Avila did not initial a photograph.

While Healy never expressly stated that Avila initialed Exhibit 376, Healy did testify that 376, an exhibit with Avila's initials on it, was the photo array he showed to Avila.  This is the same as Healy testifying that Avila identified Sparkman's photograph and, therefore, his testimony does not fall under Rule 801's exception.

31

**2.  Healy's testimony improperly bolstered Avila's prior identification**

Next, Agent Healy's testimony about Avila's prior identification was also

improper bolstering as it had little probative value and was highly prejudicial.  *See* Fed.

R. Evid. 403; *United States v. Kaquatosh*, 242 F. Supp. 2d 562, 564 (E.D. Wis. 2003) ("If the

witness-declarant has not recanted or claimed memory loss, identification testimony

from third parties could be cumulative, *improperly bolster* the declarant, confuse the jury,

and waste court time") (emphasis added) (citing to Fed. R. Evid. 403).

Agent Healy's testimony was in essence a prior consistent statement about

Avila's identification.  He testified that he went to Avila's home, showed him a photo

array, and told him to initial a photograph of his assailant.  This was not necessary to

rebut Avila's denial or recantation of a prior identification or any argument that Avila

did not initial a photograph.  Instead, Healy's testimony simply bolstered Avila's

unreliable identification that did not occur for two years after kidnapping and was not

duplicated at trial.  It was an end run around the rules of evidence to shore up an

inherently unreliable identification.

**C.  Not Harmless Error**

The improper introduction of Healy's testimony was not harmless.  Healy's

testimony overrode the suggestiveness and unreliability surrounding Avila's prior

identification.  As stated in *Kaquatosh*, the need for limiting 801's hearsay exception to

non-suggestive identifications, is necessary to "prevent Rule 801(d)(1)(C) from

becoming an end run around the constitutional standards governing pre-trial

identifications."  242 F. Supp. 2d at 564 (citing to *United States v. Wade,* 388 U.S. 218, 224 (1967); *Manson,* 432 U.S. at 114)).  Avila's identification was questionable and the procedure used was suggestive.  Healy's testimony allowed the government to overcome these shortcomings with improper bolstering.  *See e.g. United States v. Cunningham*, 462 F.3d 708, 710 (7th Cir. 2006) (reversing conviction because basis for wiretaps improperly bolstered government's evidence).

The introduction of Healy's testimony also impacted Sparkman's right to adequately confront Avila.  As the district court recognized in *Kaquatosh*, "[b]ecause the introduction in a criminal trial of evidence that would otherwise be inadmissible hearsay implicates the defendant's right to confront his accusers, and because such evidence is often of questionable reliability, testimony may be admitted under Rule 801(d)(1)(C) only under certain circumstances."  242 F. Supp. 2d at 563-64.

Healy's testimony occurred after Avila had already testified and Healy, as the case agent, sat at the prosecution table.  This impacted Sparkman's right to confront Avila and allowed the government to place Avila on the stand, not ask him to identify his assailants at trial, and then have law enforcement bolster an unreliable prior identification.

The trial court recognized the Sixth Amendment concerns but nonetheless allowed the government to bolster an unreliable, suggestive identification from two years before trial.  Although Sparkman did have the opportunity to cross examine Avila, this occurred prior to Healy's improper testimony.  Even if Sparkman recalled

33

Avila, the damage was already done and chance for meaningful cross examination was

gone


## III.  THE JURY, NOT THE TRIAL COURT, WAS REQUIRED TO FIND THAT SPARKMAN "BRANDISHED" A FIREARM DURING AVILA KIDNAPPING TO JUSTIFY AN INCREASE IN HIS MANDATORY SENTENCE FROM FIVE TO SEVEN YEARS.

### A. Standard of Review

Constitutional questions are reviewed *de novo*.  *See United States v. Seymour*, 519

F.3d 700, 709 (7th Cir. 2008); *United States v. Segal*, 495 F.3d 826, 840 (7th Cir. 2007).

The Sixth Amendment, in conjunction with the Due Process Clause, requires that

each element of a crime be proved to the jury beyond a reasonable doubt.  *See Alleyne v.*

*United States*, 133 S. Ct. 2151, 2155 (2013).

As *Alleyne* was not decided until after Sparkman's sentencing in 2012, Sparkman

did not specifically cite to *Alleyne* in his sentencing memorandum or at his sentencing

hearing.  At his sentencing hearing, however, Sparkman's counsel did argue that "I

believe my objection was that, as the Court heard the testimony, there was no evidence

that Mr. Sparkman brandished [a gun]."  (Sent. Tr. 4).

Thus, it is submitted that Sparkman preserved the *Alleyne* objection and this

issue should be reviewed *de novo*.  *See United States v. Kirklin*, 727 F.3d 711, 718 (7th Cir.

2013) (reviewing an unpreserved 924(c) *Alleyne* challenge for plain error).

34

**B. Argument**

It was error for the district court to sentence Sparkman to a mandatory seven years incarceration for "brandishing" a firearm under 18 U.S.C. § 924(c) in Count 8 when the jury did not make that determination. *See Alleyne*, 133 S. Ct. at 2162-63 (holding that the jury and not the court must make a finding that a defendant brandished a firearm during and in relation to a crime of violence under § 924(c)).

