IN THE

UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

No. 12 - 3747

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | On appeal from the United |
| | ) | States District Court for |
| Plaintiff-Appellee, | ) | the Northern District of |
| | ) | Illinois, Eastern Division |
| | ) | |
| v. | ) | No. 09 CR 332 |
| | ) | |
| JORGE URIARTE, | ) | Hon. Joan B. Gottschall |
| | ) | Presiding |
| Defendant-Appellant. | ) | |

**BRIEF OF APPELLANT AND REQUIRED SHORT APPENDIX**

John M. Beal
53 W. Jackson Blvd., Suite 1615
Chicago, IL 60604
(312) 408-2766

Attorney for Appellant

**ORAL ARGUMENT REQUESTED**

**CIRCUIT RULE 26.1 CERTIFICATE OF INTEREST**

The undersigned, counsel of record for defendant-appellant Jorge Uriarte, furnishes the following information in compliance with Circuit Rule 26.1:

1.     The name of the party represented by the undersigned is Jorge Uriate.

2.     Mr. Uriarte was represented in the district court by attorneys John M. Beal and Michael Falconer and is represented in this Court by attorney John M. Beal.

3.     Mr. Uriarte is not a corporation.


___S/ John M. Beal_____
John M. Beal

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

No. 12 - 3747

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | On appeal from the United |
| | ) | States District Court for |
| Plaintiff-Appellee, | ) | the Northern District of |
| v. | ) | Illinois, Eastern Division |
| | ) | No. 09 CR 332 |
| JORGE URIARTE, | ) | Hon. Joan B. Gottschall |
| Defendant-Appellant. | ) | Presiding |

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**JURISDICTIONAL STATEMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**ISSUES PRESENTED FOR REVIEW**. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATEMENT OF THE CASE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**SUMMARY OF ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**STANDARD OF REVIEW**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    I. The district court committed error when it stated that it did not know if
    it had the authority to consider the sentences of other defendants in
    sentencing defendant Jorge Uriarte and also when it did not address
    the sentences of co-defendants in sentencing Jorge Uriarte.. . . . 30

    II Firearms Mandatory Minimum Sentences Without Jury Findings of Fact
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**CERTIFICATES OF COUNSEL**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## TABLE OF AUTHORITIES

**CASES**                                                                                      **PAGE**

*Alleyne v. United States*, __ U.S. __, 133 S.Ct. 2151 (2013)................22,36,37

*Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586 (2007)..............................31

*United States v. Anzaldo-Contreras*, 548 Fed. Appx. 360 (9th Cir. 2013)........32

*United States v. Bartlett*, 567 F.3d 901 (7th Cir. 2009)....................................32

*United States v. Durham*, 766 F.3d 672 (7th Cir. 2014)..............................29,30

*United States v. Prado*, 743 F.3d 248 (7th Cir. 2014)..................................31,32

*United States v. Rushton*, 738 F.3d 854 (7th Cir. 2013)..................................33

*United States v. Statham*, 581 F.3d 548 (7th Cir. 2009)..................................31

*Waring v. Delo,* 7 F.3d 753 (8th Cir. 1993)......................................................33

*United States v. Wiley*, 278 F.2d 500 (7th Cir. 1960)......................................34

*United States v.. Wilson*, 506 F.2d 1252 (7th Cir. 1974)..................................33

## STATUTES AND OTHER AUTHORITIES

18 U.S.C. §924(c)...................................................................3,4,10,23,27,35

18 U.S.C. §1959(a)..........................................................................3,4,8,10

18 U.S.C. §1962(d)..................................................................................3,4

18 U.S.C. §3231.................................................................................... 3,4

18 U.S.C. §3553(a)...........................................................................*passim*

18 U.S.C. §3553(a)(6)........................................................................*passim*

18 U.S.C. §3742(a)................................................................................ 3,4

21 U.S.C. §841(a)(1)............................................................................. 3,4

21 U.S.C. §846.....................................................................................3,4

28 U.S.C. §1291...................................................................................3,4

Fed. R. Crim. P. 11(c)(1)(C).................................................15,17,18,25,34

Federal Sentencing Guideline §1B1.8(a)....................................................16

Federal Sentencing Guideline §3B1.1..........................................................6

Federal Sentencing Guideline §1B1.2..........................................................6

Federal Sentencing Guideline §5K1.1........................................................18

Memorandum from the Attorney General to Department of Justice
    Attorneys entitled Guidance Regarding §851 Enhancements
    in Plea Negotiations, September 24, 2014...........................................35

## JURISDICTIONAL STATEMENT

This is a direct appeal from a criminal conviction in federal district court. The criminal prosecution was brought pursuant to 18 U.S.C. §§924(c)(1)(A)(ii), 1959(a), 1962(d), 2 and 21 U.S.C. §§841(a)(1) and 846. The jurisdiction of the district court was based upon 18 U.S.C. §3231. The Court of Appeals for the Seventh Circuit has jurisdiction pursuant to 28 U.S.C. §§1291 and 18 U.S.C. §3742(a).

Defendant Jorge Uriarte was charged in nine counts of a Third Superseding Indictment filed on January 13, 2011. He was tried before a jury which on January 31, 2012, returned a verdict of guilty on Counts 1, 7, 8, 10, 11, 12 and 13, and a verdict of not guilty on Counts 4 and 5. Defendant Uriarte was sentenced on November 27, 2012, and the judgement was entered on the docket of the district court on December 3, 2012. Notice of Appeal was timely filed on December 5, 2012.

## ISSUES PRESENTED FOR REVIEW

1. Whether the district court committed error when it: 1) stated that it did not know if it had the authority to consider the sentences of other defendants in deciding on the sentence of defendant Jorge Uriarte, and, 2) gave no indication in imposing sentence that it had considered the sentences of other defendants, either in conformity with 18 U.S.C §3553(a)(6) or notwithstanding 18 U.S.C. §3553(a)(6)?

2. Whether the district court violated defendant Uriarte's right to trial by jury when the court found that he had brandished a firearm and sentenced him

to a consecutive seven year term of imprisonment?

3.   Whether the district court violated defendant Uriarte's right to trial by jury when the court found that his conviction under Count Eleven for possessing a firearm was a second or subsequent conviction and sentenced him to a consecutive twenty-five year term of imprisonment?

4.   Whether

## STATEMENT OF THE CASE

This is a direct appeal from a criminal conviction in federal district court. The criminal prosecution was brought pursuant to 18 U.S.C. §§924(c)(1)(A)(ii) and 2, 1959(a), 1962(d), and 21 U.S.C. §§841(a)(1) and 846.  The jurisdiction of the district court was based upon 18 U.S.C. §3231.  The Court of Appeals for the Seventh Circuit has jurisdiction pursuant to 28 U.S.C. §§1291 and 18 U.S.C. §3742(a).

Defendant Jorge Uriarte was charged in nine counts of a Third Superseding Indictment filed on January 13, 2011. Rec. Doc. #271.  He was tried before a jury which on January 31, 2012, returned a verdict of guilty on Counts 1, 7, 8, 10, 11, 12 and 13, and a verdict of not guilty on Counts 4 and 5.  Rec. Doc. #800. Defendant Uriarte was sentenced on November 27, 2012, to 720 months imprisonment, and the judgement was entered on the docket of the district court on December 3, 2012.  Jorge Uriarte J&C, Appendix One.  Notice of Appeal was timely filed on December 5, 2012. Rec. Doc. #800.

This case involved a criminal enterprise organized and operated by Saul Rodriguez. Jorge Uriarte's Presentence Report ("PSR")(Rec. Doc. # 913) states at page 13 that Rodriguez "oversaw, directed, guided, and participated in such activities as murder, kidnapping, robbery, and the illegal trafficking of controlled substances. He also oversaw the manner in which the proceeds of the enterprise's illegal activities were divided among the enterprises members and associates."

The PSR calculates Jorge Uriarte's Sentencing Guideline range based upon his involvement in the kidnappings of Maria Saldivar (racketeering Act 2); Jimmy Lopez (Racketeering Act 4); Pedro Flores (Racketeering Act 5); Salvador Hernandez (Racketeering Act 6); Giovanni Chimera (Racketeering Act 7); men in a tractor trailer lot (Racketeering Act 9); Pedro Avila and family (Racketeering Act 12 and Count 7); Jose Carranza and a friend (Racketeering Act 13 and Count 10); two §924(c) gun counts related to the incidents in Counts 7 and 10 (Counts 8 and 11); and three drug counts charged in Racketeering Acts 10, 15 and 16, which were also charged in Counts 4, 12 and 13). Jorge Uriarte was acquitted of Counts 4 and 5, but Judge Gottschall held him accountable for the drugs in Count 4 under the lower standard that applies at sentencing (Sentencing Transcript, pp. 3-5). The foregoing is set forth in more detail in the PSR at pages 16-29.

In the role in offense section for each of the above acts and counts, the PSR includes the following description of Jorge Uriarte's role in the case:

The defendant was one of approximately 13 individuals who participated in the attempted kidnapping, kidnappings and narcotics offenses committed

by the Rodriguez Enterprise. The defendant was often recruited by his brother, Hector Uriarte. His participation in these crimes was multifaceted, in that he conducted surveillance, retrieved ransoms, restrained kidnapping victims, transported kidnapping victims, held victims at gunpoint, threatened to kill victims, carried a gun and engaged in torture and/or interrogations.

Although there is no evidence that the defendant occupied an aggravating, supervisory role, it is the undersigned officer's assessment that he was also not substantially less culpable than the average participant. He was neither the least culpable of the participants, nor less culpable than most of them. Indeed, he was an average participant in the sense that his function, though different than those of his codefendants, was integral to the offense. Furthermore, he performed said function with full knowledge and understanding of the nature, scope and structure of the enterprise. Accordingly, it is the undersigned officer's assessment that no role adjustment is applicable pursuant to §3B1.1 or §3B1.2.

PSR, p. 18.

Notwithstanding having been characterized above as an "average participant," Jorge Uriarte received by far the longest sentence in the case, 720 months.

With respect to the foregoing role in the case description, one item warrants elaboration. At the end of the first paragraph, the Role in the Offense description

6

refers to Jorge Uriarte as engaging in "torture and/or interrogations." The PSR contains the following references in support of the "torture and/or interrogations" description: pages 19, 20, 31 and 42 of the Government's Version of the Offense. The Government Version of the Offense is a separately paginated portion of the PSR. The four referenced pages refer to three specific incidents. The first, Government Version at pages 19 and 20, is a description of the kidnapping of Salvador Hernandez. The Government Version states that a drug dealer and confederate of Saul Rodriguez named Pedro Victoria hired Saul Rodriguez to kidnap another drug dealer known as Toro, who owed Victoria money for drugs. Victoria hired Rodriguez to kidnap Toro and hold him for ransom. Victoria arranged to meet with Toro, with Rodriguez to be waiting in the wings. Toro smelled a rat and sent an employee named Salvador Hernandez in his place. Rodriguez and the three Uriarte brothers grabbed Hernandez, placed him in a van and asked him where the money was. He said he did not know. The Government's Version continues, "The Uriartes responded by punching him." They then called Rodriguez and told him the man claimed to not be Toro. Rodriguez called Victoria, who went to the scene and confirmed that the man was not Toro. The man was then released. There is no statement that Hernandez suffered any actual injury other than the fact of being punched a few times. Govt. Version, pp. 18-20.

The second incident is described at page 31 of the Government Version. This portion of the Government Version describes the kidnapping and beating of

two drug dealers named Lou Vega and Francisco Pizarro. The Government Version states that Saul Rodriguez, Hector Uriarte, Jorge Uriarte, Tony Sparkman, and another member of Rodriguez' crew kidnapped and tortured two men, Lou Vega and Francisco Pizarro. This event was charged as Count Five of the indictment, as kidnaping in aid of racketeering activity in violation of 18 U.S.C. §1959(a)(1). The evidence does not support the government's contention that Jorge Uriarte was, in fact, involved in the beating of Lou Vega or Francisco Pizarro. First of all, Jorge Uriarte was acquitted of Count Five. Second, in his direct examination at trial Lou Vega, the victim, described in detail what happened. (Vega Direct Examination, Trial Transcript, pp. 2417-2451). He said that there were 300 kilograms of cocaine stolen in Joliet, Illinois. [Saul Rodriguez is charged in this case with stealing those 300 kilograms. He is also charged with then being hired by the owner in Mexico to find out who had stolen the same 300 kilograms.] Vega said that he had some knowledge of the cocaine, although not who had stolen it. He was convinced to voluntarily accompany Saul Rodriguez to be questioned about the stolen cocaine.

Vega identified Rodriguez' photograph and referred to him as the "Nice Guy." Rodriguez was accompanied, according to Vega, by Hector Uriarte, whose photograph he identified and whom he referred to as the "Creepy Guy." Vega was taken to a house and testified that he was held there and beaten for several days. Vega repeatedly described what the Nice Guy and the Creepy Guy did, and he also said that there was a "tall heavy black guy" (p. 2433, 2436) actively involved. Vega

8

did not identify a photograph of the tall, heavy black guy.

In his detailed testimony, Vega did not state that any other individual was involved in beating or questioning him at the house.

Saul Rodriguez did testify that Jorge Uriarte was present at the house. But the jury had already learned that Saul Rodriguez is one of the consummate liars in the history of the American legal system. That is described more fully elsewhere in this appeal. As a result, they did not convict any defendant of any offense that depended solely on the testimony of Rodriguez, including the acquittals of Jorge Uriarte in Counts Four and Five, and Manuel Uriarte of Counts Two and Three. The jury acquitted Jorge Uriate of Count Five because he was, in fact, not present for the beating of Vega. Moreover, Judge Gottschall did not make any finding that Jorge Uriarte was involved in the kidnapping or beating of Vega or Pizarro.