Under 18 U.S.C. § 924(c)(1)(A), anyone who "uses or carries a firearm" in relation to a crime of violence shall: (i) be sentenced to a term of imprisonment of not less than 5 years; [or] (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years.

Here, the jury was not instructed and did not make any finding that Sparkman brandished a firearm. (Tr. 11613). Further, the indictment itself charged that Sparkman "did use and carry a firearm" with no mention of brandishing. (R. 271). Thus, it was error for the court to impose a sentence of 7 years.

**C. Reversible Error**

The failure to submit the brandishing element of Count 8 to the jury was a structural error under *Alleyne* and requires resentencing.

Even if this error were reviewed under a different standard, resentencing is still required. If given the opportunity, the jury may not have found Sparkman brandished a firearm. The trial testimony was confused as to who possessed or even carried a

firearm and Sparkman was not charged with aiding or abetting in the brandishing a firearm.

Thus, *Alleyne* requires this case be remanded to the district court for re-sentencing on count 8 of the indictment because the court, and not the jury, made the finding that Sparkman brandished a firearm.

**IV.  THE TRIAL COURT ERRED IN SENTENCING SPARKMAN TO A MANDATORY CONSECUTIVE SENTENCE OF 25 YEARS UNDER 18 U.S.C. § 924(c) FOR COUNT 11 WHERE: 1) THERE WAS NO INTERVAL OF PUNISHMENT BETWEEN THE 924(C) OFFENSES IN COUNT 8 AND 11 AND 2) THE JUDGE AND NOT THE JURY FOUND COUNT 11 WAS A SUBSEQUENT CONVICTION TO COUNT 8**

**A.  Standards of Review**

The following two standards of review apply:

**1.  Interval of Punishment Between Counts 8 and 11**

Sparkman objected in his sentencing memorandum and orally at his sentencing hearing that he is a first time offender and should not be subject to two consecutive sentences as a repeat offender for his convictions in Count 8 and Count 11.  (R. 935, Sent. Tr. 23).  Thus, the district court's statutory application of 18 U.S.C. § 924(c) is reviewed de novo.  *See United States v. Cureton*, 739 F.3d 1032, 1040 (7th Cir. 2014) (reviewing 924(c) statutory interpretation *de novo*).

### 2. The Judge and Not the Jury Found Count 11 Was a Subsequent Conviction to Count 8

Sparkman did not raise an *Alleyne* objection to the trial court about the court and not the jury determining his Count 11 conviction was a second or subsequent conviction to his Count 8 conviction under 924(c) as *Alleyne* had not yet been decided. Thus, it is reviewed for plain error. *See Kirklin*, 727 F.3d. at 718.

### B. Argument

Under 18 U.S.C. § 924(c)(1)(C)(i), any second or subsequent 924(c) conviction requires a term of imprisonment of not less than 25 years. Here, the trial court erred in sentencing Sparkman to 25 years incarceration for Count 11 because: 1) there was no interval between his Count 8 and Count 11 convictions under 924(c), and 2) the jury and not the trial court was required to find that the Count 11 conviction was a subsequent conviction to the Count 8 conviction.

### 1. The Count 11 conviction was not a second or subsequent 924(c) conviction

Sparkman should not be subject to a mandatory 25 year sentence for his Count 11 conviction because there was no interval of punishment between that conviction and his 924(c) conviction in Count 8. Appellant acknowledges that *Deal v. United States*, 508 U.S. 129, 113 S.Ct. 1993 (1993), suggests otherwise, but argues that its reasoning should be rejected and to preserve this issue for further review.

Here, the trial court stated that "essentially applying a recidivist enhancement of a 25-year mandatory minimum when somebody is being convicted for the very first time of two gun charges. I think that kind of sentencing makes no sense" and "I can

37

certainly say that if I were writing on a clean slate, if I were not compelled to apply it, I would not." (Sent. Tr. 26).

The trial court was correct that sentencing a first time offender to a mandatory 25 year sentence for two crimes alleged in the same indictment and both alleged to be predicate RICO acts "makes no sense." There was no time between the two convictions for Sparkman to rehabilitate or be deterred from future conduct. This is an arbitrary and unnecessarily harsh sentence, strips away important discretion from the sentencing court, and is inconsistent with *United States v. Booker*, 543 U.S. 220 (2005).

Thus, 18 U.S.C. 924(c)(1)(C)(i), should be interpreted as a recidivist statute, requiring a truly prior conviction. Sparkman, a first time offender, should not be subject to two consecutive sentences as a repeat offender. Under the rule of lenity, the 8th Amendment's prohibition against cruel and unusual punishment, and *Booker* and its progeny, there was no subsequent conviction under 18 U.S.C. § 924(c)(1)(C)(i).

## 2. The jury was required to find that Count 11 was a second or subsequent conviction

Under the principles articulated in *Alleyne*, the jury and not the trial court was required to find that Sparkman's conviction in Count 11 qualified as a "second or subsequent" conviction to his conviction in Count 8 in order for the court to impose a consecutive 25-year sentences under 924(c). Here, that did not happen.