The third, and final, incident referred to in the PSR Role in the Offense subsection for Jorge Uriarte is at page 42 of the Government's Version of the Offense. This relates to a home invasion of a house owned by Saul Rodriguez and rented by a man who Hector Uriarte thought was a drug dealer. According to the Government Version, Hector organized the incident, and drove Jorge Uriarte, Andres Flores, and Tony Sparkman to the house. Flores had a gun, which Jorge Uriate never touched. Flores, Sparkman and Jorge Uriarte entered the house. They found the occupant, Jose Carranza, and a friend inside and brought them into the kitchen. Jorge Uriarte questioned them about the presence of drugs or

money in the house, which they both denied. The house was searched and $2000 in cash, a luxury watch and a hand gun were found. The two Uriartes, Flores and Sparkman then left. The two occupants were frightened but not physically harmed.

The foregoing describes all of the conduct of Jorge Uriarte in the PSR subsection labeled "torture and interrogation."

Jorge Uriarte filed timely post trial motions preserving the issues raised in this appeal relating to 18 U.S.C. §§ 3553(a)(6) and 924(c).

**Conduct of Other Defendants**

Jorge Uriarte's principle individual claim is that the district court did not acknowledge her authority to consider nor did the district court adequately address the issue of disparities in a sentences between Jorge Uriarte and the other defendants and non-defendant participants in the case. The following sentences were imposed in this case:

| Trial Defendants | Counts Of Conviction | Sentence |
|---|---|---|
| Glenn Lewellen | Count 13 | 216 months |
| Hector Uriarte | Counts 1,4,5,7,8,10,11,12, & 13 | 216 months on Counts 1,4,5,7,10, 12, & 13; 84 months consecutive on Count 8; & 300 months consecutive on Count 11 = 600 months |

10

| | | |
|---|---|---|
| Jorge Uriarte | Counts 1,7,8,10,11,12, & 13 | 336 months on Counts 1,7,10, 12, & 13; 84 months consecutive on Count 8; & 300 months consecutive on Count 11 = 720 months |
| Manuel Uriarte | Count 1 (guilty plea after hung jury) | Count 1 = 72 months |
| Tony Sparkman | Counts 1,7,8,10,11,12 & 13 | 120 months on Counts 1,7,10,12 & 13; 84 months consecutive on Count 8; & 300 months consecutive on Count 11 = 504 months |
| Robert Cardena | Counts 4 & 13 | Counts 4 & 13 = 120 months |
| **Guilty Pleas** | | |
| Saul Rodriguez | Count 1 | Not yet sentenced |
| Andres Flores | Count 1 | Count 1 = 175 months |
| Fares Umar | Count 1 | Count 1 = 120 months with credit for 69 months time served in IDOC |
| Walter Johnson | Count 13 | Count 13 = 158 months |
| Jorge Lopez | Count 13 | Count 13 = 180 months |
| | | |
| **Immunity** | Crimes | |
| David Vanegas | Kidnapping and drug trafficking | Immunity |
| Lisette Vanegas | Kidnapping and drug trafficking | Immunity |
| Roy Cockriel | Building thousands of drug traps in cars and houses | Immunity |

The following sentences had been imposed by Judge Gottschall before defendant Jorge Uriarte was sentenced on defendants who went to trial:

1.  Tony Sparkman was convicted of Counts 1,7,8,10,11,12 and 13.  Jorge Uriarte was convicted of the vary same Counts 1,7,8,10,11,12, and 13. The charges of conviction were RICO conspiracy, kidnapping, two firearms in aid of kidnapping, and drug charges.  Sparkman was sentenced to 120 months concurrently on Counts 1,7,10,12, and 13, to 84 months consecutively on the first firearm count, and 300 months consecutively on the second firearm count. Sparkman J&C, Rec. Doc. #1132.  Defendant Uriarte was sentenced to 336 months on Counts 1,7,10,12, and 13, and the same 84 and 300 months as Sparkman on the firearms counts.

2.  Robert Cardena was convicted of drug possession and drug conspiracy counts.  The government asked the Court for a sentence of 188 months. Government's Response to Defendant Robert Cardena's Sentencing Memorandum, p. 6, Rec. Doc. #1068.  The Court imposed a sentence of 120 months.  Cardena J&C, Rec. Doc. #1121.

Following defendant Jorge Uriarte's sentencing, Judge Gottschall imposed the following sentences on the other defendants who went to trial:

3.  Hector Uriate was convicted of Counts 1,4,5,7,8,10,11,12 and 13, which included one more kidnapping and one more drug count than Jorge Uriarte. At sentencing the Court imposed on Hector a three point Sentencing Guideline enhancement  for being a manager/supervisor. See, Hector Uriarte Presentence

Report, Rec. Doc. 940 and Hector Uriarte Sentencing Transcript, Rec. Doc. 1388. Jorge received no enhancement for his role in the offense. Yet Hector was sentenced to 216 months to run concurrently on Counts 1,4,5,7,10,12, and 13, as compared to Jorge's 336 months on two fewer counts. They both received 84 and 300 months consecutively on the two firearms counts. Hector Uriarte J&C, Rec. Doc. #1258.

    4.  Glenn Lewellen was sentenced to 216 months on the drug conspiracy count, Count 13.  The jury was unable to reach a verdict on the Count One RICO charge and the government did not elect to re-try.  The government asked the Court for a sentence of 30 years (360 months) in prison.  Government's Response to Defendant's Sentencing Memorandum, p.23, Rec. Doc. #1325.  The Court imposed a sentence of 216 months.  Lewellen Amended J&C, Rec. Doc. #1345.

    5.  Manuel Uriarte.  The jury acquitted defendant Manuel Uriate of Counts Two and Three, which both charged murder in aid of racketeering activity, and was unable to reach a verdict on Count One, the RICO conspiracy charge.  The government elected to retry Count One, but before a retrial could take place a plea agreement was reached and entered on Count One.  At sentencing the government asked for a sentence of 180 months. Government's Response to Defendant's Objections to Presentence Report and Sentencing Memorandum, p. 9, Rec. Doc. #1322.  The Court imposed a sentence of 72 months. Manuel Uriarte J&C, Rec. Doc. #1343.

    This case also involved many additional offenders besides those who went

13

to trial.  Judge Gottschall was aware that the following individuals had engaged in the conduct set forth below, and that they had entered plea agreements before her before defendant Jorge Uriarte was sentenced, which plea agreements contained the agreed sentences set forth below.  Three other individuals received immunity from prosecution.

a.  **Fares Umar** admitted in his plea agreement (Rec. Doc. #585, entered Oct. 21, 2011) to violating the RICO conspiracy statute by committing the following offenses: 1. The 2001 kidnapping and robbery of 80 kilograms of cocaine from two unknown individuals in a stash house in Will County;  2. The 2001 kidnapping of an unidentified individual and the stealing of $1,500,000 in narcotics proceeds from a stash house on South Kenneth in Chicago, Illinois;  3. The 2002 kidnapping of Maria Saldivar, a bar owner whose kidnapping and ransom payment was orchestrated by her own granddaughter and by Saul Rodriguez;  4. The 2003 kidnapping of the drug supplier of a man named Paisa, from whom 20 kilograms of cocaine were stolen;  5. The May 29, 2003, kidnapping of Jimmy Lopez, whose family owned a tire shop and who "paid back" almost $1 million in ransom to Saul Rodriguez;  6. The 2003 kidnapping of drug supplier Pedro Flores, the twin brother for whom a ransom of $500,000 plus 100 kilograms of cocaine was paid; 7. The November 18, 2003 kidnapping of Teodoro Bueno, for which kidnapping Umar was arrested and convicted in state court;  8. The 2004 kidnapping of Giovanni Chimera, Francisco Espinoza, and Kenneth Rivera, drug and money couriers for drug supplier Pedro Flores, which resulted in the theft of

14

135 kilograms of cocaine; and 9) participation from 2001 to 2009 in the drug conspiracy charged in this case.

According to the plea agreement, Umar's total offense level for this case was 45, with Criminal History category IV, resulting in an advisory Sentencing Guideline range of life.  His plea agreement under Fed.R.Crim.P. 11(c)(1)(C) provides for a sentence of not less than ten and not more than 15 years incarceration, with that time to be reduced by the "actual time served and remaining to be served at the time of sentencing...in connection with Illinois case 03 CR 2675601."  That state court sentence was a 12 year sentence with day for day good time for the Teodoro Bueno kidnapping.  On May 8, 2013, Judge Gottschall actually imposed a sentence of ten years with five years nine months credit for time already served on the state sentence. (Umar J&C, Rec. Doc.# 1342). In his trial testimony, Umar stated that he is expecting to actually serve a sentence in this case of only four years.  Trial Transcript, p. 1164.  When asked if he was happy with his prospective four year federal sentence, Umar stated, "I don't think so...I didn't want to do no time...I mean, I wasn't happy with it.  I just took it 'cause I felt I didn't have no choice."

b. **Andres Flores** admitted in his plea agreement (Rec. Doc. #448, entered Aug. 10, 2011) to violating the RICO conspiracy statute by committing the following offenses: 1. In the summer of 2006, stealing 300 kilograms of cocaine from a house in Joliet, Illinois;  2. The October 20, 2007, kidnapping through a home invasion of the band manager Pedro Avila, his wife, and five children; and

3. The April 9, 2009, attempted possession of 600 kilograms of cocaine in Channahon, Illinois, at which Flores and five others were arrested.

Flores also admitted to the following criminal conduct under a proffer agreement under Sentencing Guideline §1B1.8(a), pursuant to which the conduct is not used to calculate Flores' Sentencing Guideline range: 1. The 2000 murder of Juan Levano, aka Baby G. Saul Rodriguez orchestrated this murder. In his plea agreement Flores admits to shooting Levano. Manuel Uriarte was also charged with this murder, but was acquitted by the jury in the trial in this case. 2. The 2001 murder of Michael Garcia. Saul Rodriguez also orchestrated this murder. In his plea agreement Flores admits to shooting Garcia. Manuel Uriarte was charged with being the get away driver, but was acquitted in the trial in this case. 3. The 2002 kidnapping of bar owner Maria Saldivar, discussed above. 4. The 2005 attempted murder of an unknown victim, identified in this case as Victim X. This was orchestrated by Saul Rodriguez. Flores admitted in his plea agreement shooting the man, but the man was able to run away and did not die. 5. In 2005 Flores embarked on a plan to kill the boyfriend of the mother of one of Rodriguez's children. He was waiting to a location in Berwyn, when he was approached by the police, who believed he was reading pornography in his car, and he was taken to the police station. He did not take any further steps in this endeavor. 6. The 2006 restraint of three or four men at a Home Deport parking lot who were thought to possess drug proceeds. The men were restrained, but only $2000 or $3000 was found. 7. The 2008 kidnaping of Jose Carranza and

16

Esteban LNU in a house in Lyon's Illinois owned by Saul Rodriguez's parents.  8. The 2008/2009 home invasion and attempted robbery of Rafael Montano, his wife and child in Burbank, Illinois.  And, 9. On April 9, 2009, obtaining two firearms that were taken to the Channahon, Illinois, during the attempted cocaine possession.

According to Flores' plea agreement, even excluding the proffer protected conduct, his advisory Sentencing Guidelines offense level is 38 and he is criminal history category III,  resulting in an advisory guideline range of 292 - 365 months. Under his Fed.R.Crim.P. 11(c)(1)(C) plea agreement, he agreed to and received a sentence of 175 months. Flores J&C, Rec. Doc. #1287.

c. **Jorge Lopez** admitted in his plea agreement (Rec. Doc. #504) to violating the RICO conspiracy statute and to committing the following offenses: 1. The 2004 kidnapping of Giovanni Chimera, Francisco Espinoza, and Kenneth Rivera, who were drug and money couriers for drug supplier Pedro Flores, which resulted in the theft of 135 kilograms of cocaine;  2. The 2008 kidnaping of Jose Carranza and Esteban LNU in a house in Lyon's Illinois owned by Saul Rodriguez's parents. 3. The April 9, 2009, attempted possession of 600 kilograms of cocaine in Channahon, Illinois, at which Lopez and five others were arrested.  4. The 2001 - 2009 drug conspiracy, pursuant to which Lopez both purchased cocaine from Saul Rodriguez on many occasions in wholesale quantities and delivered drugs in wholesale quantities to Rodriguez on behalf of another drug trafficking organization.  And, 5. In 2001 Lopez hired Saul Rodriguez to murder Michael

17

Garcia, who Lopez thought had struck Lopez's brother Eduardo with a car and killed him. Lopez paid Rodriguez $15,000. As set forth above, Andres Flores has admitted to killing Garcia, and Manuel Uriarte was acquitted of the charge that he was involved in that murder.

According to his original plea agreement, Jorge Lopez's advisory sentencing guideline range is level 42 with criminal history category I. Before the motion under Guideline §5K1.1 his advisory guideline range is 360 to life. An Addendum to the Plea Agreement was entered under Fed.R.Crim.P. 11(c)(1)(C) (Rec. Doc. #1399) that provided for a term of imprisonment of 180 months, which is what Judge Gottschall imposed. (Lopez J&C, Rec. Doc. #1410). Defendant Jorge Uriarte's mandatory minimum sentence of 42 years, alone, is 504 months.

d. **Saul Rodriguez** is the mastermind of this entire case. He is the moving force behind virtually all of the murders, kidnappings, robberies, and drug trafficking. Rodriguez's plea agreement sets forth criminal acts that he admitted to organizing and participating in. They include three murders, one attempt murder, 14 kidnappings involving 29 victims, the theft of 785 kilograms of cocaine, and the theft of $2,783,5000. Saul Rodriguez Plea Agreement (Rec. Doc. #534). The plea agreement agrees to a Total Offense Level of 45 and a sentence under Fed. R. Crim. P. 11(c)(1)(C) of not less than 30 or more than 35 years.