Appellant acknowledges that the Supreme Court's decision in *United States v. Almendarez–Torres v. United States*, holding that that a defendant's recidivism is not an element of the offense which must be found by a jury beyond a reasonable doubt, is still

in effect. 523 U.S. 224, 243-46 (1998). Nonetheless, appellant raises this issue to preserve it, respectfully suggests that *Almendarez-Torres* is inconsistent with *Alleyne* and should not be followed, and that this error was plain. *See Sheppard v. United States*, 544 U.S. 13, 27, 125 S.Ct. 1254, 1264, (2005) (Thomas, J., concurring in part and concurring in the judgment) ("a majority of the Court now recognizes that *Almendarez-Torres* was wrongly decided"); *United States v. Elliot*, 703 F3d 378, fn. 2 (7th Cir. 2012) (noting that the future of *Almendarez-Torres* may not be secure); *see also United States v. Mack*, 729 F.3d 594, 609 (6th Cir. 2013) (noting that "*Almendarez–Torres* may stand on shifting sands"").

## C.  Reversible Error

The trial court's holding that the two 924(C) convictions were successive was not harmless error. The failure to submit the consecutive conviction issue to the jury was error under *Alleyne*, 133 S. Ct. at 2151 (holding that any fact that increases the mandatory minimum sentence for a crime is an "element" of the crime, not a "sentencing factor," and must be submitted to the jury).

For Count 8, the Avila kidnapping, the evidence was confused as to who possessed a firearm, when the firearm was possessed, and the extent of Sparkman's involvement. As for Count 11, the Carranza kidnapping, there was no specific evidence of when this incident occurred. While Carranza testified he moved into the house in March 2008, he did not provide any specific date or evidence to show that this event occurred after the event alleged in Count 8, which occurred in October 2007. Thus, a

39

jury could have found that the firearm possession in Counts 11 was not subsequent to Count 8 or that they were both part of one continuous pattern of activity.   *See e.g.* *Cureton*, 739 F.3d at 1042 (vacating sentence where "two predicate crimes that occurred simultaneously and without any distinction in conduct along with a single use of a firearm").

<u>**CONCLUSION**</u>

WHEREFORE, for all of the above reasons, Tony Sparkman moves this Court to reverse and remand this case to the district court for dismissal with prejudice.

Dated this 11th day of February, 2015.

<u>/s/ Andrew S. Gable</u>
Andrew S. Gable
Attorney for Defendant-Appellant,
Tony Sparkman
330 S. Wells, Suite 400F
Chicago, IL
60606

**CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(a)(7)**

The undersigned, counsel of record for the Defendant-Appellant Tony

Sparkman, furnishes the following in compliance with F.R.A.P. Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P. Rule 32

(a)(7) for a brief produced with a proportionally spaced font. The length of this brief is

9439 words.

Dated this 11th day of February, 2015.




/s/ Andrew S. Gable
Andrew S. Gable
Attorney for Defendant-Appellant,
Tony Sparkman

## CIRCUIT RULE 31(e)(1) CERTIFICATION

The undersigned counsel of record for Defendant-Appellant Tony Sparkman,

furnishes the following in compliance with Fed. R. App.P. Rule 31(e)(1): Counsel hereby

certifies that she has filed a digital copy of the Brief in non-scanned .pdf format.

Counsel further certifies that she has filed a digital copy of the required appendix.

Dated this 11th day of February, 2015.


/s/ Andrew S. Gable
Andrew S. Gable
Attorney for Defendant-Appellant,
Tony Sparkman

**PROOF OF SERVICE**

The undersigned, counsel for the Defendant-Appellant, Tony Sparkman, hereby

certifies that on February 11, 2015, he filed the foregoing brief with the Clerk of the

Court for the United States Court of Appeals for the Seventh Circuit by using the

CM/ECF system.  Counsel further certifies that service has been made upon Plaintiff-

Appellees, all being registered CM/ECF users, by means of the Court's CM/ECG

system.


/s/ Andrew S. Gable
Andrew S. Gable
Attorney for Defendant-Appellant,
Tony Sparkman

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by

Circuit Rule 30(a) and (b) are included in the appendix.

Dated this 11th day of February, 2015.


/s/ Andrew S. Gable
Andrew S. Gable
Attorney for Defendant-Appellant,
Tony Sparkman

**ATTACHED REQUIRED SHORT APPENDIX**

Judgment in Criminal Case………………………………………..…. RA 1-8

Exhibit 376 …………………………………………………………….. RA 9-15

Transcript of Proceedings (Avila testimony) …...……………………. RA 15-22

Transcript of Proceedings (Healy testimony) ..……………………..... RA 23-32

AO 245B   (Rev. 09/11) Judgment in a Criminal Case   Document: 9-5   Filed: 12/21/2012   Page: 54
Sheet 1

# UNITED STATES DISTRICT COURT

Northern District of Illinois

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| Tony Sparkman | ) Case Number:  09 CR 332-7 |
| | ) USM Number: 22754-424 |
| | ) Eugene Steingold |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1, 7, 8, 10, 11, 12 and 13 of Third Superseding Indictment.
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §1962(d) | Racketeering Conspiracy | | 1sss |
| 19 U.S.C. 1959(a)(1) | Kidnapping in Aid of Racketeering | | 7sss |
| and 2 | | | |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are  dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