After the plea agreement has been entered, the government discovered that while Rodriguez was purporting to cooperate, he smuggled a cell phone into the Chicago Metropolitan Correctional Center and made over 1000 phone calls, the

18

nature of which will never be known with any certainty; he lied to a federal grand jury about the murders of Juan Levano and Michael Garcia; and he accepted a payment of at least $6000 from Vincente Zambada Niebla, son of the co-leader of the entire Sinaloa drug cartel, in exchange for information about the whereabouts of relatives of Pedro Flores and his brother, Margarito Flores (who were expected to be witnesses against Zambada), so Zambada could have the relatives killed to discourage the Flores brothers from testifying.  See, Defendant Jorge Uriarte's Objections to Presentence Report and Sentencing Memorandum, pp. 11-12 (Rec.Doc. #930).  The government did not dispute the information in this paragraph in its response, Government's Response to Jorge Uriarte's Objections to the PSR & Sentencing Memorandum (Rec. Doc. #31).

Ordinarily, a defendant who commits one felony while under a cooperation agreement will loose his plea agreement entirely.  Here, the agreed upon sentence was changed by an Addendum To Plea Agreement (Rec. Doc. # 734) from not less than 30 and more than 35 years to not less than 30 and not more than 40 years. Rodriguez had not been sentenced when this brief was filed.

Three other persons participated in the crimes in this case and testified at trial, and were given immunity from prosecution.  They are not technically co-defendants, but they are certainly unindicted co-conspirators.  The district court was entitled to take their grants of immunity into account under §3553(a).  They are David and Lisette Vanegas and Roy Cockriel.

e. **Lisette Vanegas** began working as a drug and money courier in the early

1990s for a drug dealer named Ruben Olaquez.  One of the people she delivered drugs to ten or twenty times was Saul Rodriguez. After she served a state court drug sentence in 1998, Lisette Vanegas began delivering drugs and picking up and counting drug money in amounts of up to $200,000 for Saul Rodriguez, all until 2003.  She also took money to Las Vegas to place bets for Saul Rodriguez from 1999 to 2009.  She also met a Mexican man named Chato around 2000 , who she met through Saul Rodriguez.  On ten to thirty occasions she counted and packaged drug money for Chato to be sent to Mexico, in amounts, as Vanegas put it, of never more then $5 million in cash at a time.  Finally, in approximately 2002, Vanegas agreed with Saul Rodriguez to kidnap Vanegas' own grandmother, Maria Saldivar for ransom.  She received some $40,000 from the ransom.  Lisette Vanegas also assisted Saul Rodriguez with his monitoring of the kidnapping of Jose Carranza and Esteban LNU in a house in Lyon's Illinois owned by Saul Rodriguez's parents.  She further assisted her husband David in the distribution of the cocaine received by Saul Rodriguez as a part of the ransom in the kidnapping of Pedro Flores. She testified that she and David actually stole two kilograms of the ransom cocaine.  Lisette Vanegas' criminal activities are set forth more fully in her trial testimony, pages 547 to 749 of the Trial Transcript.

     f. **David Vanegas** met Saul Rodriguez through his wife.  In 2000 he torched a car (succeeding on the third try) for Rodriguez.  He accompanied Lisette on a trip to San Diego on which they carried $1 million in drug money.  The money was seized by law enforcement in Albuquerque, New Mexico, but the Venegases were

not arrested.  David also took trips to Las Vegas in the early 2000s for Saul Rodriguez to place large bets.  Saul Rodriguez was the best man at the Vanegas's wedding and is the godfather of their daughter.  In around 2003, David worked for Saul Rodriguez delivering drugs for a few months.  In 2003, at the request fo Saul Rodriguez, David was involved with defendant Fares Umar in the purchasing of the Crown Victoria car that resembled an undercover police car and which Saul Rodriguez testified was involved in a number of crimes in this case. Next, David Vanegas participated in the kidnapping of Pedro Flores.  He testified that he was involved in the actual kidnapping and that Flores was held at his house.  In addition, David was involved in picking up the ransom paid for Flores and in distributing the drug portion, including making three or four trips to Tennessee with parts of it.   Another kidnapping that David was involved in was the kidnapping of Teodoro Bueno, described earlier in this memorandum and for which Fare Umar was arrested and convicted in state court.  David was not charged. David also testified that in 2003 or 2004 he was involved in a kidnapping at an automobile auction.  David further testified about taking part with Saul Rodriguez and Glenn Lewellen in the robbery of a Mexican man in a house near the Indiana Skyway, for which his portion of the proceeds was $80,000.  David Vanegas' criminal activities are set forth in his trial testimony, pages 1229 to 1465 of the Trial Transcript.

     g. The third person receiving immunity was **Roy Cockriel**, who built hidden compartments in cars and houses in which drugs and guns could be stored

("traps").   He testified that he was confronted by DEA about his activities on December 15, 2005.  They found in his house, but did not seize, approximately $1 million, which he has subsequently spent.  In January, 2006, he entered into an immunity agreement with the government.  He testified in this case that for the decade before he received immunity he installed thousands of traps for drug dealers around the United States, including several for Saul Rodriguez.  The largest number were in the Chicago area.  He testified that he made "millions and millions of dollars" during the decade he installed traps.  Cockriel's activities are set forth in his trial testimony, pages 1484 to 1546 and 1562 to 1575 of the Trial Transcript.

### Defendant Jorge Uriarte's Sentencing Memorandum

Defendant Jorge Uriarte filed an 18 page Sentencing Memorandum (Rec. Doc. #930).   On pages 4 though 18, the only issue that is argued is that of sentencing disparities with other defendants and individuals in the case. Defendant Uriarte set forth the sentences or sentencing agreements of the other participants in the case.  He then argued that any sentence in excess of the 42 year mandatory minimum would be greater than necessary under §3553(a) and would create unwarranted disparities with the other participants in the case.

After the Supreme Court granted *certiorari* in *Alleyne v. United States*, __ U.S. __, 133 S.Ct. 2151 (2013), defendant Uriarte filed a three page Supplemental Sentencing Memorandum on the issue jury finding for the seven and twenty-five years mandatory minimum gun sentences.

**Sentencing Hearing**

At the sentencing hearing, the Court first ruled on using acquitted conduct (a drug amount) for Count Four in the sentencing and on the vulnerable victim enhancement, (Sentencing Transcript, pp. 3-11). The defendant then preserved the 18 U.S.C. §924(c) issues of enhancements for brandishing a weapon and also for possessing a weapon after a second or subsequent conviction, neither of which were found by the jury.

Counsel for the defendant and the government then argued. The government asked for a life sentence, contending that Mr. Uriarte would always present a danger to society. It sought to portray Mr. Uriarte as not being capable of rehabilitation. The prosecutor acknowledged that before this offense, Mr. Uriarte had only two convictions, one for attempt murder for a shooting committed when he was sixteen years old and the other for possessing a handgun when he was seventeen. He served a total of three years and three months in the Illinois Department of Corrections. He then soon became involved with Saul Rodriguez in this case.

Counsel for Mr. Uriarte argued that the district court should invoke §3553(a)(6) and impose the 42 year mandatory minimum sentence. In the kidnappings many people were frightened, but no one was seriously hurt. And some of the victims, such was Maria Saldivar and Giovani Chimera were drug dealers themselves. The government did not even try to portray Mr. Uriarte as a leader or organizer of the criminal activity.

23

The judge began her summation and imposition of sentence by talking about the defendants who were cooperating with the government. The judge first says, "without saying anything about Mr. Uriarte. This may actually be a case where the guidelines are right on target. I'm just putting that aside. But none of the sentencing makes any sense to me. I mean, we've got these people who strike me as incredibly dangerous to society who are going to get out of prison really soon. They were the cooperators....Fares Umar, how many more years?" Defense counsel responds, "Three." The judge says, "That's scary, very scary. Saul Rodriguez?" Defense counsel responds, "He's going to get out and start killing again in..." The judge interjects, "He can't wait. He can't wait....How long?" Defense counsel, "Well, 30...." The judge says, "He can probably do it with his telephone before then." Sent. Tr., pp. 23 - 24. (The judge was referring to defendant Saul Rodriguez having smuggled a cell phone into the Chicago Metropolitan Correctional Center while the government was preparing him to testify).

The judge continued, "Okay. And then who else?" Defense counsel responded, "Well, we have Andres Flores, who has a 175-month sentence. He admitted killing two people, he went out to kill two more, and he participated in four kidnappings. So that's 175 months versus 504 months that's the minimum for Mr. Uriarte." The judge asked, "175 months is 16 years?" Defense counsel responded, "That's his agreed sentence with the government. So he's already served part of that." The judge continued, "And then we have a lot of people who I view as dangerous who got – didn't even get prosecuted." Defense counsel

24

replied, "Definitely.  We have David and Lisette Vanegas, who were right in the middle of this thing, and they got immunity."

The judge concluded by saying, "Then we have all these people like Tony Sparkman, who are serving 42 years, and I don't understand that at all.  It actually makes me ill.  But I don't know that I'm allowed to consider any of that.  What does the Seventh Circuit say?  You're not allowed to – you can only consider how people in other cases are treated?"

Defense counsel responded, "That's changed.  It's inconsistent with Gault [Gall].  There is some inconsistency within the Seventh Circuit law, but as I argue in my memo, the current controlling Seventh Circuit law is that you can consider Mr. Uriarte with the other people in this case and make your decision on that basis."

Judge Gottschall concluded her consideration of the issue by saying, "the decision to give these people what I find rather frightening sentences which I view as rather short is not my decision.  I can't do anything about Saul Rodriguez at this point anyway.  So I'm just not sure that I ought to be considering those people. I just don't know."  That is the last statement that Judge Gottschall made about her authority in sentencing Mr. Uriarte to take into account the sentences of the other defendants under or in spite of §3553(a)(6).  The judge made it clear that she did not know if she had the authority to do so.  She also did not acknowledge that she was the one who had accepted the guilty pleas under Fed.R.Crim.P. 11(c)(1)(C), which locked in the sentences of the other defendants of which she was so critical.

Later in the sentencing colloquy, the Assistant U.S. Attorney said that with respect to unwarranted sentencing disparities, that the government addressed the issue in its sentencing memorandum and that district courts have been found to be within their discretion to find that disparities are not unwarranted where they are based one defendant receiving a lower sentence because they cooperated, citing two cases. Sent. Tr., pp. 27-28.

Judge Gottschall had only the following enigmatic reaction to the government's argument, "Cooperated so to speak, I think we're dealing with in this case." Sent. Tr., p. 28. The judge said nothing more about her perception of her authority on the issue.

Judge Gottschall proceeded to sentence defendant Uriarte to 720 months or 60 years. Of that, 336 months were for Counts 1,7,10.12, and 13, running concurrently, and 42 years were consecutive seven and twenty five year mandatory minimum sentences for the two firearms convictions. Sent. Tr., p. 36.

In actually imposing sentence, Judge Gottschall made the following statement:

I just want to say a couple of things. I don't think, unfortunately, much in Mr. Uriarte's background gives me hope for Mr. Uriarte's future. I don't know what causes people to join gangs when they're young, and get involved in horrific acts like this, and obviously for people like Mr. Uriarte, whom the evidence shows were involved with Saul Rodriguez's activities for a lengthy period of time, one assumes that at some level they become insensitive to the

26

violence that seems to have been stock in trade.

I personally, however, do not think that a life sentence is necessary or appropriate in this case, or in many cases, bu I do feel that there is very little in Mr. Uriarte's past which gives me a concrete basis for hoping that the future would be different if he's released. So I am not going to apply the mandatory minimum in this case, but I'm also not going to give a life sentence. I think a term of years is appropriate. And I think for that reason I'm going to sentence Mr. Uriarte to a term of 60 years.

Sent. Tr., pp. 30-31, Appendix Two.

**Firearms Enhancements**

Jorge Uriarte was convicted of Counts 8 and 11 for using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §924(c). Jorge Uriarte J&C, Appendix One. He was sentenced to seven years for the first count, rather than the base of five, on the grounds that the firearm was brandished. The jury did not find that the firearm was brandished. Jorge Uriarte was sentenced to 25 years for Count 11, on the grounds that it was "a second or subsequent conviction." The jury did not find that it was a second or subsequent conviction. On June 17, 2013, well after defendant Jorge Uriarte's sentencing on November 27, 2012, the Supreme Court ruled that for a defendant to be sentenced to seven years for brandishing under18 U.S.C. §924(c), the fact of brandishing is an element of the offense that must be submitted to the jury, not a sentencing factor. Defendant Jorge Uriarte raised an objection on this issue before sentencing

27

in his Supplemental Sentencing Memorandum (Rec. Doc. #1099).

Defendant Jorge Uriarte also raised an objection in his Supplemental Sentencing Memorandum on the issue of the jury not finding that the conviction upon which the 25 year sentence was based in Count 11 was a second or subsequent conviction. The Supreme Court has not yet ruled on this issue, so defendant Uriarte raises it here to preserve it for future review.