11/15/2012
Date of Imposition of Judgment

Signature of Judge

Joan B. Gottschall        District Judge
Name and Title of Judge

_ww 20 2012_    NOV 2 0 2012
Date

12 NOV 22  PM 1: 59
CLERK
U.S. DISTRICT

AO 245B   (Rev. 09/11) Judgment in a Criminal Case
Sheet 1A

Judgment—Page   2   of   7

DEFENDANT: Tony Sparkman
CASE NUMBER:  09 CR 332-7

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §924(c)(1)(A) (ii) and 2 | Use and Carrying of a Firearm During and in Relation | 4/9/2009 | 8sss |
| 19 U.S.C. 1959(a)(1) and 2 | Kidnapping in Aid of Racketeering | 4/9/2009 | 10sss |
| 18 U.S.C. §924(c)(1)(C) (i) | Use and Carrying of a Firearm During and in Relation to a Crime of Violence | 4/9/2009 | 11sss |
| 18 U.S.C. §21 U.S.C. §846 | Attempted Possession with the Intent to Distribute | 4/9/2009 | 12sss |
| 21 U.S.C. §846 | Conspiracy to Possess with the Intent to Distribute 5 Kilograms or More of Cocaine | 4/9/2009 | 13sss |

RA2

AO 245B  (Rev. 09/11) Judgment in a Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __3__ of __7__

DEFENDANT:  Tony Sparkman
CASE NUMBER:  09 CR 332-7

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

504 months total, 120 months as to Counts 1, 7, 10, 12, 13, 84 months as to Count 8 and 300 months as to Count 11.  It is further ordered that the costs of imprisonment are waived.

☑  The court makes the following recommendations to the Bureau of Prisons:

that defendant be designated to Terre Haute, Indiana.

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at                   ☐  a.m.   ☐  p.m.   on                          .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on                     .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on                               to                           

a                             , with a certified copy of this judgment.

                                                    UNITED STATES MARSHAL

                          By                                        
                                                      DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/11) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page **4** of **7**

DEFENDANT: Tony Sparkman
CASE NUMBER: 09 CR 332-7

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

5 years on each Counts 1,7,8,10,11,12 and 13 to be served, concurrently. It is hereby ordered that the costs of supervised release are waived.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☑ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check, if applicable.)*

☑ The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐ The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐ The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

RA4

AO 245B  (Rev. 09/11) Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page   5   of   7

DEFENDANT: Tony Sparkman
CASE NUMBER: 09 CR 332-7

## ADDITIONAL SUPERVISED RELEASE TERMS

Drug tests not to exceed 104 tests per year.

Defendant shall participate in a job skills training program at the direction of the probation officer.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
            Sheet 5 — Criminal Monetary Penalties

Case: 1:09-cr-00332   Document 1132   Filed 11/15/12   Page 6 of 8   PageID 5416
       Case: 13-2321   Document: 48   Filed: 02/11/2015   Pages: 85
            Document: 9-5   Filed: 12/21/2012   Pages: 41

Judgment — Page    6    of    7

DEFENDANT: Tony Sparkman
CASE NUMBER: 09 CR 332-7

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 700.00 | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

    ☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

RA6

AO 245B    (Rev. 09 H) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Case 1:09-cr-00332 Document 1132 Filed 11/15/12 Page 7 of 8 PageID 5417
Case: 13-2321 Document: 48 Filed: 02/11/2015 Pages: 85
Case: 13-2321 Document: 9-5 Filed: 12/21/2012 Pages: 41

Judgment — Page ___7___ of ___7___

DEFENDANT: Tony Sparkman
CASE NUMBER: 09 CR 332-7

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☑ Lump sum payment of $ ___700.00___ due immediately, balance due

     ☐ not later than _____ , or
     ☐ in accordance   ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B ☐ Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

RA7

This page intentionally left blank.



GOVERNMENT
EXHIBIT

376

DEA6_030_0005

RA9



DEA6_030_0006



DEA6_030_0007

RA11





DEA6_030_0009

RA13



1   coming home with some pictures to show me about -- from

2   several people about the persons that had been involved in

3   the problem in my house.

4   Q.   So what did they tell you to do with the photographs?

5   A.   Nothing.  They showed me some pictures, and they asked

6   me if I could identify anybody of those people that had come

7   in and robbed my house.

8   Q.   I want to talk to you about the photographs that the

9   agents showed you of the African-Americans, or the

10  African-American photographs that they showed you.

11          MR. STEINGOLD:  Your Honor, I object and ask for a

12  sidebar.

13      (Discussion at sidebar on the record:)

14          MR. STEINGOLD:  The witness testified they showed

15  him a bunch of pictures of many races, all kinds of people.

16  So for the Government now to selectively say Tony Sparkman --

17          THE COURT:  I thought he testified that the people

18  that he saw were black.

19          MS. REYNOLDS:  Here's the issue, your Honor.  When

20  the agents went and talked to him in December of 2009 they

21  showed him an array of photographs, including a six-pack of

22  photographs of African-American men.