## SUMMARY OF ARGUMENT

Defendant Jorge Uriarte was convicted at trial of seven counts involving RICO conspiracy, kidnapping, firearms charges, and drug charges. He was acquitted on one kidnapping and one drug charge. At sentencing he was not given any leadership enhancement for his role in the offense. The Presentence Report characterizes him as being an average participant. Yet he received the longest sentence of any defendant who did or did not go to trial, 720 months or 60 years. Co-defendant Tony Sparkman was convicted of the same counts as Jorge Uriarte and received a 42 year sentence. Co-defendant Hector Uriarte was convicted of two more counts than Jorge Uriarte, plus he received a three point enhancement under the Sentencing Guideline for being a leader or organizer of the offense. He receive a sentence of 600 months, or 50 years.

Co-defendants who pleaded guilty and cooperated received far lesser sentences. For example, Fares Umar, whose offenses are very similar to Jorge Uriarte, received an actual sentence of four years, three months. And at least three

28

individuals heavily involved in the criminal activity received immunity from prosecution.

Before imposing sentence, the district court must address any substantial arguments made by the defendant. *United States v. Durham*, 766 F.3d 672, 685 (7th Cir. 2014). Defendant Jorge Uriarte raised the issue of disparities in sentence in both his Sentencing Memorandum and his argument at the sentencing hearing. In fact, it was the principle issue raised. Not only did the district court not adequately address the issue. Judge Gottschall said that she did not know if she had the authority to consider disparities with co-defendants. Her concluding statement on the issue was, "I'm just not sure that I ought to be considering those people. I just don't know." The judge thereby committed procedural error by failing to recognize that she had the discretion to reduce Jorge Uriarte's sentence either: 1) under 18 U.S.C. §3553(a) because of disparities with the sentence of other defendants, or 2) despite 18 U.S.C. §3553(a) by adopting her own sentencing framework.

Defendant Jorge Uriarte asks this Court to vacate his sentence and remand for re-sentencing at which the district court can adequately address the sentencing disparity issue.

With respect to the convictions on Counts 8 for brandishing firearm in relation to a crime of violence, after defendant Uriarte's sentencing the Supreme Court held that the fact of brandishing is an element of the offense which had to be found by the jury. In this case that finding was made by the judge. Defendant

29

Uriarte raised, and thereby preserved, this issue at his sentencing hearing.

With respect to the sentence on Count 11, based on that being a second or subsequent conviction, defendant Uriarte submits that that, too, should have to be found by a jury, and not the judge. However, defendant Uriarte acknowledges that the Supreme Court has not yet so held.

## STANDARD OF REVIEW

This Court reviews the district court's factual findings at sentencing for clear error. Claims of procedural or legal error are reviewed *de novo*. *United States v. Durham*, 766 F.3d 672, 685 (7th Cir. 2014).

## ARGUMENT

**I. The district court committed error when it stated that it did not know if it had the authority to consider the sentences of other defendants in sentencing defendant Jorge Uriarte and also when it did not address the sentences of co-defendants in sentencing Jorge Uriarte.**

"Before imposing a sentence, the district court is required to consider the sentencing factors in 18 U.S.C. §3553(a) and address any substantial arguments made by the defendant." *United States v. Durham*, 766 F.3d 672, 685 (7th Cir. 2014). At his sentencing, defendant Jorge Uriarte's argument concerned almost exclusively the issue of unwarranted sentencing disparities. This was raised in both defendant's sentencing memorandum and in the oral argument at the sentencing hearing. It was not adequately addressed by the district court.

Title 18 U.S.C. §3553(a) requires the Court to impose a sentence that is

30

sufficient, but not greater than necessary, to comply with the purposes of the statute.  In this case, the most significant factor that was raised under §3553(a) was subsection (a)(6), which states that the Court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  The Supreme Court in *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 599 (2007), stated that the district court is "required" by this section to consider "unwarranted sentence disparities."

The Seventh Circuit has stated, "We are...open in all cases to an argument that a defendant's sentence is unreasonable because of a disparity with the sentence of a co-defendant..."  *United States v. Statham*, 581 F.3d 548, 556 (7th Cir. 2009).  Before *Gall*, the Seventh Circuit took the position that a defendant's sentence had to be compared to defendants nationwide to invoke section 3553(a)(6).  But, as this Court stated in *Statham*, "such a categorical rule is now foreclosed by *Gall v. United States...*" *Statham*, 581 F.3d at 556.

Thus, a district court commits procedural error if it does not give "meaningful consideration" sentencing factors raised by the defendant, here §3553(a)(6). *United States v. Prado*, 743 F.3d 248, 252 (7th Cir. 2014).

A district court commits a second type of procedural error if it is unaware of its discretion to go beyond §3553(a)(6) in considering whether to reduce one defendant's sentence because of another's lenient sentence.  A district court has considerable power to adopt its own sentencing framework in order to meet the ends of justice.  This means that it can reduce one defendant's sentence, not just

31

because of §3553(a)(6), but *despite* it.  *United States v. Prado*, 743 F.3d at 252; *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).

In this case, the sixty year sentence of "average participant" Jorge Uriarte, to quote the role in the offense section of the Presentence Report, compares to the following sentences for the other defendants who went to trial: a ten year sentence for Robert Cardena, an 18 year sentence for corrupt police officer Glenn Lewellen, a 42 year sentence for trial defendant Tony Sparkman whose role was quite similar to Jorge Uriarte, and a 50 year sentence for Jorge's brother Hector Uriarte, who was not an average participant, but, rather, who received a three point leadership enhancement and then a ten year lower sentence.

In addition, cooperating defendants who engaged in similar conduct received dramatically lower sentences.  The caselaw has recognized that a sentencing court can legitimately take into account the fact that a defendant has cooperated with the government in imposing a somewhat lower sentence.  See, *e.g.*, *United States v. Anzaldo-Contreras*, 548 Fed. Appx. 360, 362-3 (9th Cir. 2013).  But there must be a limit to the discrepancies between the sentences of defendants who have engaged in similar offense conduct, followed by one cooperating and the other going to trial, if a Court is also to accord meaning to §3553(a) concepts such as reflecting the seriousness of the offense, providing just punishment for the offense, and affording adequate deterrence.  Judge Gottschall made abundantly clear that she did not think that cooperating defendant Saul Rodriguez had been deterred in the least from future crime when she said that she thought he could resume

32

committing murder from prison.

Further, there has to be a limit to the penalty that can be imposed on a defendant for exercising his right to a jury trial. "A sentence is unconstitutionally vindictive if it imposes greater punishment because the defendant exercised a constitutional right, such as the right to jury trial or the right to appeal." *Waring v. Delo,* 7 F.3d 753, 758 (8th Cir. 1993). Or, as this circuit has stated, other circuits allow the government to seek a higher sentence on remand from appeal "provided that the government is not seeking to punish the defendant for his temerity in having challenged the original sentence by appealing." *United States v. Rushton*, 738 F.3d 854, 857 (7th Cir. 2013). The same consideration would apply to going to trial.

In recognizing that defendants who plead guilty can receive a reduction in their sentence, this Court has stated, "it is within proper bounds for the court to preserve some leeway so that it is able to extend leniency in consideration of the cooperation and at least superficial penitence evidence by one who pleads guilty." *United States v. Wilson*, 506 F.2d 1252, 1260 (7th Cir. 1974). But "some leeway" does not mean unlimited leeway. Moreover, this Court reversed and remanded for re-sentencing when it discerned that the defendant had been punished for going to trial. "Our part in the administration of justice requires that we reject the theory that a person may be punished because in good faith he defends himself when charged with a crime, even though his effort proves unsuccessful. It is evident that the punishment imposed by the district court on Wiley was in part for the fact that

he had availed himself of his right to trial, and only in part for the crime for which he was indicted." *United States v. Wiley*, 278 F.2d 500, 504 (7th Cir. 1960).

The district court could and should have taken into account the sentences of the other participants in the case, many of whom engaged in conduct as egregious as defendant Uriarte. Fares Umar, whose offense conduct was very similar to Jorge Uriarte, received a net sentence of less than four and one-half years. Andres Fores, who engaged in murder and kidnapping, received a175 month sentence. Jorge Lopez, who engaged in many kidnappings, received 180 months. Judge Gottschall accepted all of the plea agreements under Fed.R.Crim.P. 11(c)(1)(C), which dictated these sentences. And three participants heavily involved in the RICO conspiracy received immunity from prosecution: David Vanegas, Lisette Vanegas and Roy Cockriel. The issue here is not whether the government should have agreed to these sentences, but whether Judge Gottschall could, if she chose to do so, take these sentences into consideration in deciding on Jorge Uriarte's sentence. As set forth in the statement of the case, Judge Gottschall stated that she did not know if she had that authority.

In this case, the defendant is arguing inattentiveness, rather than vindictiveness, by the district judge. However, it must be noted that there is evidence of vindictiveness by the government. The original Indictment (Rec. Doc. #29) and the Superceding Indictment (Rec. Doc. #126) contained no separate firearms charges. The Second Superseding Indictment (Rec. Doc. #191) contained one firearms charge, Count Seven, charging Hector Uriarte, Jorge Uriarte, and

34

Tony Sparkman with violation of 18 U.S.C. §924(c) for using and carrying a firearm in connection with the kidnapping of Pedro Avila and his family.  The Third, and final, Superseding Indictment added a second 924(c) charge, which carries a consecutive 25 year mandatory sentence, against the same three defendants (Hector Uriarte, Jorge Uriarte, and Tony Sparkman) who it was by then clear had decided to take the government to trial.  Cooperating defendants who had ample involvement with firearms and violent crimes, such as Andres Flores and Fares Umar, were not so charged.  More recent Department of Justice policies have sought to cabin such practices.  For example, "An §851 enhancement should not be used in plea negotiations for the sole or predominant purpose of inducing a defendant to plead guilty." Memorandum from the Attorney General to Department of Justice Attorneys entitled "Guidance Regarding §851 Enhancements in Plea Negotiations," dated September 24, 2014.

Defendant Jorge Uriarte's claim of legal error is with the district judge. Judge Gottschall affirmatively stated that she did not know if she had the authority to consider the sentences of codefendants in sentencing Jorge Uriarte.  And, even though defendant Uriarte raised the issue in both his Sentencing Memorandum and argument at the sentencing hearing, Judge Gottschall did not address the issue of sentencing disparities in imposing sentence.

Judge Gottschall did say, "I do feel that there is very little in Mr. Uriarte's past which gives me a concrete basis for hoping that the future would be different if he's released."  But the same could be said for many of the other defendants

such as fares Umar, whose sentence was less than 4½ years. And Judge Gottschall said of Saul Rodriguez that "he can't wait to" get out and start killing again, and will probably "do it with his phone before then." But she did not explain how Rodriguez's 30 to 40 year sentence, which she accepted in accepting his plea agreement, was compatible with Jorge Uriarte's.

Finally, the judge did not tie Jorge Uriarte's sentence to the §3553(a) factors. One could intuit that her lack of hope that Mr. Uriarte's future would be different invoked a need for incapacitation. But, separate and apart from the lack of comparison to the other defendants, there was no explicit references to any of the §3553(a) factors. That analysis should surely be made before imposing a sixty year sentence. And particularly where an "average participant" receives the longest sentence in the case.

Defendant Jorge Uriarte asks that his sentence be vacated and his case remanded to the district court for re-sentencing.

## II  Firearms Mandatory Minimum Sentences Without Jury Findings of Fact

In being sentenced on Count 8 for using and carrying a firearm during and in relation to a crime of violence, defendant Uriarte was subjected to a two year enhancement for brandishing the firearm. The issue of brandishing was not decided by the jury. *Alleyne v. United States*, 133 S. Ct. 2151 (2013), decided after defendant Uriarte's sentencing, holds that the finding as to whether the defendant had brandished, as opposed to merely having carried, a firearm had to be found by the jury. Defendant Uriarte asks the court to vacate the sentence and to

36

remand for re-sentencing consistent with the holding of *Alleyne.*

Defendant Jorge Uriarte also adopts the fuller legal analysis of this issue contained in the Brief of Appellant of co-defendant Tony Sparkman in case 12-3683.

Defendant Jorge Uriarte also asks the Court to vacate the finding that Count 11 constitutes a second or subsequent conviction, thereby supporting a 25 year consecutive sentence. That such a finding must be found by the jury constitutes a necessary extension of *Alleyne.* Defendant acknowledges that the Supreme Court has not yet recognized this extension.

Defendant Jorge Uriarte also adopts the fuller legal analysis of this issue contained in the Brief of Appellant of co-defendant Tony Sparkman in case 12-3683.

## CONCLUSION

For all of the reasons set forth above, defendant Jorge Uriarte respectfully requests this Court to vacate his sentence because of the district court's failure to consider disparities between his sentence and those of the other defendants in the case, and because of the district court's depriving defendant Uriarte of a jury finding on the issue of brandishing a firearm in Count Eight and on the issue of whether Count Eleven constituted a second or subsequent conviction, and to

remand defendant Jorge Uriarte's case to the district court for re-sentencing.

Respectfully submitted,

__S/ John M. Beal_____

Attorney for Defendant Jorge Uriate

JOHN M. BEAL

Attorney at Law

53 West Jackson Blvd., Suite 1615

Chicago, IL 60604

(312) 408-2766

## CERTIFICATES OF COUNSEL

Circuit Rule 30(d) Certification

John M. Beal, attorney for Defendant-Appellant, hereby certifies, in accordance with Cir. R. 30(d), that all of the materials required by Cir. R 30(a) and (b) are included herein.