23          THE COURT:  Okay.

24          MS. REYNOLDS:  And he was told if you recognize

25  anyone, pick somebody out.  He picked the photograph of Tony

1   Sparkman.  That identification comes in as substantive

2   evidence, and one of the reasons it does is because

3   Mr. Steingold in his opening suggested that someone

4   identified his client merely because of the fact that he's

5   black, he's the only non-Hispanic person who's involved, and

6   now we are getting into why it is that this witness knows

7   that Tony Sparkman was the person who was at his home.

8            MR. STEINGOLD:  I think, your Honor what happens is

9   that they have a photo book of 120 some pictures, and they

10  were shown to everybody who was involved in the case, and

11  there were some African-American.  So he's testifying he got

12  a set of many, many pictures, 120.  So now the Government is

13  testifying that they picked four photos out of this and

14  that's what they showed him.

15           If he was shown separately photos just of

16  African-Americans, then they asked him that, and he said, no,

17  they showed me many photos.

18           THE COURT:  What was the last question?

19      (Record read.)

20           MR. STEINGOLD:  The point is that they have not

21  established that they showed him separately some kind of an

22  array of African-Americans.  All he said is he saw a bunch of

23  photos, over 120.

24           THE COURT:  You're objecting there were just

25  African-Americans, or what?

1　　　　　　　MR. STEINGOLD:  It's leading and suggestive,

2　　because counsel is saying they separately showed him several

3　　photos that only had African-Americans or blacks in it.

4　　　　　　　THE COURT:  Right.

5　　　　　　　MR. STEINGOLD:  He never testified to that.  He

6　　said they showed him a bunch of photos.  So they asked him --

7　　if they showed him a separate array --

8　　　　　　　THE COURT:  You just want a question about --

9　　　　　　　MR. STEINGOLD:  Whether he, in fact, was shown a

10　　separate array of just, for example, African-American

11　　photographs.

12　　　　　　　MS. REYNOLDS:  And the task force officer who

13　　showed him the photographs kept them together.  He said that

14　　he was shown a lot of photographs, and the way it was kept

15　　together --

16　　　　　　　THE COURT:  Has he testified that he was shown an

17　　array of only African-American photographs?

18　　　　　　　MS. REYNOLDS:  No.

19　　　　　　　MR. STEINGOLD:  No.

20　　　　　　　THE COURT:  Then that's the question.

21　　　　　　　MS. REYNOLDS:  And I will ask him that question and

22　　move on from there.

23　　　　　　　THE COURT:  Well, I guess there is going to be a

24　　leading and suggestive objection to that.  Can he testify as

25　　to what he was shown?

1          MS. REYNOLDS:  I can show him and ask him are those

2     the photographs that you were shown of African-American

3     individuals.

4          MR. STEINGOLD:  Before they even do it they need to

5     establish that he was shown a separate array of

6     African-American photos.

7          THE COURT:  Can you do that?

8          MS. REYNOLDS:  He can say that he was shown a large

9     number of photographs --

10          MR. STEINGOLD:  He did that already.

11          MS. REYNOLDS:  And these were the photographs of

12     the African-Americans that he was shown.

13          THE COURT:  You're telling me that he was shown

14     separate arrays?

15          MS. REYNOLDS:  He was shown a separate array just

16     for African-Americans.

17          THE COURT:  And he can't say that without having it

18     suggested to him?

19          MS. REYNOLDS:  He already has said that he was

20     shown a wide array of photographs.

21          THE COURT:  Right, but not that he was shown -- the

22     objection is that he hasn't testified that he was shown an

23     array of African-American photographs, although that was

24     implicit your question -- it was explicit in your question.

25          MS. REYNOLDS:  Right.

1          MR. BLOCK:  To be clear, Judge, after being shown

2     the photographs, he initialed the photo of Tony Sparkman.

3     He's going to testify these are my initials on it.

4          THE COURT:  Right.  The only question is what you

5     have to do to get what he was shown.  Okay?  And you're

6     objecting -- the question is:  Does he know he was shown an

7     array of just African-Americans?

8          MS. REYNOLDS:  I don't know what he'll say sitting

9     here today because he's incredibly reluctant, but if we want

10    to leave it as he was shown the large photo book containing

11    over 100 photographs and he initialed that one out of 100,

12    that's fine.  We'll leave it at that.

13         MR. STEINGOLD:  This is their next question.

14    They're showing him right away the photo of Tony Sparkman.

15         MS. REYNOLDS:  That's the photograph he signed on

16    that day that he was shown that photograph.

17         MR. STEINGOLD:  I understand that.  If he was shown

18    an array, they should ask him if he was shown.  If he doesn't

19    remember that's fine, but at least --

20         MR. BLOCK:  We're going to show him the other

21    photos in the six-pack too, this photo, the next photo, the

22    next photo, the next photo, and then get back to the one he

23    initialed.  There is nothing objectionable about it.  This is

24    how you do it.  I don't understand what's going on here,

25    other than it's very bad adverse form.  I understand that.

1      THE COURT:  I'm a little confused.  We know he was

2   shown an array of only African-Americans.