_S/ John M. Beal_____

John M. Beal

Federal Rule 32(a)(7)(C) Certification

John M. Beal, attorney for Defendant-Appellant, hereby certifies in accordance with Fed. R. App. P. 32(a)(7)(C), in that this brief contains 9769 words according to a WordPerfect word count.

__S/ John M. Beal_____

John M. Beal

IN THE

UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

No. 12 - 3747

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | On appeal from the United |
| | ) | States District Court for |
| Plaintiff-Appellee, | ) | the Northern District of |
| | ) | Illinois, Eastern Division |
| v. | ) | No. 09 CR 332 |
| | ) | |
| JORGE URIARTE, | ) | Hon. Joan B. Gottschall |
| | ) | Presiding |
| Defendant-Appellant. | ) | |

**REQUIRED APPENDIX OF APPELLANT**

**Appendix Table of Contents**

App. #

1.   Judgment in a Criminal Case                                          One

2.   Transcript of Sentencing Hearing held on April 11, 2012             Two

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Northern District of Illinois

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| Jorge Uriarte | Case Number:  09 CR 332-4 |
| | USM Number: 22759-424 |
| | John M. Beal |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☑ was found guilty on count(s)    1,7,8,10, 11,12 and 13 of Third Superseding Indictment.
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §1962(d) | Racketeering Conspiracy | 4/9/2009 | 1sss |
| 18 U.S.C. 1959(a)(1) | Kidnaping in Aid of Racketeering | 4/9/2009 | 7sss |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)    4 and 5

☐ Count(s) _____  ☐ is  ☐ are  dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

RECEIVED
2012 NOV 31 PM 12: 30
CLERK
U.S. DISTRICT COURT

11/27/2012
Date of Imposition of Judgment

_Signature of Judge_

Joan B. Gottschall        District Judge
Name and Title of Judge

11/30/12        NOV 3 0 2012
Date

Judgment—Page   2   of   7

DEFENDANT: Jorge Uriarte
CASE NUMBER: 09 CR 332-4

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| and 2 | | | |
| 18 U.S.C. §924(c)(1)(A)(ii) and 2 | Use and Carrying of a Firearm During and in Relation | 4/9/2009 | 8sss |
| 18 U.S.c. 1959(a)(1) and 2 | Kidnaping in Aid of Racketeering | 4/9/2009 | 10sss |
| 18 U.S.C. §924(c)(1)(C)(i) | Use and Carrying of a Firearm During and in Relation to a Crime of Violence | 4/9/2009 | 11sss |
| 18 U.S.C. §21 U.S.C. §841(a)(1) and 846 | Attempted Possession with the Intent to Distribute 5 Kilograms or More of Cocaine | 4/9/2009 | 12sss |
| 21 U.S.C. 841(a)(1) and 846 | Conspiracy to Possess with the Intent to Distribute and to Distribute 5 Kilograms or More of Cocaine | 4/9/2009 | 13sss |

Judgment — Page    3    of    7

DEFENDANT: Jorge Uriarte
CASE NUMBER: 09 CR 332-4

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

720 months total; 336 months as to Counts 1, 7, 10, 12 & 13 to run concurrently to one another, 84 months as to Count 8 to run consecutively to any other term of imprisonment imposed and 300 months as to Count 11 to run consecutively to any other term of imprisonment imposed.  It is further ordered that the costs of imprisonment are waived.

☑  The court makes the following recommendations to the Bureau of Prisons:

that defendant be designated to Terre Haute.

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

     ☐  at _____ ☐ a.m. ☐ p.m.  on _____ .

     ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

     ☐  before 2 p.m. on _____ .

     ☐  as notified by the United States Marshal.

     ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___4___ of ___7___

DEFENDANT:  Jorge Uriarte
CASE NUMBER:  09 CR 332-4

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

5 years as to all counts to run concurrently. It is further ordered that the costs of supervision are waived.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☑    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check, if applicable.)*

☑    The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐    The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐    The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)    the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)    the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page    5    of    7

DEFENDANT:  Jorge Uriarte
CASE NUMBER:  09 CR 332-4

## ADDITIONAL SUPERVISED RELEASE TERMS

Drug tests not to exceed 104 tests per year.

Defendant shall provide the probation officer with access to any requested financial information.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Case: 1:09-cr-00332 Document #: 1171 Filed: 12/03/12 Page 6 of 8 PageID #:5664
Case: 2321   Document: 51    Filed: 02/11/2015    Pages: 90   (48 of 90)

Judgment — Page   6   of   7

DEFENDANT:  Jorge Uriarte
CASE NUMBER:  09 CR 332-4

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $  700.00 | $ | $ |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $                0.00 | $                0.00 | |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐  the interest requirement is waived for the    ☐ fine   ☐ restitution.

☐  the interest requirement for the    ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 11) Judgment in a Criminal Case    Case: 1:09-cr-00332 Document #: 1171 Filed: 12/03/12 Page 7 of 8 PageID #:5665
Sheet 6 — Schedule of Payments    Case: 13-2321    Document: 51    Filed: 02/11/2015    Pages: 90    (49 of 90)

Judgment — Page    7    of    7

DEFENDANT:  Jorge Uriarte
CASE NUMBER:  09 CR 332-4

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑ Lump sum payment of $ ___700.00___ due immediately, balance due

　　　　☐ not later than _____ , or
　　　　☐ in accordance  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**  ☐ Payment to begin immediately (may be combined with ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**  ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☑ Special instructions regarding the payment of criminal monetary penalties:

　　　Interest is waived as to special assessment.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

　　Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States:

　　See Preliminary Order of Forfeiture.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

This page intentionally left blank.

1      IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3   UNITED STATES OF AMERICA,          )
                                       )
4               Plaintiff,             )
                                       )
5          -vs-                        )  No. 09 CR 332-4
                                       )
6   JORGE URIARTE,                     )  Chicago, Illinois
                                       )  November 27, 2012
7               Defendants.            )  10:00 a.m.

8
        TRANSCRIPT OF PROCEEDINGS - SENTENCING HEARING
9          BEFORE THE HONORABLE JOAN B. GOTTSCHALL

10  APPEARANCES:

11  For the Government:      MS. TERRA REYNOLDS
                            MR. STEVEN ANDREW BLOCK
12                          MS. TIFFANY JACQUELINE TRACY
                            ASSISTANT UNITED STATES ATTORNEYS
13                          219 South Dearborn Street
                            Chicago, Illinois  60604
14

15  For the Defendant:       MR. JOHN M. BEAL
                            53 West Jackson, Suite 1615
16                          Chicago, Illinois  60604

17
               COLETTE M. KUEMMETH, CSR, RMR, FCRR
18                  OFFICIAL COURT REPORTER
                  219 South Dearborn Street
19                       Room 2328A
                  Chicago, Illinois  60604
20                     (312) 554-8931

21

22

23

24

25

1          (Proceedings heard in open court:)

2          THE CLERK:  2009 CR 332, U.S.A. versus Jorge

3    Uriarte, for sentencing.

4          MS. REYNOLDS:  Good morning, your Honor.  Terra

5    Reynolds, Steven Block, and Tiffany Tracy on behalf of the

6    United States.

7          THE COURT:  Good morning.

8          MR. BEAL:  Good morning, your Honor.  John Beal on

9    behalf of Jorge Uriarte, now present in court.

10          THE COURT:  Let me tell you what I've received

11    besides the presentence report.  I've received a filing by

12    the defendant called Objections to the Presentence Report,

13    I've received the Government response to that, a supplemental

14    sentencing memorandum filed on behalf of the defendant, and a

15    number of letters in support of the defendant which were

16    filed actually in June.

17          Is there anything that I should have that I do not

18    have?

19          MS. REYNOLDS:  No, your Honor.

20          THE COURT:  Has the defense received a copy of the

21    presentence report?

22          MR. BEAL:  Yes, Judge.

23          THE COURT:  Mr. Uriarte, have you had an

24    opportunity to read the report yourself?

25          DEFENDANT URIARTE:  Yes, your Honor.

1        THE COURT:  Have you had a chance to talk to your

2    attorney about any issues or concerns you had about it?

3        DEFENDANT URIARTE:  Yes.

4        THE COURT:  Okay.  Now let's go over -- I looked at

5    these objections a few days ago.  Let's go over the

6    objections briefly and get those resolved.

7        There is an objection to counting the cocaine --

8    and none of these objections, as I understand it, have any

9    effect on the guidelines at all, right?  We have to calculate

10   the guidelines correctly, but whatever I rule on this doesn't

11   really matter in terms of the guideline sentence, is that

12   correct?

13       MS. REYNOLDS:  That's correct.

14       THE COURT:  All right.  So the first question is

15   whether Count 4, on which I believe Mr. Uriarte was

16   acquitted, whether that quantity of cocaine should be

17   counted.  There was testimony that Mr. Uriarte was involved

18   in that, correct?

19       MS. REYNOLDS:  That's correct.  It came from both

20   Mr. Rodriguez and Mr. Flores.  In addition to that, your

21   Honor, and it is not in the Government's sentencing

22   memorandum, when Mr. Cardena was approached by agents he

23   indicated that he was involved in that theft of cocaine with

24   both Hector Uriarte and Jorge Uriarte.  So that is evidence

25   that was not presented at trial that presented a Bruton

1    issue, but it is evidence that your Honor can consider at

2    sentencing, and based upon the preponderance of the evidence

3    we'd ask that you consider that conduct and include it in it

4    guideline calculation.

5         THE COURT:  Let me say to begin with I'd just as

6    soon not consider what Mr. Cardena said when he was arrested,

7    because as I understand it, his position is he said nothing.

8    So I don't really think -- the question, it seems to me, is

9    was there a preponderance of the evidence, not proof beyond a

10   reasonable doubt.

11        Is there anything you want to say, Mr. Beal?

12   Because I think the testimony of the one or two witnesses at

13   trial is really sufficient in the absence of anything to the

14   contrary to give the Government the preponderance it needs

15   for sentencing.

16        MR. BEAL:  Well, I would just say I think, as the

17   Court has I believe previously noted, that Rodriguez was

18   quite thoroughly impeached.  And with respect to Mr. Flores,

19   I would just say that I think he was certainly substantially

20   impeached.  There was evidence that he and Rodriguez

21   communicated, which we believe the communication was

22   concocting testimony, and so I think there is a serious

23   question about the reliability of his -- I understand the

24   difference in the standard, but I would still ask the Court

25   to respect the jury's verdict.

1      THE COURT:  Well, I think the Government has the

2   better of this argument.  I certainly don't have to believe

3   the witnesses beyond a reasonable doubt on this subject, and

4   the jury did not, but I think they do provide enough evidence

5   for preponderance.  It's not much -- and there is nothing in

6   opposition, of course, so I'm going to go along with the

7   presentence report in terms of the counting that occurs here.

8      In terms of the victims, I've read everybody's

9   briefs, I think that there is certainly evidentiary support

10  for finding a vulnerable victim in one or even probably in

11  two cases.  I really -- I mean, Mr. Beal, if there is

12  anything you want to say that's not in the briefs, but I have

13  been through the briefs, and I've read the briefs.

14      MR. BEAL:  My point is simply that it's a two-part

15  test.  You have to have a vulnerable victim, but then the

16  victim has to be targeted because of their vulnerability.

17      THE COURT:  But isn't there plenty of evidence that

18  Mr. Uriarte surveilled these victims and knew the condition

19  of Maria Saldivar, I think knew the condition -- the other

20  thing was the children of Pedro Victoria, correct?

21      MR. BEAL:  The wife and children.

22      THE COURT:  The wife and children.

23      MR. BEAL:  But they were not targeted because of

24  their vulnerability, they were targeted because of the money.

25      THE COURT:  You think they have to be targeted

1  because of their vulnerability.

2          MR. BEAL:  I gave you a Seventh Circuit case that

3  says that.

4          THE COURT:  I think I missed that.  I thought the

5  defendant had to know they were vulnerable.  What is the

6  case?

7          MR. BEAL:  United States versus Jackson.

8          THE COURT:  Oh, United States versus Jackson?

9          MR. BEAL:  Yes.

10         THE COURT:  Ellen, 95 F.3d 500.  Could you get me

11  that?  Thanks.

12         What does the Government have to say?  If that's

13  what the case says, I don't think there is any indication

14  that these people were targeted because of their

15  vulnerability.  Lots of people were targeted, vulnerable or

16  not.  They were targeted I think because they had tons of

17  money.  Or they were believed to have tons of money.

18         MS. REYNOLDS:  Certainly not even Jorge Uriarte

19  would suggest that he targeted the children of Pedro Avila

20  because he believed they had tons of money.  They knew that

21  Mr. Avila had a wife and children in the home.  They could

22  have targeted Mr. Avila at a time when those individuals were

23  not there, and went ahead and chose to target Mr. Avila, his

24  wife, and his children, when all of them were home, and --

25         THE COURT:  If the case says they have to be

1    targeted because of their vulnerability, I don't think that

2    that was true in this case.  I think they were targeted

3    knowing they were vulnerable, but not because of their

4    vulnerability.

5            I actually have had some cases I think where this

6    applies.  It typically applies in a situation where the

7    victim is compromised to some extent and the defendant goes

8    about blackmailing the victim knowing that the victim's

9    compromise is going to make the victim susceptible to

10   blackmail.  That's how it's come up typically in cases I've

11   seen.  But let me look at that case.  I want to get it in

12   front of me.

13           If you want to all have a seat...

14           MR. BEAL:  Judge, while we're waiting we can deal

15   with the other issues.

16           THE COURT:  Sure.  Let's deal with the other

17   issues.