3      MR. STEINGOLD:  We don't know that.

4      THE COURT:  Otherwise there would have been a

5   motion to suppress.

6      MR. STEINGOLD:  He was not asked that question.

7      THE COURT:  And you say he has to be asked that

8   question?

9      MR. STEINGOLD:  I think he should be.  He said he

10  saw 120 photos.

11      MS. REYNOLDS:  He wasn't shown 120 photographs.

12      THE COURT:  You know what?

13      MS. REYNOLDS:  He wasn't.

14      THE COURT:  I think the best way if there is going

15  to be an objection to suggesting that the array was just

16  African-Americans, I don't understand it, but maybe just ask

17  him if he -- what he was shown.  See what he says.

18      MR. BLOCK:  We showed him photos, and say were

19  these the photos you were shown.

20      THE COURT:  Can you recognize them.

21      MS. REYNOLDS:  Yes.

22      THE COURT:  All right.

23      (End of discussion at sidebar.)

24  BY MS. REYNOLDS:

25  Q.   Mr. Avila, I want to talk to you about the photographs

```
 1      that you were shown.  Do you recognize the photographs

 2      pictured in Government Exhibit 376?  There is one, two,

 3      three, four, five, six photographs.

 4              Do you recognize having been shown those six

 5      photographs by the agents in December of 2009?

 6      A.   I remember they showed me several, but I just remember

 7      one that's there.  That one I can remember.

 8      Q.   And why is it that you only remember one of the

 9      photographs that was shown to you?

10      A.   Because he's the one that put a gun to my head.

11      Q.   I want to now talk to you about the photograph that you

12      identified.

13              I'm showing you the first page of Government

14      Exhibit 376.  What is contained on the top of Government

15      Exhibit 376?

16      A.   Are you asking me or are you showing me?  What are you

17      trying to tell me?

18              THE COURT:  Why don't you ask the question again.

19      BY MS. REYNOLDS:

20      Q.   Is there handwriting located on the top of the exhibit?

21      A.   Okay.

22      Q.   Do you see it there?

23      A.   Yes.

24      Q.   Whose handwriting is it?

25      A.   Mine.
```

1    Q.    And do you remember when it was that you signed this

2    photograph on the first page of Government Exhibit 376?

3    A.    I don't recall the day, but I know that it happened at

4    the time they showed me the photographs.

5              MS. REYNOLDS:   Your Honor, at this time the

6    Government would move to admit Government Exhibit 376.

7              THE COURT:   Any objection?

8              MR. RATHE:   There will be an objection for the

9    record, your Honor.

10             THE COURT:   Okay.   376 is received and it may be

11   published.

12       (Government Exhibit No. 376 admitted into evidence

13        and published to the jury.)

14   BY MS. REYNOLDS:

15   Q.    Mr. Avila, who is the person pictured in Government

16   Exhibit 376 on the first page?

17   A.    Do you want me to tell you the whole story all over

18   again, or do you want me to tell you that that's the guy that

19   knocked me down, that came into my house, that knocked down

20   the door --

21             MR. RATHE:   Objection.

22             THE WITNESS:   Do you want me to tell you the whole

23   story?

24             THE COURT:   The objection is overruled.   Why don't

25   you ask a more specific question.

1    Q.    Why is it that you showed Mr. Avila a photo spread?

2    A.    I wanted to see if he could identify any of the

3    offenders in the home invasion or the prior incidents.

4    Q.    I want to talk to you about what's been admitted as

5    Government Exhibit 376.

6              MR. RATHE:  Judge, again, there is a hearsay

7    objection.  Hearsay could be comments or verbal.  It doesn't

8    have to -- hearsay can be non-verbal.  If Mr. Avila is about

9    to make some kind of identification, or point at something,

10   that still is hearsay.

11             THE COURT:  If you're going to bring out what

12   Mr. Avila said -- first of all, that's the most obvious.

13   That would be hearsay.  Is that what you're going to elicit?

14             MS. REYNOLDS:  No, your Honor.  It's not hearsay.

15   The identification of a photograph is not hearsay.

16             MR. RATHE:  I say it is.  I submit it is.

17             THE COURT:  Let me see you at the side.

18        (Discussion at sidebar on the record:)

19             THE COURT:  What did Mr. Avila say about this?

20             MS. REYNOLDS:  Mr. Avila had said that he was shown

21   a lineup and that he identified Mr. Sparkman's photograph.

22   There was extensive cross-examination questioning that

23   identification, No. 1.

24             No. 2, the photo spread has come in as substantive

25   evidence, and the identification itself, what we're getting

1  into is that he showed him a photo spread, and what Mr. Avila

2  did is marked the photograph of Mr. Sparkman.

3          THE COURT:  I know this is done, but I don't know

4  why it's done.  It seems to me the kind of thing that you

5  ought to have a Sixth Amendment right to cross-examine about.

6          MS. REYNOLDS:  They did cross-examine Mr. Avila

7  about it --

8          THE COURT:  Right.

9          MS. REYNOLDS:  -- and what they suggested is that

10  the photo lineup was suggestive, and what we need to do now

11  is explain what Mr. Healy said to Mr. Avila when he was

12  showing him those photographs.