18           MR. BEAL:  The issue I just wanted to put on the

19   record; I filed a supplemental sentencing memorandum on the

20   case that the Supreme Court recently granted cert on, and I

21   just want to make a very brief oral presentation to preserve

22   the issue.

23           THE COURT:  Sure.

24           MR. BEAL:  I'm objecting to the seven years for

25   brandishing in Count 8 and the 25 years for a second or

1    subsequent conviction in Count 11 on the grounds the jury did

2    not find the brandishing, the jury did not find that there

3    was a second or subsequent conviction.  And I submit this

4    violates Aprendi, and I believe the Supreme Court is going to

5    so find.  I understand that the Seventh Circuit law hasn't

6    gotten there --

7                 THE COURT:  Right.

8                 MR. BEAL:  -- or the Supreme Court, but I do want

9    to preserve this.

10                THE COURT:  So you're preserving this in case the

11   Supreme Court decides this in your favor, and that's fine.

12   The record will so reflect.  But I have to follow the Seventh

13   Circuit, obviously.

14                Is there anything else that we have to do other

15   than consider the 3553 factors?  I think not.  I think not.

16   I think as soon as we decide the vulnerable victim issue

17   we'll be ready to proceed.  And that would reduce the

18   guideline range by two points, correct?

19                MS. REYNOLDS:  Not the guideline range --

20                MR. BEAL:  Not the ultimate guideline range.

21                THE COURT:  The offense level.

22                MS. REYNOLDS:  It actually wouldn't reduce the

23   offense level.  We'd need to go into that particular offense.

24   Ultimately because of the way the conduct is grouped in the

25   PSR, it may not result in any reduction.  It just results in

1    a reduction in the context of that particular offense.

2           THE COURT:  Okay.  So one thing we can figure out

3    is if I were to decide this in the defendant's favor is it

4    going to make any difference in the calculation of the

5    offense level.

6           Thank you.  And you highlighted the relevant

7    language for me.  Thank you so much.

8           (Brief pause.)

9           THE COURT:  Okay.  I think this is kind of easy to

10   resolve.  The Seventh Circuit in the case that Mr. Beal has

11   cited, United States versus Jackson, says this at page 507:

12   "In order to apply the 3A1.1(b) enhancement, the district

13   court must find both:  1, that a victim of the defendant's

14   crime was unusually vulnerable in some way, that is

15   well-established; and 2, that the defendant targeted that

16   victim because of this vulnerability."

17          I do not find that satisfied in this case.  I think

18   that -- I think the defendant knew that there were children,

19   he knew that Ms. Saldivar was an elderly person, but I don't

20   think they were picked because of their vulnerability.

21          MR. BLOCK:  The Government would disagree with

22   that, especially in the case -- in both cases.  Especially in

23   the case of Mrs. Saldivar.  As I understand that case, it

24   doesn't stand for the proposition that the defendant has to

25   -- it's not a multiple choice where the defendant looks at a

1   bunch of different victims, four are not vulnerable, one is,
2   he chooses that one solely because of that exclusion of all
3   other factors.  Here there is no doubt that an elderly
4   woman's vulnerability in that case the defendant knew about
5   ahead of time played a role in the decision whether to kidnap
6   her at all.  The fact they kidnapped other people who were
7   also not vulnerable doesn't mean it wasn't a factor in that
8   context.  Certainly they knew that they were going to have an
9   easier time of it, they knew that they were going to be able
10  to subdue her.

11          THE COURT:  I don't think that's enough.  There
12  certainly wasn't any evidence about that, that I recall.  Am
13  I forgetting something?

14          MS. REYNOLDS:  Well, your Honor, the other evidence
15  is with respect to Pedro Avila and his children, which is
16  that they were aware of the fact that there were children in
17  the house, and they chose to go ahead and kidnap those
18  individuals in light of the fact that they were vulnerable
19  victims.  There is no other reason to go in the house when
20  those individuals are there but for the purpose of kidnapping
21  them.

22          THE COURT:  I don't think that's what the -- that
23  is not how I read this language.  Okay?  I think that that
24  aggravates the offense, but does the vulnerable victim
25  enhancement apply; I read the Seventh Circuit -- you know, I

1   hope that they mean what they say, but they say that besides

2   finding that the victim was unusually vulnerable that I have

3   to find that the defendant targeted that victim because of

4   the vulnerability.

5              MR. BLOCK:  Judge, from the Government's view, the

6   problem with reading that language so strictly is that it

7   creates a state of mind test as to the defendant's state of

8   mind.

9              THE COURT:  But it's normal in a lot of cases that

10   are not drug cases that you don't see.  I've seen this in

11   many cases.  I think Judge Posner wrote something about --

12   didn't he write something about, when homosexuality was

13   illegal, targeting a homosexual for blackmail justified this

14   enhancement.

15              I'm going to give this one to Mr. Beal.  I think

16   he's right.  If I'm wrong and it matters, I'm sure it will be

17   corrected.

18              MR. BEAL:  It does matter, because -- Mr. Freeze is

19   checking the calculation, but we end up with a 43 by coming

20   down from 47 anyway.  So even if 47 went to 45, we'll still

21   be 43.  So it doesn't affect the ultimate --

22              THE COURT:  I hope you know what you're talking

23   about, because I don't have a clue.

24              MS. REYNOLDS:  Your Honor, to direct your attention

25   on page 28 of the PSR, which is the page that deals with

1   racketeering act 12, Count 7, which is the kidnapping of

2   Pedro Avila and his family --

3           THE COURT:  Yes.

4           MS. REYNOLDS:  -- you'll note that the base offense

5   level is 32.

6           THE COURT:  Correct.

7           MS. REYNOLDS:  And the reduction that you are

8   awarding to Mr. Uriarte is at line 784.

9           THE COURT:  Correct.

10          MS. REYNOLDS:  So that additional two-point

11  enhancement should be eliminated.

12          THE COURT:  Okay.

13          MS. REYNOLDS:  Then on page 29, the adjusted

14  offense level for that particular offense instead of 34

15  should be 32, at line 804.

16          THE COURT:  And if that line 804 is changed to 32,

17  what if any difference does that make when -- do we have

18  Maria Saldivar in here anywhere or not?

19          MS. REYNOLDS:  We do, and -- one moment.  Page 17,

20  your Honor.

21          THE COURT:  Right.  Okay.

22          MS. REYNOLDS:  If you go to those -- it starts out

23  at a base offense level of 32.  He gets a six-point

24  enhancement for making a ransom demand, two points for use of

25  a dangerous weapon, then if you turn to page 18, on line 419,

1  two points were added for vulnerable victim, so that would be

2  eliminated, and the adjusted offense level at 439 instead of

3  42 would be a 40.

4  THE COURT:  Okay.  Those changes having been made,

5  then something happens to all of these multiple counts, and

6  we come out with a total offense level.  Is that different?

7  THE PROBATION OFFICER:  Judge, it's not.

8  THE COURT:  It's not.

9  THE PROBATION OFFICER:  Page 31 of the presentence

10  report dealing with acts 2 and 12, on line 857, that 42 will

11  become 40, adjusted act 4 below it will still be assigned one

12  unit, and if you go down to act 12, you'll notice 34, and

13  zero units.  That's not going to change either, so you're

14  ultimately still going to end up with that combined adjusted

15  offense level of Count 1, 47.

16  THE COURT:  47.  All right.

17  MR. BEAL:  That's fine.

18  THE COURT:  So we'll make those changes in the

19  presentence report, but the ultimate guideline calculation in

20  the presentence report I will adopt as correct.

21  Okay.  Any more objections that anybody has to the

22  presentence report before we get on to consideration of the

23  3553 factors?

24  MR. BEAL:  No, Judge.

25  THE COURT:  I'd like to start by hearing from the

1   Government, I then would like to hear from Mr. Beal, I would

2   then like to hear anything more that any of the lawyers want

3   to say, and then Mr. Uriarte, if there is anything you want

4   to say, you will have a chance to do that before sentence is

5   imposed.  Okay.

6          MS. REYNOLDS:  Thank you, your Honor.  As your

7   Honor knows, it is rare that the guidelines call for a life

8   sentence, and it is equally rare for the Government to

9   advocate that such a sentence is necessary or appropriate.

10          As this Court knows, however, the scope and breath

11  of violence in which Jorge Uriarte engaged is extraordinary,

12  and a life sentence would meet the goals of the Sentencing

13  Reform Act and, in light of the unique circumstances of this

14  case, not be greater than necessary to achieve these goals.

15          I'd like to focus the Court's attention on where

16  the dispute seems to lie in this sentencing hearing, and that

17  is in Jorge Uriarte's argument that upon completing a 42-year

18  term of imprisonment there is absolutely no reason to think

19  that 40 years from now he will pose a cognizable danger to

20  the public.  That is from Mr. Beal's sentencing memorandum.

21          THE COURT:  42 years is the mandatory minimum,

22  correct?

23          MS. REYNOLDS:  That's correct.  A 42-year term of

24  imprisonment would result in an actual term of imprisonment

25  of 35 years, your Honor, if Jorge Uriarte -- that is, if

1  Jorge Uriarte were to serve 85 percent of his sentence as is

2  custom in the Bureau of Prisons.  Mr. Uriarte I believe is 32

3  years old, and given the time that he has already served, if

4  your Honor were to impose a term of 42 years imprisonment he

5  would be around 64 years old at the time of his release.

6         THE COURT:  He's served how long?

7         MS. REYNOLDS:  Since his arrest April 9, so

8  approximately three and a half years.

9         THE COURT:  Okay.

10        MS. REYNOLDS:  A 42-year term of imprisonment would

11  not protect the public from further crimes of Jorge Uriarte,

12  and a 42-year term of imprisonment would also fail to reflect

13  the seriousness of the offense or promote the just punishment

14  for the offense.  The sentence that would accomplish those

15  goals is a life sentence.

16           And so in determining what recommendation to make

17  to your Honor, the Government asked itself what kind of man

18  will Jorge Uriarte be if he is ever released from prison.

19  And as your Honor is well-aware, no one can provide a

20  definitive answer to that question.  But we can look at Jorge

21  Uriarte's history and characteristics, his past conduct, as

22  an indicator of what his future behavior will be.

23           Jorge Uriarte's history and characteristics, his

24  past conduct, indicate that he is a menace to society.  That

25  he cannot be rehabilitated.  Jorge Uriarte demonstrated his

1    penchant for violence at an early age.  As a teenager he

2    joined the City Knights street gang.  He was first the victim

3    and subsequently the perpetrator of gun violence.  In 1994,

4    at the age of 14, Jorge Uriarte was shot in the back.  Two

5    years later, at the age of 16, Jorge Uriarte shot a man in

6    the head and was arrested.  And after being released from

7    custody in 1997, Jorge Uriarte was again shot.

8         In March of 1998, at the age of 17, Jorge Uriarte

9    was arrested in possession of a revolver containing six spent

10   rounds.  Two months later, in May of 1998, Jorge Uriarte was

11   convicted of attempted murder stemming from that 1996

12   shooting of the man in the head, and he was sentenced to six

13   years imprisonment.  At that same time he was sentenced to

14   unlawful -- he was convicted of unlawful possession of a

15   firearm stemming from his possession of that pistol with the

16   six spent rounds and sentenced to one year imprisonment.

17        In August of 2001 Jorge Uriarte was paroled from

18   custody.  Within six months of being released from prison,

19   and while on parole, Jorge Uriarte embarked on a seven-year

20   crime spree with Saul Rodriguez and his crew by participating

21   in the kidnapping of Maria Saldivar.

22        So what this tells us is that a lengthy term of

23   imprisonment did nothing.  Nothing to deter Jorge Uriarte

24   from a life of crime.  Over the next seven years, Jorge

25   Uriarte participated in at least another eight kidnappings

1    and the distribution of hundreds of kilograms of cocaine.

2    During that time Uriarte grew his family and obtained other

3    legitimate employment.  I believe he claims in the PSR to

4    have worked as a carpenter at some period of time.  And Jorge

5    Uriarte's wife, his children, and his job, it did nothing to

6    deter him from a life of crime.

7            Unlike individuals such as Rob Cardena in this

8    case, who was involved for a short period of time and then

9    went on to legitimate employment, or Tony Sparkman, who you

10   suggested maybe got involved because people asked him, Jorge

11   Uriarte continued to engage in a life of crime, and it only

12   stopped when the DEA ended it for him.  And they ended his

13   life of crime by arresting him on April 9th, 2009, as he

14   tried to steal what he believed was 600 kilograms of cocaine.

15   And he has been in jail since that time.

16           Now, since his arrest in this case, Jorge Uriarte

17   has shown absolutely zero remorse for his crimes.  Based on a

18   review of the PSR it appears as if Jorge Uriarte has not

19   availed himself of any programs available to him at the MCC.

20   None.  And to the contrary, he has been disciplined for

21   gambling and giving or accepting money without authorization

22   since his conviction in this case in January.

23           As Jorge Uriarte stands before you today, sadly,

24   the only letters that were submitted on his behalf are from

25   Manuel Uriarte's wife and his two children.  Not from Jorge

1   Uriarte's immediate family, not from his mother, not from a

2   former employer, not from friends. There is nothing. There

3   are letters from people who have lived in California for

4   years who ostensibly had no contact with this organization or

5   with Mr. Uriarte.

6         So the only evidence that is before this Court,

7   unfortunately, suggests that if Jorge Uriarte were to be

8   released from prison he would return to a life of crime.

9         Your Honor, he is not deserving of your leniency.

10   The public is deserving of your protection. By imposing a

11   life sentence, this Court can protect the public at large and

12   it can also protect Jorge Uriarte's victims. Pedro Avila's

13   children were simply that. They were children. Children.