13          MR. RATHE:  I don't think I asked questions of

14  Mr. Avila that suggested the photo lineup was suggestive.

15          MR. BLOCK:  Judge, the issue here is this is a

16  hearsay exception.  It's in the book.

17          THE COURT:  Show me the book, because I've never

18  had this with suggestive identification.

19          MR. STEINGOLD:  He testified initially, and now

20  they're trying to bolster his testimony.

21          THE COURT:  If it's an exception in the book, it's

22  an exception in the book.

23          MR. BLOCK:  Do you know which one it is?

24          MS. TRACY:  She does.

25          MS. GIACCHETTI:  Is the Judge asking me?  I will

1    answer if you ask me.

2            MR. BLOCK:  Is it non-hearsay?

3            MS. GIACCHETTI:  I'm sorry.

4            MS. TRACY:  801 (d)(1).

5            THE COURT:  Hold on.  (d)(1)?

6            MS. TRACY:  (d)(1), and look at the very last.

7            MS. GIACCHETTI:  You can't do that to me.

8            THE COURT:  Wait a minute, wait a minute.  "If

9    declarant testifies and is subject to cross-examination and

10   the statement is --" yes, it looks to me like it's in the

11   book.

12           MR. RATHE:  Wait, wait.  Time out.  What are we

13   looking at?  (d)?

14           THE COURT:  (c)(1).

15           MS. REYNOLDS:  (d)(1)C.

16           THE COURT:  It depends on the person having been on

17   the stand and subject to cross.

18           MR. RATHE:  "Declarant testifying at the trial or

19   hearing is subject to cross-examination --"  Yes, but this is

20   the declarant.  "The declarant testifies at --" but now we're

21   putting in -- we're not talking about --

22           THE COURT:  Hold on.  You're saying --

23           MR. RATHE:  "The declarant --"

24           THE COURT:  I got it.  Just stop for a minute.

25           This does not appear to me -- your argument is that

1    the declarant can give his own hearsay.  I don't think

2    anybody who has been taught the English language would write

3    the rule in these terms, if that's what it meant.

4           "The declarant testifies at the trial or hearing,"

5    that happened.  "Subject to cross-examination concerning the

6    statement," that happened.  "And the statement is one of

7    identification of a person made after receiving the person

8    --" holy mackerel.

9           MS. REYNOLDS:  Your Honor, all we're trying to get

10   in is that this identification is already in evidence.  We

11   want to elicit from the agent the circumstances under which

12   he provided that photo lineup to Mr. Avila.

13          THE COURT:  You don't have to have him repeat what

14   the identification was, if that's your purpose.  Just have

15   him describe what happened, and not ask him.  I mean, I don't

16   know what this means, because it's not English.

17          MS. TRACY:  But he witnessed the identification,

18   your Honor.  It's certainly relevant.

19          THE COURT:  Relevance is not -- it's not relevance.

20          MR. BLOCK:  It's not hearsay.  And this happens all

21   the time, that a law enforcement officer hands someone

22   a lineup, they circle something, and the officer testifies as

23   to what happens.

24          THE COURT:  Let me see if there is anything in the

25   rules to explain -- since this is not in English.

```
 1            No, there is nothing.  I don't think it means -- I
 2    think if it means what Mr. Rathe said it meant I think it
 3    would have been stated in a simpler way than this.  It would
 4    have said:  "The declarant testifies at a trial or hearing,
 5    is subject to cross-examination concerning the statement, and
 6    the statement is one of his identification."  But it says:
 7    "One of identification of a person made at the proceeding."
 8            I don't know what it means.  We can stop and do --
 9            MR. RATHE:  We don't have to stop, Judge, but it
10    just seems that the more conservative course of action --
11    they've gotten the testimony in.  This is just making it look
12    like --
13            THE COURT:  I know you don't want it in, but it
14    isn't helping me to analyze it.
15            MR. SPIELFOGEL:  The objection for a lot of years
16    was that they were bolstering --
17            THE COURT:  Right.
18            MR. SPIELFOGEL:  -- the testimony of the witness
19    who has already testified --
20            THE COURT:  Right.
21            MR. SPIELFOGEL:  -- and he's got his name written
22    on top of all these --
23            THE COURT:  Right.
24            MR. SPIELFOGEL:  -- and it's improper to bolster
25    the testimony of a witness.
```

```
 1            Now, I don't know what his cross was that you're
 2   saying would have opened it, but normally speaking, the
 3   objection is that they're bolstering it, and they're not
 4   allowed to do that.
 5            THE COURT:  What does this rule mean?
 6            MS. REYNOLDS:  The difference here is that we can
 7   actually -- the difference is that we're in a situation where
 8   I'm asking the witness to explain what he showed someone.  It
 9   is a physical action.  And this document is in evidence now.
10            I'm not asking him to reiterate a statement.  I'm
11   showing him a photograph that will --
12            MR. SPIELFOGEL:  But Avila has already testified to
13   that.
14            MS. REYNOLDS:  And he's been cross-examined.  But I
15   can show this witness if he recognizes it any document that
16   is in evidence, and this is the document that he showed
17   Mr. Avila.  I want to ask him what he showed Mr. Avila, what
18   instructions he gave him, and --
19            MR. SPIELFOGEL:  That's bolstering the
20   identification.
21            THE COURT:  You know, I don't know --
22            MS. REYNOLDS:  It goes to the circumstances of how
23   Mr. Avila made the identification, and what Mr. Rathe
24   suggested the entire hour and a half of his
25   cross-examination.
```

```
 1            MR. RATHE:  I didn't go for an hour and a half.
 2            THE COURT:  Could you stop for a minute?  Because
 3    I'm going to sustain this objection, unless I have a case
 4    that shows me this is admissible.  I think you're -- given
 5    this isn't in English, your interpretation is as good as any
 6    other interpretation.  And I just don't know what this means,
 7    but the danger of allowing this kind of testimony without --
 8    the confrontation clause problems are just huge.
 9            MS. REYNOLDS:  He already confronted the witness.
10            THE COURT:  But he didn't know what the witness --
11    you had your chance for that.  Now we're in a new witness.
12    There is no way to cross-examine this witness.
13            MS. REYNOLDS:  Yes, there is.
14            MS. TRACY:  There is.
15            MS. REYNOLDS:  He can cross-examine him about --
16            THE COURT:  Not about what the identification was.
17            MS. REYNOLDS:  Yes, he can.  He can say:  You
18    suggested to him what the photograph was.  You suggested to
19    him who it is that he should pick out.  When you put together
20    the photo spread, you put together photographs that didn't
21    look similar, that did look different.
22            At a minimum, your Honor, we should be able to ask
23    the task force officer:  What did you show to him and why did
24    you show it to him.
25            THE COURT:  That isn't a problem.  That's not where
```