14   When Jorge Uriarte terrorized them in their home. And they

15   deserve to know that Jorge Uriarte can never harm them again.

16         So I'd like to focus on Jorge Uriarte's conduct in

17   this case. Between 2002 and April 2009 Jorge Uriarte

18   participated in a seven-year crime spree as a member of the

19   Rodriguez enterprise, and during those years Jorge Uriarte

20   engaged in extraordinary and breath-taking acts of violence.

21   And I'd like to take a step back at this point.

22         This case stands apart, as your Honor knows,

23   because it involves extraordinary acts of violence which your

24   Honor has likely seen in smaller instances in other cases,

25   and it also involves the distribution of hundreds and

1    hundreds and hundreds of kilograms of cocaine.  Which your

2    Honor has also seen in other cases.  But what is rare is that

3    all of those things together are wrapped up in this one case,

4    and this defendant was involved in all of it.  All of it.

5        So Jorge Uriarte -- excuse me.  That standing

6    alone, and thinking about the other cases that we typically

7    prosecute and bring to this court and other courts, that

8    standing alone, Jorge Uriarte's one act -- let's just take

9    Maria Saldivar's kidnapping, or the Pedro Avila kidnapping,

10   or the theft of 600 kilograms of cocaine.  The attempted

11   theft.  That would warrant a lengthy term of imprisonment.

12   But when taken as a whole, that is what justifies the term of

13   life in prison.

14       During the seven years that Jorge Uriarte was a

15   member of Saul Rodriguez's crew, he participated in at least

16   eight separate kidnappings of well over 15 victims.  And his

17   role in those kidnappings was to restrain, threaten, and

18   occasionally beat the victims so they would provide the

19   location of drugs or money.

20       And Jorge Uriarte did not discriminate in

21   determining who he would harm.  He harmed the young:  Pedro

22   Avila's children; he harmed the old, Maria Saldivar; he

23   harmed those who were involved in their own criminal conduct,

24   people like Giovanni Chimera, who was a courier for a drug

25   group led by people known as the twins; he kidnapped one of

1   the twins as well, a person named Peter Flores, who was

2   involved in drug trafficking; and he harmed the arguably

3   innocent.  Someone like Pedro Avila.

4          And at trial you heard these sinners and saints

5   alike, these victims, is what made them common to one

6   another:  Maria Saldivar, Jimmy Lopez, Salvador Hernandez,

7   Giovanni Chimera, Pedro Avila, Jose Carranza, and Veronica

8   Martinez.  They testified about the harm that they suffered

9   at the hands of Jorge Uriarte and the Rodriguez crew.

10         In 2002 during the kidnapping of Maria Saldivar,

11  Jorge Uriarte pressed a knife to Ms. Saldivar's face and

12  threatened to stab her if she did not stop screaming.  In

13  2004 Jorge Uriarte pressed a gun to Giovanni Chimera's head

14  and threatened to kill him if he did not provide the crew

15  with the location of drugs or money.  Giovanni Chimera told

16  the jury that he lost all feeling, and he prayed that God

17  would save his life.

18         In 2007, Jorge Uriarte and Tony Sparkman pointed

19  their guns at Pedro Avila and threatened to kill Avila if he

20  did not tell them about the location of the money that Avila

21  simply did not have.

22         In addition to kidnapping all of these people,

23  Jorge Uriarte participated in the theft of cocaine, and the

24  attempted theft of cocaine and, in committing these

25  kidnappings, managed to possess cocaine that Rodriguez later

1   distributed on the streets of Chicago.  And the amount of

2   cocaine is just staggering.  The Peter Flores kidnapping

3   alone is 100 kilograms of cocaine.  Your Honor is aware how

4   rare that is to have, even in a cartel-based case, to have

5   that much cocaine in one single criminal case.  Yet one year

6   later, during the kidnapping of Giovanni Chimera, they get

7   over 200 kilograms of cocaine.  And then during the theft of

8   cocaine from the house in Joliet they get 300 kilograms of

9   cocaine.  It is just staggering.  And ultimately each

10  kilogram of cocaine is broken down, and it's resold, and it's

11  put on the streets of Chicago, and it harms the users, who

12  can't break free from the cycle of addiction.  Addiction from

13  which Mr. Uriarte does not suffer but he certainly knows the

14  harms of.  It harms the families, and it harms the

15  communities, and it causes these cases to come in, here and

16  at the state's attorney's office.

17              Jorge Uriarte's seven-year crime spree affected the

18  lives of not only the community in which he lived but also

19  his victims.  And while today is about Jorge Uriarte and what

20  sentence this Court will hand down, I wanted the final words

21  of the Government to this Court and to Mr. Uriarte to be

22  about his victims.

23              Today this Court can provide his victims with some

24  measure of justice by punishing Jorge Uriarte for what he did

25  to them and protecting them by keeping him in prison for the

1  rest of his life.

2  Your Honor, I'd ask you to think of Maria Saldivar

3  as she sat in that van.  Alone.  As she was told that she was

4  going to be stabbed.  Think of Giovanni Chimera as he prayed

5  to God to save his life as Jorge Uriarte pressed a gun to the

6  back of his head.  And think of Pedro Avila as he did all

7  that he could to keep his pregnant wife and children safe,

8  all while Jorge Uriarte pointed a gun at him and threatened

9  to kill him.

10  If this is not a case that warrants a term of life

11  imprisonment, the Government is not certain what does, and we

12  believe for all the reasons under 3553, your Honor, that a

13  term of life imprisonment is appropriate and just in this

14  case, and we ask that you impose such a sentence.

15  MR. BEAL:  May it please the Court.  The issue here

16  is what a fair sentence for Mr. Uriarte is in this case,

17  particularly in light of the other sentences that this Court

18  has imposed.  But before I get to that, I'd just like to

19  respond to a few of the things that Ms. Reynolds said.

20  It's well-established that offending decreases with

21  age, and Mr. Uriarte's previous offense where he went to

22  prison in Illinois, he was 16 when he committed that offense,

23  and he was 18 when he went to prison for about three years.

24  And with respect to his conduct in the MCC, he

25  hasn't gotten in any serious trouble.  He's a separatee, it

1   makes it hard to participate in programs, but their programs

2   don't amount to very much anyway, is the reality.  And in

3   terms of family support, he didn't want his family here.  He

4   knows he's getting at least a 42-year sentence, and he

5   doesn't want them to see that happen.  Which I think is

6   understandable.

7          Now, with respect to what I think is the important

8   issue here, is what is the appropriate issue for him in the

9   context of this case.  And in this case there are -- this

10  Court has or will sentence many other people.  And I'd like

11  to start with Fares Umar, who testified and said he was going

12  to be serving four more years for eight kidnappings, and he

13  thought that was too much.  Now he's serving three more

14  years, and I'm sure he thinks that's too much.  Mr. Uriarte

15  is facing at least 42 years.

16         THE COURT:  Let me ask you this, Mr. Beal, because

17  one of the problems that I have with this case is that I

18  think that the sentencing -- without saying anything about

19  Mr. Uriarte.  This may actually be a case where the

20  guidelines are right on target.  I'm just putting that aside.

21  But none of the sentencing makes any sense to me.  I mean,

22  we've got these people who strike me as incredibly dangerous

23  to society who are going to get out of prison really soon.

24  They were the cooperators.

25         I agree with you.  Fares Umar, how many more years?

1          MR. BEAL:  Three.

2          THE COURT:  That's scary, very scary.  Saul

3     Rodriguez?

4          MR. BEAL:  He's going to get out and start killing

5     people again in -- I know he's --

6          THE COURT:  He can't wait.  He can't wait.

7          MR. BEAL:  Right.

8          THE COURT:  How long?

9          MR. BEAL:  Well, 30.  I mean, I assume, you know --

10         THE COURT:  He can probably do it with his

11    telephone before then.

12         Okay.  And then who else?

13         MR. BEAL:  Well, we have Andres Flores, who has a

14    175-month sentence.  He admitted killing two people, he went

15    out to kill two more, and he participated in four

16    kidnappings.  So that's 175 months versus the 504 months

17    that's the minimum for Mr. Uriarte.

18         THE COURT:  175 months is 16 years?

19         MR. BEAL:  That's his agreed sentence with the

20    Government.  So he's already served part of that.

21         THE COURT:  And then we have a lot of people who I

22    view as dangerous who got -- didn't even get prosecuted.

23         MR. BEAL:  Definitely.  We have Lisette and David

24    Venegas, who were right in the middle of this thing, and they

25    got immunity.

1          THE COURT:   Then we have all these people frankly,

2     like Tony Sparkman, who are serving 42 years, and I don't

3     understand that at all.  It actually makes me ill.  But I

4     don't know that I'm allowed to consider any of that.  What

5     does the Seventh Circuit say?  You're not allowed to -- you

6     can only consider how people in other cases are treated?

7          MR. BEAL:   No.

8          THE COURT:   That used to be the case.

9          MR. BEAL:   That's changed.   It's inconsistent with

10    Gault.   There is some inconsistency within the Seventh

11    Circuit law, but as I argue in my memo, the current

12    controlling Seventh Circuit law is that you can consider

13    Mr. Uriarte with the other people in this case and make your

14    decision on that basis.   That's the current Seventh Circuit

15    law.   Valid Seventh Circuit law.

16          THE COURT:   You know, let me just say I would

17    like -- I don't want to cut off the 3553 arguments -- the

18    decision to give these people that I find rather frightening

19    sentences which I view as rather short is not my decision.  I

20    can't do anything about Saul Rodriguez at this point anyway.

21    So I'm just not sure that I ought to be considering those

22    people.  I don't know.

23          MR. BEAL:   Well, the question is Mr. Uriarte has a

24    42-year mandatory minimum.   Does he deserve, especially in

25    the context of this case, any more than that.   There is

1    nothing you can do -- Mr. Sparkman, for example, there is

2    nothing you can do to sentence below that, but should you

3    sentence any more in the context of this case -- I mean, for

4    example, Mr. Uriarte, the evidence was, as accepted by the

5    jury and as argued by the Government, that people were

6    kidnapped and threatened.  The victims that Ms. Reynolds

7    talked about they weren't actually hurt, they weren't killed,

8    they weren't maimed.  There are worse -- I mean, Saul

9    Rodriguez --

10        THE COURT:  Jorge Uriarte was not involved in any

11   murders that we know of?

12        MR. BEAL:  They claim one.

13        THE COURT:  Which one?

14        MS. REYNOLDS:  The murder of Miguel Delatorre, your

15   Honor, where he was strangled to death and his ears were

16   burned off.

17        THE COURT:  What was the evidence of Mr. Uriarte's

18   involvement in that?  I knows it's in your --

19        MR. BEAL:  Saul Rodriguez's testimony, and that's

20   it.  And he had six different versions to the Government of

21   how it happened before he finally settled on the last one.

22   That is utterly unbelievable.

23        THE COURT:  Who else did Saul Rodriguez put in that

24   murder?

25        MS. REYNOLDS:  He put Manuel Uriarte involved in

1    that murder.

2              THE COURT:  Okay.  Thanks.

3              MS. REYNOLDS:  And himself.  I'm sorry.

4              THE COURT:  And himself.

5              MS. REYNOLDS:  Right.

6              MR. BEAL:  So I think that is not anything that --

7    anything that this Court can base anything it does with

8    respect to Jorge on that particular instance.

9              Leaving that aside, I'm just -- I'm not saying that

10   what happened was good, I'm just saying everything is

11   relative here, and when you look at the other defendants --

12   and the Government is entitled to make its charging

13   decisions, but then when you have to sentence Jorge Uriarte

14   in that context, I think anything beyond -- that the

15   mandatory minimum is sufficient, and anything more than the

16   mandatory minimum would be greater than necessary under

17   3553(a)(6), which is the comparisons that you're fully

18   entitled to take into account under current Seventh Circuit

19   law.  That's really the core of the situation here.

20             THE COURT:  Okay.  Thanks.

21             Anything more the Government wants to say?

22             MS. REYNOLDS:  Yes, your Honor.  With respect to

23   the need to avoid unwarmed sentencing disparities, the

24   Government did respond to that argument in writing in its

25   response brief on page 10, and we set forth several Seventh

1   Circuit cases that indicated that a district court is within

2   its discretion in finding that there is no unwarranted

3   sentencing disparity between a defendant and codefendants

4   who, unlike the defendant, cooperated.   That was in United

5   States versus Martinez, 650 F.3d 667 at 672.

6               In United States versus Bartlett --

7               THE COURT:   Cooperated so to speak, I think we're

8   dealing with in this case.

9               MS. REYNOLDS:   Right.   And that a difference

10  justified in United States versus Bartlett, 567 F.3d 901 at

11  908, a difference justified by the fact that some wrongdoers

12  have accepted responsibility and they assisted the

13  prosecution while others have not is not unwarranted.

14              Now, Mr. Beal does point out Mr. Umar's sentence

15  and Mr. Flores' sentence.   Your Honor, Mr. Umar's deal

16  involves a range of between 10 and 15 years that your Honor

17  will be determining what sentence, if you accept the plea

18  deal, and based on your comments today, you'll make that

19  determination when we get to Mr. Umar's sentencing hearing.

20  Mr. Flores has the deal that Mr. Beal set forth, and

21  Mr. Rodriguez's deal is that Mr. Steinback can come in and

22  ask for 30 years, but the Government will be asking for 40.

23              The difference with those individuals and with

24  Mr. Uriarte is, of course, that they did cooperate, and they

25  cooperated substantially in this case.