1  the problem is.  The problem is when he says that Avila

2  pointed out Sparkman.  That's the problem.

3           MR. BLOCK:  It's not hearsay if the witness --

4           MS. TRACY:  It's not hearsay.

5           THE COURT:  That is not -- this is not English,

6  saying what you say.  It says:  "A statement is not hearsay

7  if the declarant testifies at trial or hearing and is subject

8  to cross-examination and that the statement is one of

9  identification of a person made after --"

10           MS. REYNOLDS:  Right.

11           THE COURT:  Does that mean anybody could get up and

12  testify to that?

13           MS. REYNOLDS:  No.  It means if this occurred,

14  which is the declarant testified, was subject to

15  cross-examination, and what has come into substantive

16  evidence is the witness's identification.

17           THE COURT:  What you're saying this means is that

18  once that happens, you can call anybody to testify to that

19  examination?

20           MS. REYNOLDS:  No.

21           MS. TRACY:  Someone with knowledge, someone who

22  witnessed it.

23           THE COURT:  Of course.  You're not going to call

24  somebody off the street who never heard of it.

25           MS. REYNOLDS:  The difference is this isn't just

1    someone saying --

2           THE COURT:  You know what?  I think -- I don't know

3    what to do.  I'm going to overrule the objection.  I wish

4    these rules were in English.

5           MS. GAMBINO:  Even if it's not hearsay, it's still

6    improper bolstering, because there is no contradiction.

7           THE COURT:  I don't remember what -- I remember

8    some kind of hullabaloo about this.

9           MR. STEINGOLD:  Judge, he testified that he

10   initialed the picture, and they keep showing this picture

11   right in front of him.  There is no dispute he initialed it

12   and picked the picture.

13          THE COURT:  What do you think happened?

14          MR. BLOCK:  First of all, during the opening

15   statements Mr. Steingold said that Pedro Avila was shown a

16   picture of a black person, a large black man, and he picked

17   him.  That's not what happened here.

18          THE COURT:  You can show the photo spread.

19          MR. STEINGOLD:  They already did.  The jury was

20   shown the photo.

21          THE COURT:  That's fine.  There is no hearsay

22   there.

23          MS. REYNOLDS:  Right.  And that's all I want to do,

24   is ask the agent:  What did you show him, why did you show it

25   to him, what instructions --

```
 1              THE COURT:  So you don't have to ask him what Avila
 2      did.
 3              MS. REYNOLDS:  -- what instructions did you give
 4      Mr. Avila.
 5              MR. RATHE:  Are you going to ask him did Avila
 6      identify Sparkman?
 7              THE COURT:  That's where we --
 8              MR. BLOCK:  We should be able to.
 9              THE COURT:  That's the problem, it seems to me.  I
10      don't know what this means.  If you don't need to -- if
11      you're just doing it because of the idea of a suggestive
12      identification, then it seems to me you don't have to bolster
13      or repeat the identification at this point.  You just have to
14      indicate what happened.
15              MS. REYNOLDS:  Okay.
16              MR. BLOCK:  Thank you.
17              THE COURT:  No one should thank me.  I don't know
18      what that language means.
19          (End of proceedings at sidebar.)
20      BY MS. REYNOLDS:
21      Q.   Task Force Officer Healy, I'm showing you what's been
22      admitted as Government Exhibit 376.  What is Government
23      Exhibit 376?
24      A.   It's one of the photo spreads that we showed Mr. Avila.
25      Q.   Why is it that you showed Mr. Avila the photo spread
```