1       The final thing again that I'd like to point out is

2   I can't actually believe that we're at this point that we've

3   become so desensitized to the violence in this case that

4   Mr. Beal would suggest that it was, in essence, not a big

5   deal that these kidnapping victims were not killed or

6   otherwise permanently harmed.  It's laughable, and it's

7   actually insulting to Mr. Avila, to Ms. Saldivar, to any of

8   these individuals who suffer lasting and psychological harm

9   from what Mr. Uriarte and others did to them.  It's just

10  incredible that after all of these years and all of these

11  absolutely monstrous acts on the part of the defendant that

12  he should be entitled to some kind of reduction because it

13  wasn't as bad as the worst conduct in this case, when the

14  conduct in this case at a minimum is just off the charts and

15  extraordinary.

16       I just ask your Honor to look again at who

17  Mr. Uriarte was before he engaged in the violence in this

18  case, who he was during this case, and ask yourself who is he

19  going to be based on the evidence that we have, and that's

20  the basis on which we're asking you to impose a term of life

21  in prison.

22       THE COURT:  Anything more that the lawyers want to

23  say?

24       MR. BEAL:  Very briefly, Judge.  I have not said

25  that anything is laughable, and nothing that I have said --

1          THE COURT:  I understand.

2          MR. BEAL:  And the Court has to make a serious

3   decision based on the actual facts of the case.

4          THE COURT:  Okay.  Mr. Uriarte, is there anything

5   you would like to say before sentence is imposed?

6          DEFENDANT URIARTE:  No, your Honor.

7          THE COURT:  Well, let me ask the probation officer

8   to refresh my recollection as to what percentage does

9   somebody serve in the Bureau of Prisons assuming perfect

10  compliance with rules, etcetera.

11         THE PROBATION OFFICER:  80 to 90 percent, Judge.

12         THE COURT:  80 to 90, you're saying?

13         THE PROBATION OFFICER:  I think so.

14         MR. BEAL:  Between 85 and 90.  The calculation is

15  complex.  It's between 85 and 90.

16         THE COURT:  85 is the minimum.

17         MR. BEAL:  It's a little more than 85 percent.  The

18  way they calculate it actually makes it longer than it looks

19  like.  So it's about 87 percent, let's say.

20         THE COURT:  Okay.  Give me a minute.  I just want

21  to say a couple of things.

22         I don't think there is, unfortunately, much in

23  Mr. Uriarte's background that gives me great hope for

24  Mr. Uriarte's future.  I don't know what causes people to

25  join gangs when they're young, and get involved in horrific

1   acts like this, and obviously for people like Mr. Uriarte,

2   whom the evidence shows were involved with Saul Rodriguez's

3   activities for a lengthy period of time, one assumes that at

4   some level they became insensitized to the violence that

5   seems to have been stock in trade.

6           I personally, however, do not think that a life

7   sentence is necessary or appropriate in this case, or in many

8   cases, but I do feel that there is very little in

9   Mr. Uriarte's past which gives me a concrete basis for hoping

10  that the future would be different if he's released.  So I am

11  not going to apply the mandatory minimum in this case, but

12  I'm also not going to give a life sentence.  I think a term

13  of years is appropriate.  And I think for that reason I'm

14  going to sentence Mr. Uriarte to a term of 60 years.

15          I think if he completes that sentence and is

16  released when he would normally be released, assuming

17  compliance with the rules of the Bureau of Prisons, he will

18  be an elderly man.  He's in his 30s now.  On a sentence of

19  that length, I would assume he's going to serve 50 years.

20  You know, he's an 80-something-year-old man.  I think enough

21  is enough.  And I think everybody in life, unless they've

22  done something for which society cannot possibly, possibly

23  forgive them, deserves some ability to hope for something in

24  their future.

25          So that will be the term of incarceration.  And let

1   me go through the other things that I need to.

2   Obviously I'm not naive.  I mean, somebody could

3   come out of prison at that age and still create havoc in the

4   community, but I think it's very unlikely for lots of

5   reasons.  And I think in the case of Mr. Uriarte, he's been

6   in an atmosphere permeated with robbery, and kidnapping, and

7   violence for so long, maybe five decades away from it will

8   make some kind of a difference.  In any event, I don't think

9   that there is any reason for the victims in this case to be

10  concerned given the length of that sentence.

11  There are a couple other things I have to say, and

12  I will go through them.  Now, that's for Count 1, 7, 10, 12

13  and 13.  Is that correct?

14  MR. BEAL:  Well, Judge, it depends on --

15  THE COURT:  How do I do this?

16  MR. BEAL:  The problem is we have the two gun

17  counts.

18  THE COURT:  And we have to stack.

19  THE PROBATION OFFICER:  Your Honor, the math, if

20  that's the total sentence --

21  THE COURT:  Well, I can't do it that way if we've

22  got to stack those gun counts.  So let me do it a different

23  way.

24  The first gun count is 84 months, right?

25  MR. BEAL:  That's right.

1          THE COURT:  The second gun count is -- is that the

2     300 months?

3          MR. BEAL:  Yes.

4          THE COURT:  So that's 384 months, and that is --

5     well, this is complicated.

6          MS. REYNOLDS:  Your Honor, I believe that

7     Mr. Freeze did manage to back out so that he can let you know

8     on which counts --

9          THE PROBATION OFFICER:  Judge, you are correct.

10    384 would be a combination of Counts 8 and 11.

11         THE COURT:  Right.  I forgot about those other

12    counts.

13         THE PROBATION OFFICER:  That leaves us with 336

14    months for the remaining counts, which could be imposed to

15    run concurrently with each other and everything else for a

16    total of 720 months, or 60 years.

17         THE COURT:  Hold on a minute.  We've got 384 months

18    on the gun counts that have to be stacked on to whatever else

19    the sentence is, correct?

20         THE PROBATION OFFICER:  Correct, Judge.

21         THE COURT:  And the mandatory minimum, to go back

22    to that, would be 42 months plus -- no.  42 years plus --

23    that would be the total of all the stacking together, right?

24         MS. REYNOLDS:  Your Honor, I think if we would just

25    start at Counts 1, 7, 10, 12, and 13.

1          THE COURT:  Right.  But I want the help of the

2   presentence report in doing this calculation.

3          MS. REYNOLDS:  I'm just looking at Mr. Freeze's

4   notes.

5          THE COURT:  Yes.  That would be helpful.

6          MS. REYNOLDS:  So Counts 1 and 13, that's the

7   racketeering and the drug conspiracy count.

8          THE COURT:  Yes.

9          MS. REYNOLDS:  7, 10, and 12.

10          THE COURT:  Yes.

11          MS. REYNOLDS:  Are the other substantive

12   racketeering act counts.  If you impose a term of

13   imprisonment of 336 months on those counts to be run --

14          THE COURT:  Consecutively.

15          MS. REYNOLDS:  Concurrent to each other.

16          THE COURT:  Concurrent to each other but

17   consecutive to the gun counts.

18          MS. REYNOLDS:  But consecutive to Count 8, which is

19   84 months, which is the first gun count, and Count 11, which

20   is 300 months.

21          MR. BEAL:  I agree with that math.

22          THE COURT:  I don't know when we've done that math

23   what we have.  I don't know where I am.

24          MR. BEAL:  60.  That's how you end up at your

25   sentence.

1          THE PROBATION OFFICER:  That's a total of 60 years,

2     Judge.

3          THE COURT:  Yes, but I can't do that.  The Seventh

4     Circuit says I can't do that.  I've got to do it differently.

5          So the mandatory minimum on Counts 1, 7, 10, and 12

6     is 120?

7          MR. BEAL:  Yes.

8          THE COURT:  And by this math, what I'm imposing on

9     Counts 1, 7, 10, and 12 is what?

10          MR. BEAL:  356 months.

11          MS. REYNOLDS:  That's correct.

12          THE COURT:  And then we add 84 months and 300

13     months?

14          MS. REYNOLDS:  That's correct.

15          THE COURT:  And we come out with where I want him

16     to end up, which I'm not allowed to do, but...

17          MR. BEAL:  Yes.

18          THE COURT:  All right.  Well, 336 months then on

19     Counts 1, 7, 10, and 12, to run concurrently.  What do we do

20     with Count 13?

21          MS. REYNOLDS:  Count 13, I believe when you mention

22     Count -- when you mention Count 12, Count 13 should also be

23     included in that group.

24          THE COURT:  12 and 13 are lesser?

25          MS. REYNOLDS:  No.  12 and 13 are part of that

1    first grouping that you had, your Honor.

2              THE COURT:  Oh.  1, 7, 10, 12, and 13.

3              MS. REYNOLDS:  Yes.

4              THE COURT:  They all have a mandatory minimum of

5    120 months.

6              MS. REYNOLDS:  Just 1 and 13 have a mandatory

7    minimum of 120 months.

8              THE COURT:  Okay.

9              MS. REYNOLDS:  And the others are substantive.

10             THE COURT:  Are different but shorter.

11             MS. REYNOLDS:  Yes.  But you can still impose a

12   term --

13             THE COURT:  So on 1, 7, 10, 12, and 13, but the

14   sentence is driven I guess by -- I don't know what the

15   maximums are on 7, 10, and 12 -- 7 and 10, I guess.  Are they

16   all life?

17             MR. BLOCK:  Life.

18             THE COURT:  All right.  Well, then I can impose 336

19   months on 1, 7, 10, 12, and 13, to run concurrently, with the

20   gun charges of 84 months and 300 months to run consecutively

21   to that.

22             Well, I will try it.

23             Upon release from imprisonment, defendant shall be

24   placed on supervised release for a term of five years on each

25   count.  All terms to run concurrently.

1     Within 72 hours of release from the custody of the

2   Bureau of Prisons, defendant shall report in person to the

3   probation office in the district to which the defendant is

4   released.

5     While on supervised release the defendant shall not

6   commit another federal, state, or local crime, shall comply

7   with the standard conditions that have been adopted by the

8   Court, and shall additionally refrain from any unlawful use

9   of a controlled substance and submit to a drug test within 15

10   days of release from imprisonment, and random drug tests

11   thereafter, not to exceed 104 tests per year.

12     Defendant shall cooperate in the collection of a

13   DNA sample at the direction of the probation officer.

14     Defendant shall not possess a firearm or

15   destructive device.

16     Defendant shall provide the Probation Office with

17   access to any requested financial information.  We have to

18   deal with the financial issues here, and one is the special

19   assessment, which is $700, which is mandatory.

20     The Probation Office does not recommend that I

21   impose a fine.  Does anybody want to speak to the issue of a

22   fine?

23     MS. REYNOLDS:  No, your Honor.

24     THE COURT:  Okay.  Then I will not impose a fine,

25   or any additional costs of prosecution, or supervision, or

1    interest on the special assessment.

2         Does the defense object to the preliminary -- the

3    preliminary order of forfeiture?

4         MR. BEAL:  No, Judge.

5         THE COURT:  Okay.  So I will grant the motion of

6    the United States for entry of a preliminary order of

7    forfeiture.

8         You know, I think what had confused me is that the

9    Probation Office has been giving me a lot of information in

10   terms of years, and I'm trying to make sure before I leave

11   the bench that the months come out the right way.  And let me

12   just do my math to make sure.

13        Yes, it comes out.

14        MR. BLOCK:  Judge, I think just so the record is

15   clear, when you're trying to figure out the math, and it got

16   a little confused; since what your Honor is doing is your

17   Honor is departing from the guidelines range as to the

18   sentence where your Honor has discretion, which is counts --

19   what are the counts?

20        THE COURT:  Correct.

21        MS. REYNOLDS:  1 -- if Probation could help me out

22   with this, because I know that you have more detailed notes.

23        THE PROBATION OFFICER:  Counts 1, 7, 10, 12, and

24   13.

25        THE COURT:  1, 7, 10, 12, and 13.  And I think I'd

1  better just articulate more clearly why I am doing that. I

2  am doing that because I believe that Mr. Uriarte got off to a

3  wrong start with the wrong crowd, and I believe that a

4  sentence of a lengthy term of years is necessary for all the

5  3553 reasons, but it is not necessary to extinguish all hope

6  for Mr. Uriarte in terms of his future, and I believe we owe

7  him that, and I want to give him that hope.

8          MR. BEAL:  We would ask for a recommendation for a

9  designation in Terre Haute.  He does care about his children,

10  and that would be the closest realistic facility.

11          THE COURT:  We'll recommend Terre Haute.

12          MR. BEAL:  Thank you, Judge.

13          THE COURT:  Is there anything further that anybody

14  would like?

15          MR. BLOCK:  Right to appeal, Judge.

16          THE COURT:  Oh, yes, indeed.  Mr. Uriarte, you have

17  a right to appeal.  If you wish to appeal, you have to file

18  what's called a notice of appeal within 14 days of the date

19  of judgment, which is the day we enter the sentence on the

20  record.  It may be today, it may be tomorrow.

21          Mr. Beal, you can do that for Mr. Uriarte?

22          MR. BEAL:  Yes, Judge.  We've discussed it.

23          THE COURT:  You already discussed it.  And are you

24  going to do it?

25          MR. BEAL:  Yes, Judge.

1      THE COURT:  So Mr. Beal is going to file that

2   notice of appeal for you, and it just needs to be done within

3   14 days.

4      Okay.  Anything else?

5      MS. REYNOLDS:  No, your Honor.

6   (End of proceedings.)

7   C E R T I F I C A T E

8

9      I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled case on

11   November 27, 2012.

12

13

14

15   /s/Colette M. Kuemmeth
        Court Reporter

16

17

18

19

20

21

22

23

24

